1              UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3         HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,              )
                                           )
6                     PLAINTIFF,           ) CASE NO.
                                           ) CR 14-282-R
7          VS.                             )
                                           )
8   DAVID PRITCHARD,                       )
    AND CHRISTOPHER BLAUVELT,              )
9                                          )
                      DEFENDANTS.          )
10  _____)

11

12

13

14                    REPORTER'S TRANSCRIPT OF
                       JURY TRIAL - DAY 5
15                  Monday, October 20, 2014
                           1:43 P.M.
16                  LOS ANGELES, CALIFORNIA

17

18

19

20

21

22  _____

23           KHOWOONSUN CHONG, CSR 12907, CRR
              FEDERAL OFFICIAL COURT REPORTER
24            255 EAST TEMPLE STREET, ROOM 181-G
              LOS ANGELES, CALIFORNIA 90012
25               kchong12907@yahoo.com

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

STEPHANIE YONEKURA
UNITED STATES ATTORNEY
BY:  ELLYN MARCUS LINDSAY
Assistant United States Attorney
     BYRON J. McLAIN
Assistant United States Attorney
United States Courthouse
312 North Spring Street
Los Angeles, California 90012

**FOR DEFENDANT PRITCHARD:**

LAW OFFICES OF MICHAEL W. EMMICK
BY:  MICHAEL W. EMMICK
ATTORNEY AT LAW
3701 Highland Avenue, Suite 305
Manhattan Beach, California 90266

**FOR DEFENDANT BLAUVELT:**

LAW OFFICES OF STEPHANIE AMES
BY:  STEPHANIE AMES
ATTORNEY AT LAW
12100 Wilshire Boulevard, Suite 800
Los Angeles, California 90025

1              **I N D E X**

2          Monday, October 20, 2014

3      ----------------------------------------------------------

4          **CHRONOLOGICAL INDEX OF WITNESSES**

5

6    DEFENSE WITNESSES                                   PAGE

7    DAVID BARTLEY PRITCHARD
           CROSS-EXAMINATION (RESUMED)                  6
8          REDIRECT EXAMINATION BY MR. EMMICK          33
           RECROSS-EXAMINATION BY MS. LINDSAY          53
9
     William Warren Uchimoto
10         DIRECT EXAMINATION BY MR. EMMICK            57
           CROSS-EXAMINATION BY MS. AMES               90
11         CROSS-EXAMINATION BY MR. McLAIN             91
           REDIRECT EXAMINATION BY MR. EMMICK         107

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**



**<u>INDEX OF EXHIBITS</u>**

<u>MARKED FOR IDENTIFICATION</u>

(NONE)

<u>RECEIVED INTO EVIDENCE</u>

(NONE)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1              LOS ANGELES, CALIFORNIA; MONDAY, OCTOBER 20, 2014

 2                              1:43 P.M.

 3                               -oOo-

 4              (The following proceedings were held out of the

 5              presence of the jury:)

 6         THE COURT:  Bring down the jury.

 7         MS. LINDSAY:  Should I resume my position,

 8  Your Honor?

 9         THE COURT:  Cross-examination, yes.

10              (Jury in at 1:44 P.M.)

11              (The following proceedings were held in the

12              presence of the jury:)

13         THE COURT:  The record will show the jurors are all

14  present in their proper places.  The defendants are present

15  with their counsel.

16      You may proceed with cross-examination.

17         THE CLERK:  Sir, you are reminded you are still

18  under oath.  State your full name for the record.

19         THE WITNESS:  David Bartley Pritchard.

20                   DAVID BARTLEY PRITCHARD,

21  a defendant herein, called as a witness on his own behalf,

22  having been previously duly sworn, resumed the stand and

23  testified further as follows:

24  ///

25  ///
```

UNITED STATES DISTRICT COURT

1       CROSS-EXAMINATION (RESUMED)

2  BY MS. LINDSAY:

3  Q    Mr. Pritchard, last Friday you admitted that Gregory

4  Pusateri, Cherie Brown, and Christopher Blauvelt lied to

5  investors.  Is it your claim that you had no idea over the

6  seven years you worked at GigaPix that investors were lied to?

7  A    No, ma'am.

8  Q    So you know --

9  A    If you -- you said that last Friday I admitted that I knew

10 that they lied?

11 Q    The question I asked you was last Friday you admitted that

12 the statements that Gregory Pusateri, Cherie Brown, and

13 Christopher Blauvelt made to investors were false.

14     Do you recall that?

15 A    I believe what I said, ma'am, was that, if they made those

16 statements -- I don't know if they made those statements.  I

17 was not in their presence.

18 Q    That's not my question.  My question is were those

19 statements false?  You admitted it last Friday.

20 A    If they made those statements, yes.

21 Q    And is it your claim now that, over the seven years that

22 you were present at GigaPix, you had no idea that investors

23 were being lied to?

24 A    Ma'am, they were in a completely different building.

25 Q    I just asked you, yes or no?

**UNITED STATES DISTRICT COURT**

1    A    Yes.

2    Q    Is it your claim had you no idea?

3    A    I had no idea what they were saying to investors --

4    Q    Did you --

5    A    -- and any control.

6    Q    So you had no idea that investors were being lied to?

7    A    Not like that, no, ma'am.

8    Q    Now, you mentioned that you particularly -- you had

9    mentioned to Agent Potocek that you particularly did not care

10   for Greg Pusateri.  And why was that?

11   A    Am I allowed to say the personal reasons?

12   Q    Tell us why you didn't like Gregory Pusateri.

13   A    He was very disrespectful of women.  He was a womanizer,

14   and he was rather loud and --

15           MS. AMES:  I'll object as to relevance, Your Honor.

16           THE COURT:  Objection is overruled.

17           THE WITNESS:  And he was -- he was a braggart, and

18   he was just kind of loud.  And I didn't -- and he had a -- kind

19   of unique relationship with Mr. Blauvelt, and I was not very

20   supportive of that.

21   Q    BY MS. LINDSAY:  You didn't trust him?

22   A    I -- I can't say that I wouldn't trust him, but I can tell

23   you that I didn't really like him.

24   Q    Well, you told Agent Potocek that, once you took a

25   leadership role at GigaPix, you realized that salesperson

```
 1    Greg Pusateri, Blauvelt, and the process by which they raised
 2    money all had to go, didn't you?
 3    A    I don't recall saying that, but I can tell you that
 4    Mr. Pusateri was absolutely not my favorite person for the
 5    reasons that I've said and a few others that are a little more
 6    prurient, I'd rather not get into.  But I would prefer not to
 7    have him in the office, yes.
 8    Q    Well, actually, you told Agent Potocek that, once you took
 9    a more active leadership role, you realized that salesperson
10    Greg Pusateri, Blauvelt, and the process by which they raised
11    money all had to go; correct?
12    A    I don't recall saying that, but that was my instinct, yes.
13    Q    And that Blauvelt was out of control; correct?
14    A    In a particular way, ma'am.
15    Q    You said he was drinking, using drugs such --
16            MS. AMES:  Objection as to relevance, Your Honor.
17            THE COURT:  Objection is overruled.
18    Q    BY MS. LINDSAY:  Drinking, using drugs such as marijuana
19    and possibly cocaine; correct?
20    A    Yes, ma'am.
21    Q    That he liked strippers, went to strip clubs, and left his
22    wife; correct?
23    A    Yes, ma'am.
24    Q    And that you forced Blauvelt and the sales staff out of
25    the GigaPix studio in Chatsworth and into another building?
```

```
1   A     I don't think I forced them.  I don't think "forced" would
2   be the right word.  If that's a word that I used, it was
3   probably inappropriate at the time.
4   Q     You wanted them out?
5   A     Mr. Blauvelt wanted to be out of that building because of
6   my pressure and, yes, I would have preferred they were not
7   there.
8   Q     What was your pressure?
9   A     Excuse me?
10  Q     You said you put pressure on Mr. Blauvelt?
11  A     Because I didn't want them in there because I thought
12  their behavior was -- it was unacceptable to me.
13  Q     Right.
14  A     It was not behavior that was conducive to a professional
15  work environment, and there were other people working in that
16  environment who complained to me, and there were other people
17  in the work environment who basically made it very clear that
18  they felt uncomfortable.  So it's my job to make them leave.
19  It was -- it was -- it was -- you know, it was a business
20  judgment, yes.
21  Q     So you trusted somebody who was abusing drugs in the
22  office to supervise the people who were telling your investors
23  what they were going to do with the money?
24  A     Ma'am, he owned 91 percent of the company.  It was his
25  company.  It was not my company.  I owned no shares.  I had no
```

1    voting rights.  None.  It was --

2    Q    Are you taking no responsibility then for what happened to

3    these investors?  Is that what you're saying?  You used the

4    money that they put in, didn't you?

5    A    I invested that money as wisely as I could to make the

6    company successful.

7    Q    You used the money that they gave you, didn't you?  You

8    decided where that money would go; correct?

9    A    Not in all cases, but yes.  Many.

10   Q    And you put some of that money in your own pocket;

11   correct?

12   A    Ma'am, I was paid a salary for three and a half years and

13   not paid a salary for three.  And I contributed a hundred

14   percent of my ownership in a hit television series where I --

15   where I gave all of my fees to the company, all of my future

16   participations to the company.  All of them.  That is worth or

17   would be worth an enormous amount of money for me, and I gave

18   all of that to the company.  Pretty standard practice in the

19   entertainment industry, as I owned 50 percent of the --

20           MS. LINDSAY:  Your Honor, object as nonresponsive.

21           THE COURT:  Read the question.

22              (The record was read.)

23           THE COURT:  Just answer the question, Mr. Pritchard.

24           THE WITNESS:  Yes.  I was paid a salary.

25   Q    BY MS. LINDSAY:  So you didn't think it was important if

```
1   the people whose money you put in your pocket with your salary
2   were lied to in order for that money to get into your pocket?
3   A    I did not know they were lied to, ma'am.
4   Q    And you trusted Mr. Blauvelt?
5   A    It was his company.
6   Q    Now, you told Agent Potocek that Mr. Blauvelt raised money
7   for GigaPix by cold-calling; right?
8   A    I found that out in 2007, yes.
9   Q    And you told him to stop the cold-calling?
10  A    (No audible response.)
11  Q    You have to answer out loud.
12  A    Yes.
13  Q    And that's because you knew cold-calling was an improper
14  way to raise money for private --
15  A    I never had any experience in anything like this.  I did
16  not --
17          THE COURT:  Just a moment.
18      Read the question to the witness.
19              (The record was read.)
20          THE WITNESS:  I did not know it was an improper way
21  to raise money.
22  Q    BY MS. LINDSAY:  Why did you tell him to stop then?
23  A    Because I felt that it might be.  I didn't really know.  I
24  mean, I've never been involved in this situation before, never.
25  Q    And yet it didn't stop all the way through to the end of
```

1   GigaPix; right?

2   A      No.  It stopped in 2011.

3   Q      And are you saying that, even though you were

4   uncomfortable with it in 2007 because you thought it might be

5   improper, you never assured yourself that what they were doing

6   was proper?

7   A      In 2009 I drew a very bright line when I actually could

8   take control of the fund-raising, and I did that with Buchanan,

9   Ingersoll & Rooney.  And when I had the opportunity to take

10  control of it, I exercised that.

11  Q      And investors continued to be cold-called all the way

12  through 2011?

13  A      With that financing, ma'am, it was only to existing

14  investors.

15  Q      And as you heard Mr. Hicks say, that doesn't matter;

16  correct?

17  A      I -- I don't necessarily fully agree with Mr. Hicks.

18  Q      Because you're a securities expert?

19  A      No, ma'am.

20  Q      Okay.  Now, you told Agent Potocek that Blauvelt was out

21  of control; right?

22  A      Yes.

23  Q      And you knew he had numerous cease and desist orders

24  against him; correct?

25  A      I knew about one.  I did not -- I knew about the first

1    one.  I found out about that in 2007.

2    Q    So you didn't take it upon yourself to find out that

3    GigaPix itself had approximately seven cease and desist orders

4    against it?  Is that what you're saying?

5    A    No, ma'am.  We hired a law firm in New York to begin to

6    resolve those, Meyers & Heim.

7                THE COURT:  Just a moment.

8          Read the question to the witness.

9                (The record was read.)

10                THE WITNESS:  I found out about them.  We hired a

11   law firm, and we started to address them.

12   Q    BY MS. LINDSAY:  And when was that?

13   A    You know, I'm not sure I recall the exact date.  It was

14   probably the end of 2007 when I got back to the company.

15   Q    And yet as late as April of 2012, GigaPix was still

16   receiving cease and desist orders, wasn't it?

17   A    Not that I know of, no, ma'am.

18   Q    I'd like to display Government's Exhibit 207, cease and

19   desist order from Connecticut in April of 2012.  So if you look

20   at this cease and desist order, it was entered on the 24th day

21   of April in 2012; correct?

22   A    Yes, ma'am.

23   Q    So as late as 2012 GigaPix continued to get cease and

24   desist orders?

25   A    What was this for, ma'am?  Was this for the 2009 filing?

1    Q    I just asked you the question.  If you don't know the

2    answer, say "I don't know."

3    A    I don't know the answer.

4    Q    And then in the state of California -- this is

5    Exhibit 204, and you can display page 5 of Exhibit 204.

6         And this was entered in May of 2009; correct?

7    A    Yes, ma'am.

8    Q    And if we can look at page 3, there's a paragraph 2, and

9    it says, "In connection with the offer and sale of these

10   securities, GigaPix, OZ3D, Blauvelt or Pusateri made or caused

11   to be made misrepresentations of material fact or omitted to

12   state material facts necessary in order to make the statements

13   made in light of the circumstances under which they were made,

14   not misleading."  And then it lists misrepresentations and

15   omissions.

16        Don't you believe that puts you on notice that

17   Mr. Pusateri and Mr. Blauvelt were lying to your investors?

18   A    Ma'am, I never really read this, but I can tell you that

19   all of this was handled by --

20   Q    At that --

21   A    -- Buchanan.

22        MS. LINDSAY:  Your Honor, I would ask that he answer

23   the question.

24        THE COURT:  Yes.

25        Just answer the question, Mr. Pritchard.

1    Q    BY MS. LINDSAY:  Well, you told this jury that you think

2    the investors are responsible for reading the private placement

3    memorandum that was sent out.  Aren't you responsible for

4    reading the cease and desist orders against your own company?

5    A    This was not my territory.  This was Mr. Blauvelt's

6    territory, but yes.

7    Q    So you were on notice here that Mr. Pusateri and

8    Mr. Blauvelt were lying to your investors; correct?

9    A    Yes.

10   Q    Now, talking about the -- oh, I guess we're showing here

11   that very cease and desist order named you as well.  Do you see

12   that?

13   A    I believe this is the Connecticut one; correct?

14   Q    Yes.

15   A    Is that correct?

16   Q    Yes.

17   A    Connecticut in 2009?

18   Q    Two thousand -- well, I believe --

19   A    One, it was just -- this was an administrative issue, and

20   it was a fault or a mistake made by Buchanan and Ingersoll, and

21   it was corrected.

22   Q    Well, you told us that they fixed up all your C&Ds, but in

23   fact they didn't, did they?

24   A    Who?

25   Q    You told us that the law firm fixed up all your C&Ds, but

```
 1  they didn't, did they?  Yes or no?
 2  A    My understanding was Buchanan and Ingersoll handled this,
 3  and Margaret Peper handled it as well.
 4  Q    Now, going back to your opinion that the investors, the
 5  victims of the case, are responsible because they should have
 6  read the private placement memorandum, you heard the testimony
 7  of Danny Anderson and Linda Hampshire that they tried to read
 8  it but couldn't understand it; right?
 9  A    Uh-huh.
10  Q    And that your salespeople told them not to bother because
11  it was just legalese; correct?
12  A    I heard that.
13  Q    And wouldn't you agree that, even if they had read the PPM
14  and all the disclosures of risk, that the company is required
15  to provide open and honest information so that they can
16  properly evaluate that risk?
17  A    Yes, ma'am.  And we disclosed all of the C&Ds.
18  Q    I asked you a yes-or-no question.
19       Now, we heard that, after the Iowa tax credit fell
20  through, that GigaPix was in a difficult place financially;
21  correct?
22  A    Yes, ma'am.
23  Q    Some people were not receiving salaries; correct?
24  A    Most including myself.
25  Q    And people had to be laid off?
```

```
 1   A     Yes.

 2   Q     But --

 3   A     I did not lay them off.  I did not do that at that point

 4   in time.  I gave them the choice.

 5   Q     You acknowledged to Special Agent Potocek that you did not

 6   provide the, quote, "bleak, blunt picture" to the investors in

 7   your letters and your talks to the salespeople; correct?

 8   A     I was trying to be --

 9   Q     Did you say that or not?

10   A     I -- I don't recall, ma'am.

11   Q     And you agreed with Agent Potocek that the financial

12   condition would have been an important consideration for

13   investors; correct?

14   A     It would have been a consideration.

15   Q     You acknowledge that you should have told them what was

16   really truly going on with your company, shouldn't you?

17   A     What was really and truly going on, ma'am, was --

18   Q     Should you have discussed with your investors or revealed

19   to your investors what was really truly going on with your

20   company?

21   A     In an entertainment company --

22   Q     Yes or no?

23   A     Not in the way that you're presenting it, no.

24   Q     Okay.  So the investors were not entitled to know the true

25   condition of your company?  Is that what you're saying?
```

1    A     Ma'am, if you would allow me to answer it, I would answer

2    it.

3    Q     Your counsel can redirect you on whatever he wants.  This

4    is my examination.

5          Now, are the investors supposed to be evaluate -- able to

6    evaluate the risks if you don't disclose to them the true facts

7    of what is going on with the company?

8    A     This is a private company.  The information that's

9    available is determined by the owners of the company.

10   Q     Including you?

11   A     I was not an owner of the company, ma'am.

12   Q     You had no responsibility whatsoever for telling the

13   investors what was truly going on with the company?

14   A     What was truly going on with the company --

15   Q     Yes or no?  Did you have responsibility?

16   A     And I was trying to do that in these letters.

17   Q     Okay.  But you admitted to Agent Potocek that you -- you

18   omitted in those letters to tell them the true bleak, blunt

19   picture of what was happening; correct?

20   A     I don't recall that I said it in those terms, but there's

21   two pieces to a business, ma'am.  There's the upside --

22   Q     I'm not asking you that.  I'm asking you whether you told

23   the investors the trouble that the company was in.

24   A     No, I did not.

25   Q     And that would be a very important fact to the investors

1   to know in order to evaluate the risk that they were taking in

2   giving you their money; correct?

3   A     Not necessarily, ma'am.  May I explain?

4   Q     No.

5         Now, you said that you made a decision to save everything

6   by transferring the money the investors in OZ3D put into that

7   movie into GigaPix to pay its debts; correct?

8   A     So that GigaPix could survive, yes.

9   Q     And that was never disclosed to the investors, was it?

10  A     It was part of our fees.

11  Q     Well, the fees say $2 million at most to GigaPix; isn't

12  that correct?

13  A     I don't recall exactly what the use of proceeds were, but

14  it was probably more like about 3-.

15  Q     Okay.  And yet 4 million, half of what was raised, went

16  from OZ3D straight to GigaPix; correct?

17  A     Something in that number range, yes.

18  Q     So in other words, you took money from OZ3D, and you made

19  the decision on putting it into GigaPix to try and save the

20  company?

21  A     Otherwise, everything would have gone under.

22  Q     Yes or no, though?

23  A     Yes, ma'am, but otherwise --

24  Q     And you did not tell investors that you were taking their

25  money that they put into OZ3D, that they were told would be

```
 1  used for production of OZ3D, and you siphoned it off to
 2  GigaPix.  You did not tell the investors that, did you?
 3  A     Siphoning off I take exception to, ma'am.
 4  Q     You did not tell them that you were placing the money that
 5  they invested in OZ3D into GigaPix; correct?
 6  A     I was advancing the fees and using them to keep both
 7  companies alive.
 8            THE COURT:  Mr. Pritchard, that can be answered yes
 9  or no.
10  Q     BY MS. LINDSAY:  You didn't tell them, did you?
11  A     No.
12  Q     Now, isn't it a key, crucial, important fact for investors
13  to know that the money they believe is going into a movie, the
14  movie that is going to make them a return, is instead being
15  used to pay off the debts of the parent company?  Isn't that
16  important?
17  A     We had a right to use our fees.
18  Q     Well --
19  A     That's a business judgment.
20  Q     Let's take a look at Exhibit 9, and I believe it's
21  page 32.  Now, if we could just -- this is the OZ3D use of
22  proceeds from the PPM, and let's look at this.
23        Now, looking over at the percentages, where does it
24  entitle you to take half the money that the investors put into
25  OZ3D and pay off GigaPix's debt with it?
```

**UNITED STATES DISTRICT COURT**

1    A      Supervisory and management fees, ma'am, number 7.

2    Q      Number 7?

3    A      Overhead, marketing, and publicity.

4    Q      Now, overhead, marketing, and publicity, there's a -- I

5    believe there's a footnote there.  Maybe we should look at

6    footnote 8, "Includes overhead of GigaPix related to the film,

7    marketing and publicity costs related to arranging for

8    distribution of the film.  Most of such amount is expected to

9    be paid to GigaPix."

10          That money wasn't used on OZ3D.  That money was used to

11   make up the debts on Blackbeard, wasn't it?

12   A      Ma'am, we had a first look and distribution agreement with

13   two very large distribution companies, Anchor Bay and Essential

14   Entertainment, for the OZ movie.  Those were negotiated by

15   GigaPix.  So yes, ma'am, we had arranged for those things.

16   There are signed contracts to that effect.

17   Q      Well --

18   A      Both companies.

19   Q      But wasn't it your testimony that you put the money in

20   GigaPix to save the company and not for OZ3D?  Which is the

21   truth?

22   A      Had I not done that, both companies would have been out of

23   business instantaneously.

24   Q      And isn't that important to tell the investors?  "We're

25   not using the money how we're telling you.  We're using it

1    because our company is going down, and unless we use your

2    money, it's gone."  If you believed that was true, if you

3    believed that was good, why didn't you tell the investors?

4    A    You know, ma'am, this is a very fine line.  You -- you

5    hire people to run businesses, to make executive decisions, and

6    measure and mitigate risks.  And in this particular situation,

7    in my best judgment, this was the -- an intercompany loan,

8    which is a pretty traditional and common practice between

9    divisions of companies, especially wholly owned subsidiaries of

10   companies.  It's a pretty standard practice.

11              MS. LINDSAY:  I think he's going beyond the

12   question, Your Honor.

13              THE COURT:  Yes.  Nonresponsive to the question.

14   Q    BY MS. LINDSAY:  Let me put it to you this way.  If you

15   thought it was the right thing to do, why didn't you just tell

16   the investors the truth?

17   A    Don't know.

18   Q    So it's not about what you did, but what you didn't say to

19   the investors; correct?

20   A    That's what you're saying, yes.

21   Q    Let's look at some of the letters that you wrote to

22   investors.  If we can look at Exhibit 37, the letter you wrote

23   in January of 2009, and if we could look at the first page,

24   third paragraph, first line.

25              It says you had $60 million in funding for a slate of kids

**UNITED STATES DISTRICT COURT**

```
 1   films.  You didn't, did you?
 2   A     Yes, ma'am.
 3   Q     Never happened.
 4   A     Read that very clearly, ma'am.  Nearly $60 million in
 5   potential funding for a slate of kids films.  We had a signed
 6   contract.  We announced that all over the -- the entertainment
 7   trades.  And we had a signed contract with a -- with actually
 8   three valid companies that were committed to fund that.
 9   Q     And where's the letter where you told them that it didn't
10   go through?
11   A     (No audible response.)
12             MS. LINDSAY:  May the record reflect that the
13   witness was shaking his head.
14   Q     BY MS. LINDSAY:  So in other words, you never corrected
15   this error?
16   A     We replaced it with another deal.  One of the companies
17   went out of business --
18   Q     All right.  The next page of that letter, in the second
19   paragraph, second sentence, it says that you retained a public
20   accounting firm that is in the middle of a five-year audit.
21   That's false, isn't it?
22   A     We thought we had a deal with Ernst & Young, and it fell
23   through.  They couldn't do it.
24   Q     Okay.  So you thought you had a deal.  That is not the
25   same as having an accounting firm which is in the middle of a
```

1  five-year audit.  That's a false statement, isn't it, there?

2  A     Yes.

3  Q     Okay.  So you admit that in this letter you made false

4  statements to the investors right there?

5  A     That's -- yes.

6  Q     Okay.  Now, wouldn't you agree that an audit is very, very

7  important because an audit opens up your company to the air and

8  allows a third party to come in and make sure you're doing

9  everything right?  That's why it's important; right?

10  A     Very few private companies get audits.

11  Q     If you listen to my question --

12  A     I heard your question.

13  Q     So the question is, an audit is important because it opens

14  up your company to the open air and allows a third party to

15  come in and make sure you're doing everything right; isn't that

16  correct?

17  A     Yes.

18  Q     So this is a pretty important lie that you told your

19  investors right there; correct?

20  A     Yes.

21  Q     Now, I'd like to look at Exhibit 68, letter that you wrote

22  in May of 2011 where it states that GigaPix is set to go

23  public.  And that's false, isn't it?

24  A     No, ma'am.

25  Q     You never went public?

```
1   A    We had a binding letter of intent with a public shell to

2   merge into that company.

3   Q    You needed audited financials for that, didn't you?

4   A    No.  The other company -- the other company had audited

5   financials.

6   Q    But you had no audited financials, did you?

7   A    It --

8   Q    You had no audited financials, did you?

9   A    Correct.  They were going to accept an internal audit

10  instead of financials.  It's in the letter of intent, ma'am.

11  Q    But it never happened?

12  A    It didn't happen --

13  Q    Okay.  It never happened; correct?

14  A    -- because Mr. Blauvelt --

15          MR. EMMICK:  Objection, Your Honor, as to what it is

16  referring to.

17          THE COURT:  Sustained.  The objection is sustained.

18      Let's get on with it, Counsel.

19          MS. LINDSAY:  Yes.

20  Q    BY MS. LINDSAY:  Now, in the second page of that letter,

21  it states that you have a hundred million dollar print and

22  advertising fund?

23  A    We had signed agreements for that, yes, ma'am.

24  Q    It never happened, did it?

25  A    It happens a lot, ma'am, in the entertainment business.
```

```
1   Q     Did it happen or not?

2   A     It did not happen --

3   Q     And where is the --

4   A     It --

5   Q     Where is --

6              THE REPORTER:  Please speak one at a time, please.

7              MS. LINDSAY:  Sorry.

8   Q     BY MS. LINDSAY:  Where is the indication that this ever

9   fell through?  When did you tell the investors that?  You

10  didn't, did you?

11  A     Did not.

12  Q     So then you admit that you admitted --

13             THE COURT:  No, no.  Don't make a statement.

14             MS. LINDSAY:  All right.

15  Q     BY MS. LINDSAY:  Now, your girlfriend is named

16  Margaret Martin; correct?

17  A     Yes.

18  Q     And she's been your girlfriend since at least 2009?

19  A     Yes.

20  Q     And she didn't work at GigaPix, did she?

21  A     Yes.  Well, she didn't work there, but she did freelance

22  writing.

23  Q     Okay.  Now, she received over $120,000 from the GigaPix

24  and OZ3D bank accounts between September 2009 and October 2012,

25  didn't she?
```

```
1    A    That was for two purposes.
2    Q    I didn't ask you that.  I asked you if she made that
3    money.
4    A    Yes, ma'am.
5    Q    And she was living with you; correct?
6    A    Yes, ma'am.
7    Q    So at least one of you in that household was getting a
8    salary from GigaPix; right?
9    A    No, ma'am.
10   Q    At least one of you was getting money from GigaPix;
11   correct?
12   A    No, ma'am.
13   Q    You just said that she got $120,000 from GigaPix and OZ3D.
14   A    $94,000 of that was a loan that she had made to the
15   company in 2009, which is in the books.  $25,000 of that was
16   for writing a script.
17   Q    She got money, didn't she?  She got money from the bank
18   accounts, didn't she?
19   A    Yes, ma'am.
20   Q    Now, you testified that your personal spending of
21   GigaPix's money during the time that things were going
22   downhill -- that is, 2010 through 2012 -- was appropriate.
23   A    It was accounted for, yes.
24   Q    But isn't it true that in August of 2010, you used GigaPix
25   money to fly yourself, a person named Nadia Davari, and her
```

1    mother to Albuquerque?  Yes or no?

2    A     Correct.

3    Q     And once in Albuquerque, you used a GigaPix credit card to

4    take a $700 balloon flight?

5    A     That was not --

6    Q     Yes or no?

7    A     That was not a GigaPix credit card.

8    Q     You used GigaPix, OZ3D, GigaPix releasing money to take a

9    $700 balloon flight?

10   A     That was not a GigaPix credit card, ma'am.

11   Q     You used investor money to take a $700 balloon flight?

12   A     All of that money was accounted for by me.

13   Q     But you used --

14   A     I was 1099'd for all of that.  It was all accrued --

15   Q     I'm not asking you whether it was accounted for.  You used

16   money that had been sent in by investors for a $700 balloon

17   flight.  Yes or no?

18   A     Yes.

19   Q     And in September 2010 you and Nadia Davari and Nadia's mom

20   flew to Oakland on the GigaPix card; correct?

21   A     I don't recall but, yes, if you say so.

22   Q     And while there in San Francisco, you spent over $600 at

23   Louis Vuitton; correct?

24   A     I don't recall, but if you say so, yes.

25   Q     And $487 at a hotel; correct?

```
 1    A     Yes.
 2    Q     And also in September 2010 you spent $1,200 at a
      New Mexico Inn and Spa?
 3
 4    A     Yes.
 5    Q     And several hundred dollars at a craft store?
 6    A     Yes.
 7    Q     And in October 2010 it was 7-, almost $800 at the
 8    Ritz Carlton in Laguna, and then 2,300 at the two casitas in
 9    Santa Fe?
10    A     Yes, ma'am.
11    Q     And $400 at Barney's; correct?
12    A     Ma'am, these are all personal --
13    Q     I'm just asking you if you spent it.
14    A     I don't recall but these are all personal expenses.
15    Q     Okay.  Also in October 2010, you and Ms. Nadia Davari and
16    her mom flew to New York; correct?
17    A     Yes.
18    Q     And spent over $2,500 at a hotel in New York City?
19    A     Correct.
20    Q     And not to go through every expenditure, but skipping to
21    March 2011, you used the card to fly yourself, Nadia Davari,
22    and Nadia's mom to New York City again; correct?
23    A     Yes.
24    Q     And $6,200 for your hotel there; correct?
25    A     I don't recall that but --
```

1   Q     And $920 at the Metropolitan Opera; correct?

2   A     These are all personal expenses.

3   Q     I'm just asking if you spent them.

4   A     They're personal expenses.

5   Q     Okay.  And then we find $1,400 from Pronto Moda Italy

6   clothing store and another 678 at a New York City hotel;

7   correct?

8   A     Some of them are personal expenses; some of them are

9   probably business expenses.

10  Q     Now, you admitted to Agent Potocek that you said things

11  that were misleading and omitted information about the true

12  state of the company when you spoke to investors between 2010

13  and 2012; correct?

14  A     I don't remember saying that to Agent Potocek, but repeat

15  the question.

16  Q     Well, do you admit that you said things that were

17  misleading and omitted information about the true state of the

18  company when you spoke to investors between 2010 and 2012?

19  A     No.  I don't admit that.

20  Q     Did you admit that OZ3D investors were told their money

21  would go to preproduction and production of OZ3D?

22  A     I don't recall saying that, but I probably would have,

23  yes.

24  Q     And then you told Agent Potocek, quote, "Was that money

25  used for production?  No.  The money was not used for

```
 1   production"; right?
 2   A     The -- the film was not ready to go into production.
 3   Q     That's what you told Agent Potocek, isn't it?
 4   A     The -- the film was not ready to go into production.
 5              THE COURT:  Well, just read the question to the
 6   witness.
 7              (The record was read.)
 8              THE WITNESS:  The film was not ready to go into
 9   production.
10              THE COURT:  Read the question to the witness.
11         Listen to the question, Mr. Pritchard.
12              (The record was read.)
13              THE COURT:  That can be answered yes or no.
14              THE WITNESS:  It was not used for production, ma'am.
15   Q     BY MS. LINDSAY:  So, in other words, you and others lied
16   to investors about how OZ3D money would be spent; correct?
17   A     It was used for --
18   Q     Yes or no?
19   A     -- preproduction.  No, I didn't lie.  It was used for
20   preproduction.  It was for development purposes.
21   Q     Now, you admit -- excuse me.  You admitted that OZ3D
22   investors were told that their money would go to preproduction
23   and production of OZ3D; right?  You admitted that.  Do you
24   recall that?
25   A     Yes.
```

**UNITED STATES DISTRICT COURT**

```
 1  Q    And as you told Agent Potocek, "Was that money used for
 2  production?  No.  The money was not used for production."
 3       Correct?  Yes or no?
 4  A    Are you asking me to respond to this?
 5  Q    I'm asking you to respond, when you said --
 6            THE COURT:  She asked a question.  The answer can be
 7  yes or no.
 8  Q    BY MS. LINDSAY:  You told Agent Potocek, quote, "Was that
 9  money used for production?  No.  The money was not used for
10  production"; correct?
11  A    I was being very accurate.  It was not used for
12  production.  The film was not ready to go into production.
13  Q    So you and others lied to investors about how OZ3D money
14  would be spent; correct?
15  A    No, ma'am.
16  Q    Now, you told Agent Potocek that the reason that you
17  misled investors in 2010 and 2011 was that you were in a -- an
18  F-ing panic to save the company; correct?
19  A    I don't know if it was specifically to that question that
20  he asked.  I did use those words but --
21  Q    Yes or no?
22  A    No, I don't recall that.
23  Q    So what happened, though, was that you lied to investors
24  in order to take their money because you thought you could fix
25  everything; right?
```

```
 1   A     I didn't lie to them, ma'am.

 2   Q     Yes or no?

 3   A     I did not lie to them.

 4   Q     This is why you told Agent Potocek, "I get it.  I F-ed

 5   up"; right?  Yes or no?

 6   A     Not --

 7   Q     Yes or no?

 8   A     No.

 9              MS. LINDSAY:  I have nothing further.

10              THE WITNESS:  It was not everything that happened

11   that day.

12              THE COURT:  Just a moment, Mr. Pritchard.  Don't

13   make speeches.

14        Redirect.

15              MR. EMMICK:  Thank you, Your Honor.

16                        REDIRECT EXAMINATION

17   BY MR. EMMICK:

18   Q    Mr. Pritchard, let's start with the last question.  You

19   were asked whether or not you were lying, and you were about to

20   say something.  Would you tell us what was on your mind.

21              THE COURT:  No, not what you're supposed to say.

22   He's to answer the question, Counsel.

23   Q    BY MR. EMMICK:  You were asked questions about whether or

24   not you were in a panic, whether or not that was a lie, and you

25   said you didn't lie.  Explain what you had in mind.
```

1          MS. LINDSAY:  Objection.  Calls for a narrative.

2          THE COURT:  The objection is sustained.

3    Q    BY MR. EMMICK:  What did you mean when you said that you

4    didn't lie?

5    A    There's three stages to animation film production.

6          First one is preproduction.  The money we were raising at

7    this point in time was to be used for preproduction,

8    development, setting up distribution, and setting up all of the

9    things that allow you to go into production.

10   Q    Can you just explain what those things are, just to make

11   it more visual.

12   A    You do concept art.  You do screenplays.  You do

13   background art.  You basically are developing the look and the

14   sense and the feel of the film.  And you're making deals --

15         THE COURT:  Don't make signs to him, Counsel.  That

16   kind of signs.

17         MR. EMMICK:  Your Honor, I just meant he can go on

18   because he was about to answer the question.

19         THE COURT:  No.

20         THE WITNESS:  And you are making arrangements for

21   distribution and marketing and production of marketing

22   materials, promotional materials.

23   Q    BY MR. EMMICK:  That describes preproduction.  What about

24   production?

25   A    Production is kind of wonky in the animation business.  It

1  has different, you know -- in some territories it means

2  storyboards and layouts.  Production -- production means all

3  kinds of things in the animation business, and it's not -- and

4  I think one of the things that I was responding to, to

5  Agent Potocek, was it's not a bright line.  It's -- it's kind

6  of amorphous.  You know, production means these things in

7  certain ways, and in some ways it doesn't mean production.  So

8  it just doesn't have the same meaning.

9       And the other thing is you don't do animation production

10 in the United States.  It's too expensive.  It's really, really

11 expensive.

12 Q    What do you mean by animation production?

13 A    Where you have hundreds of artists doing line art,

14 coloring cells, moving characters around on the screen.  Those

15 things are generally done in territories where there are either

16 price supports, tax incentives, or a lower cost labor pool.

17 Q    And how does that relate to the question that you were

18 asked about whether or not --

19          THE COURT:  No.  His determination as to what

20 relates to or doesn't is totally irrelevant, Counsel.

21 Q    BY MR. EMMICK:  You were asked the question whether or not

22 it was used for production.  I wonder if you can explain what

23 was meant by whether it was used for production?

24 A    It was not used for production because we weren't in

25 production.  We were in preproduction.  The purpose of that

1    early money was to get the film ready to go into production.  I

2    never had any intention of being in production in the

3    United States.  It would have been -- just would not have been

4    smart.

5    Q    So you were telling them the truth?

6    A    Yes.

7    Q    You were asked some questions about the flights to

8    New York and whether they were for personal expenses.  Can you

9    tell us what you're talking about in connection with the

10   personal expenses.

11   A    They were personal expenses.  First of all, it was not a

12   company credit card.  It was Mr. Mutton's personal credit card,

13   and he and I had an understanding that that was -- that I would

14   either pay the company back for any of those personal expenses

15   because I was not being paid, or it would be allocated on a

16   1099 basis as income to me.

17   Q    Could you explain what that means, 1099 basis.

18   A    I would have to take it as income.

19   Q    What's a 1099?

20   A    1099 means as an independent contractor.  So they didn't

21   have to take taxes out of it.  It basically was -- that's what

22   it was.  It was a form of income.

23   Q    How and when was that arranged with Mr. Mutton?

24   A    We had that conversation in 2011, early 2011.

25   Q    Would you describe the conversation in some more detail.

1    A    I don't recall all of the details of it, but the -- the

2    main thrust of it was this was not a personal relationship that

3    I had with this woman.  There was a medical reason for some of

4    this, and I would rather not get into it because it's a

5    personal thing with her.

6         And some of those trips to New York and the trip to

7    San Francisco were actually for legitimate business.  In

8    San Francisco we met with an animation studio, and we met with

9    a publicity firm.  In New York we met with two or three

10   financing companies.  So there was a business purpose --

11   quasi-business purpose to it.  And if you look at

12   the bankruptcy filings, there's a clear accounting for these

13   items, very clear, signed by Mr. Mutton.  And I mean very

14   clear.

15   Q    Can you tell us what that means in terms of the bankruptcy

16   accounting.  What's the -- what's he talking about?

17   A    When we -- when we filed the -- all of the accounting for

18   the company through the bankruptcy firm, I.S. Insolvency

19   Services Group, there were a whole bunch of creditor lists, and

20   included in that creditor list is an accounting for back

21   salaries, accrued expenses, and this was accounted for in that

22   schedule.

23   Q    And then what happened to it as a result in that

24   bankruptcy?

25   A    I have to eat it.  It's my responsibility.

```
1    Q    Okay.  That means financially?

2    A    Yeah.  I mean, I have to pay taxes on it, and the same

3    thing with the unearned income.  I don't have to pay taxes on

4    the unearned income.

5    Q    The name of the person that you have in mind with these

6    expenses regarded as personal, she was named Nadia --

7    A    Davari.  She was an attorney for the company.

8    Q    Did she have a health problem?

9               MS. LINDSAY:  Objection.  Irrelevant.

10              THE COURT:  Objection is sustained.

11              THE WITNESS:  It's irrelevant.

12              THE COURT:  The objection is sustained.

13         Don't.

14   Q    BY MR. EMMICK:  On cross-examination you were asked about

15   a hundred thousand dollars.  You started to explain 94 and

16   25,000.  I wonder if you could explain the difference between

17   the 94 and the 25.

18   A    You mean the payments to Margaret Martin?

19   Q    That was Margaret Martin?

20   A    Margaret Martin is my girlfriend.  In July of 2009 she

21   loaned the company $94,000.

22   Q    Why is that, and where did that come from?

23   A    Because we were -- we were missing a payroll in Iowa.  We

24   were waiting for the Iowa tax incentive money to come in, and

25   she took a mortgage out --
```

```
 1   Q     What is the Iowa tax incentive money?
 2   A     We were about to start production on the first film in
 3   Iowa, and we were missing a payroll.  And I asked her, and she
 4   took a third mortgage out on her home to loan me that money.
 5   So the money that was paid to her a year and a half later was
 6   paying back that loan.
 7   Q     Anything wrong with paying back a loan?
 8   A     It was $94,000, the mortgage on a house.  So, yes, I
 9   thought it was important.
10         And the other one -- and the rest of the money was she
11   probably wrote three or four screenplays for the company and
12   was not paid for any of them.  So the $25,000 was basically so
13   that we could, especially at that point in time, so that the
14   company could actually own those because we did not have a
15   clear chain of title to any of them.  She would have been able
16   to exercise a right to have a chain of title for those, and so
17   I thought it was really important that we get that cleared up
18   so the company actually owned those screenplays.
19   Q     Are screenplays sold for free very often?
20   A     No.  She's a credited writer, produced a couple of
21   Broadway plays and a lot of Off-Broadway plays.  And her
22   traditional fee is about $175,000 for a screenplay.
23   Q     And just prior to that subject on cross-examination, you
24   were talked about -- you talked about a hundred million dollars
25   worth of -- excuse me, I think it might have been a hundred
```

```
 1    thousand -- of prints and advertising and some signed
 2    agreements that you had.  Can you tell us what those signed
 3    agreements were and how it relates to the money.
 4              MS. LINDSAY:  Objection.  Calls for hearsay.
 5              THE COURT:  Objection is sustained.
 6    Q    BY MR. EMMICK:  But it was your response.  Can you tell us
 7    what the agreements were?
 8    A    We had --
 9              MS. LINDSAY:  Objection.  Calls for hearsay.
10              THE COURT:  Objection is sustained.
11              MR. EMMICK:  Your Honor, it can't be hearsay because
12    he's talking about --
13              THE COURT:  Where are the agreements?
14              MR. EMMICK:  You allowed him to talk --
15              THE COURT:  Where are the agreements?
16    Q    BY MR. EMMICK:  Do we have the agreements with us today?
17    A    Probably, yeah.  They're signed agreements for all of
18    these prints and advertising funds.
19    Q    Signed agreements with GigaPix?
20    A    With GigaPix.  It was one at WR Films and Pareto bank out
21    of Norway.  There was one with Legacy Film Group.  And I can't
22    remember who the other company was.  It was in the Legacy Film
23    Group one, but all of these were backed -- we did not make
24    announcements about these things without having bona fide
25    signed agreements with companies that were operating that had a
```

1    successful history, including the $60 million one that has come

2    up now a handful of times.  And I took great exception when I

3    think it was Mr. Mutton who said that that -- that never

4    existed.

5         The company, there are two of the companies that we made

6    that agreement with, that a year before had released about 60

7    films.  So Media 8 in particular was the international

8    distributor that was working, that we had the agreement with,

9    and that company released a film that had an Academy Award.  So

10   these were all bona fide companies with operating histories and

11   financials to support these announcements.

12   Q    You mentioned in that regard a letter of intent.  Tell us

13   what a letter of intent is and how that relates to GigaPix's

14   arrangements to hire others.

15   A    Well, there's different kinds of letters of intent.  But,

16   you know, a binding letter of intent means that you are bound

17   by the terms that are in that particular agreement.  It means

18   that everybody who is signing that agreement has an obligation

19   to fulfill their rights and responsibilities.  And these were

20   all backed up with binding letters of intent.

21   Q    You were also asked questions about the $60 million and

22   whether or not you had contracts behind it.  Would you

23   explain --

24   A    Those were three companies, including a casino owner in

25   Central California, who had released probably seven or eight

1    faith-based films.  And, you know, our objective with that

2    agreement was to release a bunch of kids films, so --

3    Q    And was there some sort of prearrangement for that with

4    that investor?

5    A    Yes.  All of those things are spelled out in the

6    agreements.  Same thing with the Anchor Bay essential

7    agreement, which was a first-look agreement, which is very

8    difficult to get in the entertainment business.  And it

9    covered -- it's actually still in effect.  It runs until the

10   end of 2015, and it was for three slates of films.  One of them

11   was kids' action comedies, another one was CG animation, and a

12   third one was faith-based films.

13       And those agreements were announced.  They're -- you know,

14   and those are three really big companies in the entertainment

15   business, and it was as a result of that distribution agreement

16   which took us almost a year to get, a year of work to get an

17   agreement like that from a big company, a big releasing

18   company.

19       That's why I was completely confident that I can get OZ

20   funded in a variety of different ways without having to raise

21   all of the money from the GigaPix investors.

22   Q    And sometimes these arrangements fall through, don't they?

23   A    From 2007 until 2010, the entertainment business lost

24   probably 30 to 40 percent of their independent production

25   companies and probably easily 60 or 70 percent of the

```
 1   independent distribution companies.
 2        It was -- one of the problems, Media 8, one of the
 3   companies we signed the first deal with, the $60 million deal,
 4   they actually went bankrupt.
 5   Q    What do you do if a company goes bankrupt or a company
 6   says they can't do the deal they had with you?
 7   A    You find somebody to replace them.  And we consistently
 8   did that.  Every time one of these things fell part -- you
 9   know, the entertainment business is built on being ready.  And
10   it's just complicated because it's ego driven, and everybody
11   throws around a lot of flash money, and it's not easy to wade
12   through those waters.
13   Q    And when a contract changes a little bit and you have to
14   go from Company A to Company B, do you think you have an
15   obligation to say, let's explain the Company A, Company B
16   exchange?
17   A    I think one of the things that you get when you get an
18   experienced entertainment executive is you get, you know,
19   facility.  You get the ability to actually operate and work
20   quickly and change things and adjust to change and deal with
21   the unknowns of a -- of a -- you know, of an intensely
22   fluctuating economy and a crazier industry that's going through
23   all kinds of dramatic changes.
24        And you have someone like me, who actually knows how to
25   make those adjustments, and I think one of the things I would
```

**UNITED STATES DISTRICT COURT**

1    say is -- and I actually -- you know, I have said this to one

2    or two investors, and I -- I don't remember exactly who it was,

3    but it was -- I've spoken to about a handful or so.  What I

4    would say to them is, as long as I'm here and working, you got

5    to shop, because the entertainment business is based on hits.

6    Q    I'm sorry.  Say again?

7    A    It's based on hits.  It's based on one hit, and there are

8    more production companies that make it because of one show or

9    one movie or one idea.  And, I mean, I can name ten of them,

10   and all ten of them were probably marginally successful, and

11   they got a hit show.  And with that hit show, everything

12   changes.

13       And we had a hit show.  We had a hit show, a massive hit

14   show that I had co-created and given up all of my

15   participations in it to the company, and that show is now in

16   its eighth season.  What I would be making off of that show and

17   the residuals that come with it, had I held onto my rights, you

18   know --

19   Q    And what did you do with your rights?

20   A    I gave them all to the company.

21   Q    And how much is that worth?

22   A    Well, the show looks like it's going to run for nine or

23   ten seasons, probably a million three to a million five, my

24   participations in it.  And I've had shows on Comedy Central

25   that have run over nine years, and it's not just about those --

**UNITED STATES DISTRICT COURT**

1  those fees.  It's also about the residuals that come with it

2  because for years afterwards you can get participations in the

3  profit.  And as one of the creators of the show and executive

4  producers of the show, you get those.  I gave all of that up to

5  the company.

6  Q    Another question you were asked was about the transfer of

7  money from OZ3D to GigaPix.  You were asked a lot of questions.

8  Let's just get down to the explanation.  Can money be

9  transferred from OZ to GigaPix if it helps OZ?

10 A    Intercompany loans and transfers are pretty traditional

11 practices in business.  In fact, they're very traditional

12 practices in business, especially if it's between owned or

13 shared companies.

14           MS. LINDSAY:  Objection.  Nonresponsive.

15           THE COURT:  Objection is sustained.

16 Q    BY MR. EMMICK:  Could you tell us about intercompany loans

17 in the business that you're referring to.

18           MS. LINDSAY:  Objection.  Irrelevant.

19           THE COURT:  The objection is sustained.

20 Q    BY MR. EMMICK:  There was cross-examine -- is there

21 anything wrong with transferring money from OZ3D to GigaPix?

22 A    No.

23 Q    Why not?

24 A    As long as it's in line with the disclosed use of

25 proceeds, as long as it's in line with standard accounting

1    practices, and as long as you have a sheltered risk that you

2    can actually get the film produced without that money.

3    Q    I'll have to ask you, what is a sheltered risk?

4    A    So getting an animated film produced requires that --

5    well, it doesn't require.  The studios don't use these systems,

6    but an independent animated film will take advantage of price

7    supports, tax incentives, and tax rebates.

8         If you produce a film in Canada, you get 60 to 65 percent

9    of the cost of the film for free from the Canadian government

10   as part of the labor tax incentive.  So I knew that ultimately

11   we're going to produce this film in some tax advantaged way or

12   in some way where we are going to take advantage of all of

13   these supports.  And that is, in fact, what we were doing in

14   2011.

15        And with -- one thing I might add is --

16             MS. LINDSAY:  Objection, Your Honor.

17             THE COURT:  Objection is sustained.

18   Q    BY MR. EMMICK:  So what would have happened if the money

19   hadn't gone from OZ3D to GigaPix in order to --

20   A    Both companies would have died within probably 60 days.

21   Q    Transferring the money from OZ3D to GigaPix helps GigaPix

22   or helps OZ, or both?

23   A    It keeps them both alive.  Without doing that, they're

24   going to die.  It's not that they're going to die, but they're

25   going to -- there were enough creditor claims against GigaPix

1    to bring GigaPix down.  If GigaPix comes down, they're going to

2    take control of the assets of OZ, and both companies are going

3    to be toast, and everything just stops.

4        And, again, it comes back to, you know, the advantage of

5    someone like me.  I mean, I -- you know, I've financed and

6    produced a lot, and I know how this works, and I know that it

7    is a juggling process.  And I know that it is really pressure,

8    pressure.  And I know how to do that, and I know how to do it

9    well, and I surrounded myself with people who also knew how to

10   do it.

11   Q    You were communicating with the investors in what ways?

12   A    The communications with the investors were really just

13   information letters, and all I'm trying to do is say this is

14   what I'm trying to do.  This is what I'm -- most people in

15   private companies don't do this, and in public companies I know

16   the disclosure rules, completely know the disclosure rules.

17   I've never been in a situation like this where I felt an

18   obligation to talk to people, that I couldn't talk to them one

19   to one.

20       And there are no rules.  I mean, it's a private company.

21   So, you know, what you say to them is between you and them.

22   And is it -- you know, is it misleading?  No.  Is it hopeful?

23   Yes.  And it's hopeful because I'm hopeful.  I'm a very

24   optimistic person, and I know that -- I mean, it's happened to

25   me before.  You know, I've -- I had my own company, was in

1   really deep financial trouble, came up with an idea, sold it,

2   out of financial trouble for eight years.  So these things

3   happen pretty readily in the entertainment business.

4        The communications to the -- to the investors were purely

5   that.  They were just, here's what's going on.  This is exactly

6   what I'm trying to do.  And there's a disclaimer at the bottom

7   of those that is the disclaimer for public companies, and it

8   basically says any forward looking statements have to be

9   discounted.  You have to do your own research.  It basically

10  lays out there, if there's a forward looking statement, you

11  have to do more research on it.

12       Now, personally, I would not have put those in there.

13  I -- because I'm just talking to you.  I'm just trying to tell

14  you what I'm trying to do and to let you know that the lights

15  are on and I'm here.  And that -- and to be blunt, I went down

16  with the ship.  I mean, at the end of three years, nobody was

17  broker than me, and nobody had put more of themselves into

18  this, and a lot of my own personal economics.  A lot.

19  Q    You were also asked some questions about Connecticut.

20  Tell us when you learned about this Connecticut cease and

21  desist, C&D, and what this even related to at all.

22  A    I didn't really have time to read the whole thing, but as

23  I recall, the Connecticut C&D was an administrative matter.  It

24  was not a full cease and desist.  It was basically because

25  Buchanan, Ingersoll & Rooney had failed to file on time a

**UNITED STATES DISTRICT COURT**

1    particular item.  And it was purely an administrative C&D, and

2    they asked me to do it because Mr. Blauvelt was missing at the

3    time and he wasn't around.  And I wanted to get it off -- it

4    was purely that.  Purely that.

5    Q    Could you explain more broadly what the role of

6    Mr. Uchimoto was at Buchanan, Ingersoll firm in connection with

7    those C&Ds.

8    A    I was focused -- in this particular arena, I was focused

9    on one thing, and that thing was not something I was expecting

10   that I was going to have to do, which was deal with the

11   corporate finances of a company that had a cloud over it.  So

12   in 2009 I -- I found the best securities law firm that I could

13   find that had nothing to do with Los Angeles, that had nothing

14   to do with the entertainment business, that had never worked in

15   the entertainment business, I think.

16        And it was the -- the particular lawyer was the former

17   general counsel of the Philadelphia Stock Exchange, and we

18   hired them to show us and the company how to do this right.

19   And we did do that right and, you know --

20   Q    Can you give us a time period for that.

21   A    I don't remember the exact time.  It was -- we started at

22   the end of 2008, and we probably got done in the middle --

23   yeah, we probably got done by July of 2009.  So this

24   administrative matter that came up in 2012 was purely because

25   we had not filed within the 15-day filing period.  That's what

```
 1   that administrative filing is about.
 2        And I -- and I remember it because it was the one that had
 3   my name on it and I'm like, "Why my name?"  Because I was not
 4   filing these things.  Buchanan and Ingersoll did.  And it was
 5   because they found my name on a public document as being the
 6   president of the company.
 7   Q    Ultimately, how much of GigaPix or how much of OZ3D did
 8   you end up owning?
 9   A    I didn't own any of it.  I mean, I owned no shares from
10   2007 and -8.  In 2009, with the Buchanan filing, I was
11   awarded -- I don't remember how many shares, but I had to buy
12   them.  I had to pay 85 cents a share to get them, and I had to
13   pay Mr. Blauvelt to buy his shares.  So I had literally the
14   same price of purchase as the investors.  Otherwise, I would
15   have owned no shares.
16   Q    And --
17   A    In OZ I owned nothing.  It was all owned by GigaPix.
18   Q    And how much money did you give to GigaPix in order to
19   help them out?  You mentioned an earlier contract that you had
20   rights under.
21   A    You know, it's really hard to weigh that.  Well, I
22   deferred three years of listed salary.  It was about $775,000
23   of non-compensation from 2010, '11, and '12.
24        And the rights to Workaholics, my participation in that
25   would have been 35 to 50 percent.  And I waived that.  And 35
```

1    to 50 percent of a hit show like that -- that show is going to

2    run four more seasons, maybe five.  And I think the fees were

3    up to 500-, 550-, $600,000 a flight of ten.  So that's a

4    million dollars a year.  That's a lot of money.

5         I mean, when I created Dr. Katz --

6              MS. LINDSAY:  Objection.

7              THE WITNESS:  Anyway --

8              MS. LINDSAY:  Irrelevant and nonresponsive.

9              THE COURT:  Objection is sustained.

10   Q    BY MR. EMMICK:  Why would you give money to GigaPix?

11             MS. LINDSAY:  Objection.  Misstates the evidence.

12             THE COURT:  Objection is sustained.

13   Q    BY MR. EMMICK:  Why were you doing so much for GigaPix?

14   A    I think this is the part of the answer that I gave to the

15   FBI agent.  I don't know.  I mean, had I held onto those

16   rights, I wouldn't be in the mess I'm in.  Had I left earlier,

17   I wouldn't have been in the mess I'm in.

18        So part of the answer, the answer that I F-ed up, is that

19   I messed up my life.  I literally threw myself at something

20   because I couldn't walk away from it because I hadn't fixed it.

21   And why did I -- why did I do that?  Because I wanted it to

22   work.  I really, really wanted it to work, and I was going to

23   do everything I could to make it work.  And that was it.

24   Q    Having devoted that time, having devoted that money to

25   GigaPix, would you lie to an investor in order to get a $5,000

```
 1    investment?
 2    A    No.  I -- that's just not in me.  I've been in way too
 3    many rooms to not do that.  I mean, it's not in me.  Besides, I
 4    wasn't getting paid.  You know --
 5              MS. LINDSAY:  Objection.  Nonresponsive.
 6              THE COURT:  Sorry.  I didn't hear.
 7              MS. LINDSAY:  Objection.  Nonresponsive.
 8              THE COURT:  Objection is sustained.  That will go
 9    out.  The jury is admonished to disregard it.
10    Q    BY MR. EMMICK:  Why not?
11    A    Why not what?
12    Q    The question was -- would you be willing -- why were you
13    willing to do that?
14              THE COURT:  Willing to do what?
15              MS. LINDSAY:  Objection.
16              THE COURT:  That?  What's the question?
17    Q    BY MR. EMMICK:  Why were you willing to devote the time
18    and the money in order to make GigaPix work?
19              MS. LINDSAY:  Objection.  Asked and answered.
20              THE COURT:  The objection is sustained.
21              THE WITNESS:  I wanted it to work.
22              THE COURT:  No.
23              THE WITNESS:  Oh.
24              MR. EMMICK:  That's fine.
25         Nothing further, Your Honor.
```

1             THE COURT:  Recross?

2                    RECROSS-EXAMINATION

3   BY MS. LINDSAY:

4   Q    So you stated that for OZ3D, when you told Agent Potocek

5   that no money was used in production, can you -- you explain

6   that.  Just a minute.  You said you had no intent to go into

7   production for OZ3D?

8   A    That wasn't what I said.

9   Q    What did you say?  You said money was not used for

10  production.  It was just preproduction; correct?

11  A    Yes.  You would generally only use production money when

12  you have your incentives in place or a co-production partner.

13  Q    So no money was used on production as -- as you told

14  Agent Potocek, no money was used on production?

15  A    That's correct, ma'am.  It was all used in preproduction.

16  It was no -- you can't start production until you have all of

17  the assets developed and articulated and ready to work inside

18  of a computer.

19  Q    Okay.  Let's look at Exhibit 67.  And again --

20  A    What's the date?  Oh, okay.

21  Q    I didn't ask you a question.  So you just said you can't

22  have money for production before you are ready to do

23  production.

24  A    Uh-huh.

25  Q    You told us no money was spent on production.  So what

1    were you doing telling your investors that OZ3D was in

2    production?

3    A    At this point it was going into production.

4    Q    It doesn't say it was going into production.  It says it

5    was in production.

6            MR. EMMICK:  Objection, Your Honor.  It doesn't --

7    it doesn't say that at all.  You can see it right there in

8    words.

9            THE COURT:  The objection is overruled, Counsel.

10           THE WITNESS:  On April 6, we made it --

11   Q    BY MS. LINDSAY:  No.  No narrative.  Is that true or

12   false?  Yes or no?  True or false?

13   A    Yes.  We were in production in Canada.  In Canada.

14   Q    So you did spend money on production?

15   A    It wasn't our money.

16   Q    Now, your massive hit show, Workaholics, that's the show

17   you're talking about?

18   A    Yes.

19   Q    That didn't save GigaPix, did it?  No?

20   A    No.

21   Q    So you testified that you needed to transfer money from

22   OZ3D to GigaPix in order to pay the creditors of GigaPix;

23   correct?

24   A    Not just for that, but for that reason too, yes.

25   Q    In order to keep GigaPix alive?

UNITED STATES DISTRICT COURT

55

```
 1   A     (No audible response.)

 2   Q     Is that a "yes"?

 3   A     Yes.

 4   Q     And OZ3D alive?

 5   A     Yes.

 6   Q     Now, if you're paying creditors of GigaPix, that has

 7   nothing to do with OZ3D, does it?

 8   A     Can I tell you how that works?

 9   Q     Yes or no?

10   A     Can I tell you how that works?

11   Q     Yes or no?

12   A     I -- I can't answer the question because it's -- it's --

13   Q     Let me just ask you this:  You said nobody is broker than

14   me and nobody put more than you into GigaPix, is that your

15   position?

16   A     Yes, ma'am.

17   Q     How about the hourly wage investors who put their

18   retirement money into GigaPix and it's gone?  How about them?

19             MR. EMMICK:  Objection.  Argumentative.

20             THE COURT:  Objection is sustained.

21   Q     BY MS. LINDSAY:  Wouldn't you agree that your investors

22   lost every dime that they put into GigaPix?

23             MR. EMMICK:  Objection.  Argumentative.

24             THE COURT:  Objection is overruled.

25             THE WITNESS:  As did I, ma'am, yes.
```

```
 1   Q    BY MS. LINDSAY:  20 million, more than $20 million worth
 2   of investor money was lost; correct?
 3   A    And I personally lost over --
 4   Q    I didn't ask you that.
 5   A    -- $3 million.
 6   Q    I'm talking about the investors.  Over $20 million of
 7   mom-and-pop investor money was lost at GigaPix; correct?  Yes
 8   or no?
 9   A    I wouldn't categorize it as mom and pop, ma'am.
10         MR. EMMICK:  Objection, Your Honor.
11         THE WITNESS:  That's unfair.  I don't know who all
12   those investors are.  I can't characterize them that way.
13         MR. EMMICK:  Your Honor, objection.  Mom and pop.
14         MS. LINDSAY:  I can restate, Your Honor.
15         THE COURT:  The objection is overruled.
16         MS. LINDSAY:  Oh.
17         THE WITNESS:  What's the question?
18   Q    BY MS. LINDSAY:  The question is, isn't it true --
19         Would you like the court reporter to read it back,
20   Your Honor?
21         THE COURT:  Yeah.
22            (The record was read.)
23         THE WITNESS:  Yes.
24         MS. LINDSAY:  Nothing further.
25         THE COURT:  All right.  You may step down.  You may
```

```
 1   step down, Mr. Pritchard.

 2        Call your next witness.

 3              MR. EMMICK:  Your Honor, Mr. Pritchard calls

 4   Mr. Bill Uchimoto.  He's right outside.

 5                      William Warren Uchimoto,

 6   called as a witness by the defense, was sworn and testified as

 7   follows:

 8              THE CLERK:  Stand all the way there and then face

 9   me.  Please raise your right hand.  Do you solemnly swear that

10   the testimony you shall give in the cause now pending before

11   this court shall be the truth, the whole truth, and nothing but

12   the truth so help you God?

13              THE WITNESS:  I do.

14              THE CLERK:  Thank you.  Please take a seat.

15              THE WITNESS:  Thank you.

16        Your Honor.

17              THE CLERK:  Please state your full and true name for

18   the record and spell your last name.

19              THE WITNESS:  William Warren Uchimoto,

20   U-c-h-i-m-o-t-o.

21                      DIRECT EXAMINATION

22   BY MR. EMMICK:

23   Q    Sir, can you tell us where you work and what are you doing

24   for a living.

25   A    I'm a partner at the law firm of Stevens & Lee.  I'm a
```

**UNITED STATES DISTRICT COURT**

securities lawyer.  I have 33 years of securities law experience.  I graduated from the University of California at Davis with an economics degree in 1978.

In 1981 I graduated from the University of California Hastings, Hastings College of the Law.

My first job out of law school was with the United States Securities and Exchange Commission in Washington, D.C.  I worked for the division of market regulation.

In 1986 I went to Philadelphia, became the general counsel of the Philadelphia Stock Exchange, the nation's oldest stock exchange.  I held that position for 12 years.

Then I became general counsel of Vie Financial Group, which is a NASDAQ listed company that was in institutional trading systems development.

And then thereafter in 2003 I went to Saul Ewing and became the chairman of their law firm's securities practice.

And then in 2008 I became the chairman, after departing Saul Ewing and moving to Buchanan, Ingersoll & Rooney, a national law firm, I became their partner in charge of securities regulation there.

And in 2010 I went to Saul Ewing, which is another law firm, which is my current law firm, and I'm the chairman of their securities regulation practice group there.

Q    Have you come to know David Pritchard?

A    I have.

1    Q     And have you come to work on any contracts with GigaPix?

2    A     I have.

3    Q     Give us a time frame, and then we'll move on from there.

4    A     I met Mr. Pritchard in the summer of 2008.  I was

5    introduced by an employee of GigaPix at the time, Nicholas

6    Hines.  Nicholas Hines' daughter -- excuse me, niece, he's not

7    married -- niece was my daughter's good friend from back east.

8    And on a trip to L.A. that summer, in which my son was looking

9    at UCLA -- and he finally went and graduated from UCLA,

10   fortunately -- Mr. Hines introduced me to his boss,

11   Mr. Pritchard.

12         And, you know, we, you know, hit it off at -- because I

13   think you know David was in search of a law firm and a lawyer

14   to help with some restructuring matters for GigaPix.

15   Q     When you say "restructuring matters," what does that mean?

16   A     When we met in L.A. that summer, David expressed to me

17   that the -- that he was working at GigaPix since '06 or '07 and

18   that he had no shares in the company and that the company was

19   founded by Chris, Chris Blauvelt, and that Chris Blauvelt was

20   the majority owner of GigaPix and that there were numerous

21   private placements that Mr. Blauvelt had done and at the time

22   seemed to be a lot of, I would say, disarray in the capital

23   structure of the company, and could our law firm and myself

24   look at it and try to sort things out.

25   Q     Now, you had mentioned that that -- a meeting was arranged

**UNITED STATES DISTRICT COURT**

1    through Mr. Hines, you said?

2    A    Yes.  That's correct.  Nicholas Hines.

3    Q    Let me ask a direct question.  Did Mr. Colin Mutton play

4    any role in arranging for that initial meeting?

5    A    I have never met in person Mr. Mutton; so I don't know

6    what he looks like.  I have talked to Mr. Mutton on the phone

7    many times, but to answer your question, the only person I met

8    that summer was David Pritchard.  And Mr. Hines introduced me

9    to Mr. Pritchard, and we met numerous times that summer to talk

10   about my engagement.  Mr. Mutton was not in the picture.

11   Q    Let's set up an overall time frame.  You mentioned it

12   started in 2008.  About when did your work stop?

13   A    Well, the formal engagement was October of 2008.  I looked

14   at my records before I've come to testify, and our engagement

15   letter was out to GigaPix in October 2008.  So my first time

16   sheet billing work was in October 2008.  And by looking at my

17   time sheets, I believe my last billings were somewhere around

18   January, February 2010.

19        So pretty much October 2008, all of 2009, ending

20   February 2010.

21   Q    And that's the outline.  Let's focus a little bit on what

22   the goals were, what you were trying to accomplish and how you

23   acquired that information.

24   A    Yes.  My -- my objectives were to listen to David.  He was

25   the president of GigaPix at the time, and he gave me a very

1   thorough briefing of the company and its capital structure and

2   some of the goals that he sought to achieve.

3        He did point out that he believed his partner Mr. Blauvelt

4   would be required to come in.  But he would engage me and, you

5   know, run the interference so that I would get in with

6   Buchanan, Ingersoll & Rooney and --

7   Q    Let me stop you there because I wasn't quite sure.  Who

8   was going to engage who and under what circumstances?

9   A    Right.  I had never met Mr. Blauvelt at the time.  So my

10  meetings were exclusively with Mr. David Pritchard, and I took

11  all the preliminary information about the company by my

12  discussions with Mr. Pritchard.

13       So we really negotiated the engagement, and I remember

14  that Mr. Pritchard actually said, when he made a decision to

15  retain Buchanan, Ingersoll & Rooney, which is really an east

16  coast firm, not a west coast firm, that he actually saw a very

17  valid reason to hire myself, which I'm an east coast lawyer.

18  Even though I'm barred in California, I really practice law in

19  Pennsylvania as a Philadelphia lawyer.

20       And he said that the advantage of that would be simply

21  because --

22            MR. McLAIN:  Objection.  Hearsay.

23            THE COURT:  Objection is sustained.

24  Q    BY MR. EMMICK:  Is there any advantage to having an east

25  coast firm for a Los Angeles company?

```
1    A     Yes.  The advantage would be we were not entangled with

2    any sort of Hollywood-type entertainment law issues.  We were

3    more of a corporate finance law firm that were engaged outside

4    of that industry.  So any conflicts of interest by being in the

5    entertainment industry would be addressed by being an east

6    coast firm practicing for a client on the west coast.

7    Q     Tell us what the goals were Mr. Pritchard was describing

8    and the stats, the situation.

9              MR. McLAIN:  Objection.  Calls for hearsay.

10             THE COURT:  The objection is sustained.

11             MR. EMMICK:  Your Honor, this is --

12             THE COURT:  The objection is sustained.

13             MR. EMMICK:  It's not hearsay because it's offered

14   to show --

15             THE COURT:  Objection is sustained, counsel.

16   Q     BY MR. EMMICK:  You did speak to Mr. Pritchard.  Would you

17   tell us how many times and in what --

18   A     During the summer of 2008, during my visit to the L.A.

19   area -- it was a vacation for my family as well as my son was

20   looking at UCLA -- I met two or three occasions in person with

21   Mr. Pritchard.

22   Q     Any -- any other meetings elsewhere?

23   A     The other meetings occurred when Mr. Pritchard

24   subsequently flew back east after we were engaged, and I met

25   him several times in New York City on his travels back east.
```

1    Q    Tell us what you were trying to accomplish and what those

2    steps were that you were trying to use to accomplish that.

3    A    Did the -- the first engagement work that I performed,

4    with the assistance of some of my senior corporate financial

5    lawyers, was to review the capital structure of GigaPix,

6    evaluate the past securities offerings that the company had

7    engaged in, look at their capital structure, make some

8    observations as to any needed changes, and really produce a

9    letter that was directed to Mr. Pritchard.

10        And I do recall a specific letter dated October 24th,

11   2008, where I, with the assistance of my partners, drafted a

12   letter outlining, you know, what our findings had found about

13   GigaPix, that there were too many shares, we believed, that

14   were issued in the past pursuant to four private placements.  I

15   believe there was --

16   Q    Can you explain what you mean by that.  What were private

17   placements?  Why too many shares?

18   A    Private placements are offerings that are made without

19   registration by the company.  We noted that there were ones

20   done in '03, '04, '05, maybe one in '07, four private

21   placements that had raised some funds and, you know, had stock

22   and preferred stock issued along with warrants.  And it was

23   quite a complicated structure for a small company, and at the

24   time we were looking in around October of 2008, there were

25   220 million shares issued with approximately 90 percent owned

1    by Mr. Blauvelt.

2         We felt that 220 million shares would probably be too many

3    for a small company like that, and we would recommend a reverse

4    share split, meaning that without changing pro rata ownership

5    of Mr. Blauvelt.

6         Remember, Mr. Pritchard owns zero percentage of the

7    company at this time.  And the remaining private placement

8    shareholders or outsiders that bought through the past private

9    placements of the company -- and I would say a lot of these

10   folks had bought when Mr. Pritchard was not even at the company

11   at the time because they occurred in '03, '04, '05, prior to

12   his becoming president.  They owned a very small percentage

13   collectively, under 10 percent of the company.

14        So we understood from discussions from -- with

15   Mr. Pritchard that his objectives were to, No. 1, press

16   Mr. Blauvelt's position down, that he should own less than

17   90 percent, that the public or outside investors, which were

18   historically members of the public, outsiders that invested in

19   the company, they should have their share interest or equity

20   ownership in GigaPix increased, which means that they would

21   have a further ownership without any further consideration.

22   Q    Okay.  Can you explain that a bit more.

23   A    Right.

24   Q    Yeah.

25   A    My -- my -- my understanding was that Mr. Pritchard wanted

```
 1    the -- the outside interest holders to be more fairly treated

 2    by the company, that they owned a very small percentage and

 3    they had given, you know, money to the company, and to really

 4    create a capital structure that would ultimately one day maybe

 5    create a public company that could be financed, that the

 6    outside investors should own a bigger percentage.

 7         Mr. Blauvelt's 90 percent should be pressed down to

 8    accommodate that, and a share -- share incentive plan would

 9    be -- should be put in place so that employees, directors, and

10    officers of the company could also be given stock to

11    incentivize quality executives to join and be retained by the

12    company.

13         And, finally, Mr. Pritchard also pointed that he himself

14    was owed --

15              MR. McLAIN:  Objection.  Hearsay.

16              THE WITNESS:  -- shares of the company.

17              THE COURT:  Sustained.  It goes beyond the scope of

18    the question.

19    Q    BY MR. EMMICK:  And what steps did you, in fact, either

20    recommend or take in order to accomplish those goals?

21    A    Right.  We, in that October 24th, 2008 letter to

22    Mr. Pritchard, outlined the capital structure, and we said that

23    we would get back to him with a subsequent memorandum to

24    outline the steps that we would take.  And that memorandum came

25    out on December 15th.  I reviewed it recently.  It was written
```

1    to Mr. Pritchard as the president of GigaPix, and it outlined

2    the four-step process of what we would recommend.

3         Number 1, we would recommend an amendment to the articles

4    of incorporation of GigaPix, which is required under California

5    law to basically do a reverse share split, meaning let's take

6    this really absurdly high 220 million shares that are issued

7    mainly to Mr. Blauvelt, do a reverse share split.  So we take

8    every ten shares he owns and create one share.  Obviously,

9    everyone is pro rata brought down.  So we drop the capital

10   shares outstanding from 220 million to a more manageable

11   22 million.

12        Number 2, basically -- and Mr. Blauvelt did ultimately

13   agree with this -- have him agree to cancel some of his shares

14   so that, you know, he is -- reduces his share ownership.

15        And, number 3, we had a creative idea.  We advised that

16   the warrants, which are basically an instrument that says that

17   you can take a warrant and convert it at any time in the

18   future, you know, before it expires, for one dollar and convert

19   it to common stock -- because those were in the hands of the

20   outside investors, we thought it was creative to say, if you

21   want to get the outside investors to increase their ownership

22   interest in GigaPix without putting in any more money, give

23   them a free exchange offer, one-time free exchange offer so

24   they can convert their warrants for no charge basically and get

25   a share of stocks.  So if they did that, they would get a share

1    of stock, a voting share of stock, and have to pay nothing for

2    it.  So that would bring outside investors up in ownership.

3         And the final thing is where obviously we said, if you are

4    going to have co-equal ownership with Mr. Blauvelt and

5    Mr. Pritchard --

6              MR. McLAIN:  Objection, Your Honor.  Irrelevant.

7              THE COURT:  Objection is sustained.

8         Mr. Uchimoto, did you do any work on the question of the

9    funding of the companies that Mr. Pritchard was working in?

10             THE WITNESS:  Yes, Your Honor.  I did.

11             THE COURT:  Funding itself?

12             THE WITNESS:  Yes, I did.

13             THE COURT:  All right.  Let's get to that.  That's

14   the only relevancy to this lawsuit.

15   Q    BY MR. EMMICK:  Can you tell us about the funding

16   arrangements.

17   A    Well, again the relevance of the restructuring were that

18   the restructuring was necessary to put the company in good

19   stand- -- stead to prepare for the funding.  So also in the

20   memorandum of December 15, 2008, was contemplation of two

21   fundings of 3 million and 3 million, $6 million funding after

22   the corporate structuring is put in place.

23        So once the company's house is in order, there would be an

24   opportunity to raise money because, you know, we have a good

25   structure upon which to raise money.

**UNITED STATES DISTRICT COURT**

1      So we go now to the summer of 2009, when the structuring

2   is all put in place.  And in our law firm, Buchanan, Ingersoll

3   & Rooney managed the whole process to make sure everything that

4   we recommended in the legal memorandum was carried out.

5      Again, Mr. Blauvelt and Mr. Pritchard both agreed to all

6   those steps.  And therefore that set the stage for the

7   July 15th private placement, which is a legal document that is

8   an offering document that basically gives all the terms of the

9   sale of stock to bring in money.  So we did draft that document

10  at Buchanan, Ingersoll and a team of our lawyers.

11  Q    And what was that to accomplish?

12           THE COURT:  Mr. Uchimoto, did you do any work of the

13  funding of the company by the stockholders that were there at

14  the time you came into advice of the company?

15           THE WITNESS:  Well, I know that the offering that

16  was conducted pursuant to the July 15, 2009 private placement

17  memorandum, the specific targets of who was going to invest in

18  that, were the existing shareholders of the company who are all

19  going to be accredited investors by the terms of the offering.

20           MR. McLAIN:  Objection.  Nonresponsive.

21           THE COURT:  Mr. Uchimoto, I'm talking about the

22  funding that was in place when you came on as counsel in 2006

23  or -7.  Did you have anything to do --

24           THE WITNESS:  Your Honor, no.  We --

25           THE COURT:  Did you have anything that had to do

1    with that funding?

2              THE WITNESS:  We noticed there are four private

3    placements that occurred prior to Mr. Pritchard joining the

4    firm, and we did not have anything to do with those.  I don't

5    know which law firms or who did those prior to Mr. Pritchard

6    joining the -- joining GigaPix.

7    Q    BY MR. EMMICK:  Was any work done --

8              THE COURT:  Tell us about this lawsuit.

9    Q    BY MR. EMMICK:  Was any work done regarding the

10   accreditation of the investors?

11   A    Right.  I think the issue is we were legal counsel to the

12   July 15th, 2009 funding where $888,000 was raised by the

13   company pursuant to that private placement memorandum.  So I

14   had a bird's-eye view on the handling of that financing of

15   GigaPix, which I believe was the fifth financing.

16        So I know that -- my belief is that that is the only one

17   that Mr. Pritchard drove because he was taking charge after the

18   restructuring, and that was the natural segue into the funding.

19   So he was involved in that, and I worked on it and had a

20   bird's-eye view on it, and I know it was done absolutely

21   correctly pursuant to the law.  Every one that was in offering

22   there that was accepted was reviewed by my staff and myself.

23   Everyone was an accredited investor.  There were no mistakes

24   made in that financing.

25   Q    So what was the plan?  What was going to happen when

1   people decided to invest?

2   A     First, the PPM is always a very carefully drafted offering

3   document that has all the disclosures that you as an investor

4   want to read and are material for you to understand the

5   investment so that you know what you're investing in.  That

6   document was drafted with Mr. Pritchard and some of his staff's

7   help.

8          It had every risk factor known to the entertainment and

9   movie industry, every corporate risk factor.  It showed that

10  this was a -- you know, there are risks in any investment,

11  particularly a private investment like this.  Everything was

12  carefully disclosed.  Plus there were other disclosures in that

13  offering document that indicated that basically this is a

14  private placement being sold to accredited investors.

15         The document is the key offering document, meaning that

16  you are not entitled as an investor to talk to anyone and get

17  another sales story that is different from what's set into that

18  private placement memorandum.  The writing and the offering in

19  the writing controls.  All this was disclosed.

20         And there was a third factor that was carefully disclosed

21  that Mr. Pritchard had -- had desired and supported the

22  disclosure.  That was a number of state actions against the

23  company and Mr. Blauvelt, prior to the July 2009 PPM and

24  offering, that disclosed that the company had engaged in sales

25  practice infractions by -- by states.  There were actually

three -- four states that had settled C&Ds, basically cease and
desist orders.  There was three investigations.  We felt and
Mr. Pritchard agreed that that was a disclosure issue that had
to be disclosed to the investors prior to the investors making
a decision to invest in the July 2009 offering.

So all of that was disclosed in the PPM.  It was done
specifically with the express, you know, federal securities
laws and every state law taken into consideration.  And my
staff and I, you know, managed it and reported to
Mr. Pritchard.

Q    You described a number of risks that were included in this
writing.  Can you be more specific about the particular risks.

A    There are all sorts of types of risks when you're buying
into a private company in the movie industry.  Certainly, the
movie industry risks that, you know, any movie can fail.
There's a small handful of movies that are being undertaken.
If any fails, it can have a dramatic, material, negative impact
on the company.

The company may not raise enough money to really be
successful in this offering or otherwise.

You know, basically the management is obviously a very
small, discrete number of managers.  They're going to have huge
control over the funding, and they have a lot of discretion on
how they can use the funding because the specific purpose of
the July 2009 funding, the use of proceeds, the money coming

1   in, was to be used for general working capital.

2       What that means is that it could be used for any

3   legitimate business purpose of the company, which includes

4   payment of salaries, hiring of new executives, you know,

5   anything that's -- that a company pays.  And salaries of

6   employees are big; so therefore it was enormous discretion

7   given to the management in use of those proceeds.

8       And that was fairly clearly disclosed in the PPM document

9   that we drafted for the company.

10  Q    Just what is a PPM, and how long was this PPM?

11  A    PPM is a private placement memorandum.  It's a term of art

12  used for a legal document that really is the definitive sales

13  document for a company to go out and raise capital by selling

14  its securities.  Here, common stock was raised.  3 million was

15  sought to be raised in the sale of 2.4 million shares.  A

16  dollar and a quarter was the share price, and it spelled out

17  all the terms of the sale of the security in the PPM.

18      The law firm, working closely with the company, drafts it

19  to make sure it's accurate.  It's reviewed very carefully, and

20  once it's finalized by the company, it's used as a sales

21  document to go out to the existing shareholders to sell stock

22  to, if they choose to purchase stock.

23  Q    Then what happens?

24  A    Then there's an escrow account that was set up.  It was

25  set up by our law firm; so no money comes directly into the

1   company.  It comes into the law firm first, and it's held in a

2   segregated account.  And it's held by our law firm because we

3   don't want that money to be released into the company until we

4   check every subscription agreement that comes in.

5       Now, part of the PPM, there's a segment at the end called

6   subscription agreements, and that is something that every

7   investor who wants to participate must fill out.  It's very

8   complex, and they have to show they meet accredited investor

9   standards.  There's certain net worth, certain income combined

10  with their spouse.  It's very precise under federal law.

11      Then there's another set of questions called suitability

12  questions, suitability questions so that we know those

13  investors are sophisticated enough to understand the

14  investment, and therefore all that's filled out.

15      Once that's filled out and signed by the investor, it came

16  back to the company, reviewed by us as counsel, every single

17  one.  And if there's any questions, it's rejected, and we don't

18  let the investor come in -- come in.

19              THE REPORTER:  Slow down.

20              THE WITNESS:  If it looks like it's appropriate and

21  no red flags, it's signed off, and we let the company know that

22  the subscriber meets the accredited investor standards, and you

23  may take the money.  In this offering a minimum of $125,000

24  collectively had to be raised before closing.  Because if

25  there's only 5,000, 10,000, $100,000 raised, no closing.  The

UNITED STATES DISTRICT COURT

1    money gets returned to the investors, and basically it was a --

2    it was an unsuccessful offering.  Because the firm --

3              MR. McLAIN:  Objection.  Nonresponsive.

4              THE COURT:  Objection is sustained.

5         We'll take our afternoon adjournment at this time.  I

6    would remind you of your duty not to converse or otherwise

7    communicate among yourselves or with anyone upon any subject

8    touching the merits of the trial, and you are not to form or

9    express any opinion in the case until it's finally submitted to

10   you for your verdict.  You are excused.

11        We'll remain in session.

12             THE CLERK:  All rise.

13                  (Jury out at 3:34 P.M.)

14                  (The following proceedings were held out of the

15                  presence of the jury:)

16             THE COURT:  Mr. Emmick, let's get to this case, not

17   other matters that have nothing to do with this case.  And that

18   is the statements made to the -- to the investors that were

19   under the cold calls.

20             MR. EMMICK:  Yes, Your Honor.

21             THE COURT:  That's what this case is about, and

22   nothing else.

23        We'll be in recess for ten minutes.

24                  (Recess taken.)

25             THE CLERK:  This court is now in session.  Please be

1  seated and come to order.

2         THE COURT:  I want to clarify, Mr. Uchimoto, a

3  little thing about your testimony.  You talk about private

4  placements.  Are the persons who invest as a result of a cold

5  call a private placement?

6         MS. LINDSAY:  Your Honor, should the jury be

7  present?

8         THE COURT:  Just a moment.

9         THE WITNESS:  The answer is yes, it could be.  It

10  depends on the circumstances.  I think an errant cold call

11  could -- could still result in a private placement.  It depends

12  on the magnitude of how many cold calls and how many people

13  came in.

14      Obviously, under the JOBS Act, it would state it would be

15  permissible now because you can't have general solicitation.

16  It really goes to the issue of general solicitation and whether

17  a cold call and a lot of them would constitute general

18  solicitation.  That's prior to the JOBS Act because right now

19  you could, you know, have TV, Internet, you know, radio.

20         MR. McLAIN:  But that's --

21         THE WITNESS:  And that would be still okay as long

22  as you had a reasonable basis that everyone is an accredited

23  investor.  So again it really would depend on the facts.

24         THE COURT:  Private investments that you were

25  talking about that you were providing to the --

UNITED STATES DISTRICT COURT

1          THE WITNESS:  That was the 2009 July --

2          THE COURT:  Yes.

3          THE WITNESS:  -- private placement memorandum;

4    right?

5          THE COURT:  Was all of that private placement -- was

6    all that by cold calls in any respect?

7          THE WITNESS:  I believe those were to the existing

8    shareholder base, who may in fact historically been the result

9    of cold calls.  These are existing shareholders.  Many years

10   ago, in the earlier private placement before Mr. Pritchard's

11   time at the company, they could have been the result of earlier

12   cold calls.

13       We noticed one thing, there was an enormously large -- for

14   a private company, this company had 770 shareholders, which is

15   sort of rare for a private company to have that many

16   shareholders.  So we were envisioning that they may have been

17   cold calls that generated that big group.  But in 2009 July, at

18   least, the company simply went back to that existing group to

19   basically solicit interest for the July 2009 private placement.

20   So if that makes sense.

21         THE COURT:  No, it doesn't.  But okay.

22       Bring down the jury.

23       Let's get to this lawsuit, Counsel.  Let's get to this

24   lawsuit.

25           MR. EMMICK:  My next question is going to be in the

1    cold-calling area.  I hope that's what the judge has in mind.

2                    (Jury in at 3:50 P.M.)

3                    (The following proceedings were held in the

4                    presence of the jury:)

5                    THE COURT:  Let the record reflect the jurors are

6    all present in their proper places.  The defendants are present

7    with their counsel.

8    Q    BY MR. EMMICK:  Mr. Uchimoto, let me just ask you about

9    the concept of cold-calling and how that played a role in the

10   GigaPix transaction.

11   A    I am not aware of any cold-calling in the July 2009

12   GigaPix private placement, the one that I know for sure that

13   Mr. Pritchard had under his control and had really gave

14   direction to commence.

15   Q    And what was the approach that you were proposing?  Was it

16   cold-calling, or was it something else?

17   A    And, again, it wasn't necessarily my approaching it, but I

18   think Mr. Pritchard pointed out that we would simply go back to

19   existing shareholders.  There was a large group of existing

20   shareholders.  I believe the number was approximately 770,

21   which is large for a private company like GigaPix but, you

22   know, so be it.  There were 770 existing shareholders in

23   GigaPix.

24        It was his view that we would simply go back to that

25   existing relationship group and basically solicit interest

**UNITED STATES DISTRICT COURT**

1    if -- if anyone was interested in participating in the

2    July 2009 private placement, which sought to raise up to

3    $3 million.

4    Q    As you're planning your approach, you talked to

5    Mr. Pritchard.  Did you also talk to Mr. Blauvelt?

6    A    Yes.  We did.  We talked to both Mr. Pritchard and

7    Mr. Blauvelt.

8    Q    Tell us about the discussions with Mr. Blauvelt.

9    A    At times they may have been on a conference call together

10   because, before the private placement was approved, there was a

11   lot of colloquy on, you know, what had to go in there, the

12   disclosures, the accuracies of them, and obviously a lot of

13   back and forth.

14       So once the private placement was approved by the company,

15   then we as counsel got on the phone to give advice to both

16   Mr. Pritchard and Mr. Blauvelt on the rules of engagement --

17   you know, what can be done, what can't be done -- so that we

18   don't basically violate any of the exemptions under what we

19   call Regulation D, which really sets forth a private placement,

20   so that we don't have a public offering which would require

21   registration of the stock under the securities laws.

22       This was not a registered offering.  It was a private

23   placement or unregistered offering, and we thought that was

24   absolutely legal -- absolutely legal, and therefore we advised

25   the company of such.  We gave them the process to make sure

1   that we didn't run afoul and create a public offering here

2   unwittingly which we would be required to register.

3        So this was a legal unregistered offering that happened in

4   July 2009.

5   Q    One of the questions I'd like to ask has to do with

6   Regulation D.  Tell us what that is and what it says.

7            MR. McLAIN:  Objection.  He hasn't been established

8   as an expert.

9            THE COURT:  Objection is sustained.

10           MR. EMMICK:  I'm sorry.  What was the nature of the

11  objection?

12           THE COURT:  It's irrelevant to this lawsuit.

13  Q    BY MR. EMMICK:  Did you have occasion to look at the

14  report of Mr. Risk?

15  A    I did.

16  Q    Hicks.  I'm sorry.

17  A    Hicks.

18  Q    And are you familiar with the area of the securities laws

19  pertaining to --

20           MR. McLAIN:  Objection, Your Honor.  This witness

21  hasn't been disclosed as an expert witness to the government.

22           THE COURT:  The objection is sustained.

23           MR. EMMICK:  Your Honor, I've given them the

24  materials --

25           THE COURT:  The objection is sustained, Counsel.

```
 1   Q    BY MR. EMMICK:  Are you familiar with Section 5?

 2   A    I am.

 3   Q    And how have you come to be familiar with Section 5?

 4   A    I have 33 years --

 5              MR. McLAIN:  Objection, Your Honor.  This witness

 6   has not been proffered to the government as an expert witness.

 7              THE COURT:  The objection is sustained.

 8   Q    BY MR. EMMICK:  Have you ever testified as an expert?

 9   A    I have.

10   Q    An expert in securities?

11              MR. McLAIN:  Objection, Your Honor.

12              THE COURT:  Sustained.

13              THE WITNESS:  Yes.

14              THE COURT:  It's a little late for that, Counsel.

15              MR. EMMICK:  I've already --

16              THE COURT:  It's a little late for that.

17              MR. EMMICK:  I gave them --

18              THE COURT:  Let's get on with this lawsuit.

19              MR. EMMICK:  Your Honor, they called Mr. --

20              THE COURT:  Let's get on with this lawsuit.

21   Q    BY MR. EMMICK:  Tell us about the cease and desist orders

22   and how and why they were included within the disclosures.

23   A    Because the company was raising money pursuant to

24   Mr. Pritchard's reorganization plan, the second part of it was

25   to raise money.  And in connection with the disclosure
```

1   document, which is as I pointed out a PPM, private placement

2   memorandum, we advised as the law firm that it was absolutely

3   critical to disclose anything a reasonable investor would deem

4   material in deciding whether to buy that security or not, the

5   stock, the common stock.

6        And those, you know, cease and desist orders that were

7   pending or actually settled with the state -- and there's two

8   groups that were really affecting Mr. Blauvelt and his prior

9   activities in selling securities in the various states -- we

10  thought they, because Mr. Blauvelt is obviously part of the

11  company, along with Mr. Pritchard, we believed that they should

12  be disclosed in the private placement because an investor would

13  want to know about them.  So they were all disclosed.

14  Q    And were they disclosed in almost a hyperactive way?

15  A    Yes.  Very well detailed.

16  Q    Tell us what you mean by that.

17  A    We -- Mr. Blauvelt had his own separate counsel,

18  Margaret Peper, from another east coast firm that was

19  representing himself and GigaPix in settling or being counsel

20  on -- on the addressing of those various state actions.

21  Therefore, our disclosure counsel, our regulatory specialist,

22  Mr. James Connelly was charged with talking to Ms. Peper and

23  finding out the status and every amount of information about it

24  so that we can draft the correct disclosures to accurately

25  disclose the status and substance of each one of those state

1    cease and desist orders in the PPM.

2    Q    Was Mr. Pritchard supportive or resistant to that?

3    A    Mr. Pritchard was wholeheartedly supportive of it.  Full

4    disclosure.

5    Q    Let me ask you a few questions about what's called a Blue

6    Sky issue.  Can you tell us about the cease and desist orders

7    and how they were included and why they were included.

8    A    Blue Sky simply means state securities laws as opposed to

9    United States federal securities laws because the old -- again,

10   just for a little background, farmers in Kansas were sold blue

11   skies by shysters; therefore, state securities law came in to

12   protect them being sold the blue skies.  So they're called Blue

13   Sky laws.  Securities laws are Blue Sky laws.

14        So when Mr. Emmick says the Blue Sky laws, we're talking

15   about the various state laws, and there are 50 states that have

16   their own separate laws that affect the protection of their

17   citizens.  So, yeah, there were seven state actions, various

18   states, each one we had to evaluate, but they're all pretty

19   much the same sum and substance.

20        Mr. Blauvelt had gotten into a little bit of trouble for

21   the past private placements by selling unregistered securities

22   in those states as well as securities that used unregistered

23   finders.  That was sort of the common substance of each of the

24   actions that had been disclosed in the July 2009 PPM.

25   Q    And what about Connecticut in 2012?

**UNITED STATES DISTRICT COURT**

```
 1   A    Connecticut, Connecticut came after the issuance of the
 2   July 2009 PPM, but that was the only state cease and desist
 3   order that had Mr. Pritchard's name on it.
 4        And I saw that, it was very minor infraction.  It was
 5   actually a mistake that our paralegal at Buchanan, whose name
 6   was Paula Belcher, did a small mistake.  It's like a parking
 7   ticket.  Connecticut wanted the -- under Connecticut Blue Sky
 8   law --
 9              MR. McLAIN:  Objection.  Hearsay.
10              THE COURT:  The objection is sustained.
11              MR. EMMICK:  About -- about Connecticut Blue Sky
12   law?  All right.
13   Q    BY MR. EMMICK:  Was there any indication that
14   Mr. Pritchard knew anything about this?
15   A    No.  Again, Ms. Belcher should have filed a fee filing,
16   paid Connecticut $150 after one investor in October 2009 in
17   Connecticut was sold shares in GigaPix.  And I believe there's
18   a 15-day technical window to have paid that fee, and that -- I
19   think we missed it by two weeks; so therefore there was an
20   infraction.  And Mr. Pritchard, I noted, was named on it, but
21   very minor, very minor.
22   Q    What, in fact, was Mr. Pritchard pushing for in terms of
23   how one would sell shares to people or businesses?
24   A    He was pushing always for no cold-calling, to basically
25   upgrade the historic sales practices of how money was raised by
```

```
 1   the company.
 2        Indeed, he asked me, Bill, you're a capital markets
 3   attorney of 30 -- back then I had maybe 29 years of experience,
 4   but I had a lot of connections to some investment banks.  He
 5   asked me to introduce him to --
 6             MR. McLAIN:  Objection, Your Honor.
 7             THE COURT:  Objection is sustained.
 8        Go on.
 9   Q    BY MR. EMMICK:  Did he ask you for any advice about other
10   kinds of investors?
11             MR. McLAIN:  Objection.  Calls for hearsay.
12             THE COURT:  Objection is sustained.
13             MR. EMMICK:  But, Your Honor, he's --
14             THE COURT:  The objection is sustained, Counsel,
15   please.
16   Q    BY MR. EMMICK:  Did you make any introductions of the
17   defendant to possible investors?
18   A    Yes, I did.
19   Q    Tell us who you introduced him to.
20   A    Again, these were investment banks.  Investment banks are
21   registered with the SEC and FINRA, which is a self-regulatory
22   body that regulates comprehensively people who raise money and
23   are licensed.  And basically I did suggest a few investment
24   banks that could upgrade the way securities certificates were
25   sold so we can get away from cold-calling.
```

```
 1    Q     What was Mr. Pritchard's reaction to those introductions?

 2    A     Mr. Pritchard's reaction was "Let's go meet them."  So I

 3    set up a meeting in New York with The Rock Capital, a small

 4    boutique investment bank that would potentially be able to sell

 5    securities in a registered way, in a very high-standards

 6    fashion.  And I made the introduction.  I was at that meeting

 7    in New York with Mr. Pritchard.

 8    Q     Do you have a thought on whether or not Regulation D

 9    applies in this case?

10              MR. McLAIN:  Objection, Your Honor.

11              THE COURT:  The objection is sustained.

12    Q     BY MR. EMMICK:  Are all securities lawyers familiar with

13    Section D?

14    A     Yes.

15    Q     Why is that?

16    A     Because it's a very common exemption.  It's a safe harbor

17    for effecting private placements and securities.  If you meet

18    the safe harbor conditions, you're not going to be found

19    effecting a public offering that would be required to be

20    registered.

21    Q     And that's the kind of thing you've come to be familiar

22    with as well?

23    A     Yes.

24    Q     Would you just tell us what Section D is.

25              MR. McLAIN:  Objection, Your Honor.  He's not an
```

1    expert witness.

2              THE COURT:  The objection is sustained.

3              MR. EMMICK:  He just said --

4    Q    BY MR. EMMICK:  Have you ever been an expert witness

5    before?

6              MR. McLAIN:  Objection, Your Honor.

7              THE WITNESS:  Yes.

8              THE COURT:  Objection is sustained.

9    Q    BY MR. EMMICK:  You had mentioned some additional advice

10   that was given to Mr. Pritchard to get additional investments.

11   Did you also give advice about people on the board of

12   directors?

13   A    I did.

14   Q    Tell us what you advised and what Mr. Pritchard's reaction

15   was.

16   A    Well, Mr. Pritchard wanted to upgrade the corporate

17   governance of the company.  It was obviously controlled by

18   Mr. Blauvelt because he owned all the shares early on, and

19   basically he and his wife were on the board.  Mr. Pritchard was

20   on the board with Mr. Mutton, but Mr. -- but everyone is an

21   insider.

22        And therefore Mr. Pritchard said good corporate governance

23   demands independent outside directors to guide the company.  So

24   we advised increasing the board of directors to accommodate

25   independent outside directors, and he wanted to me to introduce

1   him to some if I had any in mind.

2   Q    All right.  And his --

3   A    And I did.

4   Q    And his reaction to that, his response?

5   A    Well, I introduced him to one of the finest corporate

6   governance attorney -- excuse me -- friends that I had.  Arnold

7   Staloff was the former president of the Philadelphia Board of

8   Trade.  When I was general counsel of the Philadelphia Stock

9   Exchange, he was basically our president of our futures

10  exchange.

11       Later on he was hired to be president of the commodities

12  exchange, which sells all of the gold and silver on that

13  exchange in New York, and thereafter he became president of a

14  major brokerage firm in Philadelphia.  And obviously

15  Mr. Staloff was on many boards, understood governance,

16  understood securities regulations; and I felt he would make an

17  excellent independent director for GigaPix's board.  So I

18  recommended him to Mr. Pritchard, and he agreed, and

19  Mr. Blauvelt did accept his admission to the board.

20  Q    And how does that change the dynamics of the company?

21  A    Now you have independent oversight of an independent

22  person that's not an insider; so therefore there would be

23  better governance.  So basically the outside direct investors

24  would be better protected because you don't have an insider

25  that has their salary and other stakeholder rights in mind when

```
 1    they're governing decisions of a macro level, at the board

 2    level.  You have a true independent guy that's very experienced

 3    on corporate governance matters and would create a better

 4    environment to protect the -- the other investors of the

 5    company.

 6    Q    Did you have occasion to talk to a Mr. Mutton?

 7    A    I have.

 8    Q    All right.  Would you tell us who he is and what the

 9    nature of your discussions with Mr. Mutton --

10    A    Like I said, I never met Mr. Mutton in person.  I know he

11    has an English accent and he's a decent fellow.  He was chief

12    financial officer of GigaPix, but quite frankly Mr. Pritchard

13    said, "Let me introduce Mr. Mutton" --

14              MR. McLAIN:  Objection.  Hearsay.

15              THE COURT:  The objection is sustained.

16    Q    BY MR. EMMICK:  All right.  Did you have occasion recently

17    to have discussions with the prosecutor and the agent?

18    A    Yes, I have.

19    Q    All right.  Tell us what happened in the course of those

20    discussions.

21    A    They -- the FBI and the U.S. Attorney's office called me

22    yesterday, approximately 3:25 P.M. west coast time.  I was

23    already in town to become a witness today.  They called me at

24    the hotel.

25    Q    What were they asking about, and what were your reactions?
```

**UNITED STATES DISTRICT COURT**

```
1              MR. McLAIN:  Objection.  Irrelevant.  Hearsay.

2              THE COURT:  The objection is sustained.

3    Q    BY MR. EMMICK:  Sir, have you had enough occasion to speak

4    with Mr. Pritchard in order to develop an opinion of his

5    honesty?

6    A    Absolutely.

7    Q    Would you tell us your view of that.

8    A    He is a man of the highest integrity.  He understands

9    corporate governance and how, you know, to really make a small

10   company thrive through proper structure of its equity table and

11   that he knows the importance of strong independent outside

12   investors.  And therefore that was some of the reasons why he

13   drove the outside investor group to get more percentage

14   ownership without paying more funds to the company.

15        And I think he is a fiduciary in all true sense of the

16   word, meaning that he controls the company and he understands

17   the obligations that are given to those that are not in

18   control, the outside investors.  And he's protecting their

19   rights, I truly believe that.

20   Q    And so he did he have the interests of the shareholders in

21   mind?

22   A    Absolutely.  Every time he talked, he understood that

23   there are stakeholders.  There are insiders.  There are outside

24   investors.  There are employees.  Everyone is important, but he

25   realized that the outside investors are very important because,
```

1    if you don't have them, you cannot raise money and therefore,

2    you know, there would be, you know, not -- not a good long-term

3    plan for the company.

4            MR. EMMICK:  Nothing further, Your Honor.

5            THE COURT:  Cross-examination.

6            MS. AMES:  Thank you, Your Honor.

7                        CROSS-EXAMINATION

8    BY MS. AMES:

9    Q    Good afternoon, sir.  You've mentioned that you were able

10   to speak with Mr. Blauvelt on a number of occasions as well; is

11   that correct?

12   A    Yes, that's correct.

13   Q    And were you able to develop an opinion as to his honesty

14   in his dealings with you?

15   A    Yes, I believe I have developed an opinion.

16   Q    And what was that opinion?

17   A    I think Mr. Blauvelt does not have the sophistication or

18   industry experience of dealing with companies and corporate

19   governance matters that Mr. Pritchard has, but I don't

20   necessarily think he's a dishonest man.  I think he's an honest

21   man but just doesn't have the same experience and level of

22   dealing with governance matters.

23   Q    In those issues you talked about you discussed and worked

24   with Mr. Pritchard, Mr. Blauvelt agreed with your plan to

25   assist --

1    A     Absolutely.  He was in agreement.

2    Q     And your job with GigaPix was to assist it in its efforts

3    to be in compliance with securities laws; is that correct?

4    A     That's part of my job, yes.  Yes, it is.

5    Q     And your assistance in drafting this PPM in 2009 was to

6    ensure that it represented accurately the status of the

7    company; correct?

8    A     Correct.

9    Q     To provide potential investors with all needed information

10   about the company; correct?

11   A     Correct.  Material information.

12   Q     To make sure that there were no omissions?

13   A     Yes.

14   Q     And you wanted to assist the company in running

15   successfully?

16   A     Absolutely.

17          MS. AMES:  No further questions.

18          THE COURT:  Examination.

19               CROSS-EXAMINATION

20   BY MR. McLAIN:

21   Q     Good afternoon, Mr. Uchimoto.

22   A     Good afternoon.

23   Q     Now, I just want to be clear, so you were hired in end of

24   2008, October 2008; is that correct?

25   A     That is correct.

1  Q    So you don't have any information about GigaPix previous

2  to you being hired in October of 2008; is that correct?

3  A    That is not correct.

4  Q    Or let me ask you this way:  Do you have any information

5  concerning what was communicated to investors previous to you

6  working at the company in 2008?

7  A    We did investigations before we took -- take on any

8  engagement to understand, you know, what has transpired with

9  the company, prior to the taking on of the engagement; so we

10 did look at the --

11          THE COURT:  Just a minute.

12      Read the question to the witness.

13          (The record was read.)

14          THE WITNESS:  In a long-winded way, I'm saying, yes,

15 we did look at their past private placements, because they were

16 documents that we wanted to see.

17 Q    BY MR. McLAIN:  Were you privy to conversations between

18 the defendants in this case and investors in GigaPix and/or

19 OZ3D before you were hired in October of 2008?

20 A    Was I a personal witness to --

21 Q    Were you privy to those conversations?

22 A    Was I privy, meaning that --

23 Q    Yes or no?

24 A    The answer is yes by talking to Mr. Blauvelt and

25 Pritchard.  Through conversations I understood what had

1    transpired in the past.  So that makes me privy, but I was not

2    a witness to them talking to investors.

3    Q    So you have no personal knowledge of what was communicated

4    to investors by the time you were hired in October 2008, before

5    that time period, you have no personal knowledge?

6    A    Prior -- prior to our engagement, yes, I have no personal

7    knowledge about prior conversations.

8    Q    So you wouldn't know whether or not misstatements were

9    made to any investors prior to you being hired by GigaPix; is

10   that correct?

11   A    That's -- that's a fair statement.

12   Q    Okay.  And even after you were hired by GigaPix in October

13   of 2008, did you talk to any investors besides the ones for

14   the -- the GigaPix July 2009 PPM, did you have any

15   communications with any of the other 700 investors that

16   invested in GigaPix?

17   A    Once again, we had communications with all the investors

18   that were the subset of the 770 that participated in the July

19   2009 private placement.

20   Q    But there were only 61 accredited investors that

21   participated in the July 2009 PPM offering; correct?

22   A    Right.  There's more offerees.  Some were rejected by us

23   and the company but, right, ultimately 61 were accepted.  So 61

24   in that stock sold --

25   Q    And those would be the only individuals you had any

1   communication with regarding GigaPix and its offerings;

2   correct?

3   A    No.  The ones that were rejected, obviously, more than 61

4   we would have --

5   Q    I'm talking about actual investors in GigaPix.  Obviously,

6   if they were rejected, they didn't invest in --

7   A    Well, they were investors already.  They were investors in

8   GigaPix.  They just didn't participate in the July 2009 PMM

9   offering.

10  Q    So there were actually people who are invested in GigaPix

11  beforehand that when you -- that, after you came in and did the

12  July 2009 PPM, you realized that they were inappropriate to be

13  investors in GigaPix?

14  A    Either their status changed or at the time they were not

15  accredited investors.

16  Q    So they were not accredited investors; so they were

17  rejected from participating in the GigaPix offering; is that

18  correct?

19  A    It might may have been a complex issue, because I remember

20  looking at relatively complicated issues on whether some

21  entity -- it could be an entity.  A lot of people like to

22  invest in a trust or a company, and it could be the trust or

23  the company was not an accredited investor because certain of

24  the beneficiaries in the trust were not accredited investors.

25  So we had to analyze issues like that and make decisions.

**UNITED STATES DISTRICT COURT**

1    Q    So it is your testimony, though, that unaccredited

2    investors had invested in GigaPix before July 2009?

3    A    That's a separate issue.  We're looking at it from

4    July 15, 2009, and thereafter.  To the extent that a person's

5    status might change because their income or net worth goes up

6    or down or they change the holding of their company to another

7    trust or something, that could change circumstances.  So

8    basically someone that was an accredited investor back in a

9    prior offering or private placement could later not be.

10   Q    You just don't know; right?

11   A    I just don't know.  You're right.  Absolutely.

12   Q    And so you -- you made a comment in direct examination

13   that all of the other PPMs took place before Mr. Pritchard was

14   hired.  Do you remember saying that?

15   A    Yes.  I -- yes, I do.

16   Q    Do you know --

17   A    I need to correct that --

18   Q    Do you --

19   A    -- by saying that I know that one was 2007.  Mr. Pritchard

20   may have been technically hired, but we investigated to our

21   satisfaction that he did not participate in supervision or any

22   activities with respect to that one 2007 private placement.

23   Q    And I'm assuming that part of your investigation was

24   talking to Mr. Pritchard and asking him if he participated?

25   A    Yes.

1   Q    And he -- okay.  So you realize that Mr. Pritchard was

2   hired in June of 2006; correct?

3   A    Right.  But I understand he may have --

4   Q    You answered my question.

5   A    Yes.

6   Q    Please let me ask the questions.

7        And you understand that there were private placement

8   memorandums on multiple occasions after that date; correct?

9   A    There was at least -- prior to July 15, 2009, I know that

10  GigaPix had probably one in 2007.

11  Q    And you know there was one in July 2006; correct?

12  A    I -- I would have to review my notes.  I know that

13  there -- there may have been one.  I know there was ones that

14  were earlier than it.

15  Q    And you know there was also an OZ3D private placement in

16  2008; correct?

17  A    That was disclosed in our 2009 July PPM.  Again, that's

18  a -- that's a collateral company that was -- that's not GigaPix

19  but affiliated GigaPix.

20  Q    And you know that between 2006, when Mr. David Pritchard

21  was hired, to 2012, $20 million was raised from investors;

22  correct?

23  A    I don't know for a fact.  I've heard different numbers

24  there.  I don't know for a fact how much was raised.

25  Q    But the only -- the PPM that you worked on, the only one

1    you worked on, you just testified only $880,000 was raised from

2    those investors; correct?

3    A      That is correct.

4    Q      So that would mean that over $21 million was raised from

5    PPMs, that you had no direct involvement in; correct?

6    A      Well, I don't know any -- any numbers on OZ, what was

7    ultimately raised, so I can't --

8    Q      Right.

9    A      I can't answer that question.

10   Q      But if approximately $22 million was raised from the other

11   PPMs from 2006 to 2012, would it be accurate to say that the

12   only involvement you had was in the 880,000 that was raised

13   from the one PPM you worked on?

14   A      Well, I mean, that's two questions you're asking me.

15   Obviously, as part of the disclosure issue of drafting the PPM,

16   we would like to, you know, disclose anything that's relevant

17   in that PPM.  So we would have to put knowledge of that into

18   the PPM for disclosure purposes.

19          But as far as, you know, working on it, you know, getting

20   advice in connection with the earlier PPMs prior to July 2009,

21   we did not give advice on those because we were not engaged as

22   counsel at that time.

23   Q      Now, is it true that you made a statement that, quote,

24   "The key to getting David out of this mess is to distance him

25   from all the offerings except the one he brought me in to

1  advise," the July 2009; is that right?

2  A    That -- that is a -- my belief because I believe that --

3  Q    I'm asking you, is that a quote from you?

4  A    That is a quote from me.  Absolutely.  That's my strong

5  belief because he's not -- I believe he is not --

6  Q    That the key to getting him out of this mess is to

7  distance himself from the other PPMs?

8  A    Because that is what the jury has to be --

9  Q    Yes or no?

10 A    Yes.  Absolutely.

11 Q    Thank you.

12       Now, is all of the information in the July 15, 2009 PMM

13 based on information that you've received from Mr. Pritchard

14 and Mr. Blauvelt?

15 A    And others from the company.

16 Q    And is all the information in that PPM true and accurate?

17 A    To the best of my knowledge, yes.

18 Q    And would you have shown that PPM to Mr. Pritchard before

19 finalizing it to make sure that everything in there was

20 accurate?

21 A    Yes.  It was shown to Mr. Pritchard, among others.

22 Q    So if there's anything in that PPM that's inaccurate,

23 Mr. Pritchard should know about it; correct?

24 A    Yes, he should.

25 Q    Let's take a look at Exhibit No. 255, and let's just look

1   at the bottom of the first -- well, first, let's go to the

2   second page and show the date on the PPM.  255.2.  And if you

3   look at the top, we highlight that date or make it bigger.

4        Can you make it bigger.

5        So this is the PPM that you drafted for GigaPix; correct?

6   July 15, 2009?

7   A    Yes.  It appears to.

8   Q    Now, if we go back to the first page, take a look at that

9   at the bottom.

10       Escape.  Point one.  255.1.  And if you can highlight the

11  bottom portion of that document.

12       And do you see on that document, if you can look at your

13  screen, it talks about the percentage of finders fees or

14  commissions.  Do you see that?  In the second column.

15  A    Oh, yeah.  Yes, the second column.  Finders fees.

16  Q    And is that second column, as it's represented on that

17  screen, is it 10 percent of the investor money if it says

18  300,000 of 3 million?

19  A    Again, that's only if finders fees are paid.  All

20  companies like to reserve the right to pay a finder, knowing

21  it's tough to raise money directly.  So to the extent that a

22  finder is used, the company can pay up to 10 percent if a

23  finder is engaged.  This doesn't assume that a finder is always

24  going to be engaged.

25  Q    So if the salespeople in this case were paid commissions

1     of 20 percent up front, as opposed to 10 percent, would that be

2     a false statement on the first page of this PPM?

3     A     Well, I don't know if --

4     Q     Yes or no?

5     A     -- that would be a false statement.

6     Q     Is it inaccurate?

7     A     Because you could -- again, I would say that that would

8     not be good practice, to pay 20 percent when 10 percent is

9     disclosed.  But say that --

10    Q     Not just be --

11    A     Say that no finders were used and then, you know,

12    therefore the pool of finder money is big; so if you can

13    allocate it, you know, more to, you know, a finder for placing

14    some of the money, in theory you could -- you should be able to

15    possibly do that.  But that would not be best practices.

16    Q     As the lawyer for GigaPix, wouldn't you advise them not to

17    make misstatements on the first page of their PPMs?

18    A     I would say that that's an interpretive issue, but that

19    would not be best practice to pay anyone more than 10 percent

20    if they were, in fact, the finder.

21    Q     You would also advise them that it would be good practice

22    not to tell the investors that they're being -- that the

23    salespeople are being paid 20 percent when actually they're

24    being paid 10 percent; is that correct?

25    A     Could you repeat that question.

**UNITED STATES DISTRICT COURT**

1  Q    I'm sorry.  Would you -- it would not be good practice to

2  tell the investors that the salespeople are being paid

3  10 percent on the PPM when in actuality they're being paid 20

4  percent?

5  A    I wouldn't advise that, absolutely not.

6         THE COURT:  When you say you wouldn't advise it, is

7  that right or wrong?

8         THE WITNESS:  It's wrong.

9  Q    BY MR. McLAIN:  Now, you were -- again, one of your

10 responsibilities was to help draft the July 15, 2009 PPM;

11 correct?

12 A    Yes.

13 Q    And part of that responsibility was to educate

14 Mr. Pritchard and Mr. Blauvelt on the securities rules and

15 regulations, Regulation D and Rule 506; correct?

16 A    That's correct.

17 Q    And you would have advised them of those rules and

18 regulations beginning in October of 2008, all the way until

19 July of 2009 when that PPM came out?

20 A    My time sheet shows that we were really focusing on

21 advising them on Reg D and requirements during the consummation

22 of the private placement on or about July, mid July 2009, is

23 when we were giving very concise advice.

24 Q    So would probably have been May, June, July because it

25 would have been up to --

A    Probably closer to July because that's when the PPM is

ready and now the sales efforts start.  So they should be

advised at that time when it's fresh in their minds what the

requirements of Reg D are.

Q    So by July of 2009?

A    Yes.

Q    And you weren't involved in the OZ3D offering at all;

correct?

A    That is correct.  I was not.

Q    And, in fact, by -- if we take a look at Exhibit No. 105,

please.  Yes.  Page 1.  So by July of 2009, Mr. Pritchard and

Mr. Blauvelt would know that the securities requirement under

Regulation D and Rule 506, they would know those requirements

when they received this check from Jerry and Linda Hampshire?

A    Well, that predates by a week the commencement of the

GigaPix private placement.

Q    That's assuming that you only informed them of the

regulation requirements on the exact day that the private

placement went out; correct?

A    I think it would have been after that date.  My time

sheets, I just looked at them.  I think it was after that date,

to tell you the truth.

Q    The defendants in this case sent out a private placement

memorandum to investors after -- before even knowing what the

securities requirements were for that private placement?

1    A     I'm saying that the PPM, if it was dated July 15, we would

2    have not advised them until it was right -- right, you know, at

3    the date that it was approved.

4    Q     So you're saying the day after?

5    A     Probably July 15th or the day after.

6    Q     So let's take a look at Exhibit No. 42.  Can we look at

7    the second page.  I'm sorry, Exhibit 42.2, yes.

8          If you can highlight the date on that document or the

9    check itself.

10         So now this one is dated the day after the PPM.  So is it

11   fair to say that Mr. Pritchard and Mr. Blauvelt would know the

12   securities requirements under Regulation D and Rule 56 [sic]

13   when they received this check from Danny and Clara Anderson?

14   A     That's a mouthful.  I think there's a distinction between

15   what Mr. Blauvelt may have known and what Mr. Pritchard may

16   have --

17   Q     Definitely Mr. Pritchard because you were in direct

18   contact with Mr. Pritchard?

19   A     No.  But I'm saying the question really is who is really

20   supervising and orchestrating the financing and the

21   fund-raising of OZ3D.  I don't believe it was Mr. Pritchard.  I

22   think Mr. Blauvelt, that was under his watch.  So, I mean,

23   that's why I would make a distinction there.

24   Q     Both of them, by the time this check came in, would know

25   the rules and regulations of Reg D?

```
1   A     What I'm saying --

2   Q     I'm not asking -- I'm asking you to answer my question.

3   So I'm asking, were they aware of the securities requirements

4   by the date of this check?

5   A     Yes.  I believe both were aware of the securities

6   requirements, yes.

7   Q     And now let's take a look at Exhibit No. 63.  63.1.  And

8   so by the date of this check from Mr. Goodman, were both

9   defendants aware of the requirements --

10  A     Yes.

11  Q     -- under the securities laws?

12  A     They should be.

13             MR. McLAIN:  One moment, Your Honor.

14             THE COURT:  You have been giving us your expertise

15  in this thing.  Could you tell us whether or not they would

16  know on December 10th, '09, of the requirements you've put

17  forth for them on these checks.

18             THE WITNESS:  I have advised on the GigaPix private

19  placement.  Again, you know, the OZ3D is a separate private

20  placement.  I don't know what -- what -- what exemptions are

21  being relied upon or what -- again, the federal securities laws

22  are a very complex body of law.  There are multiple exemptions.

23  There are all sorts of myriad of facts why one offering might

24  differ from another.  I did not give advice on this one; so I

25  don't know what advice they were getting or what they knew or
```

1    didn't know.

2         All I could do is opine fairly on the July 15, 2009,

3    GigaPix offering.  That was the -- the parent company.  And,

4    again, this is a separate offing.  So it's really unfair to mix

5    apples and oranges.  Separate offering, I don't know anything

6    about this.

7    Q    BY MR. McLAIN:  But as part of your advisement, you

8    advised concerning Regulation D; correct?

9    A    On the specific facts of the GigaPix July 15, 2009

10   offering.

11   Q    And you --

12   A    Different things.

13   Q    You advised concerning Rule 506; correct?

14   A    In terms of a specific offering, which is very factually

15   specific.  It's very unfair, you know -- the SEC would never

16   give no action relief on separate facts.  That would be

17   completely unfair.  You can't take one offering and say you've

18   advised on that, and now switch over and without the same facts

19   advise with the same law on another separate offering.  That

20   would be not proper, and I'm saying you're mixing apples and

21   oranges completely up.  It's totally unfair to take a look,

22   without knowing any of the facts of the OZ offering, and mix it

23   up with the GigaPix offering which I did advise on.

24   Q    Maybe I misunderstood your testimony.  You said you

25   referenced the OZ 2008 offering in the July 2009 PPM.  So when

1    you referenced it in the July --

2    A    Yes.

3    Q    Let me finish my question, please.

4    A    Sure.

5    Q    So when you referenced the OZ3D PPM in the July 2009

6    GigaPix PPM, you didn't have any knowledge of the OZ3D offering

7    is what you're saying?

8    A    I did.  I knew it because I know that in Hollywood movies,

9    a lot of the financing is financed off balance sheet.

10   Therefore, the bulk of the money may not be raised by the

11   parent company but be raised off the balance sheet and through

12   another separate vehicle, a subsidiary.

13        So therefore OZ was noted as an example of that; so

14   therefore the investors understood that, you know, all the

15   money being raised wouldn't be necessarily the whole amount

16   that would be used for, you know, financing these movies, that

17   the movies would in a sense be financed through other

18   investment vehicles off the balance sheet of the main parent

19   company.  That's all when we disclosed --

20   Q    So when you referenced the OZ3D PPM in the GigaPix PPM for

21   2009, you had never seen the OZ3D PPM?

22   A    I -- I can't say that.  I might have seen it.  I might

23   have seen it but --

24   Q    Might you have read it?

25   A    I might have read it, but again it was not necessarily

```
 1   relevant for purposes of advising on the GigaPix July 15 --

 2   Q    So let's couch your testimony here today.

 3   A    Yes.

 4   Q    So all you're testifying about is the July 15th, 2009,

 5   GigaPix PPM; correct?

 6   A    That is correct.  That is --

 7   Q    That went out to -- you answered the question.  That went

 8   out to 61 accredited investors; correct?

 9   A    Probably went out to 770.

10   Q    Well, that had 61 accredited investors invest in GigaPix;

11   correct?

12   A    That is correct.

13   Q    That raised about $880,000 -- 88 -- $880,000; correct?

14   A    Eight, eight, I -- that's correct.

15   Q    So you can provide no information or no testimony

16   concerning the other 700 or so investors and the other

17   $20 million that was raised from the other GigaPix offerings or

18   the other OZ3D offerings; is that correct?

19   A    I do not know exactly who advised and what advice was

20   given on those.  That is a correct statement.

21            MR. McLAIN:  No further questions, Your Honor.

22            THE COURT:  Redirect.

23                        REDIRECT EXAMINATION

24   BY MR. EMMICK:

25   Q    A few questions, sir.
```

```
 1          First, the PPM went out to all the shareholders; right?
 2   A     Yes.
 3   Q     The one that has all the disclosures that you're talking
 4   about went to all 770 shareholders?
 5   A     That's my belief.
 6               THE COURT:  That's your belief.  Do you know that?
 7               THE WITNESS:  That's what I understand.  I --
 8               THE COURT:  Do you know that?
 9               THE WITNESS:  I do not know that.
10               THE COURT:  All right.
11   Q     BY MR. EMMICK:  Is that the plan?
12   A     That was the plan.
13   Q     All right.  You were shown one page of the PPM, and it had
14   10 percent, and there was some discussion about 20 percent.
15   Who else supplied information about those kinds of numbers, and
16   who else looked at that PPM before it went out?
17               MR. McLAIN:  Objection.  Relevance.
18               THE COURT:  The objection is sustained.
19               MR. EMMICK:  I've --
20   Q     BY MR. EMMICK:  Who else had a chance to see it and make a
21   note whether it might be accurate or not?
22               MR. McLAIN:  Objection.  Relevance.
23               THE COURT:  Objection is sustained.
24               MR. EMMICK:  How could it be?
25               THE COURT:  It's beyond the --
```

1          MR. EMMICK:  Sorry.

2          THE COURT:  Beyond the cross-examination.  Beyond

3  the cross-examination, Counsel.

4  Q    BY MR. EMMICK:  Did anyone else look at it?

5          MR. McLAIN:  Objection.  Relevance.

6          THE COURT:  Objection is sustained.

7  Q    BY MR. EMMICK:  Do you know whether Mr. Pritchard actually

8  looked at that line?

9  A    I don't know for sure.  He was shown the total PPM.  It's

10 a very complex, you know -- you know, lots of complex

11 disclosures in the document.  I don't know what he looked at

12 and didn't.

13 Q    Was it shown to Mr. Blauvelt?

14 A    Yes, it was.

15 Q    Was it shown to Mr. Mutton?

16 A    Yes, it was.

17 Q    Was it shown to Mr. Walker?

18 A    I believe it was.

19 Q    Who else was it shown to?

20 A    I mean, internally at Ingersoll it was shown to a number

21 of attorneys, a tax attorney and a number of our finest

22 corporate specialist attorneys at the firm.  Maybe the -- there

23 was accountants involved too.  I believe they saw it too,

24 accountants.

25 Q    You were asked questions about Regulation D.  Remember

1    that?

2    A      Yes.

3    Q      You were asked questions about Rule 506?

4    A      Yes.

5    Q      Can you tell us what your thoughts are about the

6    applicability of Rule D and 506.

7                MR. McLAIN:  Objection, Your Honor.  He's not an

8    expert on this issue.

9                THE COURT:  Objection is sustained.

10               MR. EMMICK:  Your Honor, they used him --

11               THE COURT:  Please.  The objection has been

12   sustained.

13               MR. EMMICK:  Your Honor, they used him --

14               THE COURT:  The objection has been sustained.

15   Q    BY MR. EMMICK:  Do you have a view on that subject?

16               MR. McLAIN:  Objection, Your Honor.  He's not an

17   expert --

18               THE COURT:  The objection is sustained.

19               MR. EMMICK:  Nothing further.

20               THE COURT:  Recross.

21               MR. McLAIN:  No, Your Honor.

22               THE COURT:  You may step down.

23               THE WITNESS:  Thank you, Your Honor.

24               THE COURT:  Call your next witness.

25               MR. EMMICK:  Calling Mr. Kerry Brooks.  I believe

 1  he's out in the witness room.

 2          THE COURT:  We will take our afternoon adjournment

 3  at this time.  I would remind you of your duty not to converse

 4  or otherwise communicate among yourselves or with anyone upon

 5  any subject touching upon the merits of cause on trial, and you

 6  are not to form or express any opinion in the case until it's

 7  finally submitted to you for your verdict.

 8      Jury is excused until 9:30 tomorrow morning.  Court will

 9  remain in session.

10          THE CLERK:  All rise.

11              (Jury out at 4:35 P.M.)

12              (The following proceedings were held out of the

13              presence of the jury:)

14          THE COURT:  9:30 tomorrow morning.

15              (Matter adjourned at 4:35 P.M.)

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, KHOWOONSUN CHONG, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7    THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8    PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9    FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13   THE UNITED STATES.

14

15          DATED THIS 1ST DAY OF NOVEMBER 2014.

16

17

18          /S/ KHOWOONSUN CHONG

19          _____
            KHOWOONSUN CHONG, CSR NO. 12907, CRR
20          FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25

**UNITED STATES DISTRICT COURT**