1               UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3           HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE

4

5    UNITED STATES OF AMERICA,              )
                                            )
6                        PLAINTIFF,         ) CASE NO.
                                            ) CR 14-282-R
7            VS.                            )
                                            )
8    DAVID PRITCHARD,                       )
     AND CHRISTOPHER BLAUVELT,              )
9                                           )
                         DEFENDANTS.        )
10   _____)

11

12

13

14                   REPORTER'S TRANSCRIPT OF
                       JURY TRIAL - DAY 6
15              TUESDAY, OCTOBER 21, 2014
                          9:46 A.M.
16              LOS ANGELES, CALIFORNIA

17

18

19

20

21

22   _____

23           KHOWOONSUN CHONG, CSR 12907, CRR
              FEDERAL OFFICIAL COURT REPORTER
24          255 EAST TEMPLE STREET, ROOM 181-G
              LOS ANGELES, CALIFORNIA 90012
25                 kchong12907@yahoo.com

                  UNITED STATES DISTRICT COURT

1                    **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        STEPHANIE YONEKURA
         UNITED STATES ATTORNEY
5        BY:  ELLYN MARCUS LINDSAY
         Assistant United States Attorney
6             BYRON J. McLAIN
         Assistant United States Attorney
7        United States Courthouse
         312 North Spring Street
8        Los Angeles, California 90012

9

10   **FOR DEFENDANT PRITCHARD:**

11       LAW OFFICES OF MICHAEL W. EMMICK
         BY:  MICHAEL W. EMMICK
12       ATTORNEY AT LAW
         3701 Highland Avenue, Suite 305
13       Manhattan Beach, California 90266

14

15   **FOR DEFENDANT BLAUVELT:**

16       LAW OFFICES OF STEPHANIE AMES
         BY:  STEPHANIE AMES
17       ATTORNEY AT LAW
         12100 Wilshire Boulevard, Suite 800
18       Los Angeles, California 90025

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1

**I N D E X**

2

Tuesday, October 21, 2014

3

----------------------------------------------------------

4

**CHRONOLOGICAL INDEX OF WITNESSES**

5

6

DEFENSE WITNESSES                                         PAGE

7

KERRITH WAYNE BROOKS
        DIRECT EXAMINATION BY MR. EMMICK              7

8

        CROSS-EXAMINATION BY MR. McLAIN             15

9

JAMES FREDERICK CARDWELL
        DIRECT EXAMINATION BY MR. EMMICK             18

10

        CROSS-EXAMINATION BY MR. McLAIN             26

11

CHRISTOPHER BLAUVELT
        DIRECT EXAMINATION BY MS. AMES              29

12

        CROSS-EXAMINATION BY MR. McLAIN             70
        REDIRECT EXAMINATION BY MS. AMES            87

13

14

GOVERNMENT'S WITNESSES                                    PAGE

15

ADAM STORER
        DIRECT EXAMINATION BY MR. McLAIN            96

16

        CROSS-EXAMINATION BY MS. AMES              103
        REDIRECT EXAMINATION BY MR. McLAIN         109

17

18

19

20

21

22

23

24

25

**INDEX OF EXHIBITS**

MARKED FOR IDENTIFICATION

(NONE)

RECEIVED INTO EVIDENCE

EXHIBIT 235                                                PAGE 97

EXHIBIT 239                                                PAGE 98

```
 1              LOS ANGELES, CALIFORNIA; Tuesday, October 21, 2014

 2                            9:46 A.M.

 3                            -oOo-

 4              THE CLERK:  Calling Item No. 1, CR 14-282-R,

 5   United States of America versus David Pritchard, et al.

 6   Counsel, please state your appearances.

 7              MS. LINDSAY:  Good morning, Your Honor.  Ellyn

 8   Lindsay and Byron McLain for the United States.

 9              MR. EMMICK:  Good morning, Your Honor.  Mike Emmick

10   appearing for David Pritchard.

11              MS. AMES:  Good morning, Your Honor.  Stephanie Ames

12   appearing for Mr. Blauvelt.

13              THE COURT:  Good morning.  Juror No. 8 has called

14   and has indicated that she has a child that has a fever, could

15   not be accepted into child care.  And so we're excusing her and

16   replacing Alternate No. 1, which is Eustolia A.

17         Bring down the jury.

18         Have your man ready.

19              MS. LINDSAY:  Your Honor, I'm sorry.  I have a

20   Justin N. as Juror No. 8.

21              THE COURT:  Beg your pardon?

22              MS. LINDSAY:  I have a Justin N. as Juror No. 8.

23              THE COURT:  No.  He's alternate 2.  She was two --

24   oh, Justin N.  Yes.

25              MS. LINDSAY:  That's the juror.
```

```
 1                THE COURT:  Yes.

 2                MS. LINDSAY:  So male juror.

 3                     (Jury in at 9:48 A.M.)

 4                     (The following proceedings were held in the

 5                      presence of the jury:)

 6                THE COURT:  The record will show the jurors are all

 7     present in their proper places, the defendants are present with

 8     their counsel.

 9          Call your next witness.

10                MR. EMMICK:  Yes, sir.  We call Mr. Kerry Brooks.

11                     KERRITH WAYNE BROOKS,

12     called as a witness by the defense, was sworn and testified as

13     follows:

14                THE CLERK:  Please raise your right hand.  Do you

15     solemnly swear that the testimony you shall give in the cause

16     now pending before this court shall be the truth, the whole

17     truth, and nothing but the truth so help you God?

18                THE WITNESS:  I do.

19                THE CLERK:  Thank you.  Please take a seat and

20     please state your full and true name for the record and spell

21     your last name.

22                THE WITNESS:  Full name is Kerrith Wayne Brooks.

23     Last name is spelled B-r-o-o-k-s.

24                MR. EMMICK:  May I proceed, Your Honor.

25                THE COURT:  Yes.
```

```
 1                      DIRECT EXAMINATION
 2   BY MR. EMMICK:
 3   Q    Mr. Brooks, can you tell us what you do for a living.
 4   A    I am -- I work with companies on fixing and repairing
 5   them.  If they're stuck in a business situation or if there's
 6   been a merger, I'll come in and help them.  I'll organize and
 7   build a go-forward plan.
 8   Q    Is there a shorthand name for that?
 9   A    They call it a fix-it guy.  That's what I do.
10   Q    Where is it that you work geographically?
11   A    Virtually all over the world.
12   Q    Uh-huh.
13   A    It really doesn't matter.  And my -- my travels go to Asia
14   and Europe and also in the U.S.
15   Q    Can you give us a short summary of your background.
16   A    I started with Proctor and Gamble in the brand management
17   side of the business and moved to Coca-Cola.  I worked as brand
18   manager and moved into general business management, and I took
19   those jobs that candidly nobody else would take -- repairing
20   businesses, divisions, and et cetera.  I did that for Coca-Cola
21   and also for Citibank for about 20 -- 22 years.
22   Q    Do you know Mr. David Pritchard?
23   A    Yes, I do.
24   Q    And also are you familiar with GigaPix?
25   A    Yes, I am.
```

```
 1  Q    Can you tell us, as a starting place, how you came to meet
 2  Mr. Pritchard and how long you have known him.
 3  A    I was helping a company in 2010 called Yarn Spinner
 4  Entertainment.  It was an intellectual holding company of
 5  movies and also of TV projects.  And we were discussing --
 6  through GigaPix we were discussing with them about releasing
 7  some of the intellectual property.  So we had discussions at
 8  that stage.  That's when I met David, and that was about 2010.
 9  Q    2010.  Thank you.
10       And after you met David and met GigaPix through him, what
11  happened next?
12  A    Well, what -- what David and I talked about -- David is
13  a -- is what's called a consummate fix-it person, and we kind
14  of shared stories and what we had done throughout our careers.
15  He was in a business bind.  They were looking to raise capital
16  and were struggling doing that.  They had a terrific plan, but
17  they needed some capital to go forward, and we discussed
18  different strategies on how to do that and also different
19  business plans as well.
20  Q    What did he tell you about the nature of the problems?
21  A    Well, David -- in GigaPix, it was run by Mr. Blauvelt.  He
22  was the --
23            MS. AMES:  I'm going to object as to hearsay,
24  Your Honor.
25            THE COURT:  The objection is sustained.
```

UNITED STATES DISTRICT COURT

```
 1  Q    BY MR. EMMICK:  What did you and Mr. Pritchard decide to
 2  do?
 3  A    With the challenges of raising capital, you have to have
 4  an organized and clean company.  And one of the moves that we
 5  felt was necessary in order for that to happen was to have --
 6  to find a way for Mr. Blauvelt to step aside.
 7  Q    All right.  What sorts of ways were contemplated and --
 8            THE COURT:  No.  This is irrelevant to issues of
 9  this case.  Let's not get like we did yesterday and went
10  totally out of this case.  Let's get to this case.
11  Q    BY MR. EMMICK:  What was done with Mr. Pritchard with
12  regard to the structure of GigaPix?
13  A    David and I discussed how to restructure the company, to
14  put it in the position to bring capital in from institutional
15  investors.
16  Q    And why institutional as opposed to private individual
17  investors?
18  A    David was uncomfortable with raising money from capital --
19  from -- from individual resources.  That is not a way to build
20  a company.  He knew that.  He was trying to look towards
21  institutional investors.  And to do that, you had to have your,
22  let's say, house in order is an appropriate way to say that.
23  Q    Did you work at all on the Iowa project?
24  A    I worked --
25            THE COURT:  Please, we're not going into Iowa.  It
```

```
 1   has nothing to do with this lawsuit.  Don't waste time.
 2   Q    BY MR. EMMICK:  Did you have occasion to talk to
 3   Mr. Blauvelt?
 4   A    On a couple of occasions, yes, I did.
 5   Q    All right.  And what did the two of you talk about?
 6   A    We talked about the outlook for the company, and at one
 7   point he asked me what -- what should I do, and I suggested
 8   that he should resign and step aside.
 9   Q    And were any plans discussed with that goal in mind?
10   A    Yes.  Different type of severance packages for him.  We
11   call it a walk-away package, for him to basically get out of
12   the way so the company could go forward.
13   Q    And did he agree?
14   A    Initially, no, he did not.
15   Q    And then were there follow-up discussions?
16   A    Eventually, David was able to persuade him to take a
17   leave.
18   Q    And so what was done?
19   A    He did exit for a period of time, and at that time David
20   was pulling together the documentation you need to sit down
21   with investors.  They're pretty comprehensive, and through that
22   process he was getting ready to sit down and talk with
23   institutional investors and had just begun the process.  And I
24   had attended one of those early institutional investor
25   discussions.
```

```
 1   Q     You had mentioned that he stepped aside for a time.  What
 2   was the restructuring that was done in his absence?
 3                THE COURT:  That's not relevant to this case.  Let's
 4   get to this case.
 5   Q     BY MR. EMMICK:  Did you have discussions with
 6   Mr. Pritchard about the role of cold calling and different
 7   methods of fund-raising?
 8   A     Yes.
 9   Q     Can you tell us what Mr. Pritchard said.
10                MS. AMES:  Objection.  Hearsay.
11                THE COURT:  Objection is sustained.
12   Q     BY MR. EMMICK:  Describe how many times you had
13   discussions with him on that subject.
14   A     I would say three to four times.  We discussed that over
15   the -- over the period of time.
16   Q     And based in part on what he said, what was the approach
17   that you took with respect to cold-calling as the way to
18   acquire money, or perhaps fund-raising in other ways?
19   A     Mr. Pritchard was extraordinarily uncomfortable with this
20   and was trying to find ways not to do that at all, had coached
21   Mr. Blauvelt to let's get out of that business, that's not the
22   right thing for the company.  And that was not received very
23   well by Mr. Blauvelt.
24   Q     Did he indicate a preference for a different kind of
25   investor?
```

1    A     Yes, he did.

2    Q     What sort of investor did he express a preference for?

3    A     Professional institutional investors who -- who invest in

4    entertainment companies.

5    Q     And did you have discussions with Mr. Blauvelt as well on

6    that subject?

7    A     Just that this is the direction that could potentially

8    help the company and get the company from its current position,

9    which they were stuck to a growth platform.

10   Q     In connection with that work, did you also have occasion

11   to speak with Mr. Mutton?

12   A     Yes, I did.

13   Q     All right.  Could you tell us about your discussions with

14   Mr. Mutton.

15                 MR. McLAIN:  Objection.  Calls for hearsay.

16                 THE COURT:  Objection is sustained.

17                 MR. EMMICK:  Your Honor, it's offered --

18                 THE COURT:  The objection is sustained.

19   Q     BY MR. EMMICK:  Did you also have conversations with

20   Mr. Walker?

21                 MR. McLAIN:  Objection.  Calls for hearsay.

22                 THE COURT:  Objection is sustained.

23   Q     BY MR. EMMICK:  Did you have occasion to come to know

24   whether Mr. Pritchard had been paid the entire salary during

25   his time at GigaPix?

```
 1              MR. McLAIN:  Objection.  Calls for hearsay.
 2              THE COURT:  Objection is sustained.
 3   Q    BY MR. EMMICK:  Did you hear from Mr. Pritchard whether he
 4   had given up some of the money during this time?
 5              MR. McLAIN:  Same objection, Your Honor.
 6              THE COURT:  The objection is sustained.
 7         Let's get to this case, Counsel.
 8   Q    BY MR. EMMICK:  Do you know whether Mr. Pritchard gave up
 9   some of his money in order to come to GigaPix?  Did he
10   contribute, commit money to GigaPix?
11              MR. McLAIN:  Same objection, Your Honor.
12              THE COURT:  The objection is sustained.
13   Q    BY MR. EMMICK:  What is it that Mr. Pritchard wanted to do
14   with respect to shareholders?
15              MR. McLAIN:  Same objection.
16              THE COURT:  The objection is sustained.
17              MR. EMMICK:  Your Honor, this is --
18              THE COURT:  No, Counsel.  This case is about what
19   happened to the men who did invest.  That's what this case is
20   about, the investors who were cold-called.  That's what this
21   case is about, nothing else.  Now get to it.
22              MR. EMMICK:  If I might just make a short comment.
23              THE COURT:  No.  You're not testifying.
24              MR. EMMICK:  I wouldn't.
25   Q    BY MR. EMMICK:  And what were you paid in connection with
```

1    the work you did with GigaPix?

2    A    Nothing.

3    Q    Did you come to know what Mr. Pritchard was being paid?

4    A    At the time he was not being paid.  He took no salary.

5    Q    Did you have discussions with him about whether he

6    should --

7            MR. McLAIN:  Objection, Your Honor.  Calls for

8    hearsay.

9            THE COURT:  The objection is sustained.

10           MR. EMMICK:  At least the answer would be yes or no,

11   Your Honor.

12           THE COURT:  The objection is sustained, Counsel.

13   Q    BY MR. EMMICK:  How long did you work with Mr. Pritchard?

14   A    I -- I helped him out for about a two-year period, 20 to

15   24 months.

16   Q    Did you come to have a view about Mr. Pritchard's

17   character for honesty, perseverance, hard work?

18   A    I did.  He had the consummate DNA of a fix-it person,

19   which they look towards themselves last.  He took care of the

20   team and helped the company.  He was what I would call a

21   gentleman that was aligned with the team and also investors.

22   Q    And did you have a view about his commitment and perhaps

23   his character for making sacrifices?

24           MR. McLAIN:  Objection.  Irrelevant.

25           THE COURT:  The objection is sustained.

**UNITED STATES DISTRICT COURT**

```
 1   Q    BY MR. EMMICK:  Did he communicate with you why he wanted
 2   to use sophisticated investors --
 3              MR. McLAIN:  Objection.  Calls for hearsay.
 4              THE COURT:  Objection is sustained.
 5              MR. EMMICK:  Your Honor, he --
 6              THE COURT:  Don't, Counsel.  The objection is
 7   sustained.  Don't do that, Mr. Emmick.  Do not do that.
 8              MR. EMMICK:  Nothing further, Your Honor.
 9              THE COURT:  Cross-examination, Defendant Blauvelt.
10              MS. AMES:  No questions, Your Honor.
11              THE COURT:  Government.
12              MR. McLAIN:  Very briefly, Your Honor.
13                        CROSS-EXAMINATION
14   BY MR. McLAIN:
15   Q    Mr. Brooks, you mentioned that you got to know
16   Mr. Pritchard in 2010; correct?
17   A    Yes, sir.
18   Q    Do you know approximately when in 2010 that was?  Was it
19   the end of 2010, middle, beginning?
20   A    No.  I think it was the first quarter of 2010.
21   Q    And prior to the first quarter of 2010, is it true that
22   you have no personal knowledge of what any investor was told
23   about GigaPix or OZ3D?
24   A    Yes, sir.
25   Q    Now, you mentioned that you were brought in and you spoke
```

```
 1   to institutional investors; correct?

 2   A     Yes.

 3   Q     And that would be high net worth or rich people?

 4   A     No, not necessarily.  These were funds.

 5   Q     But funds with a lot of money?

 6   A     Yes.

 7   Q     And in your conversations or in trying to solicit money

 8   for GigaPix from these institutional funds, did you ever

 9   mention to them that returns on their investment would be

10   guaranteed?

11   A     No, sir.

12   Q     Did you ever mention to them that there was little or no

13   risk in any of their investments in GigaPix?

14   A     No, sir.

15   Q     Did you ever mention to them that they needed to invest

16   soon or they would miss the opportunity of a lifetime to invest

17   in GigaPix?

18   A     No, sir.

19   Q     Did you ever mention to them that GigaPix was financially

20   successful?

21   A     No, sir.

22   Q     Did you ever mention to them that the movie OZ3D would be

23   in theaters within the first -- within the next six to eight

24   months?

25   A     No, sir.
```

```
 1  Q     Did you ever mention to them that GigaPix had hired

 2  Ernst & Young to audit GigaPix and was in the middle of a

 3  five-year audit?

 4  A     No, sir.

 5  Q     You mentioned that Mr. David Pritchard was an honest

 6  person, in your opinion --

 7  A     Yes, sir.

 8  Q     -- on direct examination.

 9  A     Yes, sir.

10  Q     If you knew Mr. David Pritchard had sent out a letter to

11  individual investors, saying that Ernst & Young was hired by

12  GigaPix and was in the middle of a five-year audit and that

13  that was not true, would that affect your opinion of

14  Mr. Pritchard's honesty?

15  A     It would concern me, yes.

16             MR. McLAIN:  No further questions, Your Honor.

17             THE COURT:  Redirect.

18             MR. EMMICK:  No redirect, Your Honor.

19             THE COURT:  You may step down.

20        Call your next witness.

21             MR. EMMICK:  Call Mr. Jim Cardwell.

22                  JAMES FREDERICK CARDWELL,

23  called as a witness by the defense, was sworn and testified as

24  follows:

25             THE CLERK:  Stand right there.  Please face me.
```

UNITED STATES DISTRICT COURT

```
 1   Please raise your right hand.  Do you solemnly swear the
 2   testimony you shall give in the cause now pending before this
 3   court shall be the truth, the whole truth, and nothing but the
 4   truth so help you God?
 5              THE WITNESS:  Yes.
 6              THE CLERK:  Thank you.  Please take a seat and
 7   please state your full and true name for the record and spell
 8   your last name.
 9              THE WITNESS:  James Frederick Cardwell,
10   C-a-r-d-w-e-l-l.
11                      DIRECT EXAMINATION
12   BY MR. EMMICK:
13   Q    Mr. Cardwell, can we start off with just giving us a short
14   description of your -- your job and perhaps your background and
15   history.
16   A    I was at Warner Bros. for approximately 30 years, between
17   1977 and 2006.  Prior to that I was with Coopers & Lybrand, who
18   were a public accounting firm, for four years.  Prior to that I
19   was in college.
20   Q    Fair enough.  Did you eventually have occasion to talk
21   with David Pritchard?
22   A    Yes.
23   Q    Can you tell us when you had occasion to talk to
24   Mr. Pritchard.
25   A    It was -- the first time I spoke to him was either late
```

1  2010 or early 2011.

2  Q    What was the context of your discussions with

3  Mr. Pritchard?

4  A    He wanted some help at GigaPix, wanted some experienced

5  entertainment people to come in and help him turn the company

6  around.

7  Q    And what was the nature of your Warner Bros. work that

8  might make him want to talk with you about that?

9  A    I worked at some point for every division at Warner Bros.,

10  which is probably one of the biggest studios.  I have a very

11  broad entertainment background.

12  Q    And you mentioned that was in 2010 that you started

13  speaking with him.  How did that arise, and what was it you

14  were speaking with him about?

15  A    I was introduced to him by the then general counsel at

16  GigaPix, who was a personal friend.  And we discussed trying to

17  make the company more profitable, increase its liquidity.  And

18  if there was a -- if we could do that, there may be a job for

19  me as CEO or some senior executive position.

20  Q    And what was the context of that?  Were there going to be

21  any changes within the structure of GigaPix?

22  A    Not within the structure of GigaPix.  There might have

23  been some attempts to improve the financial structure.

24  Q    And so you were going to play some role with the board of

25  directors or some role as a possible CEO?

```
1    A     Possibly, yes.  Never defined or committed, but it was
2    discussed.
3    Q     And did you play any sort of a role in connection with
4    setting up agreements with OZ3D?
5    A     No.
6    Q     Can you tell us what you did with respect to OZ3D at all.
7    A     Sometime in 2012 David asked me if I could try and get it
8    financed.  I went to Canada to meet with a company called Arc
9    Holdings, who were an animation house and post house, and tried
10   to work with them to get Canadian tax rebate money plus some
11   deferred payment terms from them to enable us to get
12   substantial financing for OZ, with a view through getting the
13   balance through pre-sales.
14   Q     What was the goal of that?
15   A     To get OZ into production.
16   Q     And what was Mr. Pritchard's view on the importance of
17   getting OZ into production?
18   A     It's extremely important, if you're a motion picture
19   production and distribution company, to have product and to be
20   seen, to be making movies.
21   Q     Tell us then about the role of getting those investments
22   or loans or other sources of funding for OZ.
23   A     I only got as far as the Canadian tax rebates and the
24   deferred dating from Arc.  I never got into loans or sales.
25   Q     And did you play any role in connection with the
```

```
 1   consideration of Toronto as a possible place for some of this
 2   work?
 3   A     Yes.
 4   Q     Would you tell us about that.
 5   A     I reviewed the budget, went over it with the people from
 6   Toronto.  We had a loose agreement that they would defer their
 7   expenses so that we could pay them out of revenues.  And I
 8   researched the tax incentive programs for Canada, Ontario, and
 9   Toronto.
10   Q     And what was done to try to carry out the Toronto part of
11   GigaPix's work?
12   A     It fell apart for two reasons.
13   Q     All right.  Tell us.
14   A     Firstly, the person who had been involved prior to me had
15   not researched --
16             MS. AMES:  Objection as to hearsay, Your Honor.
17             THE COURT:  Objection sustained.
18   Q     BY MR. EMMICK:  Do you know why it fell apart?
19   A     Yes.  It was two reasons.  Firstly, the -- the -- my
20   previous --
21             MS. AMES:  Same objection, Your Honor.
22             THE COURT:  Objection sustained.
23             THE WITNESS:  Um --
24             THE COURT:  No.  Objection has been sustained.
25             THE WITNESS:  Okay.
```

1   Q    BY MR. EMMICK:  Did the lenders decide not to go forward?

2   A    There were no lenders.

3   Q    Okay.  And why were there no lenders?

4        MS. AMES:  Objection.  Hearsay.

5        THE COURT:  The objection is sustained.

6   Q    BY MR. EMMICK:  Do you know why there were no lenders?

7        MS. AMES:  Same objection.

8        THE COURT:  The objection is sustained.

9   Q    BY MR. EMMICK:  Why didn't the project go forward?

10  A    The tax incentive programs that they qualified us for

11  carried huge onerous criteria that GigaPix would have to go

12  through, and I wanted them to change the tax incentives to

13  different programs, which they refused to do.  That's the first

14  reason.

15       The second reason was that Arc committed significant

16  monies --

17  Q    Arc is what again?

18  A    That was the production company in Toronto, which agreed

19  it should have been deferred, but they wanted to get extra

20  payment.  There was two reasons.

21  Q    And that approach did not work?

22  A    No.

23  Q    Did you try any other ways to keep --

24       THE COURT:  The statement made by counsel is

25  stricken.  He's not testifying.

```
1              MR. EMMICK:  I think the words were --

2              THE COURT:  There's no answer to that.

3    Q    BY MR. EMMICK:  Did you take any other steps to try to get

4    GigaPix going forward?

5    A    Relating to OZ?

6    Q    Either GigaPix or to OZ, yes.

7    A    OZ, no.  I'd previously put together some documentation

8    for private placements in conjunction with general counsel.

9    Q    Was there any consideration given to a merger process?

10   A    Yes.

11   Q    All right.  Tell us what that was.

12   A    It was a reverse merger merging GigaPix into a company

13   whose name I -- Go Pops, I think, was the name.  But it was

14   traded publicly under a different name which I can't remember.

15   Q    What would be Mr. Blauvelt's role in connection with that

16   company?

17             MS. AMES:  Objection.  Relevance.

18             THE COURT:  The objection is sustained.

19   Q    BY MR. EMMICK:  What happened overall to these plans?

20   A    Nothing ever got finalized.

21   Q    Okay.  Meaning what?

22   A    Meaning that they fell apart.

23   Q    And what caused them to fall apart?

24             MS. AMES:  Object as to relevance.

25             THE COURT:  The objection is sustained.
```

**UNITED STATES DISTRICT COURT**

1   Q    BY MR. EMMICK:  Did it matter that Blauvelt came back to

2   the company?

3              MS. AMES:  Objection.  Relevance.

4              THE COURT:  The objection is sustained.

5   Q    BY MR. EMMICK:  Was there any effort to go down to

6   Louisiana to make another possible merger, help the

7   shareholders at GigaPix?

8              THE COURT:  Let's get to this case, Mr. Emmick, to

9   this case.

10             MR. EMMICK:  We are trying to get to this case.

11             THE COURT:  The persons who were investing in these

12  things in 2008, 2009, 2010, and 2011.

13  Q    BY MR. EMMICK:  Can you give us an overview of the

14  problems at GigaPix.

15  A    It seemed that there was management disagreement.

16  Q    Meaning what?

17  A    At the top of the company, I think David Pritchard wanted

18  to go one way and Chris Blauvelt wanted to go another.

19  Q    Can you tell us what the one way and the other way were.

20             MS. AMES:  I'll object as to knowledge of this.

21             THE COURT:  Objection sustained.

22  Q    BY MR. EMMICK:  Did you ever have conversations with a

23  fellow by the name of mutton?

24  A    Yes.

25  Q    All right.  What were the conversations about, and what

```
1    did you conclude?

2            MR. McLAIN:  Objection.  Calls for hearsay.

3            THE COURT:  Objection is sustained.

4            MR. EMMICK:  Your Honor, the --

5            THE COURT:  The objection is sustained, Counsel.

6            MR. EMMICK:  But he's not even asking --

7            THE COURT:  Objection is sustained.  Please do not

8    do that, Mr. Emmick.

9            MR. EMMICK:  Just one moment, Your Honor.

10   Q    BY MR. EMMICK:  In the course of your discussions with

11   Mr. Pritchard, did you come to have a view about his character

12   for honesty or integrity?

13   A    Yes.

14   Q    What would that be?

15   A    I thought he had extremely high integrity and honesty and

16   good character.

17   Q    Did he seem interested in the shareholders?

18   A    He was very focused on the shareholders and also very

19   focused on maintaining the company of the employees.

20   Q    And what makes you conclude that?

21   A    I was there every day for a year and a half.

22           MR. EMMICK:  Nothing further, Your Honor.

23           THE COURT:  Cross-examination, Defendant Blauvelt?

24           MS. AMES:  Nothing, Your Honor.

25           THE COURT:  Government?
```

```
 1              MR. McLAIN:  Very briefly, Your Honor.
 2                       CROSS-EXAMINATION
 3   BY MR. McLAIN:
 4   Q    So now, Mr. Cardwell, you mentioned that you first learned
 5   about GigaPix in late 2010 or early 2011; is that correct?
 6   A    That's correct.
 7   Q    So you have no personal knowledge one way or the other
 8   what was communicated to individual investors prior to late
 9   2010 or early 2011?
10   A    That's correct.
11   Q    You also made reference in direct examination that you
12   tried go get OZ3D financed in 2012; is that correct?
13   A    Correct.
14   Q    And that you said, quote, that in 2012 the goal was to get
15   OZ3D in production; is that right?
16   A    Correct.
17   Q    So is it your testimony that OZ3D was not in production in
18   2012?
19   A    It was not in physical production in 2012.
20   Q    Now, you also mentioned that you communicated with various
21   institutional investors; is that right?
22   A    No.
23   Q    You did not communicate with any investors?
24   A    No, not institutional investors.
25   Q    Did you communicate with any high net worth investors?
```

```
1    A      No.

2    Q      Now, you mentioned that Mr. Pritchard had a character for

3    honesty.  Is that your testimony?  Is that right?

4    A      It was my opinion, yes.

5    Q      Now, if you knew that Mr. Pritchard had communicated with

6    investors and told them that E&Y, Ernst & Young, was hired to

7    audit GigaPix and was in the middle of a five-year audit of

8    GigaPix and that was not true, would that impact your opinion

9    of his character for honesty?

10   A      If it was proven to be true, yes.

11              MR. McLAIN:  No further questions, Your Honor.

12              THE COURT:  Redirect.

13              MR. EMMICK:  None.

14              THE COURT:  You may step down.

15              THE WITNESS:  Thank you.

16              THE COURT:  Call your next witness.

17              MR. EMMICK:  Your Honor, the defense rests as to

18   Mr. Pritchard.

19              THE COURT:  Okay.

20          Defendant Blauvelt, call your first witness.

21              MS. AMES:  Your Honor, I just have one witness.  I

22   might ask if we could just take a brief recess.

23              THE COURT:  Members of the jury, we'll take a short,

24   very short recess now.  I would remind you of your duty not to

25   converse or otherwise communicate among yourselves or with
```

1   anyone upon any subject touching the merits of the cause on

2   trial.  And you are not to form or express any opinion on the

3   case until it is finally submitted to you for your verdict.

4        Jury is excused until called.

5        Court will remain in session.

6             THE CLERK:  All rise.

7                 (Jury out at 10:17 A.M.)

8                 (The following proceedings were held out of the

9                 presence of the jury:)

10            THE COURT:  Ten minutes.

11                (Recess taken.)

12            THE COURT:  Bring down the jury.

13                (Jury in at 10:32 A.M.)

14                (The following proceedings were held in the

15                presence of the jury:)

16            THE COURT:  Record will show the jurors are all

17   present in their proper places.  The defendants are present

18   with their counsel.

19                      CHRISTOPHER BLAUVELT,

20   a defendant herein, called as a witness on his own behalf, was

21   sworn and testified as follows:

22            MS. AMES:  Your Honor, may I --

23            THE CLERK:  Please raise your right hand.  Do you

24   solemnly swear the testimony you shall give in the cause now

25   pending before this court shall be the truth, the whole truth,

 1   and nothing but the truth so help you God?

 2            THE WITNESS:  I do.

 3            THE CLERK:  Thank you.  Please state your full and

 4   true name for the record.  And spell your last name.

 5            THE WITNESS:  My name is Christopher James Blauvelt.

 6   Last name is spelled B-l-a-u-v-e-l-t.

 7            MS. AMES:  May I proceed, Your Honor.

 8                      DIRECT EXAMINATION

 9   BY MS. AMES:

10   Q    Mr. Blauvelt, I would like you to first give the jury a

11   brief background of your business experience prior to creating

12   GigaPix in 2002.

13   A    My background primarily has been involved with sales.  I

14   started off my career in my early twenties, working for a

15   company here in Los Angeles called Automatic Dispenser

16   Equipment Company.  They sold Coca-Cola products and beverage

17   equipment, ice machines, and products like that.  I started out

18   as a truck driver, and I worked my way up to a salesman and a

19   few years later became a sales manager.  We had a few companies

20   like McDonald's, Burger King, Coca-Cola, Hollywood Park, Santa

21   Anita.  We built the company into the largest independent

22   Coca-Cola distributor in the United States.

23        After that I started my own company, B&B Beverage, with a

24   partner.  We operated for about ten years here in Los Angeles,

25   and our clients included Coca-Cola, Hills Bros Coffee,

1    companies like that.  So I had business experience operating

2    businesses.

3         And then I started a consulting business where I was

4    working with startup companies.

5         And then I started -- in 2002 I started GigaPix Studios,

6    came up with the idea and started GigaPix Studios.

7    Q    And what was your purpose in starting GigaPix studios?

8    A    I saw that there was a real opportunity here.  I had been

9    watching Pixar, enjoying their movies.  I noticed they had won

10   Academy Awards with a very short film they did a few years ago.

11   It involved a lamp that danced around.  It was done in 3D, done

12   by John Lasseter.  Then they followed up with a movie called

13   Toy Story.  It did very well in the box office, did

14   $800 million.  So I had been watching this very interestingly.

15        What happened was someone had wanted me to invest in a

16   cartoon series based on talking crayons, and I thought the idea

17   of the cartoon series was limited.  But I thought, well, you

18   know, if you find the right people, you can create a company

19   like Pixar; so I recruited a fellow by the name of John Savage.

20   He was a very technically savvy person.  He had a degree from

21   Brigham Young University.  He was a keynote speaker in their

22   graduation.  He, as an undergraduate, taught computer science

23   there and was a very qualified person, and we started off the

24   company in December of 2002.

25        We built the company very small.  We did an initial

```
 1    private placement, and we raised about $4.5 million.  And we
 2    bought supercomputers and bought all kinds of equipment and
 3    had -- we had people working for us.
 4         By the way, as far as -- go ahead.
 5    Q    I was just about to ask you as to what you did with
 6    Mr. Savage to further develop the company.
 7    A    Well, we -- we went out and we looked for business.  In
 8    other words, we found some work with Hills -- not Hills Bros
 9    but Merrill Lynch.  We did a company commercial for them.
10    There was a company called --
11              THE REPORTER:  Can you slow down, please.
12              THE WITNESS:  Sorry.  I'm a little bit nervous.
13         So we found some companies.  We did some work for them,
14    and we started to develop the business.
15    Q    BY MS. AMES:  And at some point, though, you discerned
16    that Mr. Savage wasn't able to -- to move the company as far
17    along as you had -- had hoped; is that correct?  And so he left
18    the company?
19    A    Right.  Well, that took him about four years, actually.
20    We had gone through a lot of trials and tribulations.  We had a
21    number of projects we pitched at Disney, we pitched at Cartoon
22    Network.  We weren't successful.  We weren't able to achieve --
23    the goal of the company was to do an animated feature.  We
24    wanted to be a creative company like Pixar.
25         He didn't have the business acumen.  He was very good
```

1    technically, but he didn't know about distribution, about how

2    to set up the business aspects of the entertainment company.

3    So we were kind of floundering for four years.

4          I'm going too fast.  Sorry.

5          So the -- he and I had some issues.  He --

6    Q    I'm just going to stop you.

7          As a result of the company not moving the way you wanted

8    it to, is it correct that you later sought out Mr. Pritchard

9    to -- to --

10              THE COURT:  Don't lead the witness.

11              MS. AMES:  I'm just trying to get to the area.

12   Q    BY MS. AMES:  2006, would you tell us what happened in

13   2006.

14   A    Well, John had done a -- put together a project for the

15   Henson Company that just floundered and we didn't make any

16   money.  It cost us quite a bit of money and about nine months'

17   worth of time.  It was a proof of concept project, and it just

18   didn't work out.

19          We had some disagreements, and he decided to sever ties,

20   and we agreed to separate, and he left the company and gave

21   back the stock that he had.  He originally was granted

22   25 percent of the company stock, and I had the -- about

23   51 percent share myself, and he gave it back to the company.

24   Q    And so then in 2006 what took place with the leadership of

25   the company?

1   A      Well, once John left the company, I went out and I was

2   running the company myself.  And I hired a fellow by the name

3   of Zeke Kamm as a -- as a creative director.  I'd realized in

4   dealing with John that it wasn't just the pictures and the

5   visuals that were going to make the movies go.  It's really

6   story driven.  In all entertainment, it's story driven.  So

7   Zeke was very qualified in that he had written over 200

8   episodes of cartoons, and I felt that he would be a great asset

9   to the company.

10         Along with him, I hired some technical people in addition

11   to the ones we already had under John Savage and brought on

12   Clark Graff to run our visual effects department, which we

13   started doing visual effects for a number of different

14   companies.

15   Q      And can you tell us some of these companies that you did

16   work for.

17   A      Off the top of my head, we did work for Nickelodeon.  We

18   had done work for Warren Miller Productions, the people that do

19   the ski films.  We did quite a few different things.

20         And then shortly after we were launching the -- shortly

21   after we were launching our visual effects division, that's

22   when Zeke mentioned to me that he knew a fellow who might be a

23   real good fit for us and mentioned that he knew David

24   Pritchard, and he was -- I was introduced to David Pritchard.

25   Q      So why did you bring Mr. Pritchard on board?

A      Well, I looked at his background, and he had run three

publicly traded firms and he looked really qualified.  He

produced the Simpsons, King of the Hill, and the Family Guy.

And I felt that -- you know, doing a little bit of research

about him, I felt he was going to be a good fit for our company

to help us, provide for us some of the things we had been

missing in the past and make us really go forward.

Q      Now, as part of this -- where were you located at that

time?

A      We originally started in about a 2,200 square foot

facility over on Topanga Canyon in Canoga Park.  But once John

was going along and we built the company, we moved to

Chatsworth and had a 36,000 square foot facility.  We had six

edit bays.

       The nice part about the location was it was already set

up.  It was an entertainment company prior to us going in, they

had already set it up perfectly for us.  They had a computer

room for us.  It was all air conditioned.  We had

supercomputers that cost us several million dollars.  We spent

quite a bit of money and equipment; so it was really an ideal

location for us.  It was a big place, and we felt we would be

able to produce a film there.  We had room for about 80 to 100

people, which is what would be required to produce a film.

Q      And so how were you approaching generating the money in

order to produce these films?

1  A    Well, originally we weren't raising money for the film.

2  We were raising money for the company.

3  Q    Okay.

4  A    The way we originally -- I had a -- about six people that

5  started off with me, and we did what's called straight sell.

6  In other words, I had a giant database of people that I had

7  formerly contacted.

8       The -- one of the things that I've heard in testimony here

9  is they're talking about our regulations and our exemptions.

10 And we felt that we were exempt because I had a giant database

11 of people I had contacted previous to going into GigaPix that

12 we talked about when I was with other companies, and I had that

13 preexisting relationship with them.  So we felt that we met the

14 exemptions, and we did a straight sell.  In other words, we

15 didn't use openers.  We had -- I supplied names and numbers to

16 the six people that were working for us.  We contacted people,

17 and that's how we raised the money.

18 Q    And as part of that -- that raise, did you create a

19 private placement memorandum?

20 A    Yes.  I hired an SEC attorney, a former SEC attorney by

21 the name of Ed Swanson, and he created the documentation for

22 us.

23 Q    And how did you go about presenting this private placement

24 memoranda to potential investors?

25 A    Well, the idea, we would contact people and tell them that

1    we had a company.  We had information we'd like to send them,

2    and if they'd be interested we would be more than happy to send

3    them.  What we would generally do is tell them what we had done

4    so far, who were the people working for us.

5         And we found a lot of people very interested because, when

6    you described digital animation, it was at the time a very

7    exciting thing in -- in entertainment.  It was the latest

8    thing, and so we wanted to take advantage of that.  And, you

9    know, when we'd say we were doing digitally animated features,

10   that was our goal, people liked that idea and were interested

11   in seeing the information.

12   Q    And about how many salespeople did you have at that point

13   in time?

14   A    Initially we started off with six, but when we moved into

15   the larger office, we ended up probably with about 12.

16   Q    And when Tiffany Ryan was testifying sometime last week,

17   she talked about how you were looking for accredited investors.

18   Was that correct?

19   A    Yes, that's correct.  You know, my -- there's no --

20   there's no benefit to looking for people that are not

21   accredited.  Why would you look for poor people to make an

22   investment?  We were always looking for accredited investors.

23   We were looking for people that were sophisticated.  I wasn't

24   about to try and take any food off of anybody's table or any

25   medicine out of their medicine cabinet.  We wanted to make sure

1    we did everything the right way.

2        So we hired the right attorneys.  We created documentation

3    that was correct, and we made sure -- as you also heard

4    Ken Gross, our sales manager describing it, we always made sure

5    we were looking for accredited investors.

6    Q    You mentioned Ken Gross.  What was his role there at the

7    company?

8    A    Ken was there when I started the company.  As a matter of

9    fact, he might have even come up with the idea for the name

10   GigaPix.  And he was very helpful.  He was the sales manager,

11   and he managed the sales team.

12       In fact, we had a very sophisticated phone system, and we

13   were actually able to listen in on the phone calls, and we used

14   that for training and to make sure people weren't

15   misrepresenting to any of the investors.  And Ken monitored

16   those systems and would offer sales meetings and did a sales

17   type -- sales manager job.

18   Q    Did you monitor some of those sales calls as well?

19   A    Yes.

20   Q    And during those times that you were monitoring it, did

21   you find that any of your salespeople were misrepresenting the

22   status of GigaPix to the investors?

23   A    Not often, but I would have -- you know, on occasion I

24   would hear someone say something wrong, and I would actually go

25   to the person, have them put the person on hold, and then I

**UNITED STATES DISTRICT COURT**

```
 1    would -- I would get on the phone myself, and I would say, "I'm
 2    sorry.  My name is Chris Blauvelt.  I happened to be walking by
 3    the office.  I heard something that wasn't quite right.  Let me
 4    straighten this out."  And I would make sure that I explained
 5    to them how it was properly said and stated.  And in many cases
 6    I would say, "Thank you very much for your interest" and
 7    "goodbye."  If I saw something that had been done wrong, I
 8    would stop the call immediately.
 9    Q    Do you recall any of those in particular, any type of
10    mistakes that maybe a salesperson might make?
11    A    Anytime you're going to guarantee an investment, that
12    would be a mistake, obviously, or, you know, when you start
13    saying we're going to do something now or in the future.
14    There's things, if you say it as a fact that something is going
15    to happen, and -- and it doesn't happen, it's a dangerous thing
16    to get into.  So you have to use wording which would indicate
17    that it's not -- you know, this is what we plan to do rather
18    than this is what we're going to do.
19    Q    And did you have any type of sales meetings to direct the
20    salespeople to make sure they gave correct information?
21    A    Yes.  Usually on a weekly basis, and everybody -- not only
22    just the salespeople would be involved, but John Savage would
23    be involved.  And when David Pritchard came on board, he was
24    involved in the sales meetings as well.
25    Q    Now, we've talked a little bit about accredited versus
```

**UNITED STATES DISTRICT COURT**

1    unaccredited investors.  Was there something that you sent out

2    to potential investors to determine if they were accredited or

3    unaccredited?

4    A    Right.  What would happen in the phone conversation is

5    that you would see if the person was interested in receiving

6    the investment information, which is the investment package.  I

7    think you've seen one of the investment packages.  They're a

8    folder, and they have the private placement memorandum inside.

9         We also had a company newsletter that we had created on a

10   quarterly basis that had pictures of new employees.  It had

11   pictures of the acquisitions and computers and the things we

12   were buying.  It had pictures of the, you know, the new studio

13   and all kinds -- we would make sure our investors were kept

14   updated as far as what was going on.

15        So what was your question again?  Say the question again.

16   Q    I was asking, was there anything that you sent out to

17   potential investors to confirm or assure whether they were

18   accredited or unaccredited?

19   A    Right.  So in addition to the PPM, we also had some

20   newsletters that could go out.  We basically -- I'm not talking

21   about the newsletters you saw on the screen here.  I'm talking

22   about actually with a masthead, and they were a little bit

23   different.  I don't know if you have any as evidence here.  I

24   didn't see any, but we had a few things like that in the

25   package.

**UNITED STATES DISTRICT COURT**

1       And then we had -- along with the private placement

2   memorandum, we had the signature page and the private placement

3   questionnaire, which was a questionnaire that the investors

4   would answer to determine if they were qualified to make the

5   investment.

6   Q    And I'm showing you what's previously been marked as

7   Government's Exhibit No. 23.  Is this a sample letter of the

8   type of form letter that would be sent out with part of the

9   package to potential investors?

10  A    Yes.  Basically every single package that went out went

11  out with my name and my -- a letter addressed -- in other

12  words, we would use an Excel program.  We input the person's

13  name, address, phone number, and information about them.  And

14  then it would -- at the end of the day, we would generate a

15  letter, a form letter, thank you for taking interest or taking

16  a look at the information, and so it was done on a daily basis.

17       Now, you'll notice that's a stamp.  In other words, every

18  single day, at the end of the day, there might be five or six

19  or seven of those, and they would use that stamp to stamp my

20  name on it.  So that's just a form letter that goes out with

21  the package.

22  Q    And then, as part of the package as well, you included

23  kind of a brochure about GigaPix; is that correct?

24  A    Right.  That's actually some of the artwork that we had

25  done on a project that was -- we ended up utilizing it for the

UNITED STATES DISTRICT COURT

1    OZ package, but it was actually for a project we were working

2    on called The Last Circus, which was a project that Zeke Kamm

3    and I were working on, a feature film based on a kid whose

4    grandfather got injured in the circus.  It was one of the

5    projects that Zeke and I were working on.

6    Q    And this is marked as Government's -- additionally as

7    Government's Exhibit No. 23.  And page 2, it continues on and

8    it gives -- what was the purpose of this brochure?

9    A    Well, we wanted to show the viability as far as -- I can't

10   see.  There we go.  There's a picture of David and I.  That's

11   in the package.  Those are his Emmys in the background.  He won

12   those Emmys for -- I'm not sure, but he's actually a five-time

13   Emmy Award winner.  You can see I was a little bit thicker,

14   fatter then and younger, of course, and so is David.

15   Q    And it was a big deal to have someone with Mr. Pritchard's

16   background working with GigaPix; is that correct?

17   A    In my opinion, David Pritchard is probably one of the --

18   he has an excellent bio.  How many people have won five Emmys

19   in their life?  When he came on board -- in addition to that,

20   he's produced countless films and other television shows he's

21   developed that we haven't talked about, but he has a tremendous

22   track record.

23   Q    And then as part of this package that you sent out, was

24   there something that was called a subscriber questionnaire?

25   A    Yes.

**UNITED STATES DISTRICT COURT**

```
1    Q     What was the purpose of that questionnaire?

2    A     To make sure that the person -- well, I'm not sure if you

3    could bring it up there.  It's to make sure the person was

4    qualified to invest.

5    Q     Okay.  And that begins, looks like Government's Exhibit

6    No. 23 at page 72.  This is the subscription agreement.  That's

7    different, though, than the questionnaire; correct?

8    A     If you turn the page so I can review it there, yeah, it

9    is.

10   Q     But then if we move to page 73, can you see that -- or 75,

11   excuse me.  Is this the confidential investor questionnaire

12   that you've referred to?

13   A     Yeah, that's part of it.

14   Q     And would this be the first contact that the investor

15   would have with you at GigaPix?

16   A     Most cases, yes.  What happened is they would be contacted

17   by one of our reps, and they would be sent the package.  The

18   follow-up call would then happen, and if the person was

19   interested in making investment, they would fill out all the

20   documentation, include a check, and send it in.  And we would

21   review the information and determine whether or not we wanted

22   to proceed and deposit the check.

23   Q     Now, you say that you would review the information to

24   determine if you were -- if you wanted to deposit the check.

25   Were there some that you declined?
```

```
 1   A     Actually, yes.  There was an instance where I got a check,
 2   and it had really shaky handwriting.  In fact, it was one of
 3   the things I should have brought up with Ken Gross, sitting
 4   right here.  It was shaky handwriting, and it just didn't look
 5   right to me; so I called the fellow up, and he was an old man.
 6   He was about 85 years old, and I started talking to him, and it
 7   didn't seem right.  It was a hundred thousand dollar
 8   investment, and I started speaking with him, and I realized
 9   that this guy might have Alzheimer's or some kind of a problem,
10   and I actually had that money sent back.
11   Q     Were there other occasions where you determined an
12   investor wasn't accredited and sent them back?
13   A     There was a few, but I don't -- it was a number of times,
14   yes.
15   Q     And, in fact, on this subscription agreement, if I might,
16   it also contains -- can you -- can you see that?  Is that close
17   enough that you can read that?  It also contains a summary of
18   financial information of the company as of 2006 and 2007; is
19   that correct?
20   A     Are you looking at -- is this a PPM that you're looking
21   at?
22   Q     Yes.
23   A     That PPM is different from the signature pages you were
24   just talking about.  In a PPM there are certain things that are
25   required, from my understanding.  I've done this for a while
```

UNITED STATES DISTRICT COURT

1   now.  You need a business plan, you need the management team,

2   and you need a use of proceeds.  And this is the use of

3   proceeds.

4   Q    Okay.  And was this PPM sent out to investors?

5   A    Yes.

6   Q    And is this what Mr. Swanson the attorney had assisted you

7   in preparing?

8   A    Yes.  You know, securities attorneys don't write these

9   from scratch.  They actually use programs.  Basically, it's a

10  fill-in-the-blank program.  They pop it up on their computers

11  and they put in the business plan.  They put in the, you know,

12  use of proceeds, the things unique to that particular company.

13  But most of the information is in the -- in the programs that

14  they use on their computers.

15  Q    So on this particular PPM, you notified the investors or

16  potential investors that it looks like you were at a net loss

17  at that point; is that correct?

18  A    Yes.  We never lied to our investors as far as --

19           THE REPORTER:  Slow down, please.

20           THE WITNESS:  As far as the financial situation, I

21  never lied to any of the investors about where we were

22  financially.  And so the -- the documentation reflected

23  financial information that we're aware of.

24  Q    BY MS. AMES:  Now, you've talked a little bit about the

25  investors in general.  What kind of -- walk us through the

```
 1    process.  So you've gotten the subscriber or the questionnaires
 2    back.  Do you then personally contact the individuals or does
 3    another salesperson?  How does that work?
 4    A     No, there's no other sales -- at that point the
 5    salesperson is the representative, and they're not turned over
 6    to anybody else.  Those representatives deal with their people
 7    for as long as they're working there.
 8          And I in most cases talk with them, but in some cases I
 9    didn't.  There was a period of time where I was very sick.  I
10    have a lot of health issues.  I have a bad heart, and I have
11    another -- a number of issues that I've had that prevented me
12    from always doing my job properly.  But we did the most -- the
13    best we could.
14    Q     And so did you talk with most of your investors or all of
15    them or just a few of them?  What was --
16    A     I would say, over the period of time of the 12 years that
17    I ran the company, I would say I talked to almost every single
18    one of them at one point or another.
19    Q     And was this prior to their making an investment or
20    afterwards?
21    A     Both.  It would be -- I would sometimes speak with people
22    prior to making investments, and sometimes I would follow-up.
23    Or if they called in, primarily what would happen is people
24    would call in, and I ended up speaking with them when they
25    would call in and ask to speak with me.
```

1    Q      During those conversations did you ever tell an investor

2    that GigaPix was like Pixar or comparable to Pixar?

3    A      We actually tried to use a business model like Pixar; so

4    we were similar.  My goal was to create a company like Pixar.

5    Q      So what would you tell the investors in comparing

6    yourselves to Pixar?

7    A      We would like to be like Pixar.

8    Q      Did you ever tell an investor that there was no risk or

9    very little risk?

10   A      Absolutely not.  I told them this is a high-risk

11   investment.  This has to be considered high risk, and it says

12   it all over the information we sent people.  I never, ever said

13   it was a low-risk investment to anybody.

14   Q      And did you make sure that it showed in -- in the

15   documents that you sent investors as to whether it was high

16   risk or not?

17   A      On the front page of every private placement memorandum,

18   it says this is a high-risk investment.

19   Q      Did you ever tell investors there was an urgency and they

20   had to invest very quickly for any reason?

21   A      That would depend on when.  Every single offering

22   memorandum has a time date; so there's a very good possibility

23   it could be running out.  So it could be a fair answer, a short

24   period of time.

25          Also, let's say you had a million shares left and you had

```
 1   a big investor that decided to buy a million shares.  There
 2   would be none left for anybody else; so there is an urgency
 3   involved.
 4   Q    Now, I'd like to talk for just a moment about some of your
 5   salespeople.  Was there an individual by the name of Cherie
 6   Brown that worked for your company?
 7   A    Yeah.  Cherie Brown worked for the company later on.  She
 8   actually was brought in by David Pritchard.  He knew her
 9   somehow and was aware of her and said she would be a good fit
10   for our company, and she came in just prior to us starting to
11   fund OZ3D, I think.  I'm not sure what year that was.  Might
12   have been 2008 or -9, somewhere in there.
13   Q    To your knowledge, were you aware of any
14   misrepresentations that she made to any investors?
15   A    In my opinion, Cherie Brown was -- sold very straight and
16   didn't misrep.
17   Q    And what would you have done if you had determined that
18   she was making any misrepresentations?
19   A    I fired a number of people -- if I determined they were
20   misrepping, I fired a number of people.
21   Q    So you did, in fact, fire some of your salespeople for
22   misrepresentations?
23   A    Yes.
24   Q    Who were those individuals?
25   A    Well, I actually ended up firing the fellow that
```

**UNITED STATES DISTRICT COURT**

1  introduced Mr. Uchimoto to David Pritchard, Nick Hines.  I

2  ended up firing him because I caught him saying something.  I

3  don't recall exactly what it was, but I remember firing him for

4  misrepresentation.

5       I also fired Greg Pusateri two times.  Unfortunately, I

6  should have never brought him back, but I -- I -- once we ran

7  into some regulatory issues that were based on some of the

8  things he had said, I fired Greg Pusateri.

9  Q    And why did you bring him back?

10 A    He promised -- he had two children.  I felt bad for him.

11 David -- the thing about Greg Pusateri is he wasn't really a

12 telemarketing guy necessarily.  He was a guy who won an Emmy

13 himself.  He was a sound editor.  He's not a hardcore

14 telemarketer.  This is a guy who was an Emmy Award winner, and

15 he thought he really became a salesman.

16      So I felt bad.  He had two children, and he didn't -- he

17 needed a job.  And the insurance was good, and he promised me

18 that he wouldn't -- you know, he would -- he would do the right

19 job.

20 Q    And did you do anything to oversee him, to make sure that

21 he -- that he was being straight with the investors?

22 A    Yes.  Like I said, we had a system on our phones when we

23 were in Chatsworth, which is the prime -- you know, the

24 majority of the time, where we could oversee and listen to the

25 phone conversations.

1    Q    And how often did you do that?

2    A    Constantly.

3    Q    Daily, weekly?

4    A    Daily.  When we would hear somebody making a pitch, we

5    would get on the phone and listen to them.

6    Q    And the purpose of that was?

7    A    To make sure the things were done properly and to help

8    them, assist them in -- in making a sale.

9    Q    Now, we heard from a couple of investors in GigaPix, and I

10   would like to discuss them briefly.

11        Mr. Anderson -- do you recall Mr. Anderson?

12   A    I do recall Mr. Anderson.

13   Q    Do you recall how Mr. Anderson came to be an investor in

14   GigaPix?

15   A    Mr. Anderson stated here he was a referral.  He wasn't a

16   cold call.  He stated on the stand here.

17   Q    And did you have any contact with Mr. Anderson prior to

18   receiving his subscription questionnaire?

19   A    No.  I never -- I never met him.  In fact, I didn't speak

20   with him until much later.  I'm not sure when the first time

21   was, and I vaguely remember, but I don't even recall trying to

22   sell him anything ever.  But like I said, I have 750

23   stockholders; so I don't remember the particulars.  But I can

24   tell you for certain, based on his testimony, that he -- when

25   he -- I was shocked when he said that I told him that we were

1    in production because I would never say that to anybody because

2    I know full well that we weren't in production on OZ.

3    Q    So you never said that to him?

4    A    Never said that.

5    Q    Did you ever tell him that you were in the process of

6    filming?

7    A    Filming OZ?

8    Q    Yes.

9    A    There's no filming in animated feature.

10   Q    Did you ever discuss the financial situation of the

11   company with him?

12   A    I did -- I believe I did.  When we did our private

13   placement, we told people that we needed some money and that's

14   why we were doing the private placement, we were running out of

15   money.

16   Q    So what would you have told him about the financial

17   situation?

18            THE COURT:  What would have?  No.  That's

19   irrelevant.

20            THE WITNESS:  And I -- as far as did I tell them --

21            THE COURT:  Would have, no.

22   Q    BY MS. AMES:  Sorry.  There's not a question pending.

23   Hold on one moment.

24        So, sir, you've mentioned that he was a referral.  Again

25   I'm showing you Government's Exhibit No. 34.  Would this have

```
1   been your first contact with Mr. Anderson?
2   A     This is the form letter I discussed with you earlier where
3   it would go out as a matter of course with every package.
4   Every single package that ever went out came out with that
5   letter.
6   Q     And then, as a course of your business, you would have
7   received the signed and checked subscriber questionnaire --
8   A     Yes.
9   Q     -- is that correct?
10  A     And on that particular evidence, I noticed that
11  Mr. Anderson had indicated that he was -- if you'd like to
12  bring that up, he indicated he was an accredited investor.
13  Q     And what you're referring to here is Government's Exhibit
14  No. 35 at page 9; is that correct?
15  A     That's correct.
16  Q     And that's where there's the initials HOA for accredited
17  investor status?
18  A     Yes, ma'am.
19  Q     And the purpose of having this was for them to verify
20  whether or not they were accredited?
21  A     Yes.
22  Q     And then you would continue a relationship with them based
23  upon them being accredited?
24  A     Well, I was pleased he was accredited.  We were looking
25  for people that had money, that had, you know, a good net worth
```

1    that could afford to make this investment.

2    Q    So what I'm trying to get at, this was all you knew about

3    him; correct?

4    A    Right.

5    Q    You never met him?

6    A    I never -- I've never met him in person.  I never set eyes

7    on the man.  In fact, he didn't identify either David or

8    myself.  He's never met us.  In fact, I don't know how he can

9    know that it was even me that he was talking to.  It was seven

10   years -- six years ago on the phone is what he was alleging,

11   and I thought that was kind of interesting.

12   Q    Well, and, in fact, sir, you don't recall ever having a

13   conversation with him and Mr. Pritchard on the phone; is that

14   correct?

15   A    I'm -- I'm quite certain that David Pritchard and I never

16   had a conference call with him.  That's just -- I'd never did

17   that.

18   Q    Was that just not part of the way you run business?

19   A    It was my company.  I didn't need to include somebody else

20   to help me make a sale.

21   Q    Now, regarding Mr. Goodman, do you recall him testifying?

22   A    Yes, I do.

23   Q    Did you ever have any conversations with Mr. Goodman?

24   A    I don't recall.

25   Q    In your conversations, would you ever tell an investor --

```
 1              THE COURT:  "Would you" is not relevant.
 2              MS. AMES:  Sorry, Your Honor.
 3              THE WITNESS:  I would like to talk about Mr. Goodman
 4    for a second.
 5              MR. McLAIN:  Objection, Your Honor.  I don't think
 6    there's a question.
 7              THE COURT:  Objection is sustained.
 8    Q    BY MS. AMES:  Just one moment.  Let me get my notes.
 9    A    I do have a recollection of Mr. Goodman.
10              MR. McLAIN:  Objection, Your Honor.
11              THE COURT:  Let your lawyer do it.
12              THE WITNESS:  Okay.
13    Q    BY MS. AMES:  And, sir, what is your recollection of any
14    communications with Mr. Goodman?
15    A    Well, when Mr. Goodman sat on the stand here and said the
16    first person he spoke with was Greg Pusateri, that was
17    incorrect.  We had a joke that -- I had a salesperson named
18    Jeff Goodman who worked for us, and the joke was that that
19    was -- he told me that was his brother.  And as far as I know,
20    he was a referral too.  I don't believe he was cold-called, but
21    Jeff Goodman was actually the person that sold him, not Greg
22    Pusateri like he originally said on the stand.
23         And I noticed that, when we went farther into it in your
24    cross-examination, he said, "Oh, right, Jeff.  That's right."
25    So he did remember that Greg Pusateri wasn't the person that he
```

1  spoke with originally.

2  Q    Well, and Mr. Goodman would have been a person that had

3  initial contact with potential investors; is that right?

4  A    Yes.  He was one of our representatives.

5  Q    Would you have been a person to have initial contact with

6  a potential investor?

7  A    No.

8  Q    So you would not be the person who would -- who would call

9  someone initially from GigaPix?

10  A    No.

11  Q    So you would only talk with the person after they had

12  talked with one of your salespeople; is that correct?

13  A    Yes.

14  Q    Do you recall ever having discussed GigaPix's financial

15  situation with Mr. Goodman?

16  A    No.  In fact, like I said, I don't recall having a

17  conversation with Mr. Goodman at all.

18  Q    And did you ever meet Mr. Goodman at GigaPix?

19  A    No.  When Mr. Goodman came to the GigaPix office, I didn't

20  meet him.  I don't know who he met.  He did say he met

21  Cherie Brown and she toured him around, and I'm not sure who

22  she introduced him to.

23  Q    So you had no personal knowledge of Mr. Goodman other than

24  what he said in his subscription agreement?

25  A    I know he was a stockholder.  I know their names, and I

1    saw his subscription agreement, but I had no other knowledge of

2    him.

3    Q    Would you know his age?

4    A    Yes.  Based on that I believe that I -- I didn't know that

5    he -- I'm sure, when he invested, he was in his seventies.

6    Q    And would that give you any concern?

7    A    I think age does make a difference.  You have to make sure

8    that the people are -- are not too old for this type of

9    investment because it's a long-term investment and it's fairly

10   high risk.  So you have to -- you know, or as we described, it

11   is a high-risk investment; so there are certain things that for

12   older people may not be appropriate.

13   Q    But with Mr. Goodman it didn't give you any particular

14   concern?

15   A    No.  He -- I believe he initialed he was accredited

16   investor also.  Do you have the documentation?

17   Q    No.  But it was your understanding that all of the

18   individuals were accredited investors; is that correct?

19   A    For the most part, yes.

20   Q    Now, sir, did you ever tell Mr. Goodman that everything

21   was going well at GigaPix?

22   A    I don't recall, but there was a period of time where

23   things were going well.  We made a movie that won the Sundance

24   Film Festival.  We made a documentary we sold to Discovery

25   Network.  We had a television division that had a show on

1   Comedy Central; so that is good.

2   Q    Did you ever tell Mr. Goodman that OZ3D would be released

3   in theaters shortly?

4   A    I didn't say that.  People would ask me a lot of times

5   about OZ3D and say, when is it going to be in theaters?  And I

6   was told by David Pritchard that once production started it

7   would probably be about a ninety -- I'm sorry -- a nine-month

8   process.  So the answer would be that once production starts

9   it's approximately nine months before the film is finished.

10  Q    Did you ever tell Mr. Goodman that the company was doing

11  so well that you were going to sell your shares?

12  A    No.

13  Q    What was the reason that you were selling some of your

14  additional shares?

15  A    I didn't sell any of my additional shares.  Basically, we

16  did a reorganization or a structuring that I think we've

17  discussed here.  And I don't want to keep going over this

18  because I know that we discussed it before, but we did a

19  reorganization where I gave back, voluntarily gave back some of

20  my shares to the investors so that they had a -- there were

21  several things.

22       First of all, there were three issue -- three different

23  types of stock.  There was preferred stock, which carried a

24  four-to-one return based on income the company made.  Then

25  there was a common stock that had a warrant -- offering had

```
 1    warrants attached to it.  For every share of stock you buy, you
 2    got four warrants, and you could exercise those warrants at a
 3    later date for a dollar a share.  So we had all these different
 4    types of stock.  So the attorney Bill -- what's the attorney
 5    with Bill -- Uchimuchi?  What's his name?
 6    Q     Uchimoto?
 7    A     Uchimoto.  He mentioned -- it was a little bit confusing
 8    because we had different classes of stock, and so we had to
 9    straighten that up.  In doing so, I ended up giving back some
10    of my stock and giving the -- the -- all the warrants to the
11    investors for free.
12    Q     And so did you discuss that with some of the investors?
13    A     Yes, sometimes.
14    Q     Now, there's been some discussion about cease and desist
15    orders, and I'd like to talk with you about that for a moment.
16    A     Okay.
17    Q     When did you receive the first cease and desist?
18    A     This is pretty important.  This is -- the first cease and
19    desist, a fellow that I knew wanted to come and work for me
20    over the Christmas holidays because he needed some money and
21    felt that he --
22              MR. McLAIN:  Objection.  Nonresponsive.
23              THE COURT:  The objection is sustained.
24    Q     BY MS. AMES:  Sir, just explain the -- what happened with
25    the cease and desist in Wisconsin.
```

**UNITED STATES DISTRICT COURT**

```
 1  A     Yes.  The cease and desist in Wisconsin was because we
 2  hadn't registered the stock.  There was no allegations of fraud
 3  or anything else that I could see in that documentation.  In
 4  fact, they don't even use the word "cease and desist" in the
 5  offering.  They call it a letter of prohibition.  There's no --
 6  not one word in that document says "cease and desist."
 7            MS. AMES:  And if I could just have one moment,
 8  Your Honor, to confirm something.
 9  Q     BY MS. AMES:  And, sir, is this the order of prohibition
10  that you were just referring to from Wisconsin?
11  A     Can you -- I can't see the whole thing.  It's -- I believe
12  so.  I think there was more to it.  It might have been a couple
13  of pages.
14  Q     Okay.  And what was the basis -- what were you ordered to
15  do by this?
16  A     There was no fine.  We were -- and we were -- agreed not
17  to send any more packages or trying to sell anybody in
18  Wisconsin, and we didn't after that.
19  Q     In fact, it notes that you're prohibited from employing an
20  agent in Wisconsin unless that agent is licensed; is that
21  correct?
22  A     Right.  So we stopped selling in Wisconsin.  We never --
23  after that point.
24  Q     Now, did you disclose to investors that order of
25  prohibition in Wisconsin?
```

```
1   A      Here -- that was the thing that got us in trouble.

2   Q      Why don't you explain that.

3   A      I will.  What happened was we got the letter of

4   prohibition.  Two years later we are -- we do an offering

5   memorandum that was overseen by David Pritchard and included

6   his information.  Anytime that we did an offering memorandum or

7   PPM, David was very involved in it and --

8   Q      And were you involved in that as well?

9   A      Yes.

10  Q      And did you have an attorney prepare those documents for

11  you?

12  A      Yes.  Initially, it was Ed Swanson and also we had

13  Nadia Davari, who was our in-house attorney that examined

14  documents over some of the offerings as well.  But we neglected

15  to put in that we had the -- the letter of prohibition because

16  I didn't -- it didn't say "cease and desist."  It just said

17  "letter of prohibition," and we should have put that in.  It

18  was a big error or omission.

19         And what happened was somebody -- I believe it was

20  California -- sent a package to the attorney general of State

21  of California, and when they looked on Google, they found that

22  there was the letter of prohibition from Wisconsin.  They

23  compared it to the document and saw that we didn't include it,

24  and it got us in big trouble because it was an omission.  It

25  was very -- apparently it was very important, and we goofed up.
```

```
 1   Q    Did you intend to -- to fail to disclose that order of
 2   prohibition?
 3   A    No.  I -- I mean, did I intend to do it?  Of course not.
 4   Q    So it was -- it was an oversight --
 5             THE COURT:  No, don't --
 6   Q    BY MS. AMES:  -- or mistake?
 7             THE COURT:  No, no, no.
 8             THE WITNESS:  We -- everybody missed it, and it
 9   went -- we did the offing without putting it in there, and it
10   got us in a lot of trouble.  In fact, from there on out, that
11   was when things really went bad because the attorney generals
12   in these different states share information, and so from that
13   point on we got --
14             MR. McLAIN:  Objection.  Unresponsive.
15             THE COURT:  Objection is sustained.  No question
16   pending.
17   Q    BY MS. AMES:  Did you receive a number of different
18   states' cease and desists as a result of that failure to
19   disclose?
20   A    Yes.
21   Q    And what did you do to correct that error?
22   A    We hired attorneys.  We had a fellow by the name of
23   Jeff Kravitz who was working with a firm here in Los Angeles
24   who initially handled the cease and desist in California.
25        And we wanted to get it off the record.  We wanted that to
```

UNITED STATES DISTRICT COURT

```
 1   go away.  We wanted that -- we wanted to be compliant.  So we
 2   ended up actually working with the State.  We were compliant.
 3   We sent them, all of our stockholders, 340 files of all the
 4   documentation, all the signature pages.  It cost us about
 5   $250,000 in legal fees.  And we -- there was an investigation
 6   for approximately nine months.
 7   Q    And this is your dealings with California; is that
 8   correct?
 9   A    Yes.
10   Q    And as a result of those dealings, you worked out some
11   sort of stipulation with the State of California; is that
12   correct?
13   A    Yes.  We received a small fine, and I forget what it was,
14   might have been $20,000 or something like that.  You'd have to
15   look, but the final stipulation has been entered into evidence
16   as well.  I don't remember it.  You can look at it.
17   Q    And --
18   A    But I know that on page 3, Item 3 of the final
19   stipulation, it does state that we could continue to sell from
20   that point.
21   Q    And what I'm showing you is Government's Exhibit No. 204,
22   and you say it's page 3, and is this what you were referring
23   to, sir?
24   A    Yes.  Could you read that?
25   Q    That nothing in the above-mentioned order is intended to
```

```
 1    prevent --
 2              THE COURT:  Counsel, you are questioning.
 3              MS. AMES:  Yes.
 4              THE COURT:  Not he.  He's not questioning.
 5              THE WITNESS:  I can't --
 6              THE COURT:  And he's not telling you what to do.
 7              MS. AMES:  Yes, Your Honor.  I apologize.
 8    Q    BY MS. AMES:  Mr. Blauvelt, would you please tell us what
 9    it says at paragraph number 3.  Can you read that?
10    A    It's hard.  You're moving it, so it's moving.
11    Q    Sorry.  Let me get it closer.
12    A    Sure.  It says, nothing in the above-mentioned order is
13    intended to prevent respondents from offering and selling any
14    security pursuant to a qualification or any exemption from the
15    qualification requirement under the Corporations Code.
16    Q    And so what was your understanding of what you could and
17    couldn't do as a result of this stipulation?
18    A    Well, we resolved the issues with California.  We were
19    allowed to continue to raise funds for our company.
20    Q    And so did you do so?
21    A    Yes.
22    Q    And it was your understanding that you were now in
23    compliance?
24    A    Well, for the most part.  We did subsequent offerings that
25    we believed we were in compliance, yes.
```

UNITED STATES DISTRICT COURT

```
1   Q    And did you disclose those cease and desists to the

2   investors in your PPMs after that?

3   A    Yes.

4   Q    And how did you do that?

5   A    In type.  We spelled it out.

6   Q    And you identified each and every one of the cease and

7   desists in the PPM; is that correct?

8   A    Yes.

9   Q    And, sir, also in the PPMs you disclosed all of the

10  financial aspects of the company; is that correct?

11  A    Financial --

12  Q    The profit and loss statements, is that accurate?

13  A    Are those the ones -- which PPM are you talking about?

14  Q    Well, in each one of the PPMs that you submitted, you

15  showed profit and loss statements of some sort; isn't that

16  correct?

17  A    I don't recall.  I'd have to see.  I mean, you're asking

18  me kind of a question.  I would like to see what you're talking

19  about.

20  Q    I understand.  Since I'm not finding it right now, let me

21  change my questions for just a moment.

22       Sir, did you receive compensation as an executive at

23  GigaPix?

24  A    Yes.  Let me back up and -- the compensation that I

25  received was spelled out in the documentation.  But going back
```

```
 1   to when David Pritchard came on board and even further than
 2   that, the agreement I had with John Savage was that he had a
 3   specific amount of stock equivalent to about 25 percent of the
 4   company, and he and I would make the same amount of money.
 5        And I offered the same deal to David Pritchard where he
 6   would get 25 percent of the stock and we would make the same
 7   amount of money.  And he agreed to that initially, and then
 8   subsequently he felt later that he wanted to be more of a 50/50
 9   partner.  We did receive -- whenever I paid myself, I paid him.
10   And initially we made $4,000 a week, and as we were doing
11   better and we -- we had a little bit more money, I realized
12   that -- or he realized that, you know, we could afford to pay
13   ourselves more money.  So we ran it by Colin, and we started
14   paying ourselves slightly more.
15        But there was a period -- you know, he's talking about
16   times when he was getting paid.  I got the -- I got less money
17   than he did ultimately.  So when he says he was broke and he
18   wasn't getting paid, I wasn't getting paid either.
19   Q    But you disclosed the executive payment in your PPMs to
20   investors --
21   A    Yes.
22   Q    -- is that correct?
23   A    Yes, we did.
24   Q    Sir, did you ever spend any GigaPix money on -- on a
25   mortgage?
```

**UNITED STATES DISTRICT COURT**

1    A       Never.

2    Q       Any -- any for your car?

3    A       No.  I -- GigaPix money was never used.  I used any --

4    GigaPix money was used judiciously.  And car payments, house

5    payments came out of my salary, and I paid through my own

6    personal accounts.  And so the answer is no, never did that.

7    Q       Same with boating expenses?

8    A       I -- I had an old boat, and old, old sailboat, '73

9    Catalina.  And my boating expense was $400 a month for the slip

10   fees, and I paid that out of my own money.

11   Q       So -- so would there have been any expense for $29,000 for

12   a boat?

13   A       Not from -- no.

14   Q       Because your boat wasn't even worth that?

15   A       I bought it for $15,000 to begin with, and I had it for 18

16   years.  And I -- I bought it in the nineties; so I had it for,

17   like -- I owned it for 18 years.  The expenses to the boat was

18   $400 a month for the slip fees.  So for -- you know, for ten

19   months, that's $4,000.  I mean, I don't know where the -- you

20   know, that kind of figure could have even --

21   Q       So that information that -- when it shows under personal

22   expense breakdown, that's just incorrect?

23   A       Well, I'm looking at these figures, and I don't know how

24   they came up with them at all.  There's a lot of things I found

25   glaringly wrong.  And, in fact, the witness for the FBI, the

**UNITED STATES DISTRICT COURT**

1    lady who did the forensic accounting included a separate

2    company in the forensic accounting which had no business being

3    included.

4              THE COURT:  There's no question pending.

5    Q    BY MS. AMES:  And which -- which company was included that

6    should not have been included?

7    A    Survey Says.

8    Q    And tell us what that was.

9    A    Well, when we ran into some regulatory problems, part of

10   the problem with cold calling is -- is exactly that, a lot of

11   people frown on cold calling.  So I came up with an idea that

12   would create leads for the company without cold calling,

13   accredited leads.  And basically what we did is we -- I made a

14   deal with some investment -- or with some investment lead

15   companies, that I would take their old leads and have people

16   call them and do a survey.  There's no telemarketing laws

17   against doing a survey.

18        And it did two things for us.  It found us accredited

19   investors, number one, and created a preexisting relationship.

20   So in other words, if I'm contacting you, using my company to

21   do surveys with people, they're my clients at that point on a

22   survey basis.  Then to use those same leads for our salespeople

23   is what I thought would be a viable solution to the preexisting

24   relationship issues that we had with the Regulation D/506

25   offering.

```
1    Q    So that's what Survey Says was?

2    A    Yes.  It was an experiment.  We didn't do it very long.  I

3    think I had the people doing surveys for probably less than

4    nine months.

5    Q    Now, sir, also during Ms. Pinkerton's testimony, she

6    discussed a number of bank accounts.  And, in fact, she showed

7    us Government's Exhibit No. 150.  Do you see that in front of

8    you?

9    A    Yes.

10   Q    And she advised us that she only used those accounts that

11   were highlighted; so those are the darkened ones.  Did you have

12   any signature authority on any of the GigaPix Releasing

13   accounts?

14   A    No.  In fact -- no.  Absolutely no.

15   Q    Did you have any signature authority on the Wells Fargo

16   GigaPix Studio accounts?

17   A    Well, let me answer this differently.

18              THE COURT:  That can be answered yes or no, Mr. --

19              THE WITNESS:  Could you restate the question,

20   please.

21   Q    BY MS. AMES:  Sure.  Sir, do you recall -- when you --

22   when you had the company before Mr. Pritchard came on board,

23   who was the bank that you had your accounts with?

24   A    Originally it was Glendale Federal, and they were acquired

25   by Citibank.
```

**UNITED STATES DISTRICT COURT**

1   Q    So were all of GigaPix accounts with Citibank?

2   A    There were two accounts.  Only two.

3   Q    So but then afterwards Mr. Mutton changed that; is that

4   correct?

5   A    Apparently Mr. Mutton added a lot of accounts that I was

6   unaware of --

7   Q    Okay.

8   A    -- when he became the CFO.

9   Q    Did he transfer the Citibank accounts over into Wells

10  Fargo?

11  A    What happened was, I believe -- well, we got a letter that

12  he showed me from Citibank stating they were going to be

13  closing our accounts, and they wouldn't -- I called them up,

14  and they wouldn't tell me why.  And I'm suspecting now, based

15  on what I'm seeing, is that because there were other -- there

16  were other companies --

17          THE COURT:  Mr. Blauvelt, listen to the question and

18  please answer the question.

19          THE WITNESS:  I'm doing my best, sir.

20          THE COURT:  What's the question?

21  Q    BY MS. AMES:  Sir, so did you have signature authority on

22  the GigaPix Studio Wells Fargo accounts, if you recall?

23  A    On I think two or three of the accounts.  That's all.

24  Q    And not on any of the other accounts?

25  A    There were a number of them I didn't even know existed.

**UNITED STATES DISTRICT COURT**

1  Q    And those included as well the GigaPix Releasing; is that

2  correct?

3  A    I had nothing to do with GigaPix Releasing.  In fact, in

4  testimony by Colin Mutton, the ownership of GigaPix Releasing

5  was David Pritchard and two other fellows.

6  Q    Just one moment.

7       Sir, did you ever advise an investor in GigaPix that they

8  would receive high returns on their investment?

9  A    No.

10 Q    Did you ever advise an investor in OZ3D that they would

11 receive high returns on their investment?

12 A    No.  You're making it sound like it's a guarantee in that

13 way you're forming the question.

14 Q    I'm just asking what --

15 A    No, no, I --

16          THE COURT:  Don't criticize her questioning of you.

17 Just answer the questions.

18 Q    BY MS. AMES:  Did you ever tell an investor that the

19 minimum of 65 percent of their money in OZ3D would be used to

20 produce and distribute the movie?

21 A    No.

22 Q    Did you ever tell an investor that production had begun on

23 OZ3D?

24 A    No.

25 Q    Did you ever tell an investor that GigaPix would go public

1    within a short period of time?

2    A     No.

3    Q     Did you ever tell an investor that they would receive

4    returns on their investment as soon after investing or within

5    18 months of investing?

6    A     I never put a time frame on the money, ever.

7    Q     And to your knowledge, did any of your salespeople under

8    your direction advise any investors of any of those things?

9    A     Not that I heard because, if they did, that would be a

10   misrepresentation.

11   Q     And what would you have done if you had found out that a

12   salesperson had made that representation?

13   A     They would be terminated.

14            MS. AMES:  No further questions, Your Honor.

15            THE COURT:  Cross-examination for Defendant

16   Pritchard?

17            MR. EMMICK:  No questions, Your Honor.

18            THE COURT:  Government?

19            MR. McLAIN:  Yes, Your Honor.

20                        CROSS-EXAMINATION

21   BY MR. McLAIN:

22   Q     Mr. Blauvelt, in your direct examination you made a lot

23   statements about things you never did; correct?

24   A     Yes, sir.

25   Q     And one of the things that you said that you never did is

```
1   that you never cold-called investors; is that correct?
2   A    I didn't say that.
3   Q    Did you cold-call investors?
4   A    I did not say that, sir.
5   Q    Did you cold-call investors?
6   A    Yes, sir.
7   Q    Now, if you look at the cease and desist orders -- can you
8   pull up the cease and desist order for Washington, please.
9   That's Exhibit 206.1.  If you can look at the caption, this
10  cease and desist order is specifically against you and GigaPix;
11  correct?
12  A    Yes.
13  Q    And if we take a look at page 2 of this cease and desist
14  order, paragraph number 7, can you read the last two lines of
15  paragraph number 7, please.
16  A    The last two lines?
17  Q    Yes.
18  A    Can I read the whole thing?
19  Q    I'm asking you to read the last two lines.  It starts,
20  "The salesman offered."
21  A    I can't tell.
22       The salesman offered Resident A an investment in GigaPix
23  units and told Resident A that the investment was like getting
24  in on the ground floor of a company like Pixar.  But the
25  salesperson failed to explain that there could be no assurance
```

```
 1    that GigaPix would have similar success.
 2    Q     So through this cease and desist order, you're aware -- or
 3    you were aware that your salespeople were making
 4    representations that GigaPix would be like Pixar?
 5    A     That's not what it says.
 6    Q     It would be like the investment was getting in on the
 7    ground floor of a company like Pixar?
 8    A     Company like Pixar.
 9    Q     And that that was considered by the State of Washington to
10    be a misrepresentation --
11    A     Okay.
12    Q     -- is that correct?
13    A     I don't understand what you're -- say it again.
14    Q     This cease and desist order from the State of Washington
15    is telling you that this representation that was made comparing
16    GigaPix to Pixar was a misrepresentation; correct?
17    A     They believed it was, yes.
18    Q     And you were aware of that because you --
19    A     I read the -- I did read this document, yes.
20    Q     And if you look at page -- if you look at Exhibit 204,
21    this is the cease and desist order from the State of
22    California, 204.1 or .2, and again this is a cease and desist
23    order against you, GigaPix, and Mr. Pusateri; correct?
24    A     Yes, sir.
25    Q     And if you look at the third page of the document,
```

1   paragraph number 2 -- highlight paragraph number 2.  I'm sorry.

2   Just the first -- before the subsection (a), "In connection

3   with."

4        And can you read that.

5   A    Which part would you like me to read?

6   Q    It starts with "In connection with the offer and sale of

7   these securities."

8   A    In connection with the offer and sale of these securities,

9   GigaPix, OZ3D, Blauvelt, or -- I think the operative word is

10  "or" -- Blauvelt or Pusateri made or caused to be made

11  misrepresentations of material fact or omitted to state

12  material facts necessary in order to make the statements made,

13  in the light of the circumstances under which they were made,

14  not misleading.  These misrepresentations and omissions were

15  the following.

16  Q    So you were aware through this cease and desist order that

17  salespeople at your company were making misrepresentations;

18  correct?

19  A    This particular salesperson was accused, one person.

20  Q    Now, if you look at -- let's take a look at -- one moment.

21       Now, we heard some various statements that you made on

22  March 2012; correct?  In this courtroom you heard that

23  recording?

24  A    Yes.  I was sitting here, yes.

25  Q    And those were your statements; right?

1    A     That was my voice.

2    Q     But during that interview there wasn't a complete -- we

3    didn't hear everything you said during that interview; is that

4    right?

5    A     It was a two-and-a-half -- from what I remember, it was a

6    two-and-a-half-hour interview; so what you heard here was

7    obviously edited.

8    Q     And some of the things that you said during that interview

9    related to Mr. Pritchard's involvement in GigaPix; is that

10   right?

11   A     I don't recall, sir.

12   Q     Do you remember mentioning Mr. Pritchard at all during

13   that interview?

14   A     I'm not sure which context you're referring to.

15   Q     During the entire interview, do you ever remember

16   mentioning Mr. David Pritchard?

17   A     I'm sure I did.

18   Q     So now if we can take a look -- actually, I'll just ask

19   you.  During that interview did you say that Mr. David

20   Pritchard is one of the reasons I'm here.  I really think the

21   guy stole my company, and he didn't work in the best interest

22   of our stockholders or anybody's best interest except his own?

23   A     Well, in regard to what he stole from me, he sat here --

24   and I forget what exactly the term was, but he wanted to wrest

25   control, I think, is what he said yesterday.

```
1    Q    I'm asking what you said.  Did you say that?
2    A    I didn't use his words, but on the stand yesterday he
3    admitted to wanting to wrest control from me.
4    Q    I'm asking you, during the interview in 2012, did you say,
5    quote, David Pritchard is one of the reasons I'm here.  I
6    really think the guy stole my company, and he didn't work in
7    the best interest of our stockholders or anybody's best
8    interest except his own?
9    A    That's -- that's -- I probably said that.
10   Q    And did you also say during that interview that David
11   Pritchard -- quote, David Pritchard made press releases that he
12   secured a million dollar print and advertising budget, which
13   there was, I don't know that there was any proof of that?
14   A    That's true I said that.
15   Q    And did you also say, I suggested we do the audit and that
16   the audit was canceled by David Pritchard?
17   A    There was an --
18   Q    Did you say that?
19   A    Say it again one more time then.
20   Q    Quote, I suggested we do the audit and that the audit was
21   canceled by Mr. David Pritchard?
22   A    Yes.
23   Q    And did you also say during that interview that, quote,
24   some of the financial dealings that he'd done would have shown
25   up at that point; so that's why he, David Pritchard, didn't
```

```
 1  want the audit; is that true?
 2  A    That was my belief.  Yes, that's true.
 3  Q    And then after the Iowa tax credit issue, didn't you say
 4  that David Pritchard, quote, wanted to just fold the company,
 5  which would leave the investors losing their entire investment?
 6       Did you say that during the interview?
 7  A    In -- in -- would you play the interview so everybody can
 8  hear that?  Did I say that?  I think I did.
 9  Q    No.  That's all I need.
10  A    Okay.
11  Q    And did you mention that David Pritchard would attend the
12  sales meetings and tell the salespeople, quote, things that did
13  not happen?  Did you say that?
14  A    Sometimes he would.
15  Q    And did you claim that Mr. David Pritchard refused to call
16  investors back when they called in to complain?
17  A    He didn't like to call people back.  Yes, that's true.
18  Q    In May of 2012 wasn't the only time in which you were
19  interviewed by FBI agents in this case; is that right?
20  A    That's not the only time.
21  Q    You were also interviewed in August of 2013; is that
22  correct?
23  A    There was -- I actually met with the FBI agents three
24  times.
25  Q    And I'm asking you about the second time in August of
```

```
 1   2013.
 2   A     Where did that take place?
 3   Q     Did they meet you out on the beach somewhere?
 4   A     Yes.
 5   Q     August of 2013?
 6   A     Yes.
 7   Q     And during that interview did you make the comment,
 8   saying, quote, "selling unregistered securities is not the
 9   worst thing I've done?
10   A     I don't recall that.
11   Q     You don't recall making that comment to FBI --
12   A     Right.
13   Q     -- special agents?
14   A     I don't.
15   Q     But it's possible you might have said that?
16   A     It's possible.
17   Q     And the third time you were interviewed was in March of
18   2014 -- is that correct? -- by FBI special agents?
19   A     Yes.
20   Q     And that interview, as the other two were, were voluntary
21   interviews; correct?
22   A     They were all voluntary interviews.
23   Q     And in that interview in March of 2014, you actually
24   showed up at the FBI, and they weren't even expecting you;
25   right?
```

```
 1   A     Right.

 2   Q     And you know that that interview was recorded; right?

 3   A     Yes.

 4   Q     Now, during this interview did you admit saying, quote, I

 5   should be charged.  I wasn't honest in my bio.  That's fraud?

 6   A     I never mentioned that I was --

 7   Q     Did you say that?

 8   A     I would like to tell you about it.  May I say it, or no?

 9   Q     Did you say I wasn't honest in my bio?

10   A     My bio was -- there were some inconsistencies in my bio.

11   Q     Did you say, I wasn't honest in my bio --

12   A     Yes.

13   Q     -- that's fraud?

14         If we can pull up Exhibit 23, the package that was given

15   to Mr. Tate -- can you hand him Exhibit 23, but I want you to

16   pull it up as well.

17         23.7.  And this was part of the materials that was

18   given -- given to investors; right?  Your bio?

19   A     Yes.

20   Q     And this is the bio you're referring to when you said that

21   it was fraud?

22   A     I didn't say it was fraud.

23   Q     What did you say?  It was not accurate.  You said "I

24   wasn't honest in my bio."  This is the bio you're referring to;

25   right?
```

**UNITED STATES DISTRICT COURT**

```
1    A     Yes.

2    Q     Now --

3    A     Can I state why?

4    Q     No.

5          During this interview in March of 2014, did you admit

6    that, quote, when we got the cease and desist, I wanted to

7    remove the telemarketing aspects away from GigaPix so that

8    didn't taint the company?

9    A     Say that again.

10   Q     I wanted -- when we got the cease and desist, I wanted to

11   remove the telemarketing aspects away from GigaPix so that

12   didn't taint the company.

13   A     Yes.  I said that.

14   Q     And did you say -- claim in this interview that, quote, we

15   got a cease and desist; so I stopped raising money for GigaPix.

16   Did you say that?

17   A     For a period of time until we got it rectified, yes.

18   Q     But you got the first cease and desist in 2005 --

19   right? -- from Wisconsin?

20   A     It wasn't a cease and desist.  We rectified it, and we

21   went on with business.  And I didn't sell in Wisconsin; so I

22   wasn't in violation of that cease and desist.

23   Q     But then you got other cease and desist orders from

24   California and Colorado and Alabama and Oregon; is that right?

25   A     We took care of every single one of those.
```

```
1   Q    But you continued selling GigaPix securities before those

2   were taken care of in 2009 or 2010; correct?

3   A    State the question one more --

4   Q    Did you continue selling GigaPix securities in 2007, 2008,

5   and the beginning of 2009?

6   A    Yes.

7   Q    But the cease and desist orders weren't taken care of

8   until the end of 2009 or early 2010; correct?

9   A    We took care of them.

10   Q    In two thou- -- end of 2009, 2010; correct?

11   A    Okay.  Sure.

12   Q    Yes or no?

13   A    Yes.

14   Q    So you continued selling GigaPix securities after you had

15   received the cease and desist orders from various states, even

16   though they hadn't been rectified yet; correct?

17   A    Yes.

18   Q    Okay.  During this interview in -- on March of 2014, did

19   you also admit during this interview that you -- you admitted

20   you were the CEO of GigaPix; right?

21   A    Yes.

22   Q    Okay.  And that you should have been aware that most of

23   the OZ3D investor money was being funneled into GigaPix; right?

24   A    The -- I was -- I was not aware of it.

25   Q    You were not aware --
```

**UNITED STATES DISTRICT COURT**

```
 1    A     I wasn't aware --
 2    Q     -- that money -- let me ask the question.
 3          You were not aware that money that was being raised from
 4    OZ3D investors was being sent to pay off debts that GigaPix had
 5    and not for an OZ3D movie?
 6    A     We had a use of proceeds set up for OZ3D where a portion
 7    of the money coming in, GigaPix was entitled to it.
 8    Q     Yes or no?  So either you were or were not aware.  Which
 9    one was it?
10    A     I was aware.
11    Q     You were aware that money was being sent in to -- from
12    OZ3D investors to pay off debts that GigaPix had that were
13    unrelated to the OZ3D movie?
14    A     I wasn't aware that it went -- for operational expenses,
15    when you say "pay off debts," that's not necessarily accurate.
16    We had to pay rent.  We had to pay other salaries and so son.
17    Q     Were you aware that the money was used to pay off the debt
18    for Blackbeard in Iowa?
19    A     I don't think that's accurate.
20    Q     I'm asking you, were you aware of that?
21    A     I didn't -- no.  The answer is no.
22    Q     And are you aware that Recess Films is basically the Iowa
23    movie fund; right?
24    A     The Recess Films project was -- okay.  You want me -- just
25    yes or no answers now?  That's what you're wanting?
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     Is Recess Films associated with the Iowa project?

 2   A     Yes.

 3   Q     Now, you also admitted in that March 2014 interview that

 4   GigaPix had its own sales group; right?

 5   A     Yes.

 6   Q     That it never had an outside sales team?

 7   A     We controlled the salespeople ourselves.  They all worked

 8   for us, and we didn't use outside sales organizations, yes.

 9   Q     And you admitted the salespeople got commissions; right?

10   A     Yes.

11   Q     But the salespeople didn't just get 20 or 25 percent in

12   commissions; right?

13   A     They never got 25 percent ever.

14   Q     Didn't you admit during that interview that the

15   commissions and fees say 20 percent in the PPMs, but in

16   actuality 30 to 40 percent was spent on commissions and fees?

17   A     That's a lie.

18   Q     You never said that?

19   A     Did I say that?

20   Q     I'm asking you, did you say it?

21   A     No.

22   Q     Now, you admitted that the investors were mailed checks

23   into OZ3D via FedEx; right?

24   A     Can I stop for a second?

25   Q     No.
```

1    A    Okay.  Then ask the question.

2    Q    You admitted that investors mailed their checks into OZ3D

3    and GigaPix via FedEx; correct?

4    A    Yes.

5    Q    Because you all didn't accept wire transfers; right?

6    A    We accepted wire transfers, but we never -- we never did

7    encourage that.  I think we did accept a wire transfer maybe

8    once.  Not sure, but not regularly, no.

9    Q    Did you admit that the -- quote, it's a possibility that

10   the PPM was a lie?  Did you say that in that interview?

11   A    I don't think so.  And if I did, I was -- here's the thing

12   about that particular interview --

13   Q    I'm not --

14   A    I was under a tremendous amount of stress.

15            THE COURT:  Mr. Blauvelt, there's no question

16   pending.

17            THE WITNESS:  Okay.

18   Q    BY MR. McLAIN:  Did you also admit in that interview that

19   what happened with OZ3D is the money was not -- ended up not

20   being used properly for -- I would say that the money was not

21   used properly for OZ3D?

22   A    That's a fair statement.

23   Q    Did you also admit that we ended up spending money on

24   things that had nothing to do with GigaPix?

25   A    I don't recall that.  I'd have to hear it.  If you have it

```
 1    recorded, let's hear it.
 2    Q    During that interview, did you admit that the OZ3D film
 3    was never made?
 4    A    Right.  Yes, I did.
 5    Q    Did you admit that the OZ3D money -- the money for OZ3D
 6    was, quote, misappropriated?
 7    A    I believe it was, yes.
 8    Q    Did you admit that, quote, about GigaPix, there's a lot of
 9    things you can say I was fraudulent in?
10    A    That's a half a statement.
11    Q    Did you say that?
12    A    In what regard?
13    Q    Did you say, there's a lot of things that you can say I
14    was fraudulent in?
15    A    I don't know.  I don't know.
16    Q    During that interview, did you admit that you, quote, I
17    set up GigaPix Incorporated.  So in other words, I started
18    using corporate accounts as personal accounts?
19    A    GigaPix Incorporated is different than GigaPix Studios.
20    GigaPix Incorporated is my account.
21    Q    Did you say that you started using corporate accounts as
22    personal accounts?
23    A    My personal accounts were shut down by the State of
24    California.
25    Q    So did you --
```

```
 1    A    You're asking me a question --
 2              THE COURT:  Mr. Blauvelt --
 3         Read the question to him.
 4              (The record was read.)
 5              THE WITNESS:  Not GigaPix Studios corporate
 6    accounts, no, sir.
 7    Q    BY MR. McLAIN:  Did you start using corporate accounts as
 8    personal accounts?  Yes or no.
 9    A    It had nothing to do with GigaPix.
10    Q    Did you start using corporate accounts as personal
11    accounts?
12    A    Yes.
13    Q    And you admitted during that interview -- correct? --
14    that, quote, I would set up corporations and use those to pay
15    my personal bills; is that true?
16    A    I used -- in other words, instead of a personal account, I
17    would open a corporate account.
18    Q    And you used corporations to pay your personal bills?
19    A    Yes.  Sure.  I can explain.
20    Q    During that interview in 2014, did you admit that you were
21    responsible and you were remiss in your duties as a CEO?
22    A    There was -- I was very sick for a period of time, and so
23    I --
24              MR. McLAIN:  Your Honor, move to strike.
25              THE COURT:  Listen to the question.  Answer the
```

1    question.

2    Q    BY MR. McLAIN:  During the interview, did you admit you

3    were responsible and you were remiss in your duties as CEO of

4    GigaPix?

5    A    I may have said that.  I would like to hear the tape.

6                 THE COURT:  Just --

7                 THE WITNESS:  I don't recall, sir.

8    Q    BY MR. McLAIN:  In relation to OZ3D, did you admit that

9    you were completely responsible for the mismanagement of funds

10   for the OZ3D film?

11   A    I didn't handle the funds.

12   Q    Did you admit during that interview that you were

13   responsible for the mismanagement of funds for the OZ3D film?

14   A    I will repeat, I didn't handle the funds.

15   Q    So is that a "no"?

16   A    I didn't handle the funds.

17   Q    During the interview did you admit that you were

18   completely responsible for the mismanagement of funds for the

19   OZ3D film?

20   A    No.

21   Q    During that interview, didn't you say, quote, I'm guilty

22   of the responsibility of not having -- not having taken

23   responsibility on OZ3D.  I'm totally guilty?

24   A    I -- yeah.  I should have taken more responsibility

25   instead of leaving it to David Pritchard.

1  Q    Did you say "I'm totally guilty"?

2  A    I don't recall.

3  Q    So now you just said you shouldn't have left it to

4  David Pritchard.  What did David Pritchard do to mismanage

5  funds?

6  A    I believe that David Pritchard and Colin Mutton used too

7  much of the OZ money for the Recess Films project.  And I told

8  them that, and I made my reservations at several times during

9  the operation of our business that there was too much money

10 going into Recess Films to keep the Iowa project on track.

11          MR. McLAIN:  No further questions for this witness,

12 Your Honor.

13          THE COURT:  Redirect.

14                    REDIRECT EXAMINATION

15 BY MS. AMES:

16 Q    Sir, you've mentioned that you were not completely honest

17 in your bio.  What were you not completely honest in your bio

18 about?

19 A    I didn't mention that at one point I was a car salesman.

20 I worked for Galpin Ford here in Los Angeles, one of the top

21 dealerships in the country, and I worked for them about four

22 years.  And I was a very good salesman.

23 Q    Was there anything else that was misstated in your bio?

24 A    Not really.

25 Q    When you mentioned that you should have been aware that

1    money went from OZ3D into GigaPix, what were you talking about?

2    A      The -- the problem -- I was between a rock and a hard

3    spot, trying to run the company.  David had this pet project of

4    the Recess Films and the Iowa project.  He wanted to keep it on

5    track.  He had this amazing idea about funding it for no money

6    down.  In other words -- I know the judge doesn't want to hear

7    about Iowa anymore.  I can agree, but real briefly, please let

8    me finish.

9           The idea -- it sounded like a great idea to be able to

10   presell tax credits to raise a hundred percent of the money to

11   make films without any money out of your own pocket.  So in

12   theory it was going to work really great.  The problem was that

13   the letters of credit to secure the bank loans didn't

14   materialize, and he meanwhile had the Konwiser brothers working

15   and producing this film.  They had actors selected and sets

16   being built, and they were on a timeline.  And we ended up

17   using corporate money to keep everything on track, and it

18   really bankrupted the company in a sense.

19   Q      Now, when you were raising money for OZ3D, what was the

20   purpose of raising that OZ3D money?

21   A      To make a movie, a digitally animated feature based on the

22   characters from the Wizard of Oz.

23   Q      So you intended to use that money for OZ3D?

24   A      Yes.  The answer is yes.

25              THE COURT:  Don't lead.

1   Q     BY MS. AMES:  Was it after the fact that money was later

2   spent on Iowa?

3   A     When we got in trouble with regulators, I stopped raising

4   money immediately for GigaPix until we got them straightened

5   out in California.  And we started raising money for a new

6   entity called OZ3D, and I thought that our -- it would be in

7   the best interest of our investors that we finally make that

8   digitally animated feature that I promised them from the

9   beginning of the company.

10       So I came up with the idea of OZ3D, and we allowed a

11  certain use of proceeds to keep GigaPix going so GigaPix was

12  the producer.  And we felt that we would be able to keep the

13  company going by being able to take producers fees from the

14  money that came in, and it was specified in the offering

15  memorandum.

16  Q     Now, you mentioned that -- you were asked in

17  cross-examination about using corporate accounts to pay for

18  personal expenses.  What did you mean when you brought that up

19  in that interview?

20  A     I set up corporations that I used to pay myself.  In other

21  words, there was no money.  In other words, I would get paid

22  and put the money in these accounts because I had a situation

23  where I went to the ATM one day -- my wife did -- and there was

24  something like 19 or $16,000 in the bank, and all of a sudden

25  that money was gone because the State -- I had not filed my

1    taxes, and the State came in and took all my money.  We had no
2    money.  So I couldn't -- I didn't have a personal bank account;
3    so I set up a corporation account and was using a corporation
4    account to pay home expenses and things like that.
5    Q    Was it GigaPix money that you were using to pay --
6    A    No.  It was -- the pay I got from GigaPix I would deposit
7    in that account.
8    Q    Now, when you say you admitted that you were remiss and
9    responsible for mismanagement, what did you mean by that?
10   A    I could have done a better job.
11   Q    Did you -- in what way?  How could you --
12   A    Well, I should have put my foot down.  I shouldn't have
13   let David continue with the Recess Films because the funding
14   wasn't in place.  But I didn't want to see myself as the person
15   that made that whole project fall apart.
16   Q    When you -- when you brought that up in the interview,
17   were you talking about the management of the company, or were
18   you talking about representations to investors?
19   A    I never made any bad representations to investors.
20   Q    So were you talking about the management of the company?
21   A    State the question one more time, please.
22   Q    When you say that you admitted that you were remiss and
23   responsible for mismanagement, what type of mismanagement were
24   you talking about?
25   A    Managing David Pritchard.

1   Q    When you said, I'm guilty for not taking responsibility

2   for OZ, what did you mean by that?

3   A    It's hard to say exactly what I meant by that, but I

4   allowed David Pritchard to try and make the movie, and it

5   didn't happen.  I never went up to Canada.  I never met with

6   Arc Entertainment.  I never made any of the deals.  I allowed

7   David Pritchard to go ahead and go through the motions of

8   making the OZ3D movie, and that just never happened.  I should

9   have been more proactive.

10           MS. AMES:  One moment, Your Honor.

11       Can you bring up Exhibit No. 204.

12   Q    BY MS. AMES:  Sir, now, you were asked about the

13   stipulation for GigaPix Studios with the State of California.

14   And what misrepresentations did it say that there were, if any?

15   A    You would have to read them to me or show me.  I'll read

16   them.

17   Q    It's up on the screen.

18   A    Can you make it so it's here?  Are you talking about --

19   well, which part are you talking about specifically?

20   Q    Well, the government counsel just had you read that one

21   line, but I wanted you to follow up on what your understanding

22   of any misrepresentations were.

23           THE COURT:  Don't lead.

24           THE WITNESS:  I don't -- well, which -- I mean, I'm

25   looking at it here.  I think -- I think the operative word in

```
1   all this documentation, where it says Blauvelt or Pusateri.

2   You know, Pusateri was the one that had contact with people,

3   and he said some things that he might not -- I can't be

4   responsible -- in other words, he said some things, and they

5   found fault with what he said.  And I don't believe that I was

6   the person responsible for misrepresenting to the investors at

7   all in this case.

8   Q    BY MS. AMES:  And what did you do as a result, if

9   anything, of finding out if he had made any misrepresentations?

10  A    I spoke with him.  I talked with him.  Based on what he

11  was saying, it is a fair -- I mean, a company like Pixar.

12  That's what it really came down to.  We wanted to make a

13  company like Pixar.  That would be a great thing to make a

14  company like Pixar; so that's not necessarily a

15  misrepresentation.

16  Q    So was it -- what needed to be added, if anything, other

17  than saying you wanted to have a company like Pixar?

18  A    I don't know what you mean.

19  Q    Did you advise him that he needed to -- to represent

20  anything further to investors, that you may not be like Pixar

21  or something?

22  A    He had to be more careful in how he would say things to

23  people, I think.

24  Q    And you felt that you properly addressed the issue with

25  him; is that correct?
```

UNITED STATES DISTRICT COURT

```
 1   A    I did the best I could, yes.  I think -- I think that in
 2   hindsight I probably should have at this time fired him right
 3   after that.  I shouldn't -- instead of allowing him to stay.
 4   Q    Your understanding -- I'd like to talk with you about your
 5   understanding of these various cease and desists.  What did you
 6   do when you got notice of the first one --
 7   A    I contacted --
 8   Q    -- in Wisconsin?
 9   A    I contacted the attorney who wrote the private placement
10   memorandum, Ed Swanson.  He contacted the State of Wisconsin,
11   sent them a letter, corresponded with them, and took care of
12   it, rectified -- it's a letter of prohibition, not a cease and
13   desist.  And he took care of it and signed off on it and
14   concluded the issue without any fines or without any delay.
15   Q    And did you do that same process with any of the other
16   communications with various states?
17   A    No.  What happened was we then had the problem with
18   California, and we used a fellow who charged us an arm and a
19   leg, and we ended up firing him and hiring a woman by the name
20   of Margaret Peper, who was a former regulator for the State of
21   Colorado who moved into practice in New York.
22        Margaret Peper, I think we've heard her name used a couple
23   times here in court.  She was excellent and did a very good job
24   and took care of all of our cease and desists for us and came
25   to a final resolution with them.
```

```
 1   Q    So was it your belief that you had fixed those problems
 2   and --
 3           THE COURT:  Don't lead the witness.
 4   Q    BY MS. AMES:  -- and were in compliance?
 5   A    Yes.
 6           MS. AMES:  I have no further questions, Your Honor.
 7           THE COURT:  Recross.
 8           MR. McLAIN:  No, Your Honor.
 9           THE COURT:  You may step down, Mr. Blauvelt.
10        We'll be in recess at this time.  I will remind you of
11   your duty not to converse or otherwise communicate among
12   yourselves or with anyone upon any subject touching the merits
13   of the cause on trial.  And you are not to form or express any
14   opinion on the case until it is finally submitted to you for
15   your verdict.
16        Jurors are excused until 1:30.  Court will remain in
17   session.
18           THE CLERK:  All rise.
19              (Jury out at 12:02 P.M.)
20              (The following proceedings were held out of the
21              presence of the jury:)
22           MS. LINDSAY:  Your Honor, Your Honor -- never mind.
23              (Noon recess at 12:02 P.M.)
24           THE COURT:  Defendant Blauvelt, call your next
25   witness.
```

UNITED STATES DISTRICT COURT

```
 1              MS. AMES:  Your Honor, Mr. Blauvelt rests.
 2              THE COURT:  We'll do that before the jury.
 3         Will there be any rebuttal?
 4              MR. McLAIN:  Yes, there will, Your Honor.
 5              THE COURT:  All right.  Bring down the jury.
 6                   (Jury in at 1:51 P.M.)
 7                   (The following proceedings were held in the
 8                    presence of the jury:)
 9              THE COURT:  Record will show the jurors are all
10    present in their proper places, the defendants are present with
11    their counsel.
12         Defendant Blauvelt, call your next witness.
13              MS. AMES:  Mr. Blauvelt rests, Your Honor.
14              THE COURT:  Any rebuttal?
15              MR. McLAIN:  Yes, Your Honor.
16              THE COURT:  All right.  Call your witness.
17              MR. McLAIN:  The government will call FBI Special
18    Agent Adam Storer.
19                        ADAM STORER,
20    called as a witness by the Government, was sworn and testified
21    as follows:
22              THE CLERK:  Please raise your right hand.  Do you
23    solemnly swear the testimony you shall give in the cause now
24    pending before this court shall be the truth, the whole truth,
25    and nothing but the truth so help you God?
```

UNITED STATES DISTRICT COURT

```
 1                THE WITNESS:  I do.
 2                THE CLERK:  Thank you.  Please take a seat.
 3         Please state your full and true name for the record and
 4    spell your last name.
 5                THE WITNESS:  Adam Storer, S-t-o-r-e-r.
 6                      DIRECT EXAMINATION
 7    BY MR. McLAIN:
 8    Q    So, now, FBI Agent Adam Storer, did you interview
 9    Mr. Chris Blauvelt on March 12, 2012?
10    A    Yes, I did.
11    Q    And the excerpts that we heard in court last week, was
12    that just a portion of the interview?
13    A    Yes, they were.
14                MR. McLAIN:  Madam clerk, I'd ask if you can place
15    before FBI Agent Storer Exhibit No. 235.
16                THE CLERK:  Exhibit 235 is identified and placed
17    before the witness.
18    Q    BY MR. McLAIN:  And what is Exhibit 235?
19    A    This is a copy of the recording, the audio recording on
20    March 12, 2012.
21    Q    And is that a copy of the full recording of that March 12,
22    2012 interview of Mr. Blauvelt?
23    A    Yes, it is.
24    Q    Did you review that CD?
25    A    Yes, I did.
```

```
 1   Q    And that's a true and correct copy of the full recording?
 2   A    Yes, sir.
 3             MR. McLAIN:  Your Honor, at this time the government
 4   would ask to admit Exhibit No. 235 into evidence.
 5             MS. AMES:  No objection.
 6             MR. EMMICK:  No objection.
 7             THE COURT:  235 in evidence.
 8             (Exhibit 235 received into evidence.)
 9   Q    BY MR. McLAIN:  Now, in addition to the March 12, 2012
10   interview, did you interview Mr. Blauvelt on other occasions?
11   A    Yes, I did.
12   Q    And was one of those occasions on August 2nd, 2013?
13   A    Yes, it was.
14   Q    And who else -- who did you interview Mr. Blauvelt with?
15   A    Special Agent Eric Potocek.
16   Q    And where did that interview take place?
17   A    North of Malibu, on a beach.
18   Q    And who asked that interview to occur?
19   A    Mr. Blauvelt did.
20   Q    And was that interview voluntary?
21   A    Yes, it was.
22   Q    And what did Mr. Blauvelt communicate to you on -- in that
23   interview on August 12, 2013, concerning unregistered
24   securities?
25   A    He made a comment to the effect of selling unregistered
```

```
 1   securities was not the worst thing he had done in his life.
 2   Q     And did you interview Mr. Blauvelt on a third occasion?
 3   A     Yes, I did.
 4   Q     And was that on March 7th, 2014?
 5   A     Yes, it was.
 6   Q     And where did you interview Mr. Blauvelt on that occasion?
 7   A     At the federal building at the FBI offices in Westwood.
 8   Q     And who asked Mr. Blauvelt questions during that
 9   interview, if you remember?
10   A     Myself and Special Agent Pete Conroy, C-o-n-r-o-y.
11   Q     And was the interview on March 7, 2014, recorded?
12   A     Yes, it was.
13   Q     And how long was the full interview of Mr. Blauvelt on
14   March of 2014?
15   A     Between two and a half hours and two hours and 45 minutes.
16   Q     And was the interview voluntary?
17   A     Yes, it was.
18         MR. McLAIN:  At this time, Your Honor, the
19   government would ask to place before Agent Storer Exhibit
20   No. 239.
21         THE COURT:  Any objection?
22         MS. AMES:  No objection.
23         MR. EMMICK:  No objection.
24         THE COURT:  239 in evidence.
25             (Exhibit 239 received into evidence.)
```

```
 1   Q    BY MR. McLAIN:  Is that a full recording of the full

 2   interview of Mr. Blauvelt on March 7, 2014?

 3   A    Yes, it is.

 4   Q    And it's an accurate depiction of that entire statement

 5   Mr. Blauvelt made in March of 2014?

 6   A    Yes, it is.

 7            MR. McLAIN:  At this time, Your Honor, the

 8   government will play portions of that -- that recording, and we

 9   have copies for the convenience of the Court and the jury.

10       At this time I'll ask permission to publish the first

11   clip.

12            (Playing audio recording.)

13   Q    BY MR. McLAIN:  So how does Mr. Blauvelt describe his bio?

14   A    He describes it as being fraudulent.

15   Q    And would omitting reference to him being a car salesman

16   be a huge omission?

17   A    No.

18            MR. McLAIN:  Going to clip number 2.

19            (Playing audio recording.)

20   Q    BY MR. McLAIN:  So how much OZ3D money did Mr. Blauvelt

21   admit was supposed to go to GigaPix based on the PPM?

22            MS. AMES:  I'll object, Your Honor.  This speaks for

23   itself.

24            THE COURT:  The objection is overruled.

25   Q    BY MR. McLAIN:  You can answer.
```

A     20 percent.

Q     How much actually went to GigaPix from OZ3D based on your

investigation?

A     Approximately 30 percent.

Q     I'm sorry?

A     I'm sorry.  Approximately 50 percent went from OZ3D to

GigaPix.  Approximately 30 percent was used for sales expenses

and commissions.

          MR. McLAIN:  Clip number 3.

              (Playing audio recording.)

Q     BY MR. McLAIN:  So, now, who does Mr. Blauvelt say told

Colin Mutton to transfer money to different agents?

A     Mr. Pritchard and Mr. Blauvelt.

          MR. McLAIN:  Going on to clip number 4.

              (Playing audio recording.)

Q     BY MR. McLAIN:  So how does Mr. Blauvelt say investors

almost always sent in their money?  Through what format?

A     Via FedEx.

Q     And was it through checks or wires?

A     Usually checks.

          MR. McLAIN:  Move on to clip number 5.

              (Playing audio recording.)

Q     BY MR. McLAIN:  So what does Mr. Blauvelt say about the

OZ3D money that was raised?

A     That it was not used properly and that it was spent on

```
 1   projects that had nothing to do with GigaPix.
 2           MR. McLAIN:  Let's move on to clip number 6.
 3               (Playing audio recording.)
 4   Q    BY MR. McLAIN:  And who does Mr. Blauvelt say whose fault
 5   it was?
 6   A    It was his responsibility.
 7           MR. McLAIN:  Move on to clip number 7.
 8               (Playing audio recording.)
 9   Q    BY MR. McLAIN:  What does Mr. Blauvelt admit about the
10   OZ3D film being made?
11   A    That it was never made.
12           MR. McLAIN:  Move on to clip number 8.
13               (Playing audio recording.)
14   Q    BY MR. McLAIN:  Who does Mr. Blauvelt say was responsible
15   for the mismanagement of the OZ3D funds?
16   A    That he was himself.
17               (Playing audio recording.)
18   Q    BY MR. McLAIN:  How much of the GigaPix investor money
19   does Mr. Blauvelt admit he used for credit card fees he had?
20   A    Approximately 150,000 to $160,000.
21           MR. McLAIN:  Go on to clip number 10.
22               (Playing audio recording.)
23           MS. AMES:  Object as to relevance, Your Honor.  This
24   is beyond the scope.
25           THE COURT:  The objection is overruled.
```

```
 1                    (Playing audio recording.)
 2             MR. McLAIN:  Actually, let's move on to clip
 3   number 11.
 4                    (Playing audio recording.)
 5   Q    BY MR. McLAIN:  So how much does Mr. Blauvelt admit the
 6   salespeople received in commissions?
 7   A    No less than 25 percent.
 8   Q    And is that inconsistent with all of the PPMs at issue in
 9   this case?
10   A    Yes, it is.
11             MR. McLAIN:  Move on to clip number 12.
12                    (Playing audio recording.)
13   Q    BY MR. McLAIN:  So what did Mr. Blauvelt admit to you
14   concerning his payment of taxes?
15   A    That he had not paid taxes, that -- previously in the
16   interview he said that he owed zillions of dollars in state
17   taxes.
18             MS. AMES:  I'm going to object, Your Honor.
19             THE COURT:  The objection is overruled.
20   Q    BY MR. McLAIN:  What did he say?
21   A    And that he also owed the federal government about
22   $2.5 million in taxes.  And in this instance he set up -- he
23   used the corporations to pay his personal expenses.
24             MR. McLAIN:  Move on to clip number 13.
25                    (Playing audio recording.)
```

UNITED STATES DISTRICT COURT

1  Q    BY MR. McLAIN:  Now, does Mr. Blauvelt admit that he did

2  not talk to every investor?

3  A    Yes, he did.

4  Q    And we didn't play the clip, but in the interview who does

5  Mr. Blauvelt admit disseminated information to the salespeople

6  about GigaPix and OZ3D?

7  A    Mr. Blauvelt and Mr. Pritchard.

8             MR. McLAIN:  Play clip number 14.

9                (Playing audio recording.)

10  Q    BY MR. McLAIN:  So ultimately what is Mr. Blauvelt

11  admitting here when he says the money didn't get used for the

12  movie?

13  A    He admits the money was not used for the OZ3D movie.

14             MR. McLAIN:  And then we'll play the final clip, and

15  that's from Exhibit 231.

16                (Playing audio recording.)

17             MS. AMES:  Your Honor, I'm going to object.  This

18  isn't proper rebuttal testimony.

19             THE COURT:  Overruled.

20             MR. McLAIN:  No further questions for this witness,

21  Your Honor.

22                     CROSS-EXAMINATION

23  BY MS. AMES:

24  Q    Now, Agent Storer, prior to this interview, the FBI had a

25  Web site up regarding GigaPix; is that correct?

```
 1    A    May I explain in more detail.  We did not have a Web site,
 2    no.
 3    Q    Didn't you have a Web site that said you were looking for
 4    victims?
 5    A    Yes.  We did put out an investor questionnaire online.
 6    Q    In fact, if a person Googled GigaPix, this is one of the
 7    first things that came up; is that correct?
 8    A    It is one of the things that would have come up, yes.
 9    Q    And Mr. Blauvelt was extremely upset about that, wasn't
10    he?
11    A    Yes.
12    Q    And he told you, when he came into this interview, that
13    what -- this was ruining his life; correct?
14    A    Yes.
15    Q    And his whole issue was he was looking for due process?
16    A    That is correct.
17    Q    In other words, he said, I'm feeling I'm not getting fair
18    chance to represent myself in court, in a court situation or
19    anything, and I'm basically being convicted based on the
20    Internet.
21    A    That sounds familiar, yes.
22    Q    And so that was his attitude when he came in for that
23    interview; correct?
24    A    I can't refer to his attitude, but he did speak that, yes.
25    Q    And he was quite upset about that?
```

1    A    He didn't appear upset, but he was concerned about that,

2    yes.

3    Q    Well, let's -- let's talk about his appearance.  How would

4    you describe his appearance when he came in for that interview?

5    A    He looked like -- he said he had been driving all day; so

6    he appeared like he had been in a car all day.

7    Q    And, in fact, he was living out of his car at that time;

8    correct?

9             MR. McLAIN:  Objection.  Foundation.

10            THE COURT:  Objection is sustained.

11       That will go out.  The jury is admonished to disregard.

12   Q    BY MS. AMES:  And he was extremely agitated during this

13   interview; correct?

14   A    There were times where it became a little bit contentious,

15   but overall was a fairly -- fairly calm interview, in my

16   opinion.

17   Q    And he answered all of your questions?

18   A    Some not directly, but yes.  We had a two and a half hour

19   conversation.

20   Q    And, in fact, he often was scattered in his train of

21   thought.  Is that a correct assessment?

22   A    He jumped around from point to point, and he apologized

23   for that at times.

24   Q    And oftentimes he talked about concerns completely

25   unrelated to what you were trying to discuss?

1    A    Yes.

2    Q    In fact, he -- he was concerned that he was being

3    followed?

4    A    Yes.  He mentioned that.

5              MR. McLAIN:  Objection.  Relevance.

6              MS. AMES:  It goes to his state of mind during this

7    interview, Your Honor.

8              THE COURT:  He's answered the question.

9              MS. AMES:  Okay.

10   Q    BY MS. AMES:  And he was concerned that there were people

11   after him; is that correct?

12   A    Yes.

13   Q    So -- so a number of the things during this conversation,

14   this two -- two and a half, two hour 45 minute interview you

15   had with him, didn't seem properly responsive; correct?

16   A    I don't understand your question, Ms. Ames.

17   Q    Well, he didn't seem like he was all there during some of

18   the interview, did he?

19   A    In my opinion, he was very there.

20   Q    But he was talking about being followed?

21   A    Yes.

22   Q    Did you feel that that was a reasonable attitude for him?

23   A    We tried to follow up with him, but he would not give us

24   any specifics.

25   Q    He talked about there were people that were looking at him

```
 1    strangely down in the FBI office before your interview; right?
 2    A    Yes.
 3    Q    That didn't seem like it would normally happen; correct?
 4    A    Again, I've only had the few meetings with him.
 5    Q    But it seemed -- it didn't seem like a rational response?
 6    A    Again, that's not -- that could be someone's opinion, yes.
 7    Q    And he said that there were -- there were people out in
 8    the lobby that might be after him; is that correct?
 9    A    I don't recall in the lobby specifically.
10    Q    And people on the street that seemed to be watching him?
11    A    Yes.
12    Q    Was he quite disheveled during the time he came in for
13    this interview?
14    A    Like I said, he had claimed he had been in the car all
15    day, and that's what he looked like.
16    Q    So did it appear he hadn't bathed in some time?
17    A    Again, he -- he appeared to me that he had been in the car
18    for some time, as he had stated at the beginning of the
19    interview.
20    Q    Now, you also mentioned that you had an interview with him
21    approximately a year before on August the 2nd, 2013; is that
22    correct?
23    A    Yes.
24    Q    And this interview took place on the beach?
25    A    Yes.
```

1   Q     Why did it take place on the --

2            THE COURT:  Beyond the scope of the direct

3   examination, Counsel.

4            MS. AMES:  Your Honor, it was asked --

5            THE COURT:  It goes beyond the scope.

6   Q     BY MS. AMES:  Now, Mr. Pete Conroy was there during the

7   interview -- is that correct? -- for the 2012 interview?

8   A     The first interview, yes.  He was there.

9   Q     And he's a special agent as well?

10  A     Correct.

11  Q     And had he contacted Mr. Blauvelt for that interview?

12  A     No.  I believe Mr. Blauvelt reached out to me, as I had

13  previously stated a couple days before, to set up that

14  interview.

15  Q     And how did Mr. Blauvelt appear during the 2012 interview?

16  A     Very similar to how he appeared during the 2014 interview.

17  Q     So did he seem as distracted during that interview?

18  A     Again, I believe he made comments in that interview.  My

19  best recollection is he apologized during the first interview

20  that he had bounced around from topic to topic.

21  Q     But he was actually much more calm during the 2012

22  interview, wasn't he?

23  A     No, I do not believe so.

24  Q     He didn't talk about -- during the 2012 interview, he

25  didn't talk about thinking that he was being followed?

```
 1   A     No.  He did not during the first interview.
 2   Q     He didn't appear to have the same kind of delusional ideas
 3   that people were watching him; correct?
 4   A     He did not mention anything about people watching him
 5   during -- during the first interview.
 6   Q     And that appeared a much more coherent interview; correct?
 7   A     In my opinion, they are both coherent, as our questions
 8   were answered.
 9              MS. AMES:  No further questions, Your Honor.
10              MR. McLAIN:  Very briefly, Your Honor.
11              THE COURT:  Redirect.
12                        REDIRECT EXAMINATION
13   BY MR. McLAIN:
14   Q     During your interview of Mr. Blauvelt in 2014, was he
15   concerned that he was about to be arrested?
16   A     He did not appear to be concerned about being arrested,
17   no.
18   Q     Did he understand that he had done something wrong and was
19   worried about who might be coming after him because he did
20   something wrong?
21   A     Yes.  He did make statements to that effect.
22   Q     And who did he feel was upset with him?
23   A     Multiple people.
24   Q     And who were those individuals?
25   A     Some of them were investors, some were prior people that
```

1   he had worked with in other telemarketing rooms, a variety of

2   people he mentioned.

3            MR. McLAIN:  No further questions, Your Honor.

4            THE COURT:  You may step down, Mr. Storer.

5            THE WITNESS:  Thank you, Your Honor.

6            THE COURT:  Call your next witness.

7            MR. McLAIN:  The government rests its rebuttal.

8            THE COURT:  Members of the jury, we're going to take

9   a recess now, and I'm going to give you a recess until tomorrow

10  morning at 9:30 because we have some law matters to take up.

11      And I would remind you of your duty not to converse or

12  otherwise communicate among yourselves or with anyone upon any

13  subject touching the merits of the cause on trial.  And you are

14  not to form or express any opinions on the case until it is

15  finally submitted to you for your verdict.

16      You will be hearing the arguments for both the government

17  and counsel for the defendants, and you will hear the

18  instructions on the law that applies to this case tomorrow.  So

19  you have not a full recognition of what you will be

20  deliberating on until that's all completed.

21      So jury is excused.  Court will remain in session.

22            THE CLERK:  All rise.

23                (Jury out at 2:32 P.M.)

24                (The following proceedings were held out of the

25                presence of the jury:)

```
 1              THE COURT:  This is the charge as I propose to give
 2    it.  I'll take objections to the charge in 20 minutes.  And
 3    leave that in the same order in which it is, and if there are
 4    any corrections to that charge on numbers and matters --
 5              MS. LINDSAY:  Is this different than the one we
 6    looked at last week?
 7              THE COURT:  No.  Should be the same one.
 8              MS. LINDSAY:  Thank you.
 9              THE COURT:  But I want you to look at it again.  20
10    minutes, be in recess for 20 minutes.
11              THE CLERK:  All rise.
12                  (Recess taken.)
13              THE CLERK:  All rise.  This court is now in session.
14    Please be seated and come to order.
15              THE COURT:  How much argument does Pritchard wish?
16              MR. EMMICK:  My best guess, Your Honor, would be 30
17    to 35 minutes.
18              THE COURT:  30 minutes.  Okay.
19         Mr. Blauvelt?
20              MS. AMES:  I would also say 30 to 40 minutes,
21    Your Honor.
22              THE COURT:  30.
23         And the government?
24              MS. LINDSAY:  Combined with opening and rebuttal,
25    Your Honor?
```

**UNITED STATES DISTRICT COURT**

```
 1                THE COURT:  Yes.
 2                MS. LINDSAY:  An hour.
 3                THE COURT:  All right.  What objections?
 4                MS. LINDSAY:  Your Honor, the government doesn't
 5      have any straight-out objections.  But I do believe that,
 6      because we had an expert and also because charts and summaries
 7      were admitted, that government's proposed instruction 5 or an
 8      expert instruction of the Court's choosing, and government's
 9      proposed 7, which is on charts and summaries that have been
10      admitted, should probably be given.  I can go on.
11                THE COURT:  What's your expert opinion?  What's your
12      expert --
13                MS. LINDSAY:  The expert -- I'm sorry.  Your Honor,
14      I didn't hear you.  The expert instruction?
15                THE COURT:  What instruction, yes.
16                MS. LINDSAY:  Well, it's the government's proposed
17      instruction 5, and --
18                THE COURT:  Do you have a copy of it?
19                MS. LINDSAY:  Yes.  Yes, Your Honor.  It's the
20      Ninth Circuit model instruction, and number 7 there is the
21      charts and summary.
22                THE CLERK:  Just to double-check, that's page 1139?
23                MS. LINDSAY:  Yes.
24                THE COURT:  All right.  I'll give that instruction
25      and the summaries.
```

**UNITED STATES DISTRICT COURT**

1          Any other matters?

2              MS. LINDSAY:  I did not see in Your Honor's

3    instructions the intent to defraud instruction.  It's the

4    intent to deceive or cheat, and that's 15 of the government's

5    proposed.

6              THE COURT:  No.  They're -- they're taken care of in

7    there.

8              MS. LINDSAY:  Okay.  The only other thing that I

9    would say, Your Honor, is that I've had a lot of -- recently a

10   lot of dealing with the securities instructions, and

11   specifically the "willfully" instruction.  And it's -- it seems

12   to be a very difficult area in the Ninth Circuit, but that the

13   "willfully" instruction that the government proposed, 25, has

14   been approved by the Ninth Circuit.  And so I was just going to

15   ask if that one could be given instead of the "willfully" part

16   of Your Honor's 8-B.

17             THE COURT:  No, I don't think so.

18             MS. LINDSAY:  I have nothing else, Your Honor.

19   Thank you.

20             THE COURT:  Defendant Pritchard?

21             MR. EMMICK:  We're satisfied, Your Honor.

22             THE COURT:  Defendant Blauvelt?

23             MS. AMES:  Your Honor, I would just note objections

24   to the government's proposed Exhibit No. 13 in that I believe

25   that it's unnecessary and confusing.  The elements instruction

```
 1    properly addresses it.

 2              THE COURT:  That will be given as shown.

 3              MS. AMES:  And I would note the same objection to

 4    government's proposed Exhibit No. 20.

 5              THE COURT:  And it will be given as shown.

 6         All right.  Argument Pritchard 30 minutes, Blauvelt 30

 7    minutes, government one hour.  All right.

 8              THE CLERK:  All rise.

 9              THE COURT:  9:30 tomorrow morning.

10              THE CLERK:  This court is now in recess.

11                 (Matter adjourned at 3:04 P.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, KHOWOONSUN CHONG, FEDERAL OFFICIAL REALTIME

6  COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7  THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8  PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9  FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10  STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11  ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13  THE UNITED STATES.

14

15          DATED THIS 3RD DAY OF NOVEMBER 2014.

16

17

18          /S/ KHOWOONSUN CHONG

19          _____
            KHOWOONSUN CHONG, CSR NO. 12907, CRR
20          FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25

**UNITED STATES DISTRICT COURT**