```
 1                    UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3            HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE

 4

 5    UNITED STATES OF AMERICA,            )
                                           )
 6                     PLAINTIFF,          ) CASE NO.
                                           ) CR 14-282-R
 7            VS.                           )
                                           )
 8    DAVID PRITCHARD,                     )
      AND CHRISTOPHER BLAUVELT,            )
 9                                         )
                       DEFENDANTS.         )
10    _____)

11

12

13

14                       REPORTER'S TRANSCRIPT OF
                           JURY TRIAL - DAY 7
15                    WEDNESDAY, OCTOBER 22, 2014
                               10:04 A.M.
16                      LOS ANGELES, CALIFORNIA

17

18

19

20

21

22    _____

23              KHOWOONSUN CHONG, CSR 12907, CRR
                FEDERAL OFFICIAL COURT REPORTER
24             255 EAST TEMPLE STREET, ROOM 181-G
                 LOS ANGELES, CALIFORNIA 90012
25                    kchong12907@yahoo.com
```

UNITED STATES DISTRICT COURT

```
 1                    APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFF:

 4        STEPHANIE YONEKURA
          UNITED STATES ATTORNEY
 5        BY:  ELLYN MARCUS LINDSAY
          Assistant United States Attorney
 6             BYRON J. McLAIN
          Assistant United States Attorney
 7        United States Courthouse
          312 North Spring Street
 8        Los Angeles, California 90012

 9

10   FOR DEFENDANT PRITCHARD:

11        LAW OFFICES OF MICHAEL W. EMMICK
          BY:  MICHAEL W. EMMICK
12        ATTORNEY AT LAW
          3701 Highland Avenue, Suite 305
13        Manhattan Beach, California 90266

14

15   FOR DEFENDANT BLAUVELT:

16        LAW OFFICES OF STEPHANIE AMES
          BY:  STEPHANIE AMES
17        ATTORNEY AT LAW
          12100 Wilshire Boulevard, Suite 800
18        Los Angeles, California 90025

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
1                      I N D E X

2   CASE CR 14-282-R                    OCTOBER 22, 2014

3   PROCEEDINGS:

4   CLOSING ARGUMENT                    PAGE

5       BY THE GOVERNMENT               4, 65

6       BY DEFENDANT PRITCHARD          27

7       BY DEFENDANT BLAUVELT           49

8   JURY INSTRUCTION                    80

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1              LOS ANGELES, CALIFORNIA; WEDNESDAY, OCTOBER 22, 2014

 2                            10:04 A.M.

 3                              -oOo-

 4              THE CLERK:  Calling Item No. 1.  CR 14-282-R,

 5   United States of America versus David Pritchard, et al.

 6   Counsel, please state your appearances.

 7              MS. LINDSAY:  Good morning, Your Honor.  Ellyn

 8   Lindsay and Byron McLain for the United States.

 9              MR. EMMICK:  Good morning, Your Honor.  Mike Emmick

10   appearing for Mr. David Pritchard.

11              MS. AMES:  Good morning, Your Honor.  Stephanie Ames

12   appearing with Christopher Blauvelt.

13              THE COURT:  Bring down the jury.

14                  (Jury in at 10:06.)

15                  (The following proceedings were held in the

16                   presence of the jury:)

17              THE COURT:  The record will show the jurors are all

18   present in their proper places.  The defendants are present

19   with their counsel.

20          Your summation.

21              MS. LINDSAY:  Thank you, Your Honor.

22          Good morning, Ladies and Gentlemen.  Once again, my name

23   is Ellyn Lindsay.  I'm an assistant United States attorney here

24   in Los Angeles.  This is my colleague, Assistant United States

25   Attorney Byron McLain and FBI Special Agent Eric Potocek.
```

1        Ladies and gentlemen, last Tuesday, my colleague, Byron

2    McLain, told you that this case is about theft, about theft by

3    lies, fraud, and deceit.

4        And over the past week and a half, that's exactly what

5    you've heard.  You have heard how the defendants, David

6    Pritchard and Christopher Blauvelt, stole tens of millions of

7    dollars from unsophisticated, unwealthy, and elderly investors.

8        And what did they do with it?  Well, you saw that the

9    great majority of that money just went to the company itself.

10   40 percent for administration, 25 percent just to the sales

11   staff that was soliciting the investments, and only a tiny

12   amount ever into any movie.  There was also $3 million that

13   went into the pockets of these defendants through their

14   salaries and their perks.

15       Defendant Blauvelt, as we have heard, used the company's

16   bank accounts as his personal piggy bank, getting $1,200

17   massages, supporting his girlfriend, and keeping his boat slip.

18       Defendant Pritchard threw away money on, as defendant

19   Blauvelt put it, pet projects that would never earn an investor

20   a dime.  And then he also used those bank accounts to lead a

21   luxury lifestyle, flying himself, Nadia Davari, and her mom all

22   over the country, shopping at Barney's and Louis Vuitton on the

23   investors' dime, spending tens of thousands of dollars in fancy

24   hotels.

25       You heard that in mid-2009 when Iowa denied GigaPix tax

credits, the company became a financial disaster and just going downhill.  All the money coming in was spent only to pay off the company's debts and nothing that could ever earn an investor a dime.

But you heard that in, order to keep the money flowing, to pay off these old debts and to keep the luxury lifestyles going, these defendants continued to solicit investment money through lies, fraud, and deceit, telling the investors that the investments into GigaPix and OZ3D were safe investments that would make them a big return.

As a result, 730 investors lost over $21 million.

Ladies and gentlemen, now I will discuss with you how this egregious conduct by these defendants makes them guilty of mail fraud, wire fraud, and the offer and sale of unregistered securities.

His Honor, Judge Real, will instruct you in the law, and he'll tell you that in order to find a defendant guilty of mail or wire fraud, there are four elements that you must find beyond a reasonable doubt.  The first three are the same for both crimes, so let's go over those.

The first is that the defendant participated in a scheme to defraud; that is, a scheme to deceive or cheat, or a scheme to obtain money from someone through lies.

Second, that those lies were what they say is material, which means that they reasonably influenced someone to part

1    with money or property, or, in other words, they were

2    important.

3         Third, that the defendant acted with the intent to

4    defraud, which means the intent to deceive or cheat.

5         Now, fourth, for mail fraud is that the defendant used or

6    caused to be used the mails or private or commercial carrier

7    operating in interstate commerce, for us here that means FedEx,

8    to further a part of the scheme.

9         For wire fraud, that final count -- sorry -- that final

10   element is that the defendant used or caused to be used the

11   wires in interstate commerce to carry out the scheme, and in

12   the context of this case, what that means is there was a

13   telephone call from one state to another state.

14        So let's look at these elements.  First, whether the

15   defendants participated in a scheme to defraud or a scheme to

16   obtain money from people through lies and deceit.  Now, as to a

17   scheme to defraud, you may think well, these defendants didn't

18   sit down and say, "Hey, let's cheat people," a formal agreement

19   like that, but that's not necessary.

20        The defendants have told you that they went into this

21   arrangement with good motives, that Defendant Pritchard needed

22   a source of funds for his movie projects and Defendant Blauvelt

23   wanted to stop using all the money just for his own personal

24   piggy bank and actually have something to show for it.

25        But, in fact, from the start this was nothing but a scheme

1    to defraud.  And here is why:  As these defendants well knew,

2    there was no way that any investor could ever earn a dime.

3        Now, as we know, there were two investments, GigaPix and

4    OZ3D.

5        As to GigaPix, the main reason that GigaPix was a scam

6    from the start is something that we have kind of glossed over,

7    and that is that almost no money at all was actually used to

8    make movies.  You'll remember, 40 percent administration; over

9    25 percent for the sales room; and only, if you're giving them

10   the benefit of the doubt, 20 percent ever going to anything

11   that can ever make an investor a dime.  The rest, as I said,

12   went to keep GigaPix itself going and into the pockets of these

13   defendants.

14       The second reason that, even if more money had been spent

15   on movies, this was a scheme to defraud from the beginning, is,

16   as these defendants knew, it is almost impossible to make money

17   from an independent movie.

18       And the best illustration of that is what David Pritchard

19   told you was GigaPix's shining star success, the home run of

20   GigaPix, the show Workaholics.  And what have you heard about

21   that?  It didn't put a dime of return into an investor's

22   pocket.  It didn't save the investors from losing every cent

23   they put in.  And it didn't keep GigaPix from declaring

24   bankruptcy.

25       There's simply no way that this could work.  They knew it,

1    because they knew the business, and they continued to solicit

2    the money.  That's why it's a scheme to defraud.

3         The third reason that it's a scheme to defraud is that

4    even if by some stretch money could be made in this way, after

5    mid-2009, everything was a disaster.  The company was going

6    down the tubes.  And what did they do?  They kept bringing in

7    more and more and more money, telling people that everything

8    was great, telling people that movies were going to be made.

9    And then just throwing it all away on GigaPix's debts.

10        The other investment was into OZ3D, and as we have heard,

11   this was really just a straight rip-off.  As you heard,

12   virtually every penny coming into GigaPix was misappropriated

13   by Defendant Pritchard and sent over to GigaPix to plug up

14   those debts and to try and salvage the sinking ship.

15        None of the investors into OZ3D could make a dime because

16   no money was spent on OZ3D.  Meanwhile, Defendants Blauvelt and

17   Pritchard continued to solicit the money from the investors in

18   OZ3D, telling them the movie was filming, telling them it was

19   almost released, telling them it was in production, and putting

20   investor money into their own pocket.

21        So, again, right from the start of these investments, they

22   were schemes to defraud.

23        Now, there also -- although you don't have to find both,

24   you can find one or the other -- also a scheme to take money

25   from people through lies.  So what I would like to do is go

1    through with you some of the lies that the defendants and their

2    salespeople told that these -- both of these defendants have

3    admitted are false.

4        First, that the investors would receive substantial

5    returns.  The truth was, as we've discussed, even if a movie or

6    show did well, the investors would never see any returns.

7        Lie, that OZ3D was filming or would be in theaters soon.

8    Now, why is that important?  It's important because the

9    investors can't see a return until that movie is made and

10   distributed and money starts coming in.  So that was the lie.

11   The truth that we have heard is that it was never even in

12   production and never going to be released.

13       Lie, that the investors would receive returns within 12 to

14   18 months.  The truth is, as we've seen, the investors would

15   never receive any returns.

16       Lie, that the investment carried little or no risk.  Now,

17   these defendants tried to tell you that investors weren't told

18   that.  But remember, these were hourly wage earners, these were

19   elderly people with their retirement money, their 401(k).  They

20   told you they would never have put money into a risky

21   investment.  They were told this investment had little or no

22   risk.  And the truth, as we know, is it was about as risky as

23   you can get.

24       Lie, that anytime after mid-2009 everything was going well

25   at GigaPix.  The truth, after the Iowa disaster, the company

was falling apart.

Lie, that the majority of the investors' money would be used to make movies.  Truth, only a tiny percentage would actually go to making movies.

Lie, that GigaPix was being audited.  Truth, no audit would ever happen.

Lie, that GigaPix would go public within a short period of time.  Lie -- sorry, truth, that GigaPix would never go public.

In other words, the GigaPix and OZ3D investments were not only schemes to defraud but schemes to obtain money from people through these lies.

Now, these defendants have claimed to you that they weren't the ones who lied.  They say, well, Greg Pusateri and Cherie Brown were the ones who lied.  Mr. Pritchard told you he handled production and he didn't have anything to do with the dirty salespeople.  But you know that's just another lie.  And how do you know that?  Because Shawn Walker told you that he and Mr. Pritchard discussed the fact that the salespeople were lying to investors.

And Pritchard always said he would do something about it. What he did was not put a stop to it, but rather to move the salespeople to another office so that he could separate himself from them.  The salespeople were so distasteful that he moved them away.  But the reason we're here is because he kept taking the money that they were generating and putting it into his pet

1   projects and into his pocket.  He was well aware of what those

2   salespeople were doing, and he was enjoying the benefits.

3        You also heard about the specific lies and omissions that

4   Defendant Pritchard himself told investors.  First, you recall

5   that he told Danny Anderson in 2009 that OZ3D was very close to

6   being released and that the investment was safe.  This is

7   exactly what Mr. Pusateri had told Mr. Anderson.  And in the

8   context of Mr. Pusateri, Defendant Pritchard last Friday

9   admitted to you those are false statements.

10        At the end of 2009, after the Iowa tax issue that sent the

11   company into disaster, Pritchard told Jerome Goodman that

12   everything was going really well.  Now, as you remember,

13   Defendant Pritchard told Special Agent Potocek that he failed

14   to tell the investors, as he put it, quote, the bleak, blunt

15   truth about GigaPix.  And what Jerome Goodman told you is just

16   that.  He, Defendant Pritchard, told Jerome Goodman that

17   everything was going well.

18        Mr. Pritchard also told Mr. Goodman that OZ3D was going to

19   be bigger than any of them had ever planned.  Meanwhile,

20   Mr. Pritchard was taking all the OZ3D money and throwing it at

21   the debts of GigaPix.

22        Now let's look at some of the letters that Defendant

23   Pritchard wrote.  Exhibit 37 is a letter that Defendant

24   Pritchard wrote in January of 2009 in which he states that they

25   have nearly $60 million in funding for kids' films.  As Shawn

1  Walker told you, that was false.

2      Now, Mr. Pritchard got up there on the witness stand and

3  he said, "Oh, we had all these signed contracts, we had all

4  these signed letters."  And you know what he told you?  He

5  said, "Yes, we have them here in court."  Well, ask yourself,

6  where are they?  Why wouldn't he show them to you?

7      In fact, this is just like what he did with the investors

8  he did to you.  He promised what he could never deliver.  You

9  saw in the flesh how Mr. Pritchard is all flash and talk and no

10 substance and truth.

11     Now, on the next page of this letter, it states that they

12 had retained a public accounting firm that was in the middle of

13 a five-year audit.  Everyone, even Mr. Pritchard, admits that

14 he was lying there.

15     Yet in Exhibit 40, a letter that both -- both

16 Mr. Pritchard and Mr. Blauvelt signed on June 10th, 2009, they

17 claimed that Ernst & Young is doing their audit and it will

18 begin in mid-June.  Again, a blatant lie that even

19 Mr. Pritchard admits making.

20     As Mr. Blauvelt told you, Mr. Pritchard stopped any audit

21 that could possibly happen, because if an audit happened, they

22 would have seen how he was misappropriating and misusing

23 investor money.

24     Back to Pritchard's letters.  On May 24, 2011, Defendant

25 Pritchard sent two letters.  We have the first one, Exhibit 67,

1    in which he makes the statement that OZ3D is in production.

2         Now, you saw him on the stand trying to wiggle out of that

3    misrepresentation.  But remember that when he spoke to Special

4    Agent Potocek, before he remembered that he had sent that

5    letter, he said, quote, "Such a statement would be obviously

6    misleading."

7         Then defendant's own -- Defendant Pritchard's own witness

8    got on the stand, this is Jim Cardwell who you heard from

9    yesterday, saying that OZ3D was never in production.  And

10   Shawn Walker -- and even Defendant Blauvelt had no hesitation

11   in telling you that this statement is blatantly, obviously, and

12   completely false.

13        Again, you saw for yourself how Mr. Pritchard manipulates

14   words and the truth.  Look at Exhibit 68 sent by Pritchard on

15   the same day.  Not only does he repeat the lie that OZ3D is in

16   production, but claims that GigaPix is soon to be a publicly

17   traded company.  Again a falsehood.  GigaPix was never going

18   public.

19        Then Pritchard claims that GigaPix is about to finish a

20   $100 million prints and advertising fund.  Again, he said he

21   had all these signed agreements lined up.  And, again, where

22   are they?  Why did he fail to show them to you?  Could it be

23   that they don't exist?  As both Colin Mutton and Shawn Walker

24   told you, the reason is because this statement is a total lie.

25        Thus, Defendant Pritchard not only lied to you, but he

1   lied to investors and omitted to tell them important facts.

2       Now, Defendant Blauvelt got on the stand and told you that

3   the investors, in fact, were never lied to.  First, he claimed

4   he personally never uttered a false word to any investor.  Then

5   he told you that all of his salespeople could never have lied

6   because he and Ken Gross had a monitoring system where they

7   could listen in on their telephone calls and they would have

8   heard and Mr. Blauvelt was monitoring every call and would have

9   run in and fired the person if they said something false.

10      Well, how do you know that that's not true?  From Tiffany

11  Ryan and from Ken Gross himself.  Ken Gross told you that in

12  order to be able to hear what the salespeople were saying, he

13  needed to move them to an open area because otherwise they

14  couldn't be heard behind their closed doors, and he needed to

15  do that because the salespeople were making misrepresentations

16  to investors.

17      But when he wanted to put the two worst salespeople out in

18  the open, that is Cherie Brown and Greg Pusateri, who said no?

19  Who said keep them behind closed doors where they can say

20  whatever they want?  Defendant Christopher Blauvelt.

21      And Defendant Blauvelt actually admitted to Special Agent

22  Adam Storer that he was responsible for what the salespeople

23  told the investors.  But let's take a look at what he

24  personally told them.

25      First, he told Danny Anderson in July 2009 that OZ3D was

1    filming and would be released in theaters shortly.  He told

2    Mr. Anderson that he would receive revenues very soon.

3        He told Jerome Goodman that he would receive a substantial

4    return and that the investment carried no risk.  He told

5    Mr. Goodman that he had to invest within two weeks.

6        Now, he admitted to you on the stand that all those

7    statements were blatant lies, but he said that he would never

8    say any such thing to the investors because he personally would

9    never lie to any investor.

10        Well, we actually know that that's false.  First, he

11   admitted to Agent Storer that he and the rest were lying in the

12   private placement memorandums about how much money the

13   commissions and other expenses of selling the investment were.

14   So he admitted right there that he's a liar.

15        And let's look at the letters that he personally wrote.

16        Defendant Blauvelt started lying early.  Look at

17   Exhibit 55 in which he says that two movies are going into

18   production in September 2006.  As Shawn Walker told you, that

19   was completely false.

20        In January of 2009 Mr. Blauvelt sent a letter stating that

21   GigaPix had multi-million dollar funding for kids' films.  Look

22   at Exhibit 25.  In May of 2009, he wrote a letter lying about

23   hiring Ernst & Young for an audit.  Look at Exhibit 61.

24        And then look again at Exhibit 40, the letter that both

25   Mr. Pritchard and Mr. Blauvelt signed on June 10th, 2009,

1    claiming that Ernst & Young was doing their audit and it would

2    begin in mid-June.  As both defendants admitted to you, this

3    was a blatant lie.

4        At the end of 2010, Defendant Blauvelt wrote a letter,

5    Exhibit 45, stating that, while there were some issues in Iowa,

6    everything was really going to be okay because they were just

7    going to go to another state.  He omitted to say what was the

8    truth, which is that the tax issue in Iowa was the death knell

9    for GigaPix.

10       Now, remember what Danny Anderson told you about what

11   Blauvelt told him.  He said that the Iowa issue was just a

12   regulatory thing, no big deal, and they were just moving to

13   another state.  So this is just what Mr. Blauvelt told

14   Mr. Anderson, only it's in writing.  In other words, when

15   Mr. Blauvelt told you that he would never lie to an investor,

16   he was lying to you.

17       So you have seen in this trial that GigaPix and OZ3D were

18   actually founded on the lies and deceit of the defendants,

19   David Pritchard and Chris Blauvelt, through their salespeople

20   and through their own mouths and pens.  It was a scheme to

21   defraud and a scheme to obtain money through lies.

22       Now, the second element that the government must establish

23   to prove mail and wire fraud is that the lies told or facts

24   omitted were material.  And, as I said, basically that means

25   that they were important, that they would induce someone to

1    part with money or property.

2        Here's how you know that the lies told were material and

3    important.  Because Mr. Anderson, Ms. Hampshire, and

4    Mr. Goodman would never have invested had they known the truth,

5    that the great majority of their money would get eaten up by

6    overhead, by money to the salespeople, and into the defendants'

7    own pockets.

8        That the company was falling apart, especially after

9    mid-2009, that several states had issued cease and desist

10   orders against it, that none of the movie projects ever went

11   into production, and that the money put into OZ3D was

12   misappropriated and used to soak up GigaPix's debt and to

13   continue paying the perks of the owners.

14       Now, another interesting way that you know that the lies

15   were material is through the testimony of Tiffany Ryan.  She

16   told you, remember, that she tried to be a salesperson.  And

17   when she sold the investment, she carefully went over the

18   risks, she didn't guarantee returns, and she didn't guarantee

19   anything, actually, for that matter.  As a result, no one would

20   come near the investment.

21       Now, the third element that the government must prove is

22   that the defendants acted with the intent to defraud, again,

23   the intent to deceive or cheat.  How do you know that these

24   defendants had the intent to deceive or cheat?

25       Well, I'd like to suggest that Defendant Pritchard told

1  you himself.  He said, "It's about making a deal with the

2  devil."  The defendants had a choice to make.  Be open, honest,

3  and truthful and never get a dime from any investor, do what

4  they promised they would do with the money and not have

5  millions of dollars to spend on $1,200 massages and hot air

6  balloon rides; or to continue to take money from people who

7  could ill afford it, to lie to them, to steal from them, and

8  then to use the money however they wanted, to throw the money

9  away, paying lawsuits, meanwhile guaranteeing that the

10  investors would see huge returns.

11      You know the answer.  They made a conscious choice to lie,

12  to cheat, to make a deal with the devil.  And this, ladies and

13  gentlemen, is the intent to defraud.

14      Let's talk about other ways that you know that defendants

15  had the intent to cheat their victims.  First, they lied in the

16  private placement memorandums about their salaries and

17  commissions.  They hid information from the investors about the

18  cease and desist orders.

19      They never told investors, as Defendant Pritchard put it,

20  the bleak, blunt truth about GigaPix's financial condition.

21  They spent all the GigaPix -- sorry -- the OZ3D money paying

22  off GigaPix's past debts.

23      They took money from OZ3D investors by lying about whether

24  the movie was ever in production.  They refused to allow Ken

25  Gross to put Greg Pusateri and Cherie Brown out in the open to

1    prevent them from lying to investors.

2         They lied in multiple investor update letters.  When

3    things they promised in those letters failed to happen, they

4    didn't go back and correct the misstatements that they had

5    made.  They spent almost $2 million of the investors' money on

6    their own personal lifestyles.  And finally, as we'll discuss

7    later, they both admitted that they engaged in fraud.

8         Now, the final element that the government must prove in

9    order to show mail fraud is that there was a mailing.  So let's

10   look at the charged mailings.

11        Count 1 is the mailing of the letter signed by both

12   Defendant Pritchard and Defendant Blauvelt on June 10th of 2009

13   in which they claim that Ernst & Young is doing an audit.  This

14   is Exhibit 40.

15        Count 2 is the same letter but sent, instead of to Danny

16   and Clara Anderson, instead to Jerome Goodman.  This is

17   Exhibit 62.

18        Count 3 is the letter sent by Linda and Jerry Hampshire

19   containing their check for their investment in OZ3D.

20        Now, you may think, well, the defendants didn't send the

21   check.  Jerry and Linda Hampshire sent the check.  But this is

22   where another one of His Honor's instructions will come in

23   hand, and that is that it is that the defendant used or caused

24   to be used the mail to further the scheme.  So, in other words,

25   because the defendants and their salespeople induced Jerry and

1   Linda Hampshire to send the money, they are responsible for

2   this mailing.

3      This mailing also illustrates another piece of law, and

4   that is that the mailing or the telephone call need not itself

5   contain fraudulent information or material.  It just must

6   further the scheme in some way.  So by having investors send

7   their money in, this furthers the scheme.

8      Count 4 is the letter that Defendant Blauvelt sent to the

9   Hampshires on August 5th of 2009 containing their stock

10   certificate.

11      Count 5 is the check sent from Jerome Goodman to OZ3D on

12   December 11, 2009.  This is Exhibit 63.

13      Count 6 is the letter that Defendant Blauvelt sent to

14   Danny Anderson on around December 1st, 2010, in which he

15   downplayed the devastating effect of the Iowa tax issue.  This

16   is Exhibit 45.  Now, you will see that this letter is undated.

17   But recall that at the end of the letter it says, "As we move

18   into 2011."  So that's why it's on or about December 10, 2010.

19      Count 7 is the letter that Defendant Pritchard sent from

20   OZ3D to Jerome Goodman on May 24th of 2011 stating, falsely,

21   OZ3D is in production.  And that is Exhibit 67.

22      Count 8 is the letter that Defendant Blauvelt sent to

23   Jerome Goodman on November 25, 2011.  In this letter he lies

24   about why he stepped away from GigaPix for a brief period of

25   time.  He says it's for various reasons, never mentioning,

1  omitting to tell that it was really because so many states had

2  issued cease and desist orders against him.

3       Switching to wire fraud, Count 9 is the telephone call

4  between Defendant Blauvelt in California and Danny Anderson in

5  North Carolina on or about July 1st, 2009.  Remember,

6  Mr. Anderson told you that during that call defendant told

7  Mr. Anderson -- Defendant Blauvelt told Mr. Anderson that OZ3D

8  was in the process of filming and that he would see returns

9  very soon.

10      Count 10 is the telephone call between Greg Pusateri in

11  California and Linda Hampshire in Wyoming on July 1st, 2009, in

12  which Mr. Pusateri tried to talk Ms. Hampshire into putting her

13  401(k) into OZ3D.

14      Count 11 is the telephone call between Cherie Brown in

15  California and Jerome Goodman in Arizona in December -- I'm

16  sorry -- in January 2009 -- oh, sorry -- December 2009 in which

17  she told him that GigaPix was like Pixar, that the investment

18  had no risk, and that OZ3D was winding down production so that

19  he would see returns soon.

20      Count 12 is the telephone call between Defendant Pritchard

21  in California and Jerome Goodman in Arizona on January 1st of

22  2010 in which Mr. Pritchard told Mr. Goodman that everything

23  was going great and that the OZ3D investment was a

24  once-in-a-lifetime opportunity.

25      Now, you may ask yourself, how is it that Defendant

1    Pritchard would be responsible for letters sent by Defendant

2    Blauvelt and that Defendant Blauvelt would be responsible for

3    letters sent by Defendant Pritchard, or why either one of them

4    would be responsible for telephone calls that were made by Greg

5    Pusateri and Cherie Brown.

6        And the reason is this:  When one is part of a scheme to

7    defraud like this, of course, everyone has different roles.

8    And the law holds you responsible for what the other people do.

9    His Honor, Judge Real, will instruct you that if someone is

10   part of a scheme to defraud, then that person can be

11   responsible for other co-schemers' actions in the scheme, even

12   if the defendant did not know what they said or did, so long as

13   the defendant in question could reasonably foresee the act as a

14   necessary and natural consequence of the scheme to defraud.

15       So, for example, because both defendants knew that each

16   other were sending these investor update letters, they are

17   responsible for each other's letters.  Because each defendant

18   knew that Greg Pusateri and Cherie Brown were on the phone

19   soliciting money from investors, they are responsible for those

20   phone calls.

21       So ladies and gentlemen, as you have heard, GigaPix and

22   OZ3D were schemes to defraud and schemes to obtain money by

23   lies.  The lies told and the omissions were material, they were

24   important, and the defendants acted with the intent to defraud.

25       Finally, there were mailings and telephone calls across

1   state lines to further the scheme.  The defendants are guilty

2   of mail and wire fraud.

3       The defendants are also charged with the offer and sale of

4   unregistered securities.  Now, this might make your mind go

5   blank and you just think, well, that's very technical and a

6   regulatory issue and kind of who cares.

7       But as Professor Hicks told you, that's not the case.  The

8   reason that stock offerings have to be registered with the SEC

9   is to make sure that unscrupulous fraud artists don't take

10  advantage of unsophisticated and unwealthy investors.

11      What happened here is that by failing to register with the

12  SEC, the defendants' conduct went undetected.  They could lie

13  to investors and misuse the money, and nobody would be able to

14  watch over them.

15      His Honor, Judge Real, will instruct you that in order to

16  prove the defendants guilty of the offer and sale of

17  unregistered securities, the government must show first that

18  the securities which the defendants sold were not registered

19  with the SEC; second, that the securities sold were required to

20  be registered with the SEC, that is, that they were not exempt;

21  third, that knowing that the securities were not registered and

22  not exempt, the defendants willfully sold or caused them to be

23  sold to the public; and, fourth, that the defendant used or

24  caused to be used the mails or means and instrumentalities of

25  interstate commerce to sell the securities.

1     Now, regarding the first element, there's really no

2  question here but that the investments sold into OZ3D and

3  GigaPix were securities and that they weren't registered.

4     So as to the second element, should they have been

5  registered, well, as Professor Hicks told you, neither the

6  GigaPix nor the OZ3D offerings were exempt.  They needed to be

7  registered.

8     Now, why was that?  There were two reasons.  The first

9  reason is because there was mass solicitation, cold-call

10 telemarketing.  The second reason is because both OZ3D and

11 GigaPix had way too many unaccredited -- that is, unwealthy --

12 investors in them.  So there's no question that these

13 securities should have been registered.

14     Skipping to the fourth element, let's talk about the mails

15 that were used.

16     For Count 13 these are the units sent to victims Danny and

17 Clara Anderson.  Look at Exhibit 42.

18     For Count 14, these are the units sold to victims Linda

19 and Jerry Hampshire.  Look at Exhibit 106.

20     For Count 15, these are the units sold to victim Jerome

21 Goodman.  Look at Exhibit 64.

22     So the question really is here, did each defendant know

23 that these securities should have been registered and then

24 willfully sell them anyway.  Well, the defendants told you that

25 they did.

1        Defendant Pritchard knew all about SEC rules, mergers,

2   reverse mergers, audited financials, et cetera.  He knew that

3   GigaPix was not compliant with SEC rules and that they needed

4   to comply.

5        How do you know that?  Well, look at the letter he wrote,

6   Exhibit 37.  This letter was written in January of 2009, and he

7   said the goal was to become fully reporting with the SEC by the

8   first quarter of 2009.

9        Thus, he knew they weren't compliant and that they needed

10   to be, and as you have seen, he knew that they never were.

11        Then Defendant Pritchard's own witness, the lawyer

12   William Uchimoto, told you that he explained to both

13   Christopher Blauvelt and David Pritchard what the rules are.

14   So that even if they didn't know before, by July of 2009, they

15   were fully on notice.

16        And then -- and though Mr. Uchimoto may have had something

17   to do with one small GigaPix offering, remember, it was only

18   $880,000 out of 21 million, it was only 61 investors out of

19   730, and it was only GigaPix.  Mr. Uchimoto had absolutely

20   nothing to do with the OZ3D offering.  There was nobody to

21   check and see if there were too many unaccredited investors or

22   if they had been cold-called.  As you know, they were.  And you

23   will see that all the counts that the defendants are charged

24   with relate to that OZ3D offering.

25        For Defendant Blauvelt it's a lot easier because he just

1    admitted to Special Agent Storer that he was, in fact, guilty

2    of selling unregistered securities.  In fact, he told Agent

3    Storer at this crazy meeting on the beach that selling

4    unregistered securities is not the worst thing that I have

5    done.  So he admitted that he is guilty of the securities

6    offenses.

7         Thus, each of the defendants is guilty as charged of the

8    offer and sale of unregistered securities.

9         Ladies and gentlemen, as you have heard, the defendants,

10   David Pritchard and Christopher Blauvelt, not only stole money

11   from unsophisticated, elderly, and unwealthy investors, but

12   they are guilty of mail fraud, wire fraud, and the offer and

13   sale of unregistered securities.

14        Their attorneys will now have a chance to address you, and

15   after that I will have a chance to respond, and at that time I

16   will ask you to find the defendants guilty as charged.

17        Thank you very much for your time and attention.

18             THE COURT:  Defendant Pritchard.

19             MR. EMMICK:  Thank you.

20        May I proceed, Your Honor?

21             THE COURT:  You may.

22             MR. EMMICK:  I have 30 minutes to talk.  I have

23   about between 12 and 15 points I would like to make.  Why don't

24   we get started.

25        What I want to start with is some general points.  The

1    first is that in this case you will find that there's a huge

2    difference between Mr. Blauvelt and Mr. Pritchard in their

3    personalities, in their styles, in their honesty, in the

4    evidence against them in this case.  It's important because

5    that's one of the things you will be evaluating.

6        Second, keep in mind that this is a criminal case, not a

7    civil case, not a small administrative matter with a small

8    administrative fine.  The test is beyond a reasonable doubt,

9    not by those lower standards of preponderance of the evidence

10   or even substantial evidence.

11       Third, the focus here is not on whether some technical

12   error occurred in some PPM that got sent out to this -- to the

13   shareholders.  It's not something where there's a question

14   about whether production costs were supposed to be going at

15   10 percent or 20 percent.

16       The question is whether or not there was an intent to

17   deceive, an intent to defraud, an intent to cheat, whether or

18   not there was willful action on the part of Mr. Pritchard and

19   Mr. Blauvelt -- but, of course, my attention is on

20   Mr. Pritchard -- because that's really what this case is all

21   about.  It is about what was in their minds and what was in

22   their minds at the time they took action on behalf of GigaPix.

23       Finally, as general points that I wanted to start with,

24   this case is about a scheme to defraud.  But what you have

25   heard an awful lot about is not just an occasional newsletter

1    that went out, not just a couple of -- and I think -- two is I

2    think what you will be -- you will be reminded of, just two

3    possible phone calls, in a telemarketing case, two phone calls.

4          But this is a case where Mr. Pritchard spent 16 hours a

5    day trying to make GigaPix work.  He was the person who was

6    putting in the time, the effort, the creativity, yes.  He was a

7    person who wanted GigaPix to work, but keep the general picture

8    in mind.  Was his focus on GigaPix?  Was his focus on shifting

9    the investments to these bigger institutional investors because

10   that's what he was familiar with and that's what would make

11   GigaPix work.

12         With that, there's four different starting points, if you

13   will.  Let me hit the 10 or 12 other points I would like to

14   make.

15         First, this was described in openings as a telemarketing

16   case.  It's a simple term, using a telephone, trying to market

17   the shares.  Let's take a look at this as a telemarketing case.

18   Keep in mind, this is not a case where the company falls apart

19   because of anything wrong they had said.

20         What happened in this case is that the economy went bad.

21   There was a recession.  Things bad happened.  Second, Iowa did

22   the stupid thing of pulling away the incentive, the tax

23   incentive that was what drew GigaPix into spending over a

24   million dollars, a couple million dollars, in order to make

25   their production work there.

1     When those two things happened, things do start to fall

2  apart, and it hasn't got anything to do with bad actions by

3  anyone's part, it's just stuff that happens.

4     And a related third thing is that other investors, big

5  investors, the investors that Mr. Pritchard was trying to push

6  for, did their own due diligence and found some things that

7  were just uncomfortable for them.

8     So my point here is, walking through some telemarketing

9  parts, this is not really a case where something went bad with

10  this company as a result of anything that was done by

11  Mr. Pritchard.  Mr. Pritchard was trying to save this company,

12  was trying to make the company work.  And that makes all the

13  difference when you start off.

14     Let's talk about timing.  And, again, what I'm trying to

15  do is slowly focus on more and more narrow kinds of points.

16  Timing, there was 11 years of GigaPix activity involved here.

17  Started in 2002, finally ended up in 2012.  Mr. Pritchard was

18  only there from -- he was there half time from 2006 to 2007.

19  But my point here is that for that beginning time, for half the

20  time, roughly half the time, he wasn't even there at all.

21     So whatever the kind of selling, the kind of telemarketing

22  conduct that was supposedly done by GigaPix, he wasn't even

23  there at all for that beginning period.  The focus as to

24  Mr. Pritchard then has to be in that second period.

25     One of the points that I made in my opening, and I'm just

going to stress it here as well, he was not the person in charge of sales.  He was not the person who was trying to talk people on the phone into doing anything.  There were only two phone calls involving him at all, and we'll talk about them in just two minutes.  I don't think they involved him actually at all.

But my overall point here is that he was not even a 1 percent owner.  Mr. Blauvelt was the 90 percent owner, and he -- all that was going on with Mr. -- Mr. Pritchard was that he was getting paid a salary.

Let's talk about whether he actually talked to any of the investors at all in a telemarketing case like this.  He's not the salesman.  It's not his style.  It wasn't what he liked to do.  Himself, he's an honest and straightforward guy.  He talked, by his own estimate, about 10 or 12 times to investors over six years.  That's once or twice a year.

We're not talking about somebody who's in the sales department.  We're not talking about an opener or a closer or somebody who is the chief of the section or even somebody who, like Mr. Blauvelt, is in charge of that section.  It's an occasional phone call once or twice a year.

Let's now talk about some of the investor testimony because in a telemarketing case, you would -- that's the most important thing, because that's when people are actually talking to the investors.

1          Only three investors testified.  Let's think about that

2     for a second.  Out of 770 total investors, the government has

3     brought in three.  One of them, Ms. Hampshire, didn't say

4     anything about Mr. Pritchard at all.  Zero.  Nothing.

5          So we're down to two.  Mr. Anderson, he's the retired

6     disabled Army vet, lots of calls were involved.  He talked to

7     Uch -- in fact, he read Uchimoto's letter.  He got the PPM.

8     And what did he say?  He said all those phone calls, he

9     recalled one phone call, and he thought it involved two people,

10    Mr. Blauvelt and Mr. Pritchard, but total time was ten minutes.

11    Wow.

12         So this is the small portion having to do with

13    Mr. Anderson.  Keep in mind that his questionnaire didn't

14    mention Mr. Pritchard at all, not at all.

15         And keep in mind that both Mr. Blauvelt and Mr. Pritchard,

16    although they admit that they talked to people -- or at least

17    Mr. Blauvelt admits that he talked to people a lot,

18    Mr. Pritchard didn't mention -- didn't say that he was involved

19    in this call.  In fact, he said specifically that he did not

20    get involved in this call.

21         And what, even from the government's point of view, is the

22    result of this?  A $5,000 investment, one that doesn't help

23    Mr. Pritchard at all because he is not one of the owners and

24    because he doesn't get the 10 or 20 percent or whatever it

25    might be connected to the salesperson.

1        The next -- excuse me.  The third person who testified is

2    Mr. Goodman.  Nice guy, 85 years old.  I don't want to say

3    anything bad about someone who's up in years a little bit.  He

4    was 85 years old.  He even got confused about the dates, talked

5    about 1904 as one of the dates.  It's unfortunate, but it

6    doesn't mean anything is lied to him.

7        Both Mr. Blauvelt and Mr. Pritchard deny the call at all.

8    And keep in mind, they're not denying calls generally.

9    Mr. Blauvelt made a ton of calls.  Mr. Pritchard made only a

10   few.  Why would this particular one be picked out by the

11   government?

12       There was -- as to at least two calls as to Mr. Pritchard,

13   there's no corroboration for those calls.  What do I mean by

14   that?  There's no recordings.  There's no notes.  There's no

15   other witnesses to the calls.  There's no phone records.

16       My overall point, in a telemarketing case where the focus

17   is on the use of the telephone, this is extremely weak

18   evidence.  I don't know how to quantify it on a one-to-ten

19   scale.  But we don't even know what the details are about what

20   is being spoken.  And part of that reason is it's five or six

21   or seven years ago.  And yet, if the focus is on the detail,

22   you have to know the detail in order to make this into a felony

23   case.  On a one-to-ten scale, it's like a one or a two.  This

24   is very weak evidence.  It's not even enough for a civil or

25   administrative case, much less a criminal case.

1          Let me turn my attention to a different topic, and that is

2    Mr. Pritchard himself.  What were Mr. Pritchard's motives

3    supposedly for this telemarketing activity?  Well, maybe one of

4    the sellers might have a motive to say things in order to

5    effect a sale.

6          But none of that might apply -- would apply to

7    Mr. Pritchard.  He doesn't get my money for the sale.  He

8    doesn't get any percentage money.  Even if the sale of $5,000

9    of a half a share of stock, does that somehow help him?  He

10   doesn't have any of the stock in order for that to help him at

11   all.

12         So that means that he doesn't have any particular motive.

13   He doesn't have any intent with respect to any statements that

14   are being made at that time.  He wasn't an opener or a closer,

15   and -- and that means that he didn't have the motive to do

16   these things that the government is somehow throwing in on him.

17         Let me make a second point.  Let's talk about

18   Mr. Pritchard's personal interests and his personal

19   inclinations.  Why does that matter?  Because it shows what

20   he's pushing for.  He's not pushing in order to sell $5,000

21   from one or $10,000 from the other.  What he's doing is he's

22   trying to push for the large institutional investors.

23         In fact, it doesn't even matter a hoot if he's able to get

24   a 20 and $30 million investment.  What does it even matter as

25   to a 5 or $10,000 investment?  It doesn't matter anything.

Case 2:14-cr-00282-R   Document 159   Filed 11/04/14   Page 35 of 103   Page ID #:935

35

1    And he's not one of the people who is supposed to be

2    talking to the -- excuse me -- to the possible investors at

3    all.  He's not in the sales group.  He's not a telemarketer.

4    He doesn't like telemarketing.  That's what he's trying to push

5    away, not what he's trying to bring close to him or even to

6    keep with GigaPix at all.

7        One of the things to keep in mind here is what is it that

8    Mr. Pritchard was actually doing and why was he doing it?  One

9    of the things that he did was he gave up his salary for three

10   years.  2010, 2011, 2012.  That's $250,000.  He's giving it up

11   himself.  These are things that he is willing to sacrifice in

12   order for the GigaPix arrangement to be kept along because he

13   believed that eventually this would work out.

14       Why does that matter?  It matters because he was a

15   believer, because if a person is giving up $250,000, is he

16   going to be intentionally committing a felony about 5 or

17   $10,000 that would go to the company?  He is giving a ton -- a

18   hundred times that amount of money himself.  What sense does it

19   make for him to commit an intentional felony when he's giving a

20   hundred times that amount of money himself?

21       He also was willing to give up another kind of money in

22   connection with one of the film projects that he had been

23   working on.  I think it was Workaholics.  He was actually

24   assigning some of that money to the company.

25       What's the point here?  The point here is the -- is that

we have almost no evidence that he's involved in this
telemarketing thing at all, and we have no reason to think that
he would actually do any of that because he's putting his own
personal money, sacrificing himself in the company.

Final point on Mr. Pritchard.  What about his personal
honesty?  What about that?  This is a fraud case.  This is not
just a little case where we're going to take a look at, you
know, what happens in the telemarketing arena.  In fact, one of
the odd things about this case, what started as telemarketing
in this kind of little, narrow -- everybody is on the phone
talking to people.  And then you finally find out from
Mr. Pritchard that what he's actually doing is he's going to
Toronto, he's going to Philly, and he's going to Iowa.  He's
the one who's trying to make this work.

And what is it that people say about his personal honesty?
Almost everyone who took the stand took the position that he
was a very honest guy, that he was creative, that he had
integrity, that he was actually one of the people who, when
talking to the salespeople, would specifically say to them,
"Now, I'm going to tell you about what some of our other plans
and hopes are, but don't tell that to anybody because we may
not have that actually done yet."

That is a wonderful thing because it shows how honest he
is and it shows how much he understands how to limit what the
salespeople say to the potential buyers.

1        Now, in fact, I think it was Ms. Ryan who was talking

2   about that in specific.  I guess in general I want to say that

3   there is almost no sense to the notion that Mr. Pritchard was

4   involved in this telemarketing scheme at all or even that there

5   was a telemarketing scheme.

6        And that in and of itself is enough reason for you to

7   conclude that Mr. Pritchard was not involved in this enough in

8   order to vote him guilty, and, in fact, there ought to be a not

9   guilty verdict for precisely that reason.

10       Let me try to walk through a few of the other witnesses,

11  I'll try to be as quick as I can.  But it's a way of putting

12  these things in perspective.

13       First, let's talk a little bit about the experts.  There

14  were two experts called in the case.  Honestly, they didn't

15  really matter at all.  And the reason is -- one of them was

16  Hicks.  And Hicks is a guy who came in and said, well, whether

17  the technical rules apply or not in order to give an exception,

18  he says no.

19       Okay.  But for the particular securities-related charges,

20  the real -- the relevant question is, number one, whether there

21  was a willful violation, and you have heard from both

22  Mr. Pritchard and Mr. Blauvelt what they thought of the law.

23       But even more to the point, Mr. Uchimoto, who is an actual

24  academic himself and a practitioner, he's the one who actually

25  put together the materials in 2009.  He knows what the rules

1    are, and he's the one who put them together and sent them out

2    to the investors.

3        Do you think Mr. Uchimoto is the guy who's going to be

4    aiding and abetting some kind of unregistered filing and

5    therefore himself be subject to some sort of a felonious

6    charge?  Uchimoto knows what he's doing.  And the two

7    defendants understood that what Uchimoto was okaying was

8    completely proper and appropriate.

9        Second, there was also an expert by the name of Tonya

10   Singletary [sic], the one about the money.  All she did was get

11   the money from banks, and she got information about the money

12   from Mutton.  It didn't really matter that much.

13       And part of the reason that it's worth even mentioning is

14   that Mr. Pritchard had an entitlement to the $250,000, but he's

15   the one who's actually giving it up.  He's the one who is

16   giving it up.  So when you count the money that he's being

17   paid, it's less than he's entitled to.

18       Let me talk next about the insider witnesses.  I call them

19   the insider witnesses for obvious reasons.  They're the ones

20   who were there working at GigaPix.  One of the ones, Ryan, it

21   turns out Ryan was the only one who was actually working as a

22   caller.

23       She was called by the government.  She mostly testified

24   about Mr. Blauvelt.  But she actually said some wonderful

25   things about Mr. Pritchard.  She talked about him being honest

1   and about talking with the salespeople about what not to say.

2   That's kind of a reflection of the actual character, integrity,

3   and nature of Mr. Pritchard that should be in your minds when

4   you evaluate this case in deliberations.

5        There's also two witnesses called by the government,

6   Mutton and Walker, but they were not part of the telephoning

7   crew.  They were not the closers, and they were not the

8   openers, and they were not the people in charge.  And, frankly,

9   they were strange witnesses, to say the least.

10       Mutton himself, very slack-jawed, very delayed responses

11   to the questions, trying to push the answers to the questions

12   in odd and unusual directions.  He actually -- his whole

13   background, 25 years with rock-and-roll.  Other witnesses

14   testified, like Mr. Uchimoto, that they had a problem with

15   Mr. Mutton.

16       But -- and this is the thing to think about Mutton, he's

17   the one who runs the books.  He's the one who puts the books

18   and the accounting together.  He is the one who looks at all

19   these things, talks to Mr. Pritchard, and ultimately concludes

20   this is being done right.  He sticks with it, and he sticks

21   with it all the way until the end.

22       You know, if someone takes the stand and says oh, this is

23   awful stuff, even though I stuck with it for five years, and he

24   stuck with Mr. Pritchard after the bankruptcy took place,

25   that's telling you through his actions what he really thinks of

1    Mr. Pritchard.  What he thought of him was he's being honest,

2    he's being trustworthy, and he's going to continue to work with

3    him.

4         Mr. Walker was a little bit more unusual, but you can tell

5    that as he calls himself -- and I hope I have this right --

6    that he was called the Prince of Darkness or the Sayer of Doom

7    or whatever it was.  He's a smart guy.  He hasn't got the

8    experience in these areas that Mr. Pritchard does by any

9    stretch of the imagination.

10        He is a guy who says negative stuff, and he says negative

11   stuff all the time, and that makes him subject to being

12   characterized for that.  But one thing you should know about

13   Mr. Pritchard, and a lot of people have said this, he likes to

14   listen.  He acquires information from people.  He talks to

15   people like Walker.  And that's what he does.

16        Walker doesn't know anything about production.  He doesn't

17   know anything about telemarketing.  He's in business

18   development, although he accomplished almost nothing in

19   business development.  And in the end he's a guy who had worked

20   for no money, which meant that he was owed $60,000.

21        Now, he may say that in some level something was done

22   incorrectly or imprecisely.  But the point is it wasn't the

23   kind of thing that caused him to leave.  It caused him to stay,

24   even though he's not being paid any money at all.  And that

25   undercuts what he is saying.

1          People's actions mean more than what they're willing to

2      say on the witness stand.  Even Mr. Blauvelt, who in a sense is

3      like an insider, he testifies -- and he testifies about a lot

4      of differences between him and Mr. Pritchard.

5          But he didn't say anything about Mr. Pritchard lying to

6      these investors.  What's interesting about that is Mr. Blauvelt

7      is in a position to have talked to hundreds -- excuse me --

8      thousands of investors.  And he does say a lot of things that

9      he disagrees with Mr. Pritchard but nothing about Mr. Pritchard

10     being on the telephone and talking.

11         And this is a telemarketing case.  If the people whom the

12     government's witnesses say were in joint phone calls and

13     they're -- and they're not even acknowledged by a person who

14     admits to thousands of phone calls, that's a pretty good sign

15     that that phone call didn't take place at all.

16         Finally, there was a fellow by the name of Ken Gross.

17     And, again, he's an insider.  Interesting guy, because toward

18     the end he was cross-examined about some supposed cease and

19     desist orders that at least mentioned him.  He gave completely

20     frank, completely candid answers.

21         And the way it applies to Mr. Pritchard is that he said

22     wonderful things about Mr. Pritchard who was very honest and

23     who only occasionally went to these sales meetings and said

24     things that he was supposed to be saying, what is on the table,

25     what might be happening.

1        And that's exactly what Mr. Pritchard should be doing.

2   That's not felonies.  That's not misdemeanor.  That's not civil

3   violations.  He's being supported by everyone.

4        From -- I am going to briefly talk only about the four

5   witnesses who were called as defense witnesses.  And I say that

6   because they were shorter testimony, but they were important

7   in -- in important ways.

8        I'm talking about Mr. Uchimoto, Mr. Konwiser -- that was

9   the wild yellow tie and fashionable clothes, I guess I should

10  say -- and there was a fellow named Brooks and a fellow named

11  Cardwell.

12       The overall point that they were trying to make is that

13  Mr. Pritchard is one of the most honest people they know.  He

14  is honest.  He is creative.  He has complete commitment and

15  persistent commitment to this particular venture.

16       Honesty is what a fraud case is all about.  If five or six

17  people come into this courtroom, come from Philadelphia, come

18  from Houston, come from wherever and talk about Mr. Pritchard

19  as being an honest person, that's something that you need to

20  consider.  You need to consider whether, if you work with a guy

21  for two years, he is worth flying across the country in order

22  to support if he's been charged with fraud.

23       The final point that I want to spend some time on -- I

24  have a final point and some final final points -- is the

25  interview.  And I say "the interview" because in this case

1    there has been a fair amount of emphasis placed on the

2    interview that is conducted of Mr. Pritchard at the end of --

3    after he's been arrested.

4        And it's kind of been emphasized by the prosecution that,

5    in fact, this interview was almost like a confession, almost

6    like an admission.  He is looking back at things and he is

7    saying, "Yeah, maybe I shouldn't have done that, maybe I'm to

8    blame, maybe I did something wrong."

9        What I really want to do though is stress a few aspects of

10   that that ought to undercut what the prosecution had said

11   almost entirely.  Here's what I mean.  There's a lot of odd

12   things about this interview.

13       First, it is done in connection with his arrest.  That is

14   to say, Mr. Blauvelt is actually interviewed three times before

15   this case is done at all.  I don't know if this is because this

16   is a change of heart or some kind of a last-minute decision.

17   But the point is there is no pre-indictment interview of

18   Mr. Pritchard at all, which is a little weird.

19       If you interview people at the beginning, you try to

20   acquire information, you try to check out the information.  You

21   don't wait until the charges and then do a first interview and

22   that's your best shot.  It should have been done before, in my

23   view, and it affects what kind of an interview takes place.

24       In that regard, let me say that it's also very strange not

25   to tape-record the interview.  Why is that such a big deal?

44

```
1    It's a big deal because there has been a dispute about what was
2    said and what was not said, what was meant and what was not
3    meant.  And in this case, the government obviously
4    tape-recorded these interviews for Mr. Blauvelt.  They could
5    have tape-recorded the interview of Mr. Pritchard.  It's not
6    because these are surprise things.
7         Mr. Pritchard was actually -- was actually interviewed
8    knowing that he was going to be arrested.  He -- because the
9    FBI went over there.  It was a preplanned arrest.
10   Mr. Blauvelt, on the other hand, he was just wandering in.
11        Nonetheless, which ones got actually tape-recorded?  The
12   tape recordings occurred with Mr. Blauvelt.  Does that matter?
13   I mean, I don't mean as a technical matter that it should have
14   been done.  I -- in fact, there's no requirement that they do
15   it.  Perhaps now there is.  But that's not the point.
16        The point is that these interviews are more revealing.
17   They're more important to see when you actually can hear it.
18   And that is important in this case because of what the nature
19   of the questioning was of Mr. Pritchard.  Because the
20   questioning was not that open-ended questioning where you sort
21   of say, "Well, what happened?  Tell us what was in your mind."
22        The questioning seemed to be to force Mr. Pritchard to
23   make a retrospective view of his own action and then to make a
24   kind of a retrospective hindsight evaluation.
25        Now, why does that even matter?  It matters the world.
```

1   Why is that?  Because everybody does things that are, you know,

2   variable, chaotic in their lives.  And if things don't go well

3   because -- for example, because the company doesn't go well,

4   you feel bad about it, and you wonder whether you did it wrong,

5   and you think to yourself, if you're somewhat introspective and

6   open-minded, you wonder about these things and you might even

7   entertain those ideas.

8        But the point of this case is it's not about him sitting

9   here now looking back and wondering about stuff.  The important

10  point is, when he was saying and doing things back then, he

11  wasn't on the phone, but if you're evaluating the phone calls,

12  was he saying things that he thought then were wrong or false

13  or deceptive in some way or being done willfully?  That is what

14  is required.

15       Looking back doesn't matter at all unless he is focused on

16  whether he had that criminal felonious intent at the time.

17  That is not the testimony we heard from the agent about those

18  discussions.

19       In fact, once the agent had him saying something like, "I

20  regret that," no more, no more follow-up.  He wasn't saying

21  though that, "I did something wrong and intended to do

22  something wrong at the time."  He's just one of these honest

23  guys who is willing to look at himself and say, "Now, two and a

24  half years after the company has gone bankrupt, gosh, maybe I

25  should have done something different."

1          That is candor.  That is introspection.  It has nothing to
2     do with whether five years ago the things that he said or
3     things that he thought were true or were not true.
4          Let me make a few final points, and that is this:  First,
5     there are some don'ts, I suppose you would say, in a case like
6     this.  And one is don't align Mr. Blauvelt and Mr. Pritchard.
7     They ran different parts of the company.  They did talk fairly
8     often.  But the amount of evidence against them is very, very
9     different, and the meaningfulness of the evidence is very, very
10    different.
11         A second point, and these are sort of a handful of points
12    I suppose you'd say, is that this is not and should not be by
13    you turned into sort of an oddly technical matter.  There are
14    some technical issues that get thrown around in a case like
15    this.
16         Whether or not it's a 10 percent or 20 percent commission
17    that was -- if you remember, there was a form that was put up
18    on the board.  The only false thing was whether or not the --
19    the commission that was described was supposed to be 10 percent
20    or 20 percent.  There's questions about that.  Didn't you know
21    that it was supposed to be 20 percent?  Didn't you know that it
22    shouldn't be 10 percent?
23         Those are technical issues.  They don't have anything to
24    do with the overall question of the criminal guilt of him.  And
25    in this case, if you remember, there was a witness afterwards

1    who said that the actual amount of the commission got shifted

2    from 20 to 10 after time.

3         What's the overall point there?  The overall point is that

4    this should not be about technical questions, about whether or

5    not it's productivity that's being -- that the OZ3D money is

6    being spent on, productivity or not productivity, production

7    versus preproduction.  Those are technical questions.  They're

8    important questions but only for internal management purposes.

9         If one thing -- one of the pieces of testimony that you've

10   heard is that in that animated area, the line between

11   production and preproduction is different than the line that is

12   elsewhere.  These are not the kinds of things that by any

13   stretch of the imagination should be making this into a felony

14   case.  This is little technical stuff.  It's not the stuff that

15   would make -- that would make him into someone who is engaging

16   in mail fraud or wire fraud or some sort of SEC sort of fraud.

17        And in that same regard, this is not a $10 million loss

18   case, any more than it is a $22 million loss case.  People do

19   lose money.  They lose money when they invest, and they lose

20   money when things go bad, and they lose money if something like

21   Iowa falls apart.  They lose money if something like the

22   recession falls apart.  And those things happen.

23        But the real question is did Mr. Pritchard contribute to

24   that?  Did Mr. Pritchard push things in that direction?  At the

25   end of the day, this is a case that is about whether he is

**UNITED STATES DISTRICT COURT**

1   going to be made a felon, whether or not his future is just

2   going to be laid out.

3        That is now in your hands, and I ask you, with all my

4   heart, to think closely and carefully about this, to

5   distinguish him from his co-defendant, and to find him not

6   guilty of the charges.

7             THE COURT:  All right.  Members of the jury, we'll

8   take a short recess.  I would remind you of your duty not to

9   converse or otherwise communicate among yourselves or with

10  anyone upon any subject touching on the merits of the cause on

11  trial, and you're not to form or express any opinion of the

12  case until it is finally submitted to you for your verdict.

13       Jury is excused until called.  Court will remain in

14  session.

15            THE CLERK:  All rise.

16                (Jury out at 11:24 a.m.)

17                (The following proceedings were held out of the

18                presence of the jury:)

19            THE COURT:  Ten minutes.

20                (Recess taken.)

21            THE CLERK:  All rise.

22        Please be seated.  This court is now in session.

23            THE COURT:  Bring down the jury.

24                (Jury in at 11:35 a.m.)

25                (The following proceedings were held in the

1              presence of the jury:)

2         THE COURT:  Record will show the jurors are all

3    present in their proper places.  The defendants are present

4    with their counsel.  We'll hear from Mr. Blauvelt.

5         MS. AMES:  Good morning, ladies and gentlemen.  On

6    behalf of Mr. Blauvelt, I would like to thank you for your time

7    and attention that you have spent this last week and a half and

8    to hear the evidence in this case.  Your role as fact-finders

9    is incredibly important to our community and to these two

10   individuals in particular.

11       At the beginning of this trial I told you that we would

12   let the evidence speak for itself and at the end of that

13   evidence I would come to you and ask you to find my client,

14   Christopher Blauvelt, not guilty, and that's exactly what I'm

15   here to do.

16       The government has the burden of proof to prove to you

17   beyond a reasonable doubt that Christopher Blauvelt, together

18   with others, knowingly and intentionally engaged in a scheme to

19   defraud.  The evidence has shown you that GigaPix was not a

20   scheme to defraud, that OZ3D was not a scheme to defraud.

21       You heard evidence that Mr. Blauvelt created GigaPix in

22   2002 for the purpose of making quality television and movie

23   productions, particularly in the area of 3D animation.  And

24   with that purpose in mind, he built a company from the ground

25   up.  He hired qualified people.  He purchased state of the art

1   equipment, all to meet the purpose of making this quality

2   entertainment.

3       And as he testified, the company did some work.  They had

4   various contracts, such as with Warren Miller Productions,

5   Nickelodeon.  Under Mr. Savage, they made pictures with Henson

6   Entertainment.

7       But the company wasn't really getting off the ground as he

8   had hoped, and so later on he hired five time Emmy Award

9   winning producer David Pritchard.  And the reason why he hired

10  Mr. Pritchard was to head up production.  And with all the

11  prior hits that Mr. Pritchard had produced -- the Simpsons,

12  King of the Hill, Family Guy -- Mr. Blauvelt understandably was

13  enthusiastic to have such a person leading his group.  And as

14  Mr. Blauvelt also told you during his testimony, there were

15  some limitations on some efforts of GigaPix along the way.

16      Now, Tiffany Ryan testified, and she told you that part of

17  her job was to find accredited investors.  That was part of her

18  job, to see that people were accredited, and if they weren't,

19  to put those aside, to get rid of those people.  And

20  Mr. Blauvelt testified as well that that was their goal, they

21  wanted accredited investors.  And why?  They wanted people who

22  understood the risks of the entertainment community.  You've

23  heard a lot about the risks.

24      They wanted people who could handle that risk, who

25  understood that risk, and who could afford that risk.  And so

1    along the way they created these packets of information to send

2    out to all of the investors or to the intention -- to the

3    intended investors.

4         And you've heard a lot about those packets of information.

5    And one of the first things that was in that packet of

6    information was for the investor himself or herself to let the

7    company know whether or not that they were accredited.  And

8    Mr. Blauvelt told you how if they were unaccredited, if they

9    saw that, they got rid of those people.

10        Again, they wanted people who could afford the risk.  They

11   didn't -- they were not looking for mom and pop-type people.

12   They were looking for people who could afford the risk.  And

13   that was part of that questionnaire that went out to people.

14   That was part of that questionnaire that Dan Anderson told you,

15   "Yes, I put that I was accredited," and that was the

16   information that GigaPix got.  They believed that this person

17   was accredited.

18        Along with that as well, they sent out a thick packet of

19   information.  We referred to these PPMs a number of times.  And

20   what did they lay out in these PPMs?  They laid out everything

21   that an investor would want to know about the company.

22        And I'm going to refer a few times here, it's Government's

23   Exhibit No. 58.  And what did they tell these potential

24   investors about the company?  They told them, and in bold, the

25   company has a limited operating history.  It goes on to

1    describe how Mr. Blauvelt started the company in 2002 but that

2    the company has a limited operating history.

3         They -- it notes that they've hired David Pritchard and

4    he's become associated with the company.  And as a result the

5    company produced and released in 2008 its first theatrical

6    film, Captain Abu Raed.  This provision goes on to say,

7    "However, there can be no assurance at this time that the

8    company will operate profitably or that it will have adequate

9    working capital to meet its obligations as they become to -- as

10   they become due."  Excuse me.

11        Further, this information they provided to potential

12   investors showed use of proceeds.  And it shows that their

13   total overhead expenses during 2007 -- now, this would have

14   been part of the administrative that Tonya Pinkerton talked

15   about -- our total overhead expenses, and this is page 33 of

16   the governmental exhibit, during 2007 were approximately

17   $2.8 million and in 2008 approximately $3 million.  They

18   disclosed their overhead expenses in this important document.

19        Further, as it went on to page 36, it lays out the

20   executive compensation.  And Mr. Blauvelt shows that he was

21   receiving compensation as the CEO of this company in the year

22   2006 for $250,000, in the year 2007, $230,000.  And all of that

23   information was laid out for the potential investors.

24        Now, the Honorable Judge Real is going to give you some

25   jury instructions, and one of those instructions states that an

1    investor's negligence is not a defense, and that's absolutely

2    correct.  But the reason why I am highlighting all of those

3    provisions in this packet of material that Mr. Anderson

4    received before making an investment, before Ms. Hampshire --

5    Mrs. Hampshire received before making an investment, which

6    Mr. Goodman received before making an investment, is that it

7    addresses -- for you it helps you in determining their

8    credibility as witnesses here on the stand.

9         Because each of them have said that there were various

10   representations being made to them, and you will have the

11   opportunity to evaluate -- you've had the opportunity to

12   evaluate their testimony, and when you go into your

13   deliberations, to determine what credibility you're going to

14   give that.

15        And I would submit to you that you should not give much

16   credibility to that because, in fact, each of these individuals

17   received all of this information laid out very particularly for

18   them to be able to read and understand.  And Mrs. Hampshire

19   said that she read the material.

20        Anyway, so in 2007 David Pritchard became associated with

21   the company, and they produced Captain Abu Raed.  And as Shawn

22   Walker testified, this was a successful film.  Now, it was only

23   successful critically.  It was not successful financially.  But

24   they were wanting to build upon that.  And they continued to

25   produce other critically successful endeavors, including the

1  Baker Boys, Behind the Surge, Workaholics, and each one of

2  these things created the greater potential for financial

3  success for all the people at GigaPix, for the employees, and

4  for all of the investors, and that was their goal.

5       Now, further, there's been the discussion about OZ3D.

6  And, again, packets of information, very detailed information

7  went out to each potential investor to lay out those risks for

8  OZ3D.

9       And each packet said at the very front of -- of the

10 document, this is an extremely risky business.  This is an

11 extremely risky venture.  And the government has suggested,

12 well, it's so risky that it's almost impossible to make money

13 as an independent filmmaking company.  And so they had to have

14 known, they had to have intended for this to be a scheme.

15      Well, ladies and gentlemen, we all are very well aware

16 that there are plenty of independent film production companies

17 out there.  They are attempting to make a good living at this

18 business, and it is not a scheme.  And GigaPix and OZ3D were

19 doing exactly that.

20      So the claims that have been made by the three witnesses

21 out of the 700-plus investors who invested in GigaPix are

22 directly contradicted by the written materials that were sent

23 out to all of these 700-plus investors.  They were made aware

24 of the risks up front prior to their investment.  No

25 misrepresentations were made in order to get them to invest.

1      They received all the correct information.

2          And, in fact, again, page 17 of that government's exhibit

3      shows that the year ending 2008 the company was at a net loss.

4      There was no claim that they were successful financially, that

5      they were making a lot of money.  In fact, just the opposite.

6      They showed that in 2008 they were functioning at a net loss.

7          In addition to the written materials that you have seen

8      that directly contradict those witnesses, you also heard

9      directly from Mr. Blauvelt himself.  And he told you that he

10     never told an investor that they would receive revenues very

11     soon or the company was doing so well that he was going to sell

12     his shares or that OZ3D was currently filming or that OZ3D

13     would be released in theaters shortly.  He directly contradicts

14     the testimony of those three investors of the 700 investors who

15     invested in this company.

16         So in addition to the written disclosures that you have --

17     that you have seen in evidence, he personally directly

18     contradicts the testimony of Mr. Anderson and Mr. Goodman when

19     they say otherwise.  And as been noted by counsel for

20     Mr. Pritchard previously, both Mr. Blauvelt and Mr. Pritchard

21     stated that they've never had a group conference call with

22     Mr. Anderson.

23         And, again, Mrs. Hampshire admitted that she read the

24     materials before she invested.  And I would note to you that

25     the second investment that was made was actually made by her

1    husband who was not a witness here, so we don't know what his

2    reasons were in making that second investment of $10,000.

3         Mr. Blauvelt clearly told you that he did not make any

4    knowing or intentional misrepresentations to the investors.  He

5    not -- he did not knowingly or intentionally conceal any

6    material facts to investors.

7         Now, he acknowledged, both to the agents and to you as the

8    jury, that they had some problems with regulatory agencies in

9    various states.  And he told you that they had hired an

10   attorney, Mr. Ed Swanson, in the very beginning who helped them

11   prepare all of these documents that were to go out to investors

12   to make sure they were accurate, and in preparing these PPMs,

13   that they were negligent and they failed to include the

14   information about Wisconsin and in the situation that had

15   happened in Wisconsin.

16        And he testified that that was negligence on their part,

17   he acknowledged that, and that was an oversight, but it was not

18   an intentional concealment.  And, in fact, when they discovered

19   the error, they made sure that in their subsequent PPM that

20   they disclosed that.

21        And so, again, Government's Exhibit 58, it specifically

22   notes "prior securities regulatory matters."  And it states,

23   "The company provides disclosure to prospective investors of

24   regulatory matters that have previously arisen with securities

25   regulatory authorities."  And it notes each one of them in

1   Wisconsin, in Oregon, in Colorado, and in California.  So

2   they -- they advised potential investors properly as to these

3   regulatory issues.

4        And Mr. Blauvelt on his -- on his direct testimony

5   acknowledged that he and the company neglected to disclose this

6   in the beginning, but they subsequently did.  And, in fact,

7   because of their failure to initially disclose it, that it

8   resulted in kind of a snowball effect and additional regulatory

9   problems occurring.

10       But they sought out legal counsel, and you heard from

11  Mr. Bill Uchimoto, whose -- whose purpose primarily was to make

12  sure that okay, we've learned from some prior mistakes that

13  we've made.  Going forward we want to make sure that we do

14  things accurately.  And so he followed up and made sure that

15  all of that information was in there.

16       And they even went to the extent of having a statement of

17  assets, liabilities, and equity included in their statement to

18  potential investors.  They included a statement of cash

19  receipts, of cash disbursements, again, acknowledging to all of

20  the potential investors that they were working at a net loss,

21  that they were not financially successful.  They hoped to be.

22  They wanted to be a successful company, but they hadn't reached

23  it yet.  And it was extremely risky.

24       They further note, "We have no operations or revenues at

25  this time."  They note for the OZ3D that there's risks of

1    distribution, there's risk of production.  The motion picture

2    industry is extremely speculative and inherently risky.

3         Now, I'd like to talk briefly about the salespeople.

4    Mr. Blauvelt told you that in addition to him not making any

5    misrepresentations to any potential investors, that he also did

6    what he could to make sure that the salespeople did not make

7    any misrepresentations as well.

8         And, in fact, he told you how he fired some people if he

9    heard that they had made any sort of misrepresentations.  He

10   told you about Mr. Hines.  And he told you that he did fire

11   Mr. Pusateri.  But because he wanted to help him out, he agreed

12   to let him come back.  Maybe that was a mistake, but he thought

13   he had learned his lesson and that he was going to make the

14   proper representations.

15        So there was no knowing or intentional misrepresentations

16   in that way.  He told you that there may have been some

17   isolated incidents, but when he became aware of them, he made

18   sure that they stopped.

19        And Ken Gross also testified, and he told you that that

20   was his role as well.  And he told you that he believed in the

21   honesty of Mr. Blauvelt and that Mr. Blauvelt was -- was trying

22   to take care of business properly.

23        Now, you know, he didn't -- he didn't want some of the

24   salespeople to have their own offices.  There's always politics

25   involved in offices.  But that was his role, to oversee these

1   people, and he told you that he took that role very seriously.
2   And that's his job.
3       And you heard that some investors were declined.  And, in
4   fact, Mr. Blauvelt testified that when he overheard something
5   that he didn't feel was quite right, he got on the phone and he
6   talked with that investor and he set things right.  So, again,
7   no misrepresentations or omissions were made on his part.
8       Now, I'd like to discuss briefly the securities issues.
9   And you've heard from two different experts, one who is a
10  professor who isn't licensed to practice law and he told you
11  that, well, these are unregistered, nonexempt securities.
12  There are a lot of detailed legal aspects, and he addressed
13  those.
14      But, most importantly, he did not testify that there was
15  any verification that there were more than 35 unaccredited
16  investors in any given year.  And that would be significant for
17  the sale of unregistered securities.
18      And you heard from Bill Uchimoto, who although was not
19  testifying as an expert, he told you about his expertise, he
20  told you about his experience, both with the SEC, with
21  Philadelphia, with the trade commissions, et cetera.  And I'm
22  labeling it wrong, I know.  You will recall from his testimony
23  that he was doing everything to make sure that these
24  unsecured -- these unregistered securities -- excuse me -- were
25  sold properly -- properly.

1        So, ladies and gentlemen, I would submit to you that this

2    case, as the government has noted, is about theft.  It's about

3    lies and deception.  It's about lies and deceptions that are

4    made at the time that the person gets the money from the

5    investor.

6        For defendant to be convicted of these charges, the

7    government must prove beyond a reasonable doubt that that

8    individual made a knowing and intentional misrepresentation or

9    concealment of a fact that was material to the investors

10   wanting to invest, that the person did so with the intent to

11   defraud that investor, and that that investor did respond or

12   act as a result of that misrepresentation.

13       Ladies and gentlemen, the government has failed to prove

14   beyond a reasonable doubt that Mr. Blauvelt made any such

15   knowing and intentional misrepresentations in order to get

16   investors to pay money.

17       And I'd like to look at a couple of their exhibits that

18   they have -- they have addressed in their -- in their closings.

19   Just one moment.

20       And one of those is Government's Exhibit No. 45 that was

21   sent out to investors, and it doesn't have any date or anything

22   of that on it.  But it notes and it says that this last year

23   has proven to be challenging across all industries and

24   Hollywood was no exception.

25       And it goes on to explain all the challenges that they've

**UNITED STATES DISTRICT COURT**

1   had with Blackbeard, with their other films that they were

2   hoping to make.  And it shows with the film incentives being a

3   major component of our financing, the instability of the

4   program in Iowa leaves them with no alternative but to move

5   their production out, and that's what they were trying to do,

6   and that's what the evidence has shown.

7       And, further, the evidence shows in support that their

8   films for their kids slate, as Mr. Pritchard testified, was

9   they were trying to put these -- these -- these slate of

10  materials on.  And Mr. Shawn Walker also testified as to the

11  many slates of production that they had ongoing and kind of the

12  vagueness of that term of a slate, "slated for production."

13      And Mr. Walker, I thought, was also very helpful in

14  showing all of the work that GigaPix was doing to support its

15  intent to make movies, its intent to make quality television

16  shows and animation.

17      Another exhibit that was shown by the government in their

18  closing was Government's Exhibit No. 69.  And in this

19  Mr. Blauvelt accurately lays out the fact that Mr. Jim

20  Caldwell [sic] is identified to come in and take over his role

21  so that they may further the company's interest.  And you heard

22  from Mr. Caldwell yesterday.

23      And it further notes, "Following my departure from the

24  company during the spring and summer of 2011, there have been

25  many financial events, both domestically and globally, which

1    have proven to be devastating to many industries, and these

2    conditions ultimately have had a profound effect on the future

3    in GigaPix as well."  And I won't -- I won't belabor the point

4    because you will have this exhibit back there that you are

5    going to be able to read as well.

6         But Mr. Blauvelt also told you and he told the agents,

7    "You know, you're right, things did not go properly with this

8    company.  I feel responsible.  I am responsible.  I'm the CEO.

9    I should have had better oversight.  Money was transferred into

10   GigaPix releasing when it was meant to be for OZ3D."

11        But the evidence also showed you that at the time they

12   were making the solicitations for OZ3D that they intended to

13   make that movie.  That was their intent when they requested

14   that money.  Now, admittedly, someone else moved the money

15   someplace else afterwards, but that is not what they are being

16   charged with, ladies and gentlemen.  They're being charged with

17   mail fraud and wire fraud, not with misappropriation of money

18   after it's been received into the company.

19        And I know the government made a lot about Mr. Blauvelt's

20   statements to the agents, and I would like to address that.

21   And you've had an opportunity to view him here as he testified

22   for you to determine his credibility, his honesty.

23        And you heard from witnesses who work for him who have

24   told you that they believed that he was being honest, that

25   maybe he wasn't the most sophisticated businessman, maybe he

1   didn't know as much as he should have about the industry, but
2   that he was honest in his dealings.
3        And he acknowledged to the agents two different times --
4   and I'll submit to you, the second time he was extremely
5   frustrated, and I think you can hear that in that recording.
6   He spent voluntarily an hour and a half, two hours of time in
7   2012 with these agents.  He told them the concerns that he had
8   about how money had been moved after the fact.  He was
9   concerned about that.  He wanted them to do an accounting.  He
10  was very willing and open.  He brought documents with him, gave
11  them whatever information they wanted.
12       Two years later still nothing has happened, and as
13  Agent Potocek -- no, I'm sorry, it was the other agent, I
14  apologize -- Adam Storer admitted that Mr. Blauvelt told him,
15  "You're ruining my life."  They had this Web site up, the FBI,
16  looking for victims, and when you Googled GigaPix, this is what
17  came up.  And he said, "Do something.  Either charge me or
18  leave me alone.  You are ruining my life.  I want my due
19  process.  I want a jury of my peers to determine what I've done
20  wrong, if anything."  And he acknowledged, "You know what, I
21  was the CEO.  I screwed up.  I should have done a better job."
22       The judge -- the Honorable Judge Real is also going to
23  give you an instruction that other wrongs, there was some
24  discussion about IRS, other things of that nature.  Those are
25  not to be determined in this case unless you determine they go

1   to the issues of intent or motive or something of that nature,

2   but that you are only here to determine whether Mr. Christopher

3   Blauvelt is guilty of mail fraud, of wire fraud, and the sale

4   of unregistered securities.  And I would ask that you return a

5   verdict of not guilty.

6        Thank you.

7            THE COURT:  All right.  We'll take a luncheon

8   recess.  I would remind you of your duty not to converse or

9   otherwise communicate among yourselves or with anyone upon any

10  subjects touching the merits of the cause on trial.  And you

11  are not to form any expression of the case until it is finally

12  submitted to you for your verdict.

13       You have not heard the final argument of the government or

14  the instructions, and we ask you to have that in mind as you

15  have lunch.  And return at one o'clock, and then you will hear

16  the final argument of the government and the instructions of

17  the Court.

18       You are now excused until one o'clock.  Court will remain

19  in session.

20           THE CLERK:  All rise.

21               (Jury out at 12:05 p.m.)

22               (The following proceedings were held out of the

23               presence of the jury:)

24           THE COURT:  One o'clock.

25               (Noon recess at 12:06 p.m.)

1          THE CLERK:  All rise.

2      Please be seated.  This court is now in session.

3          THE COURT:  Bring in the jury.

4              (Jury in at 1:13 p.m.)

5              (The following proceedings were held in the

6              presence of the jury:)

7          THE COURT:  Record will show the jurors are all

8  present in their proper places.  The defendants are present

9  with their counsel.

10      Final summation of the government.

11          MS. LINDSAY:  Thank you, Your Honor.

12      Ladies and gentlemen, before I respond to the arguments of

13  counsel, I just wanted to say a quick word about the beyond a

14  reasonable doubt standard.

15      As His Honor Judge Real will instruct you, the government

16  must prove its case beyond a reasonable doubt.  This is the

17  burden that the government takes on in every criminal trial in

18  this country, and it is a very high and very serious burden, as

19  it should be.  But it is not beyond all possible doubt.  It is

20  beyond a reasonable doubt, and what that means is that you must

21  use your reason and common sense in reaching a verdict.

22      Now, Mr. Emmick told you that this is a telemarketing case

23  and that Mr. Pritchard had little to do with telemarketing.

24  But this is not a telemarketing case.  This is a fraud case,

25  fraud, not only in the lies to the investors to induce them to

1   send their money, but lies in the way that the money was spent

2   and misappropriated.

3       Now, as to Mr. Pritchard not being the sales guy, that

4   doesn't matter as we discussed in my first argument to you

5   because in a scheme like this, different defendants have

6   different roles, and His Honor will -- and as His Honor will

7   instruct you, because each has different roles, each is

8   responsible for the actions of the others.

9       But Mr. Pritchard also did take part in the solicitation

10  of money from investors, as you saw, by instructing the

11  salespeople what to say, by taking calls himself, and also by

12  sending those investor letters to every single investor in the

13  investment.  Without -- and then without Mr. Pritchard's misuse

14  of the investor funds, the fraud and the loss to the investors

15  would not be complete.

16      Now, didn't you find it interesting that Mr. Emmick never

17  talked about the actual lies that Mr. Pritchard told in those

18  letters he sent to investors?  All he said was, well, there

19  weren't very many of them.  But those lies -- those lies

20  supported and extended and conferred what the salespeople told

21  the investors when they lied to them.

22      Mr. Emmick argues to you that Mr. Pritchard did not have

23  the intent to defraud, that he acted in good faith.  But again

24  this is the key question, how could he legitimately have

25  believed he could save GigaPix since everyone admits it's

1    virtually impossible to make money off of an independent movie?

2    And the investors in GigaPix and OZ3D were unsophisticated and

3    didn't even know that.

4         Now, Ms. Ames mentioned to you that there are many

5    independent movie companies operating, and if it was impossible

6    to make money off of an independent movie, how could they

7    operate.  Well, those companies are not run by mass cold-call

8    telemarketing and solicitation of hundreds and hundreds of

9    investors where 40 percent of the money coming in is eaten up

10   in administration and another 25 percent on top of that is

11   taken just to feed the sales force.

12        So there was really no way that Defendant Pritchard could

13   have saved the investors and the investments because there was

14   no way they could make any money.

15        So, what were his true motives?  I posit this to you.

16   One, to save his ego, because he invested his ego -- you saw

17   him on the stand.  He's so self-important.  He invested his ego

18   in that Blackbeard production.

19        Two, to save the disaster that he himself created by

20   failing to finalize the financing and have a production bond in

21   place.

22        And, three, to continue living luxuriously off of his

23   credit cards, paid for by the GigaPix investors.

24        But let's just say for the moment that Mr. Pritchard

25   really did believe that he could fix GigaPix.  Let's just say

1    that Mr. Blauvelt really did believe that Pritchard could earn

2    some money for the investors.

3        Well, they're still guilty as charged, and here's why:  As

4    His Honor Judge Real will instruct you, a defendant's belief in

5    the ultimate success of a venture, even if that belief is

6    honestly held, is not in itself a defense and does not justify

7    or excuse knowingly making false or misleading statements or

8    knowingly concealing material facts.

9        And basically what this means is that the ends do not

10   justify the means.  If Pritchard really thought he could save

11   the day, then he owed it to the investors to solicit their

12   money to do it honestly.

13       We would not be here if Pritchard and Blauvelt had gone to

14   the investors and said, "We have just had a disaster and we

15   need to plug the holes and we have these huge debts that we're

16   paying off, but I, Pritchard, am such a great guy and such a

17   fixer and such a hero that I believe I can take us through."

18   You heard, no investor was told that.

19       We also might not be here if the defendants had said, "Oh,

20   this is a terrible disaster.  We don't want to cause any more

21   harm to anybody else.  We're not going to take another dime

22   because we know we're just throwing good money after bad."

23   Again, did they do that?  No.  They continued to solicit just

24   the way they had before and to throw away the money they were

25   bringing in, which was OZ3D money.

1        Remember, again, that Mr. Pritchard admitted as much when

2   he said that he and the others as GigaPix failed to tell the

3   investors, as he put it, the bleak, blunt truth.  And because

4   they failed to tell the truth, they are guilty of fraud whether

5   or not they thought they could save the company.

6        Now, I wanted to talk for a minute about Mr. Emmick's

7   argument to you that Mr. Pritchard spent 18 hours a day trying

8   to save GigaPix.  And you saw two full days of testimony and

9   witnesses from Mr. Pritchard that amounted to absolutely

10  nothing because they had nothing to do with the issues in this

11  case, which are, were the investors lied to to get their money,

12  was that money misused and misappropriated.

13       But here's what you heard:  You heard a whole bunch of

14  evidence about this warrant exchange.  Well, that had nothing

15  to do with anything except these two defendants wrestling for

16  control of this company.  But control of the company didn't

17  matter because the company wasn't worth anything.  What was

18  worth anything?  That was the investor money coming in that

19  they took, in salary and in perks, $3 million between the two

20  of them.  That had nothing to do with ownership of the company.

21       Looking for institutional investors.  You heard a lot of

22  testimony about how Mr. Pritchard was running around looking

23  for institutional investors because he was disgusted by the

24  cold-call telemarketing and the salespeople.

25       But all the while -- and all this points up is that all

the while that he was talking about how disgusted he was by

this practice, he was taking in all of that money.  He never

put a stop to it.  He just accepted it.  He threw it away at

GigaPix's debts.

 And you heard he spent it on his own personal luxurious

lifestyle, flying himself and his friends around the country,

thousands and thousands and thousands of dollars at hotels,

balloon rides, Louis Vuitton, Barney's.  That's what he did

with the investor money that he was so disgusted by the way it

was brought in.

 Finally, there is some testimony that he did make some

efforts to make some movies.  So what do we have?  When he

first came into GigaPix in 2006, he did Captain Abu Raed.  And

as we heard, not a dime, not a penny for the investors.

 And then Iowa.  And Iowa, ladies and gentlemen, is his

fault.  That disaster is his fault.  He gambled with the

retirement money of Linda Hampshire, Jerome Goodman, and what

little money the Andersons had, because he wanted to go make

his movie, his pet project as Defendant Blauvelt put it, and he

didn't even have everything in place.

 And you have to have everything in place or else, if

something bad happens, it's disaster.  There's no bond.  And

all those people that thought they were going to have a job

come and sue you for your money.  That's what he did.  He

gambled with the investors' money on his ego project.

1    How about that testimony that he supposedly cared about

2  investors?  Well, Defendant Blauvelt told Agent Storer that

3  Mr. Pritchard couldn't be bothered to call back most of the

4  investors.  And then he told you himself on the stand, he said

5  I didn't really want to deal with any of these investors until

6  I -- unless I personally felt a kinship with them, unless I

7  felt that we were one to one, like these people that I -- that

8  would take me skiing.

9    How about an hourly wage earner like Danny Anderson or an

10  elderly man with hardly $20,000 to invest like Jerome Goodman?

11  He couldn't even be bothered to remember the name of Danny

12  Anderson, not only whose money he took but who testified here

13  in court.

14    And let's talk about this idea of Mr. Pritchard as an

15  honest man.  Now, he did bring in some witnesses to say, "Yes,

16  we believe Mr. Pritchard is an honest man."  But the defendant

17  admitted that he lied to the investors with that letter from --

18  saying that -- that they had hired Ernst & Young.

19    So we asked his witnesses, "Would it change your opinion

20  about his honesty if you knew that he falsely told his 700

21  investors that we were being audited by Ernst & Young?"  "Oh,

22  yes, that would change my opinion.  That would change my

23  opinion."

24    And then his witness, Konwiser, the one who got up on the

25  stand and talked about the brilliant financing of Iowa,

1    Mr. Pritchard hadn't even bothered to tell him that GigaPix's

2    contribution to that came from cold-call telemarketing, which

3    Mr. Konwiser said he would never do.

4        When I asked him, "Well, what if you knew that your

5    personal salary was paid for by investors in OZ3D," he said,

6    "Those OZ3D investors were lied to."

7        Ultimately the way that you know that Pritchard was no

8    hero at GigaPix relates to his proud recital to you, and

9    Mr. Emmick emphasized to you that he did not take a salary.

10   What a sacrifice.  First of all, as Tonya Pinkerton, the

11   financial analyst, told you, he was receiving checks through

12   2011.  And then there's, of course, his credit card.  Whether

13   it was a personal card or a company card doesn't matter because

14   the investors were paying for it.

15       And he's telling you that he's making all these sacrifices

16   and meanwhile flying around the country with his friends,

17   staying at those fancy hotels, balloon rides, Barney's, Louis

18   Vuitton.  This was Linda Hampshire's 401K, Danny Anderson's

19   hard-earned by-the-hour savings, Jerome Goodman's retirement.

20   He told you that nobody lost more than he did on this

21   investment, and that is just ridiculous and offensive.  Yes, he

22   lost the piggy bank that was the investors' money coming in,

23   but the investors lost their life savings to these defendants.

24       Defendant Blauvelt.  Now, he repeated again and Ms. Ames

25   brought up again his claim that he never lied to any investors.

We've already discussed how the investors contradict this and how his own written letters in his own hand show that he was lying.  Just remember Exhibit 40, the letter that states that they had retained Ernst & Young.

Remember also that he admitted to Special Agent Storer that they lied about the commission structure in the private placement memorandum.

We also discussed how he claims that he believed GigaPix and OZ3D would be a success because Pritchard -- and I think I have beaten enough of a dead horse about the fact that you cannot make money through these independent movies when, as Defendant Blauvelt admitted to Special Agent Storer, all the money was being eaten up by the overhead of the company.

Moreover, he knew, and he knew at the time, that the OZ3D money was being misappropriated by Defendant Pritchard.  But Defendant Blauvelt did nothing about it.  Instead he sat back, continued to collect investor money and use it as his own personal piggy bank.

I want to talk to you about the unregistered securities and about Mr. Uchimoto.  Both Mr. Pritchard and Mr. Blauvelt urge you to consider how lawyer Uchimoto cleaned up the securities problems.  Well, here's the problem with that argument:  Mr. Uchimoto only dealt with one GigaPix money raise, and it was only 61 out of 731 investors and $880,000 out of 21 million.  So what that means is that the rest of the --

1    of the money, $20 million from 670 investors, was not in

2    compliance.

3         He did nothing at all with that OZ3D private placement

4    memorandum.  And you will remember when Ms. Ames went through

5    the private placement memorandum and talked about how it

6    disclosed everything, well, that was the one that Mr. Uchimoto

7    worked on for just a few investors.  The OZ3D private placement

8    memorandum, $8 million worth of investor money, says nothing

9    about cease and desist orders.

10        I want to talk about the private placement memorandum for

11   a minute.  Now, Mr. Pritchard on the stand and Ms. Ames tried

12   to excuse the blatant lies in the letters and in the statements

13   to the investors by saying that this document, the private

14   placement memorandum, should cover them.  In other words, the

15   salesmen should be free to lie and say whatever they want to

16   say because as long as you put enough legalese in a booklet

17   like this and send it out to unsophisticated investors, you're

18   covered.  Well, that's not the way the law works.

19        First, as Ms. Ames acknowledged to you and as His Honor

20   Judge Real will instruct, in this court we do not blame the

21   victims.  The negligence or gullibility of a victim does not

22   excuse the defendants from fleecing them.

23        Also, His Honor Judge Real will instruct you that the law

24   doesn't work that way, that CYA way.  And he'll instruct you

25   that a defendant's actions can constitute a scheme to defraud,

even if there are no specific false statements involved.  The
deception need not be premised upon words or statements
standing alone.  The arrangement of words or the circumstances
in which they are used may create an appearance which is false
or deceptive even if the words themselves fall short of this.
Thus, even if statements as part of the scheme are not
literally false, you may consider whether the statements taken
as a whole were misleading and deceptive.

    What this means is that even if every single investor was
sent a PPM such as this, and even if it contained only truth,
you must consider why the victims invested in light of all the
circumstances, in light of the lies that they were told, in
light of the fact that the salespeople hired by the defendants
told the investors they didn't have to bother with this, it was
just legalese, and the fact that these investors were too
unsophisticated to even begin to understand it.

    In other words, you are to look at the situation with
common sense.  Were the investors misled or were they not?  Not
only that, but despite what the defendants tried to tell you,
they understood, they knew that the investors didn't know what
was in these PPMs.  And they knew that the investors were not
sophisticated, wealthy, or accredited.

    Now, how do we know that?  We heard from Mr. Anderson and
Mr. Goodman that neither Mr. Pritchard nor Mr. Blauvelt ever
asked them or confirmed whether they understood the risks or

1     asked them if they had read the private placement memorandum.

2         And these defendants you'll recall were in a conference

3     call with Danny Anderson, and they wanted $10,000 from him, and

4     Danny Anderson told them he didn't even have $10,000 to invest.

5     And what did these defendants say?  They said, "Oh, that's

6     okay.  We'll take 5."  They'll take his last $5,000.  So for

7     them to say that they were not aware of the nature of their

8     investors is just a lie.

9         Moreover, the investors, as we know, were never given the

10    full story of what was actually going on with the company.  So

11    even if the risks, et cetera, are delineated in the private

12    placement memorandum, if they're not given the truth, if

13    they're not the told the company is going downhill, if they're

14    not told that their GigaPix -- their OZ3D money is being

15    misappropriated, then they're not able to fully evaluate the

16    private placement memorandums.

17        And then, finally, the private placement memorandums

18    themselves had very important lies and falsehoods in them.

19    Actually, if we could just briefly look at Exhibit 255, page 1,

20    and if we could highlight the bottom box there.

21        Now, this is the private placement memorandum that

22    Mr. Uchimoto himself told you was the pinnacle of honesty and

23    forthrightness.  But right here, it says finders fee, that the

24    commissions are only 10 percent.  And as we know from the

25    testimony, every salesperson received a commission of

1   20 percent, that's a key fact, 20 percent just going into the

2   salesperson's pocket, and there's a lie.  And even Mr. Uchimoto

3   when asked by the judge said that is very wrong to do that, to

4   misrepresent like that.

5        Now, if we look at Exhibit 9, page 32, this is the OZ3D

6   private placement memorandum.  If we could just look at the use

7   of proceeds in there, it says only 2 million out of the 20

8   million, or really only 10 percent, is supposed to go to

9   GigaPix.  As you heard, 4 million or 50 percent actually did.

10       Now, if you want, take a look at all of this in the way

11  that this private placement memorandum tells the investors

12  their money is going to be used, animation, characters, voices,

13  publicity for the movie, et cetera.  In fact, as you heard,

14  less than 5 percent went to anything having to do with the

15  production of OZ3D.

16       Finally, there is nothing in this private placement

17  memorandum, and this is Exhibit 9, that says anything about the

18  multiple cease and desist orders against GigaPix.  So even if

19  you were trying to -- to rely on these private placement

20  memorandums, they're full of lies too.

21       I want to finish up with the defendants' own admissions of

22  guilt.  Now, that was very, very important testimony, and, of

23  course, the defense attorneys tried to excuse what their own

24  clients said.

25       For example, for Mr. Pritchard, Mr. Emmick brings up that

1  there was no tape recording.  Well, it would have been nice to

2  have a tape recording, and you can bet this young agent in here

3  is going to be tape-recording all his statements from now on.

4       However, you will recall that Mr. Pritchard said on the

5  stand there was only one real inaccuracy with what Agent

6  Potocek said, and that had to do with his trying to get around

7  saying that OZ3D was in production.  The rest of it was

8  accurate.  That's what he said.  The rest of it was accurate.

9       So let's look at what Mr. Pritchard said.  He said it's

10  hard to make money on independent movies.  He said after Iowa,

11  the company began to fall apart.  He said between 2010 and

12  2012, GigaPix was barely making it.  He said the salespeople

13  got their information from him.

14       He said the update letters he wrote in 2010 and 2011 did

15  not give all the bleak, blunt truth.  He said, "Was I parsing

16  it thin, probably."

17       Most importantly, he admitted that the OZ3D investors were

18  told that the majority of their investment would be spent on

19  preproduction and production for OZ3D.  And was it true, he

20  said?  No.

21       Actually, even more important than that is this, which

22  pretty much is the definition of fraud that you will hear from

23  Judge Real:  He agreed that he said things that were misleading

24  and omitted information about the true state of the company

25  when he spoke to investors.

1          That is why when Special Agent Potocek asked him, "Did you

2    commit fraud," he said, "I get it, I F'd up."

3          Now, as to Mr. Blauvelt, Ms. Ames was trying to convince

4    you that he was not in his right mind or something when he went

5    to the FBI and blaming the FBI because they were trying to

6    reach out to victims of his own offense.

7          But you heard Special Agent Storer who said, "No, he was

8    actually the same as he was the first time he came in.  It was

9    really not that different."  Here's what Mr. Blauvelt said.  He

10   said they were never really going to go public.  He said to say

11   OZ3D was in production is a lie.  He said to say there is a

12   $100 million prints and advertising fund is a lie.

13         He said most of the 24 to $25 million that they raised

14   went to overhead.  He said, quote, "Go through all the

15   financials, and let the chips fall where they may.  Whatever

16   I'm guilty of, I'm guilty of, but, you know, let's see what

17   happened and try to sort through this."

18         Then he said, as we've heard before, "Selling unregistered

19   securities is not the worst thing I've done in my life.  I'm

20   guilty of the percentage misrepresentations," that is, how the

21   private placement memorandum misrepresents how the investors'

22   money would be spent.

23         Finally, "I will stand up and plead guilty for OZ3D.  I'm

24   guilty of that."

25         Second, "I'll plead guilty for GigaPix."  And, finally,

1  "Federal time is a hoot.  It's no big deal.  It's a country

2  club."

3       So, ladies and gentlemen, as the defendants themselves

4  have admitted and as the overwhelming evidence has shown to

5  you, these defendants, David Pritchard and Christopher

6  Blauvelt, are guilty as charged of mail fraud, wire fraud, and

7  the offer and sale of unregistered securities.

8       Thank you very much.

9            THE COURT:  Members of the jury, now that you have

10  heard the arguments of the lawyers, it becomes my duty to give

11  you the instructions of the law that apply to this case.

12       Now that you have heard the evidence and the arguments of

13  the lawyers, I must now instruct you on the law that applies to

14  this case.  Your duty is to find the facts from the evidence

15  allowed during this trial, to apply the law to the facts, and

16  to return a verdict.  You must follow the law as I give it to

17  you, whether you agree with it or not.

18       You must not be influenced by any personal likes or

19  dislikes, opinions, prejudices, or sympathy.

20       You must decide the case only on the evidence as you

21  promised to do at the beginning of the case.  All instructions

22  are equally important, so you must follow them all and not

23  ignore any of them.

24       You were told about the -- about the indictment and its

25  provision of having 14 charges in that indictment.  You will

have the indictment with you in your deliberations so that you can refer to it.  It is only a reference document because an indictment is not evidence.

A defendant is presumed to be innocent until every part of the charges against him are proved beyond a reasonable doubt.

A defendant is not required to prove he is innocent.  If the government fails to prove the charge, you must return a not guilty verdict.

Unless I tell you otherwise, you are to apply these instructions individually to each defendant on trial.

A reasonable doubt is a doubt that is based upon reason and common sense.  Proof beyond a reasonable doubt is proof that leaves you firmly convinced of a defendant's guilt.  There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt.

You cannot convict on mere suspicion.  If based upon your consideration of all the evidence you are firmly convinced that the defendant is guilty of the crime charged, you must find that defendant guilty.

If, on the other hand, you think based upon reason and common sense that the government has not firmly convinced you of the guilt of the defendant, you must find that defendant not guilty.

Evidence beyond a reasonable doubt is such proof that a

1    reasonable person, in the use of reason and common sense, would

2    be willing without hesitation to make the most important

3    decisions in his or her own life.

4         The evidence that you can reach -- you can use to reach

5    your verdict is the sworn testimony of the witnesses, all

6    exhibits received in evidence, all facts you accept as

7    judicially noticed, all facts which have been agreed or

8    stipulated, and all presumptions upon which I instruct you.

9         In considering evidence, you need not accept simply the

10   bald statements of a witness.  You can use your own experience

11   to draw your conclusions from the facts you find have been

12   proved.  Evidence may be either direct or circumstantial.

13        Direct evidence is direct proof of a fact, like eyewitness

14   testimony or the contents of a document.  Circumstantial

15   evidence is proof of a chain of facts that leads to the

16   conclusion that some act has been committed or to another fact.

17   In law, there is no difference.  You can use both in

18   determining the facts of this case.

19        A trial does not require the prosecution to call every

20   possible witness to an event or to produce everything that may

21   be mentioned during the trial.  That often can be time

22   consuming and of no real value.

23        You can consider the failure to produce witnesses or

24   evidence if you feel it is necessary to your determination of

25   the believability of a witness or to meet the government's

1    burden of proof of every element of the charge beyond a

2    reasonable doubt.

3        In order to -- for a defendant to be found guilty of mail

4    fraud as charged in the indictment, the government must prove

5    each of the following four elements beyond a reasonable doubt:

6        First, the defendant knowingly participated in a scheme or

7    plan to defraud, or a scheme or plan to obtain money or

8    property, by means of false or fraudulent pretenses,

9    representations, or promises.

10        Second, statements made or facts omitted as part of the

11    scheme or material; that is, they had a natural tendency to

12    influence, or were capable of influencing, a person to part

13    with money or property.

14        Third, the defendant acted with the intent to defraud;

15    that is, the intent to deceive or to cheat.

16        And, fourth, a defendant used or caused to be used the

17    mails or private or commercial carrier operating in interstate

18    commerce, such as FedEx, to carry out or attempt to carry out

19    an essential part of the scheme.

20        In determining whether a scheme to defraud exists, you may

21    consider not only the defendants' words or statements but also

22    the circumstances in which each are used as a whole.

23        A mailing is caused when one knows that the mails or

24    private or commercial carrier operating in interstate commerce,

25    such as FedEx, will be used in the ordinary course of business

1    or when one can reasonably foresee such use.  It does not

2    matter whether the material mailed was itself false or

3    deceptive so long as the mail was used as a part of the scheme,

4    nor does it matter whether the scheme or plan was successful or

5    that any money or property was obtained.

6         Defendant David -- Defendants David Pritchard and

7    Christopher Blauvelt are charged in Counts 9 through 12 of the

8    indictment with wire fraud in violation of Title 18

9    United States Code Section 1343.  Section 1343 provides, in

10   part, as follows:  Whoever, having devised or intended -- or

11   intending to devise any scheme or artifice to defraud, or for

12   obtaining money or property by means of false or fraudulent

13   pretenses, representations, or promises, transmits or causes to

14   be transmitted by means of wire . . . communication in

15   interstate or foreign commerce, any . . . signals . . . or

16   sounds for the purpose of executing such scheme or artifice,

17   shall be guilty of an offense against the United States.

18        In order for defendant to be found guilty of wire fraud as

19   charged in the indictment, the government must prove each of

20   the following four elements beyond a reasonable doubt:

21        First, the defendant knowingly participated in a scheme or

22   plan to defraud or a scheme or plan for obtaining money or

23   property by means of false or fraudulent pretenses,

24   representations, or promises.

25        Second, the statements made or facts omitted as part of

the scheme were material; that is, they had a natural tendency to influence or were capable of influencing a person to part with money or property.

Third, the defendant acted with the intent to defraud; that is, the intent to deceive or cheat.

And, fourth, the defendant used or caused to be used the wires in interstate or foreign commerce to carry out or attempt to carry out an essential part of the scheme.

In determining whether a scheme to defraud exists, you may consider not only the defendant's words and statements but also the circumstances in which they were used as a whole.

A wire communication is caused when one knows that the interstate or foreign wires will be used in the ordinary course of business and when one can reasonably foresee such use.  It does not matter whether the material communicated in the wire was itself false or deceptive so long as the interstate or foreign wires were used as a part of the scheme, nor does it matter whether the scheme or plan was successful or that any money or property was obtained.

To prove the defendant guilty of mail or wire fraud, the government is not required to prove that the defendant actually mailed or wired anything or that the defendant even intended that the mails or wires would be used to further or to advance or to carry out the scheme to defraud.

The government must prove beyond a reasonable doubt,

however, that the mails or wires in interstate commerce were,
in fact, used in some manner to further or to advance or to
carry out the scheme to defraud.  The government must also
prove that the use of the mails or wires would follow in the
ordinary course of business or events or that the use of the
mails or wires by someone was reasonably foreseeable.

It is not necessary for the government to prove that the
item that was mailed or wired was itself false, or fraudulent
or contained any false or fraudulent statement, representation,
or promise, or that -- or was for the purpose of soliciting
money.

The government must prove beyond a reasonable doubt,
however, that the use of the mails or wires helped to further
or to advance or to carry out, in some way, the scheme to
defraud.

It is not necessary that the item mailed traveled from one
state to another.

Certain charts and summaries have been admitted in
evidence.  Charts and summaries are only as good as the
underlying supporting material.  You should, therefore, give
them only such weight as you think the underlying material
deserves.

A defendant's actions can constitute a scheme or defraud,
even if there are no specific false statements involved.  The
deception need not be premised upon words or statements

standing alone.  The arrangement of the words or the
circumstances in which they are used may create an appearance
which is false or deceptive, even if the words themselves fall
short of this.  Thus, even if statements as part of the scheme
were not literally false, you may consider whether the
statements taken as a whole were misleading and deceptive.

Evidence beyond a reasonable doubt that a scheme was
reasonably calculated to deceive is sufficient to establish a
scheme to defraud.

A defendant's belief in the ultimate success of a venture,
even if that belief is honestly held, is not in itself a
defense and does not justify or excuse knowingly making false
or misleading statements or knowingly concealing material
facts.

While it is not necessary for the government to prove that
anyone actually lost money as a result of the scheme alleged,
you may consider evidence of such a loss in determining whether
the scheme existed.

If you decide that the defendant was a member of a scheme
to defraud and that the defendant had the intent to defraud,
the defendant may be responsible for other co-schemer's actions
during the course of or in furtherance of the scheme, even if
the defendant did not know what they said or did.  For a
defendant to be guilty of an offense committed by a co-schemer
in furtherance of the scheme, the offense must be one that the

1    defendant could reasonably foresee as a necessary and natural

2    consequence of the scheme to defraud.

3         Each use of the mails or private or commercial carrier

4    operating in interstate commerce to advance or to further or to

5    carry out the scheme or plan to defraud may be a separate

6    violation of the mail fraud statute.  Each use of the wires in

7    interstate or foreign commerce to advance or to further or to

8    carry out the scheme or plan to defraud may be separated -- may

9    be a separate violation of the wire fraud statute.

10        The phrase "transmits by means of wire, radio or

11   television communications in interstate commerce" means to send

12   from one -- one state to another by means of telephone or

13   telegraph wires or by means of radio or television.  The phrase

14   "transmits by means of wire, radio, or television communication

15   in interstate commerce" includes a telephone conversation by a

16   person in one state with a person in another state.

17        A victim's negligence, gullibility, or even foolishness is

18   not a defense to a charge of mail or wire fraud.

19        Defendants Pritchard and Christopher Blauvelt are charged

20   in Counts 13 through 15 with the sale of unregistered

21   securities in violation of Title 15 United States Code Section

22   77e and 77x.

23        Section 77e and 77x provide, in part, as follows:  Unless

24   a registration statement is in effect, as to a security, it

25   shall be unlawful for any person, directly or indirectly, to

make use of any means or -- any means or instruments of
transportation or communication in interstate commerce or of
the mails to sell such security through the use or medium of
any prospectus or other -- or otherwise or to carry or cause to
be carried through the mails or in interstate commerce by any
means or instruments of transportation any such security for
the purposes of sale or for delivery after sale.  Any person
who willfully violates this prohibition shall be guilty of an
offense against the United States.

In order for a defendant to be found guilty of the illegal
sale or distribution of unregistered securities as charged in
the indictment, the government must prove each of the following
elements beyond a reasonable doubt:

First, the defendant directly or indirectly offered or
sold securities that were not registered with the Securities
and Exchange Commission.

Second, the securities were required to be registered with
the Securities and Exchange Commission; that is, the
transactions were not exempt from registration.

Third, the mails or the means and instruments of
transportation or communication in interstate commerce were
used in connection with the offer and sale of the securities.

And, fourth, that defendant acted willfully.

The term "security" includes notes, stocks, evidence of
indebtedness, transferrable shares, investment contracts, or

1    any interests or instruments commonly known as securities.

2         An investment contract is, one, an investment of money;

3    two, in a common enterprise; three, with an expectation of

4    profits produced by the efforts of others.

5         The indictment alleges that approximate amounts of money

6    were involved in the crimes charged.  It is not necessary for

7    the government to prove the exact or precise amounts of money

8    charged in the indictment.

9         Title 18 United States Code Section 2(A) provides that

10   whoever aids, abets, counsels, commands, induces, or procures

11   the commission of an offense against the United States is

12   guilty as a principal.

13        A defendant may be found guilty of mail fraud, wire fraud,

14   or the sale of unregistered securities even if the defendant

15   personally did not commit the acts -- the act or acts

16   constituting the crime but aided and abetted in its commission.

17        To prove a defendant guilty of aiding and abetting, the

18   government must prove beyond a reasonable doubt:

19        First, mail fraud or wire fraud was committed by someone.

20        Second, the defendant knowingly and intentionally aided,

21   counseled, commanded, induced, or procured that person to

22   commit each element of the mail fraud or wire fraud.

23        And, third, the defendant acted before the crime was

24   completed.

25        It is not enough that the defendant merely associated with

1  the person committing the crime or unknowingly or

2  unintentionally did things that were helpful to that person or

3  was present at the scene of the crime.

4      The evidence must show beyond a reasonable doubt that

5  the -- that the defendant acted with the knowledge and

6  intention of helping that person to commit mail fraud or wire

7  fraud.  The government is not required to prove precisely which

8  person actually committed the crime and which person aided and

9  abetted.  However, the government still bears the burden of

10  showing the guilt of any person beyond a reasonable doubt.

11      To prove a defendant guilty of causing the commission of a

12  crime, the government must prove beyond a reasonable doubt,

13  one, that the crime was committed by someone; and, two, that

14  the defendant willfully ordered, directed, or otherwise brought

15  about the commission of the crime.

16      The term "willfully" as used in the instruction means that

17  the defendant performed and acted deliberately and

18  intentionally as opposed to accidentally, carelessly, or

19  unintentionally.

20      You have heard testimony that Defendant Pritchard and

21  Blauvelt made a statement.  It is for you to decide, one,

22  whether the defendant made the statement; and, two, if so, how

23  much weight to give it.  In making these decisions, you should

24  consider all of the evidence about the statement, including the

25  circumstances under which the defendant may have made it.

1        You have heard evidence that the Defendants Pritchard and

2   Blauvelt committed other acts than are charged here.  You may

3   consider this evidence only for its bearing, if any, on the

4   question of Defendant Pritchard or Blauvelt's intent,

5   knowledge, absence of mistake, and absence of accident and for

6   one -- no other purpose.  You may not consider this evidence

7   against any other defendant on trial.

8        "Knowingly" means that an act or failure to act was done

9   or omitted voluntarily and intentionally and not because of

10  accident, mistake, or other reason.

11       "Willful" is a direct volition of the will to do an act

12  which the law forbids or to fail to do an act which the law

13  requires to be done.  It is simply a deliberate act to violate

14  a law.

15       To determine the intent of a defendant, you may use

16  circumstantial evidence.  Intent cannot ordinarily be proved by

17  direct evidence because there is no way of seeing into the

18  actual operation of a human mind.  What the defendant says or

19  does and the circumstances surrounding an act or statement is

20  generally the best method of determining the intent or

21  knowledge of a defendant.

22       You should not confuse motive and intent.  Motive is why

23  the person acts.  Intent is the state of mind in which the act

24  is done.  Personal advancement and financial gain are

25  recognized reasons for people acting.  These are a lot of the

1  motives that prompt one person to act, to commit acts of crime.

2  Good motive alone is never a defense to a crime.  You should

3  consider motive only as it helps to determine the intent or

4  knowledge of a defendant.

5      The defendants have testified and were not required to

6  testify.  The defendants each have offered themselves as a

7  witness, and their testimony should be judged just as you would

8  judge the testimony of any other witness.

9      When you retire, you should select one of your number to

10  act as your foreperson.  That person will preside over your

11  deliberations and will be your spokesperson here in court.  You

12  will then discuss the case with your fellow jurors to reach an

13  agreement.  Your verdict must be unanimous.

14      Each of you must decide the case for yourself.  But you

15  should do so only after you have considered all of the

16  evidence, discussed it fully with the other jurors, and

17  listened to the views of your fellow jurors.

18      Don't be afraid to change your opinion if the discussion

19  persuades you that you should.  You decide, and don't just join

20  the opinion of another juror unless you can conscientiously

21  agree.

22      It is important that you try to reach a unanimous verdict

23  but only on your conscientious individual decision.  Do not

24  change an honest belief about the weight or effect of evidence

25  simply to reach a verdict.

1        In trying to reach a verdict, approach it as you -- any

2    reasonable person would approach everyday decisions.  Use your

3    good common sense.  Consider the evidence for only the purposes

4    for which it has been allowed, and give it a reasonable and

5    fair interpretation in light of your experience with the

6    natural tendencies and inclinations of human beings.

7        If a defendant has been proved guilty beyond a reasonable

8    doubt, say so.  If not proved guilty, say so.

9        Remember also that the question before you can never be,

10    "Will the government win or lose this case?"  Our system of

11    government always wins when justice is done, whether the

12    verdict is guilty or not guilty.

13        In determining whether the government has proved the

14    charges against the defendants, you should -- you should not

15    and cannot consider punishment.  Punishment is my sole

16    responsibility and should not and cannot be considered by you

17    in reaching an impartial verdict.

18        We have prepared verdict forms for your convenience, which

19    you will have with the -- with the indictment.

20        And we'll take this verdict for Mr. Pritchard.  It's the

21    United States versus David Pritchard.  We, the jury, in the

22    above entitled cause, unanimously find the defendant, David

23    Pritchard, and then there's a blank.  Foreperson of the jury

24    puts in the unanimous verdict of the jury, either guilty or not

25    guilty, as charged in Count 1 of the indictment.

1

2          Then there's -- the second is a blank.  You put in the

3     unanimous verdict of the jury, guilty or not guilty, as charged

4     in Count 2 of the indictment.

5          And there's a space for in the same way as charged in

6     Count 3 of the indictment.

7          And there's a space for the same way as charged in Count 4

8     of the indictment.

9          There's the same blank as charged in Count 5 of the

10    indictment.

11         And there's a blank with as charged in Count 6 of the

12    indictment.

13         And there's a blank with as charged in Count 7 of the

14    indictment.

15         And then there's a blank with as charged in Count 8 of the

16    indictment.

17         Then there's a blank as charged in Count 9 of the

18    indictment.

19         And there's a blank with as charged in Count 10 of the

20    indictment.

21         And there's a blank with as charged in Count 11 of the

22    indictment.

23         And a blank as charged in Count 12 of the indictment.

24         And there's a blank as charged in Count 13 of the

25    indictment.

1      And there's a blank as charged in Count 14 of the

2   indictment.

3      And there's a blank as charged in Count 15 of the

4   indictment.

5      It is to be then dated and signed by the foreperson and

6   returned here to court.

7      There's also one for Mr. Blauvelt with the same blanks and

8   as charged in each count of the indictment in which that

9   defendant is charged.  It is to be dated, signed by the

10  foreperson, and returned here to court.

11     Counsel, approach the bench.

12          (Bench conference on the record:)

13          THE COURT:  Any objection to the charge as given?

14          MS. AMES:  No, Your Honor.

15          MR. EMMICK:  No, Your Honor.

16          MR. McLAIN:  No, Your Honor.

17          (The following proceedings were held in the

18          presence of the jury:)

19          THE COURT:  During your deliberations you must not

20  communicate with or provide any information to anyone by any

21  means about this case.  You may not use any electronic device

22  or media, such as a telephone, cell phone, smart phone, iPhone,

23  BlackBerry, or computer, the Internet, any Internet service, or

24  any text or instant messaging service, or any Internet chat

25  room, blog, or website such as FaceBook, MySpace, LinkedIn,

1   YouTube, or Twitter to communicate with anyone any information

2   about this case or to conduct any research about this case

3   until I accept your verdict.

4        Let me caution you again that nothing that I have said in

5   these instructions, nothing in the forms or verdict that I have

6   prepared for your convenience, no question of mine, no

7   admonition of mine to any counsel, no ruling I have made on any

8   evidence is to suggest in any way what verdict I think you

9   should find.

10        Whatever verdict you return, it is your exclusive

11   responsibility and should not be affected by any outside

12   influence.

13        If you need to communicate with me about any questions

14   that you have, you can send me a note through the foreperson.

15   You should not attempt to communicate with me during

16   deliberations except by a signed note.  And remember that you

17   are not to tell anyone how the jury stands, numerically or

18   otherwise, until you have reached a unanimous verdict.

19        All right.  Swear the pool.

20            THE CLERK:  Can I have the bailiff step to the mic?

21            THE COURT:  Swear the bailiffs.

22            THE CLERK:  Please raise your right hand.  Do you

23   solemnly swear to keep this jury together in some private and

24   convenient place, that you will not permit any person to speak

25   or communicate with them, nor do so yourself unless by order of

```
 1    the Court or to ask them whether they have agreed upon a
 2    verdict, and that you will return them into court when they
 3    have so agreed and when ordered by the Court, so help you God?
 4              THE BAILIFF:  Yes, I do.
 5              THE BAILIFF:  Yes.
 6              THE CLERK:  Please state your full and true name for
 7    the record and spell your last name.
 8              THE BAILIFF:  Duane Taylor, T-a-y-l-o-r.
 9              THE BAILIFF:  Eric Bell, B-e-l-l.
10              THE COURT:  All right.  The jury will retire to
11    consider their verdicts.
12          Except Mr. J, if you will just stay in the courtroom.
13                 (Jury out at 2:12 p.m.)
14              THE CLERK:  All rise.
15                 (The following proceedings were held out of the
16                 presence of the jury:)
17              THE COURT:  We'll be in recess subject to the call
18    of the jury.
19          Mr. J, I'm sorry that I didn't do this.  We want to thank
20    you for your services in this matter.  Even though you're not
21    deliberating with the jury, you fulfill a very, very serious
22    obligation of being a juror if something would happen to one of
23    the jurors, as what did happen to your co-extra juror.  You may
24    not -- we ask you not to talk about the case until the jury has
25    finally reached a verdict.  And if you want to talk about it at
```

```
 1   that time, you may do so.  But nobody can force you to talk

 2   about your own feelings about this case or anything about that.

 3        If they continue to ask you about -- about your opinions

 4   or anything else about the verdict, I'll ask you to just go to

 5   a telephone, call 614-5268, and we'll take care of the matter

 6   for you; 213, that is.

 7        Thank you again for your services, and you are now

 8   excused.

 9             ALTERNATE JUROR NO. 2:  Thank you.

10             THE CLERK:  This court is in recess.

11                 (Pause in the proceedings.)

12             THE COURT:  These are the instructions [sic] which I

13   will send up to the jury.  Counsel, do you want to have a look

14   at it?

15             MS. LINDSAY:  The government has no objection,

16   Your Honor.

17             MR. EMMICK:  No objections, Your Honor.

18             MS. AMES:  Oh, I'm sorry, Your Honor.  I was -- my

19   chair was falling apart.

20             MS. LINDSAY:  Objection?

21             MS. AMES:  No objections.  I apologize.

22             THE COURT:  All right.  We'll send those up.

23             MS. LINDSAY:  Your Honor, I just -- we just wanted

24   to place on the record that although full CDs of the --

25             THE COURT:  I beg your pardon?
```

1          MS. LINDSAY:  We just wanted to place on the record

2     that although full CDs of the tape-recorded conversations of

3     Mr. Blauvelt have been sent to the jury, they don't have

4     anything to play it with, so anything would have to be played

5     in court.

6          THE COURT:  We understand.

7          MS. LINDSAY:  Thank you, Your Honor.

8          THE COURT:  All right.  We'll be in recess subject

9     to call of the jury.

10              (Pause in the proceedings.)

11          THE CLERK:  All rise.  This court is now in session.

12     Please be seated and come to order.

13          THE COURT:  All right.  I understand you've approved

14     going with 8(b), 9, and 10 of my instructions; is that correct?

15          MR. EMMICK:  Yes.

16          MS. LINDSAY:  Well, Your Honor, I think the

17     government and I believe Defendant Blauvelt would request that

18     all instructions go up to the jury.

19          THE COURT:  No, we're not going to send them all up.

20     There's too many -- there's too many to do that.  They're

21     not -- they're not asking questions about the others.  And if

22     they have questions, they can ask them.

23          MS. LINDSAY:  I think we identified -- did we

24     identify a couple more that --

25          MR. McLAIN:  Right, there were --

1          THE COURT:  No, just these three is all I'm asking

2     about now.

3          MS. LINDSAY:  Okay.  Thank you, Your Honor.

4          THE COURT:  No objection?

5          MS. AMES:  Your Honor, I have no objection to the

6     definition of the -- the instruction that has "willful" and

7     "knowingly" defined.

8          However, the other two instructions, in my opinion, are

9     not definitions of terms and they start talking about direct

10    and circumstantial evidence, which is not the question that

11    they are asking.  I believe that submitting those two

12    additional ones puts particular focus on just certain

13    instructions and doesn't put them in context with the other

14    instructions.  That would be my objection.

15         THE COURT:  I think it keeps -- keeps the matter

16    within the knowingly and willfully instruction, and we'll send

17    those up.  Those come up normally in the giving of the

18    instructions.

19         All right.  Those two -- those three will be sent up, and

20    your objection will be noted.

21         The court will be in recess subject to call of the jury.

22         THE CLERK:  All rise.  This court is now in recess.

23         (Pause in the proceedings.)

24         THE CLERK:  All rise.  Please be seated.  This court

25    is now in session.

1          THE COURT:  I'm going to send them home for the

2    evening.  Bring down the jury.

3              (Jury in at 4:35 p.m.)

4              (The following proceedings were held in the

5              presence of the jury:)

6          THE COURT:  We've worked you all this day, and we're

7    going to -- I'm just going to send you home and continue your

8    work tomorrow morning.  I would remind you not to talk to

9    anybody about the case and also ask, when you come in, not to

10   have any discussions about the case until all of the jurors are

11   together.

12      You are now excused until ten o'clock tomorrow.  Jury is

13   excused.  Court will remain in session.

14          THE CLERK:  All rise.

15              (Jury out at 4:37 p.m.)

16              (The following proceedings were held out of the

17              presence of the jury:)

18          THE COURT:  All right.  Ten o'clock tomorrow

19   morning.

20              (Matter adjourned at 4:37 P.M.)

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5           I, KHOWOONSUN CHONG, FEDERAL OFFICIAL REALTIME

 6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

 7   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

 8   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

 9   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13   THE UNITED STATES.

14

15                            DATED THIS 3RD DAY OF NOVEMBER 2014.

16

17

18                    /S/ KHOWOONSUN CHONG

19                    _____
                      KHOWOONSUN CHONG, CSR NO. 12907, CRR
20                    FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**