1     **UNITED STATES DISTRICT COURT**

2   **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3    **HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE**

4

5 **UNITED STATES OF AMERICA,**    )
                 )
6        **Plaintiff,**   )
                 )
7  **vs.**          ) **Case No. CR 14-282 R**
                 )
8 **DAVID PRITCHARD and**     )  **TRIAL DAY 2**
 **CHRISTOPHER JAMES BLAUVELT,**  ) **(Pages 101 - 297)**
9               )
        **Defendants.**   )
10

11

12      **REPORTER'S TRANSCRIPT OF**
       **TRIAL PROCEEDINGS**
13        **TRIAL DAY 2**
     **WEDNESDAY, OCTOBER 15, 2014**
14        **9:41 A.M.**
      **LOS ANGELES, CALIFORNIA**

15

16

17

18

19

20

21

22

23   **MYRA L. PONCE, CSR NO. 11544, RPR, RMR, CRR**
     FEDERAL OFFICIAL COURT REPORTER
24    312 NORTH SPRING STREET, ROOM 430
     LOS ANGELES, CALIFORNIA 90012
25      (213) 894-2305

1  **APPEARANCES OF COUNSEL:**

2

3  **FOR THE PLAINTIFF:**

4      STEPHANIE YONEKURA
        Acting United States Attorney
5      BY:  ELLYN M. LINDSAY
        BY:  BYRON J. MCLAIN
6          Assistant United States Attorneys
        United States Courthouse
7      312 North Spring Street
        Los Angeles, California  90012

8

9  **FOR THE DEFENDANT DAVID PRITCHARD:**

10     LAW OFFICES OF MICHAEL W. EMMICK
        BY:  MICHAEL W. EMMICK
11         Attorney at Law
        3701 Highland Avenue, Suite 305
12     Manhattan Beach, California  90266

13

    **FOR THE DEFENDANT CHRISTOPHER JAMES BLAUVELT:**
14

        LAW OFFICES OF STEPHANIE AMES
15     BY:  STEPHANIE AMES
           Attorney at Law
16     12100 Wilshire Boulevard, Suite 800
        Los Angeles, California  90025

17

18

19

20

21

22

23

24

25

**INDEX OF WITNESSES**

PLAINTIFF'S WITNESSES                                              PAGE

ANDERSON, Harold Danny

    Direct Examination by Ms. Lindsay                         118
    Cross-Examination by Mr. Emmick                           152
    Cross-Examination by Ms. Ames                             157
    Redirect Examination by Ms. Lindsay                       168


HAMPSHIRE, Linda

    Direct Examination by Ms. Lindsay                         170
    Cross-Examination by Ms. Ames                             183


GOODMAN, Jerome

    Direct Examination by Mr. McLain                          185
    Cross-Examination by Ms. Ames                             215
    Cross-Examination by Mr. Emmick                           224


MUTTON, Colin

    Direct Examination by Mr. McLain                          227
    Cross-Examination by Mr. Emmick                           261


HICKS, William

    Direct Examination by Mr. McLain                          271
    Cross-Examination by Ms. Ames                             293

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 9 - | Letter from Chris Blauvelt dated 5/11/2009 and Investor Pack from *OZ3D* | 139 | 139 |
| 23 - | Letter from Chris Blauvelt dated 4/16/2008 and Investor Packet from GigaPix | 124 | 125 |
| 25 - | Letter dated 1/16/2009 from GigaPix signed by Chris Blauvelt | 234 | 234 |
| 34 - | Letter to Danny and Clara Anderson dated 5/13/2008 from GigaPix signed by Chris Blauvelt | 123 | 123 |
| 35 - | Check and investment documents for Harold and Clara Anderson dated May to June 2008 | 128 | 128 |
| 37 - | Letter dated 1/16/2009 signed by David Pritchard | 131 | 132 |
| 38 - | Check and Subscription documents for Harold and Clara Anderson dated August to September 2009 | 145 | 145 |
| 39 - | GigaPix Stock Certificates for Harold and Clara Anderson | 146 | 147 |
| 40 - | Letter dated 6/10/2009 signed by Chris Blauvelt and David Pritchard | 134 | 134 |
| 41 - | Letter from GigaPix dated 7/7/2009 with signature block of Chris Blauvelt to Dan Anderson | 138 | 139 |
| 42 - | Letter from *OZ3D*, LLC, containing confirmation of membership signed by Chris Blauvelt dated 8/5/2009 | 142 | 142 |
| 43 - | Notice to Shareholders dated 9/30/2009 signed by Chris Blauvelt and David Pritchard | 136 | 136 |
| 44 - | Letter from GigaPix dated 10/16/2009 re: Capital Restructure Exercises | 147 | 147 |
| 45 - | Letter signed by Chris Blauvelt | 148 | 149 |
| 54 - | Letter from GigaPix signed by Chris Blauvelt dated 2/28/2006 | 189 | 190 |
| 55 - | Letter dated 7/31/2006 signed by Chris Blauvelt | 190 | 190 |
| 56 - | Letter from GigaPix signed by David Pritchard dated 1/23/2007 | 190 | 191 |
| 57 - | Letter from GigaPix signed by David Pritchard dated 8/7/2007 | 191 | 191 |

**CONTINUED, INDEX OF EXHIBITS:**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 58 - | Letter from Chris Blauvelt dated 7/23/2008 and Investor Packet from GigaPix | 221 | 222 |
| 59 - | GigaPix letters enclosing stock certificates | 200 | 200 |
| 60 - | Letter dated 1/16/2009 signed by David Pritchard | 191 | 192 |
| 61 - | Letter from Chris Blauvelt dated 5/29/2009 discussing Colin Mutton | 192 | 192 |
| 62 - | Letter dated 6/10/2009 signed by Chris Blauvelt and David Pritchard | 192 | 193 |
| 63 - | Check for $10,000 signed by Jerome Goodman | 205 | 206 |
| 64 - | Letter from *OZ3D*, LLC, containing confirmation of membership signed by Chris Blauvelt dated 12/31/2009 | 207 | 208 |
| 65 - | Letter signed by Chris Blauvelt | 193 | 194 |
| 66 - | Letter dated November 2011 containing financial statements for GigaPix signed by Colin Mutton | 213 | 213 |
| 67 - | Letter dated 5/24/2001 signed by David Pritchard stating *OZ3D* is in production | 209 | 210 |
| 68 - | Letter dated 5/24/2011 signed by David Pritchard stating GigaPix Studios to be public company | 194 | 194 |
| 69 - | Letter dated 11/25/2011 signed by Chris Blauvelt | 194 | 195 |
| 104 - | Check for $10,000 from Jerry and Linda Hampshire dated 10/29/2008 | 174 | 175 |
| 105 - | Check for $10,000 from Jerry and Linda Hampshire dated 7/8/2009 | 179 | 180 |
| 106 - | *OZ3D*, LLC, confirmation of membership dated 12/22/2008 and 8/5/2009 | 180 | 181 |
| 107 - | GigaPix stock certificates of Jerry and Linda Hampshire | 181 | 182 |
| 108 - | Letter from GigaPix to Jerry and Linda Hampshire | 182 | 182 |

///

///

```
 1   CONTINUED, INDEX OF EXHIBITS:

 2                                          FOR            FOR
                                     IDENTIFICATION   EVIDENCE
 3   NUMBER  DESCRIPTION                   PG.            PG.

 4   201  -  Stipulation for Consent Cease and    257          257
            Desist Order concerning GigaPix
 5          Studios, Inc., OZ3D, LLC, and
            Chris Blauvelt from State of
 6          Colorado dated 11/17/2008 -
            Certified
 7   202  -  Order of Prohibition (Summary)        257          257
            regarding GigaPix Studios, Inc.,
 8          Christopher Blauvelt, John Savage,
            and Steven Wilson dated 4/24/2005
 9          from State of Wisconsin - Certified
     203  -  Order to Cease and Desist,            257          257
10          Conditioning of Exemptions, Order
            Accessing Civil Penalty and Consent
11          to Entry of Order regarding GigaPix
            Studios, Inc., and Christopher
12          Blauvelt from State of Oregon dated
            9/2/2008
13   204  -  Stipulation to Final Order that       257          257
            GigaPix Studios, Inc., OZ3D, LLC,
14          Christopher Blauvelt, and Greg
            Pusateri Desist and Refrain from
15          Offer and Sale of Unqualified,
            Non-Exempt Securities from State
16          of California dated 5/13/2009 -
            Certified
17   205  -  Cease and Desist Order regarding      257          257
            GigaPix Studios, Inc., and
18          Christopher Blauvelt from State
            of Alabama dated 7/1/2010 -
19          Certified
     206  -  Statement of Charges and Notice of    257          257
20          Intent to Enter Order to Cease and
            Desist, Impose Fines, and Charge
21          Costs regarding GigaPix Studios,
            Inc., and Christopher Blauvelt
22          from State of Washington dated
            10/14/2010 - Certified
23   207  -  Stipulation and Agreement Against     257          257
            GigaPix Studios, Inc., from State
24          of Connecticut dated 4/24/2012 -
            Certified

25
```

```
 1          LOS ANGELES, CALIFORNIA; WEDNESDAY, OCTOBER 15, 2014

 2                          9:41 A.M.

 3                            -oOo-

 4          (Out of the presence of the jury.)

 5          THE COURTROOM DEPUTY:  Calling Item No. 1, CR 14-282

 6   R, United States of America vs. David Pritchard and Christopher

 7   James Blauvelt.

 8       Counsel, please state your appearances.

 9          MS. LINDSAY:  Good morning, Your Honor.

10   Ellyn Lindsay and Byron McLain for the United States.

11          MR. EMMICK:  Good morning, Your Honor.  Mike Emmick

12   for David Pritchard.

13          MS. AMES:  And good morning, Your Honor.

14   Stephanie Ames appearing with Christopher Blauvelt.

15          THE COURT:  All right.  Bring down the jury.

16          (In the presence of the jury.)

17          THE COURT:  The record should reflect the jurors are

18   all present and in their proper places.  The defendants are

19   present with their counsel.

20       You may all sit down as you come in.

21       I'll go over some of the principles of law and procedure

22   that you will be considering during the time that you are

23   jurors in this case.

24       In the trial of the case, there are two judges that have

25   separate functions.  I must preside over the trial on questions
```

1    of evidence and procedure to assure that only proper and

2    relevant evidence is presented to you and to instruct you on

3    the law that applies to the case.

4         Your function as a juror is to be the judge of the facts

5    and to find the truth from the evidence presented to you during

6    this trial.  You should approach the duty without prejudice,

7    fear, or favor of any party but solely from your independent

8    consideration of the evidence.  Your consideration and decision

9    of the facts should be approached as you would any important

10   matter in your own experience.  Always use a common-sense

11   approach and consider only the evidence which is properly

12   before you.

13        Counsel were permitted to make opening statements but were

14   not required to do so.  But the making of an opening statement

15   should not be considered by you in any way in measuring the

16   relative merits of the case.

17        Lawyers may sometimes give reasons for objections and will

18   make summations at the end of the case.  But any statement or

19   argument of counsel is not evidence and cannot be considered by

20   you unless it is made as an admission or stipulation of fact.

21        When the lawyers on each side of the case agree or

22   stipulate to some fact, you must, unless otherwise instructed,

23   accept the stipulation or agreement as evidence and regard that

24   stipulated or agreed fact as conclusively proved.

25        I may take what is called judicial notice of some fact or

1  event which may not be the subject of any testimony -- of any

2  testimony.  If I tell you that I am taking judicial notice of

3  some fact or event, you may but need not accept my decision as

4  evidence of the fact or event which I have judicially noticed.

5      Unless you are otherwise instructed, the evidence in the

6  case which you will consider in your deliberations consists of

7  the sworn testimony of the witnesses, regardless of who may

8  have called them, all exhibits received in evidence, regardless

9  of who may have produced them, all facts which have been

10  admitted or stipulated, and all facts or events which you

11  accept as judicially noticed and all applicable presumptions

12  upon which you may be instructed.

13      The Indictment in this case is not evidence of any

14  defendant's guilt.  An Indictment is just an accusation and is

15  the method used to bring a defendant before you to determine

16  the fact of guilt or innocence.

17      A defendant in a criminal case is presumed by law to be

18  innocent.  You cannot convict the defendant upon mere suspicion

19  or conjuncture.

20      What the presumption of innocence means is that even

21  though you have heard that a defendant is charged with a crime,

22  that defendant begins the trial with a clean slate with no

23  evidence against him.  In other words, if you were asked right

24  now to vote upon the guilt or innocence of a defendant, the law

25  would compel you to find that defendant not guilty since no

1    evidence has yet been offered or received to prove the charges.

2        This presumption of innocence can be overcome only by the

3    evidence allowed during this trial.  It is the Government's

4    burden of proving a defendant guilty beyond a reasonable doubt.

5    A defendant need not prove his innocence.  He need not produce

6    any evidence on his own behalf.  He may rely upon the failure

7    of the Government to produce enough evidence or on evidence

8    brought out in cross-examination of witnesses for the

9    Government.

10       A reasonable doubt exists in any case when, after you have

11   considered all of the evidence, you have a real doubt of a

12   defendant's guilt based upon reason and common sense after a

13   complete, fair, and impartial consideration of all of the

14   evidence presented to you.

15       It is the duty of the lawyer on each side of the case to

16   object when the other side offers testimony or other evidence

17   which the attorney believes is not properly admissible.  You

18   should not be prejudiced against any party because a lawyer

19   zealously protects the right of a client to a fair trial by

20   objections to evidence.

21       If I sustain an objection or order any evidence stricken,

22   you must disregard the question and the evidence entirely.  You

23   cannot draw any inference from the wording of a question.  You

24   cannot assume that because a question is asked about a

25   particular subject, that there is any evidence on that subject.

1   You cannot speculate or guess what a witness might have

2   answered if allowed to answer the question, nor can you

3   speculate or guess why I have ordered any evidence stricken.

4       If I overrule an objection and I allow the witness to

5   answer the question or if I admit any evidence after an

6   objection, I do not, unless I expressly state it to you, intend

7   to suggest or indicate what weight you should be giving to that

8   evidence.

9       You, as a juror, are the sole judge of the believability

10  of the testimony of all witnesses and the weight and effect of

11  all evidence.  It is most important that you do not accept the

12  questions of the lawyers as evidence of proof of any fact.  If

13  a lawyer should ask a question which contains the assertion of

14  some fact, you may not consider that, because the lawyer

15  asserts a fact, it is any evidence of the fact that has been

16  asserted.  It is the answer of a witness which responds to a

17  proper question that is the evidence that you should consider

18  in your exclusive ability to determine the truth that the

19  evidence shows you.

20      During the course of the trial, I may occasionally ask

21  questions of a witness in order to bring out facts which may

22  not be fully covered by the testimony.  You are not to consider

23  my questioning of a witness, even if it may become lengthy, as

24  an indication of what I feel about the case in general or the

25  testimony of that witness in particular.  If I should make any

comments on the evidence, as the law permits me to do, you may
disregard any comment of mine on facts in arriving at your own
finding as to the facts.

When I comment on the facts, you may disregard my comment.
But when I instruct you as to the law, you must accept my
statement of the law, whether you agree with it or not.  So if
I or a lawyer make a statement on what the facts are and it
does not coincide with your own recollection of that fact, it
is your recollection that controls your deliberations.

As you listen to the testimony of witnesses, you should
remember that you are the sole judge of the believability of
any witness and the weight to be given to such testimony.  But
as you consider the testimony, you should always approach it
with a presumption of innocence of the defendant in mind.  You
should, in your evaluation of the testimony of a witness,
carefully scrutinize all of the testimony given by that
witness.  Consider the circumstances under which each witness
testifies and everything in evidence which tends to indicate
whether a witness is worthy of your belief.

You should consider the status of a witness.  If the
witness is an informer for the Government or an accomplice or a
participant in the commission of the crime charged, you should
use such testimony cautiously and weigh its probative value
with great care.  Consider the testimony carefully to determine
whether the interest of the informer or accomplice is such as

1    to effect his or her believability.

2         You should consider each witness's intelligence, motive

3    for testifying, state of mind, demeanor, and manner while on

4    the stand.  Consider the ability of the witness to observe the

5    matters to which that witness is testifying, the accuracy of a

6    witness's recollection, any relation any witness may bear to

7    either side of the case, the manner in which each witness might

8    be affected by the verdict, and the extent to which, if at all,

9    each witness is either supported or contradicted by other

10   evidence presented to you.

11        If there are inconsistencies or discrepancies in the

12   testimony of a witness or between the testimony of different

13   witnesses, it may or may not cause you to discredit such

14   testimony.  Witnesses are testifying to their observations and

15   recollection of past events, and two or more persons who have

16   witnessed an incident or transaction may have seen or heard it

17   differently.  And certainly innocent misrecollection, like a

18   failure of recollection, is not an uncommon human experience.

19   Any discrepancy should be weighed by its relationship to

20   whether it is an important or unimportant detail and, more

21   importantly, whether it results from innocent error or

22   intentional falsehood.  Make your own judgment, then give the

23   testimony of each witness such believability, if any, that you

24   think it deserves.

25        A witness may be discredited or impeached by contradictory

1    evidence, by evidence at some other time the witness has said

2    or done or, having the opportunity, has failed to say or do

3    something that is inconsistent with the present testimony, by

4    evidence that the witness has been convicted of a felony, or by

5    evidence of a general reputation of a witness for truth and

6    veracity is bad in the community where that witness now resides

7    or has recently resided.

8         If after consideration of the testimony you believe any

9    witness has been impeached and thus discredited, it is still

10   your exclusive province to give the testimony of each witness

11   such believability, if any, that you think it deserves.

12        If the witness shows that a witness is knowingly

13   testifying falsely about any material and important matter, you

14   have a right to distrust that witness's testimony in other

15   particulars, and you may reject all of the testimony of that

16   witness or give it the believability you think it deserves.

17        It is anticipated that expert testimony may be offered

18   during this trial.  The rules of evidence do not ordinarily

19   allow witnesses to testify to opinions or conclusions.  An

20   exception exists for witness -- for expert witnesses.

21        A person who has been an expert in some art, science,

22   business, profession, or calling outside of our general

23   knowledge, whether that expertise has been acquired by

24   education or experience, may state an opinion and the reason

25   for that opinion that may be helpful to you in your

1   determination of the facts.  You should consider each expert

2   opinion allowed to be given.

3       If you should decide that the expert does not have

4   sufficient education or experience to give the opinion or

5   you -- or you decide that the reasons given for the opinion are

6   not sound or that the opinion is outweighed by other evidence,

7   you may disregard the opinion entirely or give it such weight

8   as you may think it deserves.

9       It is your collective minds that must be addressed to the

10  evidence and finally decide the true facts.  You are,

11  therefore, asked not to take notes but to give your closest

12  attention to the testimony and evidence so that you can each

13  contribute your individual judgment to your deliberations.

14      There will be no transcript of the testimony available to

15  you during your deliberations, so it is extremely important

16  that you pay attention to the testimony of each witness so that

17  you can help the jury deliberations by your memory of the

18  facts.

19      During the trial, there will be times when the lawyers and

20  I will have a conference either at the bench or out of your

21  presence.  These conferences or if I refuse the request for a

22  conference should not in any way affect your own deliberations.

23  If I allow a conference, it is because I feel it necessary to

24  resolve only questions of law or procedure, which are solely my

25  duty.  If I have a conference with the lawyers, you should not

1  be prejudiced against any party because of any delay that these

2  conferences may cause.  If I allow a conference, it is not any

3  indication of my feelings on the merits of the case.

4      I may admonish a lawyer who, out of zeal for the cause,

5  does something which is not in keeping with the rules of

6  evidence or procedure.  You are not to draw any inference

7  against the side to whom an admonition of mine may be addressed

8  during the trial of this case.  A trial cannot be treated as a

9  popularity contest, nor should it be used to measure or compare

10  the skill or cleverness of the lawyers involved.

11      You, as jurors, must decide this case based solely on the

12  evidence presented to you within the four walls of this

13  courtroom.  This means that during the trial, you may not do

14  any independent research about this case, the matters in the

15  case, and the individuals or corporations involved in the case.

16  In other words, you should not consult dictionaries or

17  reference materials, search the Internet, Web sites, blogs, or

18  use any other electronic tools to obtain information about this

19  case or to help you decide the case.  Please do not try to find

20  out information from any source outside of the confines of this

21  courtroom.

22      I know that many of you use cell phones, BlackBerrys, the

23  Internet, and other tools of technology.  You must also not

24  talk to anyone about this case or use these tools to

25  communicate electronically with anyone about the case.  This

1    includes your family and friends.

2         You may not communicate with anyone about the case on your

3    cell phone, through e-mail, BlackBerry, iPhone, text messaging,

4    or on Twitter, through any blog or Web site, through any

5    Internet chat room, or by way of any other social networking

6    Web sites, including Facebook, MySpace, LinkedIn, and YouTube.

7         Trial is a most serious search for the truth from the

8    evidence presented during the trial.  And as judges of the

9    facts in search of that truth, your function is most important.

10   You have been sworn to try this case impartially and to base a

11   verdict only upon the evidence presented to you during this

12   trial.  How you discharge that duty will, in the end, be your

13   contribution to any victory of justice.

14        Call your first witness.

15             MS. LINDSAY:  Thank you, Your Honor.  The Government

16   calls Danny Anderson.

17             THE COURTROOM DEPUTY:  Please step forward.  Stand

18   right here.

19             THE WITNESS:  Sure.

20             THE COURTROOM DEPUTY:  Please raise your right hand.

21        Do you solemnly swear that the testimony you shall give in

22   the cause now pending before this Court shall be the truth, the

23   whole truth, and nothing but the truth, so help you God?

24             THE WITNESS:  I do.

25        **HAROLD DANNY ANDERSON, PLAINTIFF'S WITNESS, WAS SWORN**

```
1          THE COURTROOM DEPUTY:  Thank you.  Please take a

2    seat.

3          Please state your full and true name for the record and

4    spell your last name.

5          THE WITNESS:  My name is Harold Danny Anderson,

6    A-n-d-e-r-s-o-n.

7          MS. LINDSAY:  May I proceed?

8          THE COURT:  Yes.
```

**DIRECT EXAMINATION**

```
10   BY MS. LINDSAY:

11   Q    Mr. Anderson, how are you currently employed?

12   A    I'm retired.

13   Q    What are you retired from?

14   A    The military.  Excuse me.

15   Q    Did you have any other employment after the military?

16   A    I did.  After I got out of the military, I went to work

17   for a mobile home business selling mobile homes for awhile.

18   Q    Where do you live?

19   A    Andrews, North Carolina.

20   Q    Is that a big city or --

21   A    No, it's not.  It's a small town.

22   Q    What is your current source of income?

23   A    Um, I retired from the military, so I get a military

24   income.  And also, I'm partially disabled, so I get a VA

25   income.  And of course, now due to the age, I get social
```

```
1   security.

2   Q     How old are you?

3   A     66.

4   Q     What kind of investment history do you have?

5   A     I invested with a -- a local guy from the area before.

6   It's called Cousins Investment, but it wasn't stocks or

7   anything.  It was just a day trading.

8   Q     Did you lose your money?

9   A     I did.

10  Q     Did you become an investor in GigaPix?

11  A     Yes, ma'am.

12  Q     How did you learn of GigaPix?

13  A     I had a friend who lived in San Antonio, Texas, that was

14  in the military with me.  And he called and was -- told me

15  about the GigaPix.

16  Q     Had he received any returns from GigaPix, or was he just

17  excited about it?

18  A     He was just excited about it.

19  Q     In about May of 2008, did you receive a telephone call

20  from someone at GigaPix?

21  A     I did.

22  Q     Who was that?

23  A     Greg Pusateri.

24  Q     And eventually did you invite some friends of yours in

25  Andrews over to your house to hear Mr. Pusateri's sales pitch?
```

1    A     Yes, ma'am.

2    Q     Can you describe the scene there at your home?

3    A     We had about four or five couples and a couple single

4    people in there to listen to the GigaPix spiel.

5    Q     Was it on your speakerphone?

6    A     It was.

7    Q     Did you have your pastor present?

8    A     I did.

9    Q     And did Mr. Pusateri discuss religion with you while he

10   was giving his spiel?

11   A     The pastor introduced himself as our pastor.  And yes,

12   Mr. Pusateri said a couple of things to him about being a

13   pastor.

14   Q     What did Mr. Pusateri tell you and the people gathered in

15   your living room about GigaPix?

16   A     Well, of course, he was the one selling GigaPix and he

17   told us about how fine the company was and how long it had been

18   operating and it was going to be a good income for people who

19   wants to invest in it.

20   Q     Did he tell you how much the company was worth?

21   A     He did.

22   Q     How much did he say?

23   A     If I'm not mistaken, it was 50 million.

24   Q     Did he tell you that GigaPix had already had success?

25   A     Yes.

1    Q    What did he say about that?

2    A    He told us that there was three or four -- I forget the

3    exact number -- short films that had been produced already and

4    had made money.

5    Q    Did he tell you that actors had been signed up to be in

6    GigaPix's movies?

7    A    Yes, ma'am.

8    Q    Did he tell you whether GigaPix's earlier investors were

9    successful with the company?

10   A    I don't recall right off if he had actually said that they

11   had received the money, but -- I was leaning toward saying that

12   in the beginning.  I think he did say something that they had

13   made some money from the company.

14   Q    Did he tell you about a movie called *OZ3D*?

15   A    Yes, ma'am.

16   Q    What did he say about that?

17   A    He said that that was their next biggest project and that

18   they would -- I think he indicated it would be about a year

19   before that came out.

20   Q    Did he tell you when you would see returns if you invested

21   in that movie?

22   A    Yes, ma'am, he did.

23   Q    And when was that?

24   A    A year to 18 months.

25   Q    And this was in May of 2008?

1    A     Yes, ma'am.

2    Q     Did he tell you about ancillary products that would be

3    connected with *OZ3D*?

4    A     Yes, ma'am.

5    Q     Can you tell us what those were?

6    A     He described it as action figures, stuffed animals, CDs.

7    I think that was three of the items he mentioned.

8    Q     Did he tell you how much money you could expect to make

9    with GigaPix?

10   A     He did right off.

11   Q     What did he say?

12   A     Millions.  He didn't say exactly which -- how many but

13   millions.

14   Q     Did Mr. Pusateri say anything about GigaPix being

15   purchased by Disney?

16   A     Yes, ma'am.

17   Q     What did he say about that?

18   A     He told us that Disney had already purchased I think it

19   was Pixar and that they would probably be next on the list for

20   them to purchase because once you're successful, Disney doesn't

21   want any competition so they buy up their competition.

22   Q     But when you say "they" -- you mean GigaPix was?

23   A     Yes, ma'am.

24   Q     Did he say anything about what would happen to GigaPix

25   stock prices at that point?

1   A    Yes, ma'am.

2   Q    What did he say?

3   A    He said our investment would go from, like, $2 a share up

4   to as much as $50 a share.

5   Q    Did you receive anything in the mail from GigaPix?

6   A    I did.

7          MS. LINDSAY:  Madam Clerk, I'd ask for Exhibit 34 to

8   be placed before the witness.

9          THE COURTROOM DEPUTY:  Exhibit 34 is identified and

10  placed before the witness.

11         (Exhibit 34 for identification.)

12  BY MS. LINDSAY:

13  Q    Sir, showing you what's been marked for identification as

14  Government's Exhibit 34, do you recognize this?

15  A    Yes, ma'am.

16  Q    What is it?

17  A    It is from Chris Blauvelt and it's a letter to us.

18  Q    Let me stop you there.

19         MS. LINDSAY:  Your Honor, I would move in

20  Exhibit 34.

21         MS. AMES:  No objection.

22         MS. LINDSAY:  May we display, Your Honor?

23         THE COURT:  Yes.  34 in evidence.

24         (Exhibit 34 received into evidence.)

25  ///

```
 1    BY MS. LINDSAY:
 2    Q    And if we could just highlight the date of the letter and
 3    the addressees.  And that's to -- you said your name is Harold.
 4    Do you commonly use the name Danny?
 5    A    I do.
 6    Q    And is Clara your wife?
 7    A    She is, yes, ma'am.
 8    Q    And can you focus on who signed this letter?
 9    A    Yes.
10    Q    And who is that?
11    A    Chris Blauvelt.
12              MS. LINDSAY:  And now, Madam Clerk, I'd ask for
13    Exhibit No. 23 to be placed before the witness.
14              THE COURTROOM DEPUTY:  Exhibit 23 is identified and
15    placed before the witness.
16              (Exhibit 23 for identification.)
17              MS. LINDSAY:  Actually, there's one in the folder
18    there.  Sorry.  The red one, I think.
19    BY MS. LINDSAY:
20    Q    And showing you this exhibit, is it -- is it something
21    like what you received along with this letter?
22    A    Yes, ma'am, it is.
23              MS. LINDSAY:  I move in 23, Your Honor.
24              THE COURT:  Any objection?
25              MS. AMES:  No objection.
```

```
 1                 MR. EMMICK:  No objection.

 2                 THE COURT:  23 in evidence.

 3                 (Exhibit 23 received into evidence.)

 4                 MS. LINDSAY:  And maybe you could just hold up the

 5       folder so the jury can see what it is and the judge.

 6       BY MS. LINDSAY:

 7       Q     And if you open it up and there's a -- a booklet inside

 8       called a Confidential Private Placement Memorandum.

 9       A     Yes, ma'am.

10       Q     Did you receive something like this?

11       A     Yes, ma'am.

12       Q     Maybe you could hold that up for the jury --

13       A     Sure.

14       Q     -- and flip through it just a little so --

15       A     Yes.

16       Q     Thank you.

17             Did you at the time know what a Private Placement

18       Memorandum was?

19       A     No, ma'am.

20       Q     And did you read it?

21       A     I scanned over it.  But the further I got into it, the

22       more difficult it became to read.

23       Q     Did you talk to Mr. Pusateri about it?

24       A     I did.

25       Q     What did he tell you about that document?
```

1   A    He said not to worry about it, that it was a formality.

2   Q    Did you talk to Mr. Pusateri about whether the investment

3   was risky?

4   A    I did.

5   Q    What did he say about that?

6   A    He said it was very minimal, that he was invested in it

7   himself so there was -- I shouldn't worry about it.

8   Q    Did he tell you how much of his own money he had put into

9   it?

10  A    I don't recall that.  Perhaps he did.  I just don't recall

11  right now.

12  Q    Okay.

13  A    He said -- let me qualify something, please.  He did say

14  he was invested in it and that at the time he was living on

15  partial retirement and his wife was working.  So we assumed

16  that it was quite a bit that he was invested in.

17  Q    I'm -- I'm sorry.  I didn't hear you.  He was living on

18  what his wife made and --

19  A    And partial retirement that he still had.

20  Q    Partial retirement?

21  A    Yeah.  Yes.

22  Q    Did he ever tell you that he was going to get his money

23  when you got your money?

24  A    Yes, he did.

25  Q    Was it your belief, then, that his success financially

1  depended on the same things as your success?

2  A    Yes, ma'am.

3  Q    Now, the group of people in your living room listening to

4  Mr. Pusateri, were you a wealthy group of sophisticated

5  investors?

6  A    No, ma'am.

7  Q    Did you tell Mr. Pusateri that?

8  A    I did.

9  Q    What did you say about the nature of the work of the

10  people in the living room there?

11  A    I told them they were working people and most people there

12  worked by the hour, that no one there was wealthy.

13  Q    Did you talk about how the money to invest was your

14  retirement money?

15  A    We did.

16  Q    Did you inform Mr. Pusateri that you did not want to

17  invest if there was a risk you could lose your money?

18  A    We certainly did.

19  Q    Did he tell you that the company was rock solid?

20  A    He did.

21  Q    Did you decide to invest money into GigaPix?

22  A    Yes, ma'am.

23  Q    How much that first time?

24  A    12,000.

25  Q    And I'd ask you to take a look in the notebook there,

```
 1   what's been marked for identification as Government's
 2   Exhibit 35.
 3              THE COURTROOM DEPUTY:  Exhibit 35 is identified and
 4   placed before the witness.
 5              (Exhibit 35 for identification.)
 6   BY MS. LINDSAY:
 7   Q    Does that consist of checks that you sent in and trust
 8   documents as well as a Subscription Agreement?
 9   A    Yes, ma'am.
10              MS. LINDSAY:  I move in 35, Your Honor.
11              THE COURT:  35, any objection?
12              MR. EMMICK:  No objection.
13              THE COURT:  35 in evidence.
14              (Exhibit 35 received into evidence.)
15              MS. LINDSAY:  And if we could pull up, first, page 1
16   and make it bigger.
17   BY MS. LINDSAY:
18   Q    Is this -- do you recognize this signature on that check?
19   A    Yes, ma'am.
20   Q    Whose is that?
21   A    It's Clara, my wife.
22   Q    And who is Millennium Trust Company, and why did you make
23   your check out in that name?
24   A    That's the trust company that I had referred to earlier
25   that we were -- with Cousins Investment, that it went through
```

1    that company to -- Cousins Investment.

2    Q    And then into --

3    A    It was already established.

4    Q    And then into GigaPix?

5    A    Yes.

6    Q    Okay.  If we could look at page 13 of that exhibit,

7    please.  Is that your second check?

8    A    It is, yes, ma'am.

9    Q    Okay.  If you look at -- let's pull up page 7 and maybe

10   just kind of make the whole thing a little bit bigger if we

11   can.

12        Is this a Subscription Agreement that you and your wife

13   filled out when you sent in your shares?

14   A    Yes, ma'am, it is.

15   Q    And were you instructed in how to fill this out?

16   A    Yes, ma'am.

17   Q    How were you instructed?

18   A    Well, for everyone in the living room, we all started from

19   page 1.  And we were told everything to check and everything

20   not to check for the entire subscription.

21   Q    Did you read the booklet carefully?

22   A    No, ma'am.

23   Q    Let's look at page 9 of this exhibit.  And if we could go

24   down to that bottom part there, 4.1, and everything that's

25   there.  And it says in the Confidential Investor Questionnaire,

1    it talks about being an accredited investor.  Did you know what

2    an accredited investor was?

3    A    Only by reading this I did.

4    Q    And did you qualify as an accredited investor?

5    A    No, ma'am.

6    Q    Did you discuss that with Mr. Pusateri?

7    A    Yes, ma'am.

8    Q    Can you tell us about that?

9    A    Yes, ma'am.  In fact, I told him no one filling out these

10   applications, including myself, was worth a million dollars.

11   It doesn't matter if we use our homes, our automobiles, it

12   would not come out to a million dollars.

13   Q    What did he say about that?

14   A    He said the market anyway -- I initialed it anyway because

15   most everyone didn't qualify and that's what they did.

16   Q    Are those your initials there?

17   A    Yes, ma'am.

18   Q    But it's, in fact, not true?

19   A    That's right.  It's not true.

20   Q    Looking at page 12 of the exhibit and about halfway down

21   there, if you could just magnify (h) and (i).  And it asks you

22   if you're familiar with the risk aspects and non-liquidity of

23   the investment and you checked "Yes."  Did you believe this was

24   a risky investment?

25   A    No, ma'am.

```
1    Q     Why did you check that?

2    A     We checked it like that because everyone there was being

3    guided through this and it would go to (h) and it would say

4    check "Yes," go to (i) and check "Yes."  And so when one would

5    turn a page, all five or six would turn a page.

6    Q     Was it done quickly?

7    A     Relatively quick, yes.

8    Q     So for (i) there, it says that you're at risk of losing

9    your entire investment.  Did you believe that you were going to

10   lose your entire investment?

11   A     No, ma'am.

12   Q     If we could look at page 10.  Is that one of the stock

13   certificates that you received from GigaPix?

14   A     Yes, ma'am.

15   Q     After you invested with GigaPix, did you receive letters

16   and other information from GigaPix?

17   A     Yes, ma'am.

18   Q     I'd ask that you take a look at what's been marked for

19   identification as Government's Exhibit 37.  It will be in your

20   book -- book right there.

21            THE COURTROOM DEPUTY:  Exhibit 37 is identified and

22   placed before the witness.

23            (Exhibit 37 for identification.)

24   BY MS. LINDSAY:

25   Q     Is this one of the letters you received from GigaPix?
```

```
 1    A     Yes, ma'am.

 2              MS. LINDSAY:  I'd move in 37.

 3              MS. AMES:  No objection.

 4              MR. EMMICK:  No objection, Your Honor.

 5              THE COURT:  37 is in evidence.

 6              (Exhibit 37 received into evidence.)

 7              MS. LINDSAY:  Maybe we could put up the first page,

 8    please, and just look at the date of that letter.

 9    BY MS. LINDSAY:

10    Q     Is that January 16th, 2009?

11    A     Yes, ma'am, it is.

12    Q     And looking at the second page of that letter, just to see

13    who signed that letter.

14    A     David Pritchard.

15    Q     Okay.  I'm sorry.  Now back to the first page.

16          Looking at the third paragraph of this letter, it says

17    that in October they had announced nearly $60 million in

18    potential funding for a slate of kids films.  Is this

19    consistent with what Mr. Pusateri told you?

20    A     Yes, ma'am.

21    Q     And looking at the fourth paragraph, it states that they

22    had begun pre-production on *Oz*.  Is that consistent with what

23    Mr. Pusateri told you?

24    A     Yes, ma'am, it is.

25    Q     Looking at page 2 of the letter in the first paragraph, it
```

1    states that they've successfully managed to secure several

2    orders for pilots and series in their reality television

3    department.  And then a little later in the paragraph it states

4    that they believe that reality shows will generate for them a

5    stable cash flow.

6         Did this encourage you that things were going well at

7    GigaPix?

8    A    Yes, ma'am.

9    Q    And then also in the letter, a little farther down, do you

10   see where it says that an accounting firm was doing a five-year

11   audit on the company?

12   A    Yes, ma'am.  Uh-huh.  Yes, ma'am.

13   Q    And did that encourage you that GigaPix was on the

14   up-and-up?

15   A    Absolutely.  Yes, ma'am.

16   Q    The paragraph goes on to state that a few states had

17   notified GigaPix that they were not fully in compliance with

18   some state securities laws.  Did anyone at GigaPix tell you

19   about that problem?

20   A    No.  The only information that I recall is the fact that

21   they were in one state and -- because their permits weren't in

22   order, they had to leave that state but they would go to

23   another state.  I think it was Iowa.  I'm not sure.

24   Q    Okay.  We'll get there.

25        Now I'd ask if you can take a look at what's been marked

```
 1    for identification as Government's Exhibit 40 and ask if you

 2    recognize that.

 3              THE COURTROOM DEPUTY:  Exhibit 40 is identified and

 4    placed before the witness.

 5              (Exhibit 40 for identification.)

 6    BY MS. LINDSAY:

 7    Q    Is that another letter that you received from GigaPix?

 8    A    Yes, ma'am.

 9              MS. LINDSAY:  Your Honor, I move in Exhibit 40.

10              MS. AMES:  No objection.

11              MR. EMMICK:  No objection.

12              THE COURT:  40 in evidence.

13              (Exhibit 40 received into evidence.)

14              MS. LINDSAY:  And if we could display the first page

15    of that and maybe just look at the date.  And then if we could

16    look at the second page and look at the signature.

17    BY MS. LINDSAY:

18    Q    And can you tell us who signed this letter?

19    A    Chris Blauvelt.

20    Q    Anybody else?

21    A    David Pritchard.

22    Q    Did you receive this letter in the mail?

23    A    Yes, ma'am.

24    Q    Um, now, just generally the letter discusses converting

25    warrants to GigaPix's common stock.  Did you understand what
```

1  was going on there?

2  A    Well, pretty much.  It was explained also telephonically

3  that it had to be done and we all had a certain time to get

4  it -- the warrants back in to them in order for this to

5  convert.

6  Q    Did this also make you feel that GigaPix was a growing

7  company doing what was appropriate to maintain the business?

8  A    Yes, ma'am.  We were impressed.

9  Q    And looking at the second page, the second sentence of the

10  first paragraph, it again discusses the financial audit to

11  start in mid June of that year, which was 2009.  Again, did

12  that give you faith in the company that they were having an

13  external auditor?

14  A    Absolutely it did.

15  Q    Looking at the next paragraph, it says that they're going

16  to begin production of the first of their slate of five kids

17  action films and that principal photography was set to begin in

18  July as well as the *Wizard of Oz* movie commencing production in

19  August.  Again, did this make you believe that GigaPix was

20  actively making the movies and TV shows?

21  A    Yes.  I was counting the time frame that we were told in

22  the beginning that it would happen.

23  Q    And I'd ask that you take a look at what's been marked for

24  identification as Government's Exhibit 43.  And that may be in

25  a different binder.

1          THE COURTROOM DEPUTY:  Exhibit 43 is identified and

2    placed before the witness.

3          (Exhibit 43 for identification.)

4    BY MS. LINDSAY:

5    Q    Is that another letter that you received from GigaPix?

6    A    Yes, ma'am.

7          MS. LINDSAY:  I move in 43, Your Honor.

8          THE COURT:  Any objection?

9          MS. AMES:  No objection.

10          MR. EMMICK:  No objection.

11          THE COURT:  43 in evidence.

12          (Exhibit 43 received into evidence.)

13    BY MS. LINDSAY:

14    Q    And let's display the first page for the date.

15    September 23rd, 2009 *[sic]*; correct?

16    A    Yes, ma'am.

17    Q    And can we just look at who signed that letter?  And is

18    that, again, Mr. Blauvelt and Mr. Pritchard?

19    A    Yes, ma'am.

20    Q    Let me ask you as an aside.  All these letters and

21    communications from GigaPix and from Mr. Pritchard and

22    Mr. Blauvelt, did this help maintain your faith in GigaPix?

23    A    It absolutely did.

24    Q    And maybe just so the jury can see, if you can magnify

25    just the body of the letter.  And while they're doing that,

1    maybe -- maybe I can figure out what I'm doing.

2        Okay.  Um, did there come a time when -- well, let me ask

3    you this.  After your investment, did you continue to talk to

4    Mr. Pusateri?

5    A    Yes, ma'am.

6    Q    Did there come a time when you called and Mr. Pusateri was

7    no longer available?

8    A    Yes, ma'am.

9    Q    What were you told about what happened to Mr. Pusateri?

10   A    That he had cashed in and moved on.

11   Q    Who did you speak with, then, at GigaPix after

12   Mr. Pusateri?

13   A    Um, I think -- I think it was Sharon Simon.

14   Q    And anyone else?

15   A    Yes.  I talked to Mr. Blauvelt and a couple of times

16   Mr. Pritchard.

17   Q    Well, let's talk about speaking with Mr. Blauvelt.  What

18   did Mr. Blauvelt tell you about the condition of GigaPix when

19   you spoke to him?

20   A    He said it was still on track, it was still good.

21   Q    Did he tell you that the movie *OZ3D* would be released in

22   theaters shortly?

23   A    Yes, ma'am.

24   Q    Did he tell you whether it was in the process of filming?

25   A    Yes, ma'am.

1   Q     He said it was?

2   A     He did.

3   Q     And when did he tell you that you could expect to receive

4   returns on the movie?

5   A     He didn't give a date but in the near future.

6   Q     Did he ask you to invest more money?

7   A     Yes, ma'am.

8   Q     More than once?

9   A     Yes, ma'am.

10  Q     When Mr. Blauvelt called you, what city and state were you

11  located in?

12  A     I was in Andrews, North Carolina.

13  Q     Soon after he called you, did he send you promotional

14  materials about *OZ3D*?

15  A     Yes, ma'am.

16  Q     And if you could take a look at what's been marked for

17  identification as Government's Exhibit 41 and ask if you

18  recognize that.

19            MS. LINDSAY:  And, Ms. Clerk, I'll --

20            THE COURTROOM DEPUTY:  Exhibit 41 is identified and

21  placed before the witness.

22            (Exhibit 41 for identification.)

23  BY MS. LINDSAY:

24  Q     Is that the letter that accompanied materials for *OZ3D*?

25  A     Yes, ma'am.

1          MS. LINDSAY:  Your Honor, I move in this exhibit.

2          MR. EMMICK:  No objection.

3          THE COURT:  41 in evidence.

4          (Exhibit 41 received into evidence.)

5          MS. LINDSAY:  And if we could display that and maybe

6    just make the whole text bigger.

7    BY MS. LINDSAY:

8    Q    So the letter is dated July 7th, 2009.  Would that have

9    been shortly after you had some of your phone conversations

10   with Mr. Blauvelt?

11   A    About that time, yes, ma'am.

12         MS. LINDSAY:  Um, I'm sorry, Madam Clerk, but if you

13   could show the witness Exhibit 9 for identification.

14         THE COURTROOM DEPUTY:  Exhibit 9 is placed before

15   the witness.

16         (Exhibit 9 for identification.)

17   BY MS. LINDSAY:

18   Q    Looking at Exhibit 9, is this -- does this look like the

19   same kind of folder that you received with that letter?

20   A    Yes, ma'am.

21         MS. LINDSAY:  I move in Exhibit 9, Your Honor.

22         MS. AMES:  No objection.

23         MR. EMMICK:  No objection.

24         THE COURT:  9 in evidence.

25         (Exhibit 9 received into evidence.)

```
 1              MS. LINDSAY:  Thank you, Your Honor.
 2   BY MS. LINDSAY:
 3   Q    Again, if you could just hold it up for the jury.
 4   A    (Indicating.)
 5   Q    Thank you.
 6   A    Sure.
 7   Q    And again, inside do you see a booklet called a
 8   Confidential Private Placement Memorandum?
 9   A    Yes, ma'am.
10   Q    Did you try to read that one too?
11   A    No, ma'am, I didn't.
12   Q    Did Mr. Blauvelt ever go over this document with you?
13   A    No, ma'am.
14   Q    Did he mention it to you at all?
15   A    I don't recall if he did.
16   Q    Did he ask you about your financial situation?
17   A    No, ma'am.
18   Q    Did that come up when you were discussing how much you're
19   going to invest?
20   A    I don't believe so.
21   Q    Did you end up investing in OZ3D?
22   A    Yes, ma'am.
23   Q    What made you decide to invest in OZ3D?
24   A    Well, we were already in for $12,000 and we were being
25   told that the company was still going to be successful and
```

1    revenue was going to come in, so I -- I figured that would

2    still be a good investment.

3    Q    Who was telling you that at this point?

4    A    Well, it started off being Mr. Pusateri, but it went on

5    to, if I'm not mistaken, Chris Blauvelt before it ended.

6    Q    Did he tell you that you were close to getting a return?

7    A    Yes, ma'am.

8    Q    And was that important in your decision to invest more

9    money?

10   A    It certainly was.

11   Q    And did he talk to you about risk associated with the

12   investment?

13   A    No, ma'am.

14   Q    Did Mr. Blauvelt tell you that there were limited shares

15   available?

16   A    Yes, ma'am.

17   Q    Why was that, if you recall?

18   A    I'm trying to remember if this was at this point, but

19   there were limited shares because of -- I don't know if that

20   was his personal shares that he was referring to.  But this was

21   offered to people who wanted to invest in *Oz* and that were

22   given first choice.

23   Q    Okay.  And then I'd ask you to take a look at what's been

24   marked for identification as Government's Exhibit 42 and ask if

25   you recognize that.

1        THE COURTROOM DEPUTY:  Exhibit 42 is identified and

2   placed before the witness.

3            (Exhibit 42 for identification.)

4        THE WITNESS:  Yes, ma'am.

5   BY MS. LINDSAY:

6   Q    And is that a letter from Mr. Blauvelt enclosing your

7   stock certificate?

8   A    Yes, ma'am.

9        MS. LINDSAY:  Your Honor, I move in Exhibit 42.

10       MR. EMMICK:  No objection.

11       MS. AMES:  No objection.

12       THE COURT:  42 in evidence.

13           (Exhibit 42 received into evidence.)

14       MS. LINDSAY:  And if we could display that for the

15   jury.

16   BY MS. LINDSAY:

17   Q    And that letter is dated August 5th, 2009, and signed by

18   Mr. Blauvelt; is that correct?

19   A    Yes, ma'am.

20   Q    And looking at page 3 of that exhibit, is that the stock

21   certificate that you received?

22   A    Yes, ma'am.

23   Q    And if we could look at page 2 of the exhibit.  Is that

24   the check that you sent along -- in order to get that stock

25   certificate?

```
 1    A     Yes, ma'am.

 2    Q     After the second investment, did Mr. Blauvelt encourage

 3    you to invest again?

 4    A     Yes, ma'am.

 5    Q     Did he call you many times?

 6    A     I think -- I think twice.

 7    Q     And when he called you after that second investment, did

 8    you inform him that you wanted to talk to somebody besides him

 9    as well?

10    A     Someone in addition to him.

11    Q     And did he bring you somebody else to talk to?

12    A     Yes, ma'am.

13    Q     Who was that?

14    A     David Pritchard.

15    Q     Can you tell us about the conversation you had with

16    Mr. Pritchard and Mr. Blauvelt?

17    A     Yes, ma'am.

18    Q     What did they say?

19    A     Well, they were on the open speaker and they both took

20    turns talking.  And they told us that these shares was his

21    personal shares that he decided to sell off and to -- the

22    people who were offered the first choice would be those who

23    were in, invested already, and that it was a dollar a share and

24    that they -- I believe the amount was -- it was over $10,000.

25    Q     Was there a limited number of these shares?
```

```
 1  A     Yes, ma'am.

 2  Q     Did they tell you that GigaPix was a sound investment?

 3  A     Yes, ma'am.

 4  Q     Both of them?

 5  A     Yes, ma'am.

 6  Q     And did they tell you that OZ3D was close to being

 7  released?

 8  A     Yes, ma'am.

 9  Q     Both of them?

10  A     Yes, ma'am.

11  Q     Did they tell you the company was doing so well that they

12  were selling some of their stock off?

13  A     They did.

14         MR. EMMICK:  Your Honor, objection on the grounds of

15  leading.

16         THE COURT:  The objection is overruled.

17         THE WITNESS:  Yes, ma'am.

18  BY MS. LINDSAY:

19  Q     Both of them?

20  A     Yes, ma'am.

21  Q     In telling you that there were only these limited personal

22  shares available, did they tell you then that there was an

23  urgency that you do this investment quickly?

24  A     Yes, ma'am.

25  Q     Did you tell them that at that point you had no more money
```

```
 1    to send in?

 2    A     Yes, ma'am.

 3    Q     What did they respond to that?

 4    A     Well, they said that they would cut it down from 10,000 to

 5    5,000, make an exception for me again because I was already

 6    invested in it.

 7    Q     Showing you what's been marked for identification as

 8    Government's Exhibit 38.  I'd ask if you recognize that.

 9              THE COURTROOM DEPUTY:  Exhibit 38 is identified and

10    placed before the witness.

11              (Exhibit 38 for identification.)

12    BY MS. LINDSAY:

13    Q     Is that the check that you sent after speaking to

14    Mr. Pritchard and Mr. Blauvelt?

15    A     Yes, ma'am.

16              MS. LINDSAY:  I move in 38, Your Honor.

17              THE COURT:  Any objection?

18              MS. AMES:  No objection.

19              MR. EMMICK:  No objection.

20              THE COURT:  38 in evidence.

21              (Exhibit 38 received into evidence.)

22              MS. LINDSAY:  If we could just display that.

23    BY MS. LINDSAY:

24    Q     So this states it was in August -- August of 2009.  Is

25    that about when this all occurred?
```

```
 1    A    Yes, ma'am.
 2    Q    And if we look at page 2 of the exhibit, is that another
 3    one of those subscription forms that you filled out?
 4    A    Yes, ma'am.
 5    Q    Who helped you complete that form?
 6    A    Well, we had already filled out one or two already.  So we
 7    knew how to -- what to say on it.  So I don't know if anyone
 8    went over this with us.  We just filled it out.
 9    Q    Checked where you had --
10    A    Checked where we had previously.
11    Q    Did Mr. Blauvelt or Mr. Pritchard go over this in detail
12    with you?
13    A    No, ma'am.
14    Q    Did they go over it at all with you?
15    A    No, ma'am.
16    Q    Was there anything in what Mr. Pritchard or Mr. Blauvelt
17    told you that made you believe that the investment was any less
18    safe than when you were speaking to Mr. Pusateri?
19    A    No, ma'am.
20    Q    And then I'd ask you to take a look at what's been marked
21    for identification as Government's Exhibit 39.
22              (Exhibit 39 for identification.)
23    BY MS. LINDSAY:
24    Q    Are those your stock shares?
25    A    Yes, ma'am.
```

1            MS. LINDSAY:  I move in 39, Your Honor.

2            THE COURT:  Any objection?

3            MR. EMMICK:  No objection.

4            THE COURT:  39 in evidence.

5            (Exhibit 39 received into evidence.)

6            MS. LINDSAY:  And if we could just look at that.

7    BY MS. LINDSAY:

8    Q    And then if you could take a look at what's been marked

9    for identification as Government's Exhibit 44.  And I'd ask if

10   you recognize that.

11           THE COURTROOM DEPUTY:  Exhibit 44 is identified and

12   placed before the witness.

13           (Exhibit 44 for identification.)

14   BY MS. LINDSAY:

15   Q    Is this a letter that you received from GigaPix?

16   A    Yes, ma'am.

17           MS. LINDSAY:  I move 44 into evidence, Your Honor.

18           THE COURT:  Any objection?

19           MR. EMMICK:  No objection.

20           MS. AMES:  No objection.

21           THE COURT:  44 in evidence.

22           (Exhibit 44 received into evidence.)

23   BY MS. LINDSAY:

24   Q    And can we look at the date, please, and then at the

25   second page so we can see who signed that?

1       It says Colin Mutton.  Did you know who he was?

2   A    I knew his position because somewhere in the packet it had

3   pictures and what their position was, but I'm not sure he was

4   in it.  But I spoke with him one time, and he introduced

5   himself as a position in the company.

6   Q    And I'd ask you if we could show the first page and the

7   last paragraph.  And it says that they're raising $3 million

8   which will take the company through to the period when revenues

9   from their television and movie projects would be generating

10  revenues.

11      And first of all, did it surprise you that they were still

12  raising money even though Mr. Pritchard and Mr. Blauvelt had

13  told you that there were only limited shares left?

14  A    No one had ever discussed this information with us, so we

15  did not know that there was a problem with money.

16  Q    Was it inconsistent with what they had told you about

17  limited shares?

18  A    Yes.  We always thought the company was in good financial

19  status, yeah.

20  Q    And if you could look at what's been marked for

21  identification as Government's Exhibit 45.

22          THE COURTROOM DEPUTY:  Exhibit 45 is identified and

23  placed before the witness.

24          (Exhibit 45 for identification.)

25  ///

```
 1    BY MS. LINDSAY:

 2    Q     Is this another letter that you received from GigaPix?

 3    A     Yes, ma'am.

 4    Q     Now, if we look at the last page of this letter --

 5              MS. LINDSAY:  Oh.  I move in 45, Your Honor.  I'm

 6    sorry.

 7              MS. AMES:  No objection.

 8              MR. EMMICK:  No objection.

 9              THE COURT:  45 in evidence.

10              (Exhibit 45 received into evidence.)

11    BY MS. LINDSAY:

12    Q     Okay.  Did you receive this in the mail?

13    A     Yes, ma'am.

14    Q     If we could look at the last page of that letter.  And

15    down at the bottom, is that signed by Mr. Blauvelt?

16    A     Yes, ma'am.

17    Q     And if we look at the last page and at the last

18    paragraph -- well, because I should say this -- the letter is

19    undated; correct?

20    A     Yes, ma'am.

21    Q     Okay.  Um, if you look at that last paragraph, it says --

22    asks you to stand with them as they move forward into 2011.  So

23    would you say you received this letter sometime in December of

24    2010?

25    A     It seems as though that was about the time frame.  I don't
```

1    know exactly.  It's undated, but that's -- that's what we

2    assumed.

3    Q    And if we could look at the first page of the letter at

4    paragraph 3.  Now, it discusses the movie *Blackbeard* and it

5    states they had some problems with the state of Iowa.  Is that

6    what you were referring to earlier?

7    A    Yes, ma'am.

8    Q    Did anyone at GigaPix talk to you personally about these

9    problems in Iowa?

10   A    All I was told was they didn't have the proper permitting

11   to be there and that they would find another state to do this

12   in.

13   Q    So it was not a big problem, in your eyes?

14   A    No, ma'am.

15   Q    And if we look at the next paragraph, it talks about *OZ3D*

16   and it states that they are through the pre-production stage

17   and moving into the production stage.  Was that consistent with

18   what Mr. Pritchard and Mr. Blauvelt told you prior to your

19   investment in summer 2009, that the film would soon be in

20   theaters?

21   A    Pretty much so, yes, ma'am.

22   Q    That in the end of 2010, it was just moving into

23   production?

24   A    Well, we were under the impression that this was *Oz* and

25   that it was -- should have been out sooner, but we were told

```
 1   that it's still on track and it's coming out.

 2   Q    Um, did you speak to Mr. Blauvelt and Mr. Pritchard after

 3   you made your third investment?

 4   A    No, ma'am, I don't believe so.

 5   Q    Did you at some point begin concerned -- become concerned

 6   about not receiving revenues?

 7   A    Yes, ma'am.

 8   Q    Did you try to reach Mr. Pritchard or Mr. Blauvelt?

 9   A    Not on the revenues.  But we stopped getting any kind of

10   mail through them -- through the mail, and so I went to the

11   Internet where I followed this.  And the Internet --

12             MS. AMES:  Objection, Your Honor.  Nonresponsive.

13   Hearsay.

14             THE COURT:  Objection is sustained.

15   BY MS. LINDSAY:

16   Q    Did you try to call at any point?

17   A    Yes, ma'am.

18   Q    Were you able to get through?

19   A    No, ma'am.

20   Q    How much in all did you invest in GigaPix and OZ3D?

21   A    27,000.

22   Q    Did you lose it all?

23   A    Yes, ma'am.

24             MS. LINDSAY:  I have nothing further.  Thank you,

25   Your Honor.
```

```
1              THE COURT:  Cross-examination, Defendant Pritchard.

2              MR. EMMICK:  Thank you, Your Honor.

3                        CROSS-EXAMINATION

4    BY MR. EMMICK:

5    Q    Good morning, sir.

6    A    Good morning.

7    Q    What I wanted to do was make sure that I understood some

8    of the facts --

9              THE COURT:  Ask questions on cross-examination.

10             MR. EMMICK:  That's what I'll do, Your Honor.  Thank

11   you.

12   BY MR. EMMICK:

13   Q    So what was the time period during which you had those

14   investments?  What was the first date?  What was the last date?

15   A    The first date was in May of '08.  I would have to look

16   at -- to be sure what the other check was written in -- written

17   on.

18   Q    What year would that have been, though?

19   A    '8, 2008.

20   Q    Uh-huh.  And then the last check would have been?

21   A    I don't know, sir, unless I -- if you've got it, put it

22   up.  I'll certainly tell you.

23   Q    But it will be in a period of two, perhaps three years?

24   A    Yes, sir.  Yes.

25   Q    Now, you were shown a fair number of documents; right?
```

```
 1   A     Yes, sir.

 2   Q     Almost all of them were signed by Mr. Blauvelt; right?

 3   A     Quite a few were, yes.

 4   Q     There was -- there were two of them that were signed by

 5   Mr. Blauvelt and by Mr. Pritchard; right?

 6   A     Yes, sir.  I believe so.

 7   Q     And there's only one that is signed by Mr. Pritchard

 8   himself, just one letter, January 16th; right?

 9   A     Yeah.  I would say yes.  I don't have it in front of me

10   but --

11   Q     We could print it out.  But you have no reason to --

12   A     No reason.

13   Q     -- disagree with that?

14   A     No, sir.

15   Q     All right.  And those three documents that were -- had

16   Mr. Pritchard's name on them, they weren't addressed to you on

17   the top; right?  They were addressed to "Dear Shareholders"?

18   A     Yes, sir.

19   Q     All right.  Now, you've mentioned a number of different

20   people at GigaPix that you had phone calls from; right?

21   A     Yes, sir.

22   Q     One of them would have been Mr. Pusateri?

23   A     Yes, sir.

24   Q     And one of them would have been Mr. Blauvelt?

25   A     Yes, sir.
```

1   Q    And some others but at least one with Mr. Pritchard;

2   right?

3   A    Yes, sir.

4   Q    All right.  So you have one phone call with Mr. Pritchard.

5   You didn't ask for him by name or anything, did you?

6   A    No, sir.

7   Q    All right.  You just asked for someone else?

8   A    (No audible response.)

9   Q    Okay.  Now, Mr. Blauvelt was the person who brought

10  someone to talk on the phone; right?

11  A    It was the -- the next evening.

12  Q    Okay.

13  A    But yes, there was two people there and -- and

14  Mr. Pritchard was one of them.

15  Q    All right.  So you asked for somebody else, and then a

16  full day later there are two people on the phone?

17  A    Yes, sir.

18  Q    Okay.  Now, was that a pre-arranged call of some sort or

19  did they just call you out of the blue?

20  A    I don't remember exactly if they said they'd call back the

21  next evening or not, but it was about the same time two

22  different evenings.

23  Q    All right.  And you had -- you'd done investments before;

24  right?

25  A    The one locally with Cousins Investment.

1    Q    And you've done investments with GigaPix; right?

2    A    Oh, yes, sir.

3    Q    All right.  And this phone call lasted what?  Ten minutes?

4    Fifteen minutes?  Half an hour?

5    A    Yeah, I would say.  Not too long.

6    Q    Not too long.  All right.

7         And after a discussion on the telephone with two people,

8    one of whom was identified as Mr. Pritchard but one of whom --

9    Blauvelt you had spoken with before, you invested $5,000?

10   A    Yes, sir.

11   Q    And that would have been, I guess, the least of your

12   investments here?

13   A    Yes, sir.

14   Q    Now, you mentioned earlier an investment that you made

15   with -- I think you called it Cousins?

16   A    Yes, sir.

17   Q    All right.  And was that investment successful?

18   A    No, sir.

19   Q    All right.  So you lost money on that one as well?

20   A    Yes, sir.

21   Q    All right.  And so I take it that nearly all of the

22   conversations that you had on the phone were with either

23   Mr. Pusateri or Mr. Blauvelt?

24   A    And the secretary, between those three, yes, sir.

25   Q    Okay.  And, in fact, you were sent a questionnaire by the

1   Government and you filled it out and sent it in.

2   A    Yes, sir.

3   Q    Sorry.  I should have ended with a question.

4        And you mentioned a number of people when you were

5   answering that questionnaire?

6   A    Yes, sir.

7   Q    And you didn't even mention Mr. Pritchard in that

8   questionnaire, did you?

9   A    Um, I'm not sure which one you're referring to.

10  Q    Well, we can show you in a minute.

11  A    But possibly, sure.

12  Q    But he was certainly one part of one phone call with two

13  people.  It lasted ten or so minutes?

14  A    That's correct.

15  Q    And if I remember, your wife was in on some of these

16  telephone calls?

17  A    She was.

18  Q    All right.  And she filled out a questionnaire as well;

19  right?

20  A    She did.

21  Q    She didn't mention Mr. Pritchard either, did she?

22  A    I don't recall but probably not.  If his name's not on

23  there, she didn't.

24            MR. EMMICK:  Uh-huh.  One moment, Your Honor.

25            (Pause in the proceedings.)

```
 1                 MR. EMMICK:  That's all, Your Honor.  Thank you.
 2                 THE COURT:  Defendant Blauvelt.
 3                 MS. AMES:  Thank you, Your Honor.  If I could just
 4      have one moment to get the screen up.
 5                          CROSS-EXAMINATION
 6      BY MS. AMES:
 7      Q     Good morning, sir.
 8      A     Good morning ma'am.
 9      Q     I would like to direct your attention back to May of 2008.
10      A     Okay.
11      Q     Okay.  And the first person that you talked to from
12      GigaPix was Mr. Pusateri; correct?
13      A     Yes, ma'am.
14      Q     And do you recall when in May of 2008 that that first
15      telephone conference took place?
16      A     When in May of 2008?  The date?
17      Q     Yes.
18      A     I don't.  I do not.  Sorry.
19      Q     But during approximately a month, you actually had
20      multiple telephone calls with him; is that correct?
21      A     Yes, ma'am.
22      Q     And on each of those telephone calls, he was the only
23      person on the phone call; correct?
24      A     Yes, ma'am.
25      Q     And was it about a month later that you and your friends
```

1    grouped together to have this conference call with him?

2    A    It wasn't a month later.  It was much earlier than that.

3    Q    Okay.  About how much time had passed between your first

4    call with Mr. Pusateri and the group call?

5    A    Only days.  Two, three days that I invited them into my

6    living room and they called back for a conference call.

7    Q    And again, on that conference call, it was just

8    Mr. Pusateri from GigaPix; correct?

9    A    Yes, ma'am, I think so.

10   Q    Now, in between the time of your first call and that

11   conference call, he had sent you a packet of documents;

12   correct?

13   A    He did send out a packet of documents.

14   Q    Because you were able to review those documents with him

15   on the phone during the group call?

16   A    No, ma'am.  We didn't have the packet at that time.

17   Q    Oh, okay.  I misunderstood your direct, then.  I

18   apologize.

19        So when did you go over the packet of materials with him?

20   A    After the group conversation, it had to be -- well, he had

21   to take time -- he sent them out obviously just the next day or

22   so because they came by FedEx and it was within three or four

23   days that they were there.

24   Q    Okay.  So how much time did you have to look over these

25   documents prior to your telephone call with Mr. Pusateri to

1    discuss those documents?

2    A    Well, he was calling and asking if the information had

3    been received, if we got it a couple of times even before we

4    received it.  So very short.  But we were impressed with what

5    was sent to us.

6    Q    Okay.  So you did have some time to review the documents

7    prior to him going over them with you?

8    A    Yeah, probably -- probably a day.

9    Q    And during that period of time, did you review them?

10   A    Yes, ma'am.

11   Q    Okay.  And you say that based upon them, you were

12   impressed in the beginning?

13   A    We were.

14   Q    And part of the documents that he sent you was what was

15   entitled a Subscription Agreement; is that correct?

16   A    Yes, ma'am.

17   Q    And he went over that Subscription Agreement with you;

18   correct?

19   A    He went over it with everyone there when we filled it out,

20   yes, ma'am.

21   Q    Okay.

22            MS. AMES:  And I apologize.  I apologize,

23   Your Honor.  I'm not sure which document number that was.

24   BY MS. AMES:

25   Q    Okay.  And, sir, if I could have you again -- you've got

1    several books up there in front of you.  If I could have you

2    look at Government's Exhibit No. 35.  Let me know when you have

3    that.

4    A    Yes, ma'am.

5    Q    Okay.  And if you would refer to page 7 on the

6    Government's --

7    A    Do you want me to take it out and --

8    Q    You don't need to take it out.  If you'll just flip to

9    that page.

10        Oh, he does.  Okay.  Maybe I can do it this way.  Wow, you

11   can't see this very well.

12        And page 7 here shows Exhibit C, Subscription Agreement

13   for GigaPix Studios?

14   A    Yes, ma'am.

15   Q    And you signed that document; correct?  In fact, on page 8

16   of that Subscription Agreement, that is your signature; is that

17   correct?

18   A    Yes, ma'am.

19   Q    And also, on page 4, you have initialed it here at 4.1.

20   And this is a Confidential Investor Questionnaire?

21   A    Yes, ma'am.

22   Q    And you initialed that, stating that you are a natural

23   person whose individual net worth or joint net worth with your

24   spouse exceeds a million dollars?

25   A    Yes, ma'am.

1    Q    And you have initialed that that information is accurate;
2    is that correct?
3    A    Yes, ma'am.
4    Q    And, in fact, another page of that Subscription Agreement
5    states that the company is dependent upon your representations;
6    is that correct?
7    A    Yes, ma'am.  I don't know.
8    Q    And just give me one moment.  Well, while I'm looking for
9    that, let's look at some of the other documents.
10        Additionally, as part of that packet that you received,
11   there was what's been referred to as a PPM for GigaPix Studios;
12   correct?
13   A    Yes, ma'am.
14   Q    And you received this at the same time as the Subscription
15   Agreement; is that right?
16   A    Yes, ma'am.
17   Q    And if you go down -- you mentioned before that this was
18   somewhat voluminous, so you just kind of perused it.  Is
19   that --
20   A    Yes, ma'am.
21   Q    You didn't try to read it word for word?
22   A    No, ma'am.
23   Q    But -- but you would be able to note the highlights of it;
24   is that correct?
25   A    Yes, ma'am.

```
 1   Q     And, in fact, there's a number of portions that are in
 2   bold?
 3   A     Yes, ma'am.
 4   Q     And, in fact, on the very first page in bold it says that
 5   "the securities offered hereby are speculative and involve high
 6   degree of risk"?
 7   A     Yes, ma'am.
 8   Q     And so you were able to see and read that; is that right?
 9   A     I did.
10   Q     And then if you go --
11         MS. AMES:  And, Your Honor, for the Court and for
12   the record, I am at Government's Exhibit No. 23.
13   BY MS. AMES:
14   Q     Sir, are you able to see this?  This is page 12.  It
15   specifically states "Risk Factors."  Are you able to see that
16   on the screen?
17   A     Yes, ma'am.
18   Q     Okay.  And again, in bold it has a number of different
19   headings; is that correct?
20   A     That's correct.
21   Q     And one of them says "Minimal Operating History"?
22   A     Yes, ma'am.
23   Q     And it says that the company has a limited operating
24   history and there's no assurances that the company will operate
25   profitably; correct?
```

```
 1   A     Yes, ma'am.

 2   Q     And you had the opportunity to read that as well?

 3   A     Yes, ma'am.

 4   Q     And that's pretty self-explanatory; correct?

 5   A     Yes, ma'am.

 6   Q     It's not complicated legal terms?

 7   A     No, ma'am.

 8   Q     And further on that same PPM, for short, it shows

 9   executive compensation; is that right?

10   A     Yes, ma'am.

11   Q     And, in fact, it shows that Mr. Christopher Blauvelt was

12   receiving an annual salary from the company?

13   A     Yes, ma'am.

14   Q     And the -- those sums vary between 100,000 and $250,000 a

15   year; correct?

16   A     Yes, ma'am.

17   Q     And so this -- you were given the information that he's

18   receiving a salary from the company?

19   A     Yes, ma'am.

20   Q     And I finally found that page I was asking you about.

21         And so before you -- well, let me restate that.

22         The document that you initialed and that you signed, at

23   point 4 -- or Section 4.5 says -- and this is underlined --

24   "significance of forgoing representations and answers."  Do you

25   see that?
```

1   A     Yes, ma'am.

2   Q     And it says, "The undersigned is informed of the

3   significance to the company of the forgoing representations and

4   answers" -- second page shows -- "contained in this Section IV,

5   and such answers have been provided with the understanding that

6   the company will rely on them."  And I'm sorry.  You can't see

7   that.  So let me just -- so that you can confirm whether that's

8   what it says.

9         Do you see that, sir?

10  A     Yes, ma'am.

11  Q     So you were representing by signing this, your

12  understanding that the company would depend upon those answers;

13  is that correct?

14  A     Yes, ma'am.

15  Q     And these documents that you sent in in May of 2008 were

16  your first written communications to the company; correct?

17  A     I believe so.  Yes, ma'am.

18  Q     To your knowledge, they didn't have the company -- the

19  company didn't have any prior information about your income,

20  your assets, anything like that; correct?

21  A     No, ma'am.

22  Q     And you testified that when you filled out the later

23  documents in 2010, you didn't even discuss those -- that

24  Subscription Agreement with anyone?

25  A     I don't believe so, no, ma'am.

1  Q    You just answered pretty much the same way that you

2  answered in 2008?

3  A    Yes, ma'am.

4  Q    So no one at GigaPix other than Mr. Pusateri would know

5  anything different from what you had put in that 2008

6  agreement?

7  A    That's correct.

8  Q    Now, I would like to just kind of change gears for a

9  moment.  And you were asked by the Government to look at their

10 Exhibit No. 42, and that was a letter that was ostensibly

11 signed by Chris Blauvelt; is that correct?

12 A    Yes, ma'am.

13 Q    And does this, to you, look like a handwritten personal

14 signature, or does this look like a stamp?

15 A    I have no opinion, ma'am.  I don't know his signature or

16 if it was stamped.

17 Q    Okay.  But it does appear to be identical to this one that

18 is noted on Government's Exhibit No. 45; is that correct?

19 A    Looks very similar.

20 Q    Now, sir, when you testified that you spoke with

21 Mr. Blauvelt in 2010, did that person initiate the call or did

22 you?

23 A    If you're referring, ma'am, to the last monies that we

24 sent in, he initiated the call.

25 Q    Okay.  And this was regarding the *OZ3D* investment, is that

1    correct?

2    A    Yes.

3    Q    And you'd never met Mr. Blauvelt; is that correct?

4    A    No, ma'am.

5    Q    And the person just represented themselves to be

6    Christopher Blauvelt; is that correct?

7    A    Yes, ma'am.

8    Q    I'd forgotten, there was one question -- I just want to go

9    back for one question on the May 2008 meeting that you had with

10   everyone.  Do you recall what time of day that was?  Was it in

11   the evening?  Was it during the day?

12   A    Well, there's a three-hour time difference between the

13   east and the west.  So I'm thinking it's more like -- and a lot

14   of the people there work, so it must have been later in the

15   evening.

16   Q    Okay.  Do you have a -- a specific recollection or are you

17   kind of --

18   A    No, ma'am, I don't.

19             MS. AMES:  Okay.  Just one moment, Your Honor.

20             (Pause in the proceedings.)

21   BY MS. AMES:

22   Q    And in all of your telephone conversations with the person

23   to be Mr. Christopher Blauvelt, you didn't discuss your

24   financial situation with that individual at all; correct?

25   A    Not until the very last check that we sent.  And I just

1    told them we didn't have that amount of money to send anymore.

2    Q    Okay.  Just a few follow-up questions, sir.

3         In your work with the Army, you were a recruiter; correct?

4    A    Yes, ma'am.

5    Q    So it was your job to sell the Army to people; is that

6    correct?

7    A    Yes, ma'am.

8    Q    And based upon your conversations with those people, you

9    or someone else would send the individual a contract; is that

10   right?

11   A    The Army took care of that.

12   Q    Right.

13        And then that contract actually laid out all the specific

14   terms as to their relationship with the Army; is that right?

15   A    A little over my head, ma'am.  We only signed to go in.

16   So what they did once they got to that point, I have no idea,

17   but I'm sure you're correct.

18   Q    But you worked there as a recruiter for -- what? -- 16

19   years; right?

20   A    Yes, ma'am.

21   Q    So if a person had maybe a different recollection as to

22   what you had told them --

23             THE COURT:  That's not about investments, Counsel.

24   Please, let's get to --

25             MS. AMES:  No further questions.

1          THE COURT:  -- let's get to this case.

2                    **REDIRECT EXAMINATION**

3     BY MS. LINDSAY:

4     Q     So you did discuss your financial situation with

5     Mr. Pritchard and Mr. Blauvelt during that last investment?

6     A     Yes, ma'am.

7     Q     And you made it clear to them that you didn't even have

8     $10,000 left to invest in their company?

9     A     Yes, ma'am.

10    Q     And this was after you -- you had put in something like --

11    A     22,000.

12    Q     Now, you were shown several pages of legalese documents in

13    the Private Placement Memorandum.  Did you rely on what was in

14    that booklet or did you rely on the word of Mr. Pusateri,

15    Mr. Blauvelt, and Mr. Pritchard?

16    A     I read the booklet.  And we were told not to be concerned

17    about it, that it was formalities.  And he checked -- he told

18    everyone there which blocks to check, yes or no.

19    Q     And did Mr. Blauvelt or Mr. Pritchard tell you any

20    different?

21    A     No.

22               MS. LINDSAY:  I have nothing further.  Thank you,

23    Your Honor.

24               THE COURT:  Recross, Defendant Pritchard.

25               MR. EMMICK:  No recross, Your Honor.

```
 1              THE COURT:  Defendant Blauvelt.

 2              MS. AMES:  No, Your Honor.

 3              THE COURT:  You may step down.

 4              THE WITNESS:  Thank you, sir.

 5              THE COURT:  We'll take a short recess.

 6      I will remind you not to converse or otherwise communicate

 7 among yourselves or with anyone upon any subject touching on

 8 the merits of the cause on trial, and you are not to form or

 9 express any opinion on the case until it's submitted to you for

10 your verdict.

11      You'll be excused until called.  Court will remain in

12 session.

13              THE COURTROOM DEPUTY:  All rise.

14              (Out of the presence of the jury.)

15              THE COURT:  All right.  Ten minutes.

16              (Break taken.)

17              THE COURT:  Bring in the jury.  Have your witness

18 ready.

19              MS. LINDSAY:  She's right here, Your Honor.  Would

20 you like her in the box?

21              THE COURT:  No.  Ready.

22              MS. LINDSAY:  She will be much shorter, Your Honor,

23 time-wise.

24              THE COURT:  Don't need so much detail.

25              MS. LINDSAY:  Right.  Just the first one,
```

1    Your Honor.  That's it.

2                THE COURT:  I understand.

3                MS. LINDSAY:  She wants to go home today badly.

4    She's, like, please get me out of here.

5                (In the presence of the jury.)

6                THE COURT:  The jurors are all present and in their

7    proper places.  The defendants are present with their counsel.

8         Call your next witness.

9                MS. LINDSAY:  Linda Hampshire.

10                THE COURTROOM DEPUTY:  Please raise your right hand.

11        Do you solemnly swear that the testimony you shall give in

12    the cause now before this Court shall be the truth, the whole

13    truth, and nothing but the truth, so help you God?

14                THE WITNESS:  I do.

15                THE COURTROOM DEPUTY:  Thank you.  Please take a

16    seat.

17        Please state your full and true name for the record and

18    spell your last name.

19                THE WITNESS:  Linda Suzan, S-u-z-a-n, Hampshire,

20    H-a-m-p-s-h-i-r-e.

21                MS. LINDSAY:  May I begin, Your Honor?

22                THE COURT:  Yes.

23                          **DIRECT EXAMINATION**

24    BY MS. LINDSAY:

25    Q    Ms. Hampshire, how are you currently employed?

1    A     At present, I take care of my mother, Alzheimer's patient.

2    I -- my sisters --

3    Q     How have you been employed in your past?

4    A     My occupation, I'm a dental hygienist.  And I worked many

5    years in an orthodontics practice.  And after that, I went to a

6    medical center and was a receptionist, billing, coding,

7    insurance filing.  Then I went -- worked a couple of years at

8    the bank, and now I take care of my mom.

9    Q     Where do you live?

10   A     My husband and I have a ranch, cattle ranch in Wyoming.

11   Q     What city is that?

12   A     Arvada.

13   Q     Well, not a city.

14   A     Not a city, no.  Just a post office.

15   Q     Did you become an investor in GigaPix?

16   A     Yes, we did.

17   Q     Prior to that, what kind of investment history did you

18   have?

19   A     Very little.  Very little.

20   Q     How did you learn of GigaPix?

21   A     A couple of friends of ours had heard about it and thought

22   it was an opportunity.  They wanted us to get in with them

23   and --

24   Q     In about May of 2008, did you receive a telephone call

25   from GigaPix?

1    A    We did.

2    Q    Who called you?

3    A    Greg Pusateri.

4    Q    Did he -- what did he tell you about GigaPix?

5    A    Well, that they were going to make a movie.  They were in

6    the animation division, I believe.  They were making a movie, a

7    remake of the *Wizard of Oz*.

8    Q    Did you talk about their wholesome Christian values of the

9    company?

10   A    Oh, yes.  It was all going to be family entertainment,

11   family friendly, talked to us a lot about our -- our family

12   values and the good Christian values that we were -- we'd be

13   proud of the work they were doing.

14   Q    Did he tell you what was happening with this *Oz* movie,

15   like what stage they were at?

16   A    They had hired people.  And I guess I don't really know.

17   It was in early productions but --

18   Q    Did he tell you when the movie would come out?

19   A    We understood within about a year.

20   Q    Did he tell you about any particular actors who had been

21   hired as voices on this movie?

22   A    Um, later on, yeah, there was kind of a buzz because he

23   had told -- told us that they had hired Michael J. Fox as one

24   of the voices.

25   Q    Did he discuss risk with you on this investment or the

1    opposite?

2    A     Well, kind of the opposite.  I was pretty skeptical about

3    it.  And when I was asking questions, my husband would call and

4    talk to Greg.  And Greg said, well, he'd put in a lot of his

5    money and nobody was going to lose money on it, that --

6    Q     Was it important to you that it was not a risky

7    investment?

8    A     Well, yes.  We didn't have money to lose on it.

9    Q     Did you receive anything in the mail from GigaPix?

10   A     Yes.  We received a folder, um, with a lot of promotion

11   kind of stuff in it, like --

12              MS. LINDSAY:  I'd ask that the witness take a look

13   at Exhibit 23.  Actually, I think 23 -- the 23 I'm looking at

14   is -- it's in the separate --

15   BY MS. LINDSAY:

16   Q     Did you receive the glossy folder?

17   A     Yes.

18   Q     Maybe I'll just show you here.

19         And if you could look at that, did you receive something

20   like that in the mail?

21   A     Yes.  Yes.  Yes.

22   Q     And opening that up and looking in it, do you see a

23   booklet called a Private Placement Memorandum?

24   A     Yes.  Yes.

25   Q     Did you receive something like that?

```
1   A     Um, I think we did.  Yes.

2   Q     Did you know what a Private Placement Memorandum was?

3   A     No.  No, no.

4   Q     Did you read it?

5   A     Well, I read some of it, yes.

6   Q     Did you understand it?

7   A     No, I did not.

8   Q     Did you talk to Mr. Pusateri about it?

9   A     Um, I didn't.  I'm sure Jerry did.

10  Q     Was that an important document, as far as you knew, to

11  your investing in GigaPix?

12  A     Um --

13  Q     Or was it more what Mr. Pusateri was telling you?

14  A     I don't really remember this particular one.

15  Q     Okay.

16  A     But --

17  Q     I'd like you to take a look at what's been marked for

18  identification as Government's Exhibit 104.

19          THE COURTROOM DEPUTY:  Exhibit 104 is identified and

20  placed before the witness.

21          (Exhibit 104 for identification.)

22  BY MS. LINDSAY:

23  Q     Are these checks that you sent to GigaPix?

24  A     Oh, is there -- yes.

25          MS. LINDSAY:  I move in 104, Your Honor.
```

```
 1                THE COURT:  Any objection?

 2                MR. EMMICK:  No objection.

 3                MS. AMES:  No objection.

 4                THE COURT:  104 in evidence.

 5                (Exhibit 104 received into evidence.)

 6                MS. LINDSAY:  If we could look at page 2 of 104.

 7                THE WITNESS:  Okay.

 8   BY MS. LINDSAY:

 9   Q     Did you decide to invest in OZ3D and GigaPix?

10   A     Yes, we did.

11   Q     And looking at this check here -- and you can look on your

12   monitor if you want.

13   A     Oh.

14   Q     Is that the check that you wrote for your first

15   investment?

16   A     Yes, it is.

17   Q     Who is Penny McClurg?

18   A     She's one of our friends that brought this to our

19   attention, wanted us to invest.

20   Q     And why did you write her name on there?  Why did you

21   write the check to her?

22   A     Well, it was supposed to be $10,000, and we didn't have

23   $10,000.  So we wrote it for 5- and she put 5- with it, so we

24   got the one unit.

25   Q     Did you tell Mr. Pusateri about your financial situation?
```

1   A    Well, yes.  That was a big -- that was a large amount.

2   Q    For you?

3   A    Yes.

4   Q    Did he ever tell you anything about you having to be worth

5   a million dollars in order to invest?

6   A    No.

7   Q    At the time were you worth a million dollars?

8   A    No.  No.

9   Q    Now, if you could look at Exhibit 35 and -- well, you know

10  what?  I think that's in evidence.  So why don't we display it,

11  35, page 7.

12       Do you recall filling out anything like this in connection

13  with your investment?

14  A    I -- I don't remember.

15  Q    If we could look at page 9 of the exhibit.

16  A    Okay.

17  Q    And down at the bottom, that last question there.  Do you

18  remember having to check that you were worth a million dollars?

19  A    No.  No.

20  Q    So nobody ever asked you to fill this document out?

21  A    We couldn't have stated that we were worth a million

22  dollars.

23  Q    But nobody asked you to fill out a document like this?

24  A    Oh, no.  No.  I don't think so.

25  Q    Okay.  Did Mr. Pusateri send you materials for *OZ3D* as

1    well as for GigaPix?

2    A    Um, we got letters, but we didn't ever get, like, a big --

3    you know, like the first one we got was pretty elaborate.  We

4    didn't ever get anything like that the second time.

5    Q    Okay.  Did you invest in *OZ3D*?

6    A    We did.

7    Q    And if you look at Exhibit 104, page 1 -- and I think we

8    can bring that up on the monitor for you.  I think I moved that

9    into evidence.  I hope so.  Yeah?  Okay.  Good.

10        Does that represent your second investment?

11   A    Yes.

12   Q    Did -- after this, did Mr. Pusateri ask you to invest more

13   money, additional money in *OZ3D*?

14   A    Yes, he did.

15   Q    Was that in approximately July of 2009?

16   A    Yes, it was.

17   Q    Approximately -- and what city and state were you living

18   in or --

19   A    Near Arvada, Wyoming.

20   Q    Rural area.

21        At that time did you have a discussion with Mr. Pusateri

22   about your 401(k)?

23   A    Yes, I did.  He had started calling again and he talked to

24   my husband a couple of times.  And then one day he called

25   specifically for me and asked -- told me that, you know, with

1    this new offering, that we really needed to get into that, that

2    it was going to be a good investment and I should consider

3    taking money out of my 401(k) to put into this investment.

4         And I didn't know really what to say.  I wasn't sure

5    how -- if he knew I had one or if he was looking for

6    information or whatever.  But I just said, "If I have a

7    retirement plan and what's in it, it's none of your business."

8         And he said, "Well, it is my business.  I'm your financial

9    advisor."

10        And I said, "Since when?"

11        And he said, "Since you put money into the project.  And

12   as your investment counselor, I strongly advise you to take

13   money from that account and put it into this.  I can make you a

14   lot more money.  And if you leave it in your retirement, you

15   won't have anything."

16        And things were going down drastically about that time.

17   But I just said, "That's outrageous.  I'm not taking money out

18   of my retirement plan."  And we hadn't gotten any money back

19   yet on our other two checks we'd written.  And I just said,

20   "No.  Absolutely no."

21        And he said, "Maybe you should talk to your husband about

22   that.  He" -- "He might have a different opinion."

23        And I said, "Well, I don't really have to check with him

24   because I don't know a lot but I know that that account is in

25   my name and Jerry can't get funds and you can't get to it

1   without me and it's never going to happen."

2       And so he said he would have -- he would probably have

3   somebody else call me and see if I could be convinced.  And I

4   said, "It would be a waste of your time.  I'm not doing it."

5   So that was the last time I spoke to him.

6   Q    Jerry is your husband?

7   A    Yes.  Sorry.  Yes.

8   Q    However --

9   A    However.

10  Q    Did Jerry win out?

11  A    Yes, he did.

12  Q    And you invested more money?

13  A    Yes, we did.

14  Q    If you could take a look at Government's Exhibit 105 for

15  identification.

16              THE WITNESS:  It would be in here?

17              THE COURTROOM DEPUTY:  Yeah.

18       Exhibit 105 is identified and placed before the witness.

19              (Exhibit 105 for identification.)

20  BY MS. LINDSAY:

21  Q    Is that your third check?

22  A    Yes, it is.

23              MS. LINDSAY:  I'd move that into evidence,

24  Your Honor.

25              MS. AMES:  No objection.

```
 1              MR. EMMICK:  No objection.

 2              THE COURT:  In evidence.

 3              (Exhibit 105 received into evidence.)

 4              MS. LINDSAY:  And if we could just take a look at

 5    it.

 6    BY MS. LINDSAY:

 7    Q    The check is dated July 8th of 2009.  Is that about when

 8    you sent it in?

 9    A    Yes.

10    Q    Did you send it by mail or FedEx?

11    A    I don't recall.  Jerry sent it in, but I don't recall if

12    it went FedEx or through the mail.

13    Q    But one of the two?

14    A    Yes.

15    Q    And if you could look at Government's Exhibit 106 for

16    identification.

17              THE COURTROOM DEPUTY:  Exhibit 106 is identified and

18    placed before the witness.

19              (Exhibit 106 for identification.)

20    BY MS. LINDSAY:

21    Q    Are those stock certificates you received from GigaPix and

22    OZ3D?

23    A    Yes, it is.

24              MS. LINDSAY:  I move that in, Your Honor.

25              MR. EMMICK:  No objection.
```

1        THE COURT:  105 -- 106 in evidence.

2            (Exhibit 106 received into evidence.)

3   BY MS. LINDSAY:

4   Q    And if we could look at page 2 of that exhibit.  And if

5   you could just make the whole thing -- okay.

6        And it's dated August 5th, 2009.  Is that about when you

7   received it?

8   A    Yes.

9   Q    Did you receive that in the mail?

10  A    Yes.

11  Q    And then showing you what's been marked for identification

12  as Government's Exhibit 107 and ask if you recognize that.

13        THE COURTROOM DEPUTY:  Exhibit 107 is identified and

14  placed before the witness.

15            (Exhibit 107 for identification.)

16        MS. AMES:  No objection.

17        MR. EMMICK:  No objection.

18  BY MS. LINDSAY:

19  Q    Is that additional stock certificates?

20  A    Yes, it is.

21        MS. LINDSAY:  And I move that in, Your Honor.

22  Your Honor, I move in Exhibit 107.

23        THE COURT:  107, any objection?

24        MS. AMES:  No objection.

25        MR. EMMICK:  No, Your Honor.

```
 1                THE COURT:  Received in evidence.
 2                (Exhibit 107 received into evidence.)
 3    BY MS. LINDSAY:
 4    Q    Over the years, did you receive update letters from
 5    GigaPix?
 6    A    Yes, we did.
 7    Q    And if you could take a look at what's been marked for
 8    identification as Government's Exhibit 108 and ask if you
 9    recognize that.
10                THE COURTROOM DEPUTY:  Exhibit 108 is identified and
11    placed before the witness.
12                (Exhibit 108 for identification.)
13    BY MS. LINDSAY:
14    Q    Are those copies of the letters you received from GigaPix?
15    A    Yes.
16                MS. LINDSAY:  And I move in 108.
17                THE COURT:  Any objection?  108 in evidence.
18                (Exhibit 108 received into evidence.)
19    BY MS. LINDSAY:
20    Q    Now, you said that Mr. Pusateri told you in 2008 that you
21    would receive a return within one year.  Did you?
22    A    No.
23    Q    Did you ever -- did it ever become difficult to reach
24    Mr. Pusateri?
25    A    Yes, it did.
```

1  Q    Were you able to talk to Mr. Pusateri or anyone else at

2  GigaPix about your concerns?

3  A    Um, after the last man went in and -- our little group of

4  investors, we were talking it over, and we would call him and

5  he would assure us that we'd be seeing something within

6  probably the next three months.  And then, of course, nothing

7  happened and we'd get the same response repeatedly.  And then

8  finally we were eventually not able to get ahold of anyone.

9  Q    How much in all did you put into GigaPix and *OZ3D*?

10  A    $25,000.

11  Q    Did you lose it all?

12  A    We did.

13         MS. LINDSAY:  Thank you, Your Honor.  I have nothing

14  further.

15         THE COURT:  Cross-examination, Defendant Pritchard.

16         MR. EMMICK:  No cross-examination, sir.

17         THE COURT:  Cross-examination, Defendant Blauvelt.

18                        **CROSS-EXAMINATION**

19  BY MS. AMES:

20  Q    Just one question, ma'am.  You never talked with

21  Mr. Christopher Blauvelt; is that correct?

22  A    With Christopher?  No.

23         MS. AMES:  No further questions.

24         THE COURT:  Redirect?

25         MS. LINDSAY:  No, thank you.

```
 1              THE COURT:  You may step down.

 2         Call your next witness.

 3              MR. MCLAIN:  Your Honor, the Government will call

 4    Mr. Jerome Goodman.

 5              THE COURT:  I think before we start this witness,

 6    we'll take a -- we need a recess for the jurors.

 7         I would remind you not to converse or otherwise

 8    communicate among yourselves or with anyone on any subject

 9    touching upon the merits of the cause on trial.  You're not to

10    form or express an opinion until it's finally submitted to you

11    for your verdict.

12         You're excused until 1:30.  Jurors are excused.  Court

13    will remain in session.

14              THE COURTROOM DEPUTY:  All rise.

15              THE COURT:  1:30.

16              (Noon recess was taken.)

17              (Out of the presence of the jury.)

18              THE COURT:  Bring down the jury.  You have your

19    witness ready?

20              MR. MCLAIN:  Yes, we do, Your Honor.

21              MS. LINDSAY:  Does Your Honor have an idea of how

22    late you want to go today?

23              THE COURT:  I have no idea.

24              MS. LINDSAY:  Okay.

25              (In the presence of the jury.)
```

1          THE COURT:  The jurors are all present and in their

2     proper places.  The defendants are present with their counsel.

3          Call your next witness.

4          MR. MCLAIN:  Your Honor, the Government would call

5     Mr. Jerome Goodman.

6          THE COURTROOM DEPUTY:  Just stand right here.

7     Please raise your right hand.

8          Do you solemnly swear that the testimony you shall give in

9     the cause now pending before this Court shall be the truth, the

10    whole truth, and nothing but the truth, so help you God?

11         THE WITNESS:  I do.

12         THE COURTROOM DEPUTY:  Okay.  Thank you.  Please

13    take a seat.

14         Please state your full and true name for the record and

15    spell your last name.

16         THE WITNESS:  Jerome, J-e-r-o-m-e, Goodman, G,

17    double o, d-m-a-n.

18                         **DIRECT EXAMINATION**

19    BY MR. MCLAIN:

20    Q     Mr. Goodman, how old are you?

21    A     85.

22    Q     And where do you currently live?

23    A     Currently live in Chandler, Arizona.  422 West Beechnut.

24    Q     And what is your current profession?

25    A     I'm retired.

1   Q      And what did you retire from?

2   A      From a family beverage business.

3   Q      And how would you describe your experience and knowledge

4   of investing in securities, meaning stock options and bonds?

5   A      Well, I've done some.  I'm not a pro.  And I have a son

6   who -- who deals in that.

7   Q      Was there ever a Private Placement Memorandum issued to

8   you with those investments?

9   A      I had gotten it, but I was told not to pay any attention

10  to it.

11  Q      I mean, with your previous investments.  Was there ever a

12  PPM, or Private Placement Memorandum, with those investments?

13  A      Oh, positively.

14  Q      And did you ever invest money in a movie company called

15  GigaPix?

16  A      Yes, I did.

17  Q      And approximately when did you first learn about an

18  investment opportunity in a movie company called GigaPix?

19  A      I think it was about 1904.

20  Q      Was that the summer of 2004?

21  A      2004.

22  Q      And who did you learn about this opportunity from?

23  A      Gregory Pusateri.

24  Q      And did you also talk to Mr. Chris Blauvelt about this

25  opportunity?

A     Yes.

Q     And when you spoke to Mr. Chris Blauvelt, what did he represent to you concerning your investment in GigaPix?

A     He emphasized I'd be very, very happy with the return.  It was supposed to be very substantial.

Q     And how much was Mr. Chris Blauvelt trying to get you to invest in GigaPix in 2004?

A     About 20,000.

Q     And what did you communicate to Mr. Blauvelt concerning your ability to invest $20,000 in GigaPix all at once?

A     I do not have that type of money.  I have kids, sons in college, and I even have a mortgage on my present home.  And I -- I wasn't able to.

Q     And what was Mr. Blauvelt's response to you when you told him you didn't have $20,000 to invest at once?

A     He said, "Well, buy" -- "buy it in pieces."

Q     And how much did you ultimately end up investing in GigaPix?

A     Total?

Q     Yes.

A     $30,000.

Q     And did you invest in pieces as he suggested?

A     Well, I bought 10-, then I bought 5-, 5- more in GigaPix. And I bought 10-, I got a friend to buy the other 10- because they were sold in units of 20,000.

1   Q      And how did you send in your payments for your investments

2   in GigaPix?  Was it in U.S. mail?

3   A      U.S. mail, correct.

4   Q      And when you invested in GigaPix, were you an accredited

5   investor?

6   A      No, I wasn't.

7   Q      And did Chris Blauvelt ask you about your net worth when

8   he spoke to you?

9   A      There wasn't too much emphasis on it.  The main thing is

10  he wanted money for the present transaction.

11  Q      And before you invested, did Mr. Blauvelt mention to you

12  the risk associated with your investment in GigaPix?

13  A      Not according to him, no.

14  Q      And were you informed that you needed to invest within a

15  short period of time?

16  A      It was like -- I can't remember exactly, but it was a week

17  or two, ten days.

18  Q      And what were you told concerning the profitability of

19  GigaPix's previous movies?

20  A      That it was going to be a winner.

21  Q      Now, before you invested in GigaPix, did you receive a PPM

22  or pamphlet identifying the substantial risks that GigaPix

23  presented?  Was it before or after you invested?

24  A      Actually, it was after.

25  Q      Now, after you invested in GigaPix, did you receive any

1    investor update letters?

2    A     I received some, yes.

3    Q     And did you receive these investor update letters via the

4    U.S. mail?

5    A     Yes.

6    Q     And how did these letters affect your investments in

7    GigaPix?  Did it make you feel good about your investments?

8    A     They were very flowery.  And at first I read a few and

9    then I didn't read them because I didn't see any movement,

10   anything happening.

11            MR. MCLAIN:  Madam Clerk, I'd ask at this time that

12   Mr. Goodman be shown Exhibit No. 54.

13   BY MR. MCLAIN:

14   Q     And what we'll do, Mr. Goodman, is we'll go through a lot

15   of the exhibits at once and then have you go back and focus on

16   a few of them.  But first I want to look at Exhibit 54.

17            THE COURTROOM DEPUTY:  Exhibit 54 is identified and

18   placed before the witness.

19            (Exhibit 54 for identification.)

20   BY MR. MCLAIN:

21   Q     And do you recognize that document?

22   A     Yes, I do.

23   Q     Is that an example of one of the investment letters that

24   you were given after your investment in GigaPix?

25   A     Yes.

1          MR. MCLAIN:  Your Honor, at this time the Government

2     would ask to admit Exhibit No. 54.

3          THE COURT:  Any objection?

4          MR. EMMICK:  No objection.

5          THE COURT:  54 in evidence.

6          (Exhibit 54 received into evidence.)

7     BY MR. MCLAIN:

8     Q    And also ask you to take a look at the next exhibit,

9     Exhibit No. 55.

10          THE COURTROOM DEPUTY:  Exhibit 55 is identified and

11    placed before the witness.

12          (Exhibit 55 for identification.)

13    BY MR. MCLAIN:

14    Q    Is that also another example of an investment update

15    letter you received from GigaPix?

16    A    Yes.

17          MR. MCLAIN:  Your Honor, the Government would like

18    to admit Exhibit No. 55.

19          THE COURT:  Any objection?  55 in evidence.

20          (Exhibit 55 received into evidence.)

21    BY MR. MCLAIN:

22    Q    And if you could now take a look at Exhibit No. 56.

23          (Exhibit 56 for identification.)

24    BY MR. MCLAIN:

25    Q    Is that another example of an investor update letter you

1   received from GigaPix?

2   A     Yes.

3         MR. MCLAIN:  Your Honor, the Government would like

4   to admit Exhibit No. 56.

5         THE COURT:  Any objection?  56 in evidence.

6         (Exhibit 56 received into evidence.)

7   BY MR. MCLAIN:

8   Q     If you could take a look at Exhibit No. 57.

9         (Exhibit 57 for identification.)

10  BY MR. MCLAIN:

11  Q     Is that also an example of an investment update letter you

12  received from GigaPix?

13  A     Yes.

14        MR. MCLAIN:  The Government would like to admit

15  Exhibit No. 57, Your Honor.

16        MR. EMMICK:  No objection.

17        THE COURT:  Exhibit 57 in evidence.

18        (Exhibit 57 received into evidence.)

19  BY MR. MCLAIN:

20  Q     Now if you could take a look at Exhibit No. 60.  So flip

21  through a few of the exhibits.

22        THE COURTROOM DEPUTY:  Exhibit 60 is identified and

23  placed before the witness.

24        (Exhibit 60 for identification.)

25  ///

1    BY MR. MCLAIN:

2    Q     Is that also an example of an investment update letter you

3    received from GigaPix?

4    A     Yes, it is.

5              MR. MCLAIN:  Your Honor, the Government would like

6    to admit Exhibit No. 60.

7              THE COURT:  Any objection?

8              MR. EMMICK:  No objection.

9              THE COURT:  60 in evidence.

10             (Exhibit 60 received into evidence.)

11   BY MR. MCLAIN:

12   Q     Now if you could take a look at Exhibit No. 61.

13             (Exhibit 61 for identification.)

14   BY MR. MCLAIN:

15   Q     Is that also an example of an investment update letter you

16   received from GigaPix?

17   A     Yes, it is.

18             MR. MCLAIN:  The Government would move to admit

19   Exhibit No. 61, Your Honor.

20             THE COURT:  Any objection?  61 in evidence.

21             (Exhibit 61 received into evidence.)

22   BY MR. MCLAIN:

23   Q     If you could take a look at Exhibit No. 62.

24             (Exhibit 62 for identification.)

25   ///

1   BY MR. MCLAIN:

2   Q     Is that also an investor update letter you received from

3   GigaPix?

4   A     Yes, it is.

5            MR. MCLAIN:  The Government would move to admit

6   Exhibit No. 62.

7            THE COURT:  Any objection?

8            MR. EMMICK:  No, Your Honor.

9            THE COURT:  62 in evidence.

10           (Exhibit 62 received into evidence.)

11  BY MR. MCLAIN:

12  Q     Now if you could take a look at Exhibit No. 65.  So it's a

13  few exhibits in.

14           THE COURTROOM DEPUTY:  Exhibit No. 65 is identified

15  and placed before the witness.

16           (Exhibit 65 for identification.)

17  BY MR. MCLAIN:

18  Q     Is that also an example of an investment update letter you

19  received from GigaPix?

20  A     Yes, it is.

21           MR. MCLAIN:  The Government would move to admit

22  Exhibit No. 65.

23           THE COURT:  Any objection?

24           MS. AMES:  No.

25           MR. EMMICK:  No.

```
 1              THE COURT:  65 in evidence.
 2              (Exhibit 65 received into evidence.)
 3   BY MR. MCLAIN:
 4   Q    Now if you could take a look at Exhibit No. 68.
 5              THE COURTROOM DEPUTY:  Exhibit No. 68 is identified
 6   and placed before the witness.
 7              (Exhibit 68 for identification.)
 8   BY MR. MCLAIN:
 9   Q    Is that also an example of an investor update letter you
10   received from GigaPix?
11   A    Yes, it is.
12              MR. MCLAIN:  The Government would move to admit
13   Exhibit No. 68.
14              THE COURT:  68 in evidence.
15              (Exhibit 68 received into evidence.)
16   BY MR. MCLAIN:
17   Q    If you could take, finally, a look at Exhibit No. 69.
18              THE COURTROOM DEPUTY:  Exhibit No. 69 is identified
19   and placed before the witness.
20              (Exhibit 69 for identification.)
21   BY MR. MCLAIN:
22   Q    Is that also an example of an investment update letter you
23   received from GigaPix?
24   A    Yes, it is.
25              THE COURT:  Any objection?
```

```
 1              MS. AMES:  No objection.

 2              MR. EMMICK:  No objection.

 3              THE COURT:  69 in evidence.

 4              (Exhibit 69 received into evidence.)

 5   BY MR. MCLAIN:

 6   Q    Now, at this time, I'd like you to go back and focus on

 7   Exhibit No. 55.  And we can both bring that up on the screen,

 8   please.  If you could blow it up a little bit.

 9        And now, what is the date on this document, Mr. Goodman --

10   I'm sorry.  I'll wait until you have it in front of you.  It's

11   also on the screen in front of you, Mr. Goodman.

12   A    July 31st, 2006.

13   Q    And who is this document from?

14   A    Chris Blauvelt.

15   Q    And now, I want you to take a look at the first page of

16   this document, the third paragraph.

17   A    Yes.

18   Q    And in that third paragraph, what -- who is this document

19   saying was the new president of GigaPix on July 31st, 2006?

20   A    David Pritchard.

21   Q    And now, if you can take a look at the fourth paragraph of

22   this letter.

23        Were two movie projects slated for production in September

24   of 2006, according to that paragraph?

25   A    Yes.
```

1    Q    And does this letter represent that they were expected to

2    make a profit in the range of 6 to $8 million?

3    A    Correct.

4    Q    Now, if you take a look also at the end of that fourth

5    paragraph.  Is GigaPix being compared to the companies Pixar

6    and DreamWorks by Mr. Blauvelt?

7    A    Yes.

8    Q    Now, I'd actually like you to focus on Exhibit No. 62.

9    We'll pull that up on the screen.  And if you could highlight

10   the date on that exhibit.  What's the date on that exhibit --

11   I'm sorry.  I'll wait until you --

12   A    June 10th, 2009.

13   Q    And if you look at the second page of this exhibit -- you

14   know, it will actually be up on the monitor in front of you.

15        Who is this letter from?

16   A    Well, it's got "Regards, Chris Blauvelt."  And on the

17   right side, it's got "David Pritchard, President."

18   Q    And now, if you also look at the second page of this

19   document, the first paragraph where it references Ernst &

20   Young?

21   A    Yes.

22   Q    What accounting firm did GigaPix claim would conduct an

23   audit of its financials?

24   A    Ernst & Young.

25   Q    And now, if you look at the second page of this document,

1   the first paragraph, does it represent that this audit would be

2   done in mid June of 2009, if you look at the highlighted

3   portion?

4   A    Yes.

5   Q    Now, did Mr. Blauvelt and Mr. Pritchard give you the

6   impression that GigaPix had hired an accounting firm to audit

7   the company?

8   A    I -- I believe that was what they told me.

9   Q    And the representations like this one, did they give you

10  comfort in investing in GigaPix and *OZ3D*?

11  A    None.

12  Q    And now, if you take a look at Exhibit No. 65.  We'll pull

13  that one up.

14       Now, if you'll tell me who this letter is from.

15  A    It's from Chris Blauvelt, Chairman and CEO.

16  Q    And again, if you look at the very last line of that

17  letter, it says, "We would like to thank you for your patience

18  and support and ask you to continue to stand with us as we move

19  forward into 2011."

20       So you had received this letter probably around the end of

21  2010?

22  A    Yes.

23  Q    Now, if you would take a look at the first paragraph of

24  this letter on the first page.  And if you look at the -- near

25  the second-to-the-last line of that first paragraph where it

1    says "GigaPix has made it through and is growing into a

2    stronger company," if you can highlight that for us.

3         And so based on this letter that you received from

4    Mr. Blauvelt, is it being represented to you that GigaPix is

5    becoming a stronger company as of the end of 2010?

6    A    No.

7    Q    Would -- the sentence in that letter, what does it say?

8    A    As you -- which part?

9    Q    The highlighted portion, if you could just read that.

10   A    "GigaPix has made it through and is growing into a

11   stronger company, becoming even more," quote, "the right

12   company for the right time," end quote, "in Hollywood."

13   Q    And this is around the end of 2010?

14   A    Yes.

15   Q    Now, if we could pull up Exhibit No. 68.  And what is the

16   date on this document?

17   A    May 24th, 2011.

18   Q    And if you look at the third page of this document, who is

19   this letter from?

20   A    David Pritchard, President, GigaPix Studios.

21   Q    And now, I want to bring you back to the first page of

22   this document in the first paragraph.  And what does it say in

23   bold in that first paragraph?

24   A    "GigaPix Studios is set to become a publicly traded

25   company."

1  Q    And now, if you look at the middle of that first page, the

2  middle paragraph, what does this letter indicate concerning

3  *OZ3D* in bold?  If you could just read what's in bold.

4  A    "*OZ3D* in production."

5  Q    And again, this is as of the date of this letter,

6  May 24th, 2011?

7  A    Correct, has begun an *OZ3D* animated feature.

8  ARC Productions recently named Starz Animation in Toronto,

9  Canada.

10  Q    And now if you look at the second page of this document,

11  the portion in bold that talks about Prints and Advertising

12  Fund.  Does this letter indicate -- what does this letter

13  indicate in Prints and Advertising Fund, if you can read what's

14  in bold?

15  A    "Prints and Advertising Fund near completion.  To

16  compliment our film releasing division, we are nearing

17  completion of a Prints and Advertising Fund, (P&A), with

18  projected total assets of $100 million.  The fund would be

19  administered by a third party fund manager (exclusively for

20  GigaPix Releasing) and be used to finance the distribution of

21  both internally and externally produced films."

22  Q    Thank you, sir.

23        Now, did you ever receive any stock certificates with your

24  investments in GigaPix?

25  A    Originally I -- I received warrants.

```
 1   Q     Okay.  And did you receive those via the U.S. mail?

 2   A     U.S. mail.

 3   Q     Now, if you take a look at Exhibit --

 4              MR. MCLAIN:  Actually, if you could present to

 5   the -- Mr. Goodman for identification purposes Exhibit No. 59.

 6              THE COURTROOM DEPUTY:  Exhibit No. 59 is identified

 7   and placed before the witness.

 8              (Exhibit 59 for identification.)

 9   BY MR. MCLAIN:

10   Q     And do you recognize that document?

11   A     Yes, I do.

12   Q     And is this a true and accurate representation of letters

13   you received from GigaPix?

14   A     Yes.

15              MR. MCLAIN:  Your Honor, the Government would ask to

16   move Exhibit No. 59 into evidence.

17              THE COURT:  Any objection?

18              MS. AMES:  No objection.

19              MR. EMMICK:  No objection.

20              THE COURT:  59 in evidence.

21              (Exhibit 59 received into evidence.)

22              MR. MCLAIN:  Now, if we can pull up Exhibit No. 59

23   on the screen.

24   BY MR. MCLAIN:

25   Q     If you want to take it out of there as well, you can,
```

1   Mr. Goodman, if that's easier for you.  It's at the top.  I'm

2   going to ask you to flip through those pages.

3       So now, the first two letters are dated September 2004.

4   And did you receive those after you invested $10,000 in GigaPix

5   in September of 2004?

6   A    Well, I called Gregory.  I says, "I don't have any stock.

7   I have warrants."  He says, "Let me look into it and get them

8   for you."  Then shortly after that, I got the stock.

9   Q    So in addition to talking to Mr. Chris Blauvelt, you also

10  spoke to a person by the name of Gregory Pusateri?

11  A    Correct.

12  Q    And if you take a look at the -- so that -- those first

13  two letters, you did receive those, though, after you invested

14  $10,000 in September of 2004?

15  A    Yes.

16  Q    And that third letter, did you receive that in April of

17  2005 after you invested $5,000 in GigaPix?

18  A    Yes.

19  Q    And the fourth letter, did you receive that letter in June

20  of 2006 after you invested another $5,000 in GigaPix?

21  A    Yes.

22  Q    And now, did you receive stock certificates with these

23  letters, or did you receive the certificates later?

24  A    Not with the letters.  They came in, I think, after --

25  Q    Okay.

1    A       -- I received it.

2    Q       And now, in total, how much of your money did you invest

3    in GigaPix Studios itself?  Was it $20,000?

4    A       Correct.

5    Q       And was any representation ever made to you that your

6    investment money in GigaPix Studios may be used for personal

7    expenses of GigaPix's employees?

8    A       No.  Not -- not one time.

9    Q       And would the use of your investment for personal expenses

10   by GigaPix employees influence your willingness to invest in

11   the company?

12   A       Absolutely not.

13   Q       Well, would it influence it?  Would it cause you not to

14   invest?

15   A       Oh, I would not invest, absolutely.

16   Q       Thank you.

17          Now, I want to move over to *OZ3D*.  So after your initial

18   investment in GigaPix, did you speak to -- you've been talking

19   to, I guess, Mr. -- you talked to Mr. Greg Pusateri, but you

20   also more specifically spoke to Mr. Chris Blauvelt; correct?

21   A       Yes.

22   Q       And then if you -- then were you approached by someone by

23   the name of Cherie Brown?

24   A       Cherie Brown took the account over from Gregory Pusateri.

25   Q       And this initial conversation with Ms. Brown occurred in

1    September of 2009?

2    A     I believe so.

3    Q     And what did Ms. Brown tell you about *OZ3D*?

4    A     Well, she painted me a beautiful picture.  It's going to

5    be dynamic.  And she wanted me to get into this because the

6    ancillary end of it -- T-shirts, all kinds of memorabilia, so

7    on and so forth.  And that's where the big money is going to be

8    made.

9    Q     And did Ms. Brown tell you that your successful -- that

10   the successfulness of *OZ3D* was guaranteed?

11   A     Yes.

12   Q     And now, what did Ms. Brown tell you, if anything, about

13   the riskiness of this investment?

14   A     There was never any word of the risks.  It was always how

15   well we're going to do.

16   Q     And so Ms. Brown didn't identify for you any issues with

17   investing in *OZ3D*?

18   A     None whatsoever.

19   Q     And she never told you that you could lose your entire

20   investment by investing in *OZ3D*?

21   A     No.

22   Q     Now, what were you told concerning the profitability of

23   your returns in *Oz*?  That they were all guaranteed?

24   A     That they were guaranteed.

25   Q     Okay.  Um, and how much specifically did Ms. Brown

1    represent that *OZ3D* would earn?

2    A    Well, she put on a comparison with Pixar, one of the

3    latest things at that time.  They had done $2.1 billion.

4    Q    And was this investment concerning *OZ3D* before you

5    invested?

6    A    Positively.

7    Q    And what did Ms. Brown tell you concerning the release

8    date of the movie *OZ3D*?

9    A    Well, she didn't give me a direct day, but she said it was

10   going to be released in the near future because they were

11   winding down on the production of it.

12   Q    And did she say it would be released within a few months?

13   A    Correct.

14        Incidentally, I don't know if I mentioned, Greg Pusateri

15   called the house and he told my wife, "What are you going" --

16        MS. AMES:  I'll object, Your Honor, as to hearsay

17   and nonresponsive to the question.

18        THE COURT:  Overruled.

19        MR. MCLAIN:  It's okay.

20   BY MR. MCLAIN:

21   Q    Now, did Ms. Cherie Brown also mention to you anything

22   about the profitability of GigaPix's previous productions?

23   A    Yes, said they were being shown in movies and on TV.

24   Q    Did she describe them as profitable?

25   A    And the return -- the comments have been very, very high.

```
 1   Q    Did she mention that they were making a profit?

 2   A    I -- I believe so.

 3   Q    Now, of your investment in OZ3D -- and let me -- did you

 4   invest $10,000 in OZ3D?

 5   A    Correct.

 6   Q    And of your investment in OZ3D, how much of that did you

 7   believe would be used toward the production costs of OZ3D?

 8   A    The entire thing.

 9   Q    And did you invest in OZ3D because you thought it was a

10   guarantee that the movie was actually being produced?

11   A    Absolutely.

12   Q    Was there also pressure put on you to make this

13   investment?

14             MS. AMES:  Objection.  Leading.

15             THE COURT:  The objection is overruled.

16   BY MR. MCLAIN:

17   Q    Was there also pressure put on you to make this

18   investment?

19   A    Yes.

20   Q    Now, I'd like you to take a look -- for identification

21   purposes, if we could take a look at Exhibit No. 63.

22             THE COURTROOM DEPUTY:  Exhibit No. 63 is identified

23   and placed before the witness.

24             (Exhibit 63 for identification.)

25   ///
```

```
 1   BY MR. MCLAIN:

 2   Q     Do you recognize this document?

 3   A     Yes, I do.

 4   Q     And what is this document?

 5   A     This is a check drawn on our bank.

 6   Q     And is that a fair and accurate copy of the front and back

 7   of the check you wrote out to OZ3D for $10,000?

 8   A     Yes, it is.

 9          MR. MCLAIN:  Your Honor, the Government would ask to

10   admit Exhibit No. 63.

11          MS. AMES:  No objection.

12          MR. EMMICK:  No objection.

13          THE COURT:  63 is in evidence.

14          (Exhibit 63 received into evidence.)

15          MR. MCLAIN:  If we could pull up that exhibit,

16   Exhibit No. 63, publish it to the jury.

17   BY MR. MCLAIN:

18   Q     And what is the date on this check?

19   A     December 10th.

20   Q     And did you sign this check on or about this date?

21   A     This is my signature.  It was signed then.

22   Q     Did you send in your $10,000 payment for OZ3D via FedEx

23   mail?

24   A     Yes.

25   Q     And you mailed it on or about that date, December 10th or
```

1   11th, 2009?

2   A     Correct.

3   Q     And where did you mail the check to?  Was it sent to

4   GigaPix in California?

5   A     Yes.

6   Q     And did you include any type of cover letter with the

7   check?

8   A     I had -- this is my payment for *Oz*, Jerome Goodman, and --

9   Q     Okay.  And for your $10,000 investment in *OZ3D*, did you

10  ever receive any stock certificates related to that investment?

11  A     Well, I have a stock certificate, but it doesn't -- yeah,

12  I have a stock certificate.

13  Q     Okay.  And did you receive that via the U.S. mail as well?

14  A     Yes.

15  Q     Now, I'd actually like you to take a look at what's

16  been -- for identification purposes, Exhibit No. 64.

17             THE COURTROOM DEPUTY:  Exhibit No. 64 is identified

18  and placed before the witness.

19             (Exhibit 64 for identification.)

20  BY MR. MCLAIN:

21  Q     And do you recognize this document?

22  A     Yes, I do.

23  Q     And is this the certificate of membership for your

24  investment in *OZ3D*?

25  A     Yes.

```
 1   Q    Or letter describing it?
 2   A    Yes.
 3           MR. MCLAIN:  Your Honor, the Government would ask to
 4   admit Exhibit No. 64.
 5           MS. AMES:  No objection.
 6           MR. EMMICK:  No objection.
 7           THE COURT:  64 is in evidence.
 8           (Exhibit 64 received into evidence.)
 9           MR. MCLAIN:  Can you bring up Exhibit No. 64?
10   BY MR. MCLAIN:
11   Q    And now, according to this letter -- who sent this letter
12   to you?
13   A    Chris Blauvelt.
14   Q    And what date was this sent to you?
15   A    December 31st, 2009.
16   Q    And now, if you'll take a look at the screen, I'll ask
17   them to bring up the second page of this exhibit.  If you could
18   focus in on the membership interest.
19           How much was your membership interest in OZ3D at this
20   time?
21   A    This was $10,000.
22   Q    And is it 1 Series A Unit?  Does it say that at the
23   bottom?
24   A    Correct.  1 Series A Unit.
25   Q    And did you receive this letter from Mr. Chris Blauvelt
```

1   via U.S. mail?

2   A     Yes.

3   Q     Now, after you invested in GigaPix and then in *OZ3D*, did

4   you ever become concerned about your investments in these

5   entities and the fact that you hadn't received any returns?

6   A     Yes, I had.

7   Q     As a result, did you visit GigaPix?

8   A     I went down, saw the studio, saw if it was legitimate, if

9   there was such a place.  And -- and I had lunch with --

10  Q     And who did you have lunch with?

11  A     With Cherie Brown.

12  Q     And was there any indication during that point, when you

13  had lunch with Ms. Cherie Brown, that there were any issues

14  with GigaPix or *OZ3D*?

15  A     No.  It was in production.  It was full speed ahead.

16  Q     Now, I'd like to -- you to take a look for identification

17  purposes at Exhibit No. 67.

18              THE COURTROOM DEPUTY:  Exhibit No. 67 is identified

19  and placed before the witness.

20              (Exhibit 67 for identification.)

21  BY MR. MCLAIN:

22  Q     And is this an example of an investor update letter you

23  received from *OZ3D*?

24  A     Yes.

25              MR. MCLAIN:  Your Honor, the Government would ask to

1    admit Exhibit No. 67 into evidence.

2              THE COURT:  Any objection?

3              MS. AMES:  No objection.

4              MR. EMMICK:  No objection.

5              THE COURT:  67 in evidence.

6              (Exhibit 67 received into evidence.)

7              MR. MCLAIN:  And publish it to the jury.

8    BY MR. MCLAIN:

9    Q    And now, what is the date on this document?

10   A    May 24th, 2011.

11   Q    And who is this letter from?

12   A    It's from David Pritchard.

13   Q    And according to this letter, what is the status of the

14   *OZ3D* movie as of May 2011, if you look at the portion in bold?

15   A    It has begun --

16   Q    Actually, if you look at the screen in front of you, just

17   the part that's in bold.

18   A    "*OZ3D* in production.  Production has begun on the *OZ3D*

19   animated feature at the Starz Animation Studios in Toronto,

20   Canada."

21   Q    And was any representation -- and again, so in total you

22   invested 10,000 in *OZ3D*.  Was any representation ever made to

23   you that your investment money in *OZ3D* may be used for personal

24   expenses of GigaPix employees?

25   A    No.

1   Q    And would the use of your investment for personal expenses

2   by GigaPix employees have influenced your willingness to

3   actually invest in *OZ3D*, if you had known they were using it

4   for personal expenses?

5   A    I would never have invested.

6   Q    Now, in addition to Ms. Cherie Brown, did you also speak

7   to Mr. David Pritchard about your investments in GigaPix and

8   *OZ3D*?

9   A    I have the time -- several times.

10  Q    And did you initially speak to Mr. David Pritchard around

11  December of 2009?

12  A    Yes.

13  Q    And what did Mr. David Pritchard say to you during your

14  conversation with him?

15  A    Well, he assured me everything is going good, everything

16  is going to be a winner, and so on and so forth.  He never

17  intimated there were difficulties.  He says everything -- I

18  can't -- you know, everything's in order.

19  Q    And after December of 2009, did you also speak to

20  Mr. Pritchard a few more times?

21  A    Yes.

22  Q    And what did Mr. Pritchard tell you to convince you -- to

23  try to convince you to invest even -- or did he try to convince

24  you to invest even more money in *OZ3D*?

25  A    Oh, yes.

1    Q    And what did he tell you to try to convince you to invest

2    even more money in *OZ3D*?

3    A    Well, he said it's going to be bigger than we thought and

4    it's going to be a winner.  It's once in a lifetime.

5    Q    And now, for your investment in GigaPix, you mentioned

6    that you received the PPM after you invested; is that correct?

7    A    Correct.

8    Q    Now, for your investment in *OZ3D*, did you also receive a

9    PPM for that investment, a Private Placement Memorandum?

10   A    No.

11   Q    Do you know what a PPM is?

12   A    Yeah.

13   Q    Okay.  Were you ever informed by anyone at GigaPix that

14   GigaPix and *OZ3D* had received cease and desist orders?

15   A    No.  I never heard a thing about it.

16   Q    Was it important to you to know of any cease and desist

17   orders before you made your decision to invest in *OZ3D*?

18   A    Absolutely, it was.

19   Q    Now, so was the last investment you made in GigaPix

20   Studios or *OZ3D* in December of 2009, approximately?

21   A    Yes.

22   Q    Now, if you could take a look at -- for identification

23   purposes, if you can look at Exhibit No. 66.

24        THE COURTROOM DEPUTY:  Exhibit No. 66 is identified

25   and placed before the witness.

1            (Exhibit 66 for identification.)

2   BY MR. MCLAIN:

3   Q    And is this also a letter that you received from GigaPix

4   Studios in or about November of 2011?

5   A    Yes.

6            MR. MCLAIN:  Your Honor, the Government would ask to

7   admit Exhibit No. 66.

8            THE COURT:  Any objection?

9            MS. AMES:  No objection.

10            MR. EMMICK:  No objection.

11            THE COURT:  66 in evidence.

12            (Exhibit 66 received into evidence.)

13            MR. MCLAIN:  If you could publish Exhibit No. 66 for

14   the jury, please.

15   BY MR. MCLAIN:

16   Q    And what is the date on this document?

17   A    November 2011.

18   Q    And again, your last investment was around December of

19   2009?

20   A    Correct.

21   Q    And now, if you'll take a look -- I'll ask for page 6 of

22   Exhibit No. 66 to be brought up.  If you could highlight the

23   net income line.

24        How much in net income had GigaPix Studios lost by the end

25   of 2009?

1    A    $1,274,708.

2    Q    And now, if you could take a look at page 9 of Exhibit 66.

3    I'll ask for that to be brought up for you.  And that's as of

4    2010.

5        If you take a look at the net income line on this

6    document, how much in net income had GigaPix Studios lost by

7    the end of 2010?

8    A    $997,705.

9    Q    And now, if you take a look at page 11 of this document, I

10   believe at the top it says October of 2011.  And if you look at

11   the net income line on this document, how much had GigaPix lost

12   in net income by the end of October of 2011?

13   A    $240,948.

14   Q    So before receiving this letter, had anyone at GigaPix,

15   whether it was Mr. Blauvelt, Mr. Pritchard, or anyone,

16   mentioned to you that GigaPix was losing money?

17   A    No.

18   Q    Had you known that GigaPix was losing money, would you

19   have invested further in *OZ3D*?

20   A    Absolutely no.

21   Q    Did you ever receive any return on your $30,000 investment

22   from -- investments in GigaPix and *OZ3D*?

23   A    No.

24   Q    Did you ever receive any of your initial $30,000

25   investment money back from investments in GigaPix and *OZ3D*?

```
 1    A      No.
 2                   MR. MCLAIN:  No further questions, Your Honor.
 3                   THE COURT:  Cross-examination, Defendant Blauvelt.
 4                           CROSS-EXAMINATION
 5    BY MS. AMES:
 6    Q      Good afternoon, sir.
 7    A      Good afternoon.
 8    Q      When, again, did you take the tour of GigaPix Studios?
 9    A      It was in the summertime.  My wife and I drove up there.
10    We saw the studio.
11    Q      And what year was that, if you recall?  Do you recall?
12    A      I don't recall.
13    Q      And you were able to tour the facility; is that correct?
14    A      Correct.
15    Q      And what did you observe when you toured the facility?
16    A      I saw desks, I saw a lot of animated stuff that's used in
17    the filming, and I -- I was introduced to someone in the
18    departments.
19    Q      Do you recall who you were introduced to in the
20    departments?
21    A      Not really.  You know, I didn't write anything down and I
22    don't recall.
23    Q      But you were introduced to several different people who
24    were working there?
25    A      Yeah, working.  I said, "How's it going?"  You know, they
```

1    said --

2    Q    And did they show you the computers where they were doing

3    graphics or animation?

4    A    (No audible response.)

5    Q    And did they show you the 3D printer to do models?

6    A    Yes -- no, I don't think so.

7    Q    Okay.

8    A    I don't know if it was there or -- I saw some equipment,

9    not all of it.

10   Q    What other equipment do you recall seeing?

11   A    Well, there was a very -- there wasn't a big staff there.

12   Whoever was there showed me around, showed me what they're

13   responsible for.  And I looked around.  I mean, I'm not that

14   versed.  However, it's good to see progress.

15   Q    And about how long did you stay there?

16   A    Well, probably an hour and a half.

17   Q    And this was the facility in Chatsworth; correct?

18   A    Right.

19   Q    Now, sir, the first salesman that you dealt with -- well,

20   let me switch gears a little bit.

21        Are you related to anyone that works at GigaPix?

22   A    No.  There was a Goodman there but no relation.

23   Q    Okay.  And was Mr. Goodman the first sales representative

24   that you dealt with?

25   A    He was the first one.

```
1    Q     And what year was that?

2    A     Oh, gosh.  I think it was before 2000.

3    Q     So was he the salesperson that you dealt with in

4    purchasing GigaPix stock?

5    A     Well, he talked with me.  He told me it's going to be

6    terrific and look into it and so on and so forth.

7    Q     And after your discussions with Mr. Goodman, did you then

8    invest in the company?

9    A     I did.  I bought, I think, $5,000 worth of stock.

10   Q     And then at some point did Mr. Goodman refer you over to

11   Mr. Greg Pusateri?

12   A     Correct.

13   Q     So you first dealt with Mr. Goodman and then you dealt

14   with Mr. Pusateri?

15   A     Correct.

16   Q     And then after dealing with Mr. Pusateri, you dealt with

17   Ms. Cherie Brown; is that correct?

18   A     Right.

19   Q     And that was in relation to OZ3D?

20   A     Right.

21   Q     So Mr. Blauvelt did not deal with you in the purchase of

22   any of the --

23   A     Well, he had conversations.  Because I was willing to talk

24   to the head man, get his impressions on what's happening and

25   what's going forth.  It was very important for me.
```

1    Q    And do you recall when those discussions were?

2    A    Well --

3    Q    Just to the best of your own recollection, sir.

4    A    They were when I first started to invest and I got really

5    interested in GigaPix.  I wanted to know how the progress was,

6    what's happening.

7    Q    And so that was after you had made your first investment;

8    is that correct?

9    A    Correct.

10   Q    And so you talked to him a few times, to the best of your

11   recollection, now after you had made that investment?

12   A    (No audible response.)

13   Q    Is that "yes" or "no"?

14   A    That's "yes."

15   Q    Sorry.  We just have a court reporter who has to take down

16   all your answers.

17        Now, do you recall in, oh, September of this year having a

18   telephone interview with an Agent Potocek and someone from the

19   U.S. Attorney's Office?  Do you recall that?

20   A    Yes.

21   Q    And, in fact, you were going over with them, kind of

22   rehashing your memory from your investments; is that correct?

23   A    What my experience was.

24   Q    And originally they had that you -- that it was

25   Mr. Blauvelt who had talked to you about accreditation, but

```
 1    then you corrected them and told them that was Mr. Pusateri; is
 2    that correct?
 3    A     (No audible response.)
 4    Q     Is that a "yes"?
 5    A     Yes.
 6    Q     Okay.  And also, they had originally had that Mr. Blauvelt
 7    talked -- asked you questions about your income and you
 8    corrected them and told them that it was Mr. Pusateri; is that
 9    correct?
10    A     No.  It was -- he asked me, and then Greg Pusateri got
11    ahold of it and he says, "Don't be concerned.  Just mail the
12    check."
13    Q     So is it fair to say that there's -- you're unsure of some
14    of the individuals that you talked to during the course of
15    these several years?
16    A     No.  I -- I had conversations with both Blauvelt and also
17    Greg Pusateri.
18    Q     But just so that I'm clear, it was Mr. Goodman who you
19    talked to prior to making your investments in GigaPix; correct?
20    A     Right.  That's when I first -- I first heard about it.
21    Q     Okay.  And then after you invested with GigaPix,
22    Mr. Goodman turned you over to Mr. Pusateri?
23    A     Well, I think -- I'm not sure.  It might have been
24    Mr. Blauvelt.
25    Q     Now, do you recall specifically when you talked with
```

1    Mr. Goodman -- or excuse me, with Ms. Brown that the movies

2    that were discussed with you were *The Baker Boys*?  Do you

3    remember that one?

4    A    Yes.

5    Q    And *Captain Abu Raed;* is that correct?

6    A    Yes.

7    Q    And those were the foreign movies -- or the movies they

8    discussed with you; is that right?

9    A    Yes.

10   Q    And in 2009, you made an investment in December -- we've

11   seen your check -- in *OZ3D*.  Do you recall that?

12   A    Correct.

13   Q    And that's what I want to talk to you about now.

14        Prior to you making that investment, you received what

15   we're calling a PPM, or a Private Placement Memorandum.  Do you

16   recall that?

17   A    Yes.

18   Q    Okay.  And, in fact, you received that sometime in August

19   of 2009; correct?

20   A    Thereabouts.

21   Q    So you -- you had that several months prior to your making

22   the investment; right?

23   A    Well, the units were sold in $20,000 amounts.  My 10-

24   didn't get it taken care of.  I had to go out and get

25   another -- which I did, a friend who also invested, and he had

```
 1    a lot of conversations with Cherie.

 2    Q    Well, let me just stop you --

 3    A    Okay.

 4    Q    -- just have you answer my question.

 5         But the check that you wrote out was dated December of

 6    2009; correct?

 7    A    I believe so.

 8    Q    Okay.  And you received the PPMs sometimes in August of

 9    2009; correct?

10    A    Yes.

11    Q    So again, you received the PPM a few months prior to your

12    writing the check for OZ3D?

13    A    I gave it to my friend.

14              MS. AMES:  Just one moment, Your Honor.

15    BY MS. AMES:

16    Q    And, sir, I'm going to direct your attention to

17    Government's Exhibit No. 58.  Let me know when you have that

18    there in front of you.

19              (Exhibit 58 for identification.)

20              MS. AMES:  Oh, I apologize.  I thought it had been

21    put into evidence.

22              MR. MCLAIN:  There's no objection to Exhibit No. 58

23    being in evidence but it's not currently.

24              MS. AMES:  Okay.  Thank you.

25              THE COURT:  58 in evidence.
```

```
1            (Exhibit 58 received into evidence.)

2   BY MS. AMES:

3   Q    And, sir, looking at this, this is the -- the packet

4   that --

5            THE COURTROOM DEPUTY:  Exhibit No. 58 is identified

6   and placed before the witness.

7   BY MS. AMES:

8   Q    And I'm going to refer you to page 11 of that exhibit.

9   Sir, we're going to pull it up on the screen for you so it

10  might be a little easier for you to see.

11       This is page 11 of Government's Exhibit No. 58.  Do you

12  see that, sir?

13  A    Uh-huh.

14  Q    And that is the Private Placement Memorandum that you

15  used -- that was sent to you -- is that correct? -- for GigaPix

16  Studios; is that correct, sir?

17  A    I don't recall --

18  Q    But the packet that you received, is it -- did it look

19  similar to this, to your recollection?

20  A    This pack?

21  Q    Yes.

22  A    Oh, yes.

23  Q    Okay.  So you just don't have any specific recollection of

24  this document right now but --

25           THE COURT:  That's what he said, Counsel.  Let's get
```

1    on with it.

2    BY MS. AMES:

3    Q    I'll refer you to page 58 -- or excuse me -- 42 of that

4    document.  And it's up there on the screen, sir.  And do you

5    see halfway down it -- it says, "prior securities regulation

6    matters"?  Do you see that?

7    A    Yes.

8    Q    And down the bottom paragraph, it talks about a Wisconsin

9    cease and desist.  Do you see that?

10   A    I see it.

11   Q    And then if we look at the next page, it shows Oregon,

12   Colorado, and California; is that correct?

13   A    Correct.

14   Q    And so you did receive information as to these cease and

15   desist orders; is that correct?

16   A    If I did, I never saw it.

17   Q    Okay.  So is it your testimony that you just didn't read

18   the PPM?

19            THE COURT:  He never saw it, he said.

20   BY MS. AMES:

21   Q    Just so that I'm clear, though, sir, you do recall

22   receiving a PPM; correct?

23   A    I don't -- I don't recall.  If I had gotten it, I would

24   have read it.

25   Q    Do you recall telling, during an interview with

1   Agent Potocek, that you did receive one?

2   A     Not this one.

3   Q     Do you recall telling him that you received a PPM, though?

4   Just your own recollection.  If you don't, you don't.

5   A     I don't recall.

6            MS. AMES:  No further questions, Your Honor.

7            THE COURT:  Defendant Pritchard.

8                         **CROSS-EXAMINATION**

9   BY MR. EMMICK:

10  Q     Good afternoon, sir.

11  A     Good afternoon.

12  Q     All right.  I'm going to ask you some questions about 2009

13  and then 2011, if that's all right.  What I'd like to do is ask

14  you about your reference to getting a PPM, having to do with

15  cease and desist orders.  Do you remember that?

16  A     No.

17  Q     Okay.  You did see something in writing about cease and

18  desist orders; right?

19  A     No.  No, I didn't.

20  Q     All right.  You did hear about cease and desist orders;

21  right?

22  A     No, I didn't.

23  Q     Were there cease and desist orders made reference to in

24  some of these PPMs?

25  A     I never saw them.

```
 1    Q    Did you hear anything about a lawyer in the New York area
 2    by the name of Pepper?
 3    A    No.
 4    Q    There were some writings about a lawyer in New York by the
 5    name of Pepper who are going to be -- referred the investments
 6    in GPX; right?
 7    A    I didn't hear anything about that.
 8    Q    All right.  The name Pepper doesn't ring a bell for you at
 9    all?
10    A    No.
11    Q    Then a New York lawyer being involved doesn't ring a bell
12    for you at all?
13    A    No.
14    Q    Then what I'd like to ask you about next is the 2011 time
15    period.  Now, in that time period, there were some letters
16    going back and forth between the shareholders and the people at
17    GPX.  Do you remember that?
18    A    If I don't have it, it's not here.
19    Q    Do you remember at some point in mid 2011 Mr. Blauvelt was
20    going to step down as --
21    A    I remember seeing that.
22    Q    Okay.  That's what I'm asking about.
23         All right.  So Mr. Blauvelt was going to step down; right?
24    A    Right.
25    Q    And he was no longer going to be in control of the
```

1    company; right?

2    A    Right.

3    Q    And then there was going to be another person who was

4    going to step in and exercise control over the companies, and

5    his name was Jim Cardwell; right?

6    A    Correct.

7    Q    All right.  So we had an entire change in management;

8    right?

9    A    (No audible response.)

10   Q    That was going -- excuse me.  That was going to be a big

11   change in management, wasn't it?

12   A    Supposedly, yes.

13   Q    Okay.  And did you understand that it was Mr. Pritchard's

14   idea to change the management in that way?

15   A    The way you're reading the letter.

16   Q    Okay.  Then you recall at some time later in 2011

17   Mr. Blauvelt decided to return to his position at the head of

18   GPX.  Do you remember that?

19   A    I don't recall seeing the letter.

20   Q    Okay.  But you do remember that Mr. Blauvelt did return as

21   the head of GigaPix in late 2011?

22   A    Firstly, I thought he was never out.

23            MR. EMMICK:  All right.  Nothing further.

24            MR. MCLAIN:  No redirect examination, Your Honor.

25            THE COURT:  You may step down.

1    Call your next witness.

2            MR. MCLAIN:  Your Honor, the Government will now

3    call Mr. Colin Mutton.

4            THE COURTROOM DEPUTY:  Right this way.  If you can

5    step forward through that door.  If you could stand right here

6    and face me.  Please raise your right hand.

7        Do you solemnly swear that the testimony you shall give in

8    the cause now pending before this Court shall be the truth, the

9    whole truth, and nothing but the truth, so help you God?

10           THE WITNESS:  I do.

11      **COLIN FRANK MUTTON, PLAINTIFF'S WITNESS, WAS SWORN**

12           THE COURTROOM DEPUTY:  Okay.  Thank you.  Please

13   take a seat.

14       And please state your full and true name for the record

15   and spell your last name.

16           THE WITNESS:  Colin Frank Mutton, M-u-t-t-o-n.

17                      **DIRECT EXAMINATION**

18   BY MR. MCLAIN:

19   Q    Mr. Mutton, did you first hear about GigaPix in 2007?

20   A    Approximately.

21   Q    And did you start actually working at GigaPix around

22   2008 -- or I'm sorry, January of 2009?

23   A    Approximately.

24   Q    And who hired you or encouraged you to start working

25   there?

```
 1   A     I met Mr. Pritchard sometime during 2007.  And he said,
 2   "Just come on in, and we'll see where you fit."
 3   Q     And did you eventually take on the position of CFO of
 4   GigaPix?
 5   A     Yes, I did.
 6   Q     And how did Mr. -- was it Mr. Pritchard who convinced you
 7   to accept that role as CFO?
 8   A     There was no real convincing.  He just said, "I think you
 9   should be the CFO."  And I said, "Well, okay."
10   Q     And were you the CFO of GigaPix from 2009 until 2012?
11   A     Yes.
12   Q     And during this time period, what was Chris Blauvelt's
13   official position at GigaPix when you were hired?
14   A     Up until I was CFO, he was the chairman -- the chairman,
15   the CEO, and the CFO.
16   Q     And then you replaced Mr. Blauvelt as the CFO --
17   A     Yes.
18   Q     -- in that title?
19         And what was Mr. David Pritchard's official position at
20   GigaPix when you were hired?
21   A     President.
22   Q     And what were your responsibilities at GigaPix?
23   A     I started off sort of looking for work to sort of fit in.
24   And I realized that the sheer capital records didn't tie in
25   with the financial statements.  So I spent two or three, four
```

1    months with a number of temp people working our way back to

2    2002 to -- I think it was $19 million.  And we reconciled it

3    within about 140,000.

4    Q    As the CFO, were you aware of how salaries were paid and

5    distributed to employees at GigaPix?

6    A    Yes.  I wasn't involved in the detail.  I didn't actually

7    understand how QuickBooks payroll worked.  My colleague Sharon

8    Simon did all the payroll.

9    Q    And as the CFO, did you pay expenses and transfer

10   GigaPix's money?

11   A    Yes.

12   Q    And was that at the direction of Mr. David Pritchard?

13   A    The smaller amounts, not really.  But when it got to

14   bigger amounts, yes, except credit card statements.  I paid

15   those without having to ask first.

16   Q    And when you arrived in -- at GigaPix or started working

17   there in early 2009 and you said you reviewed the financials,

18   did you determine whether the majority of the money received by

19   GigaPix to that point was from investor funds?

20   A    It seemed to me that all of it was investor funds.

21   Q    Now, when you were working at GigaPix, were you told what

22   your salary would be or should be?

23   A    Not for a long time.

24   Q    And when you were eventually told, what were you told?

25   A    Well, for 2009, I sort of got payments now and then.  And

1    there was at some point -- and I think it was when Mr. Blauvelt

2    left for a period -- that Pritchard said to me, um, "I think

3    you should be paid the same as me," which is 6,000 a week,

4    which, by the way, I never got.

5    Q    And was that also the amount that Mr. Blauvelt was paid

6    before he left, 6,000 a week?

7    A    The first couple of years I worked there, they regularly

8    got 6,000 a week each.

9    Q    Now, before working at GigaPix, what, if any, past

10   professional relationship did you have with a company called

11   Ernst & Young?

12   A    When I came out of college, I signed a training contract

13   with a firm of accountants which merged with another firm and

14   another firm and another firm.  And eventually that became what

15   was known as one of the Big Four, Ernst & Young, like

16   Pricewaterhouse Coopers & Lybrand.

17   Q    And did you ever recommend to the Defendants Blauvelt and

18   Pritchard that GigaPix try to hire Ernst & Young to audit

19   GigaPix's financials?

20   A    Yes.

21   Q    And did you make this recommendation approximately May or

22   June of 2009?

23   A    I made it early in 2009.

24   Q    So early in 2009?

25   A    Probably May, could have been April.

1  Q    And before you made this recommendation to Mr. Blauvelt

2  and Mr. Pritchard that they try to hire Ernst & Young, had

3  GigaPix hired an auditing firm already?

4  A    No.

5  Q    Now, would you characterize what you did for GigaPix as

6  auditing the company's financials?

7  A    Um, most of my work -- most of my work for the first

8  probably year was, um, correcting and putting into good shape

9  the financial records because Sharon Simon, the bookkeeper,

10 wasn't a trained bookkeeper.  So I did a lot of work on sort of

11 tidying it up and getting it into more of a -- an acceptable

12 format.

13 Q    So what you did wasn't a formal audit?

14 A    Not remotely.

15 Q    Was it more like bookkeeping?

16 A    Glorified bookkeeping.

17 Q    Now, who was Bill Uchimoto?

18 A    Bill Uchimoto -- one of the people at the money raising

19 section of the company, I think, knew his daughter.  And then I

20 think that's how he knew Bill Uchimoto.  And he was a -- a very

21 well-respected lawyer on the East Coast.  He'd been the

22 chairman of the Philadelphia Stock Exchange.

23      And so at that time, I had recommended that we reconstruct

24 the company because Mr. Blauvelt owned 92 percent of the

25 company.  And so Bill Uchimoto and his assistants helped me to

1    reconstruct the company so that the outside investors

2    eventually ended up with about 30, 40 percent.

3    Q     Now, did Mr. Uchimoto provide any auditing services for

4    GigaPix?

5    A     No.

6    Q     Now, I'd like to show you what I believe is already in

7    evidence, Exhibit No. 37.  Can we pull that up?  And if you

8    take a look at the second page of this document.

9          Who is this document from?

10   A     Signed by David Pritchard.

11   Q     Now, how often did Mr. David Pritchard write letters to

12   investors while you were at GigaPix?

13   A     Um, David Pritchard and Chris Blauvelt wrote letters on

14   occasions, usually when they needed to raise more money.

15              MS. AMES:  Objection as to nonresponsive.

16              THE COURT:  The objection is overruled.

17   BY MR. MCLAIN:

18   Q     And they would write letters approximately how often?

19   Once a month?  Twice a month?

20   A     Usually when we were in trouble.  So every few months.

21   Q     Now, if you look at the second page of Exhibit No. 37 and

22   if you look at that -- the second paragraph, we can pull that

23   up and highlight that.

24         As of June -- it indicates, it looks like, that GigaPix

25   was in the middle of a five-year audit.  Do you see that on the

1    document?

2    A     What date was this?  I'm sorry.

3    Q     So the date of this letter was January 16th, 2009.  So --

4    A     January?

5    Q     Yes, of 2009.

6    A     All right.

7    Q     So was GigaPix actually in the middle of a five-year audit

8    as of January 2009?

9    A     January 2009, it was in the middle of reconciling the

10   shared capital.  So I had no knowledge of anything going on as

11   far as an audit.  So none, to my knowledge.

12   Q     And was GigaPix expecting to receive the results of any

13   type of audit soon?

14   A     I never heard of anything.

15   Q     If you look at the second paragraph as well, it talks

16   about having retained a public accounting firm.  In this letter

17   that GigaPix had retained a public accounting firm, was that a

18   false statement?

19   A     To the best of my knowledge.

20   Q     And as of January 2009 -- if you look at the first page of

21   this document, and it talks about $60 million in funding for

22   kids films.  Are you aware of GigaPix obtaining $60 million of

23   funding for kids films as of January of 2009?

24   A     No.

25   Q     Now, I'd like to have you look at, for identification

1    purposes, Exhibit No. 25.

2         If you don't mind, I'll actually ask that you take it out

3    of the slip.

4              THE COURTROOM DEPUTY:  Exhibit No. 25 is identified

5    and placed before the witness.

6              (Exhibit 25 for identification.)

7    BY MR. MCLAIN:

8    Q    If you look at the second page of that document, do you

9    see who it's from?

10   A    Chris Blauvelt.

11   Q    Now, just for identifying purposes, is that similar to the

12   types of letters that Mr. Chris Blauvelt would send out to

13   investors?

14   A    Yes.

15             MR. MCLAIN:  And at this time, Your Honor, I'd

16   like -- the Government would like to move to admit

17   Exhibit No. 25 into evidence.

18             THE COURT:  Any objection?

19             MS. AMES:  No objection.

20             MR. EMMICK:  No objection.

21             THE COURT:  25 in evidence.

22             (Exhibit 25 received into evidence.)

23   BY MR. MCLAIN:

24   Q    And so what is the -- if we could pull up Exhibit No. 25.

25   And if you could highlight the date on this letter.

1    A      January 16th, 2009.

2    Q      And is that the same date that was on the letter that we

3    just looked at from Mr. David Pritchard?

4    A      I don't know.

5    Q      Okay.  You can just refer to it very briefly,

6    Exhibit No. 37.

7    A      Yes.  Same date.

8    Q      Okay.  And again, in this letter, if you look at the

9    bottom of the first page, it talks about GigaPix being in the

10   middle of an audit.

11       Again, as the CFO of GigaPix, were you aware of GigaPix

12   being in the middle of an audit at any point in time in 2009?

13   A      January 16th of 2009, I was not the CFO of GigaPix.

14   Q      I'm sorry.  Going through the finances, were you aware of

15   GigaPix going through any type of audit?

16   A      No.

17   Q      Now, why did you recommend that GigaPix hire Ernst &

18   Young?

19   A      Because by that time, I had started to feel uncomfortable

20   with the way that the principals of the company ran their

21   company.  And to be quite honest, I wanted to hire a firm of

22   auditors that would look into every single thing and basically

23   protect me.

24   Q      And when you say the "principals of the company," who are

25   you referring to?

```
 1   A     Mr. Pritchard, Mr. Blauvelt.
 2   Q     And what was your role in trying to have Ernst & Young
 3   take on GigaPix as a client around the summer of 2009?
 4   A     What was my goal?
 5   Q     What was your role?
 6   A     Oh.  I called up the entertainment division.  I used to
 7   work for Ernst & Young, so I thought it made sense for me to
 8   call Ernst & Young.  And I asked for their entertainment
 9   department, and I ended up speaking to a lady named Marian
10   Cavallaro.
11              MS. AMES:  Objection.  Hearsay and nonresponsive.
12              THE COURT:  We haven't gotten to hearsay yet.
13              MR. MCLAIN:  And I'm going to cut you off before you
14   do get there.
15              THE COURT:  Ask your next question.  The objection
16   is overruled.
17   BY MR. MCLAIN:
18   Q     At any point in time during your tenure at GigaPix, did
19   Ernst & Young appear to have GigaPix as a client?
20   A     No.
21   Q     At any point in time during your tenure at GigaPix, did
22   you tell Mr. Blauvelt or Mr. Pritchard that GigaPix was a
23   client of Ernst & Young?
24   A     No.
25   Q     During the summer of 2009, did Ernst & Young decline to
```

1    take GigaPix on as a client?

2    A    Yes.

3    Q    Now, I'd like to show you what's been marked as

4    Exhibit No. 44, and I believe it's already in evidence.  If we

5    can pull that exhibit up.

6    A    Me?

7    Q    No, I'm sorry.  Agent Potocek will pull up Exhibit No. 44

8    so you can see it.

9         And if you look at the first page of this document, the

10   third -- the third paragraph.

11   A    Yeah.

12   Q    And if you look at the second sentence or the second line

13   of that third paragraph.

14   A    Right.

15   Q    We can highlight that for you.

16   A    Right.

17   Q    What does that line say?

18   A    "Auditors and the conduct of an audit.  As you know, we

19   were working with Ernst & Young to carry out the duties of our

20   external auditors."

21   Q    Is that a false statement?

22   A    Yeah.  They had already declined.

23   Q    Because this letter is dated what?  October 16th, 2009?

24   A    If you say so.

25   Q    Well, let's -- we'll have you -- have you say.

```
1   A     Yes, it is.

2   Q     Thank you.

3         And now, if you look at the -- again, the third paragraph

4   of this -- this document, it references the expense of Ernst &

5   Young.  Do you see that?

6   A     Excuse me.

7   Q     Take your time.

8         Do you see reference to the expense of Ernst & Young?

9   A     Yes.

10  Q     Was the expense of Ernst & Young the ultimate reason why

11  GigaPix did not have Ernst & Young audit its financials?

12  A     No.

13  Q     Why was it that Ernst & Young did not audit GigaPix's

14  financials?

15            MS. AMES:  Objection to hearsay, Your Honor.

16            THE COURT:  The objection is overruled.

17  BY MR. MCLAIN:

18  Q     You may answer.

19  A     Because they said on the background check --

20            MS. AMES:  Objection as to hearsay.

21            THE COURT:  Objection is overruled.  This is the

22  opinion of this man.

23            MS. AMES:  No.  He's saying that's what Ernst &

24  Young told him.

25  ///
```

```
 1   BY MR. MCLAIN:
 2   Q    What is your understanding as to why Ernst & Young did not
 3   use -- GigaPix did not hire Ernst & Young for its audit?
 4   A    Because they didn't pass the background check.
 5   Q    Now, based on your knowledge as the CFO of GigaPix,
 6   approximately how much in total did GigaPix and OZ3D raise from
 7   investors from 2002 to 2012?  And again, I'm going to focus on
 8   2002 -- not 2006 but 2002 to 2012.
 9   A    I would say GigaPix raised about 24 million and Oz raised
10   about 9 million.
11   Q    And based on your experience as the CFO of GigaPix, did
12   GigaPix misuse those funds it received from investors?
13   A    Yes.
14   Q    And how do you know that those funds were misused?
15   A    Um, well, Mr. GigaPix and Mr. Blauvelt used a great
16   deal --
17   Q    I'm sorry.  You said, "Mr. GigaPix."
18   A    Pardon?
19   Q    You said, "Mr. GigaPix."
20   A    Oh, I'm sorry.  Mr. Pritchard and Mr. Blauvelt used a
21   considerable amount of money on their own personal expenses.
22   Q    In particular, how did Mr. Chris Blauvelt treat GigaPix's
23   investor funds?
24   A    The joke around the company at the time was that he used
25   it as his personal piggybank.
```

1   Q     Now, on what specific items did Mr. Chris Blauvelt misuse

2   GigaPix's investor funds?

3   A     My colleague Sharon Simon went through -- there was --

4              MS. AMES:  I'm going to object as to personal

5   knowledge, Your Honor.

6              THE COURT:  The objection is overruled.

7              THE WITNESS:  My colleague Sharon --

8   BY MR. MCLAIN:

9   Q     But again, if you could answer based on what you know how

10  they used --

11  A     Each year was a box of papers.  So there was three, four,

12  five, six, seven, eight, nine.  And my colleague went through

13  and then I looked at them afterwards.  And we found various

14  expenses, including, um, the purchase of a titanium bicycle,

15  purchase of two still cameras, which, to the best of my

16  knowledge, we don't use in our -- in that business.  Um, there

17  was, like, 14- or 15,000 spent on Mr. Blauvelt's accountants

18  for his tax work.

19  Q     Was that for his personal taxes?

20  A     Yes.  Our taxes were done by a guy called Rod Cadney --

21  Catney [phonetic].  So this was some firm I'd never heard of.

22  Q     I mean, what else were the personal expenses used on,

23  GigaPix used on?

24  A     Mr. Blauvelt liked to have a particular woman come in to

25  give him a massage in the office, and they cost about $1200.

1    Q     Was that $1200 each, for each massage?

2    A     Yes.  And we figured out he spent about $24,000 on that.

3    Q     And what form of payment did Mr. Chris Blauvelt use to

4    purchase these items?

5    A     He probably used his debit card.

6    Q     Was that the GigaPix Studios debit card?

7    A     Yes.

8    Q     And how do you know that Mr. Chris Blauvelt used the

9    GigaPix funds to pay for these items?

10   A     Because they went through the books.

11   Q     Now, on what specific items did Mr. David Pritchard misuse

12   GigaPix's investor funds?

13   A     Um, I went back through the year 2010 as -- as an example.

14   He, um, seemed to have a relationship with Nadia Davari, our

15   in-house counsel.  And he flew her and her mother, for example,

16   to Albuquerque where they went on a $700 balloon ride.  He took

17   Ms. Davari on various trips around the country, into New York

18   especially where they spent money at Barneys, Sack's Fifth

19   Avenue, Neiman Marcus, Barneys.  Actually, if you can think of

20   any expensive company, they spent money there.

21         So, like, at Barneys they bought a $1400 handbag.  There

22   was a $2,300 watch.  There was something in -- actually, it's

23   in Beverly Hills, something called Estate Jewelry.  And $7,000

24   was spent on, I don't know, jewelry, I guess.

25   Q     Did Mr. Pritchard also spend GigaPix funds on a personal

```
 1   knee operation for himself?
 2   A     Well, he spent about 25,000 -- maybe 30,000 on medical
 3   costs.  So I don't know what that went on.  I know that he was
 4   covered by the company medical policy.  Whether this was
 5   something outside of that, I don't know.
 6   Q     And would Mr. Pritchard spend GigaPix funds on various
 7   meals, breakfast and dinner?
 8   A     Um, he spent tens of thousands, maybe hundreds of
 9   thousands on breakfast and dinners in various places.
10   Q     Did he provide you with any justification for those meals?
11   A     Each month I asked David Pritchard to give me a breakdown
12   of the credit card payments.  I was accustomed to seeing
13   Mr. Pritchard spend money on meals and flights.  I mean, the
14   guy entertained a lot.  The guy flew around a lot.  Um, but
15   once I started to look into that, I saw that he had flown the
16   woman he lives with to Washington two times, to Atlanta one
17   time.
18        I don't know who Katie Pritchard is.  Maybe it's his
19   niece, but he flew there to Atlanta.  He flew to San Francisco,
20   which is where he has family.  There's an enormous amount of
21   airline costs.  And also, in the area where we lived, there was
22   a tremendous amount of money spent on local hotels, like the
23   Westlake Four Seasons for one night, they spent over $3,000.
24   When I say "they," I mean he.  I can't assume it was him and
25   someone else.  He stayed at the Redondo Beach & Spa, he stayed
```

1    at the Shutters, he stayed at the Ritz Carlton in the marina.

2         I've lost track of the number of hotels.  But all of them

3    are within -- it's 20 miles from home to Chatsworth.  So it's

4    not clear to me why he would need to stay in 10 or 15 different

5    hotels in the neighborhood unless -- well, make up your own

6    mind.

7    Q    And were these personal expenses of Mr. Pritchard paid for

8    with the GigaPix Studios debit card?

9    A    No.  What had happened is that we had gotten to a point

10   where we had no money and he needed to buy airline tickets to

11   go to New York, so he told me.  And we didn't have any money on

12   the debit card.  And so I said, Okay.  You could -- I will get

13   on -- at that time, I had money.  At the end of GigaPix, I had

14   no money.  But anyway, at that time I had money.  So I got an

15   extra AMEX card with his name on it.  And, you know -- I had

16   forgotten your question.

17   Q    Would GigaPix funds be used to pay off that AMEX card?

18   A    Oh, yes.  So each month the AMEX card bill would come in,

19   which I would pay.  And then I would take his section and put

20   it into his current account.  And then I would ask him to give

21   me a breakdown of who he had the meals with, where he stayed,

22   where he traveled.  But the interesting thing was that when he

23   told me he needed the credit card for going to New York, he, in

24   fact, flew the whole of Eugene Taylor's family to Oakland.  So

25   his wife and three children.  So he didn't actually go to

1    New York.

2    Q    Now, did Mr. David Pritchard ever move investor funds from

3    GigaPix to other companies that he owned?

4    A    Yes.

5    Q    And what companies were those?

6    A    Well, they were going all over the place, depending on

7    which company had money.  So it maybe transferred from *Oz* to

8    Releasing, GigaPix Releasing, Releasing back to *Oz* Studios,

9    *Oz* Studios of GigaPix to *Oz*.  So I mean, I kept a record of all

10   of this in the financial -- in the QuickBooks.  But why all

11   this money flew all over the place, I don't know.

12   Q    And was GigaPix Releasing a separate and independent

13   company from GigaPix Studios and *OZ3D*, LLC?

14   A    Yes.

15   Q    And did Mr. David Pritchard own a third of the company

16   GigaPix Releasing?

17   A    He owned a third, a guy called David Williams owned a

18   third, and Eugene Taylor owned a third.

19   Q    And approximately how much money did Mr. Pritchard move

20   from GigaPix Studios to GigaPix Releasing?

21   A    I have no idea.  It was hundreds of thousands floating all

22   over the place.

23   Q    Now, specifically did Mr. David Pritchard instruct you to

24   move money raised from an investor named Danny Zucker from

25   GigaPix Studios to GigaPix Releasing?

A    I remember we got 700,000 from David Zucker, and I believe he said put 500,000 in GigaPix Releasing.  And I can't remember where the other 200,000 went.

Q    You referenced a Eugene Taylor.  What is that Eugene Taylor account used for?

A    He seems to be an old acquaintance of David Pritchard.

Q    Now, were you ever instructed to transfer investor funds from GigaPix to other companies besides GigaPix Releasing?

A    Yes.  To a firm called MetaPix.

Q    Okay.  And what is MetaPix?

A    My personal tax accountant advised me to set up an account called MetaPix because I wasn't getting a salary.  I was getting paid in chunks.  And I was sort of more freelance.  So he set up a corporation account for me.

     And at the time we were being sued by everybody under the sun, including the landlords, the Franchise Tax Board, various creditors.  And David Pritchard said we need to get this money out of the account pronto before they use their lien or whatever rights they have to take all the money out of the bank account.

Q    And what was the approximate time frame of this?  Was it 2009 or 2010?  What was the time frame?

A    Um, you know, this is five years ago.  It's very hard to remember but --

Q    Do you know approximately how long you'd been at GigaPix?

1    You started working in 2009.  So approximately how long were

2    you there when you were told this happened?

3    A    I would say probably half of 2010 in that case.

4    Q    Okay.  And did you inform Mr. David Pritchard that you

5    were moving money from GigaPix to MetaPix?

6    A    He and I discussed it, and he agreed to it -- or, rather,

7    he encouraged me to do that.

8    Q    Okay.  Now I'd like to show you what's been marked as

9    Exhibit No. 66.  I believe it's already in evidence.

10        Do you recognize this document?

11   A    Yes.

12   Q    Is that your name on the bottom of this document?

13   A    Yes.

14   Q    And the date on this document is November 2011; right?

15   A    It just says November 2011.  Oh, I'm sorry.  Yes.  Yes, it

16   does.

17   Q    And if you look at page 6 of this document -- it's

18   Exhibit No. 66, page 6.  And again, the net income line there,

19   is that an accurate representation of what the net income --

20   the amount of money that GigaPix had lost at the end of 2009?

21   A    Well, I don't know.  I do know that I prepared three sets

22   of accounts, and there were massive losses on each one of them.

23   Q    Okay.  If you look briefly at page 9 of this document,

24   take a look at that net income as well.  And again, the same

25   answer?

1    A    Yes.

2    Q    And if you look at page 11 of this document, the net

3    income amount, again, the same answer?

4    A    Yes.

5    Q    Okay.

6    A    Basically as shareholder funds are raised, they go to an

7    equity account.  They do not go to the profit and loss account.

8    So they don't show up as an income item.  They go straight into

9    capital funds.

10   Q    Now, in a -- did you ever discuss with Mr. Pritchard that

11   GigaPix was losing funds quickly?

12   A    Frequently.

13   Q    And was the -- you mentioned Mr. David Pritchard's salary

14   of $6,000 a week.  Was that separate and apart from the GigaPix

15   he used for his personal expenses?

16   A    Well, they stopped paying them -- I'm not sure when --

17   because we ran out of money.  So every now and then when we had

18   some money, we would pay them.  But we didn't pay Mr. Blauvelt

19   directly.  We paid him through another company setup called

20   GigaPix, Inc., in Nevada.

21   Q    And again, for Mr. Blauvelt, that $6,000 a week salary

22   that he was supposedly earning, was that separate from the

23   personal expenses he used at GigaPix funds?

24   A    Yes.

25   Q    Now, when you first started working at GigaPix as CFO in

1    2009, where was GigaPix located?

2    A     Chatsworth, California.

3    Q     And approximately how many square feet was the studio

4    space for GigaPix?

5    A     33,000.

6    Q     And approximately how much of that studio space did the

7    sales staff use?

8    A     At the time I finished the shared capital reconciliation,

9    they had all gone and gone to a new super plush building over

10   in Studio City because Mr. Blauvelt felt that we should have a

11   presence in the studio areas of Los Angeles.

12   Q     And approximately how much of that studio space was used

13   for administrative purposes for GigaPix?

14   A     You mean, at the Chats- --

15   Q     At the Chatsworth office.

16   A     4- or 5,000.

17   Q     And approximately how much of the studio space was used

18   for production purposes for GigaPix at the Chatsworth office?

19   A     There was a small amount of production on -- there was a

20   separate division -- or Pritchard's nephew had a company called

21   Fifth Year, and they worked on a lot of little projects.  And

22   they had -- they had used a little bit of the company, a little

23   bit of the space to do rehearsals for that.  But I would say

24   90 percent of the time the space was not used.

25   Q     And how much of the GigaPix Studios space was never used

1  by GigaPix?

2  A     Well, that's what I kind of meant by that.

3  Q     Now, based on your knowledge as CFO of GigaPix,

4  approximately how much in total was raised for *OZ3D* from

5  investors?

6  A     Approximately $9 million.

7  Q     And of this $9 million raised for *OZ3D*, approximately how

8  much of it was spent for costs related to *OZ3D*?

9  A     Well, I'm not a movie guy, but I would guess maybe --

10            MS. AMES:  I'm going to object as to guessing.

11  BY MR. MCLAIN:

12  Q     I don't want you to guess.  But based on your role as CFO,

13  approximately how much of the $9 million that was raised from

14  investors was used toward *OZ3D*?

15  A     I would estimate about a half a million.

16  Q     So $500,000?

17  A     Yes.

18  Q     And how much of the money raised for the movie *OZ3D* was

19  basically funneled into GigaPix?

20  A     Everything else.

21  Q     Do you know if Mr. Blauvelt and Mr. Pritchard were aware

22  that all of the money raised for the making of the movie *OZ3D*

23  was basically funneled into GigaPix?

24  A     That was their plan, and that's what happened.

25  Q     According to the Private Placement Memorandums, how much

1   of the *OZ3D* investor funds were supposed to be allotted to

2   GigaPix?

3   A    I was told that 20 percent -- 20 percent of the budget of

4   the movie could be allocated to management fees for GigaPix.

5   Q    Now, I'd like you to take a look at Exhibit No. --

6   A    Before or after the movie was finished.  I don't know if

7   that was before or after the movie was finished.

8   Q    I'm sorry.  I didn't mean to cut you off.

9        Can we take a look at Exhibit No. 67?  I believe it's in

10  evidence.  And if you look at that line in this letter that

11  says "*OZ3D* in production."

12       Based on your knowledge, was *OZ3D* ever in production?

13  A    There were scripts being written and rewritten, and I

14  don't know if that is counted as production in the movie

15  business.

16  Q    And if you look at where it says why did -- I'm sorry,

17  "Chris Blauvelt resigns as chairman and CEO."  Do you see that?

18  A    Yeah.  What is the date of this thing again?

19  Q    At the top.

20  A    Oh.  May 24th, 2011.

21  Q    So now, referring to where it says "Chris Blauvelt resigns

22  as chairman and CEO" and that corresponding explanation, do you

23  see that on the document in front of you?

24  A    Yes.

25  Q    Is that an accurate representation as to why Chris

1    Blauvelt resigned as CEO of GigaPix?

2    A     It is -- Mr. Pritchard wanted to get Mr. Blauvelt out of

3    the company by whatever means.  And there was a -- what do you

4    call it? -- reverse merger going on.  And Mr. Pritchard said

5    that Mr. Blauvelt's background was such that no investor would

6    invest in the company whilst he was still at the company.  And,

7    therefore, Mr. Blauvelt obtained a fairly beneficial departure

8    agreement.

9    Q     Now, if you'll take a look at Exhibit No. 68.  I believe

10   that's in evidence.  And if you take a look at that line that

11   says, "GigaPix is set to become a publicly traded company."

12         So first and foremost, did GigaPix ever become a public

13   company in 2011?

14   A     No.

15   Q     Did it ever become a public company?

16   A     No.

17   Q     Was GigaPix ever set to become a public company?

18   A     When you say "set," if you mean were there a lot of -- of

19   the -- of the transactions going on to make it a public

20   company, then no.

21   Q     Now, if you take a look at the -- I believe it's the

22   second page of this document.  And again, I'm sorry.  Let's

23   look at the first page.  And I just want to highlight the date.

24         And what's the date of this document?

25   A     May 24th, 2011.

1    Q    And as of the date of this document, you were the CFO of

2    GigaPix; correct?

3    A    Yes.

4    Q    And if you take a look at the second page, it says in the

5    middle, "Prints and Advertising Funds nears completion."  Do

6    you see that in bold?

7    A    Yes, I do.

8    Q    And it references a hundred million dollars in a Prints

9    and Advertising Fund in GigaPix.  Do you see that?

10   A    Yes, I do.

11   Q    Was there ever a Prints and Advertising fund at GigaPix?

12   A    As far as I'm concerned, in my opinion, it was another

13   fictitious projected total assets that we were told for four

14   years that were coming in that never came in.

15   Q    There was never $100 million in a Prints and Advertising

16   Fund at GigaPix?

17   A    There wasn't a nickel in a Prints and Advertising Fund

18   that came in.

19   Q    At GigaPix?

20   A    At GigaPix.

21   Q    So now I'd like to show you what I believe is in evidence

22   as Exhibit No. 69.

23   A    Uh-huh.

24   Q    And if you look at the bottom of that first page -- well,

25   first of all, let's take a look at the date on this document.

1    What's the date on this document?

2    A    November the 25th, 2011.

3    Q    If you look at the third paragraph of this document on the

4    first page -- I'm sorry.  Before we do that -- my apologies.

5         If you could take a look at the last page of this

6    document.  Who is this document from?

7    A    Chris Blauvelt.

8    Q    Okay.  Now, let's go to the first page of this document,

9    the third paragraph.

10   A    The third page, third paragraph?

11   Q    The first page, I'm sorry, third paragraph, the third full

12   paragraph that starts with "Following my departure from the

13   company..."

14   A    Okay.  Are you going to make that bigger, or am I going

15   to -- okay.

16   Q    Let's just, in fact, highlight the first three lines of

17   that.

18   A    "Following my departure from the company, during the

19   spring and summer of 2011, there were many financial events

20   both domestically and globally which proved to be devastating.

21   Many industries continued to erode worldwide banking and

22   investor confidence.  And these conditions had a profound

23   effect on the future of GigaPix as well."

24   Q    So now, does that accurately describe the reasons that

25   GigaPix failed financially?

1    A     No.

2    Q     Why did GigaPix fail its investors financially?

3    A     Because in 2009, before we had funding in place, it was

4    decided by those in charge to start making a film called

5    *Blackbeard* in March 2009.  And there was no letter of credit

6    saying that we had the money.  There was no official agreement

7    that we had the funds to make the movie.  So the movie was

8    started to make -- was started to be whatever it's called when

9    they start building all the stuff and before they start

10   shooting.

11         So the company spent millions of dollars trying to keep

12   *Blackbeard* on track out of GigaPix money while trying to find

13   various sources of finance to finance the movie so that we

14   could continue making it.  And we continued pouring money into

15   it for months afterwards until basically the company had no

16   money.

17   Q     According to the financials that we looked at during this

18   entire period, GigaPix was actually losing money; right?

19   A     Well, yeah.  GigaPix never made any money.

20   Q     Now, did you ever invest your personal money in GigaPix or

21   *OZ3D*?

22   A     In 2007 and 2008, I bought $100,000 worth of shares.  It

23   looked like a great opportunity for me.  I met Mr. Pritchard.

24   He seemed like a competent, charming, charismatic,

25   knowledgeable guy.  Also, at that time, my personal savings

1  were worth $385,000.  By the time I finished in 2012, I had

2  $35,000 left.

3  Q    Did you ever receive a return on your $100,000 in GigaPix?

4  A    No.  The opposite of that.

5  Q    And did you ever receive back any of your initial $100,000

6  investment in GigaPix?

7  A    No.

8  Q    What types of individuals did GigaPix generally seek as

9  investors?

10  A    I didn't speak to a lot of the investors.  But during

11  the -- what do you call it? -- the reverse merger, a lot of the

12  people didn't understand exactly how it worked, the fact that

13  they'd gone from 8 percent ownership to nearly 40 percent

14  ownership.  But they couldn't understand how they had less

15  shares, but they had less shares of -- of a smaller total.

16       So they called me to ask me to explain.  They wouldn't

17  phone the people.  And they often seemed to be unsophisticated

18  and older people.  And during that time, we -- somebody came up

19  with the idea of -- of taking IRAs from people -- or the money

20  in people's IRAs and putting it into GigaPix and 401(k)s, which

21  I assume is from older people, and their savings accounts.

22  Q    Do you know if GigaPix was cold calling investors?

23  A    It was pretty common knowledge.

24  Q    And did you mention your concerns to Mr. Pritchard or

25  Mr. Blauvelt about GigaPix raising funds inappropriately?

```
 1   A    I didn't at first.  I didn't know it was illegal.  I
 2   didn't know it was inappropriate or whatever.  But during the
 3   summer of, I think, 2009, I suggested that all the money that's
 4   raised from whatever funds goes to Bill Uchimoto at Buchanan,
 5   Ingersoll & Rooney so that they would then collect the money,
 6   make sure it was accredited investors, put it in the escrow
 7   account, and pay it back to us so that there would be less
 8   chance that there would be any kind of illegal -- or things
 9   that didn't correspond with SEC regulations.
10   Q    Did GigaPix periodically send update letters to its
11   GigaPix investors?
12   A    Say that again.
13   Q    Did GigaPix periodically send out investor update letters?
14   A    You asked me that a while ago.
15   Q    And I'm just trying to focus on another aspect of the
16   question that I'm going to ask you.
17   A    Yeah.  Frequently.
18   Q    And who drafted those letters?
19   A    Oh, about -- oh.  Well, David Pritchard and Chris
20   Blauvelt, but I drafted maybe one or maybe two.
21   Q    Now, were you aware that GigaPix also received cease and
22   desist orders from various dates relating to how it raised
23   funds from potential investors?
24   A    Yes.
25   Q    I'd actually like you to take a look at Exhibit 2001 to
```

1    2007, if you could just look at those for identification

2    purposes.

3                THE COURTROOM DEPUTY:  2001 --

4                MR. MCLAIN:  I'm sorry.  201 to 207.

5                (Exhibits 201 - 207 for identification.)

6                MR. MCLAIN:  And, in fact, Your Honor, we'd like to

7    admit those as certified public records.

8                THE COURT:  Any objection?

9                MR. EMMICK:  No objection.

10               THE COURT:  2001 to 2007 *[sic]* in evidence.

11               (Exhibits 201 - 207 received into evidence.)

12               THE COURTROOM DEPUTY:  201 to 207 is identified and

13   placed before the witness.

14               MR. MCLAIN:  And if we could publish

15   Exhibit No. 202.

16               THE WITNESS:  Okay.

17               MR. MCLAIN:  The second page of it.  202, yeah.

18   BY MR. MCLAIN:

19   Q    Okay.  And what is -- what is this document?  Is this a

20   cease and desist order?

21   A    This is the general format of a cease and desist order.

22   Q    From the state of Wisconsin?

23   A    Colorado.

24   Q    Is it Colorado?

25   A    201 is Colorado.

```
 1    Q     Exhibit 202.  Okay.
 2          And if you -- what's the -- the year?
 3    A     This looks much more like a cease and desist order.
 4    Q     And what's the year of the cease and desist order on this
 5    document?
 6    A     It must be under this yellow thing.  No.  Oh.  Um --
 7    Q     In fact, if you look at the third page of 202 --
 8    A     24th of October, 2005.
 9          MR. MCLAIN:  Okay.  And if we could pull up
10    Exhibit No. 203.  And we'll look at the first page of this
11    document.
12          THE COURT:  We'll take our afternoon recess at this
13    time.
14          Members of the jury, I would remind you that you are not
15    to converse with or otherwise communicate among yourselves or
16    anyone about any subject touching upon the merits of the cause
17    on trial and you're not to form or express any opinion on the
18    case until it's finally submitted for your verdict.
19          The jury is excused until called.  Court will remain in
20    session.
21          THE COURTROOM DEPUTY:  All rise.
22          (Out of the presence of the jury.)
23          THE COURT:  How much longer do you have with this
24    witness?
25          MR. MCLAIN:  Literally like five minutes.
```

```
 1              THE COURT:  We'll be in recess for ten minutes.
 2              (Break taken.)
 3              (In the presence of the jury.)
 4              THE COURT:  The jurors are all present and in their
 5   proper places.  The defendants are present with counsel.
 6   BY MR. MCLAIN:
 7   Q    Mr. Mutton, are you able to identify the defendants in the
 8   courtroom today?
 9   A    Yes.
10   Q    And who is Mr. Chris Blauvelt?  Can you describe what he's
11   wearing?
12   A    He's the second from the right on that table.
13   Q    Can you describe what he's wearing?
14   A    Suit and tie.
15   Q    The gray suit and a gray tie?
16   A    Gray hair.
17              MR. MCLAIN:  May the record please reflect that he
18   identified the defendant Mr. Chris Blauvelt?
19              THE COURT:  The record will show that the witness
20   has identified the defendants, each of them, David Pritchard
21   and Christopher Blauvelt.
22   BY MR. MCLAIN:
23   Q    Can you also identify Mr. David Pritchard?
24   A    He's at the end of the row, gray hair, glasses, goatee,
25   he's wearing a suit.
```

1   Q      Thank you.

2          How many states issued cease and desist letters to

3   GigaPix?

4               THE COURT:  Go ahead.

5               THE WITNESS:  I think most of them were going on

6   before I got there, but I would imagine it was about eight to

7   ten.

8   BY MR. MCLAIN:

9   Q      And do you know why these states issued cease and desist

10  letters against GigaPix?

11  A      My understanding is they -- you have to have a license,

12  according to the SEC, to raise money from the citizens of that

13  state.  And GigaPix Studios did not have a license.

14  Q      Did you discuss these cease and desist orders with

15  Mr. Pritchard and Mr. Blauvelt?

16  A      Not really.

17  Q      Did you ever discuss it with them?

18  A      Only to the extent that we had to get rid of them -- or

19  they had to get rid of them or we had to get rid of them.

20  Q      And specifically, what was their response concerning the

21  cease and desist orders?

22  A      It was an inconvenience that we -- Mr. Blauvelt find a

23  lawyer in New York who specializes in this thing, and she

24  basically took over everything.  And then after a while, I

25  ended up communicating with her.

```
 1   Q     Did Mr. Pritchard or Mr. Blauvelt ever communicate to you
 2   how the cease and desist order should be communicated in the
 3   PPMs?
 4   A     There was a discussion held that we had to put them in
 5   somewhere and, therefore, the discussion was held as to the
 6   best place where it could be.
 7   Q     And where was the best place they could be?
 8   A     The best place where it could be, sort of hidden in the
 9   middle of legalese or something.
10           MR. MCLAIN:  No further questions for this witness,
11   Your Honor.
12           THE COURT:  Cross-examination, Defendant Blauvelt.
13           MS. AMES:  No questions, Your Honor.
14           THE COURT:  Cross-examination, Defendant Pritchard.
15           MR. EMMICK:  Certainly.
16                     CROSS-EXAMINATION
17   BY MR. EMMICK:
18   Q     Sir, are you ready?
19   A     Yeah.
20   Q     I guess what I wanted to do was start off with some
21   questions about your background.
22   A     Sure.
23   Q     I could be wrong, but didn't you say that you were looking
24   for work when you started working with Mr. Pritchard?
25   A     No, not really.  I had been working for 25 to 30 years as
```

```
 1   a rock and roll tour manager, tour accountant.  And by this
 2   time, I was pretty burnt out.  So in 2008, I was looking for
 3   possibilities to get off the road and have a retirement job and
 4   grow old and be boring.
 5   Q    You were a rock and roll tour manager?
 6   A    A tour manager, tour accountant, business manager,
 7   promoter, representative, basically anything to do with rock
 8   and roll or live entertainment.
 9   Q    And had you had anything to do with the manufacturing
10   business or the -- anything like entertainment business?
11           THE COURT:  Totally irrelevant, Counsel.  Let's get
12   to this case.
13   BY MR. EMMICK:
14   Q    Let's talk a little bit about Nadia who was one of the
15   attorneys for GigaPix.  Do you know her?
16   A    She was the only attorney for GigaPix and she worked
17   within GigaPix.  She was an employee of GigaPix.
18   Q    Right.  So you do know her?
19   A    Yeah.  But you said one of the lawyers, plural.
20   Q    And you know that she had problems with cancer?
21           MR. MCLAIN:  Objection, Your Honor.  Relevance.
22           THE COURT:  Objection sustained.
23           MR. EMMICK:  It has to do with the expenditure --
24           THE COURT:  No.  It has nothing to do with her.
25           MR. EMMICK:  It has --
```

1          THE COURT:  It's relevant -- irrelevant at this

2     point, Counsel.

3     BY MR. EMMICK:

4     Q     Sir, was there any money spent on her staying in one of

5     these hotels?

6     A     For Mr. Pritchard to stay at seven or eight very classy

7     hotels and spend thousands of dollars to go and stay there for

8     the night when he lives 20 minutes from home --

9     Q     Didn't you understand my question?  All I said was:  Was

10    there -- did she stay at one of these hotels?

11    A     I understood your question and I answered it.

12    Q     All right.  Didn't she stay at one of the hotels because

13    she was suffering from cancer --

14          MR. MCLAIN:  Objection, Your Honor.

15    BY MR. EMMICK:

16    Q     -- and attempted suicide?

17          THE COURT:  Sustained.

18          MR. MCLAIN:  And move to strike.

19          THE COURT:  That will be stricken.  The jury's

20    admonished to disregard it --

21    BY MR. EMMICK:

22    Q     All right.  Let's --

23          THE COURT:  -- the last statement about anything.

24    BY MR. EMMICK:

25    Q     All right.  Let's talk a little bit about Ernst & Young.

1    You said that you had arranged for Ernst & Young to get

2    involved; is that right?

3    A    Correct.

4    Q    All right.  And who did you know at Ernst & Young?

5    A    I did not know anybody.

6    Q    Okay.  So you made the arrangements for Ernst & Young.

7    Now, did you talk with Mr. Pritchard about that?

8    A    Yes.

9    Q    And he knew people at Ernst & Young; right?

10   A    No.

11   Q    He didn't?

12   A    Not to my knowledge.

13   Q    Did he mention to you or didn't he mention to you that he

14   had actually worked with Ernst & Young in the past and he knew

15   people at Ernst & Young that he could work with again?

16   A    I do not recall that.

17   Q    And you remember there was some testimony about whether

18   Ernst & Young had agreed to do an accounting?  Do you remember

19   that?

20   A    Could you say that again, please?

21   Q    Sure.  I'm just trying to direct your attention to whether

22   Ernst & Young was going to do an audit.

23   A    No.  They weren't going to do an audit.

24   Q    I'm just trying to direct your attention to that, sir.

25   And then I'm going to ask you a question.

1           THE COURT:  He answered the question, Counsel.

2   BY MR. EMMICK:

3   Q    Sir, didn't you have a meeting with the people at Ernst &

4   Young along with Mr. Pritchard?

5   A    No.

6   Q    You didn't have any meeting at all?

7   A    I had a meeting without Mr. Pritchard.

8   Q    All right.  Who did you meet with there?

9   A    Marian Cavallaro.

10  Q    And isn't it true that Ms. Cavallaro said that she was

11  going to recommend that Ernst & Young do the audit of GigaPix?

12           MR. MCLAIN:  Objection.  Hearsay, Your Honor.

13           THE COURT:  The objection is sustained.

14           MR. EMMICK:  It's approval -- it's -- it's the

15  operative --

16           THE COURT:  The objection is sustained, Counsel.

17  Don't do that.

18  BY MR. EMMICK:

19  Q    Did you have a discussion with her on the subject of

20  whether she might be willing to recommend representation in

21  this matter?

22  A    Yes.  She gave me a great big pile of papers and forms

23  that I had to fill in and that I had to send back to her and

24  then they would consider whether we would be clients.  You

25  can't just go into Ernst & Young and, say, be a client.

```
 1   Q     And was she going to recommend it, though?
 2   A     She did not indicate that.  It was based upon what she had
 3   from the papers that I filled in.
 4   Q     And ultimately it was her supervisor that said no; isn't
 5   that right?
 6   A     She wrote to me and said they had an ethics officer
 7   looking at that.
 8   Q     And that included a supervisor of her?
 9   A     I don't know if he was a supervisor.
10   Q     And didn't they explain to you what the reasons were that
11   they were not going to represent GigaPix?
12   A     Yes.
13   Q     And one of the reasons was the liability that that law
14   firm might be facing?
15   A     It's an accounting firm.
16   Q     Excuse me.  An accounting firm.  Wasn't the liability of
17   the accounting firm one of the reasons?
18   A     Their internal workings are beyond my knowledge.  I know
19   that they didn't take us on as clients because the background
20   checks didn't pass.
21   Q     Didn't they explain to you the reason why they wouldn't
22   take on the company?
23   A     They said that was confidential information.
24   Q     Didn't they tell you that it was because they would become
25   potentially liable?
```

```
 1   A     No.
 2   Q     Didn't they tell you it was because there were problems
 3   with some of the managers at GigaPix?
 4   A     Yes.
 5   Q     Oh, they did say that.  All right.
 6         And didn't they also say that there were other reasons why
 7   they did not want to represent GigaPix at the time?
 8   A     No.
 9   Q     You were talking earlier about Mr. Pritchard.  Now, I want
10   to ask you some questions about discussions about costs.
11   A     Uh-huh.
12   Q     Did you have discussions with Mr. Pritchard about costs?
13   A     From the time that I got there -- do you want me to
14   answer --
15   Q     The answer is "yes" or "no."
16   A     By the time I got there, Mr. Pritchard used the debit card
17   that the company had at that time and --
18   Q     It's a simple question.  Did you have conversations with
19   him?
20   A     Yes.
21   Q     Okay.  And you had several conversations, many
22   conversations about costs of many different kinds, didn't you?
23   A     Yes.
24   Q     All right.  And that was -- those were cost conversations
25   that occurred not just monthly, not just weekly, but more like
```

1    daily?

2    A      No.

3    Q      What do you think they were?  More like weekly?

4    A      Maybe every couple of months.

5    Q      Remember the company MetaPix?

6    A      Yes.

7    Q      When was MetaPix set up?

8    A      Around February of 2009.

9    Q      And was it set up by you?

10   A      Yes.

11   Q      Now, you have spent a lot of time talking about extra

12   costs that have been -- that have been spent by Mr. Pritchard;

13   right?

14   A      Correct.

15   Q      Did you write up any reports about that?

16   A      I asked numerous times for Mr. Pritchard to give me a

17   breakdown of his expenses.

18   Q      Did you write up any reports for the prosecution about

19   this?

20   A      For the prosecution?

21   Q      Uh-huh.

22   A      I didn't know there was going to be a prosecution.

23   Q      Didn't you think it was a good idea to write up something

24   about these costs?

25   A      GigaPix Studios is a very flexible company.  I said to

```
 1   Mr. Pritchard on a regular basis, "I need you to break down
 2   what is your personal expenses and what your business expenses
 3   are, who you were with when you had your meals, what they were
 4   for, and what the travel expenses were for and where you stayed
 5   and why you stayed there."
 6   Q    And isn't one of the things that he explained to you that
 7   they used some of that money for Nadia, the woman who had that
 8   cancer?
 9            MR. MCLAIN:  Objection, Your Honor.  Relevance.
10            THE COURT:  Objection sustained.
11            THE WITNESS:  Does that mean I answer?
12            THE COURT:  No.
13            MR. EMMICK:  Just one moment, Your Honor.
14   BY MR. EMMICK:
15   Q    Just one or two more questions.  Remember Bill Uchimoto?
16   A    I don't think I ever met him, but I know his name.
17   Q    But "Do you remember him?" was the question.  Do you
18   remember Bill Uchimoto?
19   A    I remember his name on many documents.
20   Q    Have you ever talked to him?
21   A    Yes.
22   Q    Mr. Uchimoto was the person who was set up in order to
23   handle the reorganization of GigaPix --
24   A    No.
25   Q    -- wasn't he?
```

1       He was set up in order to assist in the handling of the

2   reorganization, wasn't he?

3   A     Correct.

4            MR. EMMICK:  Okay.  Nothing further.

5            THE COURT:  Redirect?

6            MR. MCLAIN:  No questions from the Government,

7   Your Honor.

8            THE COURT:  You may step down.

9            THE WITNESS:  Thank you, sir.

10            THE COURT:  Call your next witness.

11            MR. MCLAIN:  The Government will call Mr. William

12   Hicks, Professor William Hicks.

13            THE COURTROOM DEPUTY:  Right this way.  Stand right

14   here and -- and face me.  Please raise your right hand.

15       Do you solemnly swear that the testimony you shall give in

16   the cause now pending before this Court shall be the truth, the

17   whole truth, and nothing but the truth, so help you God?

18            THE WITNESS:  I do.

19       **JOHN WILLIAM HICKS, PLAINTIFF'S WITNESS, WAS SWORN**

20            THE COURTROOM DEPUTY:  Okay.  Thank you.  Please

21   take a seat.

22       And please state your full and true name for the record

23   and spell your last name.

24            THE WITNESS:  My name is John William Hicks,

25   H-i-c-k-s.

**DIRECT EXAMINATION**

BY MR. MCLAIN:

Q    Professor Hicks, what do you do for a living?

A    I'm a retired member of the faculty at the Maurer School of Law in Indiana University.

Q    And where did you attend law school?

A    I went to the University of Michigan Law School and in 1965.

Q    And when did you begin teaching law?

A    In 1968.

Q    And when did you begin teaching law at Indiana University?

A    In 1977.

Q    Do you continue to maintain a teaching load up to this time?

A    I do.  I teach one class a year.

Q    And what is your general area of focus with respect to your teaching of the law?

A    Federal securities law.

Q    And is there a subset or subspecial -- subspecialization within the larger securities laws that you specialize in?

A    Yes.  I focus primarily on exempted transactions under the Securities Act of 1933 and civil liabilities under the 1933 Act.

Q    And have you published books and articles relating to securities law and the Securities Act of 1933?

A      Yes, I have.

Q      And what is a security?

A      Well, the term "security" is defined in the Securities Act of 1933 to cover stocks and bonds and, um, instruments that are generally known but also business -- interest, investment interest in business entities.

Q      And very briefly and in broad strokes, what is the Securities Act of 1933?

A      Well, the Securities Act of 1933 came after the financial crash of the stock market in 1929 when lots of people lost money.  And it was intended to protect investors in connection with public offers and sales of securities and also to provide protection against fraud.

Q      And very briefly and in very broad strokes, what is the Securities Act of 1934?

A      The Securities Act of 1934 is the -- is a much broader statute, and it included reporting obligations for certain large companies on a continuous basis as opposed to the offering, sale, and transaction under the '33 Act.  It provided for regulation of broker dealers, and it also created the U.S. Securities and Exchange Commission.

Q      And what is the Securities and Exchange Commission?

A      Well, the SEC, as it is sometimes referred to, is an independent federal agency that interprets and administers the -- all the federal securities laws and adopt rules and

1    regulations.

2    Q    Now, have you previously testified as an expert relating

3    to the Securities Act of 1933?

4    A    Yes, I have.

5    Q    And have you previously testified in federal court?

6    A    Yes, I have.

7    Q    And have you previously testified in state court?

8    A    Yes, I have.

9    Q    And have you testified as an expert on behalf of the SEC?

10   A    Yes.

11   Q    And have you previously testified as an expert for the

12   Enforcement Division of the SEC?

13   A    Yes.

14   Q    And have you previously testified as an expert for the

15   Department of Justice?

16   A    Yes, I have.

17   Q    Have you been retained by the Government in this case to

18   provide expert testimony and opinions?

19   A    Yes, I have.

20   Q    And what is the rate of pay for your work in this case?

21   A    $450 an hour.

22   Q    And have you been asked to formulate and express opinions

23   about whether the offer and sales of securities of GigaPix and

24   *OZ3D* in this case by the defendants qualify for any exemption

25   to the registration requirements under the federal securities

1   laws?

2   A    Yes, I have.

3   Q    Have you reviewed documents and materials contained

4   therein in the course of formulating your opinions relating to

5   the securities of GigaPix and *OZ3D*, LLC?

6   A    Yes, I have.

7   Q    And what sorts of documents and information have you

8   reviewed in formulating your opinions?

9   A    I reviewed confidential Placement Memoranda -- Memorandum

10   for *OZ3D*, LLC, and confidential Private Placement Memoranda

11   by -- or for GigaPix.  I reviewed supporting documents such as

12   subscription agreements, investor questionnaires, and some of

13   the sales literature that was sent out.  I also reviewed some

14   of the investor interviews and some of the internal documents

15   of the companies.

16   Q    And did it also include reviewing the cease and desist

17   orders?

18   A    Yes, it did.

19   Q    Are these the types of documents and information that

20   experts in your field reasonably rely on in forming their

21   opinions concerning the registration requirements under the

22   federal securities laws?

23   A    Yes.

24   Q    And is your testimony and the opinions you might give

25   today going to be based on your review of the facts and

1    documents and information you reviewed relating to GigaPix,

2    *OZ3D*, and the defendants in this case?

3    A    Yes, it is.

4    Q    And is the testimony you're going to be giving today going

5    to be on the product, the principles, and methods which are

6    reliable within the securities law field?

7    A    Yes.

8    Q    And did you apply those principles and methods within the

9    securities law field to the facts of this case in formulating

10   your opinions?

11   A    Yes, I did.

12            MR. MCLAIN:  Your Honor, at this time, the

13   Government would like to offer this witness as an expert

14   concerning securities laws and concepts and exemption

15   requirements to securities laws.

16            THE COURT:  Does Defendant --

17            MR. MCLAIN:  Pritchard.

18            THE COURT:  -- Pritchard wish to question on his

19   expertise?

20            MR. EMMICK:  No, Your Honor.

21            THE COURT:  Defendant Blauvelt want to question the

22   witness on his expertise?

23            MS. AMES:  No, Your Honor.

24            THE COURT:  I'm sorry.  I didn't hear you.

25            MS. AMES:  No, Your Honor.  Thank you.

1          THE COURT:  All right.  You may proceed.

2    BY MR. MCLAIN:

3    Q     Professor Hicks, in your opinion, were the units or

4    membership interests in *OZ3D*, LLC, sold to investors in this

5    case securities?

6    A     Yes.

7    Q     And is it your understanding that these *OZ3D*, LLC,

8    securities were not registered with the Securities and Exchange

9    Commission?

10   A     Yes.

11   Q     Is that "yes"?

12   A     Yes, it is.

13   Q     And in your opinion, were these *OZ3D*, LLC, securities that

14   were sold to investors in this case required to be registered

15   with the Securities and Exchange Commission?

16   A     Yes, they were.

17   Q     And in your opinion, were these *OZ3D*, LLC, securities that

18   were sold to investors in this case not exempt from

19   registration?

20   A     That is my opinion, yes.

21   Q     In your opinion, were the units that were sold to

22   investors in GigaPix in this case securities?

23   A     Yes, they were.

24   Q     And is it your understanding, were these GigaPix

25   securities not registered with the Securities and Exchange

1    Commission?

2    A    They were not registered.

3    Q    And did the offer return to *OZ3D* and GigaPix denials that

4    these securities were unregistered securities?

5    A    Yes.  The PPM stated that.

6    Q    And in your opinion, were these GigaPix securities that

7    were sold to investors in this case required to be registered

8    with the Securities and Exchange Commission?

9    A    Yes, that's my opinion.

10   Q    And in your opinion, were these GigaPix securities that

11   were sold to investors in this case not exempt from

12   registration?

13   A    That is my opinion.

14   Q    Now, have you formulated an opinion as to whether or not

15   the offer and sale of securities of GigaPix sold by the

16   defendants specifically in this case in connection with the

17   Private Offering Memorandum were in violation of the

18   registration requirements under the federal securities laws?

19   A    Yes.

20   Q    And what is your opinion?

21   A    My opinion is that there was -- or is substantial and

22   compelling evidence that the unregistered offers and sales of

23   those securities by persons acting as agents or employees,

24   including the defendants, were in violation of Section 5.

25   Q    And what is Section 5 of the Securities Act of 1933?

1   A    Section 5 is -- contains the registration requirements of

2   the '33 Act which covers offers and sales of securities to the

3   public.

4   Q    And what is the purpose of the registration requirement in

5   Section 5 of the Securities Act of 1933?

6   A    The registration requirements are intended to provide

7   investors a review of specialized and required information that

8   the company or the issuer, as it's called in the law, that the

9   company is required to make available to investors.  And it is

10  filed with the SEC as a result of the requirements of Section 5

11  and is reviewed.  And after the review process, then the

12  securities can be made available to the public for -- for

13  purchase.

14  Q    So in layman's terms, is the purpose of Section 5 of the

15  Securities Act of 1933 to protect vulnerable investors in

16  particular?

17  A    I think that's a fair statement, yes.

18  Q    Is Section 5 of the Securities Act of 1933 found at

19  Title 15, United States Code, Section 77(e)?

20  A    Yes, it is.

21  Q    And how does the Securities Act of 1933 try to protect

22  unsophisticated investors in particular?

23  A    Well, as I was saying, in terms of the goals of the '33

24  Act, the -- the registration process basically requires that

25  during the period of time up to the moment when the company

1    decides it's going to make a public offering, that in the

2    pre-filing period, that there are no offers or no sales that

3    can be made by the company.

4         And then in the moment when the company files that

5    disclosure document called a registration statement with the

6    SEC, at that point there is a so-called waiting period during

7    which the SEC has an opportunity to look at all the

8    information, decide whether or not everything that should be

9    there is there, whether or not it's disclosed in plain English

10   so people can understand it.

11        And typically there's a communication between the SEC

12   staff and the company and the securities lawyers and others who

13   are working with the company to basically work towards a

14   document that will be, in the opinion of SEC, adequate and in

15   keeping with the requirements.

16        And during that period of time, the so-called waiting

17   period, again, no sales can be made.  So the vulnerable

18   investors are, during that period of time, in a position where

19   sales cannot be made to them.  And also during that time, there

20   were limited offers that can be made.  Oral offers can be made.

21   But any written offer is usually limited to a disclosure

22   document that's called a preliminary prospectus, a disclosure

23   or offering document that said it's preliminary or subject to

24   completion.

25        And then when the SEC is satisfied that the document has

1    finally been revised to the point where it's in keeping with

2    the obligations and requirements of the company and the Act,

3    the SEC declares that the registration statement is effective.

4    And at that point, going forward, sales can be made, oral and

5    written offers can be made.  But again, investors are being

6    protected because at that point there is an obligation that

7    that final disclosure document, the prospectus, as it's called

8    at that point, is delivered to investors in connection with the

9    sales of securities.

10   Q    Based on your review of the documents in this case, were

11   defendants in this case selling GigaPix securities to

12   unsophisticated or unaccredited investors?

13   A    Yes.  That's my opinion.

14   Q    And now, focusing on the *OZ3D* securities, were they also

15   selling *OZ3D* securities to unsophisticated and unaccredited

16   investors?

17   A    That is my opinion, yes.

18   Q    And have you formulated an opinion as to whether or not

19   the offer and sale of securities of *OZ3D* sold by the defendants

20   with the Private Offering Memorandum were in violation of the

21   registration requirements under the federal securities laws?

22   A    Yes, I have.

23   Q    And what is your opinion?

24   A    That the -- that there was and is compelling and

25   substantial evidence that the unregistered offers and sales of

1    the securities by persons who were functioning as agents or

2    employees, including the defendants, were in violation of

3    Section 5.

4    Q     Now, what does it mean to register stocks with the

5    Securities and Exchange Commission?

6    A     Um, it is, as your question indicates, common for persons,

7    including me, sometimes to say are going to register the stock.

8    But actually, what is registered is the offer and sale of the

9    securities so that in order to make sure that prior to the time

10   that there is a formal offer or even an informal offer of

11   securities or sale, that the -- the investors have an

12   opportunity to see in case of registration that the SEC review

13   takes place and that they receive the disclosure document that

14   contains the information that the Act requires.

15   Q     Now, may an entity sell securities publicly to individuals

16   throughout the United States without registering the offering

17   with the SEC?

18   A     Yes, it's possible.

19   Q     And under what circumstances?

20   A     Well, the circumstances would be that there's no

21   registration.  There has to be an exemption.  And it gets a

22   little technical here.  But essentially, under the Securities

23   Act registration requirements, it's either registered with the

24   SEC, the offers or sales, or they're exempted or it's illegal,

25   that is, in violation of Section 5 so that if there is an

1    exemption that's available, then the fact that the securities

2    were not or the offers or sales of the securities were not

3    registered would not mean that there was a violation of the

4    Act.

5    Q    And is it your opinion that there was no exemption

6    available for either *OZ3D* or GigaPix in this case?

7    A    Yes, that's my opinion.

8    Q    Now, what is ordinary trading?

9    A    Um, well, as you probably know, ordinary trading is

10   usually referred to -- or is associated with what takes place

11   every single trading day on the Stock Exchange, NASDAQ or

12   over-the-counter market where trade or securities owners buy

13   and sell securities.  And that is referred to as ordinary

14   trading.  And there is an exemption from Section 5 that is

15   contained in the Securities Act that exempts ordinary trading.

16   Q    And did ordinary trading occur with the offer and sales of

17   securities in this case?

18   A    I don't think so.  No.

19   Q    Now -- and you looked at -- one of the documents you

20   looked at was the Private Placement Memorandum for GigaPix

21   dated July 15th, 2009?

22   A    Yes.

23   Q    And I believe we have that in evidence as Exhibit No. 58.

24   If you could pull up Exhibit No. 58.  And actually, it would

25   be -- let's do 58, page 11.  Just take a look at the screen.

1    And do you see the first page of this Private Placement

2  Memorandum, the indication that the shares of security had not

3  been registered under the United States Securities Act?  Do you

4  see that?

5  A    Yes, I do.

6  Q    Can you highlight that?

7  A    Yes.

8  Q    And then if we take a look at the bottom of the next page,

9  that would be page 12, so 58.12, page 12 of this exhibit, the

10  GigaPix private offering for July 15th, 2009.  There's a

11  reference that "the securities offered hereby are being offered

12  and sold in reliance on exemptions."  Do you see that language?

13  A    I do.

14  Q    And it mentions exemption provided by Section 4(2)

15  and Regulation D.  Do you see that?

16  A    Yes, I do.

17  Q    Were -- were any references to potential exemptions even

18  mentioned in the PPM?

19  A    I don't believe so, no.

20  Q    And it's your testimony that no exemptions were applicable

21  to this GigaPix offering; correct?

22  A    That is correct.

23  Q    And what is Regulation D?

24  A    Well, Regulation D is a collection of rules that the SEC

25  adopted in 1982 to help companies and investors and attorneys

1    to understand the scope of Section 4(2).  The language of

2    Section 4(2) in the statute is that -- what we talked about

3    earlier, is registration with all the steps, including the

4    SEC's review.

5         "That provisions of Section 5 shall not apply to" and then

6    the language is "transactions by an issuer involving any public

7    offering."  That's the phrase.  So if it's a public offering,

8    it's registered.  Here's an exemption if it's not a public

9    offering.  But nobody knew for sure what that phrase really

10   meant, how many people, does it depend on the size of the

11   offering or depend on the quality of the purchaser.

12        And so with some of the uncertainty that caused attorneys

13   and investors and others to wonder whether or not this would be

14   a good exemption, the SEC came forward with Regulation D with

15   several safe harbors, including Rule 506 which clarifies what

16   Section 4(2) means according to the SEC.

17   Q    Okay.  And then what is the difference between a general

18   solicitation and a limited solicitation?

19   A    Well, a general solicitation is -- is made to anybody

20   under circumstances that involves communications between

21   persons who have no real connection with each other using a

22   very broad term.  The SEC clarified in a series of releases

23   what limited solicitation means.  And that's the opposite.  And

24   limited solicitation means that there exists a substantial

25   preexisting duty -- or excuse me, preexisting relationship

1    between the company and the prospective investor such that the

2    issuer would be able to evaluate the -- the sophistication and

3    the economics and financial circumstances of those persons.

4    Q    And based on your review of the evidence in this case and

5    your knowledge as an expert, was the solicitation of the

6    GigaPix and *OZ3D* investors at issue in this case a general

7    solicitation or a limited solicitation?

8    A    It was a general solicitation.

9    Q    And why is it your opinion that the solicitation of the

10   GigaPix and *OZ3D* investors at issue in this case was a general

11   solicitation?

12   A    Because it -- it falls into the -- into the general

13   definition of general solicitation in one of the rules of

14   Regulation D which is part of -- of what the company cannot do

15   if its going to claim an exemption.

16   Q    And what effect does general solicitation have on Rule 506

17   of Regulation D?

18   A    It makes it unavailable as an exemption for the issuer.

19   Q    And is that expressed within the rules of the Securities

20   Act of 1933?

21   A    Yes, it is.

22   Q    And what is that rule?

23   A    It's Rule 502, paragraph (c).

24   Q    And now what does the, quote, "reloading of investors"

25   mean?

A     That's a -- a nontechnical phrase.  It means that a company might go back or a company that has sold stock before might go back to persons who have bought in the past and offer additional securities to them in sort of a reloading process.

Q     And does the reloading of investors also violate the prohibition against general solicitation under 506 of Regulation D?

A     I think it depends on the circumstances.

Q     And the circumstances in this case, would it have been a violation?

A     I think so, yes.

Q     And for an offer under Rule 506 of Regulation D, if the issuer complied with the rule, the offering would not be a public offering?

A     That's correct.  It would not be a public offering.

Q     And when a company offers and sells securities under Rule 506 in a private placement, is the issuer required to provide information like audited financial statements?

A     It is required to the extent that the issuer is offering and selling those securities to any person who is not an accredited investor.

Q     And when audited financials are not provided, does this make an exemption under Section 5 unavailable?

A     Yes, it does.

Q     I believe you referenced accredited investors.  What is an

1   accredited investor?

2   A     That is a term of art that is included in one of the rules

3   under Regulation D that's relevant to a company that is

4   claiming an exemption under 506.  And it defines -- defines the

5   term "accredited investor" to include persons who fall into one

6   of eight different categories that are included there.

7   Q     And what are the two categories that are specifically

8   relevant to our case?

9   A     Well, one of them is a category that says if any person --

10   any natural person who has a net worth in excess of

11   $1 million -- that's the difference between assets and

12   liabilities and net worth.  If that person has that prior to

13   the investment, then that person would be an accredited

14   investor.

15       The other category is any individual who has a net income

16   of $200,000 or in the case with the spouse $300,000 for the

17   past two years and has a reasonable basis for believing that it

18   will reach that same economic or financial level in the current

19   year.

20   Q     In order for an issuer such as GigaPix or *OZ3D*, LLC, to

21   meet an exemption under Rule 506 of Regulation D, what must it

22   do to determine if its investors are accredited investors?

23   A     Well, I believe it should have -- and the law supports

24   what I'm saying, I think -- is that it must have some kind of a

25   mechanism or a procedure for assessing whether or not the

1   information that they have about that investor is going to

2   allow them to -- to meet those terms and conditions for

3   somebody who is an accredited investor.

4   Q    Is it enough for the issuer to just ask the investor to

5   self-report whether or not the investor is an accredited

6   investor?

7   A    No, it's not.

8   Q    And why is self-reporting by the investor not sufficient

9   to meet the exemption requirements of Rule 506 of Regulation D?

10  A    Because the definition of "accredited investor" basically

11  requires that there be some reasonable basis for the issuer to

12  believe that the person who is saying I am an accredited

13  investor is, in fact, that.

14  Q    And is the, quote, "reasonable basis" requirement for

15  establishing the accredited investor status met when offering

16  relies on investors to self-report?

17  A    No.

18  Q    Now, based on the discovery you reviewed in this case, did

19  *OZ3D*, LLC, or GigaPix have a mechanism or procedure in place to

20  independently assess the status of an investor as either an

21  accredited or unaccredited investor?

22  A    No.  I -- I know of no such mechanism or procedure.

23  Q    Now, to meet the requirements of Rule 506 of Regulation D,

24  do all unaccredited investors need to understand the merits and

25  risks of the investment?

1   A     All credited or all unaccredited?  I'm sorry.

2   Q     All unaccredited investors.

3   A     Yes, they do.  They must have such knowledge and

4   experience that -- in financial and business matters that they

5   are able to evaluate the merits and risks of the investment.

6   Q     In your opinion, does engaging in interstate cold-call

7   telemarketing through interstate wires to individuals with whom

8   you have no prior relationship constitute general solicitation?

9   A     Yes, it does.

10  Q     In your opinion, would such conduct eliminate or prohibit

11  taking advantage of the exemption under Rule 506?

12  A     Yes, it would.

13  Q     Is the general solicitation conduct in this case one of

14  the reasons or bases for your opinion that the offer and sale

15  of securities for GigaPix were made in violation of Section 5?

16  A     Yes, it was.

17  Q     Now, from 2006 to 2012, did the general solicitation of

18  investors eliminate the opportunity for GigaPix to take

19  advantage of any exemption to registration?

20  A     Yes, it did.

21  Q     With respect to the general solicitation prohibition under

22  Rule 506, would it be okay for an issuer or individual to

23  cold-call, solicit someone in another state who was accredited?

24  A     I -- it would not be proper.  It would eliminate the

25  exemption.

1    Q    So to the extent that cold-call telemarketing was used to

2    even contact wealthy accredited investors, would that still

3    have not conformed with the exemption under Rule 506?

4    A    Yes.

5    Q    And based on the information that you reviewed, did

6    Defendants Blauvelt and Pritchard qualify for any other

7    exemption to registration under Section 5 of the Securities Act

8    of 1933?

9    A    I know of no such exemption.

10   Q    I'm now going to focus very briefly on the *OZ3D* offering.

11   In this case you also indicated that you formed an opinion that

12   the offer and sale of securities of *OZ3D*, LLC, also violated

13   Section 5; correct?

14   A    Yes, I did.

15   Q    And is the general solicitation conduct in this case one

16   of the reasons or bases for your opinion that the offer and

17   sale of securities for *OZ3D* were made in violation of

18   Section 5?

19   A    Yes, it was.

20   Q    And did you review the Private Offering Memorandum for

21   *OZ3D* in formulating that opinion?

22   A    Yes, I did.

23   Q    And did you also review other materials, subscription

24   agreements in formulating that opinion?

25   A    That's correct.

1    Q    Now, please take a look at, again, Exhibit 58.  And this

2    will be page 50.  Is this the Private Placement Memorandum you

3    reviewed in relation to forming your opinion in this case

4    concerning the offer and sales of securities for *OZ3D*?

5    A    I believe it is, yes.

6    Q    And if you look at page 50, on the first page of this *OZ3D*

7    Private Offering Memorandum, is there also an indication here

8    that the shares of the securities have not been registered

9    under the Securities Act of 1933?

10   A    Yes.  It's in the bold hard caps.

11   Q    And if you look at page 56 of this document, so, 58.56,

12   are these *OZ3D* securities being sold in reliance on the

13   registration exemption requirements of the Securities Act of

14   1933 provided by Regulation D?

15   A    I believe it says that up in the top under the suitable --

16   Q    Is that the same Regulation D that we've just discussed in

17   connection with the GigaPix private offering?

18   A    Yes, it is.

19   Q    And in order to comply with Regulation D for the *OZ3D*

20   private offering, were audited financial statements required to

21   be included in the *OZ3D* PPM for unaccredited investors?

22   A    Yes.

23   Q    And did the *OZ3D* PPM dated May 5th, 2008, that you

24   reviewed contain any audited financial statements?

25   A    No, it did not.

Q    And in your opinion, would the cold-call interstate

telemarketing of investors through telephone lines in

solicitation of investors for *OZ3D* eliminate the exemption or

the eligibility for the exemption under Regulation D that is

referenced in this Private Offering Memorandum?

A    Yes, it did.

Q    And is that the same reasons that you described why there

was no exemption for the GigaPix offerings?

A    Yes, it is.

Q    And if you look at page 6 of this memorandum, there's an

indication it's a 58 -- actually, I'm sorry.  It's the -- the

next page at the top.  Do you remember there being an

indication in this document that the company would offer the

securities to sophisticated persons?

A    I -- I do recall that.  I think it's on page 2.

Q    Oh.  Okay.  And based on your review of documents in this

case, were the *OZ3D* securities offered to unsophisticated and

unaccredited investors?

A    Yes, it was.  The -- the language is right at the bottom

of that page that's now on the screen.  It says, "The company

intends to privately offer the units to selected sophisticated

persons."

Q    Thank you.

     And based on your review of the documents in this case,

were the *OZ3D* securities only offered to investors who had a

1  personal or business relationship with the officers and

2  directors of GigaPix?

3  A     No.

4  Q     And now, the individuals who may have sold these units of

5  *OZ3D*, would they -- in particular, Defendants Blauvelt and

6  Pritchard, would they have qualified for any other exemption to

7  registration of Section 5 of the Securities and Exchange Act of

8  1933 for the *OZ3D* offering?

9  A     I know of no such exemption.

10         MR. MCLAIN:  No further questions for this witness.

11         THE COURT:  Cross-examination, Defendant Pritchard.

12         MR. EMMICK:  Nothing, Your Honor.  Thank you.

13         THE COURT:  Defendant Blauvelt.

14                    **CROSS-EXAMINATION**

15  BY MS. AMES:

16  Q     Good afternoon, sir.

17  A     Good afternoon.

18  Q     And, sir, you are a retired law professor; is that

19  correct?

20  A     That is correct.

21  Q     And you, it appears, have testified many times as an

22  expert in court; correct?

23  A     I -- I have testified a number of times, yes.

24  Q     And all of those times you have testified for the

25  Government; is that accurate?

1    A     No, it's not.

2    Q     Okay.  You have -- in any criminal action, you have never

3    testified for the defense; is that correct?

4    A     Um, I -- I believe that is correct.  I was -- I was

5    retained to testify on behalf of a defendant in a criminal

6    action, but the person pled guilty at the end of the

7    prosecution's case and so I didn't have an opportunity.

8    Q     But you have actually worked on the defense side, then, as

9    well?

10   A     In many cases.  Not in criminal cases but in non-criminal

11   cases.

12   Q     So in civil cases --

13   A     Yes.

14   Q     -- is that correct?

15         And you -- you haven't in criminal cases because you don't

16   have any experience in the criminal aspects of securities laws;

17   is that correct?

18   A     Well, this is a criminal case, and I'm involved in this

19   one.  But I -- I'm not testifying as to that portion of the

20   Securities Act of 1933 that relates to criminal matters.

21   Q     Right.  You're just strictly testifying and giving your

22   opinions as it relates to the civil aspects; correct?

23   A     I'm testifying with respect to the conditions and the

24   requirements of the '33 Act and the exemptions, and that forms

25   the basis possibly for a criminal action where the Government

```
 1    would have to show that there was a willful violation.
 2    Q     And so you -- you're not expressing an opinion as to
 3    willfulness; correct?
 4    A     That is correct.
 5    Q     And you are not licensed to practice law; correct?
 6    A     I was admitted to practice law in New York in 1966 and did
 7    until I moved out of the state, had that privilege as an
 8    admitted lawyer.  But I am not presently admitted to practice
 9    law in any state.
10    Q     And so when were you last admitted to practice law?
11    A     Well, when I left the state of New York to practice -- or
12    not to practice but to teach at Indiana University, which would
13    have been the fall of 1977.
14          MS. AMES:  Thank you, sir.  I have no further
15    questions.
16          MR. MCLAIN:  No further questions from the
17    Government.
18          THE COURT:  All right.  You may step down.
19       Members of the jury, you've heard enough talk so that I'm
20    going to recess until 9:30 tomorrow morning.  I would remind
21    you that you are not to converse with or otherwise communicate
22    among yourselves or anyone about any subject touching upon the
23    merits of the cause on trial and you're not to form or express
24    any opinion on the case until it's finally submitted for your
25    verdict.
```

1          The jury's excused until 9:30 tomorrow morning.  You're

2    excused.  The court will remain in session.

3                    THE COURTROOM DEPUTY:  All rise.

4                    THE COURT:  9:30 tomorrow morning.

5                    (Trial Day 2 concluded at 4:25 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )


        I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.




        DATED THIS 2ND DAY OF NOVEMBER, 2014.



             /S/ MYRA L. PONCE
_____
    MYRA L. PONCE, CSR NO. 11544, RMR, CRR
      FEDERAL OFFICIAL COURT REPORTER