1        UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3       HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,              )
                                           )
6                    Plaintiff,            )
                                           )
7        vs.                               )  Case No. CR 14-282 R
                                           )
8   DAVID PRITCHARD and                    )      TRIAL DAY 3
    CHRISTOPHER JAMES BLAUVELT,            )   (Pages 298 - 510)
9                                          )
                     Defendants.           )
10  _____)

11

12                  REPORTER'S TRANSCRIPT OF
                     TRIAL PROCEEDINGS
13                      TRIAL DAY 3
                 THURSDAY, OCTOBER 16, 2014
14                      9:34 A.M.
                 LOS ANGELES, CALIFORNIA
15

16

17

18

19

20

21

22   _____

23      MYRA L. PONCE, CSR NO. 11544, RPR, RMR, CRR
             FEDERAL OFFICIAL COURT REPORTER
24           312 NORTH SPRING STREET, ROOM 430
             LOS ANGELES, CALIFORNIA 90012
25                  (213) 894-2305

```
 1                    APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFF:

 4        STEPHANIE YONEKURA
          Acting United States Attorney
 5        BY:  ELLYN M. LINDSAY
          BY:  BYRON J. MCLAIN
 6             Assistant United States Attorneys
          United States Courthouse
 7        312 North Spring Street
          Los Angeles, California  90012
 8

 9   FOR THE DEFENDANT DAVID PRITCHARD:

10        LAW OFFICES OF MICHAEL W. EMMICK
          BY:  MICHAEL W. EMMICK
11             Attorney at Law
          3701 Highland Avenue, Suite 305
12        Manhattan Beach, California  90266

13

     FOR THE DEFENDANT CHRISTOPHER JAMES BLAUVELT:
14
          LAW OFFICES OF STEPHANIE AMES
15        BY:  STEPHANIE AMES
               Attorney at Law
16        12100 Wilshire Boulevard, Suite 800
          Los Angeles, California  90025
17

18

19

20

21

22

23

24

25
```

1          **INDEX OF WITNESSES**

2

3      PLAINTIFF'S WITNESSES                                      PAGE

4      WALKER, Shawn

5          Direct Examination by Ms. Lindsay                   303
           Cross-Examination by Ms. Ames                       340
6          Cross-Examination by Mr. Emmick                     348
           Redirect Examination by Ms. Lindsay                 372

7

8
       RYAN, Tiffany
9
           Direct Examination by Ms. Lindsay                   377
10         Cross-Examination by Mr. Emmick                     398
           Cross-Examination by Ms. Ames                       400
11         Redirect Examination by Ms. Lindsay                 402

12

13     PINKERTON, Tonya

14         Direct Examination by Ms. Lindsay                   404
           Cross-Examination by Mr. Emmick                     428
15         Cross-Examination by Ms. Ames                       430
           Redirect Examination by Ms. Lindsay                 442

16

17
       STORER, Adam
18
           Direct Examination by Mr. McLain                    444
19         Cross-Examination by Ms. Ames                       462
           Cross-Examination by Mr. Emmick                     463
20

21
       POTOCEK, Eric
22
           Direct Examination by Ms. Lindsay                   465
23         Cross-Examination by Mr. Emmick                     498
           Redirect Examination by Ms. Lindsay                 507
24

25

1

**INDEX OF EXHIBITS**

2

|  |  | FOR IDENTIFICATION | FOR EVIDENCE |
|---|---|---|---|
| NUMBER | DESCRIPTION | PG. | PG. |
| 150 - | List of bank accounts | 406 | 406 |
| 151 - | Source of Funds Table - GigaPix and *OZ3D* combined | 408 | 409 |
| 152 - | Source of Funds Pie Chart - GigaPix and *OZ3D* combined | 410 | 411 |
| 153 - | Source of Funds Table - GigaPix and *OZ3D* separated | 411 | 412 |
| 154 - | Source of Funds Pie Charts - GigaPix and *OZ3D* separated | 415 | 415 |
| 155 - | Number of investors | 417 | 417 |
| 156 - | Use of Funds Table - GigaPix and *OZ3D* separated | 418 | 418 |
| 157 - | Use of Funds Table - GigaPix and *OZ3D* combined | 421 | 421 |
| 158 - | Use of Funds Pie Charts - GigaPix and *OZ3D* separated | 422 | 423 |
| 159 - | Use of Funds Pie Charts - GigaPix and *OZ3D* combined | 424 | 424 |
| 160 - | Payments to defendants | 425 | 425 |
| 237 - | Excerpts of audio recording of Interview of Chris Blauvelt on 3/12/2012 | 448 | 449 |
| 238 - | Transcript of Excerpts of audio recording of Interview of Chris Blauvelt on 3/12/2012 | 449 | |
| 248 - | Memorandum of Interview of David Pritchard dated 6/5/2014 - redacted | 473 | |
| 249 - | Notes of Interview of David Pritchard dated 6/5/2014 | 473 | |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        LOS ANGELES, CALIFORNIA; THURSDAY, OCTOBER 16, 2014

 2                           9:34 A.M.

 3                            -oOo-

 4        (Out of the presence of the jury.)

 5        THE COURTROOM DEPUTY:  Calling Item No. 1,

 6  CR 14-282 R, United States of America vs. David Pritchard and

 7  Christopher James Blauvelt.

 8        Counsel, please state your appearances.

 9        MS. LINDSAY:  Good morning, Your Honor.

10  Ellyn Lindsay and Byron McLain for the United States.

11        MR. EMMICK:  Good morning.  Mike Emmick appearing

12  for Mr. Pritchard.

13        MS. AMES:  And good morning, Your Honor.

14  Stephanie Ames appearing with Christopher Blauvelt.

15        THE COURT:  All right.  Bring out the jury.

16      We have a witness ready?

17        MS. LINDSAY:  Yes, Your Honor.

18      Your Honor, I think we will rest today.  I think we'll

19  rest.

20        THE COURT:  I beg your pardon?

21        MS. LINDSAY:  I think we'll rest today.  I think the

22  Government will --

23        THE COURT:  Speak into the microphone.

24        MS. LINDSAY:  I was speaking quietly.

25      I think the Government will rest today.
```

1           THE COURT:  All right.

2           (In the presence of the jury.)

3           THE COURTROOM DEPUTY:  All rise.

4           THE COURT:  The record should reflect the jurors are

5      all in their proper places and the defendants are present with

6      their counsel.

7         Call your next witness.

8           MS. LINDSAY:  Shawn Walker.

9           THE COURTROOM DEPUTY:  Please raise your right hand.

10         Do you solemnly swear that the testimony you shall give in

11     the cause now pending before this Court shall be the truth, the

12     whole truth, and nothing but the truth, so help you God?

13           THE WITNESS:  Yes.

14         **SHAWN WALKER, PLAINTIFF'S WITNESS, WAS SWORN**

15           THE COURTROOM DEPUTY:  Okay.  Thank you.  Please

16     take a seat.

17         And please state your full and true name for the record

18     and spell your last name.

19           THE WITNESS:  Shawn Walker.  Walker, W-a-l-k-e-r.

20           MS. LINDSAY:  May I proceed, Your Honor?

21           THE COURT:  Yes.

22           MS. LINDSAY:  Thank you.

23                   **DIRECT EXAMINATION**

24     BY MS. LINDSAY:

25     Q    Mr. Walker, how are you currently employed?

```
 1    A    I currently work for MetLife in Charlotte, North Carolina.
 2    Q    Did you ever work for a company called GigaPix?
 3    A    Yes.
 4    Q    Prior to working with GigaPix, how had you been employed?
 5    A    I was working at a talent agency, specializing in
 6    animation called Natural Talent.
 7    Q    Did you live in Los Angeles at the time?
 8    A    Yes.
 9    Q    In connection with that employment, did you meet
10    Mr. Pritchard?
11    A    Yes, I did.
12    Q    Can you describe how you met him?
13    A    We were assisting Mr. Pritchard on a project called
14    Ben & Izzy.  It was an animated show he was producing.  I
15    helped him produce the voiceover sessions here in Los Angeles.
16    We also provided talent, directors, writers, producers for the
17    show.
18    Q    When was this, approximately?
19    A    This was probably approximately 2004, 2005.
20    Q    Do you see Mr. Pritchard today in the courtroom?
21    A    Yes.
22    Q    Can you please point him out by where he's sitting and
23    what he's wearing?
24    A    Yes.  He's the gentlemen here in the blue tie, gray hair,
25    first one in the row.
```

1          MS. LINDSAY:  Your Honor, may the record reflect

2     that the witness has identified Defendant Pritchard?

3          THE COURT:  He has.  The record will so show.

4          MS. LINDSAY:  Thank you, Your Honor.

5     BY MS. LINDSAY:

6     Q     And did you discuss with Mr. Pritchard what he had been

7     doing prior to going to GigaPix, generally?

8     A     Yes.

9     Q     What kinds of things was he doing?

10    A     At the time he was working on the *Ben & Izzy* animated

11    show, so as a producer.

12    Q     And did he have other projects that he was working on?

13    A     Yes.

14    Q     How did you end up at GigaPix?

15    A     David Pritchard asked me to come join him.  It was a new

16    job for him.  We had a working relationship prior.  He said

17    this was a new venture and he needed somebody to help him, and

18    I was a good candidate for that.

19    Q     What did he tell you was the business of GigaPix?

20    A     At the time it was an animation studio with the idea to

21    produce animated films and shows.

22    Q     And so you and Mr. Pritchard would assist in the

23    production of these shows?

24    A     Correct.  Yes.

25    Q     When you went to GigaPix, were you told how it was funded?

1   A      When I arrived there, I wasn't told directly.  It was

2   something that, you know, just in the course of business I

3   found out.  It wasn't something prior.

4   Q      And how was it funded?

5   A      It was funded through private equity.

6   Q      When you say "private equity," do you mean personal

7   investors?

8   A      Correct.

9   Q      Would you use the term "mom and pop" investors?

10  A      I don't know that I would use that term.  I think it's --

11  my understanding, it's accredited investors that had a certain

12  net worth that were qualified to make investments.

13  Q      And who told you that those were the types of investors

14  coming into the company?

15  A      Well, that was a function of what the investment offering

16  would be.  So there's a Private Placement Memorandum that would

17  be sent to the investors.  And part of the qualifications to

18  get that, you had to be an accredited investor.

19  Q      Were you aware of how long GigaPix had been in existence

20  prior to 2006?

21  A      My understanding was probably three or four years prior to

22  that.

23  Q      Who was running GigaPix prior to the time you and

24  Mr. Pritchard came in?

25  A      Chris Blauvelt.

```
 1   Q     And after you came in, what was his main job at GigaPix?

 2   A     Mainly, the idea was that David Pritchard would produce

 3   the productions, put together the creative development, decide

 4   what sort of projects we would do.  And at the time Chris

 5   Blauvelt was in charge of bringing in the investments for the

 6   company.

 7   Q     Do you see Mr. Blauvelt in court today?

 8   A     Yes.

 9   Q     Can you please point him out by where he's sitting and

10   what he's wearing?

11   A     He's the second man in this row here in the gray suit

12   (indicating).

13         THE COURT:  The record will indicate the witness has

14   identified the defendant Christopher Blauvelt.

15   BY MS. LINDSAY:

16   Q     So when you got to GigaPix, what were you doing

17   essentially on a day-to-day basis?

18   A     On a day-to-day basis, it was a little of everything,

19   helping David and even Chris to some degree sort of organize

20   the business.  There was -- you know, there had been a previous

21   president of the company that had left.  It was really

22   assessing what we could do given what we had at the time, sort

23   of the financial status, given what projects we had available

24   to us.

25         So it was putting together a lot of the business plans for
```

1    what projects we wanted to pursue, you know, organizing

2    creative development, trying to set meetings for different

3    folks to come in and pitch projects.

4    Q     And prior to the time that you and Mr. Pritchard came into

5    the company, was it your understanding that it was these

6    investors that had funded GigaPix?

7    A     Yes.

8    Q     And prior to the time that you and Mr. Pritchard came into

9    GigaPix, what did Mr. Blauvelt tell you GigaPix had done as far

10   as producing content?

11   A     At the time when I arrived at GigaPix, there really wasn't

12   any content that had been produced substantially.

13   Q     So when you and Mr. Pritchard went to GigaPix, was it your

14   plan that the productions that you were going to do would be

15   funded solely by these private investors?

16   A     That was a possibility, but there was also the idea that

17   we would use part of that funding in conjunction with

18   third-party funding.

19   Q     Can you explain that a little bit, how that works?

20   A     Well, in financing, depending on what the project would

21   be, you know, whether it's big or small, you know, if it was,

22   say, a movie, you know, we would have some piece of equity that

23   GigaPix would contribute to the financing structure in

24   conjunction with a variety of pieces, could be tax credits,

25   could be, you know, bank loans, could be other equity investors

 1    from the outside that want to be part of that structure.

 2    Q    So, in other words, you would have GigaPix, which was the

 3    personal investors, and then some other chunk?

 4    A    Correct.

 5    Q    Now, when we say "some other chunk," just to explain that

 6    a little bit more, um, what are tax credits in this context?

 7    A    The context in film financing tax credits in certain

 8    states and jurisdictions, whether internationally, the

 9    United States, they offer basically their incentives to do

10    production there.  So in particular -- and they vary depending

11    on which state you're in.

12         So I'll give you an example.  We were going to do a film

13    in Iowa.  And so in Iowa, the tax credit function there was

14    they would give you up to, say, 50 percent of all your

15    production spent in Iowa back as a tax credit.  You would then

16    take those tax credits and you could monetize those through a

17    third party to actually get cash value for them at some

18    discounted rate.  Then you would turn around, use that cash to

19    actually put into the production of the movie.

20    Q    Can you tell us about bank loans or financial institution

21    loans in the context of these productions?

22    A    Typically, I mean, it varies per production.  There's not

23    really one standard way.  But typically it -- the bank would

24    take pieces of collateral that you would put up, whether it

25    would be the tax credits, it could be equity that you provide

1   in terms of, you know, real cash, it could be letters of

2   credit, it could be a variety of different pieces of

3   collateral.

4        Also, if you had distribution advances where you had

5   agreements with the distribution company that says we'll give

6   you X amount of dollars upon delivery of the film, you could

7   take that and you would put all those pieces together and then

8   the bank would give you one big loan against all of that that

9   you could actually use to produce your movie.

10  Q    Now, talking about distribution agreements, can you

11  explain that?  What is distribution and how is it accomplished

12  and what would it mean to have a distribution -- distribution

13  agreement in hand?

14  A    Well, there's -- it's a variety of ways, but typically you

15  have with a major distributor, say, Warner Brothers or Sony,

16  one of the major Hollywood studios, they would give you an

17  agreement based upon certain terms and conditions, you know,

18  delivery of the film, so to speak.  And for that, they would

19  guarantee you some minimum amount, you know, whether it would

20  be money or some sort of marketing support they would give you

21  based on that.

22  Q    So, for example, you might go to a distributor with your

23  idea for a movie and they would say, yes, we're very interested

24  and we will guarantee you this money to distribute your movie

25  to theaters and everything as soon as -- at least if you

1    deliver it, you could then take that promise and go to a bank

2    and get money for the production?

3    A     It's very conditional.  I mean, I think that's a very

4    summarized version, but there are a lot of terms and conditions

5    that have to be met for that.  There's a lot of scrutiny they

6    put behind it.

7    Q     So each step is questionable along the way?

8    A     Each step requires a lot of work to get done to guarantee

9    that.  I mean, they want a lot of guarantees that things are

10   going to happen before they would make that kind of commitment

11   that they would actually take to a bank.

12   Q     So if you're in discussions with a distributor or a bank,

13   that is not a guarantee that you're actually going to get the

14   financing at the end?

15   A     No.

16   Q     Now, assuming that you have a distribution agreement and

17   you do get a bank loan, in that event, who is generally -- what

18   entity is generally in first place to receive any of the

19   profits of the movie?

20   A     Well, you have to distinguish between profits and the

21   proceeds of the movie.  So if the film gets distributed and

22   generates any kind of revenue, you know, the bank loan has to

23   be paid off first.

24   Q     And who's generally in last place?

25   A     Well, typically the producers of the film sort of take the

1   back seat because they've had to go and ask other parties to

2   help them finance the film.

3   Q    And in this -- in your case, would the producers of the

4   film then be GigaPix and its investors?

5   A    Correct.

6   Q    Now, is it always a gamble as to whether a movie will make

7   any money even if the movie is made?

8   A    I wouldn't characterize it as a gamble, but it's certainly

9   very speculative.  There's so many variables at play as to what

10  the outcome of the film will be, in terms of quality, in terms

11  of the marketplace to actually receive the movie.  If competing

12  movies come out at the same time, the audience may not show up

13  for it.  So it's definitely a speculative business.

14  Q    And in your interactions with Mr. Pritchard and

15  Mr. Blauvelt, did they understand this?

16  A    Yes.

17              MS. LINDSAY:  I would ask if we can pull up

18  Government's Exhibit 55.  I believe it's in evidence.

19              MR. MCLAIN:  It's in evidence.

20  BY MS. LINDSAY:

21  Q    And if we can just see at the top of the page the date in

22  2006 and who signed that letter.  And that's in 2006 and signed

23  by Christopher Blauvelt; is that correct?

24  A    Correct.

25  Q    And if we look at the first paragraph, last sentence, in

1    2006 it said that Mr. Blauvelt represented that we anticipate

2    paying distributions on the work we've completed sometime in

3    the fourth quarter.  So this was in 2006.

4         To your knowledge, was there any work completed in 2006

5    that would pay distributions to investors at that time?

6    A    Not to my knowledge.  I -- I came in just after this.  I

7    came in September of 2006.  But from September forward, there

8    wasn't anything that would have generated any distributions.

9    Q    And if we can look at the second-to-the-last paragraph,

10   and it states that "Since David came on, there are two movie

11   projects slated for production in September."  And this is in

12   2006.

13        What movies were slated to start production in September

14   of 2006?

15   A    To my knowledge, the only movie projects around about that

16   time would have been potentially the *Wizard of Oz* animated

17   film.  Then David was also working on *Captain Abu Raed*, which

18   was an independent film.

19   Q    But were they slated to start production in September of

20   2006, to your knowledge?

21   A    Not to my knowledge, no.

22   Q    So was the statement strictly true?

23   A    I think you would have to define what "slated" would mean,

24   but I think it could be very misleading.

25   Q    Do you think -- is it your opinion working in this

1    business that the way that movies are produced and the stages

2    of production and the way profits are determined, are those

3    difficult and complicated issues that you have to have a fairly

4    specialized knowledge to understand well?

5    A    Yes, particularly in the independent film business because

6    there's not one standard way of raising finances.  There's not

7    one standard way of distributing the film or even producing the

8    film.  So it is a very complex, intricate, lots of moving parts

9    to get these projects done.

10   Q    And was it your understanding that the investors in

11   GigaPix had the necessary sophistication to understand this?

12   A    I would imagine not, being that most of the investors, to

13   my knowledge, were not industry insiders.  They had not worked

14   in this business or industry.  And there's not, in this -- in

15   the independent film business, there's not a lot of sort of

16   public information to -- to research and figure out how these

17   things work.

18   Q    So, then, assuming that the investors are not

19   sophisticated in the entertainment world, is it misleading to

20   say that these movies were slated for production in 2006?

21   A    I would say yes.

22   Q    The sentence goes on to state that "foreign distribution

23   of these films will soon be in place."

24       Now, you had talked about distribution.  Is foreign

25   distribution when distributors in countries outside the

```
 1   United States come in and offer you money once the film is
 2   completed to distribute the movie in their countries?
 3   A     Correct.  They can also -- there are instances too where
 4   they can offer money prior to the film being produced.  That
 5   happens as well.
 6   Q     So to your knowledge, was there foreign distribution soon
 7   to be in place?
 8   A     Not to my knowledge, no.
 9   Q     So this is an untrue statement?
10   A     I think you could say that if there were discussions,
11   there's -- there's certainly a distinction between talking
12   about what could happen and what is actually happening and
13   what's an actual agreement that's in place that you can
14   actually execute and actually use to do something with.  You
15   could certainly have discussions with just about anybody about
16   any project at any time.
17   Q     Well, does this letter say discussions or is it
18   misleading?
19   A     I think it would be misleading to say it will soon be in
20   place.
21   Q     Did you see anything that looked like it was actually
22   going to happen as far as foreign distributions?
23   A     At this point in time in July, I couldn't say what the
24   conversation was.
25   Q     But nothing that you knew of?
```

1   A     Nothing that I knew of coming in September, no.

2   Q     It then goes on to compare GigaPix and the way its films

3   are financed with Pixar and DreamWorks.  In your opinion,

4   working in this business, was it appropriate to put GigaPix in

5   the same category as Pixar or DreamWorks?

6   A     I think it could be very misleading to a non-sophisticated

7   investor to believe that we're on that same level because we

8   were certainly -- even when I arrived in September, they were

9   nowhere close to being considered in the category of Pixar and

10  DreamWorks.

11  Q     Why is that?

12  A     Well, these are companies that had track records of -- of

13  films being produced, generating profits.  They had lots of

14  capital at their disposal.  They had, you know, large staffs of

15  people.  We did not have any of that at the time.

16  Q     What did you have?

17  A     We had -- we had a facility, we had a few employees, we

18  had potential funding, we had a lot of potential projects.  But

19  in terms of, you know, trying to make a comparison of these

20  companies I don't think is a -- is a fair comparison.

21  Q     In 2009, what were you and Mr. Pritchard working on?

22  A     By 2009, we were really trying to get the live-action kids

23  films going and we were also working on developing the *Wizard*

24  *of Oz* animated film.

25  Q     What was the first live-action kids film going to be?

1    A      It was going to be *Blackbeard*.  It's also known as

2    *Field Trip*.

3    Q      And how was *Blackbeard* going to be financed?

4    A      It would be financed independently.  We were going to use

5    a combination of tax credits in the state of Iowa.  There was

6    an equity contribution from GigaPix as a piece.  And there were

7    also third-party financiers that would be involved.  And using

8    all that and working on a bank loan with Bankers Trust in Iowa.

9    Q      Now, when you say equity from GigaPix, you mean the

10   investors?

11   A      Correct.

12   Q      Now, what is a production bond?

13   A      Production bond is you secure -- it's basically a

14   guaranteed completion of a film so that if you have any issues

15   or any problems, it's sort of insurance for the film that will

16   come in and pay and take care of those issues to make sure the

17   film's completed so that the parties who have a -- you know, a

18   stake in the film, whether it would be a distribution company,

19   whether it would be the bank, can be rest assured the film is

20   actually going to get completed.

21   Q      Is it important to have that in place before you start

22   work on the film and sign contracts with people to work on the

23   film?

24   A      In my opinion, it's very essential to have that in place.

25   Q      Did GigaPix have that in place before you started working

1    on *Blackbeard*?

2    A      No.

3    Q      Whose job would it have been to make sure that was done?

4    A      That would have been the executive producer and producer

5    of the film.

6    Q      Would that be Mr. Pritchard?

7    A      That would be David Pritchard, yes.

8    Q      How about the bank loan?  Did you ever have the bank loan

9    in place?

10   A      To my knowledge, I wasn't involved in those transactions.

11   So I couldn't tell you exactly where they -- they were in terms

12   of whether they were in place.  Typically, though, if it -- if

13   you follow the logic, if it was in place and everything was

14   fully financed and you actually had money in the bank to

15   produce the film, you would have the production bond.  If you

16   had the production bond, then you would complete the film.  We

17   did not complete the film.

18   Q      Did something bad happen in Iowa?

19   A      Yes.  The tax credits that we thought we were going to

20   have were revoked.  Basically, the governor put a halt to the

21   program while we were in pre-production.

22   Q      So what happened?

23   A      So there was considerable back-and-forth with the state of

24   Iowa from GigaPix to try to get them to honor the tax credits.

25   We felt at the time if those could be honored, we could keep

1    the financing structure in place and continue -- finish off the

2    financing of the film and get it done.  But without those, most

3    of the parties sort of walked away from the financing for the

4    time being.

5    Q    And did GigaPix get sued?

6    A    Yes.

7    Q    Who did -- who sued GigaPix?

8    A    To my knowledge, there were -- there were certain crew

9    members that were not being paid in Iowa that were working on

10   the film on our behalf.

11   Q    And had the production bond been in place, would they have

12   been paid off and not had to sue GigaPix?

13   A    In a typical scenario, yes.

14   Q    Was Mr. Pritchard hopeful that -- that GigaPix could get

15   money from Iowa and save the situation?

16   A    What do you mean by "get money from Iowa"?

17   Q    Well, was he still trying to get money out of Iowa to pay

18   back the people that had sued and keep the production going?

19   A    At the time there was -- there was definitely an effort

20   to, again, pursue getting the tax credits honored from the

21   state.  And then there was also later down the road an effort

22   to basically make a claim against Iowa saying they created

23   damages, you know, to the production by not honoring the tax

24   credits that they thought were binding.

25   Q    Did Mr. Pritchard say how much money he was hoping to get

1    from Iowa?

2    A     He never told me directly.  I think just before I left

3    GigaPix, there were certainly talks of multi-million dollars

4    that they were hoping to get from the state of Iowa as damages

5    against what had happened to that production.

6    Q     In your experience, was that a reasonable expectation?

7    A     In my opinion, it was not because you're asking for

8    damages of something that never actually happened.  So you're

9    asking for damages for a film that wasn't financed, didn't

10   have -- basically the idea was saying that the state of Iowa,

11   hey, you messed up our film by not giving us the tax credits.

12   We didn't get to make the film so we didn't get to make any

13   money so we want a lot more money than we actually spent in the

14   state of Iowa to come back to us.

15         Now, from my personal opinion, I think that was a stretch

16   because if you're asking for more money than you even actually

17   spent there for a film that never got made, was never

18   distributed, so you have no idea of what money it could have

19   potentially made or it could have tanked at the box office.

20   Q     And also, that didn't have its financing fully in place?

21   A     Correct.

22   Q     And didn't have a production bond?

23   A     Correct.

24   Q     How much did GigaPix put into *Blackbeard* in Iowa?

25   A     I don't have an exact number that I know of.  But my best

```
 1   guess, just based on conversations and, you know, some
 2   financial statements I've seen, probably upwards between 1 and
 3   $2 million.
 4   Q    What did you, in your opinion, think that GigaPix could
 5   maybe potentially hope to get from Iowa?
 6   A    In the context of what they should have given us in terms
 7   of -- the rebate would have been honor the tax credits of the
 8   money we spent.  So if we spent -- for example, we spent a
 9   million dollars and the credits are for 50 percent, then they
10   should give us somewhere around $500,000 in tax credit.
11   Q    Did you share your opinion with Mr. Pritchard?
12   A    Yes.
13   Q    Did you have a nickname at GigaPix?
14   A    Yes.
15   Q    What was it?
16   A    Prince of Darkness.
17   Q    And why is that?
18   A    Well, from what I've heard, from the folks who called me
19   that, it was basically that I seemed to be negative on a lot of
20   issues.
21   Q    So you were, would you say, more sort of the realistic
22   foreteller as opposed to the super hopeful foreteller?
23   A    I think just the way I like to do business, if you have
24   things in place, they're either in place and they're real or
25   they're just talk.  It's not real unless it's there.  If
```

1    there's money in the bank and you can write a check against it

2    and do something with it, that's real.  If it's a discussion,

3    if it's, you know, terms sheets floating back and forth, that's

4    not real.  That's not something that you can actually do

5    business on.

6         So there was a lot of hopeful talk that things could

7    happen.  I would always be the one to say, well, it's not real

8    until it's real.

9    Q    And would you say Mr. Pritchard was more the opposite and

10   more hopeful and depending on the talks and what could happen?

11   A    I don't know that I would classify him as opposite, but I

12   think that he certainly would rely upon discussions more than

13   actual legit agreements in place that were actually executable.

14   Q    Now, what happened with the company when things went wrong

15   in Iowa?  In other words, did you see an effect on the company

16   of GigaPix when the tax credit issue stopped the funding of --

17   or the production of *Blackbeard*?

18   A    The way I would say what happened was if we had spent a

19   lot of the company's working capital towards keeping that

20   production going in Iowa, so the million to $2 million,

21   whatever the exact amount might be, that was coming right out

22   of GigaPix's accounts.  And really, it -- it prevented us then

23   from doing other things with the company.  So it basically

24   drained the money that we had, our working capital to pay

25   salaries, to pay utilities, rent.  All the different expenses

1    of running the business then were suffering because of it.

2    Q     And was money -- was money still coming in from investors

3    and going to patch up some of the holes created by the Iowa

4    disaster?

5    A     To my knowledge, money was still coming in from investors.

6    And there was also -- further along down the way we had a -- a

7    TV production called *Workaholics* that was generating revenue

8    for the company that was coming into the company.  Where that

9    money went, sort of my understanding was a lot of the money

10   went to -- to take care of the Iowa issues with the crew

11   members that were suing them.  And we were being told that is

12   why we weren't getting paid salaries at the time, was that the

13   money needed to go to Iowa.

14   Q     Did you know somebody who gave a loan to GigaPix,

15   personally know somebody who gave a loan to GigaPix to try and

16   get them out of this hole they were in?

17   A     Yes, I did.

18   Q     Who was that?

19   A     David St. Amour.

20   Q     And what was his arrangement supposed to be?

21   A     He did a few loans.  The first one was supposed to be a

22   ten-day note of loaning the company money with the

23   understanding that the financing could close if they had this

24   cash on hand and everything would be fine and he would get his

25   money back within two weeks.

```
 1   Q     Who gave him those promises?
 2   A     It was a combination of David Pritchard, Kip Konwiser,
     Brian Gilmore, David Williams, all the producers on the film.
 3
 4   Q     Did he get his money back?
 5   A     Not fully, no.
 6   Q     Now, is -- what time frame did this occur in, the -- well,
 7   let me ask you this.  When did production stop on Blackbeard,
 8   approximately?
 9   A     I would probably say sometime summer of 2009.
10   Q     Now, at that time, um, or soon thereafter, did you start
11   focusing on the Oz project?
12   A     Yes.
13   Q     Can you tell us a little bit about that project?
14   A     The Oz project was to be -- it was an animated film based
15   on the Wizard of Oz.  We had developed scripts, we had certain
16   directors that we had interviewed, we had development artwork
17   that we had generated.  The idea is we were going to produce
18   this in conjunction with a studio in Toronto and ARC
19   Productions, also with a company called Multimedia
20   Entertainment, which is a Canadian-based company, and that
21   GigaPix would provide a big source of the funding for the film.
22   And they would also be our partners in it and do the actual
23   animation work there in Toronto.
24   Q     To your knowledge, did ARC put up money for the
25   production?
```

A      To my knowledge, they -- I know that they had made a claim

further on against GigaPix for a certain amount of money,

saying that they had spent money internally to work on the

project that they were never reimbursed for.

Q      So, in other words, GigaPix never honored their agreement

to pay?

A      To my understanding, yes.

Q      Were you aware of *Oz* money, money that was supposed to go

to the *Oz* movie being transferred to the main GigaPix accounts?

A      Yes.

Q      How were you aware of that?

A      At the time, that was the only way that the money could

come into GigaPix, was the only investment vehicle for

investors was to invest in the *Oz* offering.  And so, therefore,

any money that GigaPix was spending and had was being

transferred out of that account to theirs to pay for other

expenses.

Q      And were some of those other expenses the people that

needed to be paid off in Iowa?

A      To my understanding, yes.

Q      So after the issue with Iowa, what actual production

efforts was GigaPix making?

A      In general, there was -- there was a lot of activity to

try to keep that production alive, whether it was in Iowa or

whether going to other states to produce to see if that could

1  happen, then also switching over to focus on the animated film

2  for *Oz*.  And then we also had a television department

3  developing television shows.

4  Q    Was GigaPix in financial trouble at this point?

5  A    Yes.

6  Q    And you said that *Oz* money was coming in for the *Oz* movie,

7  was going to GigaPix and partially to pay off the problems in

8  Iowa.  So would you say that the investors' money that was

9  supposed to be going to make the *Oz* movie was actually going to

10  pay GigaPix's debts?

11  A    I think that would be a very correct way to -- to say what

12  happened.

13  Q    Now, switching topics a little bit, did you and

14  Mr. Pritchard ever have discussions about the way that

15  Mr. Blauvelt was raising money for GigaPix and *OZ3D*?

16  A    Yes.

17  Q    Can you tell us about that?

18  A    Well, in general, from -- you know, even prior to *Oz*, in

19  general the idea was to try our best not to raise money the way

20  that Blauvelt was raising money.

21  Q    Why?

22  A    Because it came with a lot of, I think, issues, you know,

23  from -- from securities issues to having to deal with a big

24  group of investors that weren't sophisticated in the industry

25  that would, you know, take away and distract you from trying to

```
 1    produce things and answer questions that you really didn't have
 2    the time to answer.
 3        So in general, the idea was to try to get out of that
 4    function if we could.
 5    Q    And did you and Mr. Pritchard believe that Mr. Blauvelt
 6    and his team of telemarketers were raising the money fully,
 7    honestly, and openly?
 8    A    I think in general there was definitely a sense of trying
 9    to do it right, knowing that, you know, the more that you sort
10    of misled and did things wrong, the more issues you would have.
11    However, there were certainly instances where, you know,
12    particular folks were not being very honest, I think, with
13    investors.
14    Q    And was there a -- an attempt to separate the sales office
15    from the production office?
16    A    Well, there -- both literally and figuratively.  So one,
17    they actually moved the sales office to a different facility to
18    keep them, you know, out of the same building that the
19    production folks were in.  And then, also, really just from a
20    sort of perception in the industry point of view, there wasn't
21    something that when we meet with potential producers,
22    directors, or folks in the business, we really wouldn't explain
23    the details of where our private equity funding was coming
24    from.
25    Q    Was there an understanding that the people raising the
```

 1    money were career telemarketers and making commissions and,

 2    thus, there were issues with that?

 3    A     I think it was a mix.  I think there were certainly folks

 4    that I had met that had no background in the entertainment

 5    business, that their background was in raising equity, you

 6    know, particularly over the telephone.  There were -- there

 7    were certainly people who knew more about the business than

 8    others.

 9    Q     Did you hear about telemarketers making misrepresentations

10    on the phone to investors?

11              MS. AMES:  Object as to hearsay, Your Honor.

12              THE COURT:  Objection overruled.

13              THE WITNESS:  So yes, there were certainly times

14    where, you know, you would hear that somebody said something

15    that was either really untrue or definitely an exaggeration of

16    what things were.

17    BY MS. LINDSAY:

18    Q     And would you complain to Mr. Pritchard and Mr. Blauvelt

19    about that?

20    A     There were certainly discussions with them that these

21    items needed to be addressed.

22    Q     And yet did you keep hearing that there were

23    misrepresentations being made?

24    A     I would say yes.  There certainly wasn't a point where it

25    all stopped, where everybody was -- was completely representing

```
 1    the actual truth.  It was just part of the function of the type
 2    of folks that did this.  If they didn't understand the
 3    business, a lot of times they're trying to explain to investors
 4    how movies work but they don't understand themselves how movies
 5    work.
 6    Q    Did you and Mr. Pritchard discuss -- when you were
 7    discussing trying to get away from funding this way, did you
 8    discuss the lack of sophistication in the movie business of the
 9    investors?
10    A    Yes.
11    Q    Did you see Mr. Pritchard actually speaking to investors?
12    A    Yes.
13    Q    Was that a fairly regular experience?
14    A    I wouldn't say "regular," but it certainly was common
15    enough.
16    Q    Who would generally bring the investors to speak to
17    Mr. Pritchard?
18    A    Typically whoever the -- the person that initiated contact
19    with the investor, they sort of treated them as their clients,
20    so to speak.  And so whoever represented -- you know, over the
21    telephone and brought in the investment, they would sort of
22    curate the clients and bring them in at certain times.
23    Q    And given the lack of sophistication of these investors,
24    when you heard Mr. Pritchard speaking to them, was he
25    completely, fully open and honest about the situation at
```

1    GigaPix?

2    A      No.

3    Q      Did you ever see Mr. Pritchard doing business outside of

4    GigaPix and earning money from that without the money going to

5    GigaPix?

6    A      I never saw that firsthand, no.

7    Q      Did you hear him talk about it?

8    A      Yes.

9    Q      Can you tell us about that?

10   A      Well, specific -- I mean, there was a lot of general items

11   and conversation.  I would say specifically one item was he

12   bragged that he had made in excess of some amount of money that

13   year, which I knew was far beyond his GigaPix salary.

14   Q      Did he ever talk about Mr. Blauvelt being jealous?

15   A      Yes.

16   Q      Can you tell us about that?

17          MS. AMES:  Objection.  Relevance.

18          THE COURT:  The objection is sustained.

19   BY MS. LINDSAY:

20   Q      Okay.  Who was in charge of how money was spent at

21   GigaPix?

22   A      Primarily David Pritchard.

23   Q      And now, if we could look at Government's Exhibit 37.

24   It's in evidence, I believe.

25          MR. MCLAIN:  Yes.

BY MS. LINDSAY:

Q    And if we could just look at the date.  Is that
January 16th, 2009?

A    Yes.

Q    And who signed the letter?

A    David Pritchard.

Q    Now, if we look at the first page at the third paragraph,
so this is 2009, and it says that "In October, we announced the
nearly $60 million in potential funding for a slate of kids
films, which is the culmination of nearly a year of work
piecing together a very creative and well constructed form of
film funding."

    Was there really $60 million in funding that they were
about to get?

A    There wasn't $60 million.  In terms of is there an account
with $60 million in it and you could write checks against that
account?  No.  There was a financing structure that could
potentially provide up to that amount based on certain terms
and conditions.

Q    Did it ever come into play?  Was it ever solid?

A    No.

Q    So this is misleading?

A    I would say it's misleading in that, again, to sort of an
uneducated investor, to say that there's $60 million of
potential funds for a slate of movies certainly could be

1    construed as having $60 million available to you right away.

2    Q    And it never actually came into play either; correct?

3    A    Correct.

4    Q    Looking at the second page at the first paragraph, it says

5    that "We have also successfully managed to secure several

6    orders for pilots and series in our reality television

7    department."  And then later in the paragraph it says that "We

8    believe these shows will help the company generate a stable

9    cash flow from the sale of several shows a year."

10        Was that strictly true?

11   A    If the shows were actually produced, it certainly would

12   have a steady cash flow to the company.  At that time we only

13   had the -- the one order for the pilot for *Workaholics* and we

14   also had a series called *Baker Boys*.  It was a four-part series

15   that they had sold to HD Net and also at the time to

16   The Military Channel.

17   Q    But this was highly speculative?

18   A    Those were closed transactions.  Those actually could

19   generate revenue.  But everything else was definitely, as it's

20   said, in the early stages of negotiations.

21   Q    And as you said, they could generate revenues.  But,

22   again, that's speculative?

23   A    Well, with the *Workaholics* and *Baker Boys*, there were

24   definitely revenues that were to be generated.  That was

25   certain at that point for those two.  But everything else was

1    all speculative.

2    Q    If we could look at Exhibit 40.  I'm sorry.  Let me move

3    on to something else.

4         At the end of 2010, what was the atmosphere like at

5    GigaPix?

6    A    In 2010, you know, we had spent almost a year at that

7    point trying to refinance the live-action movie *Blackbeard*.  We

8    had -- we were doing work on *Oz*, trying to finish up the

9    scripts and development stages of that and get, you know,

10   agreements settled in place with the studio in Canada.  We were

11   also at the time putting together a -- a releasing company, a

12   distribution company ourselves and putting together a Prints

13   and Advertising Fund potentially to help that company.

14   Q    Was the company doing well financially?

15   A    No.

16   Q    Was it falling apart financially?

17   A    My opinion, yes.  I mean, I was not getting paid a salary.

18   There were other folks that worked there that weren't getting a

19   salary.  There were bills unpaid.  There were lots of issues

20   coming to us that dealt with us not being able to make

21   payments.

22   Q    And investor money was going to pay off lawsuits from

23   Iowa?

24   A    I'm sure some of it was, yes.

25   Q    To your knowledge, were investors in the *OZ3D* movie being

```
1    told that their money would be used to pay off lawsuits on

2    another movie from which they had no shares and would not see a

3    profit?

4    A    To my knowledge, no.  They were never told that.

5    Q    Can you tell us about GigaPix Releasing?

6    A    GigaPix Releasing was to be a distribution company that

7    GigaPix controlled.  We were basically -- in that aspect, we

8    would provide services to other production companies that had

9    completed films.

10   Q    And what was supposed to happen with GigaPix's Releasing?

11   A    So with the Releasing company, so we would provide

12   distribution for them through agreements that we were doing

13   with other third parties.  We were also trying to put together

14   a fund, a pool of money, so to speak, to provide those services

15   for marketing and advertising for the films to actually book

16   the films in the theaters on their behalf.

17   Q    And did that ever work out?

18   A    No.

19   Q    Why not?

20   A    We never had the fund put together.

21   Q    In other words, it was speculative and not a done deal?

22   A    Correct.

23   Q    To your knowledge, was it represented as a done deal to

24   investors?

25   A    I couldn't say if it was represented as a done deal
```

```
 1   specifically.  I could certainly say it was representative --
 2   it was in the works or that it was going to happen.  You know,
 3   specifically what stage it was in, I can't speak to what was
 4   being told to any investor.
 5   Q    But if an investor were told that it was going to happen,
 6   would that have been strictly true?
 7   A    I would say no.  And again, if the deal's not done, if the
 8   money's not there, it's not there.  So you can certainly say
 9   that it's in negotiations or it's in the works.  But to say
10   that it's going to happen, I think, is misleading, to say that
11   it will, not that it might.
12   Q    I'd like to show Government's Exhibit 68, which is in
13   evidence.  And can you just show us the date on that and -- is
14   that May 24th, 2011?
15   A    Yes.
16   Q    And then who signed this?
17   A    David Pritchard.
18   Q    Okay.  Now, if we look at the second page of the letter.
19   And it says that a Prints and Advertising Fund with projected
20   assets of a hundred million dollars is nearly complete, did
21   GigaPix ever have such a fund?
22   A    Not a completed fund, no.
23   Q    What is a Prints and Advertising Fund?
24   A    So it's a pool of money that you would use conditionally
25   for completed films.  So they would come to you with their -- a
```

1    different producer or it could be our own films that we had

2    produced at GigaPix, would come and say, okay, I want you to

3    help us distribute the film.  We need anywhere -- you know,

4    let's say, for example, $5 million to release the film and that

5    would pay for advertising in certain markets, that would buy TV

6    commercials, newspaper ads, you know, all the publicity around

7    the film that that money would pay for.  And the money would

8    also pay to actually book the film in theaters.  That's the

9    prints part of it.

10         So in the old days they call it prints because they would

11   literally send the film to the theaters.  There's a shipping

12   cost, transport cost for that.  Now it's all digital, so they

13   still charge a fee by sending a digital file to the theaters

14   and carrying cost.  So to actually put a film in the

15   theaters -- or even if you were going to go straight to home

16   video or to cable, third-party costs.

17         So the fund would provide those funds in sort of a loan

18   capacity to the producers of the film, and then we -- the --

19   whoever controlled the fund would get interest on that money

20   back.  That's how you would make money with the fund.  It would

21   be a premium you would charge to use those funds.

22   Q    Well, looking at the highlighted portion there on the

23   screen where it says that you are nearing completion of a

24   hundred million dollar fund, was that untrue?

25   A    I would say that's very misleading.

1    Q    And can you explain -- well, let me ask you this.  Did you

2    ever actually witness Mr. Pritchard lying about this to people

3    at GigaPix?

4    A    I would just say sort of a very exaggerated

5    misrepresentation of where things were with people that were

6    helping us put together the fund.

7    Q    Can you explain that?

8    A    I'll give you an example.  So I was in a business meeting

9    with Mr. Pritchard in Toronto at a particular company.  We

10   presented our ideas for the fund.  They were very interested.

11   They liked the -- the sort of basic concept behind it.  They

12   liked how it was structured.  They liked what it was.  But

13   they -- it was, again, we're interested, keep in touch, we'll

14   do some follow-up.

15        His representation back to the folks at the office over

16   the telephone, which I was there listening because I was

17   walking right beside him, was that they were highly interested,

18   this should work, they're in, they want to do this.  And so the

19   impression was that -- with these folks, that they were

20   committed.  And he would tell us at the office we're

21   oversubscribed on the fund, meaning we have more commitments

22   than we need to actually equal anywhere from 50 to a hundred

23   million dollars.

24   Q    And that wasn't, in fact, true?

25   A    No.  Because if they're committed and they're willing to

1    do it, then you complete the fund.  You actually make it happen

2    and it's a real item.  It's not just a talk.  It's not a

3    negotiation.  It's not just speculative that they may do it.

4    It's either they will do it or they don't do it.

5    Q    And so in this letter, he's making that same

6    misrepresentation to the investors?

7    A    I would say yes.

8    Q    Did you eventually leave GigaPix?

9    A    Yes, I did.

10   Q    Why did you leave?

11   A    There were several reasons.  Um, one, I wasn't being paid

12   a salary even though money was coming in, money was going

13   elsewhere, which I didn't know where it was going.  But I

14   certainly wasn't getting paid as an employee, so I couldn't

15   sustain that any longer.

16        And two, it got to where any potential prospects we had

17   for business or for funding or to sustain the company I had no

18   faith in whatsoever at that point.  So I knew that there was no

19   chance this was going to work.

20   Q    And why did you have no faith?

21   A    Because of the misrepresentations, because of the

22   continuous telling of -- of employees that things were going to

23   turn around within a certain amount of time and time and time

24   again it didn't happen.  Then also, like my example prior to,

25   where I was now hearing firsthand what he was saying and then

```
 1    witnessing the meeting to understand that it was far removed

 2    from what the truth should be.

 3    Q     And that's Mr. Pritchard?

 4    A     Correct.

 5              MS. LINDSAY:  I have nothing further.  Thank you.

 6              THE COURT:  We'll take a short recess.

 7         I would remind you of your duty not to converse or

 8    otherwise communicate among yourselves or with anyone upon any

 9    subject touching upon the merits of the cause on trial.  You

10    are not to form or express an opinion in the case until it's

11    finally submitted to you for your verdict.

12         The jury is excused until called.  Court will remain in

13    session.

14              THE COURTROOM DEPUTY:  All rise.

15              (Out of the presence of the jury.)

16              THE COURT:  Ten minutes.

17              THE COURTROOM DEPUTY:  This court is in recess.

18              (Break taken.)

19              THE COURT:  Cross-examination, Defendant Blauvelt.

20              THE LAW CLERK:  Judge, should I bring in the jury?

21              THE COURT:  Beg your pardon?

22              THE LAW CLERK:  Judge, should I bring in the jury?

23              (In the presence of the jury.)

24              THE COURT:  The record should reflect the jurors are

25    present and in their proper places.  The defendants are present
```

1    with their counsel.

2         Cross-examination, Defendant Blauvelt.

3                          **CROSS-EXAMINATION**

4    BY MS. AMES:

5    Q    Good morning, sir.

6    A    Hello.

7    Q    Sir, I'd first like to ask you a few questions about a few

8    of the productions that you've discussed.  *Captain Abu Raed*,

9    are you familiar with that production?

10   A    Yes.

11   Q    And that was produced by GigaPix; is that correct?

12   A    GigaPix was a co-producer of the production, yes.

13   Q    So there were -- were there multiple producers on that?

14   A    Yes.

15   Q    And GigaPix was one of them?

16   A    Correct.

17   Q    And when was that movie in production?

18   A    To my knowledge, probably 2008, roughly, '7, '8.

19   Q    Okay.  And that movie was completed; is that correct?

20   A    Correct.

21   Q    And was that movie considered successful, in your opinion?

22   A    Well, you'd have to define what "successful" would be.  So

23   critically, it was very successful.  It was well received in

24   terms of critically liking the movie.  Financially successful,

25   I have no idea.  I don't think it was.

```
 1   Q    Critically successful, did it win a number of awards,
 2   things of that nature?
 3   A    Yes.
 4   Q    And what did it win, to your knowledge?
 5   A    Well, we won the World Cinema Audience Award at the
 6   Sundance, which is quite a big film production.  There were --
 7   to my knowledge, there was probably upwards of 20 different
 8   awards at different festivals it won.
 9   Q    So it was critically successful?
10   A    Correct.
11   Q    In your experience in the industry, is it often the case
12   that a critically successful film may not necessarily become a
13   financially successful film?
14   A    Yes.
15   Q    But oftentimes, it may become a financially successful
16   film; is that correct?
17   A    Correct.
18   Q    Is that part of the speculative aspect of this business?
19   A    Yes.
20   Q    Baker Boys: Behind the Surge was another production of
21   GigaPix; is that right?
22   A    Correct.
23   Q    And tell us about that.
24   A    That was a -- it was a co-production we did with a company
25   out of Switzerland called Point Prod'.  It was a four-part
```

1    series of a journalist vetted with an army group in Iraq, and

2    we -- GigaPix basically provided production funds for it.  We

3    did a lot of the post-production work and were able to sell

4    that to television.

5    Q    And when was that in production with GigaPix?

6    A    Probably sometime in '09 or '10, to my recollection.

7    Q    And was that production considered, in your opinion, a

8    critical success?

9    A    I would say to some degree.  There wasn't as -- as many

10   accolades towards it, you know, obviously because it was a TV

11   production or a documentary series.  But in terms of sort of

12   how it was received, I think it was well received.  I would say

13   yes.

14   Q    Did you know whether it was a financial success?

15   A    No.

16   Q    Is that that it wasn't or did you not know?

17   A    I didn't know.  I would say from my knowledge of what the

18   sales amounts were from the television rights, that they were

19   very small.

20   Q    *Workaholics* was another production of GigaPix?

21   A    Correct.

22   Q    And what was *Workaholics*?

23   A    *Workaholics* is a half-hour sitcom on Comedy Central now

24   that was developed at GigaPix.  And we -- GigaPix provided

25   funding to produce some Web series based on the property.

1    That, in turn, was seen by Comedy Central.  They decided to do

2    a pilot and paid for it, and then it turned into a series for

3    the network.

4    Q    And you say that's still ongoing now, so it's still

5    being --

6    A    Correct.

7    Q    -- shown by Comedy Central?

8    A    Yes.

9    Q    And when did GigaPix begin production of *Workaholics*?

10   A    That probably was in -- we did development work probably

11   in either 2008, 2009.  I think it really got into the pilot

12   network in 2010.

13   Q    You mentioned just in general on direct that there were

14   other projects that, when you started with GigaPix, you were

15   working on.  Can you tell us about a few of those projects?

16   A    There was always a -- a group of items.  I mean, in a

17   production company, you have -- you try to put together a

18   development slate.  So you always have projects in different

19   stages, from simple ideas that we toss around internally to big

20   formal scripts that people are bringing in from the outside

21   that they want to produce with you.

22        There were -- in general, we had a slate of kids films we

23   were trying to produce, *Field Trip* and *Blackbeard* being one of

24   them.  There were four others that we had scripts developed

25   for.  On the TV side there were reality shows that we were

1   producing in-house to try to sell to networks.  There were --

2   going a ways back, there was a project called "Movie Books"

3   that we had where we had the rights to a couple of novels that

4   we were going to turn into sort of a limited series for

5   television.  We had a comic book that we were trying to develop

6   as a feature film.  We produced comics based on that property.

7   Q    And do you do a number of these different slates again

8   because of the speculative nature and you can't really put all

9   of your eggs in one basket or just one production?  Is that an

10  accurate statement?

11  A    That would be accurate, yes.

12  Q    And so during the entire time that you were at GigaPix,

13  you continually observed these slate -- various slates of

14  projects; is that correct?

15  A    Yes.

16  Q    Now, there's also kind of -- I guess I consider it a term

17  of art, "slated for production."  What, in your opinion, would

18  you take that to mean?

19  A    Typically if you said it was "slated for production,"

20  you've done enough work to have them ready for production in

21  terms of you have the script in a pretty decent state to where

22  you can actually make a movie based on the script.  You have a

23  general idea of what the budgets would be, you have a general

24  idea of your production plan of where you would like to shoot

25  the film, what kind of cast you would like, what production

1    personnel you would need for the film.

2         So it's sort of in a planning stage.  You've got those

3    particular projects a little further along than the others that

4    you would say "slated for production."

5    Q    Okay.  So it is kind of an amorphous term or kind of a

6    broad term?

7    A    It's a broad term.  It's -- different places could be

8    different things.  It could be you have a script, you have an

9    idea versus you have a full sort of production plan in place

10   and all you need is the financing.  Or you -- and some people

11   would say that they had the financing for it.  So it's

12   definitely -- has a variable context.

13   Q    And just so I understand and for the jury, so "slated for

14   production" could mean any of those varying things, then; is

15   that right?

16   A    Correct.

17   Q    Now, is -- in the industry, is there a definite

18   distinction between pre-production and production?

19   A    Yes.

20   Q    And what is that distinction?

21   A    Distinction in pre-production is that you have everything

22   ready to -- to go.  So, for example, in a live-action film, you

23   start production when you actually are on the set, have the

24   cameras rolling.  They typically call that first day of

25   principal photography.  So that's when you're on the set, the

1    cameras are rolling, you're actually capturing stuff on film.

2    That's production work.

3         Anything prior to that is considered pre-production.  So

4    development of script, development of cast and planning and

5    different aspects leading up to that point would be considered

6    pre-production.

7    Q    I would like to now direct your attention a little bit on

8    *OZ3D*.  You had mentioned that while you were at GigaPix, that

9    was one of the projects that you were familiar with and working

10   on; is that correct?

11   A    Correct.

12   Q    And you had a script for that; is that correct?

13   A    Yes.

14   Q    And, in fact, it had gone through multiple drafts?

15   A    Correct.

16   Q    What else did you have in place for that animation?

17   A    At the time we had -- we had multiple drafts of the

18   script.  We had development artwork.  We had contracted out to

19   different artists in the animation industry to give us, you

20   know, different ideas of what the film could look like from the

21   visual point of view.

22        At one point in time we had a producer engaged that was

23   going to help us do the film.  We also had a director engaged

24   at one point in time.  And we were also in the process of

25   negotiating and working on a deal with an animation studio in

1    Toronto to actually do the production of the film.

2    Q    And you, as part of GigaPix -- the company had determined

3    it would take 20 million to produce that film; is that correct?

4    A    Correct.

5    Q    But you were only able to get 8 million; correct?

6    A    I'm not sure what the exact number would be that they

7    actually --

8    Q    But to your knowledge, you were never able to get

9    20 million to be able to produce that film?

10   A    Correct.

11   Q    Now, regarding *Blackbeard*, that again was another one of

12   your slated projects at GigaPix?

13   A    Correct.

14   Q    And was that in the production stages?

15   A    That was in the pre-production stages, in my opinion.

16   Q    And some actual work had been done in Iowa; is that

17   correct? -- like --

18   A    Correct.

19   Q    -- creating a scene?

20   A    Right.

21   Q    What can -- please tell us about that.

22   A    So from my knowledge, they were building sets to be used

23   for the production.  They had a location that was an empty

24   shopping mall in Iowa that was going to serve as sort of the

25   sound stage for the movie.  So they had crews working to put

```
 1   together sets for the location.  They had production personnel

 2   working to do the planning and be ready to shoot the film.

 3   Q    And there were some estimations that if that film had been

 4   able to be completed, it could have generated approximately

 5   10 million; is that correct?

 6   A    It's very variable depending -- I mean, given the budget

 7   of the film and the scope of the production and the type of

 8   cast they were looking towards, that's probably a fair amount.

 9   Q    So would -- when you say "fair," is that a conservative

10   estimate or a reasonable estimate?

11   A    I think it's reasonable.  Probably fits a little in the

12   middle.

13            MS. AMES:  Thank you.  No further questions.

14            THE COURT:  Cross-examination, Defendant Pritchard.

15            MR. EMMICK:  Thank you.

16                      CROSS-EXAMINATION

17   BY MR. EMMICK:

18   Q    Good morning.

19   A    How are you?

20   Q    I'd like to ask you questions in a number of different

21   areas.  Why don't we start off, if we could, with your

22   background before you joined up with Mr. Pritchard.

23   A    Okay.

24   Q    All right.  You weren't somebody who had worked in that --

25   an area like GigaPix, were you?
```

```
 1   A     I had.
 2   Q     You hadn't worked for a production, for example, had you?
 3   A     I have.
 4   Q     Okay.  And the production that you worked was not
 5   GigaPix-like production?
 6   A     There were certain differences.  I began my career working
 7   in commercial production --
 8   Q     Uh-huh.
 9   A     -- producing commercials, videos, and we also produced
10   independent film.
11   Q     And one of the things that you were trying to find out is
12   what the goals were that GigaPix had; right?
13   A     What do you mean by "goals"?
14   Q     What the goals of GigaPix were, what they were trying to
15   accomplish in order to -- to make money, in order to make
16   movies.  Were they trying to make animation, were they --
17   A     Okay.
18   Q     You were trying to figure out their goals?
19   A     Correct.
20   Q     All right.  And one of the sources of information for you
21   was Mr. Pritchard himself; right?
22   A     Correct.
23   Q     He had a lot of background in this area, didn't he?
24   A     Yes.  I would say yes.
25   Q     And he knew a lot of things about the entertainment
```

1    industry and about production that you would not necessarily

2    have known; right?

3    A    I would say based -- that he had more experience than I

4    had.  There were certain things that I was certainly learning

5    from him as I worked with him.

6    Q    Absolutely.  And tell us a little bit of that areas of

7    experience that he had that you did not have.

8    A    Well, I mean, you could -- he's certainly been an

9    executive at different companies.  I had not been an executive

10   at different companies.

11   Q    Uh-huh.

12   A    He had produced films that he was credited as the

13   producer, television productions, all sorts of things.

14   Q    Uh-huh.  On a number of occasions; correct?

15   A    Right.

16   Q    And that was over a long period of time?

17   A    Yes.

18   Q    And that included in the United States and elsewhere?

19   A    Correct.

20   Q    Right.  So he had used that -- that breadth of experience

21   in order to help out there at GigaPix; right?

22   A    Yes.

23   Q    All right.  So he brings all of those things -- and you

24   were looking forward to working with him, weren't you?

25   A    I was looking forward to the opportunity to work at a

1    company that had a lot of dynamic issues and projects and

2    opportunities for myself.

3    Q    Right.

4    A    I certainly -- I had a relationship with David Pritchard

5    prior to GigaPix, so there was a sense of it would be nice to

6    work with somebody that I knew.

7    Q    And one of the things that you were looking forward to was

8    that you would learn some of the things that David knew that

9    you did not?

10   A    Correct.  I would say yes.

11   Q    And so let's talk about those for a minute.  What kind of

12   things would David know that you did not?  What kind of things

13   was he more experienced at?

14   A    Well, I mean, you could classify that in a lot of

15   different ways.  So, you know, in terms of, you know, producing

16   films or, you know, raising financing, all the different areas

17   of the company, sure, he certainly had more experience than I

18   did.

19   Q    And those were just the areas -- those are the two areas

20   that you would regard as ways that you could learn from

21   Mr. Pritchard?

22   A    Sure.  Correct.

23   Q    But there were other areas as well?

24   A    In general, when you work in the entertainment business,

25   it's a very dynamic business.  There's a lot of moving parts.

1    There's a lot of different pieces at play.  And to have
2    somebody with his level of experience -- yes, it was certainly
3    a learning experience, both good and bad, what to do and
4    certainly what not to do.
5    Q    And he had more background than you did in those areas?
6    A    That's fair, yes.
7    Q    And he had more information than you did in those areas?
8    A    Considering he's much older and has experience, yes.
9    Q    Okay.  Well, maybe that's -- one's age does give you
10   opportunities to work in different areas; correct?
11   A    Right.
12   Q    And he's a bit older than you, as in he's worked in other
13   areas, more areas than you have; right?
14   A    Correct.
15   Q    And that would even be true at GigaPix, wouldn't it?  At
16   GigaPix itself, he was the president; right?
17   A    Yes.
18   Q    And you were simply in charge of business development;
19   right?
20   A    True.
21   Q    All right.  And so you were going to do what you could in
22   the business development area, but that didn't include looking
23   at all of the same information that he looked at; right?
24   A    That's fair, yes.  There were certainly things that he did
25   that I didn't do.

1    Q    Right.  And he would not necessarily talk to you about

2    every single issue that arose or that faced GigaPix because you

3    had a narrower job; right?

4    A    There -- certainly, there were certain things he did not

5    talk to me about, absolutely.

6    Q    And there were certain documents that he didn't talk with

7    you about?

8    A    There certainly were documents I didn't see, yes.

9    Correct.

10   Q    You mentioned that he started doing films such as

11   *Ben & Izzy* in 2004?

12   A    Correct.

13   Q    All right.  And he did some other films in the period from

14   2004 up to, say, 2007; right?

15   A    It's possible, yes.

16   Q    Okay.  Well, you had mentioned a couple of them yourself

17   and you had mentioned other projects.  So it's more than

18   possible.  It's what he did?

19   A    Well, there was the *Captain Abu Raed* movie.  Outside of

20   that and *Ben & Izzy*, I don't know what other projects he would

21   have had outside of the scope of GigaPix.

22   Q    And part of that was from when he was -- before GigaPix

23   and part of that was worked on when he was at GigaPix; right?

24   A    Yes.

25   Q    All right.  And that was a very successful film, was it

1  not?

2  A    Critically successful, yes.

3  Q    Critically successful film.  And whether a film is

4  critically successful has something to do with how that company

5  is going to do; right?

6  A    Not necessarily.

7  Q    Doesn't have anything to do with it?

8  A    It's no guarantee it's success -- because it's critically

9  successful doesn't mean the company will be successful.

10  Q    And that's why my question was "had something to do with

11  it," wouldn't it?

12  A    It certainly could play a role, yes.

13  Q    Now, have you ever produced a film?

14  A    No.

15  Q    You've never been a producer or a co-producer of a film?

16  A    No.

17  Q    And have you ever financed a film?

18  A    Directly, no.

19  Q    You mentioned that when Mr. Pritchard came to GigaPix,

20  things changed fairly substantially.  Is that a fair statement?

21  A    Yes.

22  Q    All right.  Let's talk about how things changed.  Didn't

23  he come to GigaPix and provide inspiration and direction for

24  GigaPix?

25  A    Yes.

1  Q    Tell us about some of the things that he provided

2  inspiration and direction for.

3  A    Well some of the projects we had, there were -- with

4  the -- for example, the *Wizard of Oz* animated film was

5  something that he had done some work on prior.  It's an idea

6  that he had to do.  So that was something that, bringing that

7  into the company, certainly gave them a substantial project in

8  terms of being excited about it, the potential for it, knowing

9  what it could mean to the company.

10      The slate of kids films that we wanted to produce, very

11  similar in that there was actually a development slate now to

12  actually come into the company for Mr. Pritchard.

13  Q    All right.  So these are, to some extent, advantages that

14  he brought to GigaPix when he arrived and when he worked?

15  A    Correct.

16  Q    And he is working with you part of the time because he is

17  the producer?

18  A    Correct.

19  Q    One of the producers; right?

20  A    Yes.

21  Q    So he's in charge of production; right?

22  A    Yes.

23  Q    And he has occasional discussions with you; right?

24  A    I wouldn't classify it as occasional at the time.  That

25  would imply to me that would mean maybe every once in a while.

1    We had -- certainly in the beginning days, we had very many

2    discussions about what we wanted to do.

3    Q      Uh-huh.

4    A      And it was only near the end that it became occasional.

5    Q      And he also had occasional discussions with people who

6    weren't in business development because he was in charge of all

7    of production?

8    A      Sure.

9    Q      All right.  So it's not like the two of you were co- in

10   charge of business development?

11   A      No.  That's fair.  Of course.

12   Q      Right.  And he actually helped you out in the area of

13   business development.  He gave you suggestions, he gave you

14   ideas, didn't he?

15   A      Of course, yeah.

16   Q      And they were very helpful to you?

17   A      Yes.

18   Q      You mentioned that in some ways all of businesses and

19   perhaps the business of entertainment is always kind of a

20   gamble.  Do you remember saying that?

21   A      Not specifically that way.  But, yes, it's a very

22   speculative business, yes.

23   Q      All right.  It's a very speculative business.  I thought

24   you used the word "gamble" but perhaps not.

25          What I really want to get clear on from you is what you

1    meant by that.  What things could go wrong?  What things could

2    go right?  Things go wrong and it hasn't been anticipated, then

3    it makes things worse than you anticipated.

4            THE COURT:  Are you making a statement or asking

5    questions?

6            MR. EMMICK:  I'm trying to ask a question.

7            THE COURT:  Well, then, ask questions.  Don't make

8    statements.

9    BY MR. EMMICK:

10   Q    It's not the case that you can anticipate all of the

11   problems, is it?

12   A    Correct.

13   Q    And that's, to some extent, why it is speculative to try

14   to figure out whether the company is going to be successful;

15   right?

16   A    Correct.

17   Q    Sometimes companies are even more successful than they

18   anticipated; right?

19   A    Correct.

20   Q    And sometimes things are worse; right?

21   A    Right.

22   Q    Now, you had mentioned -- and I don't mean this to be

23   derogatory.  But you had mentioned that you had a funny

24   nickname.  What was the nickname?  Heart of Darkness?

25   A    Prince of Darkness.

1  Q     Prince of Darkness.  Okay.  My mistake.

2        And Prince of Darkness, what did Prince of Darkness mean?

3  A     It was a nickname given by Colin Mutton, the CFO of the

4  company, and they told me that it meant because I was sort of

5  the negative one in the group, that as, you know, they talked

6  about the potential of things or what could happen or what

7  stages things were in negotiations, I really was the one sort

8  of raising my hand saying, Hey.  Well, is it real or not?  Is

9  it something that's tangible here that we can do something with

10 or is it just talk?  Is it something that just, you know, is

11 going to go away?

12 Q     You were regarded as the more negative of all the people

13 who contributed to these discussions?

14 A     I would say I was regarded as more realistic and the

15 pragmatist of the group, not negative in the sense that I was

16 trying to do something negative to the business.

17 Q     Right.  But Prince of Darkness was not a positive,

18 flattering arm around your shoulders; right?

19 A     I didn't mind the nickname.

20 Q     All right.  And you had an opportunity to announce and

21 express what you agreed and disagreed with at any of these

22 meetings; right?

23 A     Correct.

24 Q     People weren't saying, "Shut up.  We don't care what you

25 think," were they?

```
 1   A     Not literally that way, no.
 2   Q     Right.  And you had plenty of opportunity to speak with
 3   David Pritchard about all of these concerns that you had?
 4   A     I did.  And I certainly did.
 5   Q     Right.  And you had those discussions in part because
 6   Mr. Pritchard was interested in your views.  He would invite
 7   you to say what was on your mind, didn't he?
 8   A     At times, yes.
 9   Q     All right.  He asked you what your thoughts were?
10   A     Correct.
11   Q     And you expressed your thoughts?
12   A     Yes.
13   Q     And he listened to you?
14   A     I think he listened, determining what to do about it.  I
15   can't speak to that.
16   Q     And whether or not he deferred to you in any particular
17   instance, you were not the producer, were you?
18   A     No, I was not.
19   Q     Okay.  You -- you mentioned the name Mutton and I -- I
20   meant to ask you.  Didn't you and Mr. Mutton disagree fairly
21   often?
22   A     I think I had a different work ethic than Mr. Mutton had.
23   Q     Okay.  Meaning what?
24   A     That I wanted things to be real.  I wanted things to work.
25   I wanted things to be tangible and something we can actually
```

1  build a business on.

2  Q    And how is that different from Mr. Mutton?

3  A    I think he came in with just a different attitude.

4  Q    Meaning what?

5  A    Meaning that he was there, he came from a different

6  background, even though he had experience in accounting, you

7  know.  So he -- in some sense he fit the role of being the CFO

8  to some degree and that he had experience in financial

9  accounting and transactions and such.

10 Q    Right.  He had been the CFO for a rock group?

11 A    Sure.  But his -- his idea and notion that, you know, he

12 thought he was going to take over the company at some point, he

13 thought that he knew better than anybody else of what was

14 going -- he just had a general attitude disagreement with him.

15 Q    Didn't you and he have lots of disagreements?

16 A    I wouldn't say "lots of disagreements" because we didn't

17 talk too much.

18 Q    But when you did talk, you had disagreements?

19 A    I'm sure I had disagreements with everybody in the office

20 at some point.

21 Q    But you get my point.  He was one of the people that you

22 did disagree with fairly often?

23 A    On particular topics, yes.

24 Q    What was your role in trying to figure out how to bring

25 more money into Iowa and what to do with any money to be

1    brought into Iowa when the governor pulled away the tax

2    incentive?

3    A     From that point in time, I had sort of minimal exposure to

4    how they were trying to refinance the film in Iowa.

5    Q     And that's because other jobs were jobs that Mr. Pritchard

6    was doing; right?

7    A     Correct.

8    Q     And among the things he was doing, for example, with

9    respect to Iowa was to try to make things work; right?

10   A     Correct.

11   Q     Right.  And so when -- when the Iowa governor yanked that

12   tax incentive -- I think you said it was $500,000 -- was that a

13   surprise?

14   A     It was a surprise, yes, that the -- that the program was

15   suspended.

16   Q     All right.  It was a surprise the program was suspended.

17   The amount was about $500,000?

18   A     Well, the amount would be based on what -- the production

19   spending that GigaPix had spent in Iowa.

20   Q     Right.  But your rough estimate was --

21   A     Well, if you had spent a million dollars, it's roughly

22   50 percent of that.

23   Q     And that's -- yeah.

24   A     So whatever the exact figure was, it's some factor.

25   Q     And it was a lot of money; right?

1    A    Yeah.   It was a significant part of the financing

2    structure, to have those tax credits, yes.

3    Q    And it was a complete surprise; right?

4    A    Yes.

5    Q    And this complete surprise caused all of the other

6    subcontractors to say, "Hey, we still have to be paid"; right?

7    A    They still demanded payment yes because they had provided

8    service.  So, you know, it was not their issue of how we funded

9    the film.  The issue was if we had contracted them to do work

10   that they provided, they needed to be paid for that.

11   Q    All right.  So something had to be done; right?  I mean,

12   did you think GigaPix was just going to hand out the money to

13   them?  Where were they going to get the money?

14   A    Well, part of the issue was GigaPix, I thought, was in a

15   normal position by not having a funded production in the first

16   place, irrespective of what happened with the tax credits.  So

17   surprise or not, if you didn't have the money in the bank to

18   pay the crew and continue going, it wouldn't have mattered what

19   happened with the tax credits.

20   Q    But the expectation at the time was that the tax incentive

21   would be in place?

22   A    Correct.

23   Q    And you were, I think, earlier taking the view that you

24   tried to be a completely strict person in evaluating the

25   likelihood of events; right?

1    A     Try the best you can, yes.

2    Q     I don't mean to suggest otherwise.  But you were sort of

3    on the more strict side; is that fair to say?

4    A     I would say I took a very conservative view with business

5    matters, yes.

6    Q     Right.  And, for example, in connection with Iowa, your

7    conservative view would not have been -- well, this is a deal.

8    Your conservative view would have been what?  Maybe it will be

9    a deal, maybe it wouldn't?  Was your conservative view maybe

10   the governor will yank this?  Can you rely on Iowa, from your

11   perspective?

12              MS. LINDSAY:  Objection.  Compound.

13              THE COURT:  The objection is sustained.  We don't

14   want speeches.  We want questions.

15   BY MR. EMMICK:

16   Q     Was Iowa certain enough for you to rely on it?

17   A     At the time when they were going into production -- and

18   again, as you mentioned, I was not the producer, the executive

19   producer.  So -- but my understanding at the time was that we

20   had agreements from the office that manages those tax credits

21   that those were in place.  They had pre-approved the script and

22   the budget and the plan and said they will honor these credits

23   at this particular point in time.  So that piece of the puzzle

24   at the time going in was certainly there, to rely upon and feel

25   that that was going to happen.

1    And yes, you're correct that you couldn't anticipate the

2    governor was going to suspend the program in some sense.

3    Q    And sometimes those agreements aren't enough because the

4    governor --

5    A    Right, right.

6    Q    -- come and yank it.

7         Now, while he was at GigaPix, Mr. Pritchard was actually

8    working on some other outside deals, wasn't he?

9    A    To my understanding, yes.

10   Q    Okay.  And you knew that because you had chatted with him

11   about these things?

12   A    Right.

13   Q    And that was consistent with his relationship with

14   GigaPix; right?  He's not, like, sneaking around or anything,

15   is he?

16   A    I wouldn't classify it as that.  But yes, there was

17   certainly an understanding that he was free to work on stuff

18   outside the company.

19   Q    All right.  And what were those kinds -- what were the

20   deals that you knew about that he was working on outside of

21   GigaPix?

22   A    I couldn't give you any specifics on those.

23   Q    All right.  In that same way that you couldn't give all

24   the specifics about how he was trying to overcome the Iowa

25   problem?

1    A     I think those are two separate items.

2    Q     They are, but I just need to say --

3    A     One is inside my scope of work and one is outside my scope

4    of work.

5    Q     But he was trying to overcome the Iowa problem.  He was

6    trying to talk with other companies to try to get business for

7    Iowa; right?

8    A     Correct.  Yes.

9    Q     He was trying to talk to a whole range of companies;

10   right?

11   A     Yes.

12   Q     And he was hoping that one or more of these companies

13   would put the money into Iowa so it would work out?

14   A     Yes.

15   Q     Now, the -- we were talking a little bit earlier about the

16   GigaPix Releasing.  Do you remember that?

17   A     Yes.

18   Q     All right.  Now, GigaPix Releasing actually did release

19   movies; right?

20   A     There was -- there was a title called *The Bleeding* that

21   was released on home video by GigaPix Releasing.  Yes.

22   Q     So there were some releases that occurred?

23   A     Yes.

24   Q     And GigaPix Releasing actually hadn't been in place for a

25   particularly long time.  They were a late addition to GigaPix;

1    right?

2    A     Correct.  I would say yes.

3    Q     All right.  But despite the late addition, they actually

4    were doing some of those releases?

5    A     Yes.  There were certainly activity for the releasing

6    company.

7    Q     And *Blackbeard* is one of the -- is the movie that was

8    really out of Iowa; right?

9    A     Correct.

10   Q     And so can you tell us a little bit more about some of

11   these other funding efforts that were going to be helping out

12   the *Blackbeard* production?

13   A     In what regards?

14   Q     What other investors, what other loans, what other sources

15   of funding were examined by Mr. Pritchard in order to make it

16   work?

17   A     Sure.  So there was always activity in that regards,

18   right, to find third-party financiers to come in and help for

19   the production.  It varied, you know, just a litany of folks, I

20   mean, from institutional investors to private high net worth

21   investors, you know, looking, examining back towards the

22   GigaPix investors.  So there -- you know, yes, correct, there

23   was always an effort to try to keep that film alive in terms of

24   getting the funding and putting that together.

25   Q     It's an effort that sometimes works, sometimes doesn't

1   work, sometimes has to be repeated because there needs to be

2   more efforts?

3   A     Yeah.  There were certainly efforts.

4   Q     All right.  And the person in charge of those efforts was

5   largely Mr. Pritchard?

6   A     Correct.

7   Q     Now, one of the time periods that you were focusing on was

8   that Iowa time period because the money got taken away; right?

9   A     Right.

10  Q     And that was in 2000 -- 2008, 2009?

11  A     Mainly 2009 is where it started.

12  Q     All right.  And wasn't it in 2009 that Mr. Pritchard

13  himself agreed to accept less payment under his salary?

14  A     I don't have knowledge of that, so I don't know.

15  Q     So you don't know whether or not he was being paid at all

16  or whether or not he actually gave up '09, '010 salary

17  entirely?

18  A     I don't know.

19  Q     You had mentioned that you had some disagreements with

20  Mr. Mutton.  What sort of disagreements did you have with

21  Mr. Mutton?

22  A     Typically it revolved around who was getting paid and who

23  wasn't.  You know, I wasn't being paid a salary many times but

24  other people in the company were.  So it would be discussions

25  on why do they get paid and I don't.  Where did the money go?

1    Q     And -- I'm sorry.  I didn't mean to interrupt.

2    A     I -- I don't know whether he was being paid or -- or who

3    was being paid what.  I only knew certain employees were being

4    paid and certain ones weren't.  So I certainly had

5    disagreements about how that should work.

6    Q     And part of the reason for the disagreement was it's hard

7    to decide who should be paid and who should not be paid?

8    A     I think that's your classification.  I didn't think it was

9    very hard to decide.

10   Q     All right.  Well, would you have decided that

11   Mr. Pritchard should not be paid?

12   A     I think if you do the work, you should be paid, period.

13   Q     And do you think Mr. Pritchard was doing some work?

14   A     Yes.  And he should be paid based on that logic.

15   Q     And if he agreed not to be paid in order to help out

16   GigaPix --

17              THE COURT:  Counsel, there's no evidence to that.

18              MR. EMMICK:  Yes, but there will be, Your Honor.

19              THE COURT:  In his direct examination.  You've gone

20   way beyond any direct examination.

21   BY MR. EMMICK:

22   Q     Excuse me.  Just a moment.

23         You were asked some questions about Pixar; right?

24   A     Correct.

25   Q     And I think everyone would agree that Pixar is not the

```
 1   same as GigaPix; right?
 2   A     Correct.
 3   Q     That doesn't mean that there's no similarities between
 4   Pixar and GigaPix, does it?
 5   A     No.  I understand the context of could you make a
 6   comparison that GigaPix was like Pixar.  No.
 7   Q     Right.  But there are some respects in which it's similar.
 8   They're not identical, but they have some similar
 9   characteristics; right?
10   A     You could say that because Pixar produces animated movies
11   and GigaPix was trying to produce animated movies.  You could
12   make a connection to that.
13   Q     There were some similarities and there are some things
14   that are not completely the same; right?
15   A     That could be said for anything, yes.
16   Q     Okay.
17   A     I'm not sure where you're going with that.
18   Q     Do you think Mr. Pritchard was trying to get things done?
19   Was his goal to get this accomplished?
20                MS. LINDSAY:  Objection.
21                THE COURT:  Objection is sustained.  That's not a
22   question.
23   BY MR. EMMICK:
24   Q     All right.  Wasn't Mr. Pritchard working 16 hours a day to
25   try to accomplish GigaPix's goals?
```

1  A    I couldn't say.

2  Q    He worked very hard to try to accomplish GigaPix's goals,

3  didn't he?

4  A    I certainly saw Mr. Pritchard work towards the advancement

5  of GigaPix.  To classify whether it was hard work, whether it

6  was a certain number of hours, I think, is very subjective.

7  Q    And he traveled to Toronto in order to try to make

8  arrangements in Toronto for the making of a movie there?

9  A    Yes.  That's correct.

10 Q    And he talked to a lot of different businesses there to

11 make that movie there?

12 A    Yes.

13          THE COURT:  We're beyond the cross-examination of

14 this witness's testimony.  That's what cross-examination is, of

15 the testimony given by the witness.

16 BY MR. EMMICK:

17 Q    You mentioned that you had seen him occasionally on the

18 telephone with investors; right?

19 A    Correct.

20 Q    Do you have a sense of how often you saw him on the phone

21 with an investor?

22 A    I worked there for five years.  I mean, I'm sure it was

23 multiple times.  I've seen him on the phone, I've seen

24 investors in his office in person.

25 Q    You started talking about whether or not the phrase

1    "nearly complete" -- do you remember that phrase?

2    A    Sure.

3    Q    Start on the small pieces.  You remember talking about the

4    phrase "nearly complete"; right?

5    A    Right.

6    Q    And the question was whether that phrase was being used

7    accurately or not.  People can use a phrase like "nearly

8    complete" in different ways, can't they?

9    A    Certainly.

10   Q    Sure.  And some people would say if it's 75 percent done,

11   that would be nearly complete?

12             MS. LINDSAY:  Objection.  Argumentative.

13             THE COURT:  The objection is sustained.

14   BY MR. EMMICK:

15   Q    "Nearly complete" doesn't mean is complete, does it?

16             MS. LINDSAY:  Objection.  Irrelevant.

17             THE COURT:  The objection is sustained.  It's

18   argument, Counsel, not a question of his testimony.

19   BY MR. EMMICK:

20   Q    You had a fair amount of interaction with Mr. Pritchard

21   during the years you were there?

22   A    Yes.

23   Q    You regarded him as smart?

24   A    Yes.

25   Q    You regarded him as organized?

1    A    I would not say organized.

2    Q    All right.  But he had a lot of different projects on his

3    plate?

4    A    Certainly.

5    Q    And he addressed those projects and worked hard at them?

6    A    Again, he put work towards those projects.  I think it's

7    subjective to say whether it's hard work.  That's your

8    definition.

9    Q    And he was persistent in that work.  For example, when

10   Iowa didn't go well, he continued to try to make Iowa work,

11   didn't he?

12   A    Yes.

13            MS. LINDSAY:  Objection asked and answered.

14            THE COURT:  The objection is sustained.  The jury is

15   admonished to disregard that question and the answer.

16            MR. EMMICK:  Just one moment, Your Honor.

17            (Pause in the proceedings.)

18            MR. EMMICK:  Nothing further, Your Honor.

19            THE COURT:  Redirect.

20                    **REDIRECT EXAMINATION**

21   BY MS. LINDSAY:

22   Q   Mr. Walker, you said that you learned from Mr. Pritchard

23   some things to do and some things not to do.  Was one of the

24   things not to do to start a production without funding being in

25   place?

A    I would say yes.  I mean, that experience in Iowa was
certainly a good lesson of seeing how not having these things
locked into place to where you could finish the film will
snowball into a big mess by being sued by the crew members, by
using all the company money up, trying to sustain it.  It just
was -- it was a lesson to don't do that again, don't ever do
that.

Q    So don't do it the way Mr. Pritchard did it?

A    No.

Q    And, um, you said that you did -- you saw him with
investors.  Going back to you being the realist and the
pragmatist and hearing what he said to investors, do you
believe he accurately conveyed the riskiness and speculative
nature of the business to these investors?

A    In the conversations that I heard or were participating
in, there really wasn't discussions about the risk of the
business.  Those discussions really pertain about sort of the
activity that we were doing and what we could do moving
forward.

Q    And you had stated in your direct testimony that you
didn't believe he was fully open and accurate with the
investors.  Can you tell us how that came out?  What would he
say that you didn't believe was fully open and accurate?

A    Well, it was more of an omission in that if you were
getting funds for the *Oz* movie, saying, "Hey, we are in

1    production.  We need the money to continue production," but

2    then if that money is then being diverted to pay for lawsuits

3    out of Iowa, I think that's an admission to an investor to

4    fully disclose to them what the use of their funds are going to

5    be.

6    Q    So he was -- he was not truthful with the investors about

7    the use of their funds?

8    A    I would say yes.

9    Q    And *OZ3D*, was it ever in production?

10   A    I would not say it's in production.  As I sort of

11   explained the difference between pre-production and production,

12   in animation it's a little different because it's not -- you

13   don't have a camera on set shooting film.  So in animation, the

14   pre-production phases are a lot longer in that you're

15   developing artwork, you're developing the scripts, you're doing

16   storyboards, you're putting together what you think will be the

17   film.

18        You're in production when you're doing layout, "layout"

19   meaning they actually lay out the scenes, composite the scenes,

20   doing key frames.  It's a whole different process.  But at no

21   time while I was at GigaPix were we in production on the film.

22   Q    So if we could just show Exhibit 67, the first page.  And

23   just correct me, this is a letter of May 24th, 2011, signed by

24   Mr. Pritchard?

25   A    Correct.

Q      And if we just highlight the portion about *OZ3D* is in
production as of May 24th, 2011.  Was that a false statement?

A      Again, based on my answer, I think it's a very misleading
statement.  That, you know, there certainly was activity that
Starz Animation was doing with us to work on the script, to do
development work, but there wasn't production in the classic
sense.

Q      So in other words, especially to unsophisticated
investors, this was false and misleading?

A      I think it would be misleading.

            MS. LINDSAY:  I have nothing further.

            THE COURT:  Redirect -- or recross?

            MS. AMES:  No, Your Honor.

            MR. EMMICK:  No, Your Honor.

            THE COURT:  All right.  Recross, Pritchard?

      I have just one question and that is:  What did you
learn -- in all the things that you were asked about learning,
what did you learn from either Mr. Blauvelt or from
Mr. Pritchard about financing of their work?

            THE WITNESS:  Well, I would say in the course of
working with those two, particularly with Mr. Pritchard, you
know, I was involved from the very beginning when he started
there in terms of how we were going to finance not only one
particular film but maybe a slate of films.  And there were
other projects from the outside that we were potentially going

1    to be involved in that needed production financing.  So there

2    was a pretty decent amount of exposure, different scenarios,

3    different structures, financing structures.

4         I would work with them to put together, you know,

5    spreadsheets, projections on financing, put together financial

6    models for them.  You know, I have a formal education in

7    film-making and in business.  I got a master's degree in

8    business.  So this is not something completely out of my

9    purview to understand film finances.

10             THE COURT:  Was there a situation in which Mr. --

11   that you knew of that Mr. Blauvelt or -- and/or Mr. Pritchard

12   would train those people who were looking specifically to

13   investors for funding?

14             THE WITNESS:  Sir, are you asking did they train the

15   people --

16             THE COURT:  Yes.

17             THE WITNESS:  -- who were soliciting the

18   investments?

19        I certainly think there were discussions about what

20   projects we were working on, what they would mean to investors'

21   potential.  But in terms of sort of formally educating them on

22   how the film business works, how anything works, there wasn't

23   a -- you know, formal efforts behind that.  No.

24             THE COURT:  All right.  Thank you.  You may step

25   down.

```
1              THE WITNESS:  Thank you.
2              THE COURT:  Call your next witness.
3              MS. LINDSAY:  Tiffany Ryan.
4              THE COURTROOM DEPUTY:  Ms. Ryan, you can step
5   forward this way.  Just walk all the way through.  You can
6   stand right there and then face me.  Please raise your right
7   hand.
8        Do you solemnly swear that the testimony you shall give in
9   the cause now pending before this Court shall be the truth, the
10  whole truth, and nothing but the truth, so help you God?
11             THE WITNESS:  I do.
12      TIFFANY RYAN, PLAINTIFF'S WITNESS, WAS SWORN
13             THE COURTROOM DEPUTY:  Okay.  Thank you.  Please
14  take a seat.
15       And please state your full name and true name for the
16  record and spell your last name.
17             THE WITNESS:  Tiffany Brisken Ryan, R-y-a-n.
18             MS. LINDSAY:  May I proceed, Your Honor?
19             THE COURT:  Yes.
20                    DIRECT EXAMINATION
21  BY MS. LINDSAY:
22  Q    Ms. Ryan, how are you currently employed?
23  A    I'm in nursing school currently.
24  Q    Did you ever work for a company called GigaPix?
25  A    I did.
```

```
 1   Q    Prior to working at GigaPix, how had you been employed

 2   generally?

 3   A    I had been an at-home mom with my high-functioning

 4   autistic son and I had gone to school earlier for operating

 5   room technician.

 6              THE COURT:  Speak up, please.

 7              THE WITNESS:  Okay.

 8   BY MS. LINDSAY:

 9   Q    And how did you come to be employed at GigaPix?

10   A    Cherie Brown brought me into the company.

11   Q    Were you an acquaintance of Ms. Brown's?

12   A    I was.

13   Q    And what did she tell you about the company?

14   A    She told me that they were, um, an independent film

15   company looking to raise money through private investors.

16   Q    What were you -- what did she suggest that your job could

17   be there?

18   A    I had some experience in the past with phone sales and she

19   thought that maybe I could be utilized as what was called an

20   opener.

21   Q    Who interviewed you at GigaPix?

22   A    Robert Jordan.

23   Q    What was his position?

24   A    He was the sales manager at the time.

25   Q    And who was the head of the sales room at GigaPix?
```

```
 1   A      Chris Blauvelt.

 2   Q      Do you see him in court today?

 3   A      I do.

 4   Q      Can you please point him out by where he's sitting and

 5   what he's wearing?

 6   A      He's sitting next to the woman on the end of this table

 7   (indicating) in a gray suit.

 8                 THE COURT:  The record will indicate that the

 9   witness has identified the defendant Christopher Blauvelt.

10   BY MS. LINDSAY:

11   Q      And did you know who was in charge of production at

12   GigaPix?

13   A      I did.

14   Q      And who was that?

15   A      David Pritchard.

16   Q      Do you see him in court today?

17   A      I do.

18   Q      And please point him out by where he's sitting and what

19   he's wearing.

20   A      He's on the end of the table (indicating).

21                 THE COURT:  The record will indicate the witness has

22   identified the defendant David Pritchard.

23   BY MS. LINDSAY:

24   Q      When did you start work at GigaPix?

25   A      June of 2008.
```

```
1    Q    At the time you started at GigaPix, where was the office

2    located?

3    A    Chatsworth.

4    Q    On Oso Avenue?

5    A    Yes.

6    Q    What was your job when you were hired?

7    A    I was an opener.

8    Q    What does that mean?

9    A    I was the person who -- I was handed a list of phone

10   numbers and I called those numbers and tried to gain interest

11   in -- from investors.

12   Q    Were you cold calling people?

13   A    Yes.

14   Q    Did you have a relationship with the people that you

15   called prior to calling them?

16   A    No.

17   Q    To your knowledge, did GigaPix have any prior relationship

18   with the people you called prior to your calling them?

19   A    Not to my knowledge.

20   Q    When you reached someone, can you tell us what you would

21   say?

22   A    Um, it was our job to do some screening to make sure that

23   the people that we were talking to on the phone were people who

24   were investors.  Um, it was our job to drum up interest.

25   Q    So what were you -- were you instructed in what to say?
```

1    A    Yes, we were given pitches.

2    Q    So can you give us an example of what was on the pitches?

3    A    Um, we would introduce ourselves, we'd talk a little bit

4    about the company, we talked a bit about David Pritchard.  He

5    had a lot of credibility.  We talked about the project we had

6    was an animated *Wizard of Oz*.  We talked about the possible

7    amount of money that could be made with children's animation.

8    Q    And so the project that you were selling at the time in

9    2008 was the *Oz* movie?

10   A    Yes.

11   Q    And did you fill out question -- I'm sorry -- fill out

12   forms about the people who were interested?

13   A    We did.  If we felt they were qualified.

14   Q    What kind of things, information did you ask for on these

15   forms?

16   A    Name, number, maybe a second number, address, occupation,

17   if they were married, if -- what kind of investments they liked

18   to make.  We asked them if they were accredited.  I guess

19   that's about it.

20   Q    Who were the closers at the time when you were there?

21   A    There's quite a few of them.

22   Q    Did they include a Greg Pusateri and Cherie Brown?

23   A    Yes.

24   Q    What did Mr. Blauvelt do in connection with the people

25   selling?

```
 1    A     I'm not quite sure.
 2    Q     You're not quite sure of my question or you're not quite
 3    sure of what he did?
 4    A     I'm not quite sure what he did.
 5    Q     So you didn't see him take a lot of control over the sales
 6    room?
 7    A     No.
 8    Q     So what was the job of the closers?
 9    A     To get money.
10    Q     When you were at the Oso office, were you aware of what
11    the closers were saying to potential investors?
12    A     No.
13    Q     Why was that?
14    A     Most of them worked behind closed doors.
15    Q     Did you sometimes ask if you could go in and listen to
16    what the closers were saying so you could learn?
17    A     There was a couple of gentlemen that would let me listen
18    to them.
19    Q     Would Ms. Cherie Brown allow you to listen to her?
20    A     No.
21    Q     How about Mr. Pusateri?
22    A     No.
23    Q     Now, when you first got there, did Mr. Blauvelt come and
24    have a conversation with you about himself?
25    A     Yes, he did.
```

```
 1   Q      Can you tell us about that?
 2   A      Um, I had been there a couple of weeks, had never met him
 3   and I was alone.  As a fronter, we were all kind of in an open
 4   area together.  And he came and sat down at a desk next to mine
 5   and introduced himself and told me he was the founder of the
 6   company and then he told me he was almost a billionaire.  And I
 7   remember thinking it was a really odd conversation.  I asked
 8   him what he was going to do with all the money.
 9   Q      What did he say?
10   A      He -- I think it stumped him a little bit.  He kind of
11   giggled and said he hadn't really thought about it so --
12   Q      Did you talk about how he was able to get Mr. Pritchard to
13   work with him?
14   A      Later on.
15   Q      In that conversation, what did he say about getting
16   Mr. Pritchard to come work with him?
17   A      He said he was shocked.
18   Q      And why was that?
19   A      He said something to the effect of, like, "I can't believe
20   that we have Pritchard" and "I can't believe we're an actual
21   studio now."
22          And I was, like -- I didn't really understand.  And I
23   said, "In compared to what?"
24          And he said, "In compared to how we started."
25          So that made me think that they didn't start off on the
```

1    up-and-up.

2    Q    Did he say anything about how he usually comes through any

3    kind of trouble?

4    A    Smelling like a rose.

5    Q    Now, you started in the Oso Avenue location.  Did your

6    office eventually move locations?

7    A    We did.

8    Q    Where did you move to?

9    A    We moved on to Lankershim Boulevard.

10   Q    About how -- how long after you started working there did

11   you move?

12   A    I'd say within six months.

13   Q    So this would be late 2008?

14   A    Yes.

15   Q    After the move, did you change jobs from being a fronter

16   at GigaPix?

17   A    I did.  Pretty close afterwards.

18   Q    What did you do after that?

19   A    I was made assistant sales manager.  They brought in a new

20   sales manager.  I don't know what happened with Robert Jordan,

21   if he quit or if he had been terminated.

22   Q    So what was your job now as the assistant sales manager?

23   A    Um, the new sales manager's name was Ken Gross.  And I

24   just kind of helped him, typing stuff up or adding stuff into

25   the computer, whatever needed to be done.

1    Q     Now, when you were at that separate location, did

2    Mr. Pritchard come and talk to the closers in the sales room?

3    A     Occasionally.

4    Q     And did you know what he was saying to the people in the

5    sales room?

6    A     Yeah.

7    Q     How did you know that?

8    A     I was there.

9    Q     What kinds of things would he say?

10   A     Um, he would give updates on to -- as to what was going on

11   with whatever various projects were happening.  Or if it wasn't

12   about *Oz*, maybe we were getting ready to offer some stock or we

13   were going into a 10-for-1 reverse split and so people needed

14   to be educated about that in case clients were calling in to

15   talk to their -- to their reps, just stuff like that.

16   Q     Did he ever say at any of those meetings that the company

17   was in bad shape financially?

18   A     No.

19   Q     Did he ever give negative news?

20   A     No.  Those meetings were essentially to raise morale in --

21   to raise the morale of the salesmen so that they could go out

22   and make more money for the company.

23   Q     So it was all these are the positive things that you can

24   say in order to sell this investment?

25   A     Yes.  Sometimes there was a caveat.

1    Q     Such as what?

2    A     Sometimes he would share something and say this is not to

3    be used.

4    Q     What would an example of that be?

5    A     Oh, maybe when we were getting ready to go into the

6    10-for-1 reverse split, maybe, you know, don't talk about this

7    until it actually happens type of thing, you know.

8    Q     But that was rare?

9    A     I'd say he'd say it once per meeting, depending on what he

10   just said.  The company was in a constant state of flux.  There

11   was always something going on.

12   Q     Something good to tell the investors?

13   A     Yes.

14   Q     But according to Mr. Pritchard in the sales meetings,

15   never anything bad?

16   A     No.

17   Q     Did you see the Oso Avenue studio being fully occupied by

18   GigaPix business?  Was the -- was the -- the big studio area,

19   was it in constant use and production going on?

20   A     No.

21   Q     What was happening there?

22   A     Sales.

23   Q     And --

24   A     Sales.

25   Q     Okay.  Thank you.

1      How much money did you earn as a -- as an opener?

2  A    I think I earned $10 an hour.  So 400 a week.

3  Q    Did you get a commission?

4  A    I would.

5  Q    And when would you get a commission?

6  A    If I called somebody who was interested and I filled out

7  my -- my questionnaire and handed it off to a closer and the

8  closer sold a portion of the *Oz* movie to that investor, I would

9  get a commission off of that.

10 Q    Were you aware of how much money the closers made?

11 A    Yes.

12 Q    How much did they make?

13 A    If they closed something on their own, it was 20 percent.

14 If they closed something that a fronter had initially gotten

15 them, the closer got 15 and the fronter got the other 5.

16 Q    To your knowledge, were any of the salespeople paid in

17 stock in the company so that his or her success would be like

18 that of the investors who invested?

19 A    No.

20 Q    So would it have been a lie if one of the salespeople told

21 an investor that that was how they were compensated?

22 A    Completely compensated by stock?  Yes, that would be a

23 lie.

24 Q    Would it have been a lie for anyone to tell investors that

25 the investment carried little risk?

1  A     That would have been a huge lie.

2  Q     Were you aware of any time GigaPix or *OZ3D* investors

3  received money from the company?

4  A     Not while I was there, no.

5  Q     Would it have been true at any time you were at GigaPix if

6  anyone told potential investors that within six months to a

7  year of their investment, the investor would receive a return?

8  A     That would have been a lie.

9  Q     Would it have been true if anyone told an investor that

10 *OZ3D* was in production?

11 A     That would have been a lie.

12 Q     Would it have been true if anyone told an investor that

13 *OZ3D* would soon come out in theaters?

14 A     That would have been another huge lie.

15 Q     To your knowledge, was there ever a threat that the

16 investments would be full and closed and not accepting money

17 from investors?

18 A     Not *Oz*.  There was a -- I think we did a stock offering

19 that was for a limited amount of time.  Um, that was supposed

20 to have a time limit on it.  I'm not sure if the company would

21 have turned down money, though.

22 Q     So you never saw the company turn down money?

23 A     I never saw the company turn down money.

24 Q     So would it have been false for a salesperson to tell a

25 potential investor that the investment was almost full?

1   A     Yes.

2   Q     Now, you said that at the Oso Avenue office, the closers

3   were behind closed doors.  Did anything change in the sales

4   room when Mr. Ken Gross was hired as the sales manager?

5   A     He was hired around the time the sales crew moved to

6   Lankershim.  Um, it was a three-story building.  The top floor

7   had two offices for Chris and David.  The second floor was kind

8   of an open -- it was open seating and that's where the bulk of

9   us were.  And then downstairs the first floor had some offices.

10  Ken wanted to bring everybody up to the second floor.

11  Q     Why?

12  A     He wanted to hear what people were saying.  He was just --

13  he had just been brought on as the sales manager and he didn't

14  know any of the closers, per se.  Or not all of them, I should

15  say.  And so he wasn't sure what people were saying.

16  Q     Was he worried that people were --

17  A     Oh, yeah.

18  Q     -- closers were misrepresenting things?

19  A     Sure.

20  Q     And that's why he wanted them in the open where he could

21  hear?

22  A     Yes.

23  Q     Was he able to get agreement from all the closers that

24  they would move into this open area?

25  A     No.

```
1    Q    Who would not move?

2    A    Cherie Brown, Greg Pusateri, I think those were the only

3    two that dug their heels in.

4    Q    And did Mr. Gross go to Mr. Blauvelt and explain that he

5    wanted to be able to listen to these people to make sure they

6    weren't misrepresenting and they would not agree to that?

7    A    Right.

8    Q    And what did Mr. Blauvelt do?

9    A    He overrode Ken.

10   Q    So he allowed them to continue to operate behind closed

11   doors?

12   A    Yes.

13   Q    And that was despite Ken Gross's worry that they were

14   misrepresenting to investors?

15   A    Yes.

16   Q    Was there a relationship between Mr. Pusateri and

17   Mr. Blauvelt?

18   A    Yes.

19            MS. AMES:  Objection.  Relevance.

20            THE COURT:  The objection is overruled.

21   BY MS. LINDSAY:

22   Q    What was that relationship?

23   A    They were friends outside of work.  I think they lived

24   close to each other.

25   Q    So they had a close personal relationship?
```

1    A    Yes.

2    Q    And, um, was there a closer named Hines?

3    A    Yes.

4    Q    And did he -- was he also suspected of misrepresenting to

5    investors?

6    A    Yes.

7    Q    Did Mr. Gross attempt to bring him out in the open where

8    he could be heard?

9    A    He did, and he got that accomplished.

10   Q    He did.

11        And what happened when Mr. Hines got out in the open?

12   A    Not a thing.  He refused to work.

13   Q    So he stopped selling where he could be heard?

14   A    He absolutely made no phone calls.

15   Q    And what happened then?

16   A    He took his client list and brought them to Cherie Brown.

17   Q    And what happened from there?

18   A    I'm not sure.  They were behind closed doors.

19   Q    Do you know whether he got a portion of the clients that

20   she sold behind closed doors of his?

21   A    I'm assuming they had a deal as far as commissions went.

22   I don't think she would work for free.

23   Q    What was the relationship between Mr. Pritchard and

24   Ms. Brown?

25   A    An unusual one.

```
 1   Q     And can you explain that?

 2   A     Um, you know, Pritchard was the boss.  I mean, he was

 3   the -- the VP of the company and she just kind of did what she

 4   wanted.  She'd walk into his office -- barge into his office, I

 5   should say, didn't matter what he was doing, what was going on.

 6   I always thought that was really bizarre.

 7   Q     Did Ken Gross attempt to fire Cherie Brown?

 8   A     Yeah.

 9   Q     And when was that?

10   A     Probably the first part of '09.  Within the first two

11   quarters of 2009.

12   Q     Was he able to do that?

13   A     No.

14   Q     Who stood in the way of Ken Gross firing Cherie Brown?

15   A     All the higher-ups.

16   Q     Did that include Mr. Blauvelt?

17   A     Yes.

18   Q     And Mr. Pritchard?

19   A     Yes.

20   Q     Why wouldn't they allow her to be fired?

21   A     Because she was the top salesman.

22   Q     And she was bringing in too much money?

23   A     Yes.

24   Q     Regardless of how she brought it in?

25   A     Regardless of how she treated her fellow coworkers.
```

1   Q     Did you ever attempt to become a closer?

2   A     I did.

3   Q     How did that go?

4   A     Not very well.

5   Q     So when you were a closer, did you discuss risk with your

6   investors?

7   A     I did.

8   Q     Did you ever guarantee a return?

9   A     No.

10  Q     Did you go through the paperwork with them carefully?

11  A     I had one sale as a closer, and I did.

12  Q     And so when -- when you were discussing the potential for

13  returns, did you say they were speculative?

14  A     I did.

15  Q     Did you promise anything?

16  A     No.

17  Q     And did you say when, say, *OZ3D* would come out?

18  A     No.

19  Q     And you were only able to make one sale?

20  A     Yes.

21  Q     And how long did you try to be a closer?

22  A     Six weeks.

23  Q     One sale in six weeks?

24  A     Yeah.

25  Q     Was the fact that GigaPix had regulatory problems

1    discussed in the sales office?

2    A    Amongst the salespeople?

3    Q    Yeah.

4    A    Yes.

5    Q    Was that downplayed to investors, however?

6    A    Yes.

7    Q    Eventually did GigaPix run out of money?

8    A    Yes.

9    Q    And how did that become clear?

10   A    Um, the whole tone of the place changed.  You know, we --

11   we moved.  We were separated from the studio, but I lived in

12   Chatsworth and I picked up payroll every Thursday.  And so it

13   kind of went from this kind of busy kind of hive to quiet.  And

14   you could tell something was going on and not anything good.

15   Q    And also, were people going without getting paid?

16   A    Yes.

17   Q    Were you aware of Colin Mutton providing money to the

18   company to keep it going?

19   A    I was.

20   Q    And he never got repaid for that?

21   A    No.

22   Q    And were the salespeople aware of how poorly things were

23   going?

24   A    I think so.  I think so.

25   Q    Did you ever hear any salesperson tell the investors how

1    poorly things were going at GigaPix?

2    A    Never.

3    Q    What is Survey Says?

4    A    Survey Says was a company that Chris Blauvelt started.

5    All of the salespeople had pretty much disappeared.  The

6    company was on its back with its legs in the air, so to speak.

7    And I think it was a way for him to try to bring some money

8    into the company.

9    Q    And so what was he doing?

10   A    He was trying to create leads of investors to sell to

11   another -- a different telemarketing company.

12   Q    So, in other words, he was having the fronters call people

13   to gauge their interest, and this was simply to sell the leads

14   to another company?

15   A    Right.

16   Q    Meanwhile, were there any salesmen still trying to bring

17   money back into the company?

18   A    No, not at the Lankershim location, but Cherie Brown was

19   still at the studios.

20   Q    So Cherie Brown at this time was still soliciting

21   investors to invest and GigaPix was accepting the investors'

22   money?

23   A    Yes.

24          THE COURT:  That's a statement, counsel, not --

25          MS. LINDSAY:  Sorry, Your Honor.

BY MS. LINDSAY:

Q    During your time at GigaPix, did you see Mr. Blauvelt using GigaPix's money in a way that was contrary to what the investors were told?

A    Yes.

Q    Can you explain that, please?

A    He had a mistress living at the Lankershim office.

        MS. AMES:  I'm going to object to relevance Your Honor.

        THE COURT:  The objection is overruled.

        THE WITNESS:  He had a mistress living at the Lankershim office.  She was getting paid a salary as a fronter. She stayed on the third floor with him.  I think she did a little bit of telephone work, but I don't really think she earned that money.

BY MS. LINDSAY:

Q    When did you leave GigaPix?

A    June of 2011.

Q    Were you actually let go?

A    I was.

Q    Why?

A    They -- they didn't have the money for me.  They didn't need me.

Q    Because nothing was going on?

A    Yeah.

```
 1  Q    And this is -- this is July of 2011?

 2  A    June.

 3  Q    Sorry.  June.

 4       So when did -- in your mind, when did things start to go

 5  badly for GigaPix?

 6  A    I think things started to go badly when the economy

 7  crashed.

 8  Q    In 2008?

 9  A    In 2008.

10  Q    And then --

11  A    I think that changed the -- that changed the whole

12  financial sphere of movies.

13  Q    And then the Iowa disaster in 2010?

14  A    Yeah.  That didn't help.

15  Q    Was that kind of the downfall?

16  A    I think so.  In hindsight, yes.

17  Q    To your knowledge, were the investors ever told how badly

18  things were going at GigaPix?

19  A    No.

20            MS. LINDSAY:  Thank you.  I have nothing further.

21            THE COURT:  All right.  We'll take our noon recess

22  at this time.

23       I would remind you of your duty not to converse or

24  otherwise communicate among yourselves or with anyone upon any

25  subject touching the merits of the cause on trial.  And you're
```

 1   the not to form or express an opinion on the case until it's

 2   finally submitted for your verdict.

 3        Jury's excused until 1:00 o'clock.  Jury's excused.  Court

 4   will remain in session.

 5              THE COURTROOM DEPUTY:  All rise.

 6              (Out of the presence of the jury.)

 7              THE COURT:  1:00 o'clock.

 8              THE COURTROOM DEPUTY:  This court is in recess.

 9              (Noon recess was taken.)

10              THE COURT:  Bring down the jury.

11              (In the presence of the jury.)

12              THE COURT:  The record should reflect the defendants

13   are present.  The defendants are present with their counsel.

14   Jurors are present in their proper places.

15        Cross-examination, Defendant Pritchard.

16              MS. AMES:  I'm sorry, Your Honor.  I didn't hear

17   which of the defendants you would like to proceed.

18              THE COURT:  It's Defendant Pritchard.

19                        **CROSS-EXAMINATION**

20   BY MR. EMMICK:

21   Q    Afternoon, ma'am.  I just wanted to ask a couple of

22   questions about one particular answer that you provided.

23        The one thing you were talking about is that Mr. Pritchard

24   came and talked to the salesmen roughly once a month or once

25   occasionally, whatever it would be; is that right?

1    A      Right.

2    Q      All right.  And one of the things you said was that

3    approximately once every time he talked, he had kind of a

4    cautionary remark.  He said some things, here's the future.

5    Can you give some examples of that or spell out what that

6    meant?

7    A      I can't remember any specific things that he would say.

8    Q      Uh-huh.

9    A      But, you know, that he would give information and maybe it

10   would be kind of some forward-thinking information, this is

11   what we're trying to do, this is what we're trying to do to

12   make that happen.

13   Q      Uh-huh.

14   A      And then he would say, "But I don't want" -- "But don't

15   use that.  Don't share that.  That's for you guys."

16   Q      Don't share --

17   A      Don't share that with investors.

18   Q      Don't share that with investors?

19   A      Uh-huh.  Right.

20   Q      Okay.  And I think you estimated that just about once or

21   so every time he talked to the salespeople, he'd give that sort

22   of cautionary prediction, here are things that we're planning

23   but don't know if it's going to happen, so don't say it?

24   A      Correct.

25   Q      All right.  That's all I wanted to touch on.  Thank you.

1          THE COURT:  Defendant Blauvelt.

2                    **CROSS-EXAMINATION**

3  BY MS. AMES:

4  Q    Good afternoon, Ms. Ryan.

5  A    Hi.

6  Q    When you joined GigaPix, Mr. Blauvelt was, in fact, the

7  CEO of the company; is that correct?

8  A    Yes.

9  Q    And Mr. Ken Gross was the manager of the sales division;

10  correct?

11  A    Not when I first started.

12  Q    But shortly thereafter, he became the manager of the sales

13  division?

14  A    Six months later.

15  Q    Okay.  And part of your job as an opener there, you

16  mentioned, was to screen potential investors; is that correct?

17  A    Correct.

18  Q    And in part of that screening, you were looking to see

19  what their prior investment history was?

20  A    Correct.

21  Q    And, in fact, you were looking for accredited investors;

22  is that correct?

23  A    Correct.

24  Q    Now, you -- you talked about an incident, a conversation

25  you had with Mr. Blauvelt -- Blauvelt, excuse me, regarding

```
 1   Mr. Pritchard.  And you had your own interpretation of that

 2   discussion.  But you were aware of Mr. Pritchard and his

 3   history prior to joining GigaPix -- correct? -- his work

 4   history?

 5   A     Prior to my joining GigaPix?

 6   Q     Yes.

 7   A     No.

 8   Q     You were aware that he had been the head of Film Roman?

 9   A     I was made aware of that when I joined GigaPix.

10   Q     So you were aware that he had been involved with TV shows

11   of success like The Simpsons?

12   A     Correct.

13   Q     And King of the Hill?

14   A     Correct.

15   Q     And -- and The Family Guy?

16   A     Correct.

17   Q     And so all these things are a big deal in the television

18   and movie industry; correct?

19   A     Correct.

20   Q     And so a person would be reasonably surprised or excited

21   to have them on their team; correct?

22   A     Correct.

23   Q     Now, you also mentioned a woman.  Which floor did she work

24   on?

25   A     She -- she was on the third floor.
```

1    Q     And which floor were you on?

2    A     Number 2.

3    Q     So you had no personal observations as to what work she

4    did or didn't do when you were there; correct?

5    A     Whenever I happened to go up to the third floor.

6    Q     But you -- you were working on the second floor; correct?

7    A     I was, and I was also in charge of sending out any

8    packages that were deemed qualified to be sent out.  And so

9    based on the number of packages that I was sending out and who

10   was sending them, I can figure out who's doing their work and

11   who wasn't.  Does that make sense?

12   Q     You were working on the second floor and she was working

13   on the third floor; correct?

14   A     Correct.

15            MS. AMES:  No further questions.

16            THE COURT:  Redirect?

17                     **REDIRECT EXAMINATION**

18   BY MS. LINDSAY:

19   Q     Can you tell us some of the things that Mr. Pritchard

20   wanted the salespeople to tell investors?

21   A     I don't know if anything that he told us was supposed to

22   have been used.

23   Q     Well, what was the purpose of him coming to the sales

24   meetings, then?

25   A     In my opinion, the purpose was to increase morale.

```
1   Q    And morale was down?

2   A    Yes.

3   Q    And was it Mr. Pritchard's position to turn that around

4   and say things were great with GigaPix?

5   A    I don't know if the words "things are great" were used,

6   but maybe there was some information that would allude to

7   things doing okay.

8   Q    Getting better?

9   A    Sure.  We have a lot of pots on the fire type of, you

10  know, meetings.

11  Q    As opposed to the company falling --

12  A    As opposed to we have nothing on the fire.

13  Q    And the company's falling apart financially?

14  A    Right.

15           MS. LINDSAY:  Thank you.  I have nothing else.

16           THE COURT:  All right.  You may step down.

17       Call your next witness.

18           MS. LINDSAY:  Tonya Pinkerton.

19           THE COURTROOM DEPUTY:  Please raise your right hand.

20       Do you solemnly swear that the testimony you shall give in

21  the cause now pending before this Court shall be the truth, the

22  whole truth, and nothing but the truth, so help you God?

23           THE WITNESS:  Yes, I do.

24       TONYA PINKERTON, PLAINTIFF'S WITNESS, WAS SWORN

25           THE COURTROOM DEPUTY:  Okay.  Thank you.  Please
```

1    take a seat.

2          And state your full and true name for the record and spell

3    your last name.

4                THE WITNESS:  Tonya Pinkerton, T- -- my name is

5    spelled T-o-n-y-a.  Pinkerton is P-i-n-k-e-r-t-o-n.

6                MS. LINDSAY:  May I proceed, Your Honor?

7                THE COURT:  Yes.

8                        **DIRECT EXAMINATION**

9    BY MS. LINDSAY:

10   Q    And, Ms. Pinkerton, you may want to pull the mike close

11   because you have a --

12   A    Okay.

13   Q    -- quiet voice.

14        How are you currently employed?

15   A    I'm a forensic accountant with the Federal Bureau of

16   Investigation.

17   Q    How long have you been so employed?

18   A    About four and a half years.

19   Q    How were you employed prior to that?

20   A    Prior to that, I was an auditor at a public accounting

21   firm.

22   Q    For how long did you do that?

23   A    About two and a half years.

24   Q    What did you do prior to that?

25   A    Prior to that, I worked in a small company doing general

1    accounting and bookkeeping work.

2    Q     And prior to that?

3    A     Prior to that, I was in the United States Air Force.

4    Q     What training did you receive prior to your employment

5    with the FBI in the area of accounting?

6    A     I obtained my bachelor's degree in business administration

7    with emphasis in accounting.  And I worked at the CPA firm

8    under an accountant in order to obtain my CPA license.

9    Q     Did you obtain your CPA?

10   A     Yes.

11   Q     What does that stand for?

12   A     Certified public accountant.

13   Q     Now, when you went to the FBI, did you receive specialized

14   training there?

15   A     I did.  I attended a six-week training course for forensic

16   accounting at Quantico, Virginia.

17   Q     And can you tell us what forensic accounting is?

18   A     Yes.  In forensic accounting, we use accounting skills and

19   investigative skills to review financial information and

20   prepare an analysis that's suitable for court.

21   Q     In the course of your employment, did you perform a

22   forensic accounting for GigaPix, *OZ3D*, and related entities?

23   A     Yes.

24   Q     In connection with your investigation, did you obtain bank

25   records for GigaPix, *OZ3D*, and related companies?

1   A     Yes.

2   Q     And how many bank accounts did you analyze?

3   A     We received approximately 42 bank accounts and I used 24

4   of those in my analysis.

5         MS. LINDSAY:  And, Ms. Clerk, I would ask that

6   Exhibit 150 for identification be placed before the witness.

7         THE COURTROOM DEPUTY:  Exhibit 150 is identified and

8   placed before the witness.

9         (Exhibit 150 for identification.)

10  BY MS. LINDSAY:

11  Q     Ms. Pinkerton, do you recognize this?

12  A     Yes.

13  Q     What is that?

14  A     That's a listing of the bank accounts that were received.

15        MS. LINDSAY:  Your Honor, I move in 150.

16        MS. AMES:  No objection.

17        MR. EMMICK:  No objection.

18        THE COURT:  In evidence.

19        (Exhibit 150 received into evidence.)

20        MS. LINDSAY:  And if we could display that.

21  BY MS. LINDSAY:

22  Q     So what are the shaded accounts there?

23  A     The shaded accounts represent the accounts that were used

24  in my financial analysis.  You'll see that there are some

25  accounts for GigaPix and *Oz* that are not shaded, and I didn't

```
 1  use them because there were minimal or insignificant amount of
 2  transactions.
 3  Q    What is Principle Media Group?
 4  A    Principle Media Group, according to the bank records, was
 5  a company belonging to Colin Mutton.
 6  Q    And how about Survey Says?
 7  A    Survey Says, according to the bank records, was a company
 8  belonging to Christopher Blauvelt.
 9  Q    And what is Taylor & Ross?
10  A    Taylor & Ross was a company for Eugene Taylor.
11  Q    Over what time period did you evaluate these records?
12  A    For analysis purposes, I evaluated from July 31st, 2006,
13  through December 31st, 2012.
14  Q    Were the records you evaluated voluminous?
15  A    Yes.
16  Q    Did you summarize the records?
17  A    Yes.
18  Q    What did you do to summarize the records?
19  A    I took every transaction from the bank statements, put it
20  into a Microsoft Excel file, and I -- I categorized every
21  transaction and I used Microsoft Excel to summarize the
22  categories and -- and the charts into charts.
23  Q    So transactions meaning deposits and withdrawals?
24  A    Yes.
25  Q    And would you look at, in particular, like, checks that
```

1    were coming in and checks that were going out, et cetera?

2    A      Yes.  The bank statement has -- when you use your debit

3    card, you'll see the debit card transaction or you can write a

4    check or deposit check or wires, all of that, every transaction

5    on the bank statement.

6    Q      Did you do a summary of the deposits into the bank

7    accounts that you evaluated?

8    A      Yes.

9             MS. LINDSAY:  And I would ask that this witness be

10   shown what's been marked for identification as Government's

11   Exhibit 151.

12        And if you want, I think we're done with that binder,

13   so --

14            THE COURTROOM DEPUTY:  Exhibit 151 is identified and

15   placed before the witness.

16            (Exhibit 151 for identification.)

17   BY MS. LINDSAY:

18   Q      Do you recognize that?

19   A      Yes.

20   Q      What is that?

21   A      That's a table showing a summary of my categories of money

22   that was deposited into the bank accounts.

23            MS. LINDSAY:  I move in 151.

24            MR. EMMICK:  No objection.

25            MS. AMES:  No objection.

1        MS. LINDSAY:  May we display, Your Honor?

2        THE COURT:  Yes.

3        (Exhibit 151 received into evidence.)

4        MS. LINDSAY:  Okay.

5   BY MS. LINDSAY:

6   Q    Now, it looks like you have five categories of deposits.

7   Can you explain that?

8   A    Yes.  The investor category is money from *Oz* and *GigaPix*

9   investors.  Movie income is income from movies.  I did see memo

10  references to *Workaholics* and *Battlefield America*, some of the

11  examples.  Financing is a category that I separated it.  It's

12  more loans from individuals and companies.  They're not

13  investors.  They're not identified as investors.

14       So Taylor & Ross is the Eugene Taylor company.  I

15  identified that separately.  And the Unknown category is -- but

16  1.6 of that.  The majority of that amount consists of the

17  account balance.  So the rest of it are items that the bank was

18  unable to provide.

19  Q    And the unknown with $1.6 million in it, is that -- you

20  call it "Unknown."  Is that because your analysis started in

21  2006 and this was the money that had come in prior to that?

22  A    Yes.

23  Q    Okay.  How did you know that the investor money was from

24  investors?  What did you do to track that?

25  A    A couple of things.  At one time eventually I did receive

1   an investor list from an employee Walker, Shawn Walker I

2   believe his name was.  He provided us with an investor list.

3   But before that, I determined it based on consistency.

4   Investor deposits were always a lump sum.  Oftentimes they had

5   a comment in the memo line that indicated how many shares of

6   GigaPix or *Oz* they were purchasing.  And then afterwards, I did

7   compare my list to Shawn Walker's list and then researched any

8   differences.

9   Q    Now, I'd ask you to take a look at what's been marked for

10  identification as Government's Exhibit 152 and ask if you

11  recognize that.

12            THE COURTROOM DEPUTY:  Exhibit 152 is identified and

13  placed before the witness.

14            (Exhibit 152 for identification.)

15            THE WITNESS:  Yes.

16  BY MS. LINDSAY:

17  Q    What is that?

18  A    This is a graphic depiction of the table of money

19  deposited into the bank accounts, pie chart.

20            MS. LINDSAY:  Your Honor, I would move in 152.

21            MR. EMMICK:  No objection.

22            MS. AMES:  Your Honor, I have no objection to this

23  as a demonstrative.  But given that it is a chart, I would

24  object to it being submitted to the jury as an exhibit.

25            THE COURT:  152 in evidence.

 1                   (Exhibit 152 received into evidence.)

 2                   MS. LINDSAY:  And let's display that.

 3    BY MS. LINDSAY:

 4    Q    So can you explain this graphic chart of the money coming

 5    into GigaPix and *OZ3D* accounts?

 6    A    Yes.  This is a pie chart that shows the majority of the

 7    pie consists of investor deposits, 83 percent or 21 million.

 8    Movie income was about 9 percent, 2.4 million.  Unknown

 9    category, about 7 percent, 1.8 million.  And the Taylor & Ross

10    and Financing are small slivers, less than 1 percent.

11    Q    And did you summarize the amounts of money coming into

12    GigaPix and *OZ3D* separately?

13    A    Yes.

14    Q    And then I'd ask you to take a look at what's been marked

15    for identification as Government's Exhibit 153 and ask if you

16    recognize that.

17                   (Exhibit 153 for identification.)

18                   THE WITNESS:  Yes.

19    BY MS. LINDSAY:

20    Q    What is that?

21    A    This is a table that separates *OZ3D* income from GigaPix

22    income.

23                   MS. LINDSAY:  I move 153 into evidence.

24                   THE COURT:  Any objection?

25                   MS. AMES:  Same objection.

1           THE COURT:  153 in evidence.

2           (Exhibit 153 received into evidence.)

3           MR. EMMICK:  No objection.

4           MS. LINDSAY:  And if we could display that and make

5    it bigger.

6    BY MS. LINDSAY:

7    Q     Now, across the top, you have three categories there, and

8    the first one is OZ3D and Survey Says.  Why did you include

9    Survey Says with OZ3D?

10   A     Looking at the bank accounts, Survey Says is a Blauvelt

11   account.  And in the bank account, there's no source of income

12   other than money that came from Oz and GigaPix.  The amount of

13   money that was deposited in Survey Says was approximately

14   500,000.  And of that, 400,000 came from Oz.  And the

15   transactions are similar to the transactions going out from the

16   Oz account, so I lumped it together with Oz.

17   Q     And so let's look at OZ3D and Survey Says.  It looks like

18   almost -- almost 100 percent of the money into OZ3D and Survey

19   Says was investor money; is that correct?

20   A     Yes.  That's correct.

21   Q     And what is the -- when you put numbers in parentheses as

22   you have for Financing, what does that mean?

23   A     Yes.  The Financing figure is a net figure.  So it's

24   loans.  So think of loans as money that they received in and

25   loan payments that they made out.  I just netted the two, so

1    it's one -- it ends up being a positive figure.

2         For *OZ3D* in particular, it looks like they made a payment

3    or two -- I'm not sure how many payments that they made out of

4    the *Oz* account, but it's more than likely a GigaPix loan that

5    they paid out of the *Oz* account.

6    Q    And so when you put it in parentheses, that means it's a

7    negative number?

8    A    Yes.

9    Q    So rather than a minus sign, you put it in parentheses?

10   A    Yes.

11   Q    Okay.  And what about the Unknown category there?

12   A    For *OZ3D* and Survey Says, the Unknown consists of items

13   the bank was unable to provide.

14   Q    So you didn't have a specific check or whatever?

15   A    Exactly.

16   Q    And in your experience as a forensic accountant with the

17   FBI, is it typical that the bank will misplace or not have full

18   and complete records and there will be some of these unknown

19   items?

20   A    Yes.  It's typical.

21   Q    And now, let's look at the GigaPix category.  And the --

22   let's highlight the top number there for the GigaPix category.

23   So of incoming money to GigaPix, what is that top category

24   there?

25   A    The top category consists of transfers from the *OZ3D*

1    account.  So of the 8.2 million of investor money that was

2    deposited into *OZ3D*, 4 million was transferred to GigaPix.

3    Q    So that was -- because *OZ3D* is almost 100 percent investor

4    funds, that would be *OZ3D* investment funds transferred to

5    GigaPix?

6    A    Yes.

7    Q    And how much from investors do you have there?

8    A    4 million.

9    Q    I'm sorry.  How much from investors into GigaPix?

10   A    Oh, I'm sorry.  13 million.

11   Q    And the -- the next category is that movie income.

12   A    Yes.

13   Q    Is that the same the combined figure that we talked about

14   before?

15   A    Yes, it is.

16   Q    And the next figures, can you explain?

17   A    The next figure is the financing, which is the loans that

18   were determined not to be investor money.  The Taylor & Ross

19   money, which is also a net figure, I took the money that came

20   in from Taylor & Ross and went back to Taylor & Ross.  And it's

21   netted to 20,000.  And the Unknown, which is the majority,

22   beginning account balance.

23   Q    So that was what you didn't know because you started your

24   analysis after that?

25   A    Yes.

1   Q    And then -- sorry.  And then the combined column there, is

2   that what we discussed previously when we talked about all the

3   money coming in?

4   A    Yes.

5   Q    And now I'd like you to take a look at what's been marked

6   for identification as Government's Exhibit 154 and ask if you

7   recognize that.

8            (Exhibit 154 for identification.)

9            THE WITNESS:  Yes.

10  BY MS. LINDSAY:

11  Q    And what is that?

12  A    This is a graphic depiction of the *OZ3D* and GigaPix money

13  that was deposited into those accounts separated.

14           MS. LINDSAY:  I move in 154.

15           MS. AMES:  Same objection.

16           MR. EMMICK:  No objection.

17           THE COURT:  154 in evidence.

18           (Exhibit 154 received into evidence.)

19  BY MS. LINDSAY:

20  Q    And now if we could display that and let's focus on the --

21  the *OZ3D* and Survey Says pie.

22       So is this basically showing that almost all the money

23  into *OZ3D* and Survey Says was investor funds?

24  A    Yes.  98.5 percent.

25  Q    And there was no movie or TV income coming into that

```
 1    account?

 2    A      No.

 3    Q      And now let's look at the GigaPix pie.

 4           Now, transfers from OZ3D, we have transfers from OZ3D --

 5    we have -- let me start over.

 6           The biggest category there is the investor money; correct?

 7    A      Yes.

 8    Q      And, um, if we combine the transfers from OZ3D, which we

 9    established was investor money into OZ3D, and then also --

10    well, if you combine those two, can you tell us how much you

11    have?

12    A      It's about 17 million.

13    Q      And then if you take the -- as a given testimony we've

14    previously heard that the money that was already in the bank

15    account that you didn't evaluate was investor funds, how much

16    would the total into GigaPix be from investors?

17    A      About 18 and a half, a little over 18 and a half million.

18    Q      And what percentage about would that be?

19    A      Putting my math skills on the spot.

20    Q      I got 88 percent.

21    A      About 88 percent, yeah.

22    Q      Let's just say.

23           And how much -- so how much of the source of funds -- what

24    percentage of the source of funds coming into GigaPix was from

25    any kind of movie or TV profit?
```

1    A    About 11 percent.

2    Q    Now, from bank and other records, were you able to

3    identify the number of investors into GigaPix and related

4    companies?

5    A    Yes.

6    Q    And I'd ask you to take a look at what's been marked for

7    identification as Government's Exhibit 155 and ask if you

8    recognize that.

9              (Exhibit 155 for identification.)

10             THE WITNESS:  Yes.

11   BY MS. LINDSAY:

12   Q    And what is that?

13   A    That's a listing showing the number of GigaPix investors,

14   the number of *OZ3D* investors, and reducing out both -- some

15   investors invested in both GigaPix and *Oz*.

16             MS. LINDSAY:  Let me stop you and ask if I can admit

17   the exhibit.

18             MS. AMES:  No objection.

19             MR. EMMICK:  No objection.

20             THE COURT:  155 in evidence.

21             (Exhibit 155 received into evidence.)

22             MS. LINDSAY:  And if we could just display it.

23   BY MS. LINDSAY:

24   Q    So you were saying this shows the number of GigaPix

25   investors?

1   A     The number of GigaPix investors, the number of *OZ3D*

2   investors, and some investors invested in both GigaPix and *Oz*.

3   And I reduced them out to avoid double counting.  So the true

4   number of investors is 731.

5   Q     Okay.  Did you summarize the expenditures from the

6   accounts that you evaluated?

7   A     Yes.

8   Q     And looking at what's been marked for identification as

9   Government's Exhibit 156, can you tell us what that is?

10            (Exhibit 156 for identification.)

11            THE WITNESS:  Yes.  This is a table that shows the

12   expense categories split between the *Oz* account and the GigaPix

13   separated.

14            MS. LINDSAY:  And I would move 156 into evidence.

15            MS. AMES:  I'll note my prior objection, Your Honor.

16            MR. EMMICK:  No objection.

17            THE COURT:  156 in evidence.

18            (Exhibit 156 received into evidence.)

19            MS. LINDSAY:  And if we could display it.  Um, let's

20   see how we can -- maybe we can for the moment just make the

21   whole thing bigger.

22       Well, I'll tell you what.  Let's -- let's cut out the

23   combined column just so that it's a little easier, if we can

24   see a little better what's on there.  That helps a little bit.

25   ///

1    BY MR. LINDSAY:

2    Q    Anyway, so can you tell us what the -- the majority

3    percentage is of money in -- money out?  Sorry.

4    A    From *OZ3D* and Survey Says account, the majority was

5    transferred to GigaPix.

6    Q    And what is the next expense that you have?

7    A    The next expense is the sales expenses, the 31 percent.

8    Q    How about administrative?

9    A    Administrative is 12 percent.

10   Q    And can you explain to us what you put into the

11   administrative category?

12   A    Sure.  Administration category consists of expenses that

13   are normal -- normally considered business expenses and the --

14   and the normal course of running a business.

15   Q    Such as what?

16   A    Such as utilities, rent for your office space, employee

17   salaries, insurance, that type of thing.

18   Q    And now, can you tell us about the sales category?  What

19   did you put into the sales category?

20   A    The sales category consists of expenses consistent with

21   raising money for movies, which is the commissions and payroll

22   for salespeople who are selling the movie, filings, state

23   filings, mailings, because I believe they mailed brochures to

24   investors, telephone expense, and Internet, rent for the sales

25   office, and leads.

```
 1   Q    You have a category there called "Production."  And how
 2   much was spent -- what percentage was spent on production from
 3   OZ3D and Survey Says?
 4   A    4.8 percent.
 5   Q    And how about for GigaPix?
 6   A    23.3 percent.
 7   Q    And what was in your Production category?
 8   A    The Production category consists of things that are used
 9   for the direct production of the movie, like the scripts, the
10   production studios, the writers, the actors, the music, that
11   type of thing.
12   Q    And your next category is Personal.  Can you explain that?
13   A    Personal expenses are expenses that are not generally
14   considered business administration expenses, like mortgage,
15   cars, entertainment.
16   Q    Well, we'll get into that in a minute.
17        And why do you have travel as a separate category?
18   A    I separated travel because often travel could either be a
19   business or a personal expense and I had no way of identifying
20   which travel was business or personal.
21   Q    And then you have an Unknown category.  Is that also where
22   the bank was unable to provide the item?
23   A    Yes.
24   Q    And finally, you have Investors and it looks like some
25   investors received some money.
```

```
 1   A     Yes.  Not all investors received money back.  Some

 2   investors received what appeared to be a refund or small

 3   interest payments.

 4   Q     Do you have a separate chart for the total combined of

 5   GigaPix and OZ3D expenditures?

 6   A     Yes.

 7   Q     And now I'd like you to take a look at what's been marked

 8   for identification as Government's Exhibit 157 and ask if you

 9   recognize that.

10              (Exhibit 157 for identification.)

11              THE WITNESS:  Yes.

12   BY MS. LINDSAY:

13   Q     And is that the total chart?

14   A     Yes.

15              MS. LINDSAY:  I move that in, Your Honor.

16              MS. AMES:  Same objection, Your Honor.

17              THE COURT:  157 in evidence.

18              (Exhibit 157 received into evidence.)

19              MS. LINDSAY:  If we can display that, and this one

20   might be a little easier to read.

21   BY MS. LINDSAY:

22   Q     And so for the money coming into GigaPix and OZ3D, can you

23   just tell us for each of your categories what percentage of the

24   money was spent on what?

25   A     Sure.  40 and a half percent was spent on general
```

```
 1   administrative expenses; 23 percent on sales expenses;
 2   21 percent on production; 7.6 percent on personal; 4 percent
 3   unknown; travel, 1.9 percent; and money back to investors,
 4   1.6 percent.
 5   Q    So is it your conclusion that approximately 77 percent of
 6   the money coming into the bank accounts was eaten up by the
 7   companies themselves and the people working there?
 8   A    Yes.
 9   Q    Now, let's look at the Production category.  And for this,
10   if you could focus on the bottom part of the page -- actually,
11   if you could -- here, I'll show you.
12        Did -- um, in your analysis, did you -- in the Production
13   category, did you allow some of the expense -- for the office
14   at the Oso Avenue address, did you allow that to -- or did you
15   consider some of the expenditures on the rent for that space in
16   the Production category?
17   A    Yes.  That facility included a studio.  So based on an
18   interview with an employee, they helped us determine what
19   percentage of the facility was used for production and what was
20   used for administrative.  So part of my expense is in the
21   Administrative category and part in the Production category.
22   Q    And, um, now I'd like you to take a look at what's been
23   marked for identification as Government's Exhibit 158 and ask
24   if you recognize that.
25              (Exhibit 158 for identification.)
```

1          THE WITNESS:  Yes.

2    BY MS. LINDSAY:

3    Q     And what is that?

4    A     That's a graphic depiction of the previous table that had

5    the GigaPix and the *OZ3D* use of funds separated.

6              MS. LINDSAY:  I would move in 158.

7              MS. AMES:  Same objection.

8              MR. EMMICK:  No objection.

9              THE COURT:  158 in evidence.

10             (Exhibit 158 received into evidence.)

11             MS. LINDSAY:  And if we could focus on the -- the

12   *OZ3D* and Survey Says pie.

13   BY MS. LINDSAY:

14   Q     Now, this demonstrates graphically that almost half of all

15   the money in *OZ3D* was sent to GigaPix; is that correct?

16   A     Yes.

17   Q     Does this also show that over 95 percent of the money into

18   *OZ3D* was spent on expenses having nothing to do with

19   production?

20   A     Yes.

21   Q     How much was actually spent on the making of the movie

22   *OZ3D*?

23   A     According to the bank records, 391,000 or 4.8 percent was

24   spent on production expense.

25   Q     And now if we could look at the GigaPix expenditures.

1     Does this graphically demonstrate that for GigaPix, over

2  three-fourths of the money going into GigaPix was spent on

3  expenses having nothing to do with production?

4  A     Yes.

5  Q     And now I'd like you to take a look at what's been marked

6  for identification as Government's Exhibit 159 and ask if you

7  recognize that.

8              (Exhibit 159 for identification.)

9              THE WITNESS:  Yes.

10  BY MS. LINDSAY:

11  Q     And what is that?

12  A     That's the graphic depiction of the combined money out of

13  the accounts for both GigaPix and *Oz*.

14              MS. LINDSAY:  I move in 159.

15              MS. AMES:  Same objection.

16              THE COURT:  159 in evidence.

17              (Exhibit 159 received into evidence.)

18              MS. LINDSAY:  And maybe we can just make that even

19  bigger if we can.

20  BY MS. LINDSAY:

21  Q     So what was the majority of the money spent on?

22  A     The majority of the money was spent on administrative

23  expenses.

24  Q     And second to that?

25  A     Sales expenses.

```
 1   Q     How about personal expenses?
 2   A     Personal expenses, 1.9 million or 7.6 percent.
 3   Q     And for the 25 million invested into both companies, only
 4   how much was spent on production?
 5   A     5.3 million.
 6   Q     Or about 21 percent?
 7   A     Yes.
 8   Q     Now, did you attempt to determine how much money each
 9   defendant now in court received from GigaPix and OZ3D?
10   A     Yes.
11   Q     And I'd like you to take a look at what's been marked for
12   identification as Government's Exhibit 160.
13              (Exhibit 160 for identification.)
14   BY MS. LINDSAY:
15   Q     Do you recognize that?
16   A     Yes.
17   Q     And what's that?
18   A     That shows the amount of money that the defendants made,
19   both their payroll commissions and their personal expenses.
20              MS. LINDSAY:  I move in 160.
21              MS. AMES:  Same objection.
22              MR. EMMICK:  No objection.
23              THE COURT:  Objection is overruled.  160 in
24   evidence.
25              (Exhibit 160 received into evidence.)
```

 1              MS. LINDSAY:   Okay.   If we could focus on the top

 2      part.

 3      BY MR. LINDSAY:

 4      Q     And for David Pritchard, can you explain the difference

 5      between payroll and/or commissions and personal charges?

 6      A     Yes.   The payroll and/or commissions is money that was

 7      paid to them.   It was believed for administrative payroll or

 8      commissions on sales and the personal charges are the personal

 9      expenses split into the ones that were attributable to

10      Pritchard.

11      Q     How were you able to attribute those to Mr. Pritchard?

12      A     In some cases, it was evident on the memo line of the

13      check or the wire.   And in other cases, we based it on the

14      signatory on the bank accounts, if Pritchard was the only

15      signatory on a particular bank account and he had control of

16      that.   We also based it on interviews of employees.   Colin

17      Mutton was helpful in identifying -- helping us to identify

18      personal charges for the defendants.

19      Q     So Mr. Pritchard received a total of 1.37 million?

20      A     Yes.

21      Q     And then for Mr. Blauvelt, would it be the same analysis?

22      A     Yes.

23      Q     So that he received over $1 million?

24      A     Yes.

25      Q     Now, you have a category for Pritchard and Blauvelt

1    together.  What is that category?

2    A    Those are personal charges from bank accounts where they

3    were both signatories on the account, and I could not identify

4    who in particular those charges belonged to.

5    Q    Okay.  Now, if we could focus on the -- the second part of

6    the chart.  And if you could explain that.

7    A    Yes.  This is the -- this breaks down the 1.9 million

8    total that was spent on personal expenses into the different

9    categories.

10         MS. LINDSAY:  You know, I apologize, Your Honor.  I

11   think we might have the wrong version in the computer.  So I

12   would ask if we could just --

13         (Pause in the proceedings.)

14   BY MS. LINDSAY:

15   Q    And if you could explain some of these categories, please.

16   A    Sure.  The Shopping category is general shopping.  It can

17   be department stores, online shopping, health and beauty,

18   doctor's offices, dental offices, the gym memberships, hair and

19   nail type places.

20        Mortgage is money to -- in some cases, there's monthly

21   payment with, in particular, Blauvelt's name and account

22   number.  And some of it is, like, to an escrow company or other

23   companies that were determined to be potentially mortgage

24   payment.

25        Family and friends, self-explanatory.  Miscellaneous, most

1    of that consists of a loan transaction that appeared to be

2    personal in nature.  Cash withdrawals, restaurant charges,

3    automobile, car payments.  Utilities, home utilities, home

4    maintenance, dry-cleaning services, grocery, entertainment.

5    Some of those were Mammoth Mountain or casino bill.  Gas and

6    convenient store, self-explanatory.  And boat expenses, most of

7    that was for a boat slip.

8         And property taxes, the memo line they included a parcel

9    number on the property.  I looked it up online, and it was

10   Blauvelt's property and personal rent.

11   Q    What made you put the boat slip into Mr. Blauvelt's

12   category?

13   A    I believe it either came out of the account that he was --

14   that he controlled or it had his name on the -- in the memo

15   line.  There was something that was attributable to him.

16             MS. LINDSAY:  Thank you very much.  I have nothing

17   further.

18             THE COURT:  Cross-examination on Pritchard.

19                     **CROSS-EXAMINATION**

20   BY MR. EMMICK:

21   Q    Hi.

22   A    Hi.

23   Q    I just wanted to ask you some questions about

24   Mr. Pritchard who's my client and payments to him.  So that's

25   the context.

1       Were you aware that he was being paid a salary?

2   A    I looked at payments to him.  They appeared to be salary

3   payments.  I can't recall the amount.

4   Q    But he was being paid a salary.

5   A    Okay.

6   Q    And he had been promised a salary on an annual basis?

7            MS. LINDSAY:  Objection.

8            THE COURT:  The objection is sustained.

9   BY MR. EMMICK:

10  Q    And are these the only payments that were salary-type

11  payments that you were keeping track of?

12  A    Any payments that were payable to Pritchard I attributed

13  for salary or payroll commission.

14  Q    And is it broken down at all by year, for example?

15  A    Not in these exhibits, no.

16  Q    But perhaps by you?

17  A    Yes.

18  Q    And so then you would know that during 2010, 2011, 2012,

19  he was not paid the salary that he was promised at all; right?

20  A    I did see payments going to Pritchard up through October

21  2011 -- or 2010.

22  Q    But there was a long stretch of time when he was not

23  getting paid a salary at all?

24  A    Correct.

25           MR. EMMICK:  Nothing further.

**CROSS-EXAMINATION**

BY MS. AMES:

Q     Good afternoon.

A     Good afternoon.

Q     It's Ms. Pinkerton; correct?

A     Yes.

Q     Sorry.  I blanked out for a moment on your last name.

You mentioned on direct examination on one of the charts that we looked at that you separated travel as a category in and of itself; correct?

A     Yes.

Q     And you said that you did that because you had no way of knowing whether it was personal or business?

A     Yes.

Q     And why is it that you had no way of knowing?

A     Because the memo line of the check or wire transaction did not indicate which individual it was for or the purpose wasn't clear.

Q     And that's also because you only inspected the bank documents; is that correct?

A     Yes.

Q     You did not look at any sorts of source documents?

A     Correct.

Q     So you didn't look at invoices?

A     Correct.

1    Q      Receipts?

2    A      Correct.

3    Q      Bills, any actual document that supports what the bill or

4    the expense is for?

5    A      That's correct.

6    Q      So on occasions, you were making a bit of an educated

7    guess; is that correct?

8    A      Yes.  Based on knowledge, experience, interviews, and memo

9    lines.

10   Q      Okay.  And you talked about interviews.  The primary

11   person that you interviewed to provide you this information was

12   Mr. Mutton?

13   A      Mutton helped with the personal expenses.  I did review

14   all of the interviews that were conducted during the

15   investigation.  Other employees helped with the category of

16   employees who were fronters, who were salespeople, who were

17   administrative employees.  So I obtained a lot of my analysis

18   from any of the interviews.  But Mutton helped with most of the

19   personal expenses, yes.

20   Q      Okay.  But those employees that you're talking about who

21   provided you information would only know about employees;

22   correct?

23   A      Correct.

24   Q      They weren't in a position to know about other business

25   expenses beyond being employees?

1    A     I wouldn't know that.  No.

2    Q     To your knowledge, Mr. Mutton, though, was the one who was

3    the accountant for the company?

4    A     Correct.  You believe he's the CFO.

5    Q     And so in the information -- I'm sorry.  What information

6    did he provide you again?

7    A     He provided information on an AMEX card.  He had an AMEX

8    card in his name that Pritchard was using for his own expenses.

9    And he provided those AMEX records to us, so I identified those

10   charges.

11         In addition, he had the QuickBooks files for the company

12   and he had separated charges that were made by Pritchard and

13   Blauvelt that were -- they needed to be categorized by Mutton

14   for business purposes, and he had asked them to give him

15   details on what those expenses were for and they never did.

16         And he also said that they often used the cards for every

17   meal.  Every meal that they ate, they charged on the card,

18   every personal expenses they charged.  They lived off the

19   business cards.

20   Q     And that was according to Mr. Mutton?

21   A     Yes.

22   Q     And, in fact, part of your analysis, you appeared to find

23   that Mr. Mutton received a tremendous amount of money from this

24   business; is that correct?

25   A     Um, I don't recall how much he received.  Um --

```
 1   Q     But in your discussions --
 2   A     I don't think it was tremendous.
 3   Q     In your analysis, there was a disparity between what he
 4   had represented as to what he had received from the company and
 5   what your independent analysis shows; is that correct?
 6   A     Initially he told us he received a certain amount.  And in
 7   my analysis, I found that he received more.
 8         So we met with him a couple of times.  We had an interview
 9   with him, and he explained why and that he was using his own
10   personal accounts or using his business accounts.  Some of them
11   were on the list earlier.  He was using those accounts to kind
12   of hide money and pay business expenses with his accounts.
13         So they transferred money to him, which initially appeared
14   to me to be payments to Mutton and salaries.  And he cleared
15   that up and provided the evidence to support it.  And what I
16   was able to verify, I re-categorized as the appropriate
17   expense.
18   Q     And what evidence did he provide to support that?
19   A     The AMEX cards.  A lot of the money that was transferred
20   to him was used to pay the AMEX cards.  A lot of it was also
21   transferred back into GigaPix.
22   Q     And he was also the one to provide you the information as
23   to what those AMEX cards were used for; correct?
24   A     Yes.
25   Q     He told you what they were used for?
```

1    A     Yes.

2    Q     You didn't have any independent information?

3    A     Right.  Other than the -- the statements themselves.

4    Q     Now, I would -- I would presume that being an accountant,

5    you work under the generally accepted accounting principles;

6    correct?

7    A     Yes.  Well, yes.

8    Q     And I -- I would presume that the -- the preferred method

9    of making any sort of accounting analysis is to have the actual

10   supporting documents in addition to any bank accounts; correct?

11   A     Certainly.  That's all preferred.

12   Q     And that's because you're not having to make kind of

13   guesstimates?

14   A     Yes.

15   Q     And oftentimes you don't have any sort of indication on

16   those memo lines of the checks?

17   A     Yes.

18   Q     And so -- and that was the situation with this case;

19   correct?

20   A     Yes.  There were not always memo lines.

21   Q     Did you attempt to obtain those supporting documents?

22   A     No.

23   Q     And why is that?

24   A     I just -- I worked with the case agent and, you know,

25   mainly do the bank accounts.  If they conduct a search on the

```
 1   company and obtain the company records, then I would review
 2   those as well.  But we had not conducted a search of the
 3   company records.
 4   Q    So the agents just didn't provide you any of those
 5   documents?
 6   A    Correct.
 7   Q    But it would be your preferred analysis, you would feel
 8   more confident in your analysis if you were able to have those
 9   documents, wouldn't it?
10   A    Sure.
11   Q    Thank you.
12        Um, in -- in your breakdown as to -- so let me go back to
13   travel for a moment, then.  I would presume that in
14   movie-making, travel is required and would be part of business
15   expenses; isn't that correct?
16   A    Sure.  That's reasonable.
17   Q    But in this case, you weren't able to decide for -- if any
18   of the travel that you noted was for business?
19   A    Correct.  I did not interview further to identify which --
20   which trips were travel -- for business and which were
21   personal.
22   Q    And you also noted cash withdrawals.  I would presume
23   oftentimes a business has to pay cash maybe for small expenses
24   along the way; is that correct?
25   A    Yes.
```

1    Q    And in this case, you would not be able to identify what

2    cash withdrawals could have been business related?

3    A    Correct.  The reason I put that in the personal expense is

4    based on an interview with Colin Mutton.

5    Q    Okay.  And so again on that, your information would be

6    only as good as the information that Mr. Mutton gave you?

7    A    Yes.

8    Q    And any problems in his memory as to certain things would

9    also affect your analysis here?

10   A    Yes.

11   Q    You have as a separate note Telephone.  And you've put

12   that under "Sales."  And I'm looking -- maybe I can help here.

13   This is Government's Exhibit 156.  Yes.

14        Is that large enough that you can see that, ma'am?

15   A    Yes.

16   Q    Now, I would presume that a production company in

17   production would require the use of telephones, would it not?

18   A    Yes.  These charges were significantly higher than average

19   in business because they did a lot of cold calling and they had

20   sales offices to call investors.

21   Q    But I see that you didn't include any telephone under

22   Production; is that correct?

23   A    Correct.

24   Q    So you put all of it under Sales?

25   A    Yes.

1   Q    And mailings, I would presume that production business

2   requires mailings out to maybe contracts, to artists,

3   et cetera; correct?

4   A    Yes.

5            MS. LINDSAY:  Objection.  Argumentative.

6            THE COURT:  The objection is sustained.

7   BY MS. AMES:

8   Q    Ms. Pinkerton, would mailing be a legitimate production

9   expense?

10            MS. LINDSAY:  Objection.

11            THE COURT:  The objection is sustained.

12   BY MS. AMES:

13   Q    Ms. Pinkerton, under the -- why don't you explain to us

14   what the generally accepted accounting principles are about?

15   A    The generally accepted accounting principles more come

16   into effect whenever you're preparing financial statements.

17   There are certain rules that you follow when you categorize

18   certain expenses for your financial statements.

19   Q    But under those accepted accounting principles, isn't --

20   isn't a film production company considered a manufacturing --

21   as equal to a manufacturing company?

22   A    I don't know that for sure.  I'd have to look it up.

23   Q    Um, are you familiar with how business assignments are

24   made from manufacturing companies?

25   A    Can you say that again?

1    Q      And I admit it was a poorly worded question.

2           Um, are you familiar under GAAP what costs for a company

3    can be attributed to that business versus not attributed to the

4    business?

5    A      I'm somewhat familiar.  I do know that there are

6    manufacturing expenses, direct manufacturing expenses and they

7    can allocate a certain number of administrative overhead to the

8    manufacturing expense as well.

9    Q      And so if a film company were treated the same as a

10   manufacturing company, some of its overhead expenses would be

11   able -- would be appropriately attributed as part of that;

12   correct?

13   A      Yes.

14   Q      And that would include things such as rent?

15   A      Yes.

16   Q      For the office space?

17   A      Yes.

18   Q      That would include payroll?

19   A      Yes.

20   Q      Employee benefits?

21   A      Yep.

22   Q      Legal?

23   A      Yes.

24   Q      Taxes?

25   A      Yes.

```
 1   Q     Now, I want to ask you as well, when we look back at use
 2   of funds, you put Legal under Administrative.
 3   A     Yes.
 4   Q     Wouldn't a production company need to have the assistance
 5   of legal experts for contracts with artists, for obtaining
 6   space to do filming, et cetera?
 7              THE COURT:  That appears to be administration,
 8   Counsel, also.
 9   BY MS. AMES:
10   Q     Ma'am, would it be considered as well as a production
11   cost?
12   A     I think that legal expenses are general administrative
13   expenses that every company incurs.
14   Q     So you would not categorize them under Production?
15   A     No.
16   Q     Even if they are directly related to the production of a
17   film?
18   A     There were either some legal fees that I attributed to the
19   sales expense in filings because one of the legal firms was to
20   help bring them public.  So I included that in the sales
21   filings.  But every other legal fee is under the Administrative
22   category.
23              MS. AMES:  Just one moment, Your Honor.
24              (Pause in the proceedings.)
25   ///
```

1    BY MS. AMES:

2    Q    Ms. Pinkerton, I'd like to direct your attention to what's

3    previously been marked as Exhibit No. 150.  And you don't seem

4    to be able to get the whole thing, but this, in essence, is

5    the -- the list of all the bank accounts that you looked at in

6    your analysis; is that correct?

7    A    This is a listing of all the bank accounts that we

8    received.  And the highlighted accounts were used in the

9    analysis figures and all the other exhibits.

10   Q    Thank you for that correction.

11        And in looking at that, the highlighted portions, you

12   noted who was an authorized signator on each of those accounts;

13   correct?

14   A    It's not noted on this exhibit but I did note it, yes.

15   Q    Right.  Okay.

16        And there were different people who were authorized

17   signators on varying of these accounts that are listed here in

18   the highlight; correct?

19   A    Yes.

20   Q    And all of the -- excuse me.

21        There were nine accounts total that you looked at for

22   GigaPix Releasing, LLC; correct?

23   A    Yes.

24   Q    And three of those were with Citibank?

25   A    Yes.

1   Q     And six of those were with Wells Fargo?

2   A     Yes.

3   Q     And Mr. Blauvelt was not a signator on any of those nine

4   accounts; is that correct?

5   A     I don't recall -- I don't believe he was on the Releasing

6   accounts.

7   Q     And then you looked at ten accounts for GigaPix Studios?

8   A     Yes.

9   Q     And five of those accounts were with Wells Fargo Bank?

10  A     Yes.

11  Q     And five of those were with Citibank?

12  A     Yes.

13  Q     And Mr. Blauvelt was also not a signator on any of the

14  five accounts with Wells Fargo; correct?

15  A     I can't say that for sure.  I'd have to see the signature

16  cards.

17  Q     Do you have any recollection?

18  A     I recall that he was on some accounts.  I don't remember

19  if they were Wells Fargo or Citibank.

20  Q     But of the GigaPix accounts, he was on all of -- one of

21  those accounts and then not on any of the others; is that your

22  recollection?  If it isn't, that's fine, but just what your

23  recollection is.

24  A     Can you say that again?  It was on one --

25  Q     Well, we've got five and five.

```
1   A     Okay.  No, I don't recall that.
2              MS. AMES:  Okay.  Just one moment, Your Honor.
3              (Pause in the proceedings.)
4   BY MS. AMES:
5   Q     I have a few more questions regarding payroll and personal
6   expenses that you note.  Um, in -- in your accounting work,
7   isn't it correct that oftentimes a person will not be
8   necessarily paid strictly the salary but they may receive it in
9   kind?  They may get perks, if you will, in other areas; is that
10  correct?
11  A     Sure.
12  Q     And so oftentimes that can be part of their employee
13  package?
14  A     Yes.
15  Q     And your break-up -- excuse me.  Let me find this again.
16        On Exhibit 160, we are actually looking at a period of
17  time from '06 through '012.
18  A     Yes.  July '06 through December of 2012.
19             MS. AMES:  Okay.  No further questions, Your Honor.
20             THE COURT:  Redirect.
21                      REDIRECT EXAMINATION
22  BY MS. LINDSAY:
23  Q     Ms. Pinkerton, when you put together your summary, was the
24  purpose of your summary to prepare a CAPA -- CAPA -- GAAP
25  financial statement for a publicly traded company or was it to
```

```
 1   make demonstrative evidence so the jury could see how GigaPix
 2   and OZ3D practically spent their money?
 3   A     To show exhibits.  There's no way I could come up with a
 4   GAAP -- which is generally accepted accounting principles.
 5   There's no way I could come up with GAAP financial statements
 6   based just on the bank records.
 7   Q     So you were just trying to demonstrate where the money was
 8   spent?
 9   A     The source and use of funds into the -- into and out of
10   the bank account.
11   Q     And you were asked when you didn't have information about
12   a check or something like that and if you had the underlying
13   documents, it would have been helpful.  But when you didn't
14   have information about a check, is that when you'd put it into
15   the Unknown category?
16   A     No.  Um, I think what she's talking -- I think it's
17   different.  I didn't have information -- the Unknown category
18   is solely items I did not receive from the bank or the
19   beginning account balance that I didn't identify what category
20   it could go into.  Everything else was put into a category
21   based on my knowledge and experience, Web searches, interviews,
22   or memo line.  There was not always a memo line.  There are
23   other ways of determining which category it goes into.
24   Q     And reviewing the files and records of the agent on the
25   case?
```

```
1    A     Yes.  Reviewing the case file.
2              MS. LINDSAY:  Thank you.  I have nothing further.
3              THE COURT:  All right.  You may step down.
4         Call your next witness.
5              MR. MCLAIN:  Your Honor, the Government will call
6    FBI Agent Adam Storer.
7         If the Court -- my direct will be about 45 minutes, at
8    least the direct examination of this witness to be about 45
9    minutes.
10             THE COURTROOM DEPUTY:  Please step forward.  Stand
11   right there.  Okay.  And then face me.  Please raise your right
12   hand.
13        Do you solemnly swear that the testimony you shall give in
14   the cause now pending before this Court shall be the truth, the
15   whole truth, and nothing but the truth, so help you God?
16             THE WITNESS:  I do.
17         ADAM STORER, PLAINTIFF'S WITNESS, WAS SWORN
18             THE COURTROOM DEPUTY:  Thank you.  Please take a
19   seat.
20        And please state your full and true name for the record
21   and spell your last name.
22             THE WITNESS:  Adam Storer, S-t-o-r-e-r.
23                       DIRECT EXAMINATION
24   BY MR. MCLAIN:
25   Q    Agent Storer, where do you currently work?
```

1   A    I'm a supervisory special agent in the financial crimes

2   section for the FBI at our headquarters.

3   Q    And how long have you been with the Federal Bureau of

4   Investigations, or FBI?

5   A    Since January of 2008.

6   Q    And what types of crimes do you investigate for the FBI?

7   A    Currently I'm a program manager in our financial crimes

8   section which oversees a variety of different investment

9   frauds, financial institution frauds, similar types of

10  investigations.

11  Q    Have you also investigated frauds involving independent

12  film companies?

13  A    Yes.  Prior to my time at headquarters, I spent

14  approximately six years on a corporate securities fraud squad

15  in Los Angeles.

16  Q    And how many investigations have you done specifically

17  involving movie investment fraud?

18  A    At least six.

19  Q    And were you one of the case agents on this case today?

20  A    Yes, I was.

21  Q    And when did the investigation on this case begin?

22  A    Approximately the end of 2011.

23  Q    And when were you the case agent on this case?

24  A    From its inception in 2011 until the beginning of 2014

25  when I transferred to headquarters.

```
 1  Q    And who were you the case agent with on this case?

 2  A    Initially it was Special Agent Pete Conroy, C-o-n-r-o-y,

    and then most recently Special Agent Eric Potocek, P-o- --

 3

 4  P-o-t-o-c-e-k.

 5  Q    And who took over as the case agent after you left the

 6  case in the year of 2014?

 7  A    Special Agent Potocek.

 8  Q    Now, based on your investigation, approximately how many

 9  individuals investigated -- well, first, let me ask you:  Was

10  GigaPix the company you initially investigated?

11  A    Yes.

12  Q    And OZ3D, LLC?

13  A    Yes.

14  Q    Now, based on your investigation, approximately how many

15  individuals invested in GigaPix and OZ3D starting from 2002,

16  the company's inception, to 2012?

17  A    Over 900 total investors in both companies.

18  Q    And approximately how many individuals invested in GigaPix

19  and OZ3D from 2006 to 2012?

20  A    Combined, there are about 730, I believe.

21  Q    And how did you and your investigative team determine the

22  number of victim investors?

23  A    In this instance, we reviewed the financial records to

24  determine the investors.

25  Q    And during the course of your investigation of the
```

1    defendants, Mr. Blauvelt and Mr. Pritchard, did you determine

2    how much the investors provided to GigaPix and *OZ3D* in funds

3    from 2006 to 2012?

4    A    Yes, we did.

5    Q    And how much was that?

6    A    Just over $21 million.

7    Q    And how did you and your investigative team determine the

8    amount of funds sent in by the investors?

9    A    We subpoenaed all the financial records for the companies,

10   especially the investor accounts.  And we were able to identify

11   over $21 million through the summary of the financial analysis.

12   Q    Did you interview Defendant Chris Blauvelt as part of your

13   investigation in this case?

14   A    Yes, I did.

15   Q    Did you interview him on March 12th, 2012?

16   A    Yes, I did.

17   Q    And where did you interview him?

18   A    In the federal building which is where the Los Angeles FBI

19   office is located.

20   Q    And did -- excuse me.  Was this an interview that he

21   submitted to voluntarily?

22   A    Yes, it was.

23   Q    Who asked Defendant Blauvelt questions during this

24   interview?

25   A    Myself and Special Agent Pete Conroy.

```
 1   Q    And was the interview on March 12th, 2012, recorded?

 2   A    Yes, it was.

 3   Q    And how long was the full interview of Chris Blauvelt?

 4   A    Approximately one and a half hours.

 5   Q    At this time I'd like you to take a look for

 6   identification purposes at Exhibit 237.

 7              THE COURTROOM DEPUTY:  Exhibit 237 is identified and

 8   placed before the witness.

 9              (Exhibit 237 for identification.)

10   BY MR. MCLAIN:

11   Q    Did you review that CD?

12   A    Yes, I did.

13   Q    And is that a true and correct copy of part of the

14   recording of your interview with Mr. Chris Blauvelt?

15   A    Yes, it is.

16   Q    And how do you know that?

17   A    I reviewed the entire recording summary, the entire

18   recording from the date of the interview, and then I compared

19   this portion out -- portioned-out section of the entire

20   transcript or the entire recording and then -- on 10/10 and

21   then I signed it with my initials right here.

22   Q    And is that an accurate depiction of the portions of the

23   statements that Defendant Chris Blauvelt provided to you on

24   March 12th, 2012?

25   A    Yes, it is.
```

1          MR. MCLAIN:  Your Honor, at this time, the

2    Government would like to admit Exhibit No. 237 into evidence.

3          THE COURT:  All right.  237 in evidence.

4          (Exhibit 237 received into evidence.)

5          MR. MCLAIN:  And, Your Honor, at this time we're

6    going to publish portions of the interview.  We actually have

7    transcripts available for the convenience of the jury, and

8    we've provided those transcripts also to defense counsel as

9    well.  And they're Exhibit 238 in the evidence books.

10          (Exhibit 238 for identification.)

11   BY MR. MCLAIN:

12   Q    Now, what were the initials of the participants in the

13   interview of Mr. Chris Blauvelt?

14   A    There was myself, "AS," or Adam Storer, "PC" for Special

15   Agent Pete Conroy, and "CB" for Mr. Chris Blauvelt.

16          MR. MCLAIN:  At this time we'd like to play the

17   first clip.

18          THE COURT:  All right.

19          (Videotape played, not reported.)

20   BY MR. MCLAIN:

21   Q    Now, based on your investigation, what company was it that

22   had regulatory issues with the State of California?

23   A    GigaPix.

24   Q    And in addition to the cease and desist orders in

25   California and Wisconsin referenced by Mr. Chris Blauvelt, were

```
 1   any other cease and desist orders issued against GigaPix and

 2   OZ3D?

 3   A     Yes, they did.  Oregon and Colorado.  And there were a few

 4   others that were initiated.

 5              MR. MCLAIN:  Can we continue?

 6              (Videotape played, not reported.)

 7              MR. MCLAIN:  Now we'll play Clip No. 2.

 8              (Videotape played, not reported.)

 9   BY MR. MCLAIN:

10   Q     Now, when does Mr. Blauvelt acknowledge that it became a

11   problem taking GigaPix public?

12   A     Once they received some regulatory issues.

13   Q     And did -- based on your investigation, did they receive

14   those regulatory issues as early as 2005?

15   A     That is correct, from the State of Wisconsin.

16              MR. MCLAIN:  Move on to Clip No. 3.

17              (Videotape played, not reported.)

18   BY MR. MCLAIN:

19   Q     Now, so what does Mr. Blauvelt acknowledge concerning the

20   financial success of the movie Captain Abu Raed?

21   A     That it was more of an art film and not a financial

22   success.

23   Q     Based on your investigation, did any of GigaPix's movies

24   produce a profit?

25   A     No, they did not.
```

1    Q    And during the interview of Chris Blauvelt, how did he

2    describe his business knowledge?

3    A    He described it -- he did not have a lot of business

4    acumen.  He was more of a salesperson.  That was his area of

5    expertise.

6              MR. MCLAIN:  Now we'll play Clip No. 4.

7              (Videotape played, not reported.)

8    BY MR. MCLAIN:

9    Q    So what does Mr. Blauvelt acknowledge concerning how the

10   money raised for the movie *OZ3D* was used?

11   A    The investor money that went into the *Oz* accounts ended up

12   going into GigaPix accounts.

13   Q    And based on your investigation, was the money raised from

14   investors for *OZ3D* actually used toward the movie *OZ3D*?

15   A    No.  Very little of it was.  Less than 5 percent was used

16   for production.

17             MR. MCLAIN:  Move on to Clip No. 5.

18             (Videotape played, not reported.)

19   BY MR. MCLAIN:

20   Q    So now, who did Mr. Blauvelt ask to be the chief financial

21   officer of GigaPix?

22   A    Mr. Colin Mutton.

23   Q    And according to Mr. Blauvelt, how much of the *OZ3D*

24   revenue was supposed to be used for GigaPix?

25   A    According to the PPM, 20 percent.

1   Q    And based on your investigation, how much of the *OZ3D*

2   revenue was actually used for GigaPix, at least?

3   A    Approximately 50 percent was transferred over.  $4 million

4   of *Oz* money was transferred to the GigaPix accounts.

5            MR. MCLAIN:  Now, let's look at Clip No. 6.

6            (Videotape played, not reported.)

7   BY MR. MCLAIN:

8   Q    So now, despite the success of *Workaholics*, how does

9   Mr. Blauvelt describe the financial condition of the company

10  GigaPix?

11  A    That they were in a bad situation.  They were broke.

12  Q    And what issues is Mr. Blauvelt describing that GigaPix

13  encountered?

14  A    With the regulatory issues.

15  Q    And the cold-calling issues?

16  A    Correct.

17  Q    And based on your investigation, did GigaPix ever obtain

18  independently audited documents?

19  A    Not to my knowledge.

20            MR. MCLAIN:  Let's move on to Clip No. 7.

21            (Videotape played, not reported.)

22  BY MR. MCLAIN:

23  Q    And based on your investigation, did GigaPix ever become a

24  publicly traded company?

25  A    No, they did not.

1  Q    And why was Mr. Blauvelt asked to resign as CEO of the

2  company?

3  A    Because others in the company were concerned about the

4  regulatory issues.

5           MR. MCLAIN:  If we can now look at Clip No. 8,

6  please.

7           (Videotape played, not reported.)

8  BY MR. MCLAIN:

9  Q    What is Mr. Blauvelt doing during this portion of the

10 interview?

11 A    My recollection is he's holding a letter dated on or about

12 May 24th, 2011, and I believe it was signed by Mr. David

13 Pritchard.

14 Q    And what is Mr. Blauvelt saying might not be an accurate

15 statement in that letter?

16 A    That *OZ3D* was in production.

17           MR. MCLAIN:  And continue, please.

18           (Videotape played, not reported.)

19 BY MR. MCLAIN:

20 Q    What is Mr. Blauvelt referring to when he says he does not

21 see any documentation to substantiate this?

22 A    The -- the GigaPix Releasing and the Prints and

23 Advertising Funds approaching a hundred million dollars.

24           MR. MCLAIN:  Let's move on to Clip No. 9.

25           (Videotape played, not reported.)

```
 1   BY MR. MCLAIN:

 2   Q    And as part of your investigation, did you and your

 3   colleagues review GigaPix's financials?

 4   A    Yes, we did.

 5   Q    And what did you determine?

 6   A    We determined that some of the money -- the Oz investor

 7   money was misappropriated and didn't follow up as what was

 8   aligned in the Private Placement Memorandums.  Same thing was

 9   also true for GigaPix.

10           MR. MCLAIN:  Let's move on to Clip No. 10.

11           (Videotape played, not reported.)

12   BY MR. MCLAIN:

13   Q    So now, let me ask you how much did Mr. Blauvelt say was

14   earned from Captain Abu Raed for GigaPix?

15   A    He was not aware of GigaPix receiving any money for

16   Captain Abu Raed.

17   Q    And based on your investigation, did Captain Abu Raed lose

18   money for GigaPix?

19   A    Yes, it did.

20           MR. MCLAIN:  Move on to Clip No. 11.

21           (Videotape played, not reported.)

22   BY MR. MCLAIN:

23   Q    Now, when did California issue its cease and desist orders

24   against GigaPix?

25   A    Around May of 2009.
```

1    Q    And did Mr. Blauvelt tell you GigaPix stopped raising

2    money for GigaPix after receiving that order from California?

3    A    Yes, he did.

4    Q    And based on your investigation, is that statement

5    accurate?

6    A    No, it is not.

7    Q    And why is that statement not accurate?

8    A    If you can look at the quick review of the financial

9    analysis, they raised in excess of $3 million from June of 2009

10   onward for GigaPix investor money deposited directly into

11   GigaPix accounts as well as to Private Placement Memorandums

12   dated after May of 2009 for GigaPix.

13   Q    And how do you know that GigaPix continued to raise money

14   from investors after the California cease and desist order?

15   A    Again, based off of financial records and investor money

16   going into GigaPix accounts.

17   Q    And what is Recess Films?

18   A    My understanding is that it is the entity created by

19   GigaPix for the production of films in the state of Iowa.

20              MR. MCLAIN:  Let's continue with this recording.

21              (Videotape played, not reported.)

22              MR. MCLAIN:  And, Your Honor, this portion of the

23   transcript is -- or the audio has been blacked out by the

24   parties' agreement.

25              THE COURT:  Okay.

1                    (Videotape played, not reported.)

2    BY MR. MCLAIN:

3    Q    Now, how much did GigaPix spend per month on overhead,

4    rent, insurance, and salaries, according to Mr. Blauvelt?

5    A    Approximately $300,000 per month.

6    Q    And how much did Mr. Blauvelt say that GigaPix raised in

7    total?

8    A    GigaPix raised 16 to $17 million.

9                    MR. MCLAIN:  Let's move on to Clip No. 12.

10                   (Videotape played, not reported.)

11                   MR. MCLAIN:  This portion has been blacked out by

12   agreement of the parties as well, Your Honor.

13                   (Videotape played, not reported.)

14   BY MR. MCLAIN:

15   Q    So what does Mr. Blauvelt acknowledge concerning who

16   authored newsletters from the company?

17   A    That ultimately was his responsibility.

18   Q    And who does Mr. Blauvelt say was responsible for the

19   salespeople?

20   A    Again, it was his responsibility.

21                   MR. MCLAIN:  Move on to Clip No. 13.

22                   (Videotape played, not reported.)

23   BY MR. MCLAIN:

24   Q    Why does Mr. Blauvelt say the sales office moved from

25   Chatsworth to Lankershim?

1  A    Because he didn't want to get into any more regulatory

2  issues.

3  Q    And based on your investigation, were investor funds for

4  *OZ3D* separated from investor funds for GigaPix?

5  A    Initially they were.  But as I mentioned previously,

6  approximately half of the investor funds were transferred to

7  GigaPix accounts.

8            MR. MCLAIN:  Move on to Clip No. 14, please.

9            (Videotape played, not reported.)

10  BY MR. MCLAIN:

11  Q    So according to Mr. Blauvelt, was GigaPix always reliant

12  on investor funds for income?

13  A    Yes, they were.

14            MR. MCLAIN:  Move on to Clip No. 15.

15            (Videotape played, not reported.)

16  BY MR. MCLAIN:

17  Q    So now, what is Mr. Blauvelt referring to when he says,

18  quote, "the money was not used for that purpose"?

19  A    The *Oz* investor money was not used for its intended

20  purpose.

21  Q    And what was that intended purpose?

22  A    To make and produce the film *OZ3D*.

23            MR. MCLAIN:  Let's continue.

24            (Videotape played, not reported.)

25            MR. MCLAIN:  Let's move on to Clip No. 16.

1              (Videotape played, not reported.)

2    BY MR. MCLAIN:

3    Q    Now, how much does Mr. Blauvelt say he was paid per week?

4    A    Eventually up to $6,000 per week.

5    Q    And what does Mr. Blauvelt say concerning GigaPix Studios

6    owning GigaPix Releasing?

7    A    That he never saw any documentation regarding that.

8              MR. MCLAIN:  Move on to Clip No. 17.

9              (Videotape played, not reported.)

10   BY MR. MCLAIN:

11   Q    So what is Mr. Blauvelt referring to?

12   A    Again, referring back to the May 24th, 2011, letter that

13   he had -- that he had recalled earlier in the -- in the

14   interview.

15   Q    And what is Mr. Blauvelt admitting is not true in the

16   investor update letter?

17   A    That *OZ3D* was in production.

18             MR. MCLAIN:  Move on to Clip No. 18.

19             (Videotape played, not reported.)

20   BY MR. MCLAIN:

21   Q    Is Mr. Blauvelt admitting to cold calling GigaPix

22   investors?

23   A    He said that he might have cold called some.

24   Q    And is he admitting to being in the, quote, "gray areas"

25   on things?

```
 1   A     Yeah, that he probably had.
 2             MR. MCLAIN:  Let's move on to Clip 19 and 20 as
 3   well.  We'll do 19 first.
 4             (Videotape played, not reported.)
 5             MR. MCLAIN:  Let's move on to Clip No. 20.
 6             (Videotape played, not reported.)
 7   BY MR. MCLAIN:
 8   Q     So now, how often is Mr. Blauvelt saying the investors
 9   received financials?
10   A     Just this one time.
11   Q     And what is Mr. Blauvelt asking you to do -- it's from
12   Clip No. 19, actually -- as far as conducting an investigation?
13   A     Oh, he asked us to basically conduct a forensic audit.
14   Q     And did the FBI do such an analysis?
15   A     Yes, we did.
16             MR. MCLAIN:  No further questions at this time,
17   Your Honor.
18             THE COURT:  We'll take our afternoon recess.
19        I would remind you of your duty not to converse or
20   otherwise communicate with yourselves or with anyone upon any
21   subject touching the merits of the cause on trial.  And you are
22   not to form or express an opinion about the case until it's
23   finally submitted to you for your verdict.
24        The jury is excused until called.  Court will remain in
25   session.
```

```
 1                THE COURTROOM DEPUTY:  All rise.

 2                (Out of the presence of the jury.)

 3                THE COURT:  All right.  Ten minutes.

 4                (Break taken.)

 5                THE COURT:  Bring down the jury.

 6                MR. EMMICK:  Your Honor, counsel and I have a

 7   request that we'd like to make before the jury comes out.  Will

 8   the Court hear it?

 9                THE COURT:  Not right now.

10                MS. AMES:  Your Honor, I thought we were going to do

11   this after the Government rested.  But I filed a motion

12   regarding my situation with the witness, Your Honor, requesting

13   a one-day continuance.

14                THE COURT:  You have witnesses and both --

15                MS. AMES:  No, Your Honor, I only have one witness.

16                THE COURT:  You're only going to present one

17   witness?

18                MS. AMES:  Correct, Your Honor.

19                THE COURT:  And the other defendant?

20                MR. EMMICK:  Your Honor, we would like to ask for

21   tomorrow to be given to us.  And the reason is we have a list

22   of ten witnesses that we would like to talk to we haven't

23   talked to yet.  We --

24                THE COURT:  Oh, no.  No, no.  For preparation of the

25   case while the case is going on is -- has to be done and we are
```

1  not going to continue.  We're going to take whatever we --

2  whatever we can take tomorrow.

3          MS. AMES:  Your Honor, does that also mean regarding

4  my one witness?

5          THE COURT:  Yes, your one witness.

6          MS. AMES:  He will not be available to testify, as I

7  put in my filing with the Court.

8          THE COURT:  Why is he not available?

9          MS. AMES:  Your Honor, I --

10         THE COURT:  Why is he not available?

11         MS. AMES:  I listed all of that out on my -- my

12  filing, Your Honor.  And part of it was because we used up the

13  funding with CJA.  And so he -- he is not willing to come in

14  until we get the approval.  We are still waiting with the

15  Ninth Circuit.

16         THE COURT:  That has nothing to do with that.  He

17  has to come in.  If he's subpoenaed, he's asked to come in,

18  he'll be ordered to come in or we'll bring him in.

19         MR. EMMICK:  Your Honor --

20         THE COURT:  This is not good cause for continuance

21  of a day when we can try cases.

22         MS. AMES:  Your Honor, it is just a one-day request

23  for a continuance.

24         THE COURT:  Well, I understand that.  But we'll be

25  through in one day.

1        MR. EMMICK:  Your Honor, we have two witnesses who

2   are coming here on Monday.  They're coming from out of the

3   state.

4        THE COURT:  Well, no.  I told you to be ready with

5   witnesses.  And if you didn't have witnesses to go forward, you

6   would rest.  Now, you put your witnesses on for tomorrow.

7        THE COURTROOM DEPUTY:  All rise for the jury.

8        (In the presence of the jury.)

9        THE COURT:  The record will show the jurors are all

10  present and in their proper places.  The defendants are present

11  with their counsel.

12                    **CROSS-EXAMINATION**

13  BY MS. AMES:

14  Q    Good afternoon, Agent Storer.

15  A    Good afternoon.

16  Q    We've heard a number of clips from the interview you had

17  with Mr. Blauvelt.  But that interview actually lasted closer

18  to an hour and a half; is that correct?

19  A    Yes.  That's correct.

20  Q    And, in fact, he had contacted you by phone and you had a

21  number of telephone conferences with him prior to him coming in

22  for this meeting; correct?

23  A    I can recall one conversation where we set up the meeting.

24  Q    And did he initiate that telephone conversation?

25  A    Yes.  He's the one that reached out to me.

1    Q     And so you scheduled an appointment for him to be able to

2    come in?

3    A     Correct.

4    Q     And he came in without counsel?

5    A     Correct.

6    Q     And you advised him that he didn't need to speak to you?

7    A     That is correct.  We completed a -- an advisal of rights

8    form which was not necessary but we felt appropriate under

9    these circumstances.

10   Q     And he answered all of your questions?

11   A     Yes, he did.

12            MS. AMES:  And no further questions.  Thank you.

13                         **CROSS-EXAMINATION**

14   BY MR. EMMICK:

15   Q     Sir, when were you the case agent on this case and before

16   you went to Washington, D.C.?

17   A     From when it started, the end of 2011, up until the

18   beginning of 2014.  I left to go to headquarters in April of

19   this year.

20   Q     Roughly two and a half years?

21   A     Approximately, yes.

22   Q     And then one case agent took over; right?

23   A     Correct.

24   Q     And that case agent had been working with you or not?

25   A     Yes, he had.

1   Q    Now, you tape-recorded the conversation with Mr. Blauvelt;

2   right?

3   A    Yes, we did.

4   Q    Do you tape-record all of these conversations?

5   A    No, we do not.

6   Q    And when you spoke with Mr. Blauvelt, did you find it

7   useful in investigating the case?

8   A    In this instance, yes.

9   Q    And you can always call up people and do interviews of

10  other witnesses; is that right?

11            MS. LINDSAY:  Objection.  Irrelevant.

12            THE COURT:  The objection is sustained.

13       Counsel, please.

14  BY MR. EMMICK:

15  Q    And do you always record all of the interviews that you

16  conduct?

17  A    No.

18  Q    Do you know an agent by the name of Perry?

19  A    Could you be more specific, sir?

20  Q    I don't know his first name.  He was the agent who took --

21            MR. MCLAIN:  Objection.  Lacks knowledge.

22            THE COURT:  That has nothing to do with his direct

23  examination.

24            MR. EMMICK:  All right.  Thank you, Your Honor.

25            THE COURT:  Any rebuttal?

1        MR. MCLAIN:  No.  No, Your Honor.

2        THE COURT:  No rebuttal.

3    You may step down.

4        THE WITNESS:  Thank you, sir.

5        THE COURT:  Call your next witness.

6        MS. LINDSAY:  Special Agent Eric Potocek.

7        THE COURTROOM DEPUTY:  Please raise your right hand.

8    Do you solemnly swear that the testimony you shall give in

9    the cause now pending before this Court shall be the truth, the

10   whole truth, and nothing but the truth, so help you God?

11       THE WITNESS:  I do.

12       **ERIC POTOCEK, PLAINTIFF'S WITNESS, WAS SWORN**

13       THE COURTROOM DEPUTY:  Thank you.

14   And please state your full and true name for the record

15   and spell your last name.

16       THE WITNESS:  My name is Eric Potocek.  Last name is

17   P-o-t-o-c-e-k.

18       MS. LINDSAY:  May I proceed, Your Honor?

19       THE COURT:  Yes.

20                    **DIRECT EXAMINATION**

21   BY MS. LINDSAY:

22   Q    How are you employed?

23   A    I'm a special agent with the FBI.

24   Q    How long have you been so employed?

25   A    Approximately two and a half years.

```
 1   Q     And do you have a specialty?
 2   A     I do.  I work in a white collar squad.  We investigate
 3   corporate and securities fraud.
 4   Q     Did you work with Special Agent Storer before he left to
 5   Washington, D.C.?
 6   A     Yes.
 7   Q     And did you take over as the case agent from him on the
 8   case now before this jury?
 9   A     I did.
10   Q     In the course of your duties as the case agent, did you
11   arrest Defendant Pritchard on the charges in the Indictment?
12   A     Yes.
13   Q     What date was that?
14   A     I believe that was June 5th, 2014.
15   Q     Do you see Mr. Pritchard here in court today?
16   A     I do.
17   Q     And if you could please point him out by where he's
18   sitting and what he's wearing.
19   A     He's at the first seat of the defendant's table and he's
20   wearing a dark suit with either a gray or blue tie.
21             THE COURT:  The record will indicate that the
22   witness has identified the defendant David Pritchard.
23   BY MS. LINDSAY:
24   Q     Can you describe the scene at the arrest of Mr. Pritchard?
25   A     Sure.  There were approximately 11 agents that showed up
```

```
 1  at Pritchard's residence on June 5th.  We -- once we
 2  established the perimeter, we conducted a knock-and-announce.
 3  Q    Wait.  What do you mean by establishing a perimeter?
 4  A    That's standard procedure for any arrests we do for
 5  officer or agent safety.
 6  Q    So standing around the place?
 7  A    Yes, the perimeter of the residence.
 8  Q    And what is a knock-and-announce?
 9  A    That's -- that's standard procedure.  Basically agents go
10  to the door, knock on the door, and announce who they are to
11  the people inside.
12  Q    So you didn't storm in with your guns blazing?
13  A    I would not characterize it like that.
14  Q    So who was the person who knocked on the door?
15  A    It was either Special Agent Woo or Special Agent Chang.
16  Q    And is that Special Agent Perry Woo?
17  A    That's correct.
18  Q    W-o-o.
19       And is that Special Agent Sherwin Chang?
20  A    That's correct.
21  Q    What happened when either Agent Woo or Agent Chang knocked
22  on the door and announced that FBI was there?
23  A    A woman came to the door.  She was asked to step outside.
24  She was non-compliant and agitated, so she was pulled out of
25  the house.  She was not cuffed, and she was brought back to
```

1    another agent and myself.  The other agent was Special Agent

2    Heather Stachnik -- excuse me.  No.  Amy Choate.

3    Q    C-h-o-a-t-e?

4    A    Yes.

5    Q    A-m-i-e; right?

6    A    Right.

7    Q    Okay.  Now, you have been in court and you heard

8    Mr. Pritchard's opening statement.  Can you tell us what you

9    saw in connection with Mr. Pritchard's girlfriend's

10   grandmother?

11   A    Right.  I was outside in the front of the residence.  And

12   once we had Mr. Pritchard out in front of the house and

13   Ms. Martin out in front of the house, we entered the house to

14   do a protective sweep because we had to enter the house anyway.

15   Q    And Ms. Martin, was she the one who was non-compliant at

16   the --

17   A    She was not compliant.  She was not cuffed.  She was

18   standing just to my left.  Anyway, we conducted the protective

19   sweep for agent safety.

20   Q    Did she inform you that her grandmother was in the house?

21   A    She did.  She said that her grandmother was elderly and in

22   the house and she was concerned for her grandmother's health,

23   that she saw an agent go into her room whom she didn't know

24   with a gun, gun in hand.

25   Q    And who went into the room?

```
 1   A    My understanding is two agents went into the room, Special
 2   Agent Sherwin Chang and Special Agent Heather Stachnik.
 3   Q    And did they have their guns showing?
 4   A    Special Agent Sherwin Chang actually had his hands up when
 5   he entered that room.
 6   Q    Like this (indicating)?
 7   A    Like, yeah, hands up (indicating).
 8   Q    And did you see Special Agent Chang escort the grandmother
 9   outside?
10   A    Yes.  She was an elderly lady, and she had trouble
11   walking, not a lot of mobility.  So she held Special Agent
12   Chang's hand as he helped her down the stairs.  And she
13   actually didn't go outside.  We set up a chair for her near the
14   front of the residence inside, and she sat there.  And once
15   Special Agent Chang sat her down, he explained, you know, what
16   was happening.
17   Q    And was -- was she scared or mad?
18   A    She was mad.
19   Q    And when you say a "protective sweep," can you tell us
20   what that is?
21   A    Um, well, in this situation -- and frequently, this is a
22   very common situation.  You need to go -- if you need to
23   re-enter the house after a subject has been pulled out, you
24   want to make sure that it's safe and -- for the agents inside.
25   So what you do is you do a brief search of the house just to
```

```
 1   make sure that there's no threats on the inside.

 2   Q    And then you ask people inside the house to step outside

 3   the house while you re-entered?

 4   A    That's correct.

 5   Q    And did you allow -- when you re-entered, was this for the

 6   purpose of allowing Mr. Pritchard to use the restroom and

 7   change into clothes appropriate for going downtown?

 8   A    Exactly.

 9   Q    After you arrested Mr. Pritchard, what did you do?

10   A    After he was arrested and was allowed to use the restroom

11   and put into appropriate clothes for transportation to

12   Metropolitan Detention Center, Special Agent Perry Woo and I

13   transported him back to the Los Angeles field office of the FBI

14   for booking.

15   Q    And did you interview him there?

16   A    Yes.  Special Agent Woo and I did.  We interviewed

17   Mr. Pritchard for approximately three and a half hours.

18   Q    What was the room that you were in like that you

19   interviewed Mr. Pritchard in?

20   A    It's an interviewing room.  It's actually in the garage of

21   our building.  It's really three rooms.  There's one main room

22   and then there's a bathroom and then there's an interviewing

23   room which is where we spent most of our time, a table, a few

24   chairs.

25   Q    Was Mr. Pritchard handcuffed?
```

1    A    He was uncuffed, given water, allowed to use the restroom

2    and then we proceeded with the interview.

3    Q    And so it was just you and Mr. Pritchard and Special Agent

4    Perry Woo?

5    A    That's correct.

6    Q    Did you tape-record the interview?

7    A    I did not.

8    Q    Why not?

9    A    It didn't occur to me at the time.

10   Q    And is this due to your inexperience, in part, and, in

11   part --

12   A    That's one of the reasons.

13   Q    In part, accompanying agents on other interviews that were

14   not tape-recorded?

15   A    I had done several interviews with subjects which had not

16   been tape-recorded.

17   Q    And has the FBI policy in that regard recently changed?

18   A    Yes.  At the time of the interview, there was no policy

19   requiring post-custodial interviews be tape-recorded.  Shortly

20   after the arrest, that policy had changed.  At the time of the

21   arrest, I wasn't aware of the policy change -- or being about

22   to change.

23   Q    Did Mr. Pritchard ask about the interview being recorded?

24   A    He did.  He asked me if it was going to be tape-recorded.

25   Q    And what did you tell him?

A    I told him it was not and that I wished it were because

then I wouldn't have to type up a lengthy report.

Q    Did Mr. Pritchard request that you tape-record the

interview?

A    He did not.

Q    Now, when you did the interview, who was doing most of the

speaking with Mr. Pritchard and who was taking the notes?

A    So I -- I did most of the speaking.  I asked Mr. Pritchard

the majority of the questions.  My colleague, Special Agent

Perry Woo, he sat next to me and took detailed notes of the

entire interview.

Q    Did you advise Mr. Pritchard of his constitutional rights?

A    I did.

Q    And when you advised him of these rights, did you read

them off of a form?

A    I read them to him off of a form and I had him read along

as I -- as I spoke.

Q    And did he agree to speak to you?

A    He did.

Q    Did he read and sign the form?

A    He did.

          MS. LINDSAY:  Now, Your Honor, during this agent's

testimony, I would ask that he have placed before him

Government's Exhibit 248 and 249.

          THE COURTROOM DEPUTY:  248 and 249?

1              (Exhibits 248 - 249 for identification.)

2    BY MS. LINDSAY:

3    Q    And is Exhibit 248, is that a Memorandum of Interview that

4    you wrote up with Special Agent Woo following the interview?

5    A    Yes.

6    Q    And Exhibit 249, are those Special Agent Perry Woo's

7    notes?

8    A    Yes, they are.

9    Q    Okay.  Now, what was -- when you arrived there, what was

10   Mr. Pritchard's demeanor?

11   A    Um, when I arrived at the --

12   Q    At the interview room.

13   A    Oh.  It was pretty friendly.  He was joking.  It was

14   pretty light.  It changed, you know, kind of went through the

15   spectrum of emotions throughout the interview, but initially it

16   was pretty --

17   Q    He was making jokes?

18   A    Yes.

19   Q    So in the beginning of the interview, did Mr. Pritchard

20   tell you about his education and background?

21   A    He did.

22   Q    And about how long did he end up spending talking about

23   his education and background?

24   A    We went over his background for -- in chronological order

25   for probably around 30 minutes.

1    Q      And did he say anything in particular about the

2    September 11th attacks?

3    A      He did.

4    Q      Can you tell us about that?

5    A      Absolutely.  He said that he was scheduled to travel that

6    day.  He had a ticket, a plane ticket.  And, you know, for a

7    reason I don't recall right now, he missed his flight.  And

8    that inspired him to -- to, I guess, try to -- try to come up

9    with a project to help fix the problems that he saw over in the

10   Middle East.

11   Q      And did that lead to him working on concepts in Jordan?

12   A      Yes, it did.

13   Q      How did Mr. Pritchard say he got involved with GigaPix?

14   A      Through Mr. Blauvelt.

15   Q      And what did he say that he and Mr. Blauvelt discussed

16   about GigaPix?

17   A      Mr. Blauvelt told Mr. Pritchard that Mr. Pritchard was

18   exactly what he needed to get the company GigaPix off the

19   ground.

20   Q      And what did he say his position was at GigaPix?

21   A      Mr. Pritchard said he was called the president --

22   president of GigaPix but he didn't actually have an official

23   position or an employment contract.

24   Q      And did he say whether he had contracts or shares of

25   GigaPix stock?

1    A    He said he didn't have shares of GigaPix stock at that

2    time.

3    Q    Did he say how he would be paid and make money?

4    A    Um, he advised that he was paid $200,000 per year while he

5    was at GigaPix.

6    Q    Did he at first say that he would only be paid if the

7    studio was successful and the shareholders were paid?

8    A    Initially that's what he said.

9    Q    And then he changed it to 200,000 a year?

10   A    Right.  Initially -- yes, that's correct.

11   Q    Did he tell you that he was capable of earning more money

12   than that?

13   A    Yes, he did.

14   Q    Did he give you an estimate of how much money he spent in

15   Jordan during the years of 2006 to 2008?

16   A    Right.  Between 2006 and 2008, he told me he spent maybe

17   50 to 60 percent of his time over in Jordan.

18   Q    And what was he working on in Jordan?

19   A    A movie called *Captain Abu Raed*.

20   Q    And that's R-a-e-d, I believe?

21   A    That's correct.

22   Q    What did Mr. Pritchard say about that movie?

23   A    It was financed by wealthy Arab investors.  But around

24   2008 Mr. Pritchard needed some money to finish *Captain*

25   *Abu Raed*, so GigaPix invested about $800,000 in the film for

1    post-production.  In exchange, GigaPix received a 25 percent

2    stake in the film *Captain Abu Raed*.

3    Q    Did he say whether it won awards?

4    A    He did.  I think he said it won close to 30 awards,

5    including the -- an award at the Sundance Film Festival.

6    Q    But did he tell you whether it was financially successful?

7    A    He said the film didn't make any money but received

8    distribution.  He also said that independent films -- it's

9    tough for them to make money.

10   Q    So he said it's tough for independent movies to make any

11   money?

12   A    Yes.  Yes, he did.

13   Q    Now, did he tell you who wrote the PPM for GigaPix?

14   A    He couldn't recall the name of the attorney who helped

15   create the PPM.

16   Q    Did he say he was familiar with the PPM dated July 31st,

17   2006?

18   A    Yes.  He was familiar with it.

19   Q    And then did you discuss the cease and desist orders that

20   GigaPix had received?

21   A    At some point during -- at multiple points during the

22   conversation, I believe, we discussed the cease and desist

23   orders.

24   Q    When did he say he learned of the cease and desist orders?

25   A    I believe he -- he learned of the cease and desist orders

1    when he got back to Los Angeles and started spending time in

2    Los Angeles on a full-time basis and started working at GigaPix

3    on a full-time basis, which is the end of around 2008, maybe

4    the beginning of 2009.

5    Q    Did he say anything about building a studio in Iowa?

6    A    Yeah.  Around that time he planned on building another

7    studio in the state of Iowa.

8    Q    Did he talk about the tax credits?

9    A    Right.  That was kind of the basis of -- that's what he

10   told me.  That was the basis of building the studio because the

11   state of Iowa was offering 50 percent tax credits for

12   production.

13   Q    And did he tell you that he had a financing structure in

14   place to produce the film?

15   A    He did.

16   Q    Did he tell you that he had signed agreements for

17   institutional funding on that movie?

18   A    Yeah.  He told me that the movie was going to be funded

19   using tax credits, equity from -- I believe it was an

20   institutional investor in Newport Beach and then a signed

21   agreement with a bank for a loan.

22   Q    And what was the principal purpose, did he say, of the

23   investors' money at GigaPix?

24   A    In the GigaPix investment, which is separate from the *OZ3D*

25   investment, the GigaPix investor funds were supposed to be used

1    to run the company, run the studio, not to pay for production

2    necessarily.

3    Q    And when were investors going to make money -- investors

4    into GigaPix, that is, when were they supposed to make money?

5    A    They would make money when the films GigaPix produced and

6    released started making money and proceeds started coming into

7    the company.

8    Q    Did Mr. Pritchard talk about *Blackbeard* in Iowa?

9    A    He did.

10   Q    Did he say whether they had even hired a cast for

11   *Blackbeard*?

12   A    He told me a cast had not been hired.

13   Q    What did he tell you happened in Iowa?

14   A    Around August 2010, which was about three weeks before

15   they were about to start filming, GigaPix ran into some issues.

16   He said the financing for the film *Blackbeard* had not closed,

17   and the window to shoot the movie before the seasons changed in

18   Iowa was closing.  Additionally, the State of Iowa suspended

19   its 50 percent tax incentive program.

20   Q    Did he say that GigaPix had sued Iowa?

21   A    He did.

22   Q    How much -- how much did he say he was counting on coming

23   from Iowa?

24   A    He told me he was counting on a 14 to $20 million windfall

25   and that his attorneys had advised him that that was a -- that

1   was a reasonable amount.

2   Q    Did he say -- what did he say was the result of the issues

3   in Iowa?

4   A    He told me it was a major blow to GigaPix Studios.  And

5   afterwards, you know, I asked him if he agreed that the studio

6   began to fall apart, and he said, "Yeah."  And the company was

7   barely making it from 2010 to 2012.  Employees weren't being

8   paid.  No one was working in the office.  And they were facing

9   lawsuits.

10  Q    So this is from 2010 to 2012?

11  A    Yes.

12  Q    Everything was falling apart?

13  A    Yes.

14  Q    Did he talk about the stock split at GigaPix?

15  A    He did.  It's actually a reverse split.

16  Q    Can you tell us what a reverse stock split is?

17  A    Sure.  My understanding is -- well, I'll start off -- a

18  traditional stock split is you have one share of stock which is

19  converted into any number of shares.  You know, one stock may

20  be turned into five or ten.  A reverse split is just the

21  opposite.  It's when five or ten shares or any number of shares

22  are converted into one share of stock.

23  Q    Did he say what the reverse stock split at GigaPix was

24  supposed to do?

25  A    Yes.  The -- this was supposed to put the shareholders in

```
 1    a position to earn some real money in the event that the tax
 2    credit lawsuits from Iowa -- you know, they prevailed and there
 3    was a windfall and other reasons.
 4    Q    Did he say anything about taking GigaPix public?
 5    A    Yes.  There was at one point a plan to take GigaPix public
 6    using a reverse merger.
 7    Q    What's a reverse merger?
 8    A    In this situation, it would be a means of going public
 9    where a private company is either purchased by or merges with a
10    publicly traded company, usually a shell company.
11    Q    What's a shell company?
12    A    A shell company, in my understanding, is a publicly traded
13    entity.  A lot of times there isn't much of a business there in
14    the traditional sense of business.  But it is an entity that is
15    traded on exchanges.
16    Q    Did Mr. Pritchard say what else the people helping them
17    take GigaPix public were going to do at the company?
18    A    Right.  The shell company, I believe it was called Make
19    Something Happen Entertainment.  It was owned by a friend or a
20    prior work colleague of Mr. Pritchard named Bob Maerz.  And
21    Maerz was a fairly large guy, and Pritchard thought that Maerz
22    could help clean up what was going on at GigaPix.
23    Q    And did he say whether that deal went through or fell
24    through?
25    A    Ultimately that deal fell through.  The company never went
```

1    public.

2    Q    And now I'd like to show you Government's Exhibit 68,

3    which I believe is in evidence, and specifically paragraph 2

4    where it says GigaPix is set to go public.

5         Did you show this letter to Mr. Pritchard?

6    A    I did.

7    Q    And what did he say about this?

8    A    He told me that he wrote the letter and he caused it to be

9    mailed.

10   Q    Did Mr. Pritchard say anything about Colin Mutton?

11   A    He did.  Mr. Mutton was hired by Mr. Pritchard.

12   Mr. Pritchard said Mutton was supposedly an accountant.  Later

13   on, after Mutton had been hired, Mr. Pritchard learned that

14   Colin Mutton, who is actually a rock and roll accountant --

15   that meant Mr. Mutton didn't understand all of the securities

16   law issues that GigaPix was facing.

17   Q    So what did -- what did Mutton do at the company,

18   essentially, according to Mr. Pritchard?

19   A    He paid the bills.

20   Q    Did he say who instructed Mr. Mutton on how to pay the

21   bills?

22   A    Right.  He said that Pritchard and -- or Mr. Pritchard and

23   Mutton, Colin Mutton together decided which employees and

24   creditors would be paid, and then Mutton handled the

25   transactions.  But after the studio ran into tax problems in

1  Iowa, they continued to spend money, but it was mainly at

2  Pritchard's -- Mr. Pritchard's direction.

3  Q     Did Mr. Pritchard talk about the *Oz* movie?

4  A     He did.

5  Q     What did he say about that?

6  A     Um, in approximately 2007, GigaPix started working on an

7  animated movie, a version of the *Wizard of Oz* story called

8  *OZ3D*.  And they set up an entity for that project called *OZ3D*,

9  LLC.

10  Q     Did he say what was different about the *Oz* offering as

11  opposed to the GigaPix offering?

12  A     Right.  The offering for *OZ3D*, LLC, was an investment in

13  the *OZ3D* movie and its ancillary products, whereas the GigaPix

14  offering was an investment in the studio itself.

15  Q     Did Mr. Pritchard say whether he thought the salesmen

16  raised money the same way for *OZ3D* and GigaPix?

17  A     Yes.  He said as far as he knew, the money was raised in

18  the same manner.

19  Q     Did he say where the salespeople got their information to

20  tell investors?

21  A     Yes.  A lot of times he said he provided the salespeople

22  with information.

23  Q     For example, what kinds of information would he tell the

24  salespeople?

25  A     On one occasion, Mr. Pritchard told the salespeople that a

1   director named Jim Camrone -- Camrude was hired to direct *OZ3D*.

2   Q     Did Mr. Pritchard say anything about what the GigaPix and

3   *OZ3D* investors received in the mail?

4   A     Yes, he did.  He said that the investors received a

5   Private Placement Memorandum and brochure which would be about

6   the investments, and these would be sent to investors, either

7   using FedEx or U.S. mail.

8   Q     Did he say anything about the update letters sent out?

9   A     Yeah.  GigaPix investors also received investment update

10  letters which, you know, generally described what was happening

11  at the studio.

12  Q     Who wrote those?  Did he say?

13  A     Mr. Pritchard and other individuals.

14  Q     And did he say they were mailed to investors?

15  A     He did.

16  Q     Did you ask Mr. Pritchard whether the letters he wrote

17  contained new misrepresentations or omissions?

18  A     I did.

19  Q     And what did he say?

20  A     He told me that in 2010, 2011, he probably didn't include

21  all of the bleak, blunt stuff that was occurring at the

22  company.

23  Q     And was that a quote?

24  A     Quote was he "did not give all of the bleak blunt stuff."

25  Q     Did he elaborate on this later in the interview?

```
 1   A      Yeah, he did.

 2   Q      What did he say?

 3   A      He was, you know, "Was I parsing it thin?  Probably."

 4   Q      And is that a quote as well?

 5   A      That's a quote as well.

 6   Q      Did Mr. Pritchard say how far along they got with OZ3D?

 7   A      He told me that OZ3D made it to the pre-production stage

 8   but physical production had never actually started.

 9   Q      Did he then describe to you what the difference is between

10   pre-production in animation?

11   A      He did.

12   Q      As opposed to production?

13   A      He did.

14   Q      And did he tell you that he knew the difference?

15   A      He did.

16   Q      Did you show him the letter -- we have 68 up there.  Did

17   you show him the letter saying OZ3D is in production?

18   A      I -- I showed him a letter.  I'm not sure if it was this

19   one or another one sent to OZ3D investors.

20   Q      Prior to your showing him that letter, did you ask him

21   whether it would be true to tell an investor that OZ3D was in

22   production?

23   A      I did.  Mr. Pritchard said that he didn't think it

24   would -- I asked him if he sent a letter to OZ3D investors

25   stating the movie was in production.  He told me that he didn't
```

1    think so; and if he had, it would not have been true.

2    Q    And is this when he said that *OZ3D* was not in production

3    and he knew the difference between production and

4    pre-production?

5    A    Around this time, yes.

6    Q    Did he say anything about "in production" being obviously

7    misleading?

8    A    Yes, but this is before I showed him the letter.  He told

9    me that if an investor letter said that *OZ3D* was in production,

10   it would be obviously misleading.

11   Q    Well, then, let's pull up Exhibit 67.  It's in.

12        Is this the letter that you showed to Mr. Pritchard?

13   A    It is.

14   Q    And did you show him the portion of the letter that says

15   *OZ3D* is in production?

16   A    I did.

17   Q    And what did he say at that time?

18   A    At this point, he stated that for animation,

19   pre-production and production, it was kind of a gray area.  And

20   it was difficult to distinguish, you know, the different phases

21   of pre-production and production for animation compared to

22   live-action production.

23   Q    And this is completely opposite to what he told you prior

24   to him showing you the letter he authored?

25   A    Yes.

```
 1   Q      Did he talk about an animation studio for OZ3D?

 2   A      He did.

 3   Q      And what did he say about that?

 4   A      He told me that he was working with -- he was trying to

 5   have a foreign animation studio -- I believe it was called

 6   Starz -- co-produce the film.  Yeah, Starz is a Canadian

 7   animation company, to co-produce the film with GigaPix.

 8   Q      And did anything ever happen with that?

 9   A      He told me that Starz wanted 90 percent of the OZ3D, LLC,

10   shares.  And while Starz and GigaPix were in negotiations,

11   nothing was ever finalized between the two studios.

12   Q      Now, turning to investors that he spoke to, did

13   Mr. Pritchard say how many investors approximately that he had

14   personally spoken to?

15   A      He told me that he may have spoken with around 12 to 15

16   different investors.

17   Q      And did he tell you what his state of mind was during

18   GigaPix's last year and a half?

19   A      He did.  He said he was trying to bring OZ3D back to life.

20   And during the last year, year and a half, he was desperate in

21   doing whatever he could to keep the company going -- the

22   companies going.

23   Q      And what did he say about misleading investors?

24   A      I asked him if he may have said things which misled

25   investors and he agreed with me.  He said there were things
```

1  which were misleading and he admitted information about the

2  true state of the company when he spoke to the investors.

3        He told me -- I mean, he continued.  He said that the

4  reason he did it is because he was betting on the Iowa

5  settlement to come through and kick-start the company.

6  Q    What did he say that he said to investors?  For example,

7  did he claim that he told investors that the offerings were

8  high-risk?

9  A    Yes.  He told me he told investors the offerings were

10 high-risk.  The investors must be qualified.

11 Q    Did he say whether he told investors that *OZ3D* -- or

12 sorry, GigaPix going public was a sure thing?

13 A    He never said that the company going public was a sure

14 thing.

15 Q    He told you that he never told them that?

16 A    Right.  That's what he told me.

17 Q    And did he say whether he said that --

18       THE COURT:  How much longer are you going to be

19 with --

20       MS. LINDSAY:  Five or ten, Your Honor.

21       THE COURT:  I have some matters to take up with the

22 lawyers, so we'll take a very short recess.

23       And I would remind you of your duty not to converse or

24 otherwise communicate with yourselves or with anyone on any

25 subject touching upon the merits of the cause on trial.  You're

1    not to form or express any opinion in the case until it's

2    submitted to you for your verdict.

3         Jury's excused until called.  Court will remain in

4    session.

5               THE COURTROOM DEPUTY:  All rise.

6               (Out of the presence of the jury.)

7               THE COURT:  Counsel, you can get the subpoenas for

8    your witnesses for tomorrow.  We'll take -- the clerk's office

9    will close at 4:00 o'clock.  We'll take a recess right now, and

10   you can go down and get subpoenas for your witnesses.

11              MS. AMES:  And, Your Honor, I apologize.  I wasn't

12   quite expecting us to address the issue earlier.  I thought we

13   would take it up after the Government had closed.  That isn't

14   the issue with my witness.  That's a problem that I have, but

15   he's very accommodating and he would come.

16        The problem that I had is given the voluminous nature of

17   the bank records and, as I put in my -- my written filing with

18   the Court, the problem that I really have and that is my main

19   problem in putting Mr. Wall on the stand is that we have been

20   frantically trying to go through all of those records for him

21   to be able to effectively testify as an expert on the issue,

22   Your Honor.

23              THE COURT:  That's not good cause, Counsel.  That's

24   not good cause.

25              MS. AMES:  But there are 90,000 pages of those

1    records which he has been going through --

2              THE COURT:  I saw that in your note, and that --

3    that's not good cause.

4         All right.  Bring down the jury.  You have subpoenas if

5    you want or if you need.

6              THE COURTROOM DEPUTY:  All rise.

7              (In the presence of the jury.)

8              THE COURT:  The jurors are all present and in their

9    proper places.  Defendants are present with their counsel.

10        You may proceed.

11   BY MS. LINDSAY:

12   Q    Now, talking about OZ3D, did Mr. Pritchard say what

13   investors were told about their money or how their money would

14   be used in OZ3D?

15   A    Mr. Pritchard told me that the investor money for OZ3D

16   would be used to -- used in pre-production and production of

17   the film.

18   Q    Did you show Mr. Pritchard the Use of Proceeds of the

19   Private Placement Memorandum for OZ3D?

20   A    I did.

21   Q    And showing you Government's Exhibit 23 -- and it's

22   page 32 -- is this what you showed to Mr. Pritchard?

23   A    No, it's not.

24   Q    Uh-oh.  Exhibit 23 -- it will be in a folder.

25   A    I think it's a couple of pages.  I think it's a couple

```
 1   pages past.  I think it's page 6 of the document.
 2             MS. LINDSAY:  It should be in one of the --
 3   BY MS. LINDSAY:
 4   Q    And can you tell us the Sanctions number on that?
 5   A    This is 23.34.  23.34.
 6   Q    Try that.  Does that look more like it?
 7   A    No.  This is a -- this is a GigaPix Studios PPM.  I need
 8   an OZ3D PPM.
 9   Q    Sorry.  Try Exhibit 9.
10             MS. LINDSAY:  I apologize, Your Honor.
11   BY MS. LINDSAY:
12   Q    Is that more like it?
13   A    This is it.  This is -- Sanctions number is 9.32.
14   Q    Okay.  Is that what you showed to Mr. Pritchard?
15   A    It is.
16   Q    And this is the Use of Proceeds page of the OZ3D Private
17   Placement Memorandum?
18   A    It is.
19   Q    And did you discuss with Mr. Pritchard how the -- how this
20   says that the majority of investor funds were supposed to be
21   used for pre-production and production expenses related to
22   OZ3D?
23   A    I did.
24   Q    And what did Mr. Pritchard say about that?
25   A    Um, when I asked him if the funds were actually used for
```

```
 1   pre-production and production, he said -- he agreed with me
 2   that they were -- that investors were told that their money
 3   would be used for production of OZ3D.  And then he said, quote,
 4   "Was it true?  No.  The money was not used for production."
 5   Q    And do you recall him saying that?
 6   A    I do.
 7   Q    Did you discuss the financial analysis with Mr. Pritchard?
 8   A    I did.  That was one of the first things I did in the
 9   interview.
10   Q    Go ahead.
11   A    Mr. Pritchard was -- he was uncuffed, we read him his
12   rights, provided him with water, and then I kind of explained
13   to him why we were here.  I read to him the charges, and I -- I
14   said, you know -- generally I summarized the financials, the
15   financial analysis that was done by our forensic accountant
16   Tonya Pinkerton.  And I said for the roughly $14 million that
17   was raised for GigaPix, around -- only around 20 percent of
18   that money was used for production.  And then I said for the
19   roughly 8 to $9 million raised for OZ3D, less than 5 percent of
20   that money was actually used for production-related expenses
21   and that that was being generous.
22   Q    And what was his reaction?
23   A    He just looked at me and he said, "That's it?"
24   Q    And did he make a gesture with his -- his head?
25   A    Yeah.  He looked up, he seemed to be surprised that it was
```

1    only 5 percent.

2    Q    And did he say what his plan was for the money coming in

3    to *OZ3D*?

4    A    He did.

5    Q    And what was that?

6    A    Um, he told me that, um, he was going to use the first 4

7    or $5 million of investor money to pay GigaPix overhead and

8    fees and then use the next 2 to 2 and a half million dollars on

9    scripts and storyboards.

10    Q    Did you ask him if he should have told investors that the

11    majority of the first $8 million raised through the *OZ3D*

12    offering was going to be used to pay GigaPix expenses and

13    things other than the production of *OZ3D*?

14    A    I did.

15    Q    And what did he say?

16    A    He -- he told me that he should have told that information

17    to the *OZ3D* shareholders but he didn't.

18    Q    Did you ask him about in-person meetings with

19    shareholders?

20    A    I did.  He told me he had around two or three in-person

21    meetings with investors.

22    Q    And did he mention one in particular?

23    A    He mentioned a couple.  One was an investor named Kirk

24    Dupall *[phonetic]*, a doctor who -- and another one, a doctor

25    who didn't invest.  And then he also mentioned meetings that he

1    had with an investor named Danny Zucker who invested around a

2    million dollars in GigaPix and *OZ3D* and GigaPix Releasing

3    towards the end of GigaPix.

4    Q    And did you ask him if he told Mr. Zucker that GigaPix and

5    *OZ3D* had raised money from investors for years and only a

6    fraction of that money had been used for any production?

7    A    I did.

8    Q    And what did he say?

9    A    Mr. Pritchard told me that he did not provide Mr. Zucker

10   with that information.

11   Q    And did he say that he should have?

12   A    He agreed that he should have.

13   Q    Did he think that Mr. Zucker would have wanted to know

14   that before he gave Mr. Pritchard his money?

15   A    I asked Mr. Pritchard if he thought Mr. Zucker would have

16   wanted to know and he agreed.

17   Q    Did you ask Mr. Pritchard whether after the tax issues in

18   Iowa he told potential investors, such as Mr. Zucker, that the

19   studio had been raising money to produce *OZ3D* for years and

20   production had not started?

21   A    Yes.

22   Q    And what did he say?

23   A    He said he didn't tell -- he didn't share that information

24   with investors.

25   Q    And did he think investors would have wanted to know that

1  information before investing?

2  A    He did.  He said he was -- he was in a panic and he was

3  betting on the state of Iowa that lawsuit would come through.

4          MS. LINDSAY:  Your Honor, I'm going to ask a

5  question that will result in a bad word being used, but it's a

6  quote.  Shall I have the agent use the exact word?

7          THE COURT:  Quote.

8  BY MS. LINDSAY:

9  Q    Okay.  Did you ask Mr. Pritchard why he did not share the

10  information with investors that *OZ3D* had never began

11  production?

12  A    Yes, I did.  And he said he was in a -- "in a fucking

13  panic."

14  Q    Is that a quote?

15  A    That is a quote.

16  Q    Did you ask Mr. Pritchard how much money the salespeople

17  made?

18  A    I did.  He said that salespeople made either 10 percent

19  commission or 20 percent commissions off of the investors'

20  investments.

21  Q    Off the top?

22  A    Off the top.

23  Q    Did you ask him whether he believed the salespeople shared

24  this information with investors?

25  A    He didn't believe -- he told me that he didn't believe the

```
 1   salespeople would share this.
 2   Q    And did he say that he shared such information?
 3   A    He told me that he didn't disclose it either during his
 4   conversations with investors.
 5   Q    And then at that point did he make a statement about
 6   basically what he did?
 7   A    Um, not necessarily at this point.  This -- it's
 8   conversation.  I guess the report of this conversation is a
 9   summary, a general summary of all the events.  Mr. Pritchard
10   was asked if -- you know, if he had committed fraud, and at
11   that point he didn't say yes or no.  He said, "I get it."  And
12   I quote, "I get it.  I fucked up."
13   Q    Did you ask Mr. Pritchard whether he was aware if
14   investors were told that GigaPix was a successful company on
15   track to become the next Pixar?
16   A    I did.
17   Q    And what did he say?
18   A    He told me that he was an experienced producer and that
19   investors would get that impression.
20   Q    Did you ask him about GigaPix Releasing?
21   A    I did.
22   Q    And what did he say?
23   A    He described GigaPix Releasing as a way of generating cash
24   flow without production risk.  Basically GigaPix Releasing was
25   going to be a distribution company.  They were going to --
```

1    to -- they were going to be paid to release completed films

2    from other studios and they would earn a fee for doing so.

3    Q    Did he say that GigaPix Releasing ran into problems?

4    A    He did.

5    Q    What were the problems that GigaPix Releasing --

6    A    Another individual at GigaPix Releasing named Geno Taylor,

7    he was a co-owner of GigaPix Releasing, he misjudged a number

8    of films GigaPix Releasing would be able to get to distribute.

9    Q    And did he say whether Mr. Taylor got investor money from

10   GigaPix?

11   A    He did.  Mr. Taylor did receive investor money from

12   GigaPix.

13   Q    Was GigaPix Releasing money also used to pay -- used by

14   GigaPix to pay its creditors and its rent?

15   A    Mr. Pritchard said it was.

16   Q    Did he say when he saw the issues that GigaPix was having

17   raising money from investors?

18   A    He said he saw them around 2008.

19   Q    And what did he say he should have done at that point?

20   A    He told me that he should have just left the company then.

21   Q    But did he stay?

22   A    He did.

23   Q    And by 2001, did he have doubts about *OZ3D* ever getting

24   made?

25   A    2011.  He said by 2011 --

1    Q    Sorry.

2    A    -- he began to have serious doubts about the film being

3    made.

4    Q    And what did he say he thought about raising money from

5    small investors?

6    A    He -- he told me he thought it was a bad idea to raise

7    money from small investors.  I got the sense that he was

8    looking back on it in hindsight.  And then he said, you know,

9    in the entertainment world, which he described as a mess,

10   studios looking to raise money need institutional backing,

11   bigger investors.

12   Q    So it was a mistake to raise money from small investors?

13   A    Yes.

14   Q    Did the interview then end?

15   A    Yes, it did.

16   Q    At any time before that, had Mr. Pritchard asked to stop

17   the interview but you did not?

18   A    No.  A couple of times he asked to -- to stop -- to use

19   the restroom and the interview was stopped and Mr. Pritchard

20   was given a couple of minutes.

21            MS. LINDSAY:  Thank you very much.  I have nothing

22   further.

23            THE COURT:  Cross-examination, Defendant Pritchard.

24   ///

25   ///

1          **CROSS-EXAMINATION**

2     BY MR. EMMICK:

3     Q     Sir, I just have a few questions for you.

4     A     Yes, sir.

5     Q     One of the ones I wanted to start with was -- we did hear

6     from the agent earlier who was the starting agent on the case.

7     You know him, I take it?

8     A     Yes, sir.  Adam Storer.

9     Q     And he had been the case agent for two and a half years, I

10    think; is that right?

11    A     That's correct.

12    Q     And you took over sometime in early to mid 2014 as the

13    case agent?

14    A     That's correct.

15    Q     And so that would have been a month or two, maybe three

16    months prior to the indictment?

17    A     Um, yes.  That's true.

18    Q     All right.  And this is a case that fundamentally covers

19    seven, eight years of activity?

20    A     Yes.  That's true.  It's a historical case.

21    Q     All right.  And had Perry Woo been involved in the

22    investigation?

23    A     Not as a principal investigator.  He's on the same

24    corporate and securities fraud squad, so he might have helped

25    out on tangential things.

1   Q    But he wasn't a person who would be routinely reading the

2   materials?

3   A    No.

4   Q    And, in fact, he was just somebody who was the official

5   note-taker during the interview; right?

6            THE COURT:  Counsel, this is, again, beyond his

7   testimony.

8            MR. EMMICK:  Your Honor, he referred to Perry Woo

9   and --

10           THE COURT:  Well, he said Woo.  That's all.  But he

11  didn't say anything that he did.

12           MR. EMMICK:  I think --

13           THE COURT:  That's not his -- cross-examination of

14  his testimony.

15           MR. EMMICK:  All right.

16  BY MR. EMMICK:

17  Q    So Perry Woo was involved in the interview?

18  A    Yes, sir.

19  Q    He's the one who took the notes?

20  A    Yes, sir.

21  Q    Now, you mentioned that there was an arrest of

22  Mr. Pritchard; right?

23  A    That's right, sir.

24  Q    And the arrest involved 11 agents?

25  A    Yes.

1   Q    And the agents were all armed?

2   A    Yes.

3   Q    And they all came to the house at about 6:00 o'clock in

4   the morning?

5   A    That's correct.

6   Q    Now, when you said that they were armed, can you tell us

7   what that means?  Are we talking about pistols?  Are we talking

8   about rifles?  What are we talking about?

9   A    Standard bureau-issued firearms, so it can encompass both.

10  Q    Both pistols and rifles?

11  A    Yes.

12  Q    Yep.

13       Now, you mentioned that the 93-year-old mother was mad?

14  A    I think that's a fair characterization.

15  Q    Yeah.  She was angry; right?

16  A    Right.

17  Q    And the girlfriend of Mr. Pritchard, she was angry too;

18  right?

19  A    Yes, sir.

20  Q    Okay.  And Mr. Pritchard, he was angry as well, wasn't he?

21  A    I -- I couldn't tell.  He was very compliant.

22  Q    But he was -- seeing his angry wife -- excuse me,

23  girlfriend and his angry mother, do you think he was angry?

24            THE COURT:  Counsel, please.  That's argument.

25  ///

```
 1   BY MR. EMMICK:
 2   Q    Did he exhibit any anger?
 3   A    Um, not -- not outwardly.
 4   Q    All right.  Let's talk a little bit about the policy
 5   change that you had suggested in connection with tape-recording
 6   interviews.  All right?
 7   A    Yes, sir.
 8   Q    All right.  And that policy change took place because when
 9   you tape-record an interview, everything is set forth
10   accurately; right?
11                MS. LINDSAY:  Objection.
12                THE COURT:  The objection is over- -- is sustained.
13   I'm sorry.
14   BY MR. EMMICK:
15   Q    It's a big change in policy, isn't it?
16   A    It's certainly a change in policy.
17   Q    Okay.  And you had decided that Mr. Blauvelt would be
18   tape-recorded for his interview?
19   A    No, sir.
20   Q    But somebody did?
21   A    Yes, sir.
22   Q    All right.  And that would have been the other agent who
23   was here speaking earlier?
24   A    That's correct.
25   Q    And so there was a -- an intentional decision to
```

1    tape-record one interview?

2    A     Yes.

3    Q     And there was an intentional decision not to tape-record

4    the interview of Mr. Pritchard?

5    A     No.  I wouldn't describe it as intentional.

6    Q     It's not intentional.  Okay.  Somebody made -- you had --

7    you had tape-recording devices there, didn't you?

8    A     Not in that interview room, no.

9    Q     Not in the room.  But did you have them somewhere there in

10   that little FBI place?

11   A     Yes.  We have tape recorders.

12   Q     Yes.  And you could have used a tape recorder to

13   tape-record this interview, couldn't you?

14   A     Yes, I could have.

15   Q     Okay.  And whether it's an intentional decision or some

16   other kind of a decision, you actually decided not to use a

17   tape recorder?

18   A     At the end of the day, Mr. Pritchard was not

19   tape-recorded.

20   Q     I'm just -- I'm just asking whether you made a decision

21   not to tape-record him.

22           THE COURT:  He just answered the question, Counsel.

23   BY MR. EMMICK:

24   Q     All right.  You didn't do the tape recording.

25   A     No, sir.

```
 1  Q    All right.  Did you have discussions with Mr. Pritchard
 2  about whether he was paid by -- excuse me -- by GigaPix?
 3  A    Yes, I did.
 4  Q    All right.  And did you know at the time that he was
 5  actually not paid by GigaPix?  His salary, at least for that
 6  long period of time between 2010 and --
 7            THE COURT:  Ask your question, Counsel, please.
 8  BY MR. EMMICK:
 9  Q    Did you know at the time that he had not been paid a
10  salary, 2011 and -- excuse me, '10, '11, and '12?
11  A    I didn't -- I did not know when he received a salary --
12  over what periods he was paid and what periods he was not.
13  Q    And is that because the documents weren't in your
14  possession?
15  A    That -- those documents that would break that down were
16  not in my possession at that time.
17  Q    Had you asked for the documents prior to any arrests or
18  any indictment?
19  A    No.  No, I did not.
20  Q    And did you ask Mr. Pritchard for any documents in
21  connection with his work?
22  A    No, I did not.
23  Q    Now, the person who took notes was Mr. Perry Woo; right?
24  A    Yes, sir.
25  Q    All right.  And when Perry Woo took the notes, those notes
```

```
 1   were used when you wrote up your report; right?
 2   A     That's correct.
 3   Q     Now, you know that the notes weren't completely right;
 4   correct?
 5            MS. LINDSAY:  Objection, Your Honor.
 6            THE COURT:  The objection is sustained.
 7            MR. EMMICK:  All right.  Then I'll ask it a little
 8   differently.
 9            THE COURT:  No.  The Government is not on trial in
10   this case.  Your defendants are on trial in this case.
11   BY MR. EMMICK:
12   Q     All right.  Did you notice that he made some mistakes?
13   A     Yes, I did.
14   Q     Okay.  So the Government made mistakes?
15            MS. LINDSAY:  Objection, Your Honor.
16            THE COURT:  The objection is sustained.
17   BY MR. EMMICK:
18   Q     So the person working for the Government, Mr. Woo, made
19   mistakes?
20   A     He made mistakes, yes.
21   Q     All right.  He made mistakes in his notes, and you used
22   the notes in drafting up the 302?
23   A     Yes.  My notes -- or his notes and our recollections.
24   Q     And he knew very little about the underlying case, didn't
25   he?
```

1          MS. LINDSAY:  Objection.  Asked and answered.

2          THE COURT:  The objection is sustained.

3    BY MR. EMMICK:

4    Q    One of the things that he didn't even know at all, for

5    example, was that the -- one of the states involved was Iowa?

6    A    Well, Mr. Pritchard at first misspoke and said Ohio and

7    then corrected himself later on in the interview, and the notes

8    do reflect that.  But you are correct, Special Agent Woo wrote

9    Ohio for the majority of the notes and then only later

10   corrected it to Iowa at the end.

11   Q    Now, earlier you made a reference to whether a Jim Camrude

12   was going to somehow play a role in GigaPix.  Do you remember

13   that?

14   A    That's right.

15   Q    Do you know who Jim Camrude might be?

16   A    I -- I do know.  I believe he was a -- either a CEO

17   possibly of a distributor.

18   Q    And, in fact, later you found out that it wasn't even a

19   reference to anyone named Camrude.  It was Jim Caldwell; right?

20   A    I just know what Mr. Pritchard told me.

21   Q    Okay.  All right.  Didn't Mr. Pritchard make a reference

22   to Jim Caldwell?

23   A    I have Jim Camrude in there, in the notes.  So he may have

24   misspoke or been mischaracterized in the notes --

25   Q    Or had you heard it wrong?  I didn't mean to interrupt

1    you.

2         Had you heard of Jim Caldwell before?

3    A    Yes.

4    Q    And you knew that Jim Caldwell was the person who was

5    going to step in and be the manager of GigaPix after changing

6    the stock structure; right?

7    A    You know what?  I don't recall those specifics.

8    Q    Well, you do know that there was going to be a change in

9    the stock structure?

10   A    Yes.  Yes, sir.

11   Q    You knew that Blauvelt was going to go from 92 percent

12   owner down to 51 percent owner?

13   A    Yes, sir.

14   Q    And there were other changes that were going to be made as

15   well, an exchange of some sorts for other stocks; right?

16              MS. LINDSAY:  This is beyond the scope, Your Honor.

17              THE COURT:  Beyond the scope of the

18   cross-examination -- of the direct examination of this witness.

19   BY MR. EMMICK:

20   Q    And was it Jim Caldwell who was going to step in and be

21   the manager?

22              MS. LINDSAY:  Objection.

23              THE COURT:  Beyond the scope of this man's

24   testimony.

25              MR. EMMICK:  One moment, Your Honor.

1        Nothing further, Your Honor.

2               THE COURT:  Redirect?  I'm sorry.

3               MS. AMES:  No questions of this witness, Your Honor.

4                    **REDIRECT EXAMINATION**

5    BY MS. LINDSAY:

6    Q    Prior to the time that you became the case agent in this

7    matter, how long were you co-case agent with Special

8    Agent Storer?

9    A    Um, 2012, I believe I did my first interview regarding

10   GigaPix Studios.

11   Q    And in the, say, particularly three months leading up to

12   the indictment of this case and the arrest of Mr. Pritchard,

13   were you working extremely intensively and exclusively or

14   almost exclusively on this case?

15   A    I -- I would characterize it as probably the seven months

16   leading up to it.

17   Q    Okay.  Now, when you said there's mistakes in the notes,

18   were you referring to Agent Woo writing Ohio instead of Iowa?

19   A    That's correct.

20   Q    And did that stem from Mr. Pritchard at first stating the

21   wrong state?

22   A    Yes.  That's correct.

23   Q    And were there any other mistakes in the notes that you

24   can recall here?  Anything --

25   A    Nothing off the top of my head.

```
 1   Q    And were you able -- when you were writing your memorandum
 2   of the interview from those notes, were you able to recall
 3   freshly in your mind what Mr. Pritchard had said?
 4   A    Yes, I was.
 5   Q    And is your Memorandum of Interview on your testimony here
 6   based on that -- on that recollection as well as notes?
 7   A    Yes, it is.
 8             MS. LINDSAY:  I have nothing further.
 9             THE COURT:  You may step down.
10        Call your next witness.
11             MS. LINDSAY:  Your Honor, the Government would like
12   to reserve discussing exhibits with the clerk.  But otherwise,
13   the Government will rest.  Thank you.
14             THE COURT:  All right.  We're going to excuse you
15   now until tomorrow morning at 9:30.
16        I would remind you of your duty not to converse or
17   otherwise communicate among yourselves or with anyone on any
18   subject touching upon the merits of the cause on trial.  And
19   you're not to form or express any opinion of the case until
20   it's finally submitted for your verdict.
21        The jury's excused until 9:30 tomorrow morning.  The
22   jury's excused.  Court will remain in session.
23             THE COURTROOM DEPUTY:  All rise.
24             (Out of the presence of the jury.)
25             THE COURT:  All right.  9 :30 tomorrow.
```

1          MS. LINDSAY:  Your Honor?

2          THE COURT:  Yes.

3          MS. LINDSAY:  Obviously the Government did not call

4   all the witnesses named in the Indictment.  So we will be --

5   we're not proceeding on several counts of the Indictment.

6      I don't know if it was Your Honor's practice to submit the

7   Indictment to the jury, but the Government will create a

8   redacted Indictment per your instructions.  I don't know if you

9   want a redacted Indictment.

10          THE COURT:  I think there should be a redacted

11   Indictment.

12          MS. LINDSAY:  And --

13          THE COURT:  Any objection?

14          MS. AMES:  No.  I believe it's appropriate,

15   Your Honor.

16          MR. EMMICK:  No objection.

17          MS. LINDSAY:  And do you prefer -- because different

18   judges are different, do you prefer that we then renumber so

19   the counts are consecutive or just chop them out?

20          THE COURT:  You can work that out with defense

21   counsel as to how they want it best.

22          MS. LINDSAY:  Okay.  Thank you, Your Honor.

23          THE COURT:  All right.  9:30 tomorrow morning.

24          THE COURTROOM DEPUTY:  This court is in recess.

25          (Trial Day 3 concluded at 4:13 p.m.)

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                             )
4    STATE OF CALIFORNIA      )

5

6          I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17          DATED THIS 2ND DAY OF NOVEMBER, 2014.

18

19

20          /S/ MYRA L. PONCE
     _____
21   MYRA L. PONCE, CSR NO. 11544, RMR, CRR
            FEDERAL OFFICIAL COURT REPORTER

22

23

24

25