1             **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3       **HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE**

4

5  **UNITED STATES OF AMERICA,**          )
                                  )

6               **Plaintiff,**     )
                                  )

7     **vs.**                     )  **Case No. CR 14-282 R**
                                  )

8  **DAVID PRITCHARD and**         )    **TRIAL DAY 4**
  **CHRISTOPHER JAMES BLAUVELT,**   )  **(Pages 511 - 666)**

9                         )
               **Defendants.**    )

10  _____)

11

12              **REPORTER'S TRANSCRIPT OF**
                **TRIAL PROCEEDINGS**

13                **TRIAL DAY 4**
          **FRIDAY, OCTOBER 17, 2014**

14                **9:39 A.M.**
          **LOS ANGELES, CALIFORNIA**

15

16

17

18

19

20

21

22  _____

23    **MYRA L. PONCE, CSR NO. 11544, RPR, RMR, CRR**
       FEDERAL OFFICIAL COURT REPORTER

24      312 NORTH SPRING STREET, ROOM 430
       LOS ANGELES, CALIFORNIA 90012

25          (213) 894-2305

1       **APPEARANCES OF COUNSEL:**

2

3 **FOR THE PLAINTIFF:**

4   STEPHANIE YONEKURA
   Acting United States Attorney
5   BY:  ELLYN M. LINDSAY
   BY:  BYRON J. MCLAIN
6    Assistant United States Attorneys
   United States Courthouse
7   312 North Spring Street
   Los Angeles, California  90012
8

9 **FOR THE DEFENDANT DAVID PRITCHARD:**

10   LAW OFFICES OF MICHAEL W. EMMICK
   BY:  MICHAEL W. EMMICK
11    Attorney at Law
   3701 Highland Avenue, Suite 305
12   Manhattan Beach, California  90266

13

 **FOR THE DEFENDANT CHRISTOPHER JAMES BLAUVELT:**
14

   LAW OFFICES OF STEPHANIE AMES
15   BY:  STEPHANIE AMES
    Attorney at Law
16   12100 Wilshire Boulevard, Suite 800
   Los Angeles, California  90025
17

18

19

20

21

22

23

24

25

1            **INDEX OF WITNESSES**

2

3    DEFENDANT'S WITNESSES                                    PAGE

4    KONWISER, Kip

5        Direct Examination by Mr. Emmick              519
         Cross-Examination by Ms. Lindsay             534
6

7

     GROSS, Kenneth Stephen
8
         Direct Examination by Mr. Emmick              541
9        Cross-Examination by Ms. Ames                549
         Cross-Examination by Ms. Lindsay             554
10

11
     PRITCHARD, David
12
         Direct Examination by Mr. Emmick              569
13       Cross-Examination by Ms. Ames                643
         Cross-Examination by Ms. Lindsay             651
14

15

16

17

18

19

20

21

22

23

24

25

1

**INDEX OF EXHIBITS**

2

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 255 - | Private Placement Memorandum for GigaPix dated 7/15/2009 with associated documents | 645 | 645 |
| 258 - | Order to Cease and Desist Assessing Civil Penalty Denying Exemptions, Case 0-99-0023 (Department of Consumer and Business Services - State of Oregon) in the Matter of Tracker International, Inc., v. Ken Gross, et al. | 563 | |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          LOS ANGELES, CALIFORNIA; FRIDAY, OCTOBER 17, 2014

 2                          9:39 A.M.

 3                           -oOo-

 4          (Out of the presence of the jury.)

 5          THE COURTROOM DEPUTY:  Calling Item No. 1, CR 14-282

 6   R, United States of America vs. David Pritchard and Christopher

 7   James Blauvelt.

 8       Counsel, please state your appearances.

 9          MS. LINDSAY:  Good morning, Your Honor.

10   Ellyn Lindsay and Byron McLain for the United States.

11          MR. EMMICK:  Good morning.  Mike Emmick appearing

12   with Mr. David Pritchard.

13          MS. AMES:  And good morning, Your Honor.

14   Stephanie Ames appearing with Christopher Blauvelt.

15          THE COURT:  All right.  I do want to clarify the

16   matter of the -- the matter that I have -- so there won't be

17   any question about it, that on the denial of the stipulation

18   for the continuing of trial and -- the reason given for there

19   is that the defense -- that the expert, Mr. David Wall, which

20   is one of the six defendants which -- six witnesses that

21   defendant witness list provides, that because he was authorized

22   by the CJA on -- for 100 hours.  And that -- it was indicated

23   that Mr. Wall needed additional time and that -- given by the

24   CJA but that no request had been made or had been approved by

25   the CJA for any further time to provide for that and, according
```

1   to the request, that the defendant did not wish to waive his

2   speedy trial rights.  And so defense counsel had continued to

3   diligently prepare the defense as it relates to financial

4   information.

5       All these general amounts given in the stipulation to

6   continue trial do not cause for -- because Mr. Wall was

7   authorized in July, on July 28th of 2014 for 100 hours and

8   there appears to be no situation in which -- for that one

9   purpose of Mr. Wall that the matter should be continued and not

10  proceeded on Friday the 16th *[sic]* with the other five

11  witnesses and the defense of Mr. Pritchard, who gave no reason

12  for joining in the stipulation at a late period after there had

13  been a ruling by the Court that we were to proceed on Friday

14  the 16th *[sic]* to continue with the trial without delay.

15      All right.  And I have a redacted Indictment, and there's

16  one correction to be made.

17              MS. LINDSAY:  Correct, Your Honor.

18              THE COURT:  Any objection to that redacted

19  Indictment?

20              MS. AMES:  No, Your Honor.  I just don't know what

21  the correction is.  So if I could just have one moment.

22              MS. LINDSAY:  It was just that Byron had caught that

23  I had two Count 6's and there were actually eight mail fraud

24  counts.  And it still says 1 to 7, Counts 1 to 7.  So I just

25  changed it.

1          MS. AMES:  I didn't catch that.

2          MR. MCLAIN:  The first page, Counts 1 through 7 and

3    now it says Counts 1 through 8, and there were already eight

4    listed.

5          MR. EMMICK:  No objection, Your Honor.

6          THE COURT:  All right.  And this is the charge as I

7    propose to give it.  And there are -- there, the questions of

8    those eight counts, but you will have to correct which ones are

9    applied to Mr. Pritchard and Mr. Blauvelt.

10          MS. LINDSAY:  And you'd like me to do that so I can

11    e-mail a clean copy to your clerk?

12          THE COURT:  Yes, with the defendants and correct

13    only those and leave them in the same order in which they are

14    given to counsel.

15      All right.  Bring down the jury.

16      And the record will show the defendant has not given the

17    Court a witness list until the morning of Friday the 13th --

18    16th *[sic]* of the proceeding of the trial, in which he now

19    lists ten witnesses for Defendant Pritchard.

20          MR. EMMICK:  Your Honor, that's the same list I

21    showed to opposing counsel yesterday.

22          THE COURT:  I understand but not to the Court.

23          MR. EMMICK:  And I --

24          THE COURT:  That's the order -- the rule is the

25    Court is to be given the witness list.

```
1              MR. EMMICK:  I did show it to the clerk.

2              THE COURT:  That's the concern for the trial of the

3    matter.

4              MR. EMMICK:  I just wanted to say, Your Honor, I

5    showed it to the clerk as soon as I had it.

6              THE COURT:  No.  That's what's been happening here,

7    Counsel, between the Court and you.  No question about it,

8    Mr. Emmick.

9              THE COURTROOM DEPUTY:  All rise.

10             (In the presence of the jury.)

11             THE COURT:  The record should reflect the jurors are

12   all present and in their proper places.  The defendants are

13   present with their counsel.

14        Defendant Pritchard, call your first witness.

15             MR. EMMICK:  Yes, Your Honor.  We'll call Mr. Kip

16   Konwiser.  I believe he's in the witness room.  I'll get him

17   right now.

18             THE COURTROOM DEPUTY:  Please step forward.  If you

19   could walk all the way through.

20             THE WITNESS:  Sure.

21             THE COURTROOM DEPUTY:  And then stand right here.

22   Face me.  Please raise your right hand.

23        Do you solemnly swear that the testimony you shall give in

24   the cause now pending before this Court shall be the truth, the

25   whole truth, and nothing but the truth, so help you God?
```

```
 1              THE WITNESS:  I do.
 2       KIP KONWISER, DEFENDANT'S WITNESS, WAS SWORN
 3              THE COURTROOM DEPUTY:  Thank you.  Please take a
 4  seat.
 5              THE WITNESS:  Yes.
 6              THE COURTROOM DEPUTY:  And please state your full
 7  and true name for the record and spell your last name.
 8              THE WITNESS:  Certainly.  Kip Morse Konwiser,
 9  K-o-n-w-i-s-e-r.
10              MR. EMMICK:  May I proceed, Your Honor?
11              THE COURT:  Yes.
12                        DIRECT EXAMINATION
13  BY MR. EMMICK:
14  Q    Good morning, Mr. Konwiser.  I just want to start out with
15  some preliminary questions, sir.
16       Can you tell us what you do for a living?
17  A    I'm a producer of film, television, music, live events.
18  I've also been an executive in the entertainment industry for
19  about 30-plus years.
20  Q    Your name is Konwiser.  I've seen another "K" name
21  associated with that.  Can you tell us --
22              THE COURT:  Let's not do that, Counsel.  Let's ask
23  questions of the witness, not make speeches.
24  BY MR. EMMICK:
25  Q    Do you have a brother?
```

```
 1   A     Yes.

 2   Q     What's his name?

 3   A     Kern, K-e-r-n.

 4   Q     Thank you.

 5         Can you tell us if you know Mr. David Pritchard?

 6   A     Yes, I do.

 7   Q     When did you come to know him?

 8   A     I first knew of David Pritchard before I got to know him

 9   personally directly.  My brother Kern and I are business

10   partners.  We have been since we were little kids.  All we've

11   done is made movies and been in the entertainment industry

12   together.

13         While we were at Cornell University, my brother's class in

14   theater arts developed a play called *Miss Evers' Boys* which got

15   nominated for a Pulitzer Prize.  And we took that to HBO.

16             THE COURT:  Would you read the question -- just a

17   moment.  Would you read the question to the witness.

18             (Record read.)

19             THE WITNESS:  Uh-huh.  Should I finish the answer?

20             THE COURT:  No.  Answer the question.

21             THE WITNESS:  Uh-huh.

22   BY MR. EMMICK:

23   Q     When did you come to know Mr. Pritchard?

24   A     For clarity, would you like a year or would you like me to

25   explain when I got to know him?
```

1   Q    We'll start with the year and then I'll -- I'll ask you to

2   explain more detail.

3   A    I first knew of Mr. Pritchard approximately 1995 when he

4   was an exec at HBO and I was a producer there.

5   Q    And when is it that you came to actually meet him?

6   A    I came to meet him at -- in about 2008.

7   Q    And when you met him, did you have in mind what you knew

8   of him before?

9   A    Absolutely.

10  Q    Can you tell us what you knew of him before?

11  A    Stellar reputation and a -- one of the brilliant minds in

12  the industry, both creative and business, one of the very few

13  people in the industry I would ever consider working alongside,

14  especially back in my career when things were quite good for me

15  on my own.

16  Q    Did that include an assessment of some of the work that he

17  had done?

18  A    Yes.

19  Q    Can you tell us what that means?

20  A    His work is of the highest quality, both in front of the

21  camera and behind it, which is important as an executive.  He

22  knows how to manage people extraordinarily well.  He knows the

23  industry and advanced it considerably for many of us in the

24  industry thereafter.  His work on *The Simpsons*, his work in

25  HBO, and his work in everything that I had seen prior was the

```
1    top of show.

2    Q    And what was it that caused you to come meet him in 2008?

3    A    It was a mutual acquaintance who introduced us who thought

4    I could be a nice fit with David, and I saw that as an honor.

5    Q    And tell us in more detail how that meeting took place and

6    what its subject was.

7    A    The individual introduced me to David at the GigaPix

8    offices.  We discussed GigaPix's ambitions for producing film

9    and television and determined that my skills and resources

10   might align well with the company's ambitions.

11   Q    And who was at that meeting, if you can recall?

12   A    As best I can recall, it was David, myself, and Jimmy

13   Cummings, James Cummings.

14   Q    Uh-huh.  And what did you understand to be Mr. Pritchard's

15   goals in that regard?

16   A    His goals were very clear.  To develop GigaPix into a

17   full-course feature film in television, production company, and

18   studio, to look to own its own destiny, control distribution

19   and leverages that are otherwise difficult for independent film

20   to be able to control.

21   Q    Would that include animation?

22   A    Not with me.  No.

23   Q    All right.  And over the course of time, did you have

24   further meetings with Mr. Pritchard?

25   A    Over the course of time, yes.
```

1   Q      Yes.

2   A      Yes, I did.

3   Q      Can you give us an approximation of how often you met with

4   Mr. Pritchard and perhaps how often you spoke with him on the

5   telephone?

6   A      On a daily basis, multiple times a day.  That's the way

7   producing works.  It's a constant and collaborative process.

8   Q      And what is it that you were working on when you were

9   speaking with Mr. Pritchard?

10  A      I was working on that which I do, which is furthering the

11  producing process of taking things from either original

12  conception or intellectual property all the way to fruition and

13  delivery to distributor.

14  Q      What other people at GigaPix did you work with?

15  A      My brother Kern, James Cummings, we had an assistant,

16  otherwise David Pritchard.

17  Q      And how long did your work with GigaPix last?  You

18  mentioned 2008 you had met.  When did it end?

19  A      Um, I don't recall exactly.  Um, approximately 2011.

20  Q      Uh-huh.  Did those meetings take place on GigaPix's

21  property or at your offices?

22  A      On GigaPix's property and during the course of natural

23  business.

24  Q      All right.  Can you describe for us some of the particular

25  projects that you were working on with GigaPix?

1   A     Yes.  When I first arrived, I helped with the final

2   post-production and delivery on *Captain Abu Raed*, a feature

3   film that is extraordinary.

4   Q    If I might offer one suggestion.  "Post-production" and

5   "delivery" may not be things that the jury is accustomed to, so

6   if you could just slow down and spell it out a bit.

7   A     I'd be happy to.  Post-production is the process by which

8   a movie completes itself so that it can get to the distributor.

9   There are a lot of elements in a movie from sound and video.

10  Collecting those elements and putting them through quality

11  control so that they're acceptable to be released is a part of

12  post-production, at the very end of the process.

13       Oftentimes on small independent movies, there isn't

14  necessarily someone who has the knowledge sufficient to deliver

15  all those tiny elements.  This movie did not have a

16  post-production supervisor who would be that person.  I do have

17  that expertise.  I am a full producer.  I produce from concept

18  to completion and every single element along the way.  That's

19  rare.

20       I was capable of delivering this movie to the distributor

21  so that GigaPix can complete its process.

22  Q    You began talking about *Captain Abu Raed* and then you

23  referred to the film.  I wonder if you can follow up on that.

24            THE COURT:  No.  Let's get to the relevancy of this

25  lawsuit, this lawsuit which has some charges in it.

1          MR. EMMICK:  It does, and we're getting there,

2     Your Honor.

3          THE COURT:  No.  Let's get to it, what this man did

4     about these charges that are here.

5     BY MR. EMMICK:

6     Q    Did you continue to work with Mr. Pritchard?

7     A    Yes.

8     Q    And did you work with Mr. Pritchard on any particular

9     projects other than *Abu Raed*?

10    A    Yes.  I worked on a number of other projects which were of

11    equal prestige and esteem to *Captain Abu Raed* while associated

12    with David Pritchard, others that also won slews and slews of

13    awards because of his efforts.  *Baker Boys: Inside the Surge* is

14    a picture that my brother directed with the gentleman who went

15    overseas to film it and I produced alongside David Pritchard,

16    another outstanding piece of work.  And we then moved into

17    trying to get a feature film *Blackbeard* aka *Field Trip*

18    produced.

19    Q    Were there any problems or difficulties that arose in the

20    course of that work?

21    A    Nothing up until *Field Trip*.  There were difficulties with

22    *Field Trip* at the very end due -- really in large part entirely

23    due to the state of Iowa.

24    Q    That's -- that's what I was hoping to ask questions about.

25    Can you tell us what happened with respect to Iowa?

1    A    Absolutely.  GigaPix had positioned itself very solidly

2    with Film Finances which is a bond company.  A bond company is

3    a completion guarantee company.  It's important that everybody

4    understand the relevance of that.

5        In order to have your film come successfully financed when

6    it is debt and equity structured -- and we had the structure

7    100 percent complete on *Field Trip* -- you need to have a

8    completion guarantee signed by the bond.

9        In order to do so, it's required that a producer invest

10   some money in their project in order to pull the elements

11   necessary to close the bond.  The cast, schedule, locations,

12   crew -- these are a long list of things that are very formal in

13   a bond.  Much like in the real estate industry, you need a bond

14   before you build a building.

15       So we progressed to the point which was responsible to go

16   out and put those elements in place so we can have the

17   completion guarantee so that the structure that was in place

18   could then complete its funding and we could draw on the

19   funding of the debt and equity structure financed by the bank.

20       An important element to that structure was the 50 percent

21   rebate from the state of Iowa, which had already been

22   established for years before we got there but was being abused

23   by local and small films.

24   Q    Let me just ask you to slow down a little if you could --

25   A    Sure, sure.

1    Q    -- and explain about the 50 percent rebate that has been

2    the subject of something already in this case.

3    A    I'm very familiar with rebates.  I was one of the

4    originators of the Puerto Rico state tax incentive and rebate

5    program.  And the Iowa program was very similar.  It's a

6    transferable tax credit.

7         The program was represented formally by the state at

8    location expos and other demonstrations where they solicit

9    business.  They came after us, looking for us to bring our

10   business there because our business was family films, wholesome

11   and good for the area.

12   Q    And what happened?

13   A    What happened was we -- on the confidence of the state, we

14   continued and put our structure around the relevance of the

15   state's contribution and built the financing structure, which

16   was a genius structure of owning your own distribution and

17   leverage so that you don't make a movie and find it never gets

18   released, which you may have read about.  It happens all the

19   time.

20        David and his expertise knew that this could happen and

21   set things up for the future so that there was a guarantee of

22   success for not one but multiple films.  It all delivered

23   really great messages to families.  The state, however, ignored

24   all that they had put in value with us and instead turned their

25   attention to some of the films that were local that were small

1  films, small, under a million dollars kind of films, that were

2  independent films that abused the Iowa tax credit.

3       Because those films abused it, the governor closed down

4  the entire program two weeks before we were to start shooting

5  the production.

6  Q    What was the impact of that for GigaPix?

7  A    The impact was enormous.  On the confidence of the state

8  of Iowa, who we never thought would be able to lie to us --

9            THE COURT:  Iowa is not here involved in this case

10 at all.

11           THE WITNESS:  Uh-huh.

12           THE COURT:  Let's go to this case.

13           THE WITNESS:  Uh-huh.

14 BY MR. EMMICK:

15 Q    What did Mr. Pritchard do when Iowa said we're not going

16 to adhere to our contract?

17 A    Mr. Pritchard put it to Iowa that they must honor their

18 contract and their commitment.  We had signed contracts and we

19 pursued this as aggressively as we could to hold them to their

20 commitment because they knew we had built an entire momentum

21 around it.  We had legitimized the state and with our

22 legitimate operation.

23 Q    And what was Mr. Pritchard's role in that regard?

24 A    Mr. Pritchard was at the forefront of it.  He was the

25 genius who really showed Iowa how to use its credit.  And when

1   they floundered and lied, he was responsible and stepped

2   forward and tried to handle it as professionally as he could.

3   Q    Did he take any steps to try to obtain additional funding

4   for GigaPix?

5   A    Many.  Many.  David worked without any exaggeration 12 to

6   14 hours a day, six or seven days a week.  I never saw him put

7   a penny in his pocket ever since I've known him, and all he did

8   was work to try to bring more money in to recover the Iowa

9   debacle that they had caused.

10  Q    And what was -- what was it that you were continuing to

11  work on with Mr. Pritchard for that very -- that you were

12  talking about after the Iowa debacle?

13  A    Uh-huh.  I was continuing to work in the directions that

14  David was steering, which is to bring additional capital and

15  try to recover, essentially.  Sometimes people lie and you've

16  got to move on.

17  Q    And did you come to know a fellow by the name of Cardwell,

18  Jim Cardwell?

19  A    Just not so much.  I didn't really get to know him, no.

20  Q    All right.  And was there a concept called reverse merger

21  that was occurring with GigaPix in the course of your work with

22  him?

23  A    Can you be more specific?  Reverse merger in regards to?

24  Q    I can in just a moment, but I'll ask some -- a different

25  question in a different direction.

1        What about Toronto?  Did you have any involvement with

2   GigaPix's work and Mr. Pritchard's work in Toronto?

3   A     No.

4   Q     All right.  And what about in connection with the work

5   that they did in Louisiana?

6   A     No.

7             THE COURT:  This case is not about Toronto,

8   Louisiana, and what Mr. Pritchard was doing in those places.

9   Let's get to this case, to this case which has a very specific

10  concern in the Indictment.

11  BY MR. EMMICK:

12  Q     Did you have occasion to talk with Mr. Pritchard in the

13  course of the three, I think, years you were talking about?

14  A     I'm sorry.  Can you repeat the question?

15            THE COURT:  Read the question to the witness.

16            (Record read.)

17            THE WITNESS:  Between the years of 2008 and 2011,

18  those are the three years you're referring to?

19  BY MR. EMMICK:

20  Q     Yes.

21  A     Yes.  I had occasion to speak with Mr. Pritchard.

22  Q     All right.  And did he talk with you about the financial

23  status of GigaPix?

24            MS. LINDSAY:  Objection.  Calls for hearsay.

25            THE COURT:  Objection sustained.

1          MR. EMMICK:  Your Honor, he's going to be testifying

2     shortly.  And it reflects his state of mind.

3          THE COURT:  I'm talking to this man about his

4     relationship.  And you've already given his opinion of his

5     character.  And that's --

6          MR. EMMICK:  I don't think --

7          THE COURT:  -- I assume, the reason he was called.

8     All the other is totally irrelevant.

9     BY MR. EMMICK:

10    Q    You had many discussions with Mr. Pritchard.  Can you tell

11    us if you had enough discussions to come to an opinion about

12    his honesty or about his experience or about his background?

13    A    Absolutely.

14    Q    All right.  Would you tell us what your opinions are in

15    that regard?  Let's start with honesty.

16    A    On a scale of 1 to 10, I would rate David at a thousand.

17    In the course of honesty, character, morality, ability to

18    execute lead people, David is one of the very few people on the

19    planet with whom I would ever align outside of my own family.

20    Q    Can you tell us why you reached those conclusions?

21    A    All of us are the combination of our choices and

22    sacrifices.  That's what makes up who we are.  When you witness

23    someone make choices and they speak well of their character,

24    then that's timeless.  And that's how we judge people in my

25    family.

1    Q    And can you tell us about any other character traits that

2    you might have in mind?  Did he appear to be hard-working?

3    A    David is extremely hard-working.  He's the hardest working

4    person I've ever worked alongside and alongside with all the

5    people you read about in *People* magazine who get credit for

6    doing that.

7    Q    And did he have in mind the interest of the shareholders?

8    A    First and foremost was his interest in the shareholders

9    and the employees and the projects and the integrity of the

10   brand he was trying to build.

11   Q    And how is it that you came to that conclusion?  What is

12   it that you saw with respect to Mr. Pritchard?

13   A    I saw Mr. Pritchard turn away opportunities that would

14   have been negative or possibly destructive to the positive

15   image of the company and instead forged forward with some of

16   the challenges of building something reputable out of GigaPix.

17   Q    Can you give us any examples?

18   A    If you watch *Captain Abu Raed*, which I think is relevant,

19   David's character and that of GigaPix, it speaks volumes of who

20   David Pritchard is.  If you want to know who as an artist we

21   are, watch and look at our art.  It's a reflection of the

22   honesty we try to pour into our work.  *Captain Abu Raed* speaks

23   perfectly to your questions of David's character.

24   Q    You mentioned the concept of creativity.  Can you fill in

25   what creativity means to you when you're talking about

1    Mr. Pritchard's character?

2    A     Creativity is the opportunity for people to, within a

3    parameter of space, be able to create and provide things from

4    their imagination that can come to speak to other people.  We

5    work in the business of selling emotions.  That's what we do

6    for a living.  To do that, you have to conjure authentic

7    emotions inside yourself and put them into a story structure.

8    That's a gift that most business executives do not have at all,

9    and rarely will one who is creative have any sense of business.

10   David is the ideal blend of both business and creative acumen

11   like you have never seen or will ever be around ever again.

12              MR. EMMICK:  One moment, Your Honor.

13              (Pause in the proceedings.)

14   BY MR. EMMICK:

15   Q     You mentioned earlier that you had occasion to interact

16   with Mr. Pritchard about investors.  Can you expand a bit about

17   Mr. Pritchard's interaction with investors and how that

18   influences your view of him?

19   A     Um, there's a saying, *Always respect the money first.*

20   *Make sure it's treated with respect and understands its*

21   *importance*.  That means putting any of your own ambitions aside

22   and maybe even your own needs aside.  I learned that from David

23   Pritchard, and I watched him perform it every single day.

24              MR. EMMICK:  Nothing further, Your Honor.

25              THE COURT:  Cross-examination, Defendant Blauvelt.

1          MS. AMES:  No questions, Your Honor.

2          THE COURT:  Government?

3                    **CROSS-EXAMINATION**

4   BY MS. LINDSAY:

5   Q     Mr. Konwiser, how many movies have you made?

6   A     Approximately 55.

7   Q     How many of those movies did you finance through cold-call

8   telemarketing by professional career telemarketers who were

9   receiving 20 percent of the investors' money off the top?

10  A     None.

11  Q     Why not?

12  A     It's not a business with which I'm familiar.

13  Q     And isn't it also because such -- assuming the investors

14  are mom and pop from across the United States, they don't

15  understand the movie business; isn't that correct?

16  A     No.  The answer to the question is that which I gave

17  before.  I'm not familiar with the industry.

18  Q     And you're not familiar with the industry, so you don't

19  know how that financing works at all; correct?

20  A     That is correct.

21  Q     So you don't understand the way that GigaPix was financed,

22  assuming that it was financed through cold-call telemarketing

23  by professional telemarketers; correct?

24  A     That's incorrect.  That's not accurately stated.

25  Q     Okay.  State it.

1    A    As I said before, for the record, I do not -- am not an

2    expert or participating in what you call cold-call financing.

3    Q    So you don't know anything about the financing of GigaPix,

4    then?

5    A    Um, I don't see a connection between those two things.

6    Q    All right.  How was -- the money raised for GigaPix that

7    you went out and used on your movies, how was that money

8    raised?  Who was giving you the money to go play and make

9    movies?  Who was doing that?

10   A    Sure.  On *Field Trip*, the money is debt and equity

11   structure.  The money was raised by a bank company that is in

12   the business of financing movies alongside the tax credit of

13   Iowa.

14   Q    And it's important that those are the people that are

15   financing the movie because they understand the business and

16   they understand the risks; correct?

17   A    No.  It's important because they have the appetite and

18   interest to be financing it.  Their understanding is really

19   their responsibility.

20   Q    So you -- you don't take it as your responsibility to make

21   sure that the people that finance your movies understand the

22   risks involved?

23   A    It's my responsibility to respond to any questions that

24   they may have of me and the process.  And I do so.

25   Q    And these institutional lenders, in your experience,

1   understand how risky the ventures are; correct?

2   A    Those who are involved and have had experience in the film

3   industry can have a appreciation for that, sure.

4   Q    Yes.  And it's very important when you say that these

5   investors, these financial investors understand carefully,

6   specifically with unscrupulous honesty what the process is?

7   A    It's important that if they have experience in the

8   industry, that they know to ask the right questions to protect

9   their own investment.

10  Q    And so it's inappropriate to -- to finance your movies

11  with people who really don't understand?

12  A    No.  I would say that's false.

13  Q    Okay.  So --

14  A    What's important is that people --

15  Q    Excuse me.  I'm asking a question.  Isn't it okay -- are

16  you then saying that it's perfectly all right to use money from

17  people who don't understand what's going on in the business?

18  A    No.  That's not what I'm saying.  That's what you said.

19  Q    Tell us what you're saying.

20  A    No.  That's what you said.  That's not what I said.

21  Q    I said tell us what you're saying, then.

22  A    What's important is that when we do business with people

23  in the film industry, that if they ask us questions, we are

24  transparent, honest, and provide them all the information

25  before they make their investment or commitment if that's their

1   choice.

2   Q    So wouldn't you agree that if the money you're using to

3   make your movies comes from mom and pop investors across the

4   United States, it's extremely important that they be treated

5   with scrupulous honesty because their money -- you're using

6   their money to make your movies?

7   A    That's a speculative question because I'm not using their

8   money to make our movies.  As I explained, our structure of

9   financing was not as you're describing it right now.

10  Q    So you're saying none of GigaPix's money went into your

11  movies?

12  A    I'm saying that the structure of the picture that you're

13  referring to, *Field Trip*, was not used for any structure other

14  than the one I described.

15  Q    So you were not aware that the money you used on

16  *Blackbeard* coming from GigaPix was coming from mom and pop

17  investors?

18  A    The money -- how to explain this.  The money for

19  *Field Trip* is a structured finance that came from a bank and a

20  state and a bond company.

21  Q    And that's what Mr. Pritchard told you?

22  A    Well, that's what it was.  That's -- that's a fact.

23  That's the fact.  Nobody had to tell me.

24  Q    Okay.

25  A    That's the structure of the financing of *Field Trip*.

```
 1    Q    All right.  Now, did you understand how Mr. Pritchard was
 2    raising money for GigaPix?
 3    A    That was not my responsibility and not my purview --
 4    Q    So you didn't --
 5    A    -- my job.
 6    Q    You didn't know anything about that angle?
 7    A    Certainly not enough to make a comment.
 8    Q    Now, were you aware that Mr. Pritchard raised money for
 9    the movie OZ3D from a Private Placement Memorandum asking
10    investors to put money into the movie OZ3D?
11    A    No.  As I understand, it was not Mr. Pritchard who was
12    doing that but GigaPix as a company was sourcing money for the
13    picture Oz, which I was not involved.
14    Q    So you had nothing to do with OZ3D?
15    A    Correct.
16    Q    So let's assume that you received a salary from GigaPix
17    and that money came from people who were told that their money
18    would be used to make the movie OZ3D.  They would have been
19    lied to; correct?
20    A    If your statement is true.
21    Q    And would it change --
22              THE COURT:  You're not deciding whether her
23    statements are true.  Answer the question.
24          Give the question to the witness again.
25              (Record read.)
```

1            THE WITNESS:  Okay.  I did not receive a salary, I

2    was not an employee.  So the question is -- how would you like

3    me to answer the question?

4    BY MS. LINDSAY:

5    Q    I can ask you another question.  Were you paid?

6    A    Paid, sure.  I have to get paid for my time and services.

7    Q    But were you paid by GigaPix?

8    A    I was paid an advance against my producing fees for the

9    work that I was doing.

10   Q    Well, the question I asked you was:  Were you paid by

11   GigaPix?  I don't care if you call it a salary or an advance or

12   what.  Were you paid by GigaPix?

13   A    Yes.  Sure.

14   Q    And if that money -- if the money that went into your

15   pocket came from mom and pop investors who were told that their

16   money was going to make *OZ3D*, then they would have been lied

17   to; correct?

18   A    If they were told something like that.

19            MS. LINDSAY:  One moment, please.

20        I have nothing further.

21            THE COURT:  Redirect?

22            MR. EMMICK:  No redirect.

23            THE COURT:  Mr. Konwiser, so we have it clear, do

24   you know anything about the financing of GigaPix and this

25   matter of the creation of this other movie that GigaPix was

1    involved with and Mr. Pritchard was involved with?  Do you know

2    anything about the financing of that --

3              THE WITNESS:  What movie?  You said "other movie."

4              MS. LINDSAY:  *OZ3D*, Your Honor?

5              MR. EMMICK:  *OZ3D*.

6              THE COURT:  *OZ3D*.

7              THE WITNESS:  Okay.

8              THE COURT:  Do you know anything about *OZ3D,* the

9    financing of it?

10             THE WITNESS:  No.  I was not involved in *OZ3D*.

11             THE COURT:  All right.  That's all I wanted to know.

12             THE WITNESS:  Okay.

13             THE COURT:  All right.  You may step down.

14             THE WITNESS:  Sure.

15             THE COURT:  Call your next witness.

16             MR. EMMICK:  Thank you, Your Honor.  Call Mr. Ken

17   Gross.

18             THE COURTROOM DEPUTY:  Mr. Gross, right this way.

19   Walk all the way through to the wall.  Please face me.  Please

20   raise your right hand.

21        Do you solemnly swear that the testimony you shall give in

22   the cause now pending before this Court shall be the truth, the

23   whole truth, and nothing but the truth, so help you God?

24             THE WITNESS:  I do.

25        **KENNETH STEPHEN GROSS, DEFENDANT'S WITNESS, WAS SWORN**

1          THE COURTROOM DEPUTY:  Thank you.  Please take a

2     seat.

3          And please state your full and true name for the record

4     and spell your last name.

5          THE WITNESS:  Kenneth Stephen Gross, G-r-o-s-s.

6     Stephen is spelled with a p-h.

7                         **DIRECT EXAMINATION**

8     BY MR. EMMICK:

9     Q    Good morning, Mr. Gross.

10         Can you tell me if you ever worked at GigaPix?

11    A    Yes, I did.

12    Q    Can you tell us when you worked at GigaPix?

13    A    I don't remember the exact years.  But when it was first

14    formed, I was there.  I worked there for three or four years,

15    um, left the company and came back about a year or so later and

16    worked there for maybe a year and a half, two years.

17    Q    Can you tell us sort of the start dates and end dates and

18    then we'll try to fill it in as best we can?

19    A    The start date would be when the company was formed which

20    I think was in 2002 but I'm not sure.

21    Q    Uh-huh.  And then -- go ahead.

22    A    And the end date was, I believe, around 2010, but it's --

23    it's not something I put on my calendar, so I can't -- it's a

24    little vague.  And when I came back to work, I was there for, I

25    believe, a year and a half, but that's just a guesstimate.

1    Q    And that would have been something like 2008, 2010?

2    A    Uh-huh.

3    Q    2009?

4    A    Yes, sir.

5    Q    All right.  And what was your role there?  What was it

6    that you were doing for GigaPix?

7    A    We had a room full of people whose job it was to help

8    raise money for the company, for its growth by contacting

9    investors and offering them stock in the company.

10   Q    Uh-huh.

11   A    And we were reps or producers.  We weren't salespeople, we

12   weren't officers of the company.  Our job was to identify

13   investors, inform them, give them the materials they needed to

14   make a decision, collect those materials, and turn them over to

15   an officer of the company.

16   Q    And would that apply to both of the periods of time that

17   you worked there?

18   A    Yes, sir.

19   Q    Have you heard the terms "openers" and "closers"?

20   A    Yes, sir.

21   Q    All right.  Would you tell us what those things mean?

22   A    In our jargon, an opener was somebody who was calling

23   people to identify whether or not they were qualified to invest

24   and getting them interested enough so that we could send them a

25   package of information.

1   Q    And closers?

2   A    A closer was somebody who would take it from that point,

3   answer their questions, provide them with additional

4   information, and, if necessary, help them fill out the

5   documentation and then arrange for it to be delivered to the

6   company where an officer of the company was supposed to take

7   over, do a compliance call and complete the sale.  Since we

8   were not officers of the company, we couldn't complete the

9   sale.

10  Q    And so what was your role within that arrangement?

11  A    My job was to supervise the producers/reps, depending on

12  how you want to call them, and provide them with the materials,

13  train them in what they were supposed to do but most

14  importantly to make sure that they stayed within the confines

15  of what the company wanted them to say, didn't do anything

16  which was a misrepresentation of any material facts.

17  Q    Uh-huh.  Um, how many people at GigaPix would you come to

18  know during that period you were working there?

19  A    Who were reps?

20  Q    Yes.

21  A    Um, I'd have to guess about 15 to 20.  You mean at one

22  time or total?

23  Q    Just total.  Break it down after that.

24  A    25, maybe 30.

25  Q    All right.  And working in one place?

```
 1   A    Well, initially we were working in one place.  The second

 2   time when I came back to the company, we were in a different

 3   location.

 4   Q    Uh-huh.  At some point did you come to know David

 5   Pritchard?

 6   A    Yes, sir.

 7   Q    Tell us when you came to know David Pritchard.

 8   A    Chris Blauvelt called me and asked me if I'd come back to

 9   the company to work for the company.  And one of the things

10   that he told me was that he had a new --

11                MS. LINDSAY:  Objection.  Calls for hearsay.

12                THE COURT:  The objection is sustained.

13                MR. EMMICK:  It's not offered for the truth of the

14   matter asserted, Your Honor.  It's offered with respect to his

15   motives for coming to the company.

16                THE COURT:  The objection is sustained, Counsel.

17   BY MR. EMMICK:

18   Q    All right.  You did come back to the company?

19   A    When I learned that David Pritchard was involved and did

20   research on his background, it was my thought that the company

21   would have a really good chance for success and it warranted my

22   coming back.

23   Q    So you did come back?

24   A    Yes, I did.

25   Q    And did you come back in the same role?
```

1   A      Yes, I did.

2   Q      Did you come back and have occasion to meet Mr. Pritchard?

3   A      A number of times.

4   Q      All right.  Tell us about how you came to meet

5   Mr. Pritchard, what the circumstances were, the number of

6   occasions, that background.

7   A      I was first introduced to Mr. Pritchard by Mr. Blauvelt.

8   And we took a little walk around the building, got to know each

9   other, and I started listing off the different reps and -- and

10  what I knew about them to see if -- how familiar he was with

11  the people that I had under me.

12  Q      And what did you find out?

13  A      I found out that this was a man who seemed very confident,

14  experienced, knew what he wanted to do and who was basically

15  somebody who could get things done in terms of films, movies,

16  production because he had -- he'd won, I believe, five Emmys

17  and was responsible for a lot of things on television, in the

18  movies that I knew about personally.

19  Q      And was that to be successful in what he was going to be

20  doing at GigaPix?

21  A      I didn't see any reason why he couldn't be successful if

22  he was left to do what he was supposed to do.

23  Q      And in connection with your discussions with investors,

24  did you talk about Mr. Pritchard?

25  A      Yes.

1  Q    What did you -- what did you say and what was their

2  reaction?

3  A    Well, what I said was this was a man who was responsible

4  for -- and I would name certain TV shows that he was

5  responsible for and give a background based on what I had in

6  front of me.  And I said that, you know, we brought him in to

7  get movies done and to get the company to a position where it

8  could go public, and his qualifications were a big part of the

9  presentation.

10 Q    What kinds of matters was GigaPix getting involved in at

11 that point?

12 A    Well, we had -- we were transitioning from an animation

13 studio to a production -- to a studio where we would have

14 movies made or make movies or be involved in movies and

15 television shows and other projects but not necessarily do the

16 animation in-house.  And so there was a change in the direction

17 of how we were going to get things done, but the idea was we

18 were going to secure the rights or produce or make or

19 co-produce projects that would make the company money, that

20 would make the company famous and allow it at some point to go

21 public by either a buyout or merger or whatever.

22 Q    And what would be Mr. Pritchard's role in connection with

23 those changes and direction?

24 A    He was the -- we had had two people.  We had Mr. Pritchard

25 and Mr. Blauvelt.  Mr. Blauvelt's expertise was in raising

1    money.  Mr. Pritchard's expertise was in film-making,

2    television shows, production.  The guts of what the company was

3    supposed to do was Pritchard's purview.  Mr. Blauvelt's

4    position essentially was to help raise the money to get that

5    done.

6    Q    Um, did you work directly with Mr. Pritchard on any

7    occasions?  For example, did he speak with you on occasions?

8    A    We had occasion to talk.  Um, and he would have meetings

9    every once in a while with all of the reps where he would give

10   us an update, basically news, what we had accomplished, what we

11   were doing, what was going on in Iowa, what was going on with

12   *Oz* or the script for *Oz*.  And it was just to keep us up-to-date

13   on what the company was accomplishing.

14   Q    Can you give us your best estimate of how often those

15   sorts of discussions by Mr. Pritchard to that sales group took

16   place?

17   A    Every couple of months.  It wasn't a regular thing.  But

18   on average, I would say about every 60 days we'd have a

19   meeting.

20   Q    And was Mr. Pritchard giving you a full picture of the

21   status of the company?

22           MS. LINDSAY:  Objection.  Calls for speculation.

23           THE COURT:  The objection is sustained.

24   BY MR. EMMICK:

25   Q    Can you give us some examples of what Mr. Pritchard told

1    the sales group about the status of the company's production

2    efforts?

3    A    He would tell us, um, about deals that were pending, deals

4    that were completed.  He would tell us about the set that we

5    were building for a movie that we were making and show us

6    pictures of the set.  He would talk about the problem in Iowa,

7    that Iowa was supposed to give us a tax credit and we invested

8    a lot of money based on those.  But Iowa had a problem with

9    that, apparently defaulted, the way it was explained to us.

10   And that was inhibiting us from completing the project.  Those

11   are the examples of the types of things he would tell us.

12   Q    And over the course of the years, did you have occasion to

13   see whether or not what Mr. Pritchard had told you was right?

14   A    Do you mean did I visit the sets or anything like that?

15   Q    Or however you might acquire more information.  In other

16   words, was he telling you the truth?

17   A    Well, I was able to verify a lot of the things he said

18   because a lot of the things were published or available.  You

19   could Google those things, you could get them off of *Variety*

20   articles and other things we were provided with so that they

21   were public and common knowledge.  The investors could also

22   refer to them.  So it kind of corroborated -- I never heard

23   anything or saw anything that circumvented things we were told

24   in terms of what the company was doing or trying to do.

25   Q    Did you then come to an opinion about whether or not he

1    was credible, whether he was being honest?

2    A    I never thought anything different that -- I never had a

3    reason to doubt his honesty.

4    Q    Was he careful?

5    A    I believe he was very careful.

6    Q    Did he listen to other people when he had discussions?

7    A    Yes.

8    Q    Can you -- do you have any examples in mind?

9    A    Well, we would have meetings with all of the reps

10   sometimes once a week.  We would be called into the conference

11   room.  Mr. Pritchard would be there, Mr. Blauvelt would be

12   there, and there would be dialogues back and forth.  And

13   Mr. Pritchard would listen to what we had to say and what

14   Mr. Blauvelt had to say.  And so I got the feeling that he was

15   open to -- as a good manager, I believe you have to listen to

16   what people under you are saying because that's where the

17   information comes.  It comes from the bottom up.

18              MR. EMMICK:  One moment, Your Honor.

19              (Pause in the proceedings.)

20              MR. EMMICK:  Nothing further with this witness,

21   Your Honor.

22              THE COURT:  Defendant Blauvelt.

23                       **CROSS-EXAMINATION**

24   BY MS. AMES:

25   Q    Good morning, sir.

1    A    Good morning.

2    Q    Now, as I understand it, it was your role at GigaPix to

3    oversee -- oversee the salespeople; correct?

4    A    The reps.

5    Q    The reps.

6         And these are the people who were selling the investment

7    opportunity in GigaPix; correct?

8    A    As I previously defined it.

9    Q    Okay.

10   A    They weren't consummating the sale, but they were in the

11   "food chain," quote/unquote.

12   Q    Okay.  So let me further understand that process.  You had

13   individuals who would make first contact with potential

14   investors; correct?

15   A    Correct.

16   Q    And those people were part of -- they did kind of an

17   initial screening?

18   A    That's correct.

19   Q    And part of that initial screening was to make sure that

20   those investors were accredited; is that correct?

21   A    That's correct.

22   Q    And what was your understanding of that?

23   A    My understanding was that we were allowed to bring in 3500

24   unaccredited investors but we would prefer not to.  And that if

25   the investor was unaccredited, we had to pay specific attention

1    to how old he was, his occupation, his level of expertise, his

2    ability to -- to risk the funds.  In other words, kind of a

3    suitability test.  If they're not accredited but they're an

4    89-year-old retired person, um, we didn't consider those

5    people.

6    Q    So you wanted to get rid of those people.  You don't want

7    to have them as --

8    A    We didn't think they were qualified to make the

9    investments based on the qualifications that were given to us

10   by management.

11   Q    So when you were working there, if you saw a potential

12   investor that fit that description you just gave me, you would

13   choose not to pursue that individual.  Is that --

14   A    If I was aware of that fact or talked to the person and I

15   felt that the person was not suitable, then I would refuse to

16   allow the sale to continue.

17   Q    And that was kind of part of your control job; is that

18   correct?

19   A    That's correct.

20   Q    And just -- I think we maybe misunderstood the question I

21   was posing with you, so maybe I didn't formulate it very well.

22   But these openers that you had working for you, one of the main

23   criteria was that they were actually looking for accredited

24   investors; correct?

25   A    That's correct.

1   Q     Their goal was to find people who were accredited to

2   invest?

3   A     That's correct.

4   Q     And then once they found these people, then they were

5   turned over to who you referred to as closers?

6   A     Well, first -- before that, they were sent a package of

7   information.  And in some cases, the same person was the

8   closer.

9   Q     I see.

10  A     It -- it was -- if the person's only job was to qualify,

11  then it was turned over to somebody else.  If the person was

12  experienced and did the qualification, then he kept it and

13  continued on with it.

14  Q     And when you talk about the packages, that included these

15  questionnaires to -- to further determine if someone was

16  accredited?

17  A     That's correct.

18  Q     And then the closers talked to the individual?

19  A     That's correct.

20  Q     And it wasn't until after the closers talked to them that

21  then they were turned over to the executives; is that correct?

22  A     They were turned over to the executives when the closer

23  had collected the funds and the documentation necessary to

24  complete the sale.

25  Q     And this was your standard policy or procedure at

GigaPix -- correct? -- when you were working there?

A    It was in writing.  We had a disclaimer that was handed out to all the reps.  We told them that if they didn't explain to the prospect that an officer of the company would finish the sale, that they'd be buying it from an officer of the company, that we were not brokers and we were not authorized to sell them stock, if they didn't read that disclaimer prior to collecting the final package, the sale could be refused.

Q    Um, and so I understand the process, though, the executive didn't talk to any of the potential investors or investors until it had made that second-step process?

A    Not necessarily.  At some point -- at some -- there were occasions where an officer of the company might get involved because a potential investor had questions that could only be answered by somebody who had that knowledge, in which case he would talk to the investor prior to the completion of the transaction.

Q    And part of your job was to make sure that these salespeople were honest and up-front with the investors and potential investors; correct?

A    That was my main function.

Q    And that's what Mr. Blauvelt had hired you to do?

A    That's correct.

Q    And that's what he directed you to do to make sure that they did not make any misrepresentations and that they were

1    honest; correct?

2    A     He insisted on it and was very adamant about the fact that

3    it was my responsibility to make sure that misrepresentations

4    of material facts were not made on my watch.

5    Q     And you took that responsibility seriously?

6    A     Very seriously.

7    Q     And so to the best of your ability, you made sure that

8    that did not happen; correct?

9    A     Whenever possible, I would -- I would make sure that --

10   that did not happen.

11            MS. AMES:  No further questions.

12            THE COURT:  Cross-examination for the Government.

13                       **CROSS-EXAMINATION**

14   BY MS. LINDSAY:

15   Q     Good morning, Mr. Gross.

16   A     Good morning.

17   Q     Now, you -- you said that part of your job was to make

18   sure that salespeople were not making misrepresentations to

19   investors?

20   A     That's correct.

21   Q     And one of the reasons that there's concern about that is

22   because telemarketers who work for high commissions are known

23   to be not necessarily a trustworthy lot?

24   A     I agree.

25   Q     So in the commissions -- in the investment, both GigaPix

1    and *OZ3D* were 20 percent; correct?

2    A     Yes.  That's what I recall.

3    Q     So, um -- so your job was to make sure that these people

4    who are somewhat suspect were scrupulously open and honest with

5    the investors?

6    A     If they were somewhat suspect in my opinion, I would have

7    never hired them or allowed them to continue to work there.

8    You were asking generically telemarketers I thought of as

9    suspect, I agree with that.  But the people that I work with,

10   if I thought that, I would terminate them.

11   Q     Well, wasn't it true that at one point you were worried

12   enough to want all your closers in the open so you could hear

13   them?

14   A     That was always my concern.

15   Q     And isn't it true that Mr. Blauvelt prevented you from

16   putting certain of your closers out in the open?

17   A     In two instances, that is correct.

18   Q     And weren't those Mr. Pusateri and Ms. Brown?

19   A     Yes, ma'am.

20   Q     And your concern in having them behind closed doors was

21   that they might be lying to investors; correct?

22   A     My concern was that not being able to hear them, I

23   couldn't do my job with -- with respect to preventing them from

24   doing misrepresentations.

25   Q     And presumably, if they were being fully open and honest,

1    there would be no reason not to let you hear what they had to

2    say; correct?

3    A    That's correct.

4    Q    But they refused; correct?

5    A    That's correct.

6    Q    And Mr. Blauvelt backed them up; correct?

7    A    That's correct.

8    Q    And they were not fired; correct?

9    A    Correct.

10   Q    Now, you -- you stated that you would not take money from

11   somebody who was unaccredited and 89.  What if they were 85?

12   A    I think the best way to answer that is you look at the

13   entire person, his background, his occupation, his income, his

14   age, his health, and you make a determination as to whether or

15   not you feel it's a suitable investment, knowing that at the

16   end of the day an officer of the company doing compliance will

17   have the final say-so.  It's not just up to you.  But if you're

18   going to proceed, you want to get the feeling that the investor

19   is qualified to make the investment, qualified to take the risk

20   of loss.  And in your opinion -- I mean, you can only form an

21   opinion.  You can't --

22   Q    So, in other words, you would want to have a very

23   detailed, very open and honest discussion with such an investor

24   about the risks involved in an investment like this?

25   A    I think the risks were very clearly spelled out in the

1   offering memorandum and other documentations and in a lot of

2   cases big, bold writing.

3   Q    And you made sure that all of your closers went over in

4   detail the Private Placement Memorandum with the investors?

5   A    Um, they weren't required to go over it in detail.

6   However, they were required to present it and to ask the

7   investor to review it and to be open to questions or

8   interpretation on any questions they had.

9   Q    Now, when you said that -- the things that Mr. Pritchard

10  said that you went and verified, were those things about, for

11  example, them maybe getting together production on, say,

12  *Blackbeard* in Iowa, that kind of thing, what they were doing

13  with production?

14  A    That's correct.

15  Q    And because the investors' money was going into that

16  *Blackbeard* film; correct?

17  A    I can't tell you where the investors' money ever went.

18  Q    Okay.  So you have no --

19  A    Specifically.

20  Q    You had no idea where the investors' money went?

21  A    I wasn't privy to that.

22  Q    And were you aware that -- well, let's talk about the *OZ3D*

23  offering.  Now, you oversaw that raise too; correct?

24  A    That's correct.

25  Q    And the investors were told that their money would be used

1    for the production of *OZ3D*; correct?

2    A    Correct.

3    Q    And were you aware of how the *OZ3D* investor money was

4    spent?

5    A    No.

6    Q    And were you aware that Mr. Pritchard directed that all

7    but 5 percent of that money go to GigaPix?

8    A    Again, I wasn't aware of how the money was used.

9    Q    And would it change your opinion of Mr. Pritchard's

10   honesty and integrity if you knew that all but 5 percent of the

11   investor money into *OZ3D* went to pay off GigaPix debts?

12   A    It's a complicated question.  Can I give you a bifurcated

13   answer?  It's not a yes or no question to me.  May I answer

14   it --

15   Q    Go ahead.

16   A    Okay.  Um, GigaPix was the parent company.  GigaPix

17   apparently owned *OZ3D* or the property and was producing it.  If

18   the money needed to go to GigaPix or to *Oz* and the idea was to

19   keep the company afloat so that *Oz* can be completed and if

20   there were agreements in place to allow GigaPix to retain some

21   of the money that was -- that was reserved for *Oz* and vice

22   versa, if those things were all in place and that was the

23   purpose of doing it, it would not change my opinion.  If, on

24   the other hand, those things weren't in place and he was doing

25   it improperly, it would change my opinion.

1    Q    Well, isn't it a fact that the investors into *OZ3D* were

2    told that only $1 million or -- at most $2 million would go to

3    GigaPix as the producer of *OZ3D*?

4    A    That's a -- that's a detail that I can't specifically

5    recall.

6    Q    Well, assuming that's in the PPM but, in fact, over half

7    of the money into *OZ3D* went to GigaPix, then that would be a

8    false statement?

9    A    If more money went to GigaPix than was allocated or in the

10   Private Placement Memorandum, then if you're asking for my

11   opinion, then it would be improper.

12   Q    And it would change your opinion about Mr. Pritchard's

13   honesty?

14   A    If Mr. Pritchard did something improper intentionally and

15   knowingly, yes, it would.

16   Q    Now, talking about the problems in Iowa, did Mr. Pritchard

17   come in and tell you that the company was falling apart

18   financially?

19   A    Which company?

20   Q    GigaPix.

21   A    Um, he never really presented that scenario to us in the

22   way you're stating it.

23   Q    Did he say that you had had problems in Iowa but now you

24   were changing the focus and looking to maybe doing a movie in

25   Toronto?

A    There were a lot of things on the table, some of which were in various stages of completion and negotiation.  Um, we -- what we knew was that the situation in Iowa was causing a great economic drain on the company because we had invested a lot of money there and we were at a standstill.

Q    Did you tell your investors that the situation in Iowa had created a great financial strain on the company and the company was struggling financially?  You didn't, did you?

A    Actually, what we told them was that we were having a problem in Iowa and that that problem was preventing us from going through with production.  But we -- we never had enough information to be -- or instructions to tell the investor what the financial status of the company was.

Q    So you never told the investors that you couldn't pay -- GigaPix couldn't even pay its salaries or debts?

A    I was never aware of that.

Q    So you never told the investors that?

A    I never told the investors anything I wasn't aware of.

Q    And wouldn't you agree that it was extreme -- it would have been extremely important for the investors to know that GigaPix was struggling financially, couldn't pay salaries, and was shoveling investor money towards lawsuits surrounding Iowa?

A    Um, I think if that information were available and we were instructed to tell the investors, I think that would be the proper thing to do.

1    Q    Well, was it then improper not to make that information

2    available to the very people who were talking to the investors?

3    A    Um, since we didn't know it at the time --

4    Q    No.  I'm asking you.  Was it improper not to inform you of

5    that so that you would be in the know and you'd be able to

6    convey the accurate condition of the company to the investors?

7    A    If that was, in fact, true and we were not told to convey

8    it as part of the presentation, in my personal opinion, that

9    would be improper.

10   Q    Now, are you in your dealings -- are you telling us that

11   you operate always with honesty and integrity?

12   A    I try to.

13   Q    Isn't it a fact that in 1999 you were the subject of a

14   cease and desist order in the case of Tracker International,

15   Inc., Mark Labertew, David Cheng, Southport S.D.G.,

16   Les Fleishman, Ken Gross, Anthony Hall, and Craig Williams

17   brought by the Department of Consumer and Business Services,

18   Division of Finance and Corporate Securities, in the state of

19   Oregon?  Yes or no.

20   A    Um, honestly, I can't recall, but I -- I can't refute

21   that.

22   Q    And so you can't recall --

23   A    I wasn't a principal in that company.  And if the company

24   received a cease and desist because of something it did and I

25   was working there, then I've never --

1   Q    Isn't it a fact that you were a named defendant in this

2   lawsuit?

3   A    Never received any -- any paperwork to that effect.

4   Q    And isn't it a fact that it states that pursuant to Oregon

5   statute, the offer and sales of Tracker common stock by Gross,

6   Hall, and Williams as described herein constitutes the

7   transactions of securities business in Oregon by an unlicensed

8   salesperson, in violation of Oregon law?

9           MR. EMMICK:  Your Honor, objection.  He's already

10  said he didn't look at the --

11          THE COURT:  The objection is sustained.

12  BY MS. LINDSAY:

13  Q    Would it refresh your recollection if I showed you the

14  lawsuit stating that you, in connection with the offer and sale

15  of securities, made untrue statements of material fact and

16  omitted to state material facts which were necessary in order

17  to make the statements, made in light of the circumstances?

18          MR. EMMICK:  Same objection, Your Honor.  She's just

19  read the report.

20          THE COURT:  It's overruled as to that.

21          MR. EMMICK:  He's not seen it.

22  BY MS. LINDSAY:

23  Q    Would it refresh your recollection if I showed you the

24  lawsuit?

25  A    Yes.

```
 1              MS. LINDSAY:  May I approach, Your Honor?

 2   BY MS. LINDSAY:

 3   Q    Showing you Government's Exhibit 258 for identification.

 4              THE COURTROOM DEPUTY:  Exhibit 258 is identified and

 5   placed before the witness.

 6              (Exhibit 258 for identification.)

 7   BY MS. LINDSAY:

 8   Q    If you could look where I marked it with a sticky pad.

 9   Does that refresh your recollection of that lawsuit and order

10   against you?

11   A    Since I've never before seen it, I -- I can't tell you

12   whether or not it refreshes my recollection.  However, a cease

13   and desist was brought because apparently the company had not

14   done the necessary Blue Sky filing with the state which is

15   necessary in order to telemarket in that state.  And so the

16   state was saying since you're not registered to sell in this

17   state, you must cease and desist, which allows the company to

18   then comply and reregister.

19        As far as misrepresentations, I'm -- I'm not aware of any

20   misrepresentations I ever made that were brought to my

21   attention, either of fact or by omission of fact.

22   Q    But isn't it a fact that the lawsuit not only talks about

23   securities violations but about misrepresentations and

24   omissions of material fact?

25   A    Well, based on what --
```

1  Q    Isn't it a fact that the lawsuit mentions that?

2  A    Yes, it is.

3           MR. EMMICK:  Your Honor, the questions are trying to

4  refresh his recollection.

5           THE COURT:  The objection is overruled.

6  BY MS. LINDSAY:

7  Q    So the -- the lawsuit claims that you personally made

8  false statements and omissions of material fact?  Yes or no.

9  A    That's what it claims, yes.

10 Q    Okay.  And then in 2013, you were actually the subject of

11 a lawsuit in the Central District of California, which is here,

12 a complaint for violations of the federal securities laws in

13 the lawsuit of Securities and Exchange Commission vs. Robert

14 Hurd, Your Best Memories International, Inc., and Kenneth

15 Gross; correct?

16 A    Correct.

17 Q    And in that case, the allegation is the conduct involved

18 fraud, deceit, or delivery of reckless disregard of regulatory

19 requirements and resulted in substantial loss or significant

20 risk of substantial loss to other persons; correct?

21 A    No.  Not correct.

22 Q    So you're -- you're saying that's not what the lawsuit

23 alleged?

24 A    No.  What you've done is you've combined the lawsuit as to

25 me and Mr. Hurd and you've included me in things which were

1    not -- Mr. Hurd was the only person accused of fraud.  It was

2    separate from me.  He was -- fraud was alleged in his -- his

3    circumstance, not in mine.  And I settled with the SEC.  And

4    basically it was because Mr. Hurd hadn't complied properly with

5    the securities laws.  And because he hadn't, the company was

6    violating securities laws.  But as to fraud specifically, I was

7    not charged with that, only Mr. Hurd.

8    Q    Well, in fact, you were charged with violating securities

9    laws; correct?

10   A    That's correct.

11   Q    And you agreed that you did?

12   A    I -- I -- rather than fight it, I -- I settled with them.

13   And in the settlement, I agreed not to continue to do it.  It

14   was -- it was one of those things where you say I didn't do

15   anything wrong but I won't do it again.

16            MS. LINDSAY:  Okay.  I have nothing further.

17            THE COURT:  Mr. Gross, do the names Harold Anderson,

18   Linda Hampshire, and Jerome Goodman mean anything to you?

19            THE WITNESS:  Um, they may have been investors in

20   the company, but I didn't have any -- don't have any other --

21            THE COURT:  As investors in the company, do you know

22   what Mr. Pusateri told any or -- or Ms. Brown told any of these

23   people --

24            THE WITNESS:  No, I don't -- I'm sorry.

25            THE COURT:  -- about the financing of this company?

```
 1              THE WITNESS:  No, I don't.
 2              THE COURT:  Do you know any -- anything that any of
 3    the -- that any of the closers or cold callers told people that
 4    were then investing in the company GigaPix and the --
 5              MS. LINDSAY:  OZ3D, Your Honor.
 6              THE COURT:  -- OZ3D matter?
 7              THE WITNESS:  I'm sorry.  I don't understand.
 8              THE COURT:  Do you know what was told to any of the
 9    people who then invested in GigaPix or OZ3D?
10              THE WITNESS:  Yes.
11              THE COURT:  Were you present?
12              THE WITNESS:  Not with regard to Mr. Pusateri or
13    Ms. Brown.
14              THE COURT:  All right.  Did any of those that you
15    heard have to do with Mr. Anderson, Ms. Hampshire, or
16    Mr. Goodman?
17              THE WITNESS:  Your Honor, I cannot recall.
18              THE COURT:  All right.  Thank you.  You may step
19    down.
20         Call your next witness.
21              MR. EMMICK:  We'll next call Mr. Jim Cardwell.  I
22    think he's out in the witness room.
23              (Pause in the proceedings.)
24              MR. EMMICK:  Your Honor, our next witness is not in
25    the witness room.  I'm hoping that --
```

1          THE COURT:  Well, he's your witness.  Call your next

2    witness.

3          MR. EMMICK:  I did try to call him, Your Honor.  I

4    thought this would be a good time to take the morning recess.

5    He's not --

6          THE COURT:  Call your next witness.

7          MR. EMMICK:  Your Honor, the next witness would be

8    Jim Cardwell.  That would be the person I'd want to call.

9          THE COURT:  No.  Then call some other next witness.

10          MR. EMMICK:  Just a moment, Your Honor.

11       Your Honor, we have a next witness.  We're ready to start

12    right now.  If we would take a three-minute bathroom break,

13    that would be a good thing.

14          THE COURT:  All right.  Ladies and gentlemen, I'll

15    remind you of your duty not to converse or otherwise

16    communicate with yourselves or with anyone upon any subject

17    touching the merits of the cause on trial.  And you're not to

18    form or express any opinion of the case until it's finally

19    submitted to you for your verdict.

20       The jury is excused until called.  Court will remain in

21    session.

22          THE COURTROOM DEPUTY:  All rise.

23          (Out of the presence of the jury.)

24          THE COURT:  Mr. Emmick, my responsibility is to run

25    this courtroom.

```
 1              MR. EMMICK:  Yes.

 2              THE COURT:  And I don't want you trying to run it.

 3              MR. EMMICK:  I am not trying --

 4              THE COURT:  That's what you've been trying to do

 5    with all of your tactics which have nothing to do with the

 6    evidence in this case.  What's -- what's involved here is the

 7    honesty of these two defendants and reputation for honesty, not

 8    for being famous but for honesty.

 9              MR. EMMICK:  I agree, Your Honor.

10              THE COURT:  The reputation.

11              MR. EMMICK:  I agree.

12              THE COURT:  That's what's relevant to this case.

13              MR. EMMICK:  I agree, Your Honor.

14              THE COURT:  We'll be in recess ten minutes.

15              (Break taken.)

16              THE COURT:  Bring down the jury.

17              THE COURTROOM DEPUTY:  All rise.

18              (In the presence of the jury.)

19              THE COURT:  The record should show the jurors are

20    all present and in their proper places.  The defendants are

21    present with their counsel.

22          Call your next witness.

23              MR. EMMICK:  We call Mr. David Pritchard.

24              THE COURTROOM DEPUTY:  Please raise your right hand.

25          Do you solemnly swear that the testimony you shall give in
```

1  the cause now pending before this Court shall be the truth, the

2  whole truth, and nothing but the truth, so help you God?

3          THE WITNESS:  Yes, I do.

4          **DAVID PRITCHARD, DEFENSE WITNESS, WAS SWORN**

5          THE COURTROOM DEPUTY:  Thank you.

6      Please state your full and true name for the record and

7  spell your last name.

8          THE WITNESS:  David Bartley Pritchard,

9  P-r-i-t-c-h-a-r-d.

10         MR. EMMICK:  May I proceed, Your Honor?

11         THE COURT:  Yes.

12                    **DIRECT EXAMINATION**

13  BY MR. EMMICK:

14  Q    Mr. Pritchard, can you tell us how you came to work for

15  GigaPix?

16  A    Um, I can't remember the guy's name.  A guy that used to

17  work for me when I was running Film Roman, Zeke Kamm actually

18  called me and told me that there was an animation studio in

19  Chatsworth and introduced me to Chris Blauvelt; that the

20  president had just left and that he thought it would be a good

21  opportunity for me.

22  Q    Can you give us a starting point of the time frame when

23  this happened?

24  A    It was probably May, June of 2006.

25  Q    Uh-huh.  And --

1    A     It was probably June.  I think it was June.

2    Q     Where were you working at that time and what attracted you

3    to GigaPix?

4    A     Um, I -- I'm actually -- GigaPix was, like, the first job

5    that I've had in a while.  Um, I'm, um -- I'm -- usually I'm

6    really picky about what I do.

7         Um, so I had -- at that time I was finishing a transaction

8    with a company called Blow Torch.  I had raised $50 million

9    from a venture capital fund in San Francisco -- San Jose.  The

10   fund was Ignition Partners, and that was based on a business

11   plan that I wrote and, um, actually, a very unique transaction

12   because that was the basis of me actually making the decision

13   to kind of go to GigaPix over some other options that I had.

14        And at the same time I was also living in Jordan, in

15   Amman, Jordan, about half the time.  And it was probably

16   65 percent of the time.  And I built a software company and

17   animation studio and started to work on a film company, all in

18   Arabic.

19   Q     So you mentioned Amman, Jordan.  Can you tell us what you

20   were doing in Amman, Jordan?

21   A     Well, kind of what I said.  Um, I, um -- I've lived and

22   worked in the Middle East for probably 10 or 12 years in

23   various iterations.  And I worked for a big French oil company

24   Schlumberger.  So I spent a lot of time in the Arab world and I

25   had a lot of relationships there.  And I think actually, um,

1    one of the agents actually brought this up in the interview.

2    I, um -- you know, I had a kind of emotional reaction to 9/11.

3    And I -- I was kind of, okay, I can probably help fix this,

4    meaning the Arab-West relationships.  And I'm kind of quixotic

5    in how I approach things that I'm going to go do.  I try to

6    test myself and not get bored.

7         And so I lived in Jordan from 2003 until 2007.

8    Q    You mentioned that through another person you came to

9    GigaPix.  Tell us how that started out.

10   A    Um, well, we met.  God, you know, I went to the office and

11   Chris and I sat down and --

12   Q    "Chris and I."  Can you just be --

13   A    Chris Blauvelt and I sat down in Zeke's -- in Chris's

14   office.  And they kind of told me what the situation was, that

15   the prior president had just left and didn't really tell me all

16   the reasons that he was leaving.

17        Um, but he took me on a tour of the place, introduced me

18   to a bunch of CG/3D artists that were working there.  I mean,

19   there were probably -- I think there was one guy there that

20   worked for me before, not -- at one of the other animation

21   studios that I had run.

22        And -- um, so I met a couple of people and then we talked.

23   Um, and I think I came back about two weeks later or ten days

24   later.  Um, and we started talking specifically about what he

25   wanted to do -- about what Chris Blauvelt wanted to do with the

1    company.  And I told him that I was probably going to be, um,

2    only able to dedicate 50, maybe 40 percent of my time to

3    GigaPix for at least a year because I had a couple of things

4    that I was winding up in Jordan, one of them being an animation

5    production that I had started.  It was actually the first Arab

6    language cartoon.  And then the other thing was, um, a film

7    that I really wanted to do.  So I wanted to go back and finish

8    that film.

9    Q    What are you referring to when you --

10   A    The film was called *Captain Abu Raed*.  And it was one of

11   these -- you know, what I was trying to do was to build a

12   quality film industry in the Arab world.  And that was my

13   concept, to -- to help them tell us who they were culturally

14   and sociologically.

15       And I really -- you know, I'm a history nut and an avid

16   reader.  And I kind of understood the Arab culture, and I

17   really believed that there were aspirational factors that were

18   kind of being quelled, and I wanted to try to heighten those.

19   And I did that through an animated show and then through a

20   series of movies.  I mean, I actually had a couple of movies I

21   wanted to do.  But *Captain Abu Raed* was the first one.

22   Q    And was Mr. Blauvelt accepting of that other activity?

23   A    Yes.

24   Q    And tell us, then, what arrangements were made for your

25   joining GigaPix.

A     I think we met again.

Q     Uh-huh.

A     I mean, I -- you know, I made it kind of clear that I'm not, um -- that taking a job doesn't always work for me mostly because I -- I'm too obsessive.  I -- if I'm going to do something, I actually would prefer -- like, with, um, Blow Torch, the Ignition Partners funding, that took me about two years to raise that $50 million.  When it came in, it was -- you know, it's like anything else, a bunch of institutional money comes into a small startup company and everybody starts vying for it.  And -- but it was a business model that I had created that had a better commercial opportunity in the kids business.

It was basically a college theater business.  And we owned -- we owned -- I negotiated agreements with 600 theater screens to program those theater screens on college campuses between 10:00 p.m. and 1:00 a.m. on Thursday, Friday, and Saturday nights.  And I was going to produce really low-budget films and make them, you know, college-fair and make them funny.  And we would control the advertising space and the marketing space around that.  And we also would set up a -- with Blow Torch because they were basically a digital distribution company.  They were going to distribute the films streaming.

So I wanted to do the same thing with the kids business.

1   And that's really what intrigued me about kind of a -- an

2   untested animation studio because the kids business is kind of

3   a -- it's a weird business from a film and entertainment

4   perspective.  There's four channels that dominate.  There are

5   no broadcast channels that carry kids programming of any note.

6   It's all reruns and silly action shows.

7       So it's Nickelodeon, Cartoon Network, Disney Channel.  And

8   I thought I could build a channel for kids like I was building

9   in the college business for kids.  And when I grew up, I grew

10  up going to Saturday matinees.  So the concept was that I was

11  going to negotiate agreements with exhibitors, movie theaters

12  to run kids films.

13      And I thought GigaPix would be a good place because they

14  hadn't produced anything.  They really didn't have a brand

15  recognition, and it seemed like they would be, you know, okay

16  to do this.

17      And also, Chris had explained to me that they had a couple

18  of million dollars in the bank.  And I was, like, okay.  Well,

19  then, I don't have to, like, stretch to go get the money.

20  Because normally when I come into companies, the first thing

21  they ask me to do is to go find institutional money.  And, you

22  know, in 2006 that started to get really difficult.

23  Q   When you say it started to get difficult, what do you have

24  in mind?

25  A   I -- I think it's called difficult.  The, um --

1   Q      Let me ask you --

2   A      The economy was -- you know, anybody who was kind of

3   living in the bigger world knew that or can see that the

4   economy was going to start to tilt.  And, um -- and with that

5   tilting, there was going to be, you know, restrictions and

6   compression and that -- you know, when I was in the Middle

7   East, they had none of that because they had a completely

8   different economic construct.  They -- you know, they have oil,

9   they have huge oil deposits.  So they were not actually

10  struggling as much as when you would come back to the States.

11  Q      And when you raised those sorts of issues with

12  Mr. Blauvelt and with GigaPix, what was their reactions since

13  you wouldn't be spending all of your time with GigaPix that

14  first year?

15  A      You know, I think the main thing that Chris wanted was for

16  me to help him figure this out.  That's really what we talked

17  about.  And we said, you know -- you know, I have kind of a

18  weird approach to stuff like this.  I don't really care if

19  somebody gives me an employment contract.  I mean, I probably

20  take two-thirds of my advisory assignments without any kind of

21  a written agreement.  I basically work it out and -- and if I

22  kind of feel like it's going to happen, you know, I throw

23  myself at it for 60 or 180 days and see if I can make it work.

24  Q      And can you describe what the arrangement was with

25  GigaPix, for your starting with GigaPix?

1    A     It was pretty simple.  Um, I was going to get $4,000 a

2    week in salary.  You know, I think that was what it was.  Um --

3    and then, um -- and then, um, there was going to be stock.

4    And -- and Chris and I had a couple conversations about, you

5    know, profit sharing and, you know, revenue sharing and -- you

6    know, you generally look at those things as, okay, well,

7    let's -- we'll approach that when we get to it.  But right now,

8    let me just see if I can figure this out.  And it's going to

9    take me six months to figure it out.

10   Q     And can you tell us, then, what your position or formal

11   role would be within GigaPix from that point forward?

12   A     Well, we -- we -- Chris actually sent me -- I can't

13   remember if he wrote the -- actually, yeah.  He wrote the -- an

14   employment contract with me as the president of the company.

15   And, you know, I was like, look, I don't really want to run

16   things.  It's not -- um, it's not fun for me anymore.  Um --

17   Q     What did you mean by that?

18   A     Um, it stinks to have the responsibility for a bunch of

19   people.  I mean, it -- it sounds like it's fun to be the boss,

20   but it isn't, you know, and especially in small startup

21   companies.  And that's essentially what this was.  And, you

22   know, I had a pretty good track record of turning animation

23   studios around.  You know, I clearly -- you know, I'm clearly

24   opinionated and, you know, I have no problem expressing myself.

25   And I -- and if I feel strongly about something, I say it.

1      Um, so we -- we kind of agreed.  But, you know, I said,

2  look, I don't want an employment contract.  It doesn't matter

3  to me.  Let me see if I can figure this out.  And let's go six

4  months at a time.

5  Q    Tell us then what happened during those first six or 12

6  months.

7  A    Um, well there were a bunch of weird things that happened.

8  But, you know, I guess right in the beginning, I was in Jordan

9  because the, um -- I had just attended an event in New York

10  City at the Metropolitan Museum of Art where the king and queen

11  of Jordan and a bunch of dignitaries had kind of honored the

12  animation series.  And I felt like I was kind of on high and,

13  um, they -- you know, they kind of asked me if I would stay and

14  move to Jordan.  And I was, like, half the time is okay;

15  two-thirds, I don't know.

16      And so I -- you know, I said no and -- but I felt really

17  good about what I had just done.  And I -- and I said to the

18  partners who actually owned the company in Jordan, I said,

19  look, I'm gonna go do some work with this animation studio.

20  Looks like they've got a decent post-production facility.  I

21  don't know exactly what their capacities are.

22      Um, and around that time, Chris found some guy by the name

23  of Clark Graff who I kind of knew because he was a -- a motion

24  capture animator.  You know, when you get into a bodysuit and

25  you put the targets on.  It's more for games than it is

1    anything else.  And I had produced a couple of shows,

2    television shows doing that.

3        And so we hired Clark Graff and brought him into GigaPix

4    and set up a post facility and that made me feel more

5    comfortable about bringing the *Ben & Izzy* project into GigaPix.

6    Q    Let me stop you there.  What is this *Ben & Izzy* project?

7    A    *Ben & Izzy* is the -- I'm sorry.  That's the animated

8    series that I had created in Jordan and -- and that they had

9    just honored me on and all that stuff.

10   Q    But you referred to the -- the *Abu Raed* and the

11   *Ben & Izzy*.  How was GigaPix going to be involved in those?

12   A    Well, with *Ben & Izzy*, it was kind of simple because we

13   now had a -- you know, a graphic system, a couple of people --

14   there was another guy that came with Clark Graff.  So I felt

15   pretty comfortable that we could get the -- the post-production

16   done on that pilot.  It turned out to be a lot more

17   complicated, a lot more difficult.  And some of it was because

18   the systems that GigaPix had and that Clark had brought in were

19   not, um -- they weren't current.

20   Q    Uh-huh.

21   A    Um, so the first thing was that work came in and I think

22   we got $200,000, somewhere around $200,000 for that work.  And

23   then at the same time, I started raising the money in Jordan

24   to -- to start production on this movie or potentially start

25   production on *Captain Abu Raed*.  And it turned out to be pretty

1    easy.  I mean -- so --

2    Q    Let me just stop you there.

3         And what was GigaPix's role with respect to the movie

4    *Captain Abu Raed*?

5    A    Um, well, I said to Chris, I said, look, um, the first

6    thing the studio needs to do is get some credits.  And the

7    second thing is -- the entertainment business has just -- like

8    any other industry, has all kinds of layers.  And so there's

9    like, um, people that operate at the high end, you know, the

10   über Spielberg characters and there's all kinds of people down

11   here (indicating) and there's a whole bunch of stuff happening

12   in the middle (indicating).  And if you're going to try to

13   define your company with creative expression, then you should

14   try to do something that's, number one, going to get some

15   attention; number two, is going to be different and that will

16   help you get attention; and number three, really, really high

17   quality.

18        So I said to Chris, I said this is one of the best

19   screenplays I've ever read.  And I think it has the potential

20   to be *Cinema Paradiso* or something like that, which is -- I

21   mean, it's a beautiful film.

22        And the other thing was I -- at that time, I had -- I had

23   a really good relationships in the Middle East, I mean, you

24   know, 40-year family relationships.  And that's how they

25   operate.  I mean, you know, I think I raised $2 million for

1    *Captain Abu Raed* in three dinners with about 15 people, and

2    there was never paperwork.  I mean, you know, that's kind of

3    how that part of the world works.

4         So, um, what I said to Chris was -- I said if this is as

5    good as I think it's going to be, we should really try to do

6    the post-production on it and the color grading, which is where

7    you kind of fix the final color and the sound.  And if we can

8    do all of those things, it would be a great thing for the

9    studio.  And if I can get a co-production out of it where we

10   actually get our name on the marquee, then it will be better.

11        So do you want me to keep going, or do you want to ask --

12   Q    I really am just trying to focus on what happens during

13   that first year.

14   A    Okay.

15   Q    You're working --

16   A    So what happened was I was in Jordan most of the early

17   part of 2007.  We started production on the film in, um -- and

18   it was probably July or August.  And I say that because it was

19   really hot.  And, um, I remember calling Chris at one point and

20   saying this is an unbelievable film.  This is going to -- I

21   actually thought only to myself that it could win an Academy

22   Award.  And I -- that's -- that was not in my stars.

23        So I said, "Chris, if we can, we should throw a little bit

24   of money at this and not ask them to necessarily fund

25   100 percent of this because it will cut the budget of the film.

1    And, you know, if you're willing to go at it, I actually think

2    it would be an incredible way to launch the company."

3    Q    And what is it that Mr. Blauvelt responded with?

4    A    He was game.  He -- you know, I told him, I said that, you

5    know, it's probably going to be -- depending upon what kind of

6    a deal we could make with Clark Graff on his equipment and how

7    much we would have to pay an editor because the editor was

8    going to be a Jordanian guy, so I knew that that would probably

9    be not a big cost, but it's really the equipment and the

10   software and all of that stuff that kind of can kill you.

11        And I told Chris that it would probably be 600 grand at

12   the most.

13   Q    So there were discussions about that movie -- excuse me --

14   and then some other movies as well during that first year time

15   period?

16        THE COURT:  Don't state.  Ask questions.

17   BY MR. EMMICK:

18   Q    Were there discussions during that first year during --

19   A    Well, one of the things that was important to me and it

20   looked like we had an opportunity to actually execute against

21   this, the reason most movies stink or are not -- actually, the

22   reason that I don't really like to produce movies is because it

23   takes up a year of your time as the producer.  That's number

24   one.  Number two, you've got to get 250 to 300 people to come

25   together over the course of six weeks and gel, and then they

 1  have to go to work for about eight to ten weeks while you're

 2  producing the movie and then they all go away.

 3      And that sociology is really tricky and, you know, it's --

 4  I mean, it's really, really tricky.  And so if you're the

 5  producer, the executive producer and the producer, you've got

 6  to kind of hold that together.  And it's not -- you know, it's

 7  like herding cats.  It's actually it's more like having a bunch

 8  of 10-year-old kids, you know, that you're hanging around with.

 9  Q    Can you tell us about a movie by the name of *Baker Boys*

10  and how that related to GigaPix?

11  A    Well, in 2006, a guy named John Steele, whom I've known

12  for 30 years, he's probably the top war videographer in the

13  world, he had been the head cinematographer for ITN, which is

14  the biggest news service out of the UK.  And he had covered

15  more wars than -- John was probably about three years younger

16  than me, but he had covered more wars than any other

17  journalist.

18      And he was -- he's married to a Jordanian, a

19  Palestinian-Jordanian woman.  And we're really good friends.

20  And he said he -- he put his camera down and walked out of Iraq

21  in 2003 because of the debacle that he thought was coming.  And

22  in 2006, he wanted to go back and see what had happened, see if

23  all of the things he thought were going to happen happened.

24      And, you know, his wife was pretty upset.  And I said,

25  "Look, John.  You know, you can't do something like that

1   without getting insurance.  So I know a Swiss company, Swiss

2   production company.  They'll put up the insurance company,"

3   because the Swiss had favorable insurance rates.  And, um -- so

4   he literally -- and then he made a bunch of calls, I made a

5   bunch of calls, and he embedded himself with a company of

6   soldiers right in the middle of Baghdad with unfettered access,

7   24/7.  He lived with them and could shoot anything he wanted.

8       And it was pure serendipity.  The first night that he

9   called me on a sat phone -- on a satellite phone, he said,

10  "You're never going to believe what's going on."  He said,

11  "They're letting me film this."  He said, "I'm actually

12  watching transactions where American G.I.s that are under the

13  age of 25 are handing million dollar" -- "million dollars in

14  cash, in 50 and hundred dollar bills, to Sunni sheikhs to not

15  fight."

16      And I said, "And they're letting you shoot that?"

17      And he was, like, "Yes."  And he said, "I have, like,

18  eight transactions already and they're telling me I can shoot

19  all of them I want."

20      Um, so as a result, that was -- I mean, I didn't -- no one

21  had ever captured anything like that.  And John's a pretty

22  intense guy.  He's been blown up a bunch of times, shot at a

23  bunch of times.  And he's an American.

24  Q   By "John," you mean John --

25  A   John Steele.  John Steele.

1     So I told him, I said, "Look, if we can get worldwide

2  rights, we will post this thing."  And, you know, by that

3  time -- you know, I knew the Konwisers were coming to work with

4  GigaPix.  I recruited them.

5  Q     When you say "the Konwisers," is that the same Konwiser

6  who just testified?

7  A     Kip and Kern Konwiser.  And they're two of the best

8  documentary directors/producers in the world.  Actually created

9  street basketball with -- I can't remember the name of the

10  thing it was called.  *Uncommon Ground*.

11     So, you know, I got Kip and Kern involved, and we found a

12  couple of crazy young 19-year-old editors or 25-year-old

13  editors.  And we made a deal with Point Prod' and John Steele

14  and we threw in the post.  I think it cost us about -- and we

15  had worldwide rights, which was a pretty cool thing for a

16  documentary mini-series that was as unique as this.

17  Q     And did that generate any income for GigaPix?

18  A     Yeah.  Um, limited doc series are -- documentary series

19  are kind of tough.  That particular one, because of the story

20  angle and the -- and the level of intensity, was unbelievable.

21  And we sold it in 80 countries, I think.  We didn't sell it.

22  We sold it to Target Distribution.  And I think we made about

23  $400,000, $420,000 I think.  We sold it to History Channel,

24  Military Channel, HD Net, and it's on DVD.  It's on Amazon.

25  Q     Was that unusual?

1  A     Yeah.  It's unusual because it's really hard to get a

2  documentary to get that kind of distribution.  You know, but we

3  had a guy working for us that we hired who had really good

4  relationships with the people at Target.

5  Q     What about any television series?  Is that a subject that

6  was covered with your employment at GigaPix as well?

7              THE COURT:  This is all very interesting, but it has

8  nothing to do with the charges set forth in this Indictment.

9              MR. EMMICK:  Your Honor, if I might --

10             THE COURT:  It's all very interesting.

11             MR. EMMICK:  Thank you, Your Honor.

12             THE WITNESS:  Um, yes.  Television was part of it.

13 We had a pretty big TV department.  We probably had 200, 250

14 series that we were developing, ideas that we were developing.

15      And I -- and, you know, by the way, to respond to the

16 judge's comment, one of the things that, you know, when

17 you're -- when you're characterizing a production company --

18 and I'm not going to talk about *Oz* in this conversation.  I'm

19 talking about GigaPix as a production company.  I have no

20 problem talking about either one of them, as Eric knows.  But

21 the production company, you really don't want to produce

22 things.  What you want to do is you want to develop them and

23 sell them.  You want to develop them so that as much of the

24 risk is -- is defrayed and, um -- and keep that -- some kind of

25 rational level because it's easier to develop a whole lot of

1    things and get a whole lot of it back.

2        And so when, you know, they were breaking down the --

3    the -- the distribution expenses and where the money was going

4    within the studio, you kind of don't want a lot of that to be

5    in production.  You want it to be in overhead.  You want it to

6    be in development.  You want it to be in those areas where

7    you're actually building an infrastructure to create a whole

8    bunch of content.

9    BY MR. EMMICK:

10   Q    And the television area that you referred to, does

11   *Workaholics* play a role in that?

12   A    Yes.

13   Q    Tell me what that means.

14   A    Um, we had a small part of the company.  There were two

15   young guys.  One of them happened to be my nephew.  And they

16   were really creative and they were just going out with cameras

17   and shooting stuff and not stuff that I particularly understood

18   or could relate to.  But, um, one of them that they shot was a

19   pilot, and it got picked up by Comedy Central and turned out to

20   be, I think, their first hit narrative show in 10 years, 10,

21   12 years.

22   Q    Uh-huh.  Uh-huh.

23       There's been some testimony about children's films.  Tell

24   me about the role of children's films with GigaPix.

25   A    I got off that subject.

1    So I was going to mirror the transaction I had with

2   Blow Torch on the college campuses in the kids business.  And

3   the idea was to create, you know, funny, entertaining,

4   inspirational kids films that would play on a Saturday morning,

5   on a Sunday morning.  And we could kind of control the

6   distribution at the same time we could control all the other

7   stuff and so that was really what the idea was.

8    Um -- and that was it.

9   Q    And did that play some role in sort of the financing, the

10  economic viability of GigaPix itself?

11  A    Um, well, the kids business -- the kids film business has

12  an economic formula that's considerably better than the

13  economic formula for traditional films.  There's, um,

14  42 million kids, I think, under the age of 12 in the

15  United States.  That's about 12 -- maybe 18 percent of the --

16  12 to 18 percent -- I'm not doing my math well -- of the total

17  population, but only 4 or 5 percent of the films that are made

18  every year are geared specifically towards kids.  And most of

19  those films are big 200, $300 million films.  So I thought

20  there was an opportunity there for something like *Home Alone*,

21  *Goonies*, you know, classic kids action comedies where kids are

22  at the center of the story.

23    So that's what we did.  We spent development money

24  acquiring scripts, developing scripts so that we could finance

25  a slate of films and that we could kind of carve out that

1    territory for ourselves.

2    Q    Uh-huh.  You've been talking about that 2006/2007 time

3    period.  How did the time change during that and shift toward

4    GigaPix to a greater degree?

5    A    Well, when, um -- after we finished shooting *Captain Abu*,

6    I came back with the film.  And, um, the more we edited, the

7    more we mixed it, the more we tuned it, it just kept testing

8    better and better and better.  And so by September of 2007, um,

9    I was in L.A. probably 85 percent of the time.

10   Q    Uh-huh.

11   A    And so I was at GigaPix then a considerable amount of

12   time.  You know, we were posting the film and we were about to

13   go out and launch the film on the festival circuit and to start

14   trying to win an Academy Award.

15   Q    Now, we're going to be turning your attention to that

16   period, 2007/2008.  Can you describe for us what your position

17   was at GigaPix and how that, you know, modified itself over

18   that first year because you were partly out of town?

19   A    So Chris and I had a bunch of conversations about the

20   strategy, and the strategy was that we were going to go after

21   this kind of kids business.  And at the same time, I felt

22   really strongly that the relationships that I had in the Middle

23   East could help us on the financial side and especially since

24   most of the people that had invested in *Captain Abu* wanted to

25   build a film studio and a film company in Jordan.

1     And so I had developed a whole bunch of screenplays in
2 Arabic or Iambic.  So I felt that there was -- there were two
3 things that could happen.  One of them was we could get a slate
4 of Arab language films for the world cinema circuit and we
5 could get these really cool kids niche films.  And so by the
6 time we locked on that strategy, it was the first of 2008.
7     And by that time I had been in -- you know, in the company
8 probably four or five months.
9 Q     And your role in the company was what?
10          THE COURT:  No.
11          THE WITNESS:  You know, well, they called me
12 president.
13     No.  Okay.
14     By that time, I'd been there about a year and six months,
15 I don't know, something like that.  I didn't really -- first of
16 all, there are only two or three people there that I had hired,
17 and the rest of them were kind of inherited.  And at one point
18 Chris and I -- you know, I told Chris, I said, "If we're going
19 to do these film things and we're going to go after the
20 live-action television business, we probably don't need all of
21 these artists."  Because there were, like, 12 artists or 15
22 artists that were there and they weren't really doing anything.
23 They were animated -- animation artists.
24     And so Chris and I agreed and we laid them off and then
25 started hiring -- selectively hiring one or more two people who

1    were more attune to the new strategy.

2    BY MR. EMMICK:

3    Q    You mentioned that you hired two or three people.  Tell us

4    who you hired.

5    A    Well, actually, within three months of -- of, you know,

6    Chris and I agreeing, I had met Shawn Walker.  He had worked on

7    *Ben & Izzy* with me.  He had helped me do the voice-overs and he

8    was the first person I hired.  And the reason was I needed eyes

9    and ears, you know, and somebody who I could call up who could

10   get -- you know, who could help me.

11       And so he was the first person.  And then there were a

12   couple other people.  Some of them didn't work out.  One of the

13   things in the entertainment business is, um, you have to be

14   prepared to, um, not -- not employ people who aren't working.

15   Does that make sense?  Something like that.

16       Um, so, um, you have to be prepared to fire people because

17   not everybody comes to work in the entertainment business.

18   Q    All right.  So how did -- how did things change there in

19   that 2008 time period?

20   A    Well, you know, by the time I got back, I -- I actually

21   realized then full on kind of what the financing structure was.

22   And I -- you know, I hadn't really paid any attention to it.

23   Um, and, you know, the office was cavernous.  I mean, it was a

24   big place.  And it was not full.  And, um, I -- you know, so

25   I -- you know, I saw these people and they were all calling on

1    the phone.

2         So Chris and I had a conversation about it and I said, you

3    know, how does this work?  And I think there was a guy

4    running -- I can't remember -- Robert Jordan.  Um -- and, you

5    know, I just said, "Look, you've got to Blue Sky these things.

6    You've got to make sure that all" -- you know --

7    Q    What do you mean "Blue Sky these things"?

8    A    You have to register all of the securities in the various

9    states.  And -- and when I got back, Chris was yeah, yeah,

10   yeah.  And I was really into the three things that I was doing.

11   Q    Meaning what?

12   A    Meaning finishing *Captain Abu*, focusing on the new

13   strategy, getting the kids business off the ground, and trying

14   to launch a television business.

15   Q    Uh-huh.  And so what happened then?

16   A    I didn't really pay a lot of attention to it.  You know, I

17   kind of -- I'm not going to be naive about it.  I kind of

18   figured it out.  But I'm -- I'm not normal.

19   Q    What do you mean?

20   A    Well, I wish I knew.  Like the thing -- like the rationale

21   for me going to Amman, Jordan, and literally living there for

22   three and a half years and just making a decision that I could

23   fix the cultural wars, I mean, that's -- that's -- that's

24   not -- you know, you've really got to have a lot of conviction

25   to do something like that.  And it was really -- it was

```
 1    difficult for me at times.
 2         But, um, so I -- I kind of assessed the things.  And by
 3    that time, I had gotten to know Chris and I understood that,
 4    you know, confronting and pushing would only create resistance.
 5    And so I said -- so I kind of dug in and I -- I actually, you
 6    know, admittedly -- I looked at what they were doing and I
 7    assessed the shareholder base and I said got to get this
 8    company public.  It's a C Corp.  It's the only logical exit.
 9    Q    Let me just stop you there.
10         C Corp., going public, can you just explain what those
11    things mean, what they meant to you, what was in your mind?
12    A    Um, for -- um, from 1979 until, I don't know, 1984, I was
13    a -- I had one of these kinds of weird jobs at a company called
14    Gulf and Western.  It was the last big conglomerate and they
15    owned everything.
16         And the guy that ran it was, you know, an incredibly
17    inspirational guy but very difficult.  And they had teams of
18    people, of which I was one of the team leaders, that would
19    basically go out and buy companies.  And you would either fix
20    them and you had a very short period of time to fix them, you
21    know, less than a year, year and a half.  And if you couldn't
22    fix them, you had to sell them.  You could strip them out, you
23    could do whatever you wanted, but you had to -- so what that
24    meant was in the first three or four months, you had to come up
25    with a strategy.  So I did that for six years, and I was really
```

1   good at it.

2       When the gentleman that founded the company died, I -- you

3   know, I didn't like the management that was taking over and I

4   left.  That's when I went to HBO.

5       So I have this conviction that I can fix things.  And --

6   and that no matter how complicated or how difficult it is, I

7   actually like to do that.

8       And -- and so I -- I -- I knew in probably the first two

9   months of 2008 that I had to get the thing public.  And -- and

10  I knew that that was not going to be simple.  And I knew that I

11  was probably going to have to go through a couple of different

12  steps.  I knew I would have to bring in, um, a really

13  sophisticated banker or lawyer to kind of help me with that and

14  someone who I didn't really have a personal relationship with

15  because I know -- unfortunately, I know too many lawyers.

16  Okay.  I can make a lawyer joke, but I won't.

17      And I -- you know, I found a guy named Bill Uchimoto who

18  worked at a really prestigious firm in Pittsburgh and

19  Philadelphia, Buchanan, Ingersoll & Rooney.  And I hired

20  Bill Uchimoto and said, "Look, this is what the issue is.  We

21  need to change the cap structure of the company."

22  Q   Okay.  Let me just stop you there.

23      You make --

24          THE COURT:  We'll take our noon recess at this time.

25      Members of the jury, I would remind you of your duty not

1    to converse or otherwise communicate among yourselves or with

2    anyone upon any subject touching the merits of the cause on

3    trial.  And you're not to form or express any opinion in the

4    case until it's finally submitted to you for your verdict.

5         The jury is excused until 1:30.  Jury is excused until

6    1:30.  Court will remain in session.

7              THE COURTROOM DEPUTY:  All rise.

8              (Out of the presence of the jury.)

9              THE COURT:  I've heard a lot of interesting

10   adventures but nothing having to do with this lawsuit.

11             THE COURTROOM DEPUTY:  This court is in recess.

12             (Noon recess was taken.)

13             THE COURT:  Bring down the jury.

14             MS. AMES:  Your Honor, I'm sorry.  There's just one

15   management issue I think I need to address before the jury

16   comes out.  I just -- I don't know how many more witnesses and

17   how much longer Mr. Pritchard's counsel -- we just had the

18   issue with my client with his leg chain, so we would need to

19   make sure we have a break or something if he ends up having to

20   testify this afternoon.

21             THE COURT:  I understand.

22             MS. AMES:  Thank you.

23             MS. LINDSAY:  Is Your Honor willing to entertain

24   written commentary on the proposed jury instructions over the

25   weekend?  Or that we can file them?

1          THE COURT:  Yes.  I don't know what's going to

2     happen yet.

3          MS. LINDSAY:  Okay.  Thank you, Your Honor.

4          (In the presence of the jury.)

5          THE COURT:  The record will show the jurors are

6     present and in their proper places.  And the defendants are

7     present with their counsel.

8        You were on the stand, Mr. Pritchard.

9          MR. EMMICK:  All the way around.

10       May we proceed, Your Honor?

11          THE COURT:  Yes.

12     BY MR. EMMICK:

13     Q    Sir, when we broke for lunch, you were talking about the

14     year 2008, some of the events of 2008.  Can I ask you to turn

15     your attention to that year?  And what were the concerns that

16     were taking your time and your attention?

17     A    Um, well, there were -- there were three of them.  The

18     main one was making sure that the company stayed kind of having

19     momentum, moving towards this execution of the strategy, um, of

20     the two film concepts.

21        The second thing was trying to figure out how to, um,

22     arrest control of the company from Mr. Blauvelt for two

23     reasons.  The first one was it was very obvious to me by the

24     first quarter of 2008 that -- that no institutional investor or

25     no public company was going to come in and work with GigaPix as

1   long as you had someone who's in control of 91 percent of the

2   shares.  And by the way, this may not just be Mr. Blauvelt.  It

3   would be anybody.  It would just be very, very difficult.

4   Q    Uh-huh.  You were about to list a third item.  We can

5   circle back to this subject.

6   A    Well, I mean, the third one is we really needed to find an

7   institutional investment strategy that would work.

8   Q    All right.  Tell me what you have in mind when you're

9   talking about concerns about Mr. Blauvelt's 91 percent

10  ownership.  Why is that a problem at all?

11  A    Um, well because he basically has complete authority.

12  He's basically an alter ego for the company.  It's him.  And

13  when I joined the company, he offered to give me or grant me a

14  bunch of shares.  And I said no, that wasn't how I would do it.

15  Um, and, you know, I wanted to earn them.

16       Um, and that's actually reflected in the -- in the

17  restructuring that we ended up doing in 2008.  I had to pay

18  options -- I never owned shares in the company.  The only way I

19  got any common shares or any kind of equity in the company was

20  by paying 85 cents a share.

21  Q    What are the ways to get the 91 percent shareholder out?

22  A    Well, first of all, they have to agree.  Um, and by that

23  time, I had exhausted the list of conversations and meetings

24  with probably 40 or 50 potential merger partners and

25  institutional investors.

1      And, um -- and many of them liked the strategy.  Many of

2    them liked, you know, the things that I was saying about the

3    company.  But the minute they kind of did a little bit of

4    background work or they kind of -- where they looked at the

5    fact or they answered -- asked me, "Who controls the company?

6    You?"

7      And I was, like, "No."  So it would just end there.

8      So I was really spinning my wheels.  And that's when I

9    called Buchanan Ingersoll.

10   Q    What do you mean by "Buchanan Ingersoll"?

11   A    They're a securities and exchange law firm in Philadelphia

12   and Pittsburgh, very prestigious and very conservative.  And

13   the particular gentleman who was doing this, I didn't really

14   know.

15     And actually, I -- you know, I was a little offended by

16   Mr. Mutton the other day when he said that it was his idea and

17   that he knew Bill Uchimoto.

18            THE COURT:  The jury is admonished to disregard it,

19   that statement.

20            THE WITNESS:  Sorry.

21   BY MR. EMMICK:

22   Q    Who came up with the idea of working --

23   A    I mean, it was -- you know, I knew him.  He was the

24   general counsel of the Philadelphia Stock Exchange.  I invited

25   a gentleman onto the board of directors of GigaPix, a guy named

```
 1   Arnie Staloff who had been the president of the Philadelphia
 2   Stock Exchange.
 3   Q    Let me stop you there.  Just tell us what the fellow's
 4   name is so we have that in mind.
 5   A    Bill Uchimoto.
 6   Q    Okay.
 7   A    And a very conservative lawyer, really smart guy.  And I
 8   had a conversation with him.  I told him what the situation
 9   was.  And I said there are four things we had to address.  The
10   first one was we were never going to go public without having a
11   smaller ownership of the company.  We were never going to find
12   a partner or a financing partner or a merger partner without
13   Mr. Blauvelt not having 91 percent of the company.  The second
14   thing was there were, I think, three or four C&D's at that
15   point in time.
16   Q    C&D's meaning what?
17   A    Cease and desist.
18        One of the things that was most troubling was that I found
19   out at the end of 2007 that the -- there was a cease and desist
20   in Wisconsin from 2005 I didn't know anything about that.  And
21   then and I found out about that because the -- there was
22   another state that came forward.  There were two states that
23   came forward, like one on top of each other.  So it was obvious
24   to me that I had to clean those up.  And -- because you can't
25   go public.  You can't have anything to do with the public
```

1    listing if you have a state that's holding you back.

2         So when I talked to Mr. Uchimoto, we came up with a

3    strategy that would create a warrant swap -- I'm not going to

4    get in all the technicalities, but it would basically allow the

5    existing shareholders to take shares from Mr. Blauvelt, which

6    he agreed to give to the shareholders.  He agreed to give them

7    another 40 percent of his shares.  So he went from 91 to 51 and

8    the investors got 40 percent more.

9         And, um, the process that you have to go through to do

10   that is, you know, two steps.  One of the steps, it was really

11   important to Mr. Uchimoto and myself, was that we would

12   register all of the securities in this offering in every state

13   so that we would invite any cease and desist that were sitting

14   out there, we would get them.  And what we did was we hired a

15   law firm in New York to handle every one of them.

16        And actually, you know, Mr. Blauvelt, um, was -- was very

17   helpful in hiring that lawyer.  It was a woman named Margaret

18   Pepper.  This was a specialty for her.

19   Q    So let's be clear.  Where is Margaret Pepper located?

20   A    Margaret Pepper is in Manhattan in New York City, and

21   she's a specialist in -- in securities regulations.

22   Q    Meaning, for example, handling cease and desist orders?

23   A    Yes.

24   Q    And where was it that the Buchanan firm was located and

25   Mr. Uchimoto?

1  A     In Philadelphia.

2  Q     All right.  And so what's the overall plan?  And I don't

3  mean the specifics.  But what's the overall plan?  What's going

4  to happen with Mr. Blauvelt's shares and what's going to happen

5  with ownership and control of the company?

6  A     He will still be in control of the company.  He has

7  51 percent.  But it's not egregious.  So there's a higher

8  probability you're going to get a merger or some small

9  institution to invest in you because with that investment, he

10 will be diluted under 51 percent.

11       And the second thing was we really needed to get the C&D's

12 out in the open so we knew what they were.  And, um, by the end

13 of -- actually, probably by the middle of 2010, we had resolved

14 almost all of them.  I think there might have been one or two

15 left, but -- I don't recall exactly what that date was, but we

16 had resolved most of them.

17 Q     Can you orient us to the time frame that you're talking

18 about for those actions?

19 A     Probably from April of 2008 -- no.  Actually, it was

20 probably April of 2009.

21 Q     Okay.

22 A     Until June, July of 2009.

23 Q     All right.  Then let's go back to 2008 for just a couple

24 of topics.  And I'll just ask the question generally.  What in

25 2008 was coming to be a problem for GigaPix?

A      Well, there are a couple of things.  The first one was,
um, we had started a -- a financing for *Oz*.  And I think it was
right around that time.  Um, I don't really recall what the
dates were.

Q      Uh-huh.

A      And that was problematic because now there were -- there
were two pipes that were kind of operating in parallel.  And,
you know, I knew -- and I asked Mr. Blauvelt to please go
through self-registrations, please, you know, Blue Sky these
with all the states.

Q      Explain to us what that means.

A      It basically means don't do what you did before.  It
means, you know, do the right thing here, register these
things.  Um, and -- um, so that was No. 1.

       Number 2, the economy was in a deep stall.  And so, you
know, there were -- there were going to be just issues with
costs, with holding on to people.  I mean, it was just going to
be all kinds of issues.  And the third thing was I really
needed to execute the -- the -- this first step in the company
going public.

Q      Uh-huh.  And by that, you mean what, the first step?

A      The first step, meaning to change the cap structure, the
capital structure of the company so that the shareholders have
49 percent and Mr. Blauvelt has 51 percent.

Q      And how was that going to be an advantage?

1   A      Well, because --

2            THE COURT:  Let's go to this lawsuit, please.

3            MR. EMMICK:  Yes, Your Honor.

4   BY MR. EMMICK:

5   Q    One of the subjects that's been talked about earlier is

6   Iowa.  Tell us what's going on with Iowa and the concerns and

7   advantages being sought through Iowa.

8   A      Um, it was actually one of the most beautiful financings

9   anybody can imagine.  The State of Iowa had offered a

10  transferable 50 percent tax incentive for any production that

11  came into their state.  Not just 50 percent in production but

12  50 percent in marketing expenses.  So that meant that literally

13  the total cost of whatever you wanted to produce there was

14  going to be halved.  And it was non-recourse, you didn't have

15  to pay it back.  It actually -- they gave it to you.

16       So we put a financing structure together to do one film

17  and then roll it into a slate.  And that was a really critical

18  period for us because it was the way that the company was going

19  to actually potentially either attract a merger partner or an

20  investment partner or give us the strategy that we could

21  execute to go public.

22  Q    Uh-huh.  Uh-huh.  And how much is that going to help the

23  company?

24  A      Enormously.  I mean, I don't know if it's actually

25  measurable.  Um, but -- you know, the -- you know, because it's

1    an -- you know, it's the film business, so it's complicated.

2    Q    What is going to happen to telemarketing as -- or

3    telephone marketing in general at GigaPix --

4    A    Goes away.

5    Q    -- when that happens?

6    A    Goes away.  I mean, the minute we get, um -- um, outside

7    financing, a successful film, it -- it changes everything.

8    And, um, it's either that or it's getting Mr. Blauvelt to a

9    place where he's no longer, um, in a stranglehold in the

10   company.

11   Q    Uh-huh.  And you started that process.  What went on in

12   Iowa?

13   A    Um, it was really bizarre.  Um, a new governor comes in

14   and basically says I'm -- I don't want to honor the program

15   anymore.  Specifically what happened was two producers who were

16   producing very small films, both of them from the Mid West from

17   the area, bought cars with their tax incentive money.  They

18   literally went into a -- a car lot and -- and bought cars and

19   told the car salesman that the state was paying for them.

20   Q    Uh-huh.

21   A    And so the governor just yanked the program.  But he

22   didn't yank it to us.  He essentially said to us, um, we're

23   going to reinstate --

24              MS. LINDSAY:  Objection.  Hearsay, Your Honor.

25              THE COURT:  Objection's sustained.

BY MR. EMMICK:

Q    After he said whatever he said, were you going to lose the tax incentive?

A    No.

Q    Okay.  Tell us what the impact was going to be.

A    They, um -- at first they said they would reinstate us. Secondly, they said that --

MS. LINDSAY:  Objection.  Hearsay, Your Honor.

THE COURT:  The objection is sustained.

BY MR. EMMICK:

Q    Did it have any impact on your decision-making or on GigaPix's decision-making?

A    Yes.  Because we had started pre-production on the film, and we were probably a million and a half to maybe $2 million into pre-production of the film.  And we did that because it was September.  It was a summer movie.  And we were going to lose the whole year if we didn't start the movie soon.

Q    Let me ask you a more general question because you used the phrase "pre-production."  What I'd like to do is ask you the general question:  Tell me about production and pre-production.  What's the difference?  What does it mean?

A    Pre-production in live-action films is, you know, building the sets, getting the cast, wardrobe, camera, hiring the crew, getting everything set up so that you can get to a point where -- production is where you actually have the cameras

1    rolling, you have actors on the set.  There's -- there's

2    actually a pretty consistent bright line.

3    Q    And that's for action films?

4    A    Yes.

5    Q    Is it different for different -- other films?

6    A    Well, it's different for animation.  And I've produced

7    animated television shows and films in nine countries, um, and

8    built studios in seven.  So I know the animation business

9    pretty well.  In each one of those territories it's a little

10   bit different.  It's different in India than it is in China.

11   It's different in China than it is in France.

12   Q    But there are principles, production -- pre-production

13   principles that you're familiar with?

14   A    Yes.  I mean, it's just -- it's a little more -- it's a

15   little muddier.  It's a little mushier.

16   Q    Uh-huh.  So what happened with Iowa?

17   A    They kept sending us, you know, commitment letters and,

18   um, telling us that they were going to reinstate us and that we

19   were going to be, um, you know, fully reinstated.  And so for

20   the first six or eight months --

21            THE COURT:  Counsel, this case is not about Iowa.

22   This is not a case about Iowa.

23            MR. EMMICK:  Your Honor, there's some aspects of

24   Iowa --

25            THE COURT:  No, there is not.  It's not about Iowa,

1    only the fact that there was a cease and desist.  That's all.

2    Period.  End quote.  Or that it was -- they weren't given the

3    money or the promise that Iowa gave them.  But this is not

4    about Iowa and its failure to meet the promises that they were

5    making.

6    BY MR. EMMICK:

7    Q     Tell me about your contact using either letters or PPMs

8    with shareholders.  When were they used?  Did you draft them?

9    Tell us about them.

10   A     On the PPM, the only one that I was actually deeply

11   involved with was the one that Mr. Uchimoto did, that Buchanan

12   Ingersoll did.  And if you read the -- the quality of that,

13   it's significantly better.  It's -- it's a clearer document and

14   it spells out, um, a lot of the risks and rewards.  And it's --

15   it's just a clearer document.

16   Q     What does "PPM" stand for?

17   A     Public -- I forgot now.  Um, PPM.  Um --

18   Q     Placement memo.  All right.  What is a PPM?  Just tell us

19   what it is.

20   A     It's a document that basically lays out, um, an

21   opportunity or an offer, um, to invest in a security or a

22   company that is behind the security.

23   Q     What kind of information is placed into a PPM?

24   A     Um, the business plan, the officers, the, um -- the

25   economic structure of what's being offered, um, whether or not

1    there's a market in those underlying securities, um, what the

2    risks are, um, what the risks are that are inherent in the

3    exact security and also what the risks are in the environment

4    or the economy of the security.

5    Q    Who are they sent to?

6    A    In this case, they were only sent to existing

7    shareholders.

8    Q    Okay.  How often were PPMs sent out?

9    A    I don't -- I'm not sure.  I know about this one.

10   Q    Uh-huh.

11   A    I know intimately about this one because I was involved in

12   it.  Um, and there were two of them.  And they were done within

13   a month of each other and they were done so that we could

14   encourage the C&D's and also -- the cease and desist to come

15   out of the woodwork but also so that we could better inform all

16   of the shareholders of exactly what the situation was at

17   GigaPix.

18   Q    Tell me what you mean by that.  Did that include risk, for

19   example?

20   A    The delineation of risk in that PPM is -- um, is very

21   straightforward.

22   Q    Give us some examples, if you would.

23   A    Um, well, I mean, it -- it describes in great detail that

24   there's an abandonment issue with films, that many times --

25   that oftentimes films are abandoned.  They don't get finished;

1    that they start and they don't close.

2         Um, there's also, um, a more articulated risk section

3    on -- there's, like, four or five different things.  I don't

4    remember all of them.  But it's -- it's really detailed.

5         The other thing that was in that PPM was there was a --

6    um, a balance sheet of the company and there was a discussion

7    and description of the, um, overhead of the company for the

8    last three years.  And, um, and as I recall, um, there was --

9    there was a caution in there that the company -- um, you know,

10   it was a small company, not a lot of operating history.  You

11   know, it was more methodically laid out.

12   Q    Uh-huh.  When was the reduction in ownership by

13   Mr. Blauvelt going to come about?

14   A    It was in, um -- I think August of 2009.  The -- the

15   offering memorandums went out, the PPMs went out June of 2009

16   and July of 2009.  And there was a certain period where people

17   had to respond, and 99.7 percent of the company investors

18   responded.

19   Q    How much of this work are you doing as opposed to others

20   at GigaPix?

21   A    Um, I would say that I was -- other than collecting all

22   the data.

23   Q    Uh-huh.

24   A    I was doing all of this.

25   Q    What do you mean by all of it?  Tell us all that you're

1  doing.

2  A     Putting the structure of the offering together, um, making

3  sure that there's -- that all of the right information is in

4  there, and that the thing is simply written so that it's not

5  complicated.  Um, and that we've actually started to articulate

6  the broader strategy to the shareholders.

7  Q     And when things started to go bad because of either Iowa

8  or the economy generally, what changes were done within GigaPix

9  to -- to talk about it internally?

10  A     Um, well, in, um, probably August, September of 2009, um,

11  I went to almost all of the, you know, executives in the

12  company -- there are only six -- and I just said to them, this

13  is -- you know, that we're going to get really tight and I

14  would encourage -- "I'm not going to be able to pay you.  And

15  you should start looking for a job and you should do it as

16  quickly as you can."

17        Um, and the Konwiser brothers were out of the office the

18  next day.  Um, and --

19  Q     Were there changes made firing people as well?

20  A     Well, I mean, I -- you know, I gave people the choice.  I

21  said, "You can continue to work in the office, but I can't pay

22  you.  And -- um, and I don't know when that's -- I don't know

23  when that's going to happen."

24  Q     Did people leave?

25  A     Many of them did, yeah.  I'd say about a third.

1   Q    Okay.  So what ultimately happened with this effort to try

2   to move Mr. Blauvelt's control from 91 to 51 percent?

3   A    He agreed to it and we executed it, and it was seamless.

4   And it -- it appeared as if we were going to kind of find a

5   track for outside investment in some form.

6   Q    And was there an effort made to use that in order to get

7   more investment?

8   A    Yeah.  Um, I mean, I -- I put on a road show, went to

9   probably 15 different -- at least 15 different, maybe more,

10  institutional banks and put together a -- you know, a road

11  show, you know, a presentation.  And it didn't work.

12  Q    Why are you going to the institutions whereas you had

13  telemarketers who were talking to individual investors?

14  A    This is the first time I've ever been involved in anything

15  like this.

16  Q    Meaning what?

17  A    In -- in any kind of telemarketing thing.  And -- and I

18  mean, I've never had this kind of an experience before.  I come

19  out of an institutional investment banking area, I know what

20  the disclosure rules are, I know what transparency is in the

21  public market.  And I -- I get it.  And I'm comfortable in that

22  zone.

23       And in this case, I didn't know what the rules were.  And

24  I was being told two or three different things from, you know,

25  Mr. Blauvelt and -- and, actually, from the lawyers who had

1   written the earlier PPMs.  And I was a little bit confused.

2       So my objective was to get us out of that business as fast

3   as possible.

4   Q   One thought might be why didn't you just leave yourself?

5   A   Um, to be facing this, sure.  If I knew -- if I had any

6   kind of hindsight, um, I would have done that in a minute.  Um,

7   I -- um, I go back to what I said earlier, I -- I completely

8   believe I can fix things.  I believe that I have -- actually, I

9   believe I have skill sets that are different than most people.

10  And I'm not bragging.  I'm just -- I think differently.

11      And I really wanted to fix this.  By that time, there were

12  three things happening that were pretty dramatic.  I had put

13  maybe one of the best intellectual property ideas that I ever

14  had in the form of the kids film business into the company.

15  Inextricably, I could not get that out.  It's sitting in Iowa,

16  tons of claims.  There's, like, all kinds of people running

17  around it.  I couldn't get that out.

18      I had created a concept called Movie Books which, um, was

19  basically making a mini-series out of murder mystery books.

20  And so we bought the rights to a bunch of murder mystery

21  writers, and we were going to make Movie Books.  And it was --

22  um, it was a great idea.  Um, the lead writer who we had to pay

23  a bunch of money, Mr. Blauvelt didn't want to pay him the

24  money, so it caved.  Um, but now that's locked in there.

25      Um, and then the third thing is I had started this

1    conversation with the Jordanians and the Arab investors.  And,

2    um, at the Sundance Film Festival Mr. Blauvelt embarrassed me

3    and he did it in front of an individual who was the president

4    of the bank that had actually funded a majority of the film.

5    And -- and he was, like -- anyway, enough.

6         So -- so the Arab relationship had stalled, all my

7    intellectual property rights -- not all of them but really good

8    ones were tied up in this.  And I -- I really felt like I could

9    fix it.

10   Q    What about your salary?  Weren't you being paid a salary?

11   A    In 2010, 2011, 2012, no.  I was not paid anything.

12   Q    How was that decision made --

13   A    Actually, let me correct that.  I was probably paid 30-,

14   $40,000.  The -- the agreement I had with Colin Mutton was the

15   company would have to cover my base expenses and some personal

16   expenses, and we went through what those were.  And I said any

17   of those personal expenses that are outside of the zone, um --

18   Q    Let me stop you there.  Outside of the zone?

19   A    Well, where they're personal expenses.  1099 me.  I have

20   personal expenses that I filed with the company for 2007, '8,

21   '9, and '10.  And, um, I -- you know, actually Mr. Mutton has a

22   copy of those.  And, um, the only one I think I have a copy of

23   is 2010.

24   Q    Uh-huh.

25   A    Um, so I -- I -- I felt like I actually -- I was really --

1    I was into fixing it.  And I -- and -- and I actually thought I

2    could.

3    Q    By that time, did you have any stocks?

4    A    No.

5    Q    In order for you to acquire stocks, was there some deal

6    for you to have -- keep stocks?

7    A    No.  I was -- all of my shares were, um, tied to

8    Mr. Blauvelt's shares.  And I had to exercise a strike price.

9    I had to pay 85 cents per share.  And at the time I think the

10   shares were selling for a dollar, a dollar and a quarter.  So

11   it was -- you know, it was probably some discount to the market

12   but not a lot.

13   Q    What about what happened with the efforts to have

14   Mr. Blauvelt drop his ownership from 91 to 51 percent?

15   A    It worked seamlessly.

16   Q    And what was the reaction?

17   A    You know, I -- I don't -- I'm not sure that the

18   shareholders actually understood everything that was happening

19   in that.

20   Q    Uh-huh.

21   A    It was a somewhat complicated exchange.  But we really did

22   our best and Colin was fantastic about communicating and, um, I

23   actually felt at the end of that that we were -- you know, that

24   there was some hope.  And two months later, Iowa hit and, um,

25   it wasn't a great day.

1  Q     So what happened as a result of those problems?

2  A     Well, then it became very apparent to me that, um -- um, I

3  had to find a solution.  And the only solution that I could

4  think of that would be within my control was to, um, find an

5  existing public shell to merge into.

6        So I --

7  Q     What do you mean by that, a public shell?  I don't --

8  A     It's -- it's a -- um, it's a process by which a private

9  company can become a public company by merging into the public

10 company, and it's a lot less expensive.  The issue is you've

11 got -- you should ideally try to find a shell that is in a

12 similar industry as like-minded shareholders, all of that.

13 Q     Uh-huh.  And so how is that going to help?

14 A     Well, I interviewed about eight people that had shells.

15 And in the process of calling a bunch of people, a guy that I

16 knew and hadn't been in touch with for about two years called

17 me back and said he had a -- a shell that I was actually kind

18 of familiar with.  Um, and that was called MSHE, Make Something

19 Happen Entertainment.

20       And it was -- it met all the criteria.  Um, it had audited

21 financials, was a -- was an actively traded penny stock, listed

22 on the over-the-counter exchange of the pink sheets.  And

23 actually, I think it was listed on a couple of other smaller

24 exchanges and, um, a very supportive investor pool of

25 institutions.  There were about 25 institutions of some note,

1    um, that owned shares in the company.

2    Q    You have these two plans.  One is the reduction of his --

3            THE COURT:  No.  Let's not do that, Counsel.

4    BY MR. EMMICK:

5    Q    What happened to the two plans that you were talking

6    about?

7    A    Well, we, um, starting executing that one and I knew that

8    I needed to find a way to, um, raise institutional money to

9    support that, um, initiative.  And so the -- the gentleman who

10   owned that shell, um, and I went to New York, New Orleans.  We

11   went to a couple of places where we had really good

12   institutional relationships.  And we lined up about 20

13   investors who would put the early money in after the company

14   became public or simultaneous to it becoming public.

15   Q    And did that work?

16   A    Um, well, while we were, um -- well, first of all, one of

17   the ways that we got these institutions to commit the money was

18   we put a board of directors together for the company.  And we,

19   um, convinced Mr. Blauvelt that he should step down as the

20   chairman and CEO of the company.  And we had a gentleman by the

21   name of, um, Tom Conigliaro who was going to be the chairman.

22   And he had been the head of equity trading at Merrill Lynch and

23   at Goldman Sachs and had been a movie producer, had gone into

24   movie production.

25           And the CEO of the company was going to be a gentleman by

1    the name of Jim Cardwell who I knew professionally.  He had

2    been the president of Warner Brothers Home Entertainment for

3    about 15 years, which was about a $5 billion -- it's actually

4    the biggest division in Warner Brothers.

5         And so those -- those two gentlemen and then a list of

6    other pretty heady board members were going to be the -- the

7    security for the investor -- for the institutional investors.

8    Q    All right.  And did that work out?

9    A    Um, we -- Mr. Blauvelt agreed.  We sent out a letter to

10   the investors that he was resigning and that Mr. Cardwell was

11   going to be taking over, that there would be a period of time

12   here where we would have to go -- you know, we would have to do

13   a couple of things and, um, I think that was in September.

14   And --

15   Q    What year?

16   A    September of 2010.

17   Q    Okay.

18   A    And -- I think.  Yeah.  2010.

19        And in November, Mr. Blauvelt came back and said, you

20   know, I'm not going to go along with this.

21   Q    What's the "this"?

22   A    I'm not going to go along with this reverse merger.  Um,

23   and the only way we got him to commit to it was we had to give

24   him a kickout clause so he could throw us out if we didn't do

25   certain things by a certain date.  And he came back and said no

1   and unilaterally sent a letter to all of the shareholders, um,

2   saying that he was coming back and asserting his rights and he

3   didn't think the deal that we were offering the shareholders

4   was of any value.

5       And what I can tell you is the -- the reverse merger, um,

6   before the merger, the GigaPix shareholders had 49 percent of

7   GigaPix.  After the merger into the public shell, they would

8   own 45 or something like that percent of the public shell.

9   Actually, the GigaPix shareholders in general were going to own

10  about 80 percent, I think somewhere in that range.

11      And the -- the MSH shareholders were going to own, like,

12  18 or 20 percent.  So it was actually a pretty favorable deal.

13  Q    Tell us what happened then.

14  A    Well, he came back and asserted himself and I -- there's

15  nothing you can do.  I mean, he -- it's his shares, it's his

16  rights and, um -- I mean, I was -- um --

17  Q    Did you still try to get other investors, institutional

18  investors?

19  A    No.

20  Q    Did you reach out?

21  A    No.  I mean, all of the people -- and, in fact, it made it

22  a kind of -- it was a pretty big cloud and a pretty big

23  dampening effect on all of our efforts.  And in a way, it kind

24  of hurt both of our reputations because we had kind of extended

25  ourselves and now we were left holding an empty bag.

```
1   Q      You've talked up to about November of 2011, I think.

2   A      Okay.

3   Q      Let's just take the next year.  What happened next?

4   A      Well, I mean, you know, most of the sales crew was gone.

5   Mr. Blauvelt was almost completely gone.  He had been living

6   upstairs in his office with someone and who had worked at the

7   company.  And I was just -- I mean, I didn't know what to do.

8   I mean, um, and -- and the two of them got arrested and thrown

9   in jail.

10          MS. AMES:  I'm going to object as to relevance and

11  nonresponsive.

12          THE COURT:  The objection is sustained.

13          THE WITNESS:  Okay.  I'm sorry.

14      Um, literally I didn't know what to do.  I mean, I -- I'm

15  like -- I'm not getting paid.  I don't own any stock.  What am

16  I going to do?  And -- and -- and I didn't know what to do,

17  literally, and that was like a new experience for me.

18      And, um --

19  BY MR. EMMICK:

20  Q      So what happened in 2012?

21  A      Well, towards the end of 2011, Colin Mutton was, like, you

22  know, we have to bankrupt this and, um -- and I was, like, no.

23  And so from the end of 2011 until the first quarter of 2012, I

24  kind of resisted.  I brought in a couple of television

25  networks, um, a couple of toy companies.  I mean, I literally
```

```
 1   threw myself at the wall and brought in a handful of
 2   opportunities.
 3        But, um -- and I thought I had a couple of them and I --
 4   you know, um, a friend of mine had bought a television channel
 5   and asked if we would take over the programming of it.  And,
 6   um, when he found out what was going on in the company and
 7   Mr. Blauvelt, he said no.
 8   Q    Whatever happened to the Iowa arrangement?  They had
 9   promised you something.  Was that a possible settlement that
10   would --
11             THE COURT:  The Iowa thing is not relevant to this
12   case.
13             MR. EMMICK:  Your Honor --
14             THE COURT:  This is not about the Iowa matter.
15   That's not this indictment.  It has nothing to do with the Iowa
16   matter.
17   BY MR. EMMICK:
18   Q    Were there any other sources of financing that you thought
19   might be useful to GigaPix?
20   A    Well, um, yes.
21   Q    All right.  Like what?
22   A    Um, so there was a substantial amount of money that had
23   been raised since 2007 or '8 for OZ3D.  Um -- and, um, just --
24   you know, by way of history, that was a project that I had been
25   working on for ten years.  Um -- I, um, had -- I had so many
```

1    scripts developed -- I mean I had so much work developing that.

2    And so it was -- you know, it was kind of a personal thing for

3    me.

4         And *Oz* had raised some money, still -- still was raising

5    some money.  And in my best business judgment, I made the

6    decision that I could cover some of the expenses of GigaPix out

7    of the *Oz* pool.  And I did that because if I didn't do it, they

8    both would have died right there.

9         You know, it's -- um, it's a deal with the devil.  And I

10   don't mean that in a really diabolic way.  But, you know, you

11   literally have to make really hard decisions sometimes, and

12   this goes back to why I said I don't -- I don't even want to be

13   the boss again ever.  It just stinks.

14        So I looked at the -- the scenario that was in front of me

15   and I said, okay.  So I can allocate, um, the producer's fees,

16   some of the overhead fees, and -- um, and advance those to

17   GigaPix who was due them at some point.  Um, and I -- and one

18   of the reasons I did that was because, um, I've financed

19   animated films before.  And there's -- there's a lot of ways

20   you can finance animated films with even better tax credits

21   than what you have in Iowa.  And you can go to Korea, Canada

22   and Korea, France and Canada.  I mean, there's ways you can

23   create co-production alliances that, um, can cover 65 to

24   70 percent of the budget.

25        And what it means is you have to just find a really good

1    partner that you can trust that sees the project, you know,

2    creatively the same way you do.  And it -- and so that's --

3    that's what I believed.

4    Q    Let me jump back in time.  Let's talk audits.  Were audits

5    done on GigaPix?  When?  Where?  By whom?

6    A    Touchy subject.  So, um, I have a 35-year relationship

7    with Ernst & Young -- back to Ernst & Ernst.  When I was at

8    Gulf and Western, they were our auditing firm.  In fact, the,

9    um, managing director of that company married one of my old

10   secretaries at Gulf and Western.  So I have a really good

11   relationship with that firm.

12         They also were my audit firm when I ran a couple of their

13   public companies, small public companies here in Los Angeles.

14   So I had a really good relationship with Ernst & Young.

15   Q    And what happened?

16   A    Well, we went to -- we sat down with them, Colin and I sat

17   down with them and I let him make the entree since he was the

18   CFO, even though I had called my friend who was retired at that

19   point.  And I said -- you know, I let Colin make the entree.

20         So we sat down with -- you know, he mentioned her name the

21   other day, Cavallaro or something like that.  I can't remember

22   exactly what her name was.  But she was terrific.  She wanted

23   to be helpful.  She said she would have --

24              MS. LINDSAY:  Objection.  Calls for hearsay.

25              THE COURT:  The objection is sustained.

```
1    BY MR. EMMICK:

2    Q    Did what she said have anything to do with GigaPix or with

3    your reaction?

4    A    Um, she said she would have to go back to the --

5              MS. LINDSAY:  Objection, Your Honor.

6              MR. EMMICK:  Your Honor, it's not --

7              THE COURT:  It's sustained.

8              MR. EMMICK:  It's not offered for the truth,

9    Your Honor.  It's offered because there's been an allegation

10   that it's -- that there's an incorrect point, and I'm trying to

11   clarify it.

12             THE COURT:  Objection sustained, Counsel.  Both on

13   that and irrelevant.  Both.

14   BY MR. EMMICK:

15   Q    All right.  You talked to Ernst & Young.  What happened to

16   the Ernst & Young discussions?

17   A    She came back about two weeks later and said --

18             MS. LINDSAY:  Objection.  Calls for hearsay --

19             THE COURT:  The objection is sustained.

20             MR. EMMICK:  Your Honor, this goes to --

21             THE COURT:  No, please.  The objection is sustained.

22   Get to another subject.

23             THE WITNESS:  That didn't work.

24   BY MR. EMMICK:

25   Q    Earlier there were some discussions about expense reports.
```

1    Can you tell us about your expense reporting with -- internally

2    with GigaPix?

3    A     Until 2010, they were all on my credit cards and some on

4    the company credit cards.  Um, probably most of them on the

5    company credit cards.  And there are expense reports filed for

6    all of those years.  I think the 2010 one is about $30,000.

7    Q     All right.

8    A     For the year.

9    Q     And are those expense reports that are generally

10   available?  What's the availability of them?

11   A     The 2010 ones you have --

12   Q     Uh-huh.

13   A     -- immediately.  The '9, '8, and '7 ones are with the

14   company.  Changed computers.

15   Q     Mr. Mutton had some testimony having to do with an AMEX

16   card.  And can you tell us what he was -- what he was talking

17   about?  What are the underlying facts?

18   A     Well, there was a couple of pieces to that.  One of them

19   was, um, the -- I had deferred all of my fees from *Workaholics*.

20   I was an executive producer on the show.  I actually -- the

21   first season I actually, you know, had to deliver the show.

22   Um, and I waived all of my fees to the company.

23         And what I said to Mr. Mutton was, "Look, at least have

24   the company pay my expenses.  If there are personal expenses in

25   there, we'll identify them and I'll either pay them back or

1    you'll 1099 me."

2    Q    Explain what that means, please.

3    A    Meaning I'll take them as salary, I'll take them as

4    compensation.  And he said, "Fine, as long as we sit down and

5    regularly do that."  And, um, so that's one part of it.

6         There's another part of it where he was alleging that I

7    was in a liaison with one of the employees, and it's

8    categorically not true.  There was another larger issue there

9    that, um, I'd rather not discuss.

10        And then the nights in the hotel, um, I didn't really know

11   what they were.  I -- I kind of -- there were only about six or

12   eight of them.  But, um, what they were was, um, I -- my

13   girlfriend and I share caregiving services for her mother who's

14   quite elderly, and so we would go away for a night because we

15   needed to get away for a night.  It's that simple.

16   Q    Let me ask some questions about employees of GigaPix.

17   Tell me about Mr. Mutton, how -- how did you come to know him?

18   What was your relationship like with him?  What kind of work

19   did he do?

20   A    If I might add one thing regarding the expenses.

21   Q    Uh-huh.

22   A    Um, there's a bankruptcy filing that you have to do when

23   you submit the -- the company creditor list.  And, um, on that

24   creditor list, there's an allocation for those expenses.  And,

25   um, it's clearly delineated in that as a -- as a -- as a 1099

```
 1   item, a portion of it as a 1099 item.
 2        Um -- um -- and that had to be signed by Mr. Mutton
 3   himself.
 4   Q    Uh-huh.
 5   A    I met Colin Mutton -- I don't remember.  He had made an
 6   investment in the company, which I -- I thought was actually
 7   wonderful.  And we met in New York when he was doing, I think,
 8   Bon Jovi.  And, I mean, he was the tour accountant for
 9   Bon Jovi.  And we got along.  And he was looking for something
10   else to do.  And, you know, I said, "Look, I can't pay you.
11   Um, but if you want to come and try to do this, let's start
12   with the project."  And, um, that project was the shareholder
13   records.  And I will tell you that he did an unbelievable job
14   with that.  I mean, Herculean job.
15   Q    And then what happened with respect to him?
16   A    Well, he kind of settled into the company and, um -- and
17   I -- you know, I realized after about eight to ten months that
18   he really wasn't, you know, a CFO.  But he was -- in the
19   situation that we were in, he was someone that could help me
20   think about things and he was someone who would ask questions.
21   And there were not a lot of people around who had, um -- who
22   had any kind of balance.  And I -- and we had a -- you know, a
23   very favorable working relationship.
24   Q    And how did that evolve over time?
25   A    Well, when we -- when we put the company into bankruptcy,
```

```
 1    we tried to operate a -- um, an advisory company together.
 2    And --
 3    Q    He went along with that?
 4    A    Excuse me?
 5    Q    He went along with that?
 6    A    Yes.  Yeah.  Um --
 7    Q    What sort of advisory company?  What is an advisory
 8    company?  Tell us what that is.
 9    A    Um, I have a -- I actually have a very strong reputation
10    for, you know, being a strategic thinker and helping companies
11    in strategic problems and in raising institutional financing.
12    And I don't do that as a broker-dealer.  I don't do that as a
13    Series 7.  I do that --
14    Q    What is a Series 7?
15    A    I don't do that under a licensing.  I'm not licensed to --
16    to raise money.  What I -- what I do is I introduce them to
17    investment banks, and I have a fairly good track record of
18    doing that.
19    Q    And he works with you -- or worked?
20    A    We were working together for about six months.  And, um,
21    advisory services are very, um -- it's a consulting business.
22    And it's a really kind of strange business because they --
23    they -- they want to have a relationship with a consultant and
24    they want to have a relationship with a consultant that's
25    actually going to drive their business or move them somewhere.
```

1    And -- and, um, that's not Mr. Mutton's skill set, so it didn't

2    work.

3    Q    How often did you work with him during the GigaPix years

4    is what I mean.

5    A    I mean, every day.  But we had very different work habits.

6    Q    What do you mean?

7    A    I'm a 7:00 to 9:00 guy.  I work from 7:00 o'clock in the

8    morning until 9:00 at night, and Mr. Mutton works from

9    11:00 o'clock until 5:00 o'clock.

10   Q    Was that an issue between you?

11   A    At GigaPix, no.  But in the other business, yes.  Because

12   when you're starting a new business, you really have to throw

13   yourself at it.

14   Q    Okay.  Now, you know that Mr. Mutton testified in this

15   case?

16   A    Yes.

17   Q    Did he say some things that you thought were incorrect?

18   A    He said some things that were hurtful.  He said some

19   things that were not consistent with what our relationship had

20   been.  Um, I got the sense that he was kind of angry and

21   spiteful, but, you know, we all grow up and move on.  Sometimes

22   we just move on.

23        The stuff about the expenses was -- was troubling because

24   it was kind of personal.  And we had a bunch of conversations

25   about it.  And, um, the Consolidated Services Group, the ABC --

```
 1    the people we went through for the bankruptcy, it's clearly
 2    delineated in the -- in the creditor list how we're handling
 3    that.  And so I thought that was just a little hurtful.
 4         And then, you know, the comments about Mr. Uchimoto and --
 5    um, and the comment about Ernst & Young.  I mean, we met with
 6    ten public accounting firms after Ernst & Young because it was
 7    very, very clear to -- to me -- actually, to both of us that we
 8    had to find a small firm.  And every firm was going to have a
 9    problem with GigaPix.
10         And this is -- we had some verbal commitments from -- I
11    can't remember Jeff -- I don't remember Jeff's last name, but
12    we had a verbal commitment.  That's when we made one of those
13    announcements that he would do this.  It didn't -- you know, he
14    came back a couple of weeks later and said his partners
15    wouldn't let him do it.  And then he came back a week later and
16    said, "Look, I can do it" --
17              MS. LINDSAY:  Objection, Your Honor.  This is
18    hearsay.
19              THE COURT:  Objection sustained.
20              THE WITNESS:  You're right.  Yes, you're right.
21         Um, so -- um, so we kept trying.
22    BY MR. EMMICK:
23    Q    What about audits?  You made a comment about audits.
24    Could you address that?
25    A    Well, from the beginning I wanted them.  Um, well, first
```

1    of all, you have to have -- you have to have them.

2    Q     And you say "from the beginning."  What do you mean "from

3    the beginning"?

4    A     From 2007 and '8 we had a small accounting firm -- I can't

5    remember the gentleman's name, but he didn't do audits.  He was

6    a CPA.  And I -- I tried to get a couple of audits done, but

7    it's very difficult.  It's very difficult when you're a small

8    company because the liabilities are pretty terrific.

9    Q     And what happened?  Did you have any audits done?  Were

10   any audits turned over to the investors or potential investors?

11   A     No.  I mean, after 2000 -- after the PPM issues in 2009,

12   we had disclosed the -- basically the state of the condition of

13   the company in the -- in the body of the PPMs.  And then in

14   2010 -- I think it was 2010 -- we issued some balance sheets.

15   Q     Any other things from Mr. Colin Mutton that he said that

16   you disagreed with?

17   A     Well, I would say that some of his characterizations of

18   me, at least the ones that I read of me -- the written

19   documents were a little troubling.  Um, I mean, um, until this

20   happened, um, and -- you know, and -- by the way, I -- I take

21   some of the credit for the situation that I'm in.  I'm not --

22   I'm not 25.  Um, but I've never had a problem making a very

23   decent living picking what I want to do with clients that I

24   want to work with, industries that I really have something to

25   add.  And, um, it's --

```
 1   Q    Let me continue on to another of the GigaPix employees,
 2   and we'll return in a while to that subject.
 3        The next employee that I wanted to ask you about was
 4   Mr. Walker.  How often did you work with Mr. Walker?  What was
 5   the nature of your interactions?
 6   A    Daily.  Um --
 7   Q    What was his position?
 8   A    It was funny when he said the Dr. Doom thing or whatever
 9   it was he said.  I mean, that was basically what his position
10   was.
11   Q    What do you mean?
12   A    He was the head of business development.  That was what
13   his job was.
14   Q    And?
15   A    And -- and in that regard, um, he was more of a Mr. Inside
16   than an outside.  Business development executives that I've
17   worked with in the past are usually really high-powered
18   salespeople, people who, you know, know how to talk to senior
19   executives, who know how to generate -- you know, they're --
20   they're essentially people on track to be a chief revenue
21   officer somewhere.
22   Q    And Mr. -- Mr. Walker was not?
23   A    I -- I can't -- I can't make that decision at this point,
24   you know.  What I know is I -- we had a really solid working
25   relationship until we didn't.  And he was extremely offended
```

1    that he was not being paid.  And --

2    Q     How long was he not being paid?

3    A     He -- he made about -- actually, I don't remember exactly

4    what his final salary was.  But I -- I remember that the -- the

5    creditor list had him at about $62,000 I think the number was,

6    that he was owed $62,000, and mine was $770,000.

7    Q     All right.

8    A     Which is a lot of money.

9    Q     Um, let me then turn our attention to other employees

10   there at GigaPix.  And that is to say, let's talk next about

11   Mr. Blauvelt.  You made some earlier remarks.  Did you get

12   along with him during your years at GigaPix?

13              MS. AMES:  I'll object as to relevance.

14              THE COURT:  The objection is sustained.

15   BY MR. EMMICK:

16   Q     What about Mr. -- let's talk a little, then, about people

17   who worked in the sales department.  How often did you talk

18   with or meet with Mr. Pusateri?

19   A     That would not have been something that I would have done.

20   Um, I -- I -- he was not my favorite person.  He was not

21   somebody who I would have had conversations with.

22         Um, as far as the rest of the staff was concerned, um,

23   until he moved out of the building, I'd see him.  Um, I tried

24   to not have a lot of conversations with him.  And, um, I would

25   occasionally -- I mean, I can actually -- you know, Chris --

1    Chris asked me and I -- you know, I agreed, um, to have, you

2    know -- like every three or four months, I would have a

3    conversation with the salespeople.  It was not on a recurring

4    basis, not on a regular basis.

5        And again, I would go back and I'm -- you know, I'm used

6    to being in a, um -- a public environment, an environment

7    where -- where there's -- where there's very delineated rules,

8    where there is a clear understanding of exactly what the rules

9    are.

10        And I was completely unfamiliar with these rules.  And

11   I -- I mean, really unfamiliar with them.  And -- and I -- some

12   of it I get now, a little late.  But, um -- so those -- those

13   conversations were information conversations, as were -- as

14   were the shareholder letters.  I mean, my objective there was

15   really simple.  It was talk about what I'm trying to do, talk

16   about what the company is trying to get accomplished.  That's

17   it.  I mean, really simple.  And in hindsight, it should have

18   been on the Web.

19   Q    Let's talk a little, then, about contact with possible

20   investors.  Did you call up investors?

21   A    No.

22   Q    Did you occasionally talk to investors?

23   A    Yes.

24   Q    Tell us about that.  When?  Where?  How often?

25   A    Not more than ten.  Um --

1   Q    Over the whole seven years?

2   A    Yeah.

3   Q    Once or twice a year, then?

4   A    Well, there was no programatic basis to it.  There were a

5   couple of investors who I actually ended up socializing with.

6   You know, there was one in particular who, um -- I'll have to

7   remember his name, very prominent physician in Wichita, Kansas.

8   That guy was great.  I mean, I went skiing with him and his

9   family and, you know, a couple different times.  They invited

10  me on their annual ski trip.  Um, so I -- I just liked that.

11       There were a couple other things that I just -- I liked.

12  And I wasn't -- I wasn't hocking them, I wasn't trying to sell

13  them stuff.  I was just, you know, socializing with -- with

14  people who, um, I liked.

15  Q    Just tell us more, though, about the -- the conversations

16  with those that you did have, ten or however many.  What were

17  you saying?

18  A    Well, I mean, that -- that gentleman in particular -- Jody

19  Galichia.  Am I allowed to say their names?

20  Q    No reason not to.  The truth is the truth.

21  A    He had a son who had graduated from Stanford who was kind

22  of trying to figure out how to get into Hollywood and, um, he

23  asked me if I'd help.  And we had a couple of meetings, and I

24  helped.

25       I mean, that -- that's a guy who I really liked.  And I --

1    but I would never initiate a phone call to him.  He would send

2    me an e-mail and say, "We're going to have a ski trip.  Do you

3    want to come?"  And -- and there were probably five in that

4    category, and those are the ones that I talked to the most.

5    And most of those were represented by Cherie Brown.

6    Q    Because she referred them to you or -- what does that

7    mean?

8    A    Everybody has a gift, and she has a -- a very -- she has

9    an incredible gift for persuading.  I mean, incredible.  And,

10   um -- I mean, we did not have what I would call a relationship

11   where we worked together or where we spent a lot of time

12   together.  It would be intermittently.  And, um, she was always

13   trying to get me to socialize with her clients, especially the

14   four or five that I had a little bit of a -- of a connection

15   with.

16   Q    Uh-huh.  Did you have any telephone conversations with

17   possible investors with Mr. Blauvelt?

18   A    I don't think so.  I don't recall.  Um, it's possible, but

19   I -- but it would have been -- first of all, you know, he was

20   covetous of that territory, and that was his territory.  And,

21   um -- and he didn't want to share that with anybody.  And I

22   didn't really want -- first of all, I didn't -- I've never been

23   involved in a situation like that.

24       In fact, when I -- actually, when I got to, um -- right

25   before I got to GigaPix, when I was coming back from Jordan on

1    a plane, I -- I got an e-mail from a friend of mine saying,

2    "Hey, I just saw that you joined this film company."  And I was

3    thinking that it might have been GigaPix.  And it was -- it was

4    not GigaPix.  It was some other company that was -- when I

5    looked online and I saw exactly who they were and what they

6    were doing, I just went, uh-oh, I've got -- and they had me in

7    there as their chief financial officer.  It's called Big Sky.

8         And I -- I was like -- I didn't want to have anything to

9    do with these people.  And I actually sued them and separated

10   myself from them, had them indemnify me for having

11   misrepresented my relationship with them.  And they were a real

12   shop.  I knew -- I had heard things about them.

13        So -- and, you know, I have a settlement paper that was

14   drawn up by my lawyer.  And they actually had to pay me money

15   in damages.  Nothing serious but --

16   Q    You were here, there were three victims who testified.  I

17   think two of them said that they had spoken to you.  Can you

18   tell us if you remember speaking to them or remember anything

19   about them?

20   A    No.  Categorically not.  I mean, I --

21   Q    Meaning you don't remember or --

22   A    No.  I mean, I -- I would say -- I remember the people

23   that I spoke to because genuinely -- if I didn't genuinely

24   relate to them, I wouldn't do it.  Um, and the other thing was,

25   um -- this was not something I was doing regularly.  You know,

```
 1    clearly they could have come by the studio and stopped in my
 2    office and said hello.  But, I mean, it was not something that
 3    I entertained regularly and it was not something that I had --
 4    I wanted to do even on -- on an exclusionary basis.  So the
 5    answer is no.
 6              MR. EMMICK:  Your Honor, I'm going to turn to
 7    another subject that will take 15 minutes.  What would you like
 8    to do?
 9              THE COURT:  You will proceed, Counsel.
10              MR. EMMICK:  I apologize for the question,
11    Your Honor.
12    BY MR. EMMICK:
13    Q    Let's turn our attention, then, to 2013.  Did you receive
14    any requests for an interview by the FBI?
15    A    No.
16              MS. LINDSAY:  Objection.  Irrelevant.
17              THE COURT:  Objection is sustained.
18    BY MR. EMMICK:
19    Q    Tell us what happened in May of 2014, if I've got the date
20    right, the -- the day you were arrested.
21    A    June 5th.
22    Q    June.  All right.  Sorry.
23    A    Well, I was aware that there was -- if I can put a little
24    context to it.  I was completely aware that there was an
25    investigation.  And I, um -- you know, I have relatives who --
```

1    relatives and college roommates who, you know, were in the FBI,

2    you know, and so I called them up.  I said, "Is this something

3    I should worry about?"

4         He said, "You didn't do anything wrong.  You" --

5              MS. LINDSAY:  Objection.  It's getting into hearsay.

6              THE WITNESS:  Okay, you're right.

7              THE COURT:  The objection is sustained.

8              THE WITNESS:  Um -- um, I was aware that there was

9    an investigation going on.  I did not feel any level of

10   culpability.

11        And I, um -- and the only thing -- the only memory I have

12   of GigaPix is wearing myself out, trying to get the things done

13   that I really believe needed to get done and, you know,

14   investing, um, a lot of my business relationships and a lot of,

15   um, creative enterprise.  I mean, there are at least 20

16   projects or 20 concepts that are projects that I could probably

17   sell or do something with, but they're encumbered there.

18        And -- and I really put -- I put everything I had into

19   that.  And I -- and I did it relentlessly.

20             THE COURT:  Mr. Pritchard -- would you read the

21   question to him.

22             (Record read.)

23             THE COURT:  All right.  That's a specific question,

24   Mr. Pritchard.

25             THE WITNESS:  I was arrested.

1          THE COURT:  It's not a place for speeches.

2          THE WITNESS:  You're right, Your Honor.  I

3    apologize.

4      Um, I was arrested.  And --

5    BY MR. EMMICK:

6    Q    Is there anything about the arrest occurrence that made

7    you -- that evoked an emotional reaction?

8    A    Um, well, yeah.  But, I mean, I -- you know, we've kind of

9    gone through this.  I mean, I -- I -- yeah.  I've never been

10   arrested.  I have no criminal record.  I've never had anything

11   like this happen to me before in my life.  I have a 44-year

12   career.  So I was arrested.  And -- and by, you know, the big

13   guns.  You know, I don't mean the guns they were carrying.  I

14   mean, you know, the -- the people who are literally charged

15   with protecting all of us from bad guys.  And so now all of a

16   sudden I'm a bad guy, and I was completely shocked.

17        Um -- and so, you know, I said, um -- I mean, my

18   girlfriend was a lot more upset.  I -- I -- um, I basically --

19   I didn't think I had anything to hide.  I went into that

20   interview understanding, you know, what the situation was.  I

21   didn't really understand the charges.  I mean, I had been

22   handed them, but I -- you know, it was a pretty emotional

23   moment.

24        Um, and I went through the -- actually, um, the agent

25   described it pretty accurately.  You go through these little

1    emotional ups and downs.  And I went through those.  Um, and --

2    but the -- the first thing that I was, um, really alarmed by

3    was when, you know, there was a little, um -- I remember

4    perfectly, um, the room was kind of a weird little room,

5    reminded me of something in *NYPD Blue*.

6         But it was -- over the agent's shoulder was a -- was a

7    phone jack, and there was -- there was no -- there was no plug

8    in the phone jack.  And I -- I kept looking to see the light.

9    And I -- and I -- I actually said, "You're recording this."

10        And he was, like, "No."

11        And about four or five minutes later, I was, like, "You're

12   recording this."

13        And he goes, "No, we're not."

14        And I was watching the other agent, um, and how he was

15   writing quotes.  And I'm a -- I'm a, um, rapid note-taker.  I

16   mean, I -- I speed-write.  I -- I have a pretty good memory.

17   Um, my age is affecting that to a degree.  But I'm -- um, the

18   third time I asked, I asked because I saw these quotes go up

19   around something.  And I just felt -- you know, please tell me

20   you're recording this.  And when he said no, I was, like, okay.

21   Well, maybe they don't record these things.

22        So that was -- that was it.  And then they took me down

23   to -- um, down here somewhere, um, and then that was it.  I got

24   out.

25   Q    And you have had a chance to look at the report put

1    together in connection with that interview?

2    A      Yeah.  And I -- I take exception to some of this stuff

3    because, as the judge has pointed out, I actually tried to

4    create context.  And maybe I do it to a fault.  But it -- it --

5    I do it because it -- it -- it helps anchor me in what's

6    happening.  And context is important.  It -- it tells you

7    intention, motive, it tells you all that stuff.  And why --

8    Q      Why does that arise now as you're talking about that

9    interview?

10   A      I mean, unless I had my notes -- you know, there were a

11   handful of things.  And, you know, one of them -- the one that

12   I thought was most problematic for me was -- and I -- actually,

13   the biggest error in it was when he -- when he asked me if

14   you -- if you had said production had started, that would be

15   wrong.  And I said -- and the context within which I created it

16   was very straightforward.

17          We had signed a contract with an animation studio in

18   Toronto, um, that studio and the distribution company.  We had

19   agreed to a three-way financing structure and a production

20   contract.  And about a month later, we made a joint

21   announcement.  And in that joint announcement, it said going

22   into production or something -- I don't know if it said going

23   into production but about to go into production.  I don't

24   remember what the thing said.  I'm sure I'm going to see it in

25   a little while.

1     And so I said if I was saying that before we actually

2  signed that agreement and made that announcement -- because it

3  wasn't just me making that announcement.  It was a bunch of

4  people.  And, yeah, I would probably be misleading, would

5  probably be out of whack.  But it was after that, well after

6  it.

7     And that's the one that kind of sticks in my head.  You

8  know, there are some other little ones.  But, you know, um, I'd

9  have to have my notes in front of me and -- and, um, I mean --

10  anyway.

11          MR. EMMICK:  Your Honor, if this is a convenient

12  time, I'd please ask him to look at his notes.  I can bring him

13  his notes.

14          THE COURT:  The jury is reminded of your duty not to

15  converse or otherwise communicate among yourselves or with

16  anyone upon any subject touching the merits of the cause on

17  trial.  You're not to form or express any opinion in the case

18  until it's finally submitted for your verdict.

19     The jury is excused until called.  Court will remain in

20  session.

21          THE COURTROOM DEPUTY:  All rise.

22          (Out of the presence of the jury.)

23          THE COURT:  Mr. Emmick, don't do that in this

24  courtroom.  You know better than that.

25          MR. EMMICK:  Which "that"?

```
 1              THE COURT:  Just what you've been doing.  Just
 2    exactly what you've been doing.
 3         How much longer are you going to take with Mr. Pritchard?
 4              MR. EMMICK:  Not very long at all.
 5              THE COURT:  I beg your pardon?  How long?
 6              MR. EMMICK:  I would guess five or ten minutes.
 7              THE COURT:  All right.  Because what's been going
 8    on, you have always asked questions which have nothing to do
 9    with this lawsuit and just for Mr. Pritchard to be able to make
10    statements, speeches on all of those things.
11         All right.  We'll be in recess, five minutes -- ten
12    minutes.
13              (Break taken.)
14              MR. EMMICK:  Your Honor, we had a chance for the
15    witness to look at his notes.  We're satisfied and we're
16    prepared to turn the witness over for cross.  If you'd like us
17    to do it now or whatever you'd like is fine.
18              THE COURT:  Do what?
19              MR. EMMICK:  Turn the witness over for the
20    cross-examination.  I could sit down if you'd like.
21              THE COURT:  Well, it's up to you.  We haven't been
22    getting into anything having to do with this lawsuit.  So I
23    don't know what cross-examination will be, in any event.  But
24    that's -- that's -- that's up to you.
25         You're finished with your questioning of this witness?
```

1        MR. EMMICK:  That's what I was trying to convey,

2  Your Honor.

3        THE COURT:  Well, your offer of him as a witness.

4        MR. EMMICK:  Yes.

5        THE COURT:  All right.  Bring down the jury.

6        (In the presence of the jury.)

7        THE COURT:  The record should reflect the jurors are

8  all present and in their proper places.  The defendants are

9  present along with their counsel.

10       MR. EMMICK:  Your Honor, we've concluded the direct

11 exam of Mr. Pritchard, and we offer him for cross-examination.

12       THE COURT:  Cross-examination, Defendant Blauvelt.

13                    **CROSS-EXAMINATION**

14 BY MS. AMES:

15 Q    Good afternoon, Mr. Pritchard.

16 A    Good afternoon.

17 Q    I just have a few questions that I would like to follow up

18 with you on.

19       You talked about the -- the problems with the cease and

20 desists in 2009; correct?

21 A    Yes, ma'am.

22 Q    And you were aware that GigaPix had been using attorneys

23 for the PPMs prior to that time; correct?

24 A    Yes, ma'am.

25 Q    And it was your understanding that -- or belief that --

```
 1    that GigaPix was in compliance -- is that correct? -- in the
 2    disclosures that they had in their PPMs?
 3    A    Yes.  I mean, when you have a lawyer write it, it
 4    generally means that there's some level of scrutiny for, you
 5    know, legalese.
 6    Q    So you were --
 7    A    Yes.
 8    Q    -- dependent upon their work?
 9    A    Yeah.  I mean, you're depending upon the lawyer's work
10    product.
11    Q    Okay.  But there were problems; is that accurate?  You've
12    talked about these Blue Sky laws and there was some problems
13    with the cease and desist?
14    A    Yes.
15    Q    And so you retained new counsel who specifically worked in
16    that area of securities; is that correct?  And that was
17    Margaret Pepper?
18    A    Um, you mean, to handle the -- there was a pretty clear
19    bifurcation.  Margaret handled the resolution of the cease and
20    desist claims, and Bill Uchimoto was, you know, on the
21    prospective side.
22    Q    I see.  Okay.  Thank you for clarifying that.
23         Um, but that was their purpose, is to resolve any problems
24    with those cease and desist orders; is that correct?
25    A    Yes, ma'am.
```

1   Q    And so it was your belief or feeling that you were in

2   compliance after they had resolved those issues?

3   A    That would be the logical thought.

4   Q    But you specifically referred to one.

5            MS. AMES:  And, Madam Clerk, if you would put

6   Exhibit No. -- Government's Exhibit No. 255 before the witness

7   for identification.

8            THE COURTROOM DEPUTY:  Government's Exhibit No. 255

9   is identified and placed before the witness.

10           (Exhibit 255 for identification.)

11           MS. AMES:  And, Your Honor, I would move to have

12  this entered.

13           MR. EMMICK:  No objection.

14           THE COURT:  Any objection?

15           MS. LINDSAY:  No, Your Honor.

16           THE COURT:  Exhibit 255 in evidence.

17           (Exhibit 255 received into evidence.)

18           MS. AMES:  If I may display it, Your Honor.

19  BY MS. AMES:

20  Q    And Government's Exhibit No. 255, if you could take a

21  moment to look at this.  Is this the PPM that you were

22  referring to in your direct examination?  And maybe if I could

23  more -- since a lot -- most of them are very similar to each

24  other; is that correct?

25  A    Yeah.  I'm actually just looking for the date that's

1    generally found at the bottom on the registration, but it --

2    it --

3    Q     And this one doesn't have one?

4    A     It actually -- your copier moved it to the next page, so

5    yes.  Yes, it is, ma'am.

6    Q     Okay.  And if you look at page 33 of that document, it

7    shows there in bold heading that says, "PRIOR SECURITIES

8    REGULATORY MATTERS."

9    A     Yes.

10   Q     And is this where you disclosed any and all of the issues

11   that you were having with the various states on the cease and

12   desist issues?

13   A     Yes, ma'am.

14   Q     And looking back on the first page again of this one a

15   little further down than -- half -- a little further than

16   halfway down, it also says that the securities offered hereby

17   are speculative and involve a high degree of risk; is that

18   correct?

19   A     Yes, ma'am.

20   Q     And it specifically refers to a Risk Factors section;

21   correct?

22   A     Yes, ma'am.

23   Q     And if you look at page 13, the very first full paragraph

24   with a bold above that says the company has a limited operating

25   history; is that correct?

1    A     Yes, ma'am.

2    Q     And, in fact, it lays out, does it not, that the company's

3    been in existence since 2002 but has not raised any money, in

4    essence -- or excuse me.  Let me -- I'm sorry.  Totally

5    misstated that.  I'm sorry.

6          At this time David Pritchard became associated -- I don't

7    mean to read it, excuse me.  However, there can be no

8    assurances at this time that the company will operate

9    profitably or that it will have adequate working capital to

10   meet its obligations.

11   A     Yes, ma'am.

12   Q     And was that an accurate statement at the time?

13   A     Yes, ma'am.

14   Q     Now, sir, when you came in to GigaPix in 2006, um, that

15   was initially because of your relationship with Zeke Kamm;

16   correct?  He introduced you to the company?

17   A     Yes.

18   Q     And you were aware that he was doing some work with the

19   company, he was an employee?

20   A     Yes.

21   Q     And GigaPix was working on a production of *The Last*

22   *Circuit*?  Do you recall that?

23   A     No, I don't.  No.

24   Q     But you were aware from -- from your meetings with Zeke

25   Kamm and going to GigaPix that the company had everything

1   that -- not everything but it had most of everything that you

2   would need to make animated TV shows or movies; correct?   It

3   had the -- the computer systems, it had artists, it had CG

4   artists working there?

5   A     Yes.

6   Q     And during all of these problems that you've talked about

7   with the company, you've mentioned that you were continually

8   trying to find outside funds.   And one of those occasions,

9   isn't it correct that you and Mr. Blauvelt went to John Thomas

10  Financial to -- to seek financial assistance from them?   Or do

11  you recall?

12  A     Yes.   They were the ones in New York and Houston.

13  Q     Okay.   And both of you went to them to see if you could

14  get financing assistance from them; is that correct?

15  A     Yes, ma'am.

16  Q     And most importantly, you talked about how it was

17  important that you had these 20 or so projects with GigaPix.

18  And was this part of the kids slate of films that you've talked

19  about previously?   Or what were these 20 projects?

20  A     Would you like me to list them?

21  Q     Yes, please.

22  A     Um, there was a slate of kids films.   I can name the films

23  if you'd like.

24  Q     Sure.   What are they?

25  A     Um, *Super Soakers*, um, *Chinatown*, um, *Elvis & Leon*.

1   Q    And I'm not going to make -- I'll stop you.  I won't make

2   you list all of them.  But were these in pre-development?

3   What -- pre-production?  What was the status of these slate of

4   kids films?

5   A    No.  They were in development.

6   Q    Okay.  And your intention for them and for GigaPix was to

7   produce them to bring money to GigaPix; is that correct?

8   A    The strategy and the objective was to produce them in the

9   jurisdiction of Iowa as part of that kids film slate.

10  Q    Um, but that was -- the kids films is only a portion of

11  the 20 projects you were talking about?

12  A    Yes.

13  Q    What was one of the other projects?

14  A    Um, there was a mini-series called *Tripoli*.  It was about

15  the history of the U.S. Marine Corps in 1789, Barbary Coast

16  Pirates.

17  Q    And that was to be produced by GigaPix?

18  A    Yes.  There was a slate of, um, what I would call adult

19  contemporary films.  And those were dramatic historical films.

20  So included in that was a bio picture of Duke Ellington.  There

21  was a picture based on the resurrection of Christ.  There were

22  probably seven or eight other films.  I've got to dust off some

23  stuff to -- I mean, in my head --

24  Q    That's okay.

25       But Shawn Walker had testified yesterday or the day before

1  about wanting to -- is it typical in a production business that

2  you want to have multiple slates of films?  Is that accurate

3  or -- slates of projects.

4  A    Um, yes.  I mean, you have to because it's a -- it's an

5  8 percent business.

6  Q    And what do you mean by that?

7  A    Um, it's really, really difficult to hit all of the marks

8  with one film.  That's why if you go into the kids business,

9  you have a higher probability of -- of getting -- recouping

10 some money.  And I don't mean to sound pejorative, but you can

11 have four scenes in a movie that are funny and kids will watch

12 the movie forever.  They're not as discerning.  So that's the

13 reason.

14 Q    Um, and the goal in having all of these different slates

15 was to bring -- to make GigaPix successful to bring money into

16 GigaPix?

17 A    Yes.

18 Q    And to pay the investors on their investments?

19 A    Yes.  And I -- and we were -- I mean, there was -- there

20 are probably a couple handful of people that could have gotten

21 the distribution agreements that we got.  I mean, we had an

22 output deal of -- a personal output deal with Overture/Anchor

23 Bay for all of the kids films and the animated film.

24 Q    And you've alluded that you and Mr. Blauvelt may have had

25 some -- some differences on business.  But both of you, it was

1   your goal -- correct? -- to make GigaPix a successful

2   production company?

3   A     Yes.

4   Q     And to make it a financially successful production

5   company?

6   A     Absolutely.

7   Q     And that would mean financial success for all of its

8   investors?

9   A     Yes.

10          MS. AMES:  No further questions, Your Honor.

11          THE COURT:  Government.

12                    **CROSS-EXAMINATION**

13  BY MS. LINDSAY:

14  Q     Good afternoon, Mr. Pritchard.

15  A     Good afternoon, ma'am.

16  Q     Would you agree that the making of independent movies is a

17  risky business financially?

18  A     Yes.

19  Q     And there's a high degree of speculation in whether the

20  movie will ever make money for anyone; right?

21  A     Um, there's a lot of variables that go into that, and I

22  think Mr. Walker touched on some of them but --

23  Q     I just asked you --

24  A     Yeah.  I mean, is it -- it's --

25  Q     Speculative?

```
 1   A     It's speculative.  Yes.

 2   Q     For example, a movie might not ever even really go into

 3   production, like OZ3D; correct?

 4   A     Yes, ma'am.

 5   Q     And even if it does go into production, problems can arise

 6   like there were with Blackbeard; correct?

 7   A     Yes, ma'am.

 8   Q     And even if the movie is done, you might not ever get

 9   distribution for it; right?

10   A     Yes, ma'am.

11   Q     So it might just sit on a shelf somewhere and not make

12   money for anybody?

13   A     Many of them do.

14   Q     Many of them do.

15         And even if a movie gets released and distributed, it

16   still might not make money; correct?

17   A     Yeah.  If people don't like it, it's not going to make

18   money.

19   Q     Well, what if they liked it a lot like Captain Abu Raed

20   which got awards and awards and awards but still didn't make

21   any money for anybody at GigaPix?  Right?

22   A     Completely different foundational strategy.

23   Q     Well, I'm just talking about money --

24   A     Yes.

25   Q     -- and making money.  So you can have a great movie,
```

1    artistically beautiful, award, award, award, and it doesn't

2    make any money; correct?

3    A     Correct.

4    Q     So when you told Special Agent Potocek that it's very hard

5    to make money on independent movies, that's a correct

6    statement; right?

7    A     Yes, ma'am.

8    Q     Also, I think, as we've heard during the trial, it's kind

9    of a specialized area with particular ins and outs of the

10   financing; correct?

11   A     Yes, ma'am.

12   Q     So it's -- it's difficult and a little hard to understand,

13   even if you are an industry insider; right?

14   A     If you're an industry insider, it's a little bit easier

15   because you should know the parameters and you should

16   understand the -- you know, the economics of it.  I mean, the

17   key to all of it is distribution.

18   Q     Right.  And people who aren't in the industry aren't

19   generally going to understand all of that; correct?

20   A     You know, the odd thing about the film business is, um,

21   everybody knows box office scores probably better than they do

22   baseball scores.  People know what's going on in the box

23   office.  It's kind of a weird thing.  But I would say,

24   generally speaking, most people don't understand the ins and

25   outs.

1  Q    Because studios mess with exactly what profit is to make

2  themselves look better; right?

3  A    They do it for a variety of reasons.

4  Q    So when you have investors like you had in GigaPix and

5  *OZ3D*, wouldn't you agree that you and the salespeople working

6  for you at GigaPix owed these investors a duty of complete

7  honesty and integrity in taking their money?

8  A    Well, they didn't work for me, ma'am.  None of those

9  people reported to me.

10  Q    Okay.  Let's ask it a different way.  Wouldn't you agree

11  that you and the salespeople who raised money for GigaPix and

12  *OZ3D* were owed a complete -- a duty of complete honesty and

13  integrity in the solicitation of their money?

14  A    Well, if you read every one of these PPMs --

15  Q    I'm not asking you about PPMs.  I'm asking you about a

16  duty of honesty.  I'm not asking you right this minute whether

17  you were honest.  I'm asking if they were owed a duty of

18  honesty and integrity.

19  A    Yeah.  Generally, yes.

20  Q    And would you agree that if the salespeople -- if the

21  salespeople were not completely open and honest in their sale

22  of the investment, then a fraud has been committed at least by

23  someone?

24  A    I -- I don't know if it would be a fraud.  But, I mean, I

25  would say that that would probably be a wrong thing, yeah.

```
 1   Q     When Greg Pusateri told Danny Anderson in May of 2008 that
 2   OZ3D would be in theaters in 12 to 18 months, that was false;
 3   correct?
 4   A     Danny Anderson is one of the investors that came in the
 5   other day?  I don't know who Danny Anderson is.
 6   Q     Well, let's just say there's an investor named Danny
 7   Anderson.  And Greg Pusateri -- or he testified at trial --
 8              MR. EMMICK:  Your Honor, I wonder if we could object
 9   to that.
10              THE COURT:  The objection is overruled.
11   BY MS. LINDSAY:
12   Q     Were you paying attention when the investors testified in
13   trial here?
14   A     Absolutely.
15   Q     Okay.  Danny Anderson was the first witness.  So --
16   A     I --
17   Q     When Danny Anderson testified that Greg Pusateri told him
18   that in May 2008 OZ3D would be in theaters in 12 to 18 months,
19   that's a false statement; correct?
20   A     Greg Pusateri said --
21   Q     Can I ask you if that is a false --
22   A     Yes.
23   Q     -- false statement?
24   A     If he said that, yes.  I wasn't there, but yes.
25   Q     And if Greg Pusateri told the same thing to Linda
```

1    Hampshire, he would be lying then too; right?

2    A    Yes, ma'am.

3    Q    And when Greg Pusateri told Danny Anderson in May 2008

4    that Mr. Anderson would see returns from *OZ3D* within a year,

5    that was a false statement as well; correct?

6    A    Yes, ma'am.

7    Q    And when Greg Pusateri told Danny Anderson that there was

8    no risk in this investment, that was a lie; correct?

9    A    Yes, ma'am.

10   Q    And the same thing with Linda Hampshire.  When Greg

11   Pusateri told Linda Hampshire that there's no risk in this

12   investment, that was a lie; correct?

13   A    Yes, ma'am.

14   Q    How about when Greg Pusateri told Danny Anderson that

15   Michael J. Fox -- I'm sorry -- Linda Hampshire that Michael J.

16   Fox had been hired to be one of the voice actors in *OZ3D*?

17   That's a lie; right?

18   A    Yes, ma'am.

19   Q    Now, you seem to be saying that because the Private

20   Placement Memoranda had disclosures in them, that the

21   investment was sold honestly.  Is that what you're saying?

22   A    I -- I'm saying that any prudent person who's going to

23   make an investment should read all the documents.  That's

24   really where the -- where the reality lives.  And, um, you

25   know, it's no different than a car sales, being, you know --

1  you know, you kind of test the car.  You test the -- you know,

2  you look at the -- you do consumer reports.  I mean, you do

3  your work, you do your research.  Yes.

4  Q    What if the salespeople are telling you the PPM doesn't

5  matter, it's legal gobbledygook, listen to what I'm telling

6  you?

7  A    That's unacceptable.

8  Q    So you're saying, then, that the victims who took the

9  stand here are to blame for losing their money into GigaPix

10  because they failed to read the PPM?

11 A    I'm saying that they share some responsibility, yes,

12 ma'am.  I mean, I -- I -- I think whenever you purchase

13 something that's more than pocket money, you have an obligation

14 to protect yourself.

15 Q    Are you aware that the law says that a victim's negligence

16 is no defense to fraud?

17 A    No, I'm not, ma'am.

18 Q    When, in the end of 2009, Mr. Blauvelt told Danny Anderson

19 that everything was going great at GigaPix, that was a false

20 statement; correct?

21 A    It -- when in 2009?

22 Q    End of 2009.

23 A    Um, we -- we weren't in really, really bad shape in the

24 end of 2009.  It was really -- there was still a lot of -- I

25 mean, we had just sold *Workaholics*.  There were some other

1    things that were going on.  So, you know, things were in great

2    shape?  Probably not.

3    Q    So it's a lie to say that they were?

4    A    Sure.

5    Q    How about when Mr. Blauvelt told Mr. Anderson in -- at the

6    end of 2009 that *OZ3D* was filming?  That was a lie; correct?

7    A    At the end of 2009?

8    Q    Yes.

9    A    Yes.

10   Q    How about when Mr. Blauvelt told Mr. Anderson at the end

11   of 2009 that *OZ3D* would be released in theaters shortly?  That

12   was a lie; right?

13   A    Yes, ma'am.

14   Q    How about when Mr. Blauvelt told Mr. Anderson that he

15   would see revenues from his investment very soon?  That was a

16   lie; correct?

17           MR. EMMICK:  Your Honor, objection.  This is all

18   being asked --

19           THE COURT:  The objection -- the objection is

20   overruled.

21           THE WITNESS:  Can you repeat the question?  I'm

22   sorry.

23   BY MS. LINDSAY:

24   Q    When Mr. Blauvelt told Mr. Anderson at the end of 2009

25   that he would see revenues from his investment very soon, that

1    was a lie; correct?

2    A      Revenues?  Yeah.  Yeah, I mean, there were no revenues for

3    shareholders.  So that's -- yeah.

4    Q      At the end of 2009 when Mr. Blauvelt told Mr. Anderson

5    that the company was doing so well, he was selling his own

6    shares but only to select investors, that was false; correct?

7    A      Um, actually, all of the shares that were being sold were

8    Mr. Blauvelt's shares.  He controlled 91 percent of the company

9    at that time.  So -- but -- but, um, I don't -- I don't know

10   what shares he was selling.  But he was the, um, principal

11   shareholder of the company, so I would guess theoretically most

12   of the shares that were sold at any given time were coming out

13   of his -- his portfolio.

14   Q      If you told -- if you told Mr. Anderson in 2009, at the

15   end of 2009 that GigaPix was doing really great, that was a

16   lie; correct?

17   A      If I did?

18   Q      Yes.

19   A      Yes.

20   Q      And if you told Mr. Anderson that *OZ3D* at the end of 2009

21   was very close to being released, that would also be a lie;

22   correct?

23   A      Yes.

24   Q      When Mr. Blauvelt told Jerome Goodman that he would

25   receive a substantial return with no mention of risk, that was

1  false; correct?

2  A     Yes, ma'am.

3  Q     And when Ms. Brown guaranteed Mr. Goodman a return from

4  *OZ3D*, she shouldn't have done that, should she?

5  A     No.

6  Q     Because there is no guarantee of return on an independent

7  movie; correct?

8  A     There's no guarantee about anything in life.

9  Q     When in July 2009 Ms. Brown told Mr. Goodman that *OZ3D* was

10  winding down production, that was false; correct?

11  A     What was the date?

12  Q     July 2009.

13  A     Yes.

14  Q     When Ms. Brown told Mr. Goodman that he -- he would see

15  returns soon after July 2009, that was false; correct?

16  A     Yes.

17  Q     So would you agree, then, that Mr. Pusateri lied to

18  investors in order to get them to invest?

19         MR. EMMICK:  Objection, Your Honor.  This is all

20  assuming that there's --

21         THE COURT:  Just a moment.  The objection is

22  sustained -- it's overruled.  I'm sorry.

23  BY MS. LINDSAY:

24  Q     Would you agree, given the statements that we've gone

25  over, that Mr. Pusateri lied to investors in order to get them

1    to invest?

2    A    Based on the statements that you just said to me, yes,

3    ma'am.

4    Q    And would you agree that Ms. Brown lied to investors to

5    get their money?

6    A    Based on the statements that you just read to me, yes,

7    ma'am.

8    Q    And that Mr. Blauvelt lied to investors to get their

9    money?

10   A    Based on the statements that you just read to me, yes,

11   ma'am.

12   Q    So you would agree, then, that the investors who the jury

13   heard from were lied to and that GigaPix got their money

14   through lies and deceit?

15   A    Provided those are truthful comments, yes, ma'am.  I mean,

16   the only thing --

17   Q    I didn't ask you a question.

18       Now, you say that all of the false statements of the

19   salespeople that worked at GigaPix and *OZ3D* are excused to a

20   certain extent by the PPMs.  Is that what you're saying, that

21   the investors are at fault for not reading through every word

22   of those PPMs and instead relying on the -- on what the

23   salesmen who were working at GigaPix told them?

24   A    I -- I would go back to what I said earlier, ma'am.  Um,

25   when you're --

1    Q    That's the end of the answer.  Thank you.

2         Now, wouldn't, then, it not be so much the investors'

3    fault but more GigaPix's fault if the PPMs themselves had lies,

4    misstatements, and misrepresentations in them?

5    A    That would be troubling.

6    Q    Well, is it troubling to you to hear the types of

7    investors that we've heard in court here who put their life

8    savings into GigaPix?

9         MS. AMES:  I'm going to object to the form of the

10   question.

11        THE COURT:  The objection is sustained.

12   BY MS. LINDSAY:

13   Q    Well, you heard that Mr. Anderson and his friends were

14   by-the-hour workers who had very little money; correct?

15   A    Yes, ma'am.

16   Q    And you heard that Linda Hampshire and her husband did not

17   even have the full amounts for their first investment, and for

18   their last investment they had to use Ms. Hampshire's 401(k)

19   retirement money; correct?

20   A    Yes, ma'am.

21   Q    And you heard that Jerome Goodman who's in his 80s didn't

22   even have the full 20,000 he was supposed to invest but was

23   convinced to do it in pieces; right?

24   A    Um, I -- I don't really recall that part of it, but I -- I

25   would say yes.

1  Q    And none of the people who testified were accredited, were

2  they?

3  A    I -- I'm -- I don't know.  I mean, I -- you know, they

4  said that they don't own property and stuff like that, and

5  those rules have changed a little bit.  But yes, generally.

6  Q    And you've heard that each of these investors were told

7  that their investments would be safe; correct?

8  A    I heard that.

9  Q    And, in fact, the investment was highly risky; correct?

10  A    Yes.

11  Q    So it wasn't an appropriate investment for those people,

12  was it?

13  A    No, ma'am.

14  Q    But you took their money and used it anyway, didn't you?

15  A    I didn't know that that's what was going on, ma'am.

16  Q    You didn't know for seven years that that was going on?

17  A    I didn't know that it was as dramatic as I saw.

18  Q    You didn't know that the salespeople that worked for

19  GigaPix and *OZ3D* were selling the investment to unaccredited,

20  unsophisticated investors based on lies, fraud, and deceit?

21  A    No, ma'am.

22  Q    Well, you talked about the cease and desist orders;

23  correct?

24  A    Yes, ma'am.

25  Q    And you saw the cease and desist orders; correct?

```
1   A     Um, I saw the first one in 2000 -- end of 2007.

2   Q     So you didn't think it was important enough for you to

3   read the cease and desist orders that were issued against

4   GigaPix.  Is that what you're saying?

5   A     Um, in 2007, I was awash in a whole bunch of things.

6   Q     Well, were you --

7   A     I was going back and forth to Jordan.  I was in the middle

8   of a film.  I was winding down an animation studio.  I was

9   really not in the United States more than probably half the

10  time.

11  Q     So it didn't concern you that the sale of the securities

12  into GigaPix was being done unlawfully?  You didn't trouble

13  yourself with that?

14  A     I had way too many other things I was paying attention to.

15  This was not an arena that I've lived in before.  I don't

16  understand the rules.  I don't understand the regs.  You're

17  telling me things that I find troubling, but I also am honestly

18  not as informed about this.  This is -- I've never had this

19  experience before.

20        THE COURT:  We're going to take our jury panel to

21  Monday at 1:30.

22        I will remind you not to converse or otherwise communicate

23  among yourselves or with anyone upon any subject touching upon

24  the merits of the cause on trial.  Do not form or express any

25  opinion of the case until it's finally submitted to you for
```

1    your verdict.

2        You are now excused until Monday at 1:30.  Jury's excused.

3    Court will remain in session.

4            THE COURTROOM DEPUTY:  All rise.

5            (Out of the presence of the jury.)

6            THE COURT:  You folks all came off on tangents.

7        Monday at 1:30.

8            THE COURTROOM DEPUTY:  This court is adjourned.

9            (Proceedings concluded at 3:56 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5

6            I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17            DATED THIS 3RD DAY OF NOVEMBER, 2014.

18

19

20            _____
              /S/ MYRA L. PONCE

21            MYRA L. PONCE, CSR NO. 11544, RMR, CRR
                FEDERAL OFFICIAL COURT REPORTER

22

23

24

25