1          **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3        **HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE**

4

5   **UNITED STATES OF AMERICA,**              )
                                                )
6                     **Plaintiff,**            )
                                                )
7        **vs.**                                )   **Case No. CR 14-282 R**
                                                )
8   **DAVID PRITCHARD and**                     )
    **CHRISTOPHER JAMES BLAUVELT,**             )
9                                               )
                      **Defendants.**           )
10   _____)

11

12              **REPORTER'S PARTIAL TRANSCRIPT OF**
                     **TRIAL PROCEEDINGS**
13          **TESTIMONY OF HAROLD DANNY ANDERSON**
                **WEDNESDAY, OCTOBER 15, 2014**
14                    **10:03 A.M.**
                 **LOS ANGELES, CALIFORNIA**
15

16

17

18

19

20

21

22   _____

23        **MYRA L. PONCE, CSR NO. 11544, RPR, RMR, CRR**
              FEDERAL OFFICIAL COURT REPORTER
24           312 NORTH SPRING STREET, ROOM 430
              LOS ANGELES, CALIFORNIA 90012
25                    (213) 894-2305

**UNITED STATES DISTRICT COURT**

```
 1                      APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4        STEPHANIE YONEKURA
          Acting United States Attorney
 5        BY:  ELLYN M. LINDSAY
          BY:  BYRON J. MCLAIN
 6            Assistant United States Attorneys
          United States Courthouse
 7        312 North Spring Street
          Los Angeles, California  90012
 8

 9    FOR THE DEFENDANT DAVID PRITCHARD:

10        LAW OFFICES OF MICHAEL W. EMMICK
          BY:  MICHAEL W. EMMICK
11            Attorney at Law
          3701 Highland Avenue, Suite 305
12        Manhattan Beach, California  90266

13

14    FOR THE DEFENDANT CHRISTOPHER JAMES BLAUVELT:

15        LAW OFFICES OF STEPHANIE AMES
          BY:  STEPHANIE AMES
16            Attorney at Law
          12100 Wilshire Boulevard, Suite 800
17        Los Angeles, California  90025

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1                    **INDEX OF WITNESSES**

2

3    PLAINTIFF'S WITNESSES                                    PAGE

4    ANDERSON, Harold Danny

5        Direct Examination by Ms. Lindsay                    6
         Cross-Examination by Mr. Emmick                      39
6        Cross-Examination by Ms. Ames                        44
         Redirect Examination by Ms. Lindsay                  55
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 9 - | Letter from Chris Blauvelt dated 5/11/2009 and Investor Pack from *OZ3D* | 27 | 27 |
| 23 - | Letter from Chris Blauvelt dated 4/16/2008 and Investor Packet from GigaPix | 12 | 12 |
| 34 - | Letter to Danny and Clara Anderson dated 5/13/2008 from GigaPix signed by Chris Blauvelt | 11 | 11 |
| 35 - | Check and investment documents for Harold and Clara Anderson dated May to June 2008 | 15 | 16 |
| 37 - | Letter dated 1/16/2009 signed by David Pritchard | 19 | 19 |
| 38 - | Check and Subscription documents for Harold and Clara Anderson dated August to September 2009 | 33 | 33 |
| 39 - | GigaPix Stock Certificates for Harold and Clara Anderson | 34 | 34 |
| 40 - | Letter dated 6/10/2009 signed by Chris Blauvelt and David Pritchard | 21 | 22 |
| 41 - | Letter from GigaPix dated 7/7/2009 with signature block of Chris Blauvelt to Dan Anderson | 26 | 26 |
| 42 - | Letter from *OZ3D*, LLC, containing confirmation of membership signed by Chris Blauvelt dated 8/5/2009 | 29 | 30 |
| 43 - | Notice to Shareholders dated 9/30/2009 signed by Chris Blauvelt and David Pritchard | 23 | 24 |
| 44 - | Letter from GigaPix dated 10/16/2009 re: Capital Restructure Exercises | 35 | 35 |
| 45 - | Letter signed by Chris Blauvelt | 36 | 37 |

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; WEDNESDAY, OCTOBER 15, 2014

 2                              10:03 A.M.

 3                                -oOo-

 4              (The following is a partial transcript

 5               of the day's trial proceedings.)

 6              (In the presence of the jury.)

 7              THE COURT:  Call your first witness.

 8              MS. LINDSAY:  Thank you, Your Honor.  The Government

 9    calls Danny Anderson.

10              THE COURTROOM DEPUTY:  Please step forward.  Stand

11    right here.

12              THE WITNESS:  Sure.

13              THE COURTROOM DEPUTY:  Please raise your right hand.

14      Do you solemnly swear that the testimony you shall give in

15    the cause now pending before this Court shall be the truth, the

16    whole truth, and nothing but the truth, so help you God?

17              THE WITNESS:  I do.

18      HAROLD DANNY ANDERSON, PLAINTIFF'S WITNESS, WAS SWORN

19              THE COURTROOM DEPUTY:  Thank you.  Please take a

20    seat.

21      Please state your full and true name for the record and

22    spell your last name.

23              THE WITNESS:  My name is Harold Danny Anderson,

24    A-n-d-e-r-s-o-n.

25              MS. LINDSAY:  May I proceed?
```

```
 1              THE COURT:  Yes.
 2                   DIRECT EXAMINATION
 3   BY MS. LINDSAY:
 4   Q    Mr. Anderson, how are you currently employed?
 5   A    I'm retired.
 6   Q    What are you retired from?
 7   A    The military.  Excuse me.
 8   Q    Did you have any other employment after the military?
 9   A    I did.  After I got out of the military, I went to work
10   for a mobile home business selling mobile homes for awhile.
11   Q    Where do you live?
12   A    Andrews, North Carolina.
13   Q    Is that a big city or --
14   A    No, it's not.  It's a small town.
15   Q    What is your current source of income?
16   A    Um, I retired from the military, so I get a military
17   income.  And also, I'm partially disabled, so I get a VA
18   income.  And of course, now due to the age, I get social
19   security.
20   Q    How old are you?
21   A    66.
22   Q    What kind of investment history do you have?
23   A    I invested with a -- a local guy from the area before.
24   It's called Cousins Investment, but it wasn't stocks or
25   anything.  It was just a day trading.
```

```
1    Q    Did you lose your money?

2    A    I did.

3    Q    Did you become an investor in GigaPix?

4    A    Yes, ma'am.

5    Q    How did you learn of GigaPix?

6    A    I had a friend who lived in San Antonio, Texas, that was

7    in the military with me.  And he called and was -- told me

8    about the GigaPix.

9    Q    Had he received any returns from GigaPix, or was he just

10   excited about it?

11   A    He was just excited about it.

12   Q    In about May of 2008, did you receive a telephone call

13   from someone at GigaPix?

14   A    I did.

15   Q    Who was that?

16   A    Greg Pusateri.

17   Q    And eventually did you invite some friends of yours in

18   Andrews over to your house to hear Mr. Pusateri's sales pitch?

19   A    Yes, ma'am.

20   Q    Can you describe the scene there at your home?

21   A    We had about four or five couples and a couple single

22   people in there to listen to the GigaPix spiel.

23   Q    Was it on your speakerphone?

24   A    It was.

25   Q    Did you have your pastor present?
```

1    A    I did.

2    Q    And did Mr. Pusateri discuss religion with you while he

3    was giving his spiel?

4    A    The pastor introduced himself as our pastor.  And yes,

5    Mr. Pusateri said a couple of things to him about being a

6    pastor.

7    Q    What did Mr. Pusateri tell you and the people gathered in

8    your living room about GigaPix?

9    A    Well, of course, he was the one selling GigaPix and he

10   told us about how fine the company was and how long it had been

11   operating and it was going to be a good income for people who

12   wants to invest in it.

13   Q    Did he tell you how much the company was worth?

14   A    He did.

15   Q    How much did he say?

16   A    If I'm not mistaken, it was 50 million.

17   Q    Did he tell you that GigaPix had already had success?

18   A    Yes.

19   Q    What did he say about that?

20   A    He told us that there was three or four -- I forget the

21   exact number -- short films that had been produced already and

22   had made money.

23   Q    Did he tell you that actors had been signed up to be in

24   GigaPix's movies?

25   A    Yes, ma'am.

1  Q    Did he tell you whether GigaPix's earlier investors were

2  successful with the company?

3  A    I don't recall right off if he had actually said that they

4  had received the money, but -- I was leaning toward saying that

5  in the beginning.  I think he did say something that they had

6  made some money from the company.

7  Q    Did he tell you about a movie called *OZ3D*?

8  A    Yes, ma'am.

9  Q    What did he say about that?

10  A    He said that that was their next biggest project and that

11  they would -- I think he indicated it would be about a year

12  before that came out.

13  Q    Did he tell you when you would see returns if you invested

14  in that movie?

15  A    Yes, ma'am, he did.

16  Q    And when was that?

17  A    A year to 18 months.

18  Q    And this was in May of 2008?

19  A    Yes, ma'am.

20  Q    Did he tell you about ancillary products that would be

21  connected with *OZ3D*?

22  A    Yes, ma'am.

23  Q    Can you tell us what those were?

24  A    He described it as action figures, stuffed animals, CDs.

25  I think that was three of the items he mentioned.

```
 1   Q    Did he tell you how much money you could expect to make
 2   with GigaPix?
 3   A    He did right off.
 4   Q    What did he say?
 5   A    Millions.  He didn't say exactly which -- how many but
 6   millions.
 7   Q    Did Mr. Pusateri say anything about GigaPix being
 8   purchased by Disney?
 9   A    Yes, ma'am.
10   Q    What did he say about that?
11   A    He told us that Disney had already purchased I think it
12   was Pixar and that they would probably be next on the list for
13   them to purchase because once you're successful, Disney doesn't
14   want any competition so they buy up their competition.
15   Q    But when you say "they" -- you mean GigaPix was?
16   A    Yes, ma'am.
17   Q    Did he say anything about what would happen to GigaPix
18   stock prices at that point?
19   A    Yes, ma'am.
20   Q    What did he say?
21   A    He said our investment would go from, like, $2 a share up
22   to as much as $50 a share.
23   Q    Did you receive anything in the mail from GigaPix?
24   A    I did.
25           MS. LINDSAY:  Madam Clerk, I'd ask for Exhibit 34 to
```

```
 1   be placed before the witness.
 2            THE COURTROOM DEPUTY:  Exhibit 34 is identified and
 3   placed before the witness.
 4            (Exhibit 34 for identification.)
 5   BY MS. LINDSAY:
 6   Q    Sir, showing you what's been marked for identification as
 7   Government's Exhibit 34, do you recognize this?
 8   A    Yes, ma'am.
 9   Q    What is it?
10   A    It is from Chris Blauvelt and it's a letter to us.
11   Q    Let me stop you there.
12            MS. LINDSAY:  Your Honor, I would move in
13   Exhibit 34.
14            MS. AMES:  No objection.
15            MS. LINDSAY:  May we display, Your Honor?
16            THE COURT:  Yes.  34 in evidence.
17            (Exhibit 34 received into evidence.)
18   BY MS. LINDSAY:
19   Q    And if we could just highlight the date of the letter and
20   the addressees.  And that's to -- you said your name is Harold.
21   Do you commonly use the name Danny?
22   A    I do.
23   Q    And is Clara your wife?
24   A    She is, yes, ma'am.
25   Q    And can you focus on who signed this letter?
```

1    A     Yes.

2    Q     And who is that?

3    A     Chris Blauvelt.

4            MS. LINDSAY:  And now, Madam Clerk, I'd ask for

5    Exhibit No. 23 to be placed before the witness.

6            THE COURTROOM DEPUTY:  Exhibit 23 is identified and

7    placed before the witness.

8            (Exhibit 23 for identification.)

9            MS. LINDSAY:  Actually, there's one in the folder

10   there.  Sorry.  The red one, I think.

11   BY MS. LINDSAY:

12   Q     And showing you this exhibit, is it -- is it something

13   like what you received along with this letter?

14   A     Yes, ma'am, it is.

15           MS. LINDSAY:  I move in 23, Your Honor.

16           THE COURT:  Any objection?

17           MS. AMES:  No objection.

18           MR. EMMICK:  No objection.

19           THE COURT:  23 in evidence.

20           (Exhibit 23 received into evidence.)

21           MS. LINDSAY:  And maybe you could just hold up the

22   folder so the jury can see what it is and the judge.

23   BY MS. LINDSAY:

24   Q     And if you open it up and there's a -- a booklet inside

25   called a Confidential Private Placement Memorandum.

13

```
 1   A     Yes, ma'am.

 2   Q     Did you receive something like this?

 3   A     Yes, ma'am.

 4   Q     Maybe you could hold that up for the jury --

 5   A     Sure.

 6   Q     -- and flip through it just a little so --

 7   A     Yes.

 8   Q     Thank you.

 9         Did you at the time know what a Private Placement

10   Memorandum was?

11   A     No, ma'am.

12   Q     And did you read it?

13   A     I scanned over it.  But the further I got into it, the

14   more difficult it became to read.

15   Q     Did you talk to Mr. Pusateri about it?

16   A     I did.

17   Q     What did he tell you about that document?

18   A     He said not to worry about it, that it was a formality.

19   Q     Did you talk to Mr. Pusateri about whether the investment

20   was risky?

21   A     I did.

22   Q     What did he say about that?

23   A     He said it was very minimal, that he was invested in it

24   himself so there was -- I shouldn't worry about it.

25   Q     Did he tell you how much of his own money he had put into
```

1  it?

2  A    I don't recall that.  Perhaps he did.  I just don't recall

3  right now.

4  Q    Okay.

5  A    He said -- let me qualify something, please.  He did say

6  he was invested in it and that at the time he was living on

7  partial retirement and his wife was working.  So we assumed

8  that it was quite a bit that he was invested in.

9  Q    I'm -- I'm sorry.  I didn't hear you.  He was living on

10 what his wife made and --

11 A    And partial retirement that he still had.

12 Q    Partial retirement?

13 A    Yeah.  Yes.

14 Q    Did he ever tell you that he was going to get his money

15 when you got your money?

16 A    Yes, he did.

17 Q    Was it your belief, then, that his success financially

18 depended on the same things as your success?

19 A    Yes, ma'am.

20 Q    Now, the group of people in your living room listening to

21 Mr. Pusateri, were you a wealthy group of sophisticated

22 investors?

23 A    No, ma'am.

24 Q    Did you tell Mr. Pusateri that?

25 A    I did.

```
 1   Q     What did you say about the nature of the work of the
 2   people in the living room there?
 3   A     I told them they were working people and most people there
 4   worked by the hour, that no one there was wealthy.
 5   Q     Did you talk about how the money to invest was your
 6   retirement money?
 7   A     We did.
 8   Q     Did you inform Mr. Pusateri that you did not want to
 9   invest if there was a risk you could lose your money?
10   A     We certainly did.
11   Q     Did he tell you that the company was rock solid?
12   A     He did.
13   Q     Did you decide to invest money into GigaPix?
14   A     Yes, ma'am.
15   Q     How much that first time?
16   A     12,000.
17   Q     And I'd ask you to take a look in the notebook there,
18   what's been marked for identification as Government's
19   Exhibit 35.
20              THE COURTROOM DEPUTY:  Exhibit 35 is identified and
21   placed before the witness.
22              (Exhibit 35 for identification.)
23   BY MS. LINDSAY:
24   Q     Does that consist of checks that you sent in and trust
25   documents as well as a Subscription Agreement?
```

```
 1   A     Yes, ma'am.
 2               MS. LINDSAY:  I move in 35, Your Honor.
 3               THE COURT:  35, any objection?
 4               MR. EMMICK:  No objection.
 5               THE COURT:  35 in evidence.
 6               (Exhibit 35 received into evidence.)
 7               MS. LINDSAY:  And if we could pull up, first, page 1
 8   and make it bigger.
 9   BY MS. LINDSAY:
10   Q     Is this -- do you recognize this signature on that check?
11   A     Yes, ma'am.
12   Q     Whose is that?
13   A     It's Clara, my wife.
14   Q     And who is Millennium Trust Company, and why did you make
15   your check out in that name?
16   A     That's the trust company that I had referred to earlier
17   that we were -- with Cousins Investment, that it went through
18   that company to -- Cousins Investment.
19   Q     And then into --
20   A     It was already established.
21   Q     And then into GigaPix?
22   A     Yes.
23   Q     Okay.  If we could look at page 13 of that exhibit,
24   please.  Is that your second check?
25   A     It is, yes, ma'am.
```

1    Q    Okay.  If you look at -- let's pull up page 7 and maybe

2    just kind of make the whole thing a little bit bigger if we

3    can.

4         Is this a Subscription Agreement that you and your wife

5    filled out when you sent in your shares?

6    A    Yes, ma'am, it is.

7    Q    And were you instructed in how to fill this out?

8    A    Yes, ma'am.

9    Q    How were you instructed?

10   A    Well, for everyone in the living room, we all started from

11   page 1.  And we were told everything to check and everything

12   not to check for the entire subscription.

13   Q    Did you read the booklet carefully?

14   A    No, ma'am.

15   Q    Let's look at page 9 of this exhibit.  And if we could go

16   down to that bottom part there, 4.1, and everything that's

17   there.  And it says in the Confidential Investor Questionnaire,

18   it talks about being an accredited investor.  Did you know what

19   an accredited investor was?

20   A    Only by reading this I did.

21   Q    And did you qualify as an accredited investor?

22   A    No, ma'am.

23   Q    Did you discuss that with Mr. Pusateri?

24   A    Yes, ma'am.

25   Q    Can you tell us about that?

```
1    A    Yes, ma'am.  In fact, I told him no one filling out these

2    applications, including myself, was worth a million dollars.

3    It doesn't matter if we use our homes, our automobiles, it

4    would not come out to a million dollars.

5    Q    What did he say about that?

6    A    He said the market anyway -- I initialed it anyway because

7    most everyone didn't qualify and that's what they did.

8    Q    Are those your initials there?

9    A    Yes, ma'am.

10   Q    But it's, in fact, not true?

11   A    That's right.  It's not true.

12   Q    Looking at page 12 of the exhibit and about halfway down

13   there, if you could just magnify (h) and (i).  And it asks you

14   if you're familiar with the risk aspects and non-liquidity of

15   the investment and you checked "Yes."  Did you believe this was

16   a risky investment?

17   A    No, ma'am.

18   Q    Why did you check that?

19   A    We checked it like that because everyone there was being

20   guided through this and it would go to (h) and it would say

21   check "Yes," go to (i) and check "Yes."  And so when one would

22   turn a page, all five or six would turn a page.

23   Q    Was it done quickly?

24   A    Relatively quick, yes.

25   Q    So for (i) there, it says that you're at risk of losing
```

```
 1   your entire investment.  Did you believe that you were going to

 2   lose your entire investment?

 3   A     No, ma'am.

 4   Q     If we could look at page 10.  Is that one of the stock

 5   certificates that you received from GigaPix?

 6   A     Yes, ma'am.

 7   Q     After you invested with GigaPix, did you receive letters

 8   and other information from GigaPix?

 9   A     Yes, ma'am.

10   Q     I'd ask that you take a look at what's been marked for

11   identification as Government's Exhibit 37.  It will be in your

12   book -- book right there.

13              THE COURTROOM DEPUTY:  Exhibit 37 is identified and

14   placed before the witness.

15              (Exhibit 37 for identification.)

16   BY MS. LINDSAY:

17   Q     Is this one of the letters you received from GigaPix?

18   A     Yes, ma'am.

19              MS. LINDSAY:  I'd move in 37.

20              MS. AMES:  No objection.

21              MR. EMMICK:  No objection, Your Honor.

22              THE COURT:  37 is in evidence.

23              (Exhibit 37 received into evidence.)

24              MS. LINDSAY:  Maybe we could put up the first page,

25   please, and just look at the date of that letter.
```

1    BY MS. LINDSAY:

2    Q    Is that January 16th, 2009?

3    A    Yes, ma'am, it is.

4    Q    And looking at the second page of that letter, just to see

5    who signed that letter.

6    A    David Pritchard.

7    Q    Okay.  I'm sorry.  Now back to the first page.

8         Looking at the third paragraph of this letter, it says

9    that in October they had announced nearly $60 million in

10   potential funding for a slate of kids films.  Is this

11   consistent with what Mr. Pusateri told you?

12   A    Yes, ma'am.

13   Q    And looking at the fourth paragraph, it states that they

14   had begun pre-production on *Oz*.  Is that consistent with what

15   Mr. Pusateri told you?

16   A    Yes, ma'am, it is.

17   Q    Looking at page 2 of the letter in the first paragraph, it

18   states that they've successfully managed to secure several

19   orders for pilots and series in their reality television

20   department.  And then a little later in the paragraph it states

21   that they believe that reality shows will generate for them a

22   stable cash flow.

23        Did this encourage you that things were going well at

24   GigaPix?

25   A    Yes, ma'am.

1    Q    And then also in the letter, a little farther down, do you

2    see where it says that an accounting firm was doing a five-year

3    audit on the company?

4    A    Yes, ma'am.  Uh-huh.  Yes, ma'am.

5    Q    And did that encourage you that GigaPix was on the

6    up-and-up?

7    A    Absolutely.  Yes, ma'am.

8    Q    The paragraph goes on to state that a few states had

9    notified GigaPix that they were not fully in compliance with

10   some state securities laws.  Did anyone at GigaPix tell you

11   about that problem?

12   A    No.  The only information that I recall is the fact that

13   they were in one state and -- because their permits weren't in

14   order, they had to leave that state but they would go to

15   another state.  I think it was Iowa.  I'm not sure.

16   Q    Okay.  We'll get there.

17        Now I'd ask if you can take a look at what's been marked

18   for identification as Government's Exhibit 40 and ask if you

19   recognize that.

20             THE COURTROOM DEPUTY:  Exhibit 40 is identified and

21   placed before the witness.

22             (Exhibit 40 for identification.)

23   BY MS. LINDSAY:

24   Q    Is that another letter that you received from GigaPix?

25   A    Yes, ma'am.

```
 1              MS. LINDSAY:  Your Honor, I move in Exhibit 40.
 2              MS. AMES:  No objection.
 3              MR. EMMICK:  No objection.
 4              THE COURT:  40 in evidence.
 5              (Exhibit 40 received into evidence.)
 6              MS. LINDSAY:  And if we could display the first page
 7    of that and maybe just look at the date.  And then if we could
 8    look at the second page and look at the signature.
 9    BY MS. LINDSAY:
10    Q    And can you tell us who signed this letter?
11    A    Chris Blauvelt.
12    Q    Anybody else?
13    A    David Pritchard.
14    Q    Did you receive this letter in the mail?
15    A    Yes, ma'am.
16    Q    Um, now, just generally the letter discusses converting
17    warrants to GigaPix's common stock.  Did you understand what
18    was going on there?
19    A    Well, pretty much.  It was explained also telephonically
20    that it had to be done and we all had a certain time to get
21    it -- the warrants back in to them in order for this to
22    convert.
23    Q    Did this also make you feel that GigaPix was a growing
24    company doing what was appropriate to maintain the business?
25    A    Yes, ma'am.  We were impressed.
```

1   Q    And looking at the second page, the second sentence of the

2   first paragraph, it again discusses the financial audit to

3   start in mid June of that year, which was 2009.  Again, did

4   that give you faith in the company that they were having an

5   external auditor?

6   A    Absolutely it did.

7   Q    Looking at the next paragraph, it says that they're going

8   to begin production of the first of their slate of five kids

9   action films and that principal photography was set to begin in

10  July as well as the *Wizard of Oz* movie commencing production in

11  August.  Again, did this make you believe that GigaPix was

12  actively making the movies and TV shows?

13  A    Yes.  I was counting the time frame that we were told in

14  the beginning that it would happen.

15  Q    And I'd ask that you take a look at what's been marked for

16  identification as Government's Exhibit 43.  And that may be in

17  a different binder.

18          THE COURTROOM DEPUTY:  Exhibit 43 is identified and

19  placed before the witness.

20          (Exhibit 43 for identification.)

21  BY MS. LINDSAY:

22  Q    Is that another letter that you received from GigaPix?

23  A    Yes, ma'am.

24          MS. LINDSAY:  I move in 43, Your Honor.

25          THE COURT:  Any objection?

**UNITED STATES DISTRICT COURT**

```
 1                 MS. AMES:  No objection.

 2                 MR. EMMICK:  No objection.

 3                 THE COURT:  43 in evidence.

 4                 (Exhibit 43 received into evidence.)

 5    BY MS. LINDSAY:

 6    Q    And let's display the first page for the date.

 7    September 23rd, 2009 [sic]; correct?

 8    A    Yes, ma'am.

 9    Q    And can we just look at who signed that letter?  And is

10    that, again, Mr. Blauvelt and Mr. Pritchard?

11    A    Yes, ma'am.

12    Q    Let me ask you as an aside.  All these letters and

13    communications from GigaPix and from Mr. Pritchard and

14    Mr. Blauvelt, did this help maintain your faith in GigaPix?

15    A    It absolutely did.

16    Q    And maybe just so the jury can see, if you can magnify

17    just the body of the letter.  And while they're doing that,

18    maybe -- maybe I can figure out what I'm doing.

19         Okay.  Um, did there come a time when -- well, let me ask

20    you this.  After your investment, did you continue to talk to

21    Mr. Pusateri?

22    A    Yes, ma'am.

23    Q    Did there come a time when you called and Mr. Pusateri was

24    no longer available?

25    A    Yes, ma'am.
```

```
 1   Q     What were you told about what happened to Mr. Pusateri?
 2   A     That he had cashed in and moved on.
 3   Q     Who did you speak with, then, at GigaPix after
 4   Mr. Pusateri?
 5   A     Um, I think -- I think it was Sharon Simon.
 6   Q     And anyone else?
 7   A     Yes.  I talked to Mr. Blauvelt and a couple of times
 8   Mr. Pritchard.
 9   Q     Well, let's talk about speaking with Mr. Blauvelt.  What
10   did Mr. Blauvelt tell you about the condition of GigaPix when
11   you spoke to him?
12   A     He said it was still on track, it was still good.
13   Q     Did he tell you that the movie OZ3D would be released in
14   theaters shortly?
15   A     Yes, ma'am.
16   Q     Did he tell you whether it was in the process of filming?
17   A     Yes, ma'am.
18   Q     He said it was?
19   A     He did.
20   Q     And when did he tell you that you could expect to receive
21   returns on the movie?
22   A     He didn't give a date but in the near future.
23   Q     Did he ask you to invest more money?
24   A     Yes, ma'am.
25   Q     More than once?
```

```
 1    A    Yes, ma'am.

 2    Q    When Mr. Blauvelt called you, what city and state were you

 3    located in?

 4    A    I was in Andrews, North Carolina.

 5    Q    Soon after he called you, did he send you promotional

 6    materials about OZ3D?

 7    A    Yes, ma'am.

 8    Q    And if you could take a look at what's been marked for

 9    identification as Government's Exhibit 41 and ask if you

10    recognize that.

11              MS. LINDSAY:  And, Ms. Clerk, I'll --

12              THE COURTROOM DEPUTY:  Exhibit 41 is identified and

13    placed before the witness.

14              (Exhibit 41 for identification.)

15    BY MS. LINDSAY:

16    Q    Is that the letter that accompanied materials for OZ3D?

17    A    Yes, ma'am.

18              MS. LINDSAY:  Your Honor, I move in this exhibit.

19              MR. EMMICK:  No objection.

20              THE COURT:  41 in evidence.

21              (Exhibit 41 received into evidence.)

22              MS. LINDSAY:  And if we could display that and maybe

23    just make the whole text bigger.

24    BY MS. LINDSAY:

25    Q    So the letter is dated July 7th, 2009.  Would that have
```

```
 1   been shortly after you had some of your phone conversations
 2   with Mr. Blauvelt?
 3   A    About that time, yes, ma'am.
 4         MS. LINDSAY:  Um, I'm sorry, Madam Clerk, but if you
 5   could show the witness Exhibit 9 for identification.
 6         THE COURTROOM DEPUTY:  Exhibit 9 is placed before
 7   the witness.
 8         (Exhibit 9 for identification.)
 9   BY MS. LINDSAY:
10   Q    Looking at Exhibit 9, is this -- does this look like the
11   same kind of folder that you received with that letter?
12   A    Yes, ma'am.
13         MS. LINDSAY:  I move in Exhibit 9, Your Honor.
14         MS. AMES:  No objection.
15         MR. EMMICK:  No objection.
16         THE COURT:  9 in evidence.
17         (Exhibit 9 received into evidence.)
18         MS. LINDSAY:  Thank you, Your Honor.
19   BY MS. LINDSAY:
20   Q    Again, if you could just hold it up for the jury.
21   A    (Indicating.)
22   Q    Thank you.
23   A    Sure.
24   Q    And again, inside do you see a booklet called a
25   Confidential Private Placement Memorandum?
```

**UNITED STATES DISTRICT COURT**

```
 1    A     Yes, ma'am.

 2    Q     Did you try to read that one too?

 3    A     No, ma'am, I didn't.

 4    Q     Did Mr. Blauvelt ever go over this document with you?

 5    A     No, ma'am.

 6    Q     Did he mention it to you at all?

 7    A     I don't recall if he did.

 8    Q     Did he ask you about your financial situation?

 9    A     No, ma'am.

10    Q     Did that come up when you were discussing how much you're

11    going to invest?

12    A     I don't believe so.

13    Q     Did you end up investing in OZ3D?

14    A     Yes, ma'am.

15    Q     What made you decide to invest in OZ3D?

16    A     Well, we were already in for $12,000 and we were being

17    told that the company was still going to be successful and

18    revenue was going to come in, so I -- I figured that would

19    still be a good investment.

20    Q     Who was telling you that at this point?

21    A     Well, it started off being Mr. Pusateri, but it went on

22    to, if I'm not mistaken, Chris Blauvelt before it ended.

23    Q     Did he tell you that you were close to getting a return?

24    A     Yes, ma'am.

25    Q     And was that important in your decision to invest more
```

UNITED STATES DISTRICT COURT

```
 1   money?
 2   A     It certainly was.
 3   Q     And did he talk to you about risk associated with the
 4   investment?
 5   A     No, ma'am.
 6   Q     Did Mr. Blauvelt tell you that there were limited shares
 7   available?
 8   A     Yes, ma'am.
 9   Q     Why was that, if you recall?
10   A     I'm trying to remember if this was at this point, but
11   there were limited shares because of -- I don't know if that
12   was his personal shares that he was referring to.  But this was
13   offered to people who wanted to invest in Oz and that were
14   given first choice.
15   Q     Okay.  And then I'd ask you to take a look at what's been
16   marked for identification as Government's Exhibit 42 and ask if
17   you recognize that.
18            THE COURTROOM DEPUTY:  Exhibit 42 is identified and
19   placed before the witness.
20            (Exhibit 42 for identification.)
21            THE WITNESS:  Yes, ma'am.
22   BY MS. LINDSAY:
23   Q     And is that a letter from Mr. Blauvelt enclosing your
24   stock certificate?
25   A     Yes, ma'am.
```

```
 1              MS. LINDSAY:  Your Honor, I move in Exhibit 42.

 2              MR. EMMICK:  No objection.

 3              MS. AMES:  No objection.

 4              THE COURT:  42 in evidence.

 5              (Exhibit 42 received into evidence.)

 6              MS. LINDSAY:  And if we could display that for the

 7    jury.

 8    BY MS. LINDSAY:

 9    Q    And that letter is dated August 5th, 2009, and signed by

10    Mr. Blauvelt; is that correct?

11    A    Yes, ma'am.

12    Q    And looking at page 3 of that exhibit, is that the stock

13    certificate that you received?

14    A    Yes, ma'am.

15    Q    And if we could look at page 2 of the exhibit.  Is that

16    the check that you sent along -- in order to get that stock

17    certificate?

18    A    Yes, ma'am.

19    Q    After the second investment, did Mr. Blauvelt encourage

20    you to invest again?

21    A    Yes, ma'am.

22    Q    Did he call you many times?

23    A    I think -- I think twice.

24    Q    And when he called you after that second investment, did

25    you inform him that you wanted to talk to somebody besides him
```

```
 1    as well?
 2    A     Someone in addition to him.
 3    Q     And did he bring you somebody else to talk to?
 4    A     Yes, ma'am.
 5    Q     Who was that?
 6    A     David Pritchard.
 7    Q     Can you tell us about the conversation you had with
 8    Mr. Pritchard and Mr. Blauvelt?
 9    A     Yes, ma'am.
10    Q     What did they say?
11    A     Well, they were on the open speaker and they both took
12    turns talking.  And they told us that these shares was his
13    personal shares that he decided to sell off and to -- the
14    people who were offered the first choice would be those who
15    were in, invested already, and that it was a dollar a share and
16    that they -- I believe the amount was -- it was over $10,000.
17    Q     Was there a limited number of these shares?
18    A     Yes, ma'am.
19    Q     Did they tell you that GigaPix was a sound investment?
20    A     Yes, ma'am.
21    Q     Both of them?
22    A     Yes, ma'am.
23    Q     And did they tell you that OZ3D was close to being
24    released?
25    A     Yes, ma'am.
```

1    Q     Both of them?

2    A     Yes, ma'am.

3    Q     Did they tell you the company was doing so well that they

4    were selling some of their stock off?

5    A     They did.

6          MR. EMMICK:  Your Honor, objection on the grounds of

7    leading.

8          THE COURT:  The objection is overruled.

9          THE WITNESS:  Yes, ma'am.

10   BY MS. LINDSAY:

11   Q     Both of them?

12   A     Yes, ma'am.

13   Q     In telling you that there were only these limited personal

14   shares available, did they tell you then that there was an

15   urgency that you do this investment quickly?

16   A     Yes, ma'am.

17   Q     Did you tell them that at that point you had no more money

18   to send in?

19   A     Yes, ma'am.

20   Q     What did they respond to that?

21   A     Well, they said that they would cut it down from 10,000 to

22   5,000, make an exception for me again because I was already

23   invested in it.

24   Q     Showing you what's been marked for identification as

25   Government's Exhibit 38.  I'd ask if you recognize that.

 1              THE COURTROOM DEPUTY:  Exhibit 38 is identified and

 2    placed before the witness.

 3              (Exhibit 38 for identification.)

 4    BY MS. LINDSAY:

 5    Q    Is that the check that you sent after speaking to

 6    Mr. Pritchard and Mr. Blauvelt?

 7    A    Yes, ma'am.

 8              MS. LINDSAY:  I move in 38, Your Honor.

 9              THE COURT:  Any objection?

10              MS. AMES:  No objection.

11              MR. EMMICK:  No objection.

12              THE COURT:  38 in evidence.

13              (Exhibit 38 received into evidence.)

14              MS. LINDSAY:  If we could just display that.

15    BY MS. LINDSAY:

16    Q    So this states it was in August -- August of 2009.  Is

17    that about when this all occurred?

18    A    Yes, ma'am.

19    Q    And if we look at page 2 of the exhibit, is that another

20    one of those subscription forms that you filled out?

21    A    Yes, ma'am.

22    Q    Who helped you complete that form?

23    A    Well, we had already filled out one or two already.  So we

24    knew how to -- what to say on it.  So I don't know if anyone

25    went over this with us.  We just filled it out.

```
 1   Q    Checked where you had --
 2   A    Checked where we had previously.
 3   Q    Did Mr. Blauvelt or Mr. Pritchard go over this in detail
 4   with you?
 5   A    No, ma'am.
 6   Q    Did they go over it at all with you?
 7   A    No, ma'am.
 8   Q    Was there anything in what Mr. Pritchard or Mr. Blauvelt
 9   told you that made you believe that the investment was any less
10   safe than when you were speaking to Mr. Pusateri?
11   A    No, ma'am.
12   Q    And then I'd ask you to take a look at what's been marked
13   for identification as Government's Exhibit 39.
14            (Exhibit 39 for identification.)
15   BY MS. LINDSAY:
16   Q    Are those your stock shares?
17   A    Yes, ma'am.
18            MS. LINDSAY:  I move in 39, Your Honor.
19            THE COURT:  Any objection?
20            MR. EMMICK:  No objection.
21            THE COURT:  39 in evidence.
22            (Exhibit 39 received into evidence.)
23            MS. LINDSAY:  And if we could just look at that.
24   BY MS. LINDSAY:
25   Q    And then if you could take a look at what's been marked
```

UNITED STATES DISTRICT COURT

```
 1    for identification as Government's Exhibit 44.  And I'd ask if
 2    you recognize that.
 3              THE COURTROOM DEPUTY:  Exhibit 44 is identified and
 4    placed before the witness.
 5              (Exhibit 44 for identification.)
 6    BY MS. LINDSAY:
 7    Q    Is this a letter that you received from GigaPix?
 8    A    Yes, ma'am.
 9              MS. LINDSAY:  I move 44 into evidence, Your Honor.
10              THE COURT:  Any objection?
11              MR. EMMICK:  No objection.
12              MS. AMES:  No objection.
13              THE COURT:  44 in evidence.
14              (Exhibit 44 received into evidence.)
15    BY MS. LINDSAY:
16    Q    And can we look at the date, please, and then at the
17    second page so we can see who signed that?
18         It says Colin Mutton.  Did you know who he was?
19    A    I knew his position because somewhere in the packet it had
20    pictures and what their position was, but I'm not sure he was
21    in it.  But I spoke with him one time, and he introduced
22    himself as a position in the company.
23    Q    And I'd ask you if we could show the first page and the
24    last paragraph.  And it says that they're raising $3 million
25    which will take the company through to the period when revenues
```

1    from their television and movie projects would be generating

2    revenues.

3         And first of all, did it surprise you that they were still

4    raising money even though Mr. Pritchard and Mr. Blauvelt had

5    told you that there were only limited shares left?

6    A    No one had ever discussed this information with us, so we

7    did not know that there was a problem with money.

8    Q    Was it inconsistent with what they had told you about

9    limited shares?

10   A    Yes.  We always thought the company was in good financial

11   status, yeah.

12   Q    And if you could look at what's been marked for

13   identification as Government's Exhibit 45.

14              THE COURTROOM DEPUTY:  Exhibit 45 is identified and

15   placed before the witness.

16              (Exhibit 45 for identification.)

17   BY MS. LINDSAY:

18   Q    Is this another letter that you received from GigaPix?

19   A    Yes, ma'am.

20   Q    Now, if we look at the last page of this letter --

21              MS. LINDSAY:  Oh.  I move in 45, Your Honor.  I'm

22   sorry.

23              MS. AMES:  No objection.

24              MR. EMMICK:  No objection.

25              THE COURT:  45 in evidence.

```
 1              (Exhibit 45 received into evidence.)
 2    BY MS. LINDSAY:
 3    Q    Okay.  Did you receive this in the mail?
 4    A    Yes, ma'am.
 5    Q    If we could look at the last page of that letter.  And
 6    down at the bottom, is that signed by Mr. Blauvelt?
 7    A    Yes, ma'am.
 8    Q    And if we look at the last page and at the last
 9    paragraph -- well, because I should say this -- the letter is
10    undated; correct?
11    A    Yes, ma'am.
12    Q    Okay.  Um, if you look at that last paragraph, it says --
13    asks you to stand with them as they move forward into 2011.  So
14    would you say you received this letter sometime in December of
15    2010?
16    A    It seems as though that was about the time frame.  I don't
17    know exactly.  It's undated, but that's -- that's what we
18    assumed.
19    Q    And if we could look at the first page of the letter at
20    paragraph 3.  Now, it discusses the movie *Blackbeard* and it
21    states they had some problems with the state of Iowa.  Is that
22    what you were referring to earlier?
23    A    Yes, ma'am.
24    Q    Did anyone at GigaPix talk to you personally about these
25    problems in Iowa?
```

**UNITED STATES DISTRICT COURT**

```
 1   A    All I was told was they didn't have the proper permitting
 2   to be there and that they would find another state to do this
 3   in.
 4   Q    So it was not a big problem, in your eyes?
 5   A    No, ma'am.
 6   Q    And if we look at the next paragraph, it talks about OZ3D
 7   and it states that they are through the pre-production stage
 8   and moving into the production stage.  Was that consistent with
 9   what Mr. Pritchard and Mr. Blauvelt told you prior to your
10   investment in summer 2009, that the film would soon be in
11   theaters?
12   A    Pretty much so, yes, ma'am.
13   Q    That in the end of 2010, it was just moving into
14   production?
15   A    Well, we were under the impression that this was Oz and
16   that it was -- should have been out sooner, but we were told
17   that it's still on track and it's coming out.
18   Q    Um, did you speak to Mr. Blauvelt and Mr. Pritchard after
19   you made your third investment?
20   A    No, ma'am, I don't believe so.
21   Q    Did you at some point begin concerned -- become concerned
22   about not receiving revenues?
23   A    Yes, ma'am.
24   Q    Did you try to reach Mr. Pritchard or Mr. Blauvelt?
25   A    Not on the revenues.  But we stopped getting any kind of
```

```
 1   mail through them -- through the mail, and so I went to the
 2   Internet where I followed this.  And the Internet --
 3             MS. AMES:  Objection, Your Honor.  Nonresponsive.
 4   Hearsay.
 5             THE COURT:  Objection is sustained.
 6   BY MS. LINDSAY:
 7   Q    Did you try to call at any point?
 8   A    Yes, ma'am.
 9   Q    Were you able to get through?
10   A    No, ma'am.
11   Q    How much in all did you invest in GigaPix and OZ3D?
12   A    27,000.
13   Q    Did you lose it all?
14   A    Yes, ma'am.
15             MS. LINDSAY:  I have nothing further.  Thank you,
16   Your Honor.
17             THE COURT:  Cross-examination, Defendant Pritchard.
18             MR. EMMICK:  Thank you, Your Honor.
19                          CROSS-EXAMINATION
20   BY MR. EMMICK:
21   Q    Good morning, sir.
22   A    Good morning.
23   Q    What I wanted to do was make sure that I understood some
24   of the facts --
25             THE COURT:  Ask questions on cross-examination.
```

1          MR. EMMICK:  That's what I'll do, Your Honor.  Thank

2     you.

3     BY MR. EMMICK:

4     Q    So what was the time period during which you had those

5     investments?  What was the first date?  What was the last date?

6     A    The first date was in May of '08.  I would have to look

7     at -- to be sure what the other check was written in -- written

8     on.

9     Q    What year would that have been, though?

10    A    '8, 2008.

11    Q    Uh-huh.  And then the last check would have been?

12    A    I don't know, sir, unless I -- if you've got it, put it

13    up.  I'll certainly tell you.

14    Q    But it will be in a period of two, perhaps three years?

15    A    Yes, sir.  Yes.

16    Q    Now, you were shown a fair number of documents; right?

17    A    Yes, sir.

18    Q    Almost all of them were signed by Mr. Blauvelt; right?

19    A    Quite a few were, yes.

20    Q    There was -- there were two of them that were signed by

21    Mr. Blauvelt and by Mr. Pritchard; right?

22    A    Yes, sir.  I believe so.

23    Q    And there's only one that is signed by Mr. Pritchard

24    himself, just one letter, January 16th; right?

25    A    Yeah.  I would say yes.  I don't have it in front of me

```
 1   but --
 2   Q    We could print it out.  But you have no reason to --
 3   A    No reason.
 4   Q    -- disagree with that?
 5   A    No, sir.
 6   Q    All right.  And those three documents that were -- had
 7   Mr. Pritchard's name on them, they weren't addressed to you on
 8   the top; right?  They were addressed to "Dear Shareholders"?
 9   A    Yes, sir.
10   Q    All right.  Now, you've mentioned a number of different
11   people at GigaPix that you had phone calls from; right?
12   A    Yes, sir.
13   Q    One of them would have been Mr. Pusateri?
14   A    Yes, sir.
15   Q    And one of them would have been Mr. Blauvelt?
16   A    Yes, sir.
17   Q    And some others but at least one with Mr. Pritchard;
18   right?
19   A    Yes, sir.
20   Q    All right.  So you have one phone call with Mr. Pritchard.
21   You didn't ask for him by name or anything, did you?
22   A    No, sir.
23   Q    All right.  You just asked for someone else?
24   A    (No audible response.)
25   Q    Okay.  Now, Mr. Blauvelt was the person who brought
```

1    someone to talk on the phone; right?

2    A     It was the -- the next evening.

3    Q     Okay.

4    A     But yes, there was two people there and -- and

5    Mr. Pritchard was one of them.

6    Q     All right.  So you asked for somebody else, and then a

7    full day later there are two people on the phone?

8    A     Yes, sir.

9    Q     Okay.  Now, was that a pre-arranged call of some sort or

10   did they just call you out of the blue?

11   A     I don't remember exactly if they said they'd call back the

12   next evening or not, but it was about the same time two

13   different evenings.

14   Q     All right.  And you had -- you'd done investments before;

15   right?

16   A     The one locally with Cousins Investment.

17   Q     And you've done investments with GigaPix; right?

18   A     Oh, yes, sir.

19   Q     All right.  And this phone call lasted what?  Ten minutes?

20   Fifteen minutes?  Half an hour?

21   A     Yeah, I would say.  Not too long.

22   Q     Not too long.  All right.

23         And after a discussion on the telephone with two people,

24   one of whom was identified as Mr. Pritchard but one of whom --

25   Blauvelt you had spoken with before, you invested $5,000?

```
 1   A     Yes, sir.
 2   Q     And that would have been, I guess, the least of your
 3   investments here?
 4   A     Yes, sir.
 5   Q     Now, you mentioned earlier an investment that you made
 6   with -- I think you called it Cousins?
 7   A     Yes, sir.
 8   Q     All right.  And was that investment successful?
 9   A     No, sir.
10   Q     All right.  So you lost money on that one as well?
11   A     Yes, sir.
12   Q     All right.  And so I take it that nearly all of the
13   conversations that you had on the phone were with either
14   Mr. Pusateri or Mr. Blauvelt?
15   A     And the secretary, between those three, yes, sir.
16   Q     Okay.  And, in fact, you were sent a questionnaire by the
17   Government and you filled it out and sent it in.
18   A     Yes, sir.
19   Q     Sorry.  I should have ended with a question.
20         And you mentioned a number of people when you were
21   answering that questionnaire?
22   A     Yes, sir.
23   Q     And you didn't even mention Mr. Pritchard in that
24   questionnaire, did you?
25   A     Um, I'm not sure which one you're referring to.
```

```
 1   Q    Well, we can show you in a minute.

 2   A    But possibly, sure.

 3   Q    But he was certainly one part of one phone call with two

 4   people.  It lasted ten or so minutes?

 5   A    That's correct.

 6   Q    And if I remember, your wife was in on some of these

 7   telephone calls?

 8   A    She was.

 9   Q    All right.  And she filled out a questionnaire as well;

10   right?

11   A    She did.

12   Q    She didn't mention Mr. Pritchard either, did she?

13   A    I don't recall but probably not.  If his name's not on

14   there, she didn't.

15            MR. EMMICK:  Uh-huh.  One moment, Your Honor.

16            (Pause in the proceedings.)

17            MR. EMMICK:  That's all, Your Honor.  Thank you.

18            THE COURT:  Defendant Blauvelt.

19            MS. AMES:  Thank you, Your Honor.  If I could just

20   have one moment to get the screen up.

21                        CROSS-EXAMINATION

22   BY MS. AMES:

23   Q    Good morning, sir.

24   A    Good morning ma'am.

25   Q    I would like to direct your attention back to May of 2008.
```

```
 1    A      Okay.
 2    Q      Okay.  And the first person that you talked to from
 3    GigaPix was Mr. Pusateri; correct?
 4    A      Yes, ma'am.
 5    Q      And do you recall when in May of 2008 that that first
 6    telephone conference took place?
 7    A      When in May of 2008?  The date?
 8    Q      Yes.
 9    A      I don't.  I do not.  Sorry.
10    Q      But during approximately a month, you actually had
11    multiple telephone calls with him; is that correct?
12    A      Yes, ma'am.
13    Q      And on each of those telephone calls, he was the only
14    person on the phone call; correct?
15    A      Yes, ma'am.
16    Q      And was it about a month later that you and your friends
17    grouped together to have this conference call with him?
18    A      It wasn't a month later.  It was much earlier than that.
19    Q      Okay.  About how much time had passed between your first
20    call with Mr. Pusateri and the group call?
21    A      Only days.  Two, three days that I invited them into my
22    living room and they called back for a conference call.
23    Q      And again, on that conference call, it was just
24    Mr. Pusateri from GigaPix; correct?
25    A      Yes, ma'am, I think so.
```

1   Q     Now, in between the time of your first call and that

2   conference call, he had sent you a packet of documents;

3   correct?

4   A     He did send out a packet of documents.

5   Q     Because you were able to review those documents with him

6   on the phone during the group call?

7   A     No, ma'am.  We didn't have the packet at that time.

8   Q     Oh, okay.  I misunderstood your direct, then.  I

9   apologize.

10         So when did you go over the packet of materials with him?

11  A     After the group conversation, it had to be -- well, he had

12  to take time -- he sent them out obviously just the next day or

13  so because they came by FedEx and it was within three or four

14  days that they were there.

15  Q     Okay.  So how much time did you have to look over these

16  documents prior to your telephone call with Mr. Pusateri to

17  discuss those documents?

18  A     Well, he was calling and asking if the information had

19  been received, if we got it a couple of times even before we

20  received it.  So very short.  But we were impressed with what

21  was sent to us.

22  Q     Okay.  So you did have some time to review the documents

23  prior to him going over them with you?

24  A     Yeah, probably -- probably a day.

25  Q     And during that period of time, did you review them?

```
 1   A     Yes, ma'am.
 2   Q     Okay.  And you say that based upon them, you were
 3   impressed in the beginning?
 4   A     We were.
 5   Q     And part of the documents that he sent you was what was
 6   entitled a Subscription Agreement; is that correct?
 7   A     Yes, ma'am.
 8   Q     And he went over that Subscription Agreement with you;
 9   correct?
10   A     He went over it with everyone there when we filled it out,
11   yes, ma'am.
12   Q     Okay.
13           MS. AMES:  And I apologize.  I apologize,
14   Your Honor.  I'm not sure which document number that was.
15   BY MS. AMES:
16   Q     Okay.  And, sir, if I could have you again -- you've got
17   several books up there in front of you.  If I could have you
18   look at Government's Exhibit No. 35.  Let me know when you have
19   that.
20   A     Yes, ma'am.
21   Q     Okay.  And if you would refer to page 7 on the
22   Government's --
23   A     Do you want me to take it out and --
24   Q     You don't need to take it out.  If you'll just flip to
25   that page.
```

UNITED STATES DISTRICT COURT

1          Oh, he does.  Okay.  Maybe I can do it this way.  Wow, you

2     can't see this very well.

3          And page 7 here shows Exhibit C, Subscription Agreement

4     for GigaPix Studios?

5     A     Yes, ma'am.

6     Q     And you signed that document; correct?  In fact, on page 8

7     of that Subscription Agreement, that is your signature; is that

8     correct?

9     A     Yes, ma'am.

10    Q     And also, on page 4, you have initialed it here at 4.1.

11    And this is a Confidential Investor Questionnaire?

12    A     Yes, ma'am.

13    Q     And you initialed that, stating that you are a natural

14    person whose individual net worth or joint net worth with your

15    spouse exceeds a million dollars?

16    A     Yes, ma'am.

17    Q     And you have initialed that that information is accurate;

18    is that correct?

19    A     Yes, ma'am.

20    Q     And, in fact, another page of that Subscription Agreement

21    states that the company is dependent upon your representations;

22    is that correct?

23    A     Yes, ma'am.  I don't know.

24    Q     And just give me one moment.  Well, while I'm looking for

25    that, let's look at some of the other documents.

1        Additionally, as part of that packet that you received,

2   there was what's been referred to as a PPM for GigaPix Studios;

3   correct?

4   A    Yes, ma'am.

5   Q    And you received this at the same time as the Subscription

6   Agreement; is that right?

7   A    Yes, ma'am.

8   Q    And if you go down -- you mentioned before that this was

9   somewhat voluminous, so you just kind of perused it.  Is

10  that --

11  A    Yes, ma'am.

12  Q    You didn't try to read it word for word?

13  A    No, ma'am.

14  Q    But -- but you would be able to note the highlights of it;

15  is that correct?

16  A    Yes, ma'am.

17  Q    And, in fact, there's a number of portions that are in

18  bold?

19  A    Yes, ma'am.

20  Q    And, in fact, on the very first page in bold it says that

21  "the securities offered hereby are speculative and involve high

22  degree of risk"?

23  A    Yes, ma'am.

24  Q    And so you were able to see and read that; is that right?

25  A    I did.

```
 1   Q     And then if you go --
 2             MS. AMES:  And, Your Honor, for the Court and for
 3   the record, I am at Government's Exhibit No. 23.
 4   BY MS. AMES:
 5   Q     Sir, are you able to see this?  This is page 12.  It
 6   specifically states "Risk Factors."  Are you able to see that
 7   on the screen?
 8   A     Yes, ma'am.
 9   Q     Okay.  And again, in bold it has a number of different
10   headings; is that correct?
11   A     That's correct.
12   Q     And one of them says "Minimal Operating History"?
13   A     Yes, ma'am.
14   Q     And it says that the company has a limited operating
15   history and there's no assurances that the company will operate
16   profitably; correct?
17   A     Yes, ma'am.
18   Q     And you had the opportunity to read that as well?
19   A     Yes, ma'am.
20   Q     And that's pretty self-explanatory; correct?
21   A     Yes, ma'am.
22   Q     It's not complicated legal terms?
23   A     No, ma'am.
24   Q     And further on that same PPM, for short, it shows
25   executive compensation; is that right?
```

```
 1  A      Yes, ma'am.
 2  Q      And, in fact, it shows that Mr. Christopher Blauvelt was
 3  receiving an annual salary from the company?
 4  A      Yes, ma'am.
 5  Q      And the -- those sums vary between 100,000 and $250,000 a
 6  year; correct?
 7  A      Yes, ma'am.
 8  Q      And so this -- you were given the information that he's
 9  receiving a salary from the company?
10  A      Yes, ma'am.
11  Q      And I finally found that page I was asking you about.
12         And so before you -- well, let me restate that.
13         The document that you initialed and that you signed, at
14  point 4 -- or Section 4.5 says -- and this is underlined --
15  "significance of forgoing representations and answers."  Do you
16  see that?
17  A      Yes, ma'am.
18  Q      And it says, "The undersigned is informed of the
19  significance to the company of the forgoing representations and
20  answers" -- second page shows -- "contained in this Section IV,
21  and such answers have been provided with the understanding that
22  the company will rely on them."  And I'm sorry.  You can't see
23  that.  So let me just -- so that you can confirm whether that's
24  what it says.
25         Do you see that, sir?
```

1    A    Yes, ma'am.

2    Q    So you were representing by signing this, your

3    understanding that the company would depend upon those answers;

4    is that correct?

5    A    Yes, ma'am.

6    Q    And these documents that you sent in in May of 2008 were

7    your first written communications to the company; correct?

8    A    I believe so.  Yes, ma'am.

9    Q    To your knowledge, they didn't have the company -- the

10   company didn't have any prior information about your income,

11   your assets, anything like that; correct?

12   A    No, ma'am.

13   Q    And you testified that when you filled out the later

14   documents in 2010, you didn't even discuss those -- that

15   Subscription Agreement with anyone?

16   A    I don't believe so, no, ma'am.

17   Q    You just answered pretty much the same way that you

18   answered in 2008?

19   A    Yes, ma'am.

20   Q    So no one at GigaPix other than Mr. Pusateri would know

21   anything different from what you had put in that 2008

22   agreement?

23   A    That's correct.

24   Q    Now, I would like to just kind of change gears for a

25   moment.  And you were asked by the Government to look at their

1    Exhibit No. 42, and that was a letter that was ostensibly

2    signed by Chris Blauvelt; is that correct?

3    A    Yes, ma'am.

4    Q    And does this, to you, look like a handwritten personal

5    signature, or does this look like a stamp?

6    A    I have no opinion, ma'am.  I don't know his signature or

7    if it was stamped.

8    Q    Okay.  But it does appear to be identical to this one that

9    is noted on Government's Exhibit No. 45; is that correct?

10   A    Looks very similar.

11   Q    Now, sir, when you testified that you spoke with

12   Mr. Blauvelt in 2010, did that person initiate the call or did

13   you?

14   A    If you're referring, ma'am, to the last monies that we

15   sent in, he initiated the call.

16   Q    Okay.  And this was regarding the *OZ3D* investment, is that

17   correct?

18   A    Yes.

19   Q    And you'd never met Mr. Blauvelt; is that correct?

20   A    No, ma'am.

21   Q    And the person just represented themselves to be

22   Christopher Blauvelt; is that correct?

23   A    Yes, ma'am.

24   Q    I'd forgotten, there was one question -- I just want to go

25   back for one question on the May 2008 meeting that you had with

```
 1   everyone.  Do you recall what time of day that was?  Was it in
 2   the evening?  Was it during the day?
 3   A    Well, there's a three-hour time difference between the
 4   east and the west.  So I'm thinking it's more like -- and a lot
 5   of the people there work, so it must have been later in the
 6   evening.
 7   Q    Okay.  Do you have a -- a specific recollection or are you
 8   kind of --
 9   A    No, ma'am, I don't.
10             MS. AMES:  Okay.  Just one moment, Your Honor.
11             (Pause in the proceedings.)
12   BY MS. AMES:
13   Q    And in all of your telephone conversations with the person
14   to be Mr. Christopher Blauvelt, you didn't discuss your
15   financial situation with that individual at all; correct?
16   A    Not until the very last check that we sent.  And I just
17   told them we didn't have that amount of money to send anymore.
18   Q    Okay.  Just a few follow-up questions, sir.
19        In your work with the Army, you were a recruiter; correct?
20   A    Yes, ma'am.
21   Q    So it was your job to sell the Army to people; is that
22   correct?
23   A    Yes, ma'am.
24   Q    And based upon your conversations with those people, you
25   or someone else would send the individual a contract; is that
```

```
 1   right?
 2   A     The Army took care of that.
 3   Q     Right.
 4         And then that contract actually laid out all the specific
 5   terms as to their relationship with the Army; is that right?
 6   A     A little over my head, ma'am.  We only signed to go in.
 7   So what they did once they got to that point, I have no idea,
 8   but I'm sure you're correct.
 9   Q     But you worked there as a recruiter for -- what? -- 16
10   years; right?
11   A     Yes, ma'am.
12   Q     So if a person had maybe a different recollection as to
13   what you had told them --
14             THE COURT:  That's not about investments, Counsel.
15   Please, let's get to --
16             MS. AMES:  No further questions.
17             THE COURT:  -- let's get to this case.
18                     REDIRECT EXAMINATION
19   BY MS. LINDSAY:
20   Q     So you did discuss your financial situation with
21   Mr. Pritchard and Mr. Blauvelt during that last investment?
22   A     Yes, ma'am.
23   Q     And you made it clear to them that you didn't even have
24   $10,000 left to invest in their company?
25   A     Yes, ma'am.
```

```
 1   Q     And this was after you -- you had put in something like --
 2   A     22,000.
 3   Q     Now, you were shown several pages of legalese documents in
 4   the Private Placement Memorandum.  Did you rely on what was in
 5   that booklet or did you rely on the word of Mr. Pusateri,
 6   Mr. Blauvelt, and Mr. Pritchard?
 7   A     I read the booklet.  And we were told not to be concerned
 8   about it, that it was formalities.  And he checked -- he told
 9   everyone there which blocks to check, yes or no.
10   Q     And did Mr. Blauvelt or Mr. Pritchard tell you any
11   different?
12   A     No.
13              MS. LINDSAY:  I have nothing further.  Thank you,
14   Your Honor.
15              THE COURT:  Recross, Defendant Pritchard.
16              MR. EMMICK:  No recross, Your Honor.
17              THE COURT:  Defendant Blauvelt.
18              MS. AMES:  No, Your Honor.
19              THE COURT:  You may step down.
20              THE WITNESS:  Thank you, sir.
21              (Testimony of Harold Danny Anderson
22               concluded at 11:10 a.m.)
23
24
25
```

```
 1                  CERTIFICATE OF OFFICIAL REPORTER

 2

 3    COUNTY OF LOS ANGELES   )
                              )
 4    STATE OF CALIFORNIA     )

 5

 6              I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

 7    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

 8    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

 9    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10    IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11    REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12    THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17                  DATED THIS 5TH DAY OF NOVEMBER, 2014.

18

19

20                       /S/ MYRA L. PONCE
                     _____
21                   MYRA L. PONCE, CSR NO. 11544, RMR, CRR
                         FEDERAL OFFICIAL COURT REPORTER
22

23

24

25
```

**UNITED STATES DISTRICT COURT**