1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE

4

5  UNITED STATES OF AMERICA,              )
                                          )
6                    Plaintiff,           )
                                          )
7        vs.                              )   Case No. CR 14-282 R
                                          )
8  DAVID PRITCHARD and                    )
   CHRISTOPHER JAMES BLAUVELT,            )
9                                         )
                     Defendants.          )
10 ───────────────────────────────────── )

11

12            REPORTER'S PARTIAL TRANSCRIPT OF
                    TRIAL PROCEEDINGS
13            TESTIMONY OF SHAWN WALKER
               THURSDAY, OCTOBER 16, 2014
14                    9:35 A.M.
               LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22 ─────────────────────────────────────────────────

23      MYRA L. PONCE, CSR NO. 11544, RPR, RMR, CRR
            FEDERAL OFFICIAL COURT REPORTER
24          312 NORTH SPRING STREET, ROOM 430
            LOS ANGELES, CALIFORNIA 90012
25                  (213) 894-2305

UNITED STATES DISTRICT COURT

1          **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4       STEPHANIE YONEKURA
        Acting United States Attorney
5       BY:  ELLYN M. LINDSAY
        BY:  BYRON J. MCLAIN
6          Assistant United States Attorneys
        United States Courthouse
7       312 North Spring Street
        Los Angeles, California  90012

8

9   **FOR THE DEFENDANT DAVID PRITCHARD:**

10      LAW OFFICES OF MICHAEL W. EMMICK
        BY:  MICHAEL W. EMMICK
11         Attorney at Law
        3701 Highland Avenue, Suite 305
12      Manhattan Beach, California  90266

13

    **FOR THE DEFENDANT CHRISTOPHER JAMES BLAUVELT:**
14
        LAW OFFICES OF STEPHANIE AMES
15      BY:  STEPHANIE AMES
           Attorney at Law
16      12100 Wilshire Boulevard, Suite 800
        Los Angeles, California  90025
17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1              **INDEX OF WITNESSES**

2

3    PLAINTIFF'S WITNESSES                                    PAGE

4    WALKER, Shawn

5        Direct Examination by Ms. Lindsay                     5
         Cross-Examination by Ms. Ames                        41
6        Cross-Examination by Mr. Emmick                      49
         Redirect Examination by Ms. Lindsay                  74

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, OCTOBER 16, 2014

 2                            9:35 A.M.

 3                            -oOo-

 4              (The following is a partial transcript

 5               of the day's proceedings.)

 6              (In the presence of the jury.)

 7              THE COURTROOM DEPUTY:  All rise.

 8              THE COURT:  The record should reflect the jurors are

 9   all in their proper places and the defendants are present with

10   their counsel.

11         Call your next witness.

12              MS. LINDSAY:  Shawn Walker.

13              THE COURTROOM DEPUTY:  Please raise your right hand.

14         Do you solemnly swear that the testimony you shall give in

15   the cause now pending before this Court shall be the truth, the

16   whole truth, and nothing but the truth, so help you God?

17              THE WITNESS:  Yes.

18         **SHAWN WALKER, PLAINTIFF'S WITNESS, WAS SWORN**

19              THE COURTROOM DEPUTY:  Okay.  Thank you.  Please

20   take a seat.

21         And please state your full and true name for the record

22   and spell your last name.

23              THE WITNESS:  Shawn Walker.  Walker, W-a-l-k-e-r.

24              MS. LINDSAY:  May I proceed, Your Honor?

25              THE COURT:  Yes.
```

1    MS. LINDSAY:  Thank you.

2                    **DIRECT EXAMINATION**

3    BY MS. LINDSAY:

4    Q    Mr. Walker, how are you currently employed?

5    A    I currently work for MetLife in Charlotte, North Carolina.

6    Q    Did you ever work for a company called GigaPix?

7    A    Yes.

8    Q    Prior to working with GigaPix, how had you been employed?

9    A    I was working at a talent agency, specializing in

10   animation called Natural Talent.

11   Q    Did you live in Los Angeles at the time?

12   A    Yes.

13   Q    In connection with that employment, did you meet

14   Mr. Pritchard?

15   A    Yes, I did.

16   Q    Can you describe how you met him?

17   A    We were assisting Mr. Pritchard on a project called

18   *Ben & Izzy*.  It was an animated show he was producing.  I

19   helped him produce the voiceover sessions here in Los Angeles.

20   We also provided talent, directors, writers, producers for the

21   show.

22   Q    When was this, approximately?

23   A    This was probably approximately 2004, 2005.

24   Q    Do you see Mr. Pritchard today in the courtroom?

25   A    Yes.

**UNITED STATES DISTRICT COURT**

1    Q    Can you please point him out by where he's sitting and

2    what he's wearing?

3    A    Yes.  He's the gentlemen here in the blue tie, gray hair,

4    first one in the row.

5              MS. LINDSAY:  Your Honor, may the record reflect

6    that the witness has identified Defendant Pritchard?

7              THE COURT:  He has.  The record will so show.

8              MS. LINDSAY:  Thank you, Your Honor.

9    BY MS. LINDSAY:

10   Q    And did you discuss with Mr. Pritchard what he had been

11   doing prior to going to GigaPix, generally?

12   A    Yes.

13   Q    What kinds of things was he doing?

14   A    At the time he was working on the *Ben & Izzy* animated

15   show, so as a producer.

16   Q    And did he have other projects that he was working on?

17   A    Yes.

18   Q    How did you end up at GigaPix?

19   A    David Pritchard asked me to come join him.  It was a new

20   job for him.  We had a working relationship prior.  He said

21   this was a new venture and he needed somebody to help him, and

22   I was a good candidate for that.

23   Q    What did he tell you was the business of GigaPix?

24   A    At the time it was an animation studio with the idea to

25   produce animated films and shows.

```
1    Q     And so you and Mr. Pritchard would assist in the
2    production of these shows?
3    A     Correct.  Yes.
4    Q     When you went to GigaPix, were you told how it was funded?
5    A     When I arrived there, I wasn't told directly.  It was
6    something that, you know, just in the course of business I
7    found out.  It wasn't something prior.
8    Q     And how was it funded?
9    A     It was funded through private equity.
10   Q     When you say "private equity," do you mean personal
11   investors?
12   A     Correct.
13   Q     Would you use the term "mom and pop" investors?
14   A     I don't know that I would use that term.  I think it's --
15   my understanding, it's accredited investors that had a certain
16   net worth that were qualified to make investments.
17   Q     And who told you that those were the types of investors
18   coming into the company?
19   A     Well, that was a function of what the investment offering
20   would be.  So there's a Private Placement Memorandum that would
21   be sent to the investors.  And part of the qualifications to
22   get that, you had to be an accredited investor.
23   Q     Were you aware of how long GigaPix had been in existence
24   prior to 2006?
25   A     My understanding was probably three or four years prior to
```

1    that.

2    Q    Who was running GigaPix prior to the time you and

3    Mr. Pritchard came in?

4    A    Chris Blauvelt.

5    Q    And after you came in, what was his main job at GigaPix?

6    A    Mainly, the idea was that David Pritchard would produce

7    the productions, put together the creative development, decide

8    what sort of projects we would do.  And at the time Chris

9    Blauvelt was in charge of bringing in the investments for the

10   company.

11   Q    Do you see Mr. Blauvelt in court today?

12   A    Yes.

13   Q    Can you please point him out by where he's sitting and

14   what he's wearing?

15   A    He's the second man in this row here in the gray suit

16   (indicating).

17            THE COURT:  The record will indicate the witness has

18   identified the defendant Christopher Blauvelt.

19   BY MS. LINDSAY:

20   Q    So when you got to GigaPix, what were you doing

21   essentially on a day-to-day basis?

22   A    On a day-to-day basis, it was a little of everything,

23   helping David and even Chris to some degree sort of organize

24   the business.  There was -- you know, there had been a previous

25   president of the company that had left.  It was really

1    assessing what we could do given what we had at the time, sort

2    of the financial status, given what projects we had available

3    to us.

4         So it was putting together a lot of the business plans for

5    what projects we wanted to pursue, you know, organizing

6    creative development, trying to set meetings for different

7    folks to come in and pitch projects.

8    Q    And prior to the time that you and Mr. Pritchard came into

9    the company, was it your understanding that it was these

10   investors that had funded GigaPix?

11   A    Yes.

12   Q    And prior to the time that you and Mr. Pritchard came into

13   GigaPix, what did Mr. Blauvelt tell you GigaPix had done as far

14   as producing content?

15   A    At the time when I arrived at GigaPix, there really wasn't

16   any content that had been produced substantially.

17   Q    So when you and Mr. Pritchard went to GigaPix, was it your

18   plan that the productions that you were going to do would be

19   funded solely by these private investors?

20   A    That was a possibility, but there was also the idea that

21   we would use part of that funding in conjunction with

22   third-party funding.

23   Q    Can you explain that a little bit, how that works?

24   A    Well, in financing, depending on what the project would

25   be, you know, whether it's big or small, you know, if it was,

1 say, a movie, you know, we would have some piece of equity that

2 GigaPix would contribute to the financing structure in

3 conjunction with a variety of pieces, could be tax credits,

4 could be, you know, bank loans, could be other equity investors

5 from the outside that want to be part of that structure.

6 Q    So, in other words, you would have GigaPix, which was the

7 personal investors, and then some other chunk?

8 A    Correct.

9 Q    Now, when we say "some other chunk," just to explain that

10 a little bit more, um, what are tax credits in this context?

11 A    The context in film financing tax credits in certain

12 states and jurisdictions, whether internationally, the

13 United States, they offer basically their incentives to do

14 production there.  So in particular -- and they vary depending

15 on which state you're in.

16     So I'll give you an example.  We were going to do a film

17 in Iowa.  And so in Iowa, the tax credit function there was

18 they would give you up to, say, 50 percent of all your

19 production spent in Iowa back as a tax credit.  You would then

20 take those tax credits and you could monetize those through a

21 third party to actually get cash value for them at some

22 discounted rate.  Then you would turn around, use that cash to

23 actually put into the production of the movie.

24 Q    Can you tell us about bank loans or financial institution

25 loans in the context of these productions?

1  A    Typically, I mean, it varies per production.  There's not

2  really one standard way.  But typically it -- the bank would

3  take pieces of collateral that you would put up, whether it

4  would be the tax credits, it could be equity that you provide

5  in terms of, you know, real cash, it could be letters of

6  credit, it could be a variety of different pieces of

7  collateral.

8      Also, if you had distribution advances where you had

9  agreements with the distribution company that says we'll give

10  you X amount of dollars upon delivery of the film, you could

11  take that and you would put all those pieces together and then

12  the bank would give you one big loan against all of that that

13  you could actually use to produce your movie.

14  Q    Now, talking about distribution agreements, can you

15  explain that?  What is distribution and how is it accomplished

16  and what would it mean to have a distribution -- distribution

17  agreement in hand?

18  A    Well, there's -- it's a variety of ways, but typically you

19  have with a major distributor, say, Warner Brothers or Sony,

20  one of the major Hollywood studios, they would give you an

21  agreement based upon certain terms and conditions, you know,

22  delivery of the film, so to speak.  And for that, they would

23  guarantee you some minimum amount, you know, whether it would

24  be money or some sort of marketing support they would give you

25  based on that.

```
 1  Q    So, for example, you might go to a distributor with your
 2  idea for a movie and they would say, yes, we're very interested
 3  and we will guarantee you this money to distribute your movie
 4  to theaters and everything as soon as -- at least if you
 5  deliver it, you could then take that promise and go to a bank
 6  and get money for the production?
 7  A    It's very conditional.  I mean, I think that's a very
 8  summarized version, but there are a lot of terms and conditions
 9  that have to be met for that.  There's a lot of scrutiny they
10  put behind it.
11  Q    So each step is questionable along the way?
12  A    Each step requires a lot of work to get done to guarantee
13  that.  I mean, they want a lot of guarantees that things are
14  going to happen before they would make that kind of commitment
15  that they would actually take to a bank.
16  Q    So if you're in discussions with a distributor or a bank,
17  that is not a guarantee that you're actually going to get the
18  financing at the end?
19  A    No.
20  Q    Now, assuming that you have a distribution agreement and
21  you do get a bank loan, in that event, who is generally -- what
22  entity is generally in first place to receive any of the
23  profits of the movie?
24  A    Well, you have to distinguish between profits and the
25  proceeds of the movie.  So if the film gets distributed and
```

UNITED STATES DISTRICT COURT

1    generates any kind of revenue, you know, the bank loan has to

2    be paid off first.

3    Q    And who's generally in last place?

4    A    Well, typically the producers of the film sort of take the

5    back seat because they've had to go and ask other parties to

6    help them finance the film.

7    Q    And in this -- in your case, would the producers of the

8    film then be GigaPix and its investors?

9    A    Correct.

10   Q    Now, is it always a gamble as to whether a movie will make

11   any money even if the movie is made?

12   A    I wouldn't characterize it as a gamble, but it's certainly

13   very speculative.  There's so many variables at play as to what

14   the outcome of the film will be, in terms of quality, in terms

15   of the marketplace to actually receive the movie.  If competing

16   movies come out at the same time, the audience may not show up

17   for it.  So it's definitely a speculative business.

18   Q    And in your interactions with Mr. Pritchard and

19   Mr. Blauvelt, did they understand this?

20   A    Yes.

21          MS. LINDSAY:  I would ask if we can pull up

22   Government's Exhibit 55.  I believe it's in evidence.

23          MR. MCLAIN:  It's in evidence.

24   BY MS. LINDSAY:

25   Q    And if we can just see at the top of the page the date in

```
 1    2006 and who signed that letter.  And that's in 2006 and signed
 2    by Christopher Blauvelt; is that correct?
 3    A     Correct.
 4    Q     And if we look at the first paragraph, last sentence, in
 5    2006 it said that Mr. Blauvelt represented that we anticipate
 6    paying distributions on the work we've completed sometime in
 7    the fourth quarter.  So this was in 2006.
 8          To your knowledge, was there any work completed in 2006
 9    that would pay distributions to investors at that time?
10    A     Not to my knowledge.  I -- I came in just after this.  I
11    came in September of 2006.  But from September forward, there
12    wasn't anything that would have generated any distributions.
13    Q     And if we can look at the second-to-the-last paragraph,
14    and it states that "Since David came on, there are two movie
15    projects slated for production in September."  And this is in
16    2006.
17          What movies were slated to start production in September
18    of 2006?
19    A     To my knowledge, the only movie projects around about that
20    time would have been potentially the *Wizard of Oz* animated
21    film.  Then David was also working on *Captain Abu Raed*, which
22    was an independent film.
23    Q     But were they slated to start production in September of
24    2006, to your knowledge?
25    A     Not to my knowledge, no.
```

UNITED STATES DISTRICT COURT

```
 1   Q     So was the statement strictly true?
 2   A     I think you would have to define what "slated" would mean,
 3   but I think it could be very misleading.
 4   Q     Do you think -- is it your opinion working in this
 5   business that the way that movies are produced and the stages
 6   of production and the way profits are determined, are those
 7   difficult and complicated issues that you have to have a fairly
 8   specialized knowledge to understand well?
 9   A     Yes, particularly in the independent film business because
10   there's not one standard way of raising finances.  There's not
11   one standard way of distributing the film or even producing the
12   film.  So it is a very complex, intricate, lots of moving parts
13   to get these projects done.
14   Q     And was it your understanding that the investors in
15   GigaPix had the necessary sophistication to understand this?
16   A     I would imagine not, being that most of the investors, to
17   my knowledge, were not industry insiders.  They had not worked
18   in this business or industry.  And there's not, in this -- in
19   the independent film business, there's not a lot of sort of
20   public information to -- to research and figure out how these
21   things work.
22   Q     So, then, assuming that the investors are not
23   sophisticated in the entertainment world, is it misleading to
24   say that these movies were slated for production in 2006?
25   A     I would say yes.
```

1   Q    The sentence goes on to state that "foreign distribution

2   of these films will soon be in place."

3        Now, you had talked about distribution.  Is foreign

4   distribution when distributors in countries outside the

5   United States come in and offer you money once the film is

6   completed to distribute the movie in their countries?

7   A    Correct.  They can also -- there are instances too where

8   they can offer money prior to the film being produced.  That

9   happens as well.

10  Q    So to your knowledge, was there foreign distribution soon

11  to be in place?

12  A    Not to my knowledge, no.

13  Q    So this is an untrue statement?

14  A    I think you could say that if there were discussions,

15  there's -- there's certainly a distinction between talking

16  about what could happen and what is actually happening and

17  what's an actual agreement that's in place that you can

18  actually execute and actually use to do something with.  You

19  could certainly have discussions with just about anybody about

20  any project at any time.

21  Q    Well, does this letter say discussions or is it

22  misleading?

23  A    I think it would be misleading to say it will soon be in

24  place.

25  Q    Did you see anything that looked like it was actually

1    going to happen as far as foreign distributions?

2    A    At this point in time in July, I couldn't say what the

3    conversation was.

4    Q    But nothing that you knew of?

5    A    Nothing that I knew of coming in September, no.

6    Q    It then goes on to compare GigaPix and the way its films

7    are financed with Pixar and DreamWorks.  In your opinion,

8    working in this business, was it appropriate to put GigaPix in

9    the same category as Pixar or DreamWorks?

10   A    I think it could be very misleading to a non-sophisticated

11   investor to believe that we're on that same level because we

12   were certainly -- even when I arrived in September, they were

13   nowhere close to being considered in the category of Pixar and

14   DreamWorks.

15   Q    Why is that?

16   A    Well, these are companies that had track records of -- of

17   films being produced, generating profits.  They had lots of

18   capital at their disposal.  They had, you know, large staffs of

19   people.  We did not have any of that at the time.

20   Q    What did you have?

21   A    We had -- we had a facility, we had a few employees, we

22   had potential funding, we had a lot of potential projects.  But

23   in terms of, you know, trying to make a comparison of these

24   companies I don't think is a -- is a fair comparison.

25   Q    In 2009, what were you and Mr. Pritchard working on?

```
 1   A     By 2009, we were really trying to get the live-action kids
 2   films going and we were also working on developing the Wizard
 3   of Oz animated film.
 4   Q     What was the first live-action kids film going to be?
 5   A     It was going to be Blackbeard.  It's also known as
 6   Field Trip.
 7   Q     And how was Blackbeard going to be financed?
 8   A     It would be financed independently.  We were going to use
 9   a combination of tax credits in the state of Iowa.  There was
10   an equity contribution from GigaPix as a piece.  And there were
11   also third-party financiers that would be involved.  And using
12   all that and working on a bank loan with Bankers Trust in Iowa.
13   Q     Now, when you say equity from GigaPix, you mean the
14   investors?
15   A     Correct.
16   Q     Now, what is a production bond?
17   A     Production bond is you secure -- it's basically a
18   guaranteed completion of a film so that if you have any issues
19   or any problems, it's sort of insurance for the film that will
20   come in and pay and take care of those issues to make sure the
21   film's completed so that the parties who have a -- you know, a
22   stake in the film, whether it would be a distribution company,
23   whether it would be the bank, can be rest assured the film is
24   actually going to get completed.
25   Q     Is it important to have that in place before you start
```

1   work on the film and sign contracts with people to work on the
2   film?
3   A     In my opinion, it's very essential to have that in place.
4   Q     Did GigaPix have that in place before you started working
5   on *Blackbeard*?
6   A     No.
7   Q     Whose job would it have been to make sure that was done?
8   A     That would have been the executive producer and producer
9   of the film.
10  Q     Would that be Mr. Pritchard?
11  A     That would be David Pritchard, yes.
12  Q     How about the bank loan?  Did you ever have the bank loan
13  in place?
14  A     To my knowledge, I wasn't involved in those transactions.
15  So I couldn't tell you exactly where they -- they were in terms
16  of whether they were in place.  Typically, though, if it -- if
17  you follow the logic, if it was in place and everything was
18  fully financed and you actually had money in the bank to
19  produce the film, you would have the production bond.  If you
20  had the production bond, then you would complete the film.  We
21  did not complete the film.
22  Q     Did something bad happen in Iowa?
23  A     Yes.  The tax credits that we thought we were going to
24  have were revoked.  Basically, the governor put a halt to the
25  program while we were in pre-production.

```
1    Q     So what happened?
2    A     So there was considerable back-and-forth with the state of
3    Iowa from GigaPix to try to get them to honor the tax credits.
4    We felt at the time if those could be honored, we could keep
5    the financing structure in place and continue -- finish off the
6    financing of the film and get it done.  But without those, most
7    of the parties sort of walked away from the financing for the
8    time being.
9    Q     And did GigaPix get sued?
10   A     Yes.
11   Q     Who did -- who sued GigaPix?
12   A     To my knowledge, there were -- there were certain crew
13   members that were not being paid in Iowa that were working on
14   the film on our behalf.
15   Q     And had the production bond been in place, would they have
16   been paid off and not had to sue GigaPix?
17   A     In a typical scenario, yes.
18   Q     Was Mr. Pritchard hopeful that -- that GigaPix could get
19   money from Iowa and save the situation?
20   A     What do you mean by "get money from Iowa"?
21   Q     Well, was he still trying to get money out of Iowa to pay
22   back the people that had sued and keep the production going?
23   A     At the time there was -- there was definitely an effort
24   to, again, pursue getting the tax credits honored from the
25   state.  And then there was also later down the road an effort
```

1   to basically make a claim against Iowa saying they created

2   damages, you know, to the production by not honoring the tax

3   credits that they thought were binding.

4   Q    Did Mr. Pritchard say how much money he was hoping to get

5   from Iowa?

6   A    He never told me directly.  I think just before I left

7   GigaPix, there were certainly talks of multi-million dollars

8   that they were hoping to get from the state of Iowa as damages

9   against what had happened to that production.

10   Q    In your experience, was that a reasonable expectation?

11   A    In my opinion, it was not because you're asking for

12   damages of something that never actually happened.  So you're

13   asking for damages for a film that wasn't financed, didn't

14   have -- basically the idea was saying that the state of Iowa,

15   hey, you messed up our film by not giving us the tax credits.

16   We didn't get to make the film so we didn't get to make any

17   money so we want a lot more money than we actually spent in the

18   state of Iowa to come back to us.

19        Now, from my personal opinion, I think that was a stretch

20   because if you're asking for more money than you even actually

21   spent there for a film that never got made, was never

22   distributed, so you have no idea of what money it could have

23   potentially made or it could have tanked at the box office.

24   Q    And also, that didn't have its financing fully in place?

25   A    Correct.

1    Q      And didn't have a production bond?

2    A      Correct.

3    Q      How much did GigaPix put into *Blackbeard* in Iowa?

4    A      I don't have an exact number that I know of.  But my best

5    guess, just based on conversations and, you know, some

6    financial statements I've seen, probably upwards between 1 and

7    $2 million.

8    Q      What did you, in your opinion, think that GigaPix could

9    maybe potentially hope to get from Iowa?

10   A      In the context of what they should have given us in terms

11   of -- the rebate would have been honor the tax credits of the

12   money we spent.  So if we spent -- for example, we spent a

13   million dollars and the credits are for 50 percent, then they

14   should give us somewhere around $500,000 in tax credit.

15   Q      Did you share your opinion with Mr. Pritchard?

16   A      Yes.

17   Q      Did you have a nickname at GigaPix?

18   A      Yes.

19   Q      What was it?

20   A      Prince of Darkness.

21   Q      And why is that?

22   A      Well, from what I've heard, from the folks who called me

23   that, it was basically that I seemed to be negative on a lot of

24   issues.

25   Q      So you were, would you say, more sort of the realistic

1    foreteller as opposed to the super hopeful foreteller?

2    A     I think just the way I like to do business, if you have

3    things in place, they're either in place and they're real or

4    they're just talk.  It's not real unless it's there.  If

5    there's money in the bank and you can write a check against it

6    and do something with it, that's real.  If it's a discussion,

7    if it's, you know, terms sheets floating back and forth, that's

8    not real.  That's not something that you can actually do

9    business on.

10         So there was a lot of hopeful talk that things could

11   happen.  I would always be the one to say, well, it's not real

12   until it's real.

13   Q     And would you say Mr. Pritchard was more the opposite and

14   more hopeful and depending on the talks and what could happen?

15   A     I don't know that I would classify him as opposite, but I

16   think that he certainly would rely upon discussions more than

17   actual legit agreements in place that were actually executable.

18   Q     Now, what happened with the company when things went wrong

19   in Iowa?  In other words, did you see an effect on the company

20   of GigaPix when the tax credit issue stopped the funding of --

21   or the production of *Blackbeard*?

22   A     The way I would say what happened was if we had spent a

23   lot of the company's working capital towards keeping that

24   production going in Iowa, so the million to $2 million,

25   whatever the exact amount might be, that was coming right out

1    of GigaPix's accounts.  And really, it -- it prevented us then

2    from doing other things with the company.  So it basically

3    drained the money that we had, our working capital to pay

4    salaries, to pay utilities, rent.  All the different expenses

5    of running the business then were suffering because of it.

6    Q    And was money -- was money still coming in from investors

7    and going to patch up some of the holes created by the Iowa

8    disaster?

9    A    To my knowledge, money was still coming in from investors.

10   And there was also -- further along down the way we had a -- a

11   TV production called *Workaholics* that was generating revenue

12   for the company that was coming into the company.  Where that

13   money went, sort of my understanding was a lot of the money

14   went to -- to take care of the Iowa issues with the crew

15   members that were suing them.  And we were being told that is

16   why we weren't getting paid salaries at the time, was that the

17   money needed to go to Iowa.

18   Q    Did you know somebody who gave a loan to GigaPix,

19   personally know somebody who gave a loan to GigaPix to try and

20   get them out of this hole they were in?

21   A    Yes, I did.

22   Q    Who was that?

23   A    David St. Amour.

24   Q    And what was his arrangement supposed to be?

25   A    He did a few loans.  The first one was supposed to be a

1  ten-day note of loaning the company money with the

2  understanding that the financing could close if they had this

3  cash on hand and everything would be fine and he would get his

4  money back within two weeks.

5  Q     Who gave him those promises?

6  A     It was a combination of David Pritchard, Kip Konwiser,

7  Brian Gilmore, David Williams, all the producers on the film.

8  Q     Did he get his money back?

9  A     Not fully, no.

10  Q     Now, is -- what time frame did this occur in, the -- well,

11  let me ask you this.  When did production stop on *Blackbeard*,

12  approximately?

13  A     I would probably say sometime summer of 2009.

14  Q     Now, at that time, um, or soon thereafter, did you start

15  focusing on the *Oz* project?

16  A     Yes.

17  Q     Can you tell us a little bit about that project?

18  A     The *Oz* project was to be -- it was an animated film based

19  on the *Wizard of Oz*.  We had developed scripts, we had certain

20  directors that we had interviewed, we had development artwork

21  that we had generated.  The idea is we were going to produce

22  this in conjunction with a studio in Toronto and ARC

23  Productions, also with a company called Multimedia

24  Entertainment, which is a Canadian-based company, and that

25  GigaPix would provide a big source of the funding for the film.

1    And they would also be our partners in it and do the actual

2    animation work there in Toronto.

3    Q    To your knowledge, did ARC put up money for the

4    production?

5    A    To my knowledge, they -- I know that they had made a claim

6    further on against GigaPix for a certain amount of money,

7    saying that they had spent money internally to work on the

8    project that they were never reimbursed for.

9    Q    So, in other words, GigaPix never honored their agreement

10   to pay?

11   A    To my understanding, yes.

12   Q    Were you aware of *Oz* money, money that was supposed to go

13   to the *Oz* movie being transferred to the main GigaPix accounts?

14   A    Yes.

15   Q    How were you aware of that?

16   A    At the time, that was the only way that the money could

17   come into GigaPix, was the only investment vehicle for

18   investors was to invest in the *Oz* offering.  And so, therefore,

19   any money that GigaPix was spending and had was being

20   transferred out of that account to theirs to pay for other

21   expenses.

22   Q    And were some of those other expenses the people that

23   needed to be paid off in Iowa?

24   A    To my understanding, yes.

25   Q    So after the issue with Iowa, what actual production

1   efforts was GigaPix making?

2   A     In general, there was -- there was a lot of activity to

3   try to keep that production alive, whether it was in Iowa or

4   whether going to other states to produce to see if that could

5   happen, then also switching over to focus on the animated film

6   for *Oz*.  And then we also had a television department

7   developing television shows.

8   Q     Was GigaPix in financial trouble at this point?

9   A     Yes.

10  Q     And you said that *Oz* money was coming in for the *Oz* movie,

11  was going to GigaPix and partially to pay off the problems in

12  Iowa.  So would you say that the investors' money that was

13  supposed to be going to make the *Oz* movie was actually going to

14  pay GigaPix's debts?

15  A     I think that would be a very correct way to -- to say what

16  happened.

17  Q     Now, switching topics a little bit, did you and

18  Mr. Pritchard ever have discussions about the way that

19  Mr. Blauvelt was raising money for GigaPix and *OZ3D*?

20  A     Yes.

21  Q     Can you tell us about that?

22  A     Well, in general, from -- you know, even prior to *Oz*, in

23  general the idea was to try our best not to raise money the way

24  that Blauvelt was raising money.

25  Q     Why?

1   A    Because it came with a lot of, I think, issues, you know,

2   from -- from securities issues to having to deal with a big

3   group of investors that weren't sophisticated in the industry

4   that would, you know, take away and distract you from trying to

5   produce things and answer questions that you really didn't have

6   the time to answer.

7        So in general, the idea was to try to get out of that

8   function if we could.

9   Q    And did you and Mr. Pritchard believe that Mr. Blauvelt

10  and his team of telemarketers were raising the money fully,

11  honestly, and openly?

12  A    I think in general there was definitely a sense of trying

13  to do it right, knowing that, you know, the more that you sort

14  of misled and did things wrong, the more issues you would have.

15  However, there were certainly instances where, you know,

16  particular folks were not being very honest, I think, with

17  investors.

18  Q    And was there a -- an attempt to separate the sales office

19  from the production office?

20  A    Well, there -- both literally and figuratively.  So one,

21  they actually moved the sales office to a different facility to

22  keep them, you know, out of the same building that the

23  production folks were in.  And then, also, really just from a

24  sort of perception in the industry point of view, there wasn't

25  something that when we meet with potential producers,

1  directors, or folks in the business, we really wouldn't explain

2  the details of where our private equity funding was coming

3  from.

4  Q    Was there an understanding that the people raising the

5  money were career telemarketers and making commissions and,

6  thus, there were issues with that?

7  A    I think it was a mix.  I think there were certainly folks

8  that I had met that had no background in the entertainment

9  business, that their background was in raising equity, you

10  know, particularly over the telephone.  There were -- there

11  were certainly people who knew more about the business than

12  others.

13  Q    Did you hear about telemarketers making misrepresentations

14  on the phone to investors?

15            MS. AMES:  Object as to hearsay, Your Honor.

16            THE COURT:  Objection overruled.

17            THE WITNESS:  So yes, there were certainly times

18  where, you know, you would hear that somebody said something

19  that was either really untrue or definitely an exaggeration of

20  what things were.

21  BY MS. LINDSAY:

22  Q    And would you complain to Mr. Pritchard and Mr. Blauvelt

23  about that?

24  A    There were certainly discussions with them that these

25  items needed to be addressed.

1    Q     And yet did you keep hearing that there were

2    misrepresentations being made?

3    A     I would say yes.  There certainly wasn't a point where it

4    all stopped, where everybody was -- was completely representing

5    the actual truth.  It was just part of the function of the type

6    of folks that did this.  If they didn't understand the

7    business, a lot of times they're trying to explain to investors

8    how movies work but they don't understand themselves how movies

9    work.

10   Q     Did you and Mr. Pritchard discuss -- when you were

11   discussing trying to get away from funding this way, did you

12   discuss the lack of sophistication in the movie business of the

13   investors?

14   A     Yes.

15   Q     Did you see Mr. Pritchard actually speaking to investors?

16   A     Yes.

17   Q     Was that a fairly regular experience?

18   A     I wouldn't say "regular," but it certainly was common

19   enough.

20   Q     Who would generally bring the investors to speak to

21   Mr. Pritchard?

22   A     Typically whoever the -- the person that initiated contact

23   with the investor, they sort of treated them as their clients,

24   so to speak.  And so whoever represented -- you know, over the

25   telephone and brought in the investment, they would sort of

```
 1  curate the clients and bring them in at certain times.
 2  Q     And given the lack of sophistication of these investors,
 3  when you heard Mr. Pritchard speaking to them, was he
 4  completely, fully open and honest about the situation at
 5  GigaPix?
 6  A     No.
 7  Q     Did you ever see Mr. Pritchard doing business outside of
 8  GigaPix and earning money from that without the money going to
 9  GigaPix?
10  A     I never saw that firsthand, no.
11  Q     Did you hear him talk about it?
12  A     Yes.
13  Q     Can you tell us about that?
14  A     Well, specific -- I mean, there was a lot of general items
15  and conversation.  I would say specifically one item was he
16  bragged that he had made in excess of some amount of money that
17  year, which I knew was far beyond his GigaPix salary.
18  Q     Did he ever talk about Mr. Blauvelt being jealous?
19  A     Yes.
20  Q     Can you tell us about that?
21            MS. AMES:  Objection.  Relevance.
22            THE COURT:  The objection is sustained.
23  BY MS. LINDSAY:
24  Q     Okay.  Who was in charge of how money was spent at
25  GigaPix?
```

UNITED STATES DISTRICT COURT

1    A     Primarily David Pritchard.

2    Q     And now, if we could look at Government's Exhibit 37.

3    It's in evidence, I believe.

4              MR. MCLAIN:  Yes.

5    BY MS. LINDSAY:

6    Q     And if we could just look at the date.  Is that

7    January 16th, 2009?

8    A     Yes.

9    Q     And who signed the letter?

10   A     David Pritchard.

11   Q     Now, if we look at the first page at the third paragraph,

12   so this is 2009, and it says that "In October, we announced the

13   nearly $60 million in potential funding for a slate of kids

14   films, which is the culmination of nearly a year of work

15   piecing together a very creative and well constructed form of

16   film funding."

17         Was there really $60 million in funding that they were

18   about to get?

19   A     There wasn't $60 million.  In terms of is there an account

20   with $60 million in it and you could write checks against that

21   account?  No.  There was a financing structure that could

22   potentially provide up to that amount based on certain terms

23   and conditions.

24   Q     Did it ever come into play?  Was it ever solid?

25   A     No.

1    Q     So this is misleading?

2    A     I would say it's misleading in that, again, to sort of an

3    uneducated investor, to say that there's $60 million of

4    potential funds for a slate of movies certainly could be

5    construed as having $60 million available to you right away.

6    Q     And it never actually came into play either; correct?

7    A     Correct.

8    Q     Looking at the second page at the first paragraph, it says

9    that "We have also successfully managed to secure several

10   orders for pilots and series in our reality television

11   department."  And then later in the paragraph it says that "We

12   believe these shows will help the company generate a stable

13   cash flow from the sale of several shows a year."

14         Was that strictly true?

15   A     If the shows were actually produced, it certainly would

16   have a steady cash flow to the company.  At that time we only

17   had the -- the one order for the pilot for *Workaholics* and we

18   also had a series called *Baker Boys*.  It was a four-part series

19   that they had sold to HD Net and also at the time to

20   The Military Channel.

21   Q     But this was highly speculative?

22   A     Those were closed transactions.  Those actually could

23   generate revenue.  But everything else was definitely, as it's

24   said, in the early stages of negotiations.

25   Q     And as you said, they could generate revenues.  But,

1   again, that's speculative?

2   A    Well, with the *Workaholics* and *Baker Boys*, there were

3   definitely revenues that were to be generated.  That was

4   certain at that point for those two.  But everything else was

5   all speculative.

6   Q    If we could look at Exhibit 40.  I'm sorry.  Let me move

7   on to something else.

8        At the end of 2010, what was the atmosphere like at

9   GigaPix?

10  A    In 2010, you know, we had spent almost a year at that

11  point trying to refinance the live-action movie *Blackbeard*.  We

12  had -- we were doing work on *Oz*, trying to finish up the

13  scripts and development stages of that and get, you know,

14  agreements settled in place with the studio in Canada.  We were

15  also at the time putting together a -- a releasing company, a

16  distribution company ourselves and putting together a Prints

17  and Advertising Fund potentially to help that company.

18  Q    Was the company doing well financially?

19  A    No.

20  Q    Was it falling apart financially?

21  A    My opinion, yes.  I mean, I was not getting paid a salary.

22  There were other folks that worked there that weren't getting a

23  salary.  There were bills unpaid.  There were lots of issues

24  coming to us that dealt with us not being able to make

25  payments.

1    Q    And investor money was going to pay off lawsuits from

2    Iowa?

3    A    I'm sure some of it was, yes.

4    Q    To your knowledge, were investors in the *OZ3D* movie being

5    told that their money would be used to pay off lawsuits on

6    another movie from which they had no shares and would not see a

7    profit?

8    A    To my knowledge, no.  They were never told that.

9    Q    Can you tell us about GigaPix Releasing?

10   A    GigaPix Releasing was to be a distribution company that

11   GigaPix controlled.  We were basically -- in that aspect, we

12   would provide services to other production companies that had

13   completed films.

14   Q    And what was supposed to happen with GigaPix's Releasing?

15   A    So with the Releasing company, so we would provide

16   distribution for them through agreements that we were doing

17   with other third parties.  We were also trying to put together

18   a fund, a pool of money, so to speak, to provide those services

19   for marketing and advertising for the films to actually book

20   the films in the theaters on their behalf.

21   Q    And did that ever work out?

22   A    No.

23   Q    Why not?

24   A    We never had the fund put together.

25   Q    In other words, it was speculative and not a done deal?

```
 1   A      Correct.
 2   Q      To your knowledge, was it represented as a done deal to
 3   investors?
 4   A      I couldn't say if it was represented as a done deal
 5   specifically.  I could certainly say it was representative --
 6   it was in the works or that it was going to happen.  You know,
 7   specifically what stage it was in, I can't speak to what was
 8   being told to any investor.
 9   Q      But if an investor were told that it was going to happen,
10   would that have been strictly true?
11   A      I would say no.  And again, if the deal's not done, if the
12   money's not there, it's not there.  So you can certainly say
13   that it's in negotiations or it's in the works.  But to say
14   that it's going to happen, I think, is misleading, to say that
15   it will, not that it might.
16   Q      I'd like to show Government's Exhibit 68, which is in
17   evidence.  And can you just show us the date on that and -- is
18   that May 24th, 2011?
19   A      Yes.
20   Q      And then who signed this?
21   A      David Pritchard.
22   Q      Okay.  Now, if we look at the second page of the letter.
23   And it says that a Prints and Advertising Fund with projected
24   assets of a hundred million dollars is nearly complete, did
25   GigaPix ever have such a fund?
```

```
 1    A      Not a completed fund, no.

 2    Q      What is a Prints and Advertising Fund?

 3    A      So it's a pool of money that you would use conditionally

 4    for completed films.  So they would come to you with their -- a

 5    different producer or it could be our own films that we had

 6    produced at GigaPix, would come and say, okay, I want you to

 7    help us distribute the film.  We need anywhere -- you know,

 8    let's say, for example, $5 million to release the film and that

 9    would pay for advertising in certain markets, that would buy TV

10    commercials, newspaper ads, you know, all the publicity around

11    the film that that money would pay for.  And the money would

12    also pay to actually book the film in theaters.  That's the

13    prints part of it.

14         So in the old days they call it prints because they would

15    literally send the film to the theaters.  There's a shipping

16    cost, transport cost for that.  Now it's all digital, so they

17    still charge a fee by sending a digital file to the theaters

18    and carrying cost.  So to actually put a film in the

19    theaters -- or even if you were going to go straight to home

20    video or to cable, third-party costs.

21         So the fund would provide those funds in sort of a loan

22    capacity to the producers of the film, and then we -- the --

23    whoever controlled the fund would get interest on that money

24    back.  That's how you would make money with the fund.  It would

25    be a premium you would charge to use those funds.
```

1  Q    Well, looking at the highlighted portion there on the

2  screen where it says that you are nearing completion of a

3  hundred million dollar fund, was that untrue?

4  A    I would say that's very misleading.

5  Q    And can you explain -- well, let me ask you this.  Did you

6  ever actually witness Mr. Pritchard lying about this to people

7  at GigaPix?

8  A    I would just say sort of a very exaggerated

9  misrepresentation of where things were with people that were

10  helping us put together the fund.

11  Q    Can you explain that?

12  A    I'll give you an example.  So I was in a business meeting

13  with Mr. Pritchard in Toronto at a particular company.  We

14  presented our ideas for the fund.  They were very interested.

15  They liked the -- the sort of basic concept behind it.  They

16  liked how it was structured.  They liked what it was.  But

17  they -- it was, again, we're interested, keep in touch, we'll

18  do some follow-up.

19      His representation back to the folks at the office over

20  the telephone, which I was there listening because I was

21  walking right beside him, was that they were highly interested,

22  this should work, they're in, they want to do this.  And so the

23  impression was that -- with these folks, that they were

24  committed.  And he would tell us at the office we're

25  oversubscribed on the fund, meaning we have more commitments

**UNITED STATES DISTRICT COURT**

1    than we need to actually equal anywhere from 50 to a hundred

2    million dollars.

3    Q    And that wasn't, in fact, true?

4    A    No.  Because if they're committed and they're willing to

5    do it, then you complete the fund.  You actually make it happen

6    and it's a real item.  It's not just a talk.  It's not a

7    negotiation.  It's not just speculative that they may do it.

8    It's either they will do it or they don't do it.

9    Q    And so in this letter, he's making that same

10   misrepresentation to the investors?

11   A    I would say yes.

12   Q    Did you eventually leave GigaPix?

13   A    Yes, I did.

14   Q    Why did you leave?

15   A    There were several reasons.  Um, one, I wasn't being paid

16   a salary even though money was coming in, money was going

17   elsewhere, which I didn't know where it was going.  But I

18   certainly wasn't getting paid as an employee, so I couldn't

19   sustain that any longer.

20        And two, it got to where any potential prospects we had

21   for business or for funding or to sustain the company I had no

22   faith in whatsoever at that point.  So I knew that there was no

23   chance this was going to work.

24   Q    And why did you have no faith?

25   A    Because of the misrepresentations, because of the

```
 1   continuous telling of -- of employees that things were going to
 2   turn around within a certain amount of time and time and time
 3   again it didn't happen.  Then also, like my example prior to,
 4   where I was now hearing firsthand what he was saying and then
 5   witnessing the meeting to understand that it was far removed
 6   from what the truth should be.
 7   Q    And that's Mr. Pritchard?
 8   A    Correct.
 9            MS. LINDSAY:  I have nothing further.  Thank you.
10            THE COURT:  We'll take a short recess.
11        I would remind you of your duty not to converse or
12   otherwise communicate among yourselves or with anyone upon any
13   subject touching upon the merits of the cause on trial.  You
14   are not to form or express an opinion in the case until it's
15   finally submitted to you for your verdict.
16        The jury is excused until called.  Court will remain in
17   session.
18            THE COURTROOM DEPUTY:  All rise.
19            (Out of the presence of the jury.)
20            THE COURT:  Ten minutes.
21            THE COURTROOM DEPUTY:  This court is in recess.
22            (Break taken.)
23            THE COURT:  Cross-examination, Defendant Blauvelt.
24            THE LAW CLERK:  Judge, should I bring in the jury?
25            THE COURT:  Beg your pardon?
```

```
 1                  THE LAW CLERK:  Judge, should I bring in the jury?
 2                  (In the presence of the jury.)
 3                  THE COURT:  The record should reflect the jurors are
 4      present and in their proper places.  The defendants are present
 5      with their counsel.
 6             Cross-examination, Defendant Blauvelt.
 7                            CROSS-EXAMINATION
 8      BY MS. AMES:
 9      Q    Good morning, sir.
10      A    Hello.
11      Q    Sir, I'd first like to ask you a few questions about a few
12      of the productions that you've discussed.  Captain Abu Raed,
13      are you familiar with that production?
14      A    Yes.
15      Q    And that was produced by GigaPix; is that correct?
16      A    GigaPix was a co-producer of the production, yes.
17      Q    So there were -- were there multiple producers on that?
18      A    Yes.
19      Q    And GigaPix was one of them?
20      A    Correct.
21      Q    And when was that movie in production?
22      A    To my knowledge, probably 2008, roughly, '7, '8.
23      Q    Okay.  And that movie was completed; is that correct?
24      A    Correct.
25      Q    And was that movie considered successful, in your opinion?
```

1  A    Well, you'd have to define what "successful" would be.  So

2  critically, it was very successful.  It was well received in

3  terms of critically liking the movie.  Financially successful,

4  I have no idea.  I don't think it was.

5  Q    Critically successful, did it win a number of awards,

6  things of that nature?

7  A    Yes.

8  Q    And what did it win, to your knowledge?

9  A    Well, we won the World Cinema Audience Award at the

10 Sundance, which is quite a big film production.  There were --

11 to my knowledge, there was probably upwards of 20 different

12 awards at different festivals it won.

13 Q    So it was critically successful?

14 A    Correct.

15 Q    In your experience in the industry, is it often the case

16 that a critically successful film may not necessarily become a

17 financially successful film?

18 A    Yes.

19 Q    But oftentimes, it may become a financially successful

20 film; is that correct?

21 A    Correct.

22 Q    Is that part of the speculative aspect of this business?

23 A    Yes.

24 Q    *Baker Boys: Behind the Surge* was another production of

25 GigaPix; is that right?

```
 1    A     Correct.

 2    Q     And tell us about that.

 3    A     That was a -- it was a co-production we did with a company

 4    out of Switzerland called Point Prod'.  It was a four-part

 5    series of a journalist vetted with an army group in Iraq, and

 6    we -- GigaPix basically provided production funds for it.  We

 7    did a lot of the post-production work and were able to sell

 8    that to television.

 9    Q     And when was that in production with GigaPix?

10    A     Probably sometime in '09 or '10, to my recollection.

11    Q     And was that production considered, in your opinion, a

12    critical success?

13    A     I would say to some degree.  There wasn't as -- as many

14    accolades towards it, you know, obviously because it was a TV

15    production or a documentary series.  But in terms of sort of

16    how it was received, I think it was well received.  I would say

17    yes.

18    Q     Did you know whether it was a financial success?

19    A     No.

20    Q     Is that that it wasn't or did you not know?

21    A     I didn't know.  I would say from my knowledge of what the

22    sales amounts were from the television rights, that they were

23    very small.

24    Q     Workaholics was another production of GigaPix?

25    A     Correct.
```

**UNITED STATES DISTRICT COURT**

1    Q     And what was *Workaholics*?

2    A     *Workaholics* is a half-hour sitcom on Comedy Central now

3    that was developed at GigaPix.  And we -- GigaPix provided

4    funding to produce some Web series based on the property.

5    That, in turn, was seen by Comedy Central.  They decided to do

6    a pilot and paid for it, and then it turned into a series for

7    the network.

8    Q     And you say that's still ongoing now, so it's still

9    being --

10   A     Correct.

11   Q     -- shown by Comedy Central?

12   A     Yes.

13   Q     And when did GigaPix begin production of *Workaholics*?

14   A     That probably was in -- we did development work probably

15   in either 2008, 2009.  I think it really got into the pilot

16   network in 2010.

17   Q     You mentioned just in general on direct that there were

18   other projects that, when you started with GigaPix, you were

19   working on.  Can you tell us about a few of those projects?

20   A     There was always a -- a group of items.  I mean, in a

21   production company, you have -- you try to put together a

22   development slate.  So you always have projects in different

23   stages, from simple ideas that we toss around internally to big

24   formal scripts that people are bringing in from the outside

25   that they want to produce with you.

1           There were -- in general, we had a slate of kids films we
2    were trying to produce, *Field Trip* and *Blackbeard* being one of
3    them.  There were four others that we had scripts developed
4    for.  On the TV side there were reality shows that we were
5    producing in-house to try to sell to networks.  There were --
6    going a ways back, there was a project called "Movie Books"
7    that we had where we had the rights to a couple of novels that
8    we were going to turn into sort of a limited series for
9    television.  We had a comic book that we were trying to develop
10   as a feature film.  We produced comics based on that property.
11   Q    And do you do a number of these different slates again
12   because of the speculative nature and you can't really put all
13   of your eggs in one basket or just one production?  Is that an
14   accurate statement?
15   A    That would be accurate, yes.
16   Q    And so during the entire time that you were at GigaPix,
17   you continually observed these slate -- various slates of
18   projects; is that correct?
19   A    Yes.
20   Q    Now, there's also kind of -- I guess I consider it a term
21   of art, "slated for production."  What, in your opinion, would
22   you take that to mean?
23   A    Typically if you said it was "slated for production,"
24   you've done enough work to have them ready for production in
25   terms of you have the script in a pretty decent state to where

1  you can actually make a movie based on the script.  You have a

2  general idea of what the budgets would be, you have a general

3  idea of your production plan of where you would like to shoot

4  the film, what kind of cast you would like, what production

5  personnel you would need for the film.

6       So it's sort of in a planning stage.  You've got those

7  particular projects a little further along than the others that

8  you would say "slated for production."

9  Q    Okay.  So it is kind of an amorphous term or kind of a

10 broad term?

11 A    It's a broad term.  It's -- different places could be

12 different things.  It could be you have a script, you have an

13 idea versus you have a full sort of production plan in place

14 and all you need is the financing.  Or you -- and some people

15 would say that they had the financing for it.  So it's

16 definitely -- has a variable context.

17 Q    And just so I understand and for the jury, so "slated for

18 production" could mean any of those varying things, then; is

19 that right?

20 A    Correct.

21 Q    Now, is -- in the industry, is there a definite

22 distinction between pre-production and production?

23 A    Yes.

24 Q    And what is that distinction?

25 A    Distinction in pre-production is that you have everything

1    ready to -- to go.  So, for example, in a live-action film, you

2    start production when you actually are on the set, have the

3    cameras rolling.  They typically call that first day of

4    principal photography.  So that's when you're on the set, the

5    cameras are rolling, you're actually capturing stuff on film.

6    That's production work.

7         Anything prior to that is considered pre-production.  So

8    development of script, development of cast and planning and

9    different aspects leading up to that point would be considered

10   pre-production.

11   Q    I would like to now direct your attention a little bit on

12   *OZ3D*.  You had mentioned that while you were at GigaPix, that

13   was one of the projects that you were familiar with and working

14   on; is that correct?

15   A    Correct.

16   Q    And you had a script for that; is that correct?

17   A    Yes.

18   Q    And, in fact, it had gone through multiple drafts?

19   A    Correct.

20   Q    What else did you have in place for that animation?

21   A    At the time we had -- we had multiple drafts of the

22   script.  We had development artwork.  We had contracted out to

23   different artists in the animation industry to give us, you

24   know, different ideas of what the film could look like from the

25   visual point of view.

1          At one point in time we had a producer engaged that was

2    going to help us do the film.  We also had a director engaged

3    at one point in time.  And we were also in the process of

4    negotiating and working on a deal with an animation studio in

5    Toronto to actually do the production of the film.

6    Q    And you, as part of GigaPix -- the company had determined

7    it would take 20 million to produce that film; is that correct?

8    A    Correct.

9    Q    But you were only able to get 8 million; correct?

10   A    I'm not sure what the exact number would be that they

11   actually --

12   Q    But to your knowledge, you were never able to get

13   20 million to be able to produce that film?

14   A    Correct.

15   Q    Now, regarding *Blackbeard*, that again was another one of

16   your slated projects at GigaPix?

17   A    Correct.

18   Q    And was that in the production stages?

19   A    That was in the pre-production stages, in my opinion.

20   Q    And some actual work had been done in Iowa; is that

21   correct? -- like --

22   A    Correct.

23   Q    -- creating a scene?

24   A    Right.

25   Q    What can -- please tell us about that.

```
1    A    So from my knowledge, they were building sets to be used
2    for the production.  They had a location that was an empty
3    shopping mall in Iowa that was going to serve as sort of the
4    sound stage for the movie.  So they had crews working to put
5    together sets for the location.  They had production personnel
6    working to do the planning and be ready to shoot the film.
7    Q    And there were some estimations that if that film had been
8    able to be completed, it could have generated approximately
9    10 million; is that correct?
10   A    It's very variable depending -- I mean, given the budget
11   of the film and the scope of the production and the type of
12   cast they were looking towards, that's probably a fair amount.
13   Q    So would -- when you say "fair," is that a conservative
14   estimate or a reasonable estimate?
15   A    I think it's reasonable.  Probably fits a little in the
16   middle.
17             MS. AMES:  Thank you.  No further questions.
18             THE COURT:  Cross-examination, Defendant Pritchard.
19             MR. EMMICK:  Thank you.
20                       CROSS-EXAMINATION
21   BY MR. EMMICK:
22   Q    Good morning.
23   A    How are you?
24   Q    I'd like to ask you questions in a number of different
25   areas.  Why don't we start off, if we could, with your
```

1    background before you joined up with Mr. Pritchard.

2    A    Okay.

3    Q    All right.  You weren't somebody who had worked in that --

4    an area like GigaPix, were you?

5    A    I had.

6    Q    You hadn't worked for a production, for example, had you?

7    A    I have.

8    Q    Okay.  And the production that you worked was not

9    GigaPix-like production?

10   A    There were certain differences.  I began my career working

11   in commercial production --

12   Q    Uh-huh.

13   A    -- producing commercials, videos, and we also produced

14   independent film.

15   Q    And one of the things that you were trying to find out is

16   what the goals were that GigaPix had; right?

17   A    What do you mean by "goals"?

18   Q    What the goals of GigaPix were, what they were trying to

19   accomplish in order to -- to make money, in order to make

20   movies.  Were they trying to make animation, were they --

21   A    Okay.

22   Q    You were trying to figure out their goals?

23   A    Correct.

24   Q    All right.  And one of the sources of information for you

25   was Mr. Pritchard himself; right?

UNITED STATES DISTRICT COURT

1    A    Correct.

2    Q    He had a lot of background in this area, didn't he?

3    A    Yes.  I would say yes.

4    Q    And he knew a lot of things about the entertainment

5    industry and about production that you would not necessarily

6    have known; right?

7    A    I would say based -- that he had more experience than I

8    had.  There were certain things that I was certainly learning

9    from him as I worked with him.

10   Q    Absolutely.  And tell us a little bit of that areas of

11   experience that he had that you did not have.

12   A    Well, I mean, you could -- he's certainly been an

13   executive at different companies.  I had not been an executive

14   at different companies.

15   Q    Uh-huh.

16   A    He had produced films that he was credited as the

17   producer, television productions, all sorts of things.

18   Q    Uh-huh.  On a number of occasions; correct?

19   A    Right.

20   Q    And that was over a long period of time?

21   A    Yes.

22   Q    And that included in the United States and elsewhere?

23   A    Correct.

24   Q    Right.  So he had used that -- that breadth of experience

25   in order to help out there at GigaPix; right?

1   A     Yes.

2   Q     All right.  So he brings all of those things -- and you

3   were looking forward to working with him, weren't you?

4   A     I was looking forward to the opportunity to work at a

5   company that had a lot of dynamic issues and projects and

6   opportunities for myself.

7   Q     Right.

8   A     I certainly -- I had a relationship with David Pritchard

9   prior to GigaPix, so there was a sense of it would be nice to

10  work with somebody that I knew.

11  Q     And one of the things that you were looking forward to was

12  that you would learn some of the things that David knew that

13  you did not?

14  A     Correct.  I would say yes.

15  Q     And so let's talk about those for a minute.  What kind of

16  things would David know that you did not?  What kind of things

17  was he more experienced at?

18  A     Well, I mean, you could classify that in a lot of

19  different ways.  So, you know, in terms of, you know, producing

20  films or, you know, raising financing, all the different areas

21  of the company, sure, he certainly had more experience than I

22  did.

23  Q     And those were just the areas -- those are the two areas

24  that you would regard as ways that you could learn from

25  Mr. Pritchard?

1    A      Sure.  Correct.

2    Q      But there were other areas as well?

3    A      In general, when you work in the entertainment business,

4    it's a very dynamic business.  There's a lot of moving parts.

5    There's a lot of different pieces at play.  And to have

6    somebody with his level of experience -- yes, it was certainly

7    a learning experience, both good and bad, what to do and

8    certainly what not to do.

9    Q      And he had more background than you did in those areas?

10   A      That's fair, yes.

11   Q      And he had more information than you did in those areas?

12   A      Considering he's much older and has experience, yes.

13   Q      Okay.  Well, maybe that's -- one's age does give you

14   opportunities to work in different areas; correct?

15   A      Right.

16   Q      And he's a bit older than you, as in he's worked in other

17   areas, more areas than you have; right?

18   A      Correct.

19   Q      And that would even be true at GigaPix, wouldn't it?  At

20   GigaPix itself, he was the president; right?

21   A      Yes.

22   Q      And you were simply in charge of business development;

23   right?

24   A      True.

25   Q      All right.  And so you were going to do what you could in

1    the business development area, but that didn't include looking

2    at all of the same information that he looked at; right?

3    A    That's fair, yes.  There were certainly things that he did

4    that I didn't do.

5    Q    Right.  And he would not necessarily talk to you about

6    every single issue that arose or that faced GigaPix because you

7    had a narrower job; right?

8    A    There -- certainly, there were certain things he did not

9    talk to me about, absolutely.

10   Q    And there were certain documents that he didn't talk with

11   you about?

12   A    There certainly were documents I didn't see, yes.

13   Correct.

14   Q    You mentioned that he started doing films such as

15   *Ben & Izzy* in 2004?

16   A    Correct.

17   Q    All right.  And he did some other films in the period from

18   2004 up to, say, 2007; right?

19   A    It's possible, yes.

20   Q    Okay.  Well, you had mentioned a couple of them yourself

21   and you had mentioned other projects.  So it's more than

22   possible.  It's what he did?

23   A    Well, there was the *Captain Abu Raed* movie.  Outside of

24   that and *Ben & Izzy*, I don't know what other projects he would

25   have had outside of the scope of GigaPix.

```
 1    Q     And part of that was from when he was -- before GigaPix
 2    and part of that was worked on when he was at GigaPix; right?
 3    A     Yes.
 4    Q     All right.  And that was a very successful film, was it
 5    not?
 6    A     Critically successful, yes.
 7    Q     Critically successful film.  And whether a film is
 8    critically successful has something to do with how that company
 9    is going to do; right?
10    A     Not necessarily.
11    Q     Doesn't have anything to do with it?
12    A     It's no guarantee it's success -- because it's critically
13    successful doesn't mean the company will be successful.
14    Q     And that's why my question was "had something to do with
15    it," wouldn't it?
16    A     It certainly could play a role, yes.
17    Q     Now, have you ever produced a film?
18    A     No.
19    Q     You've never been a producer or a co-producer of a film?
20    A     No.
21    Q     And have you ever financed a film?
22    A     Directly, no.
23    Q     You mentioned that when Mr. Pritchard came to GigaPix,
24    things changed fairly substantially.  Is that a fair statement?
25    A     Yes.
```

```
1   Q    All right.  Let's talk about how things changed.  Didn't
2   he come to GigaPix and provide inspiration and direction for
3   GigaPix?
4   A    Yes.
5   Q    Tell us about some of the things that he provided
6   inspiration and direction for.
7   A    Well some of the projects we had, there were -- with
8   the -- for example, the Wizard of Oz animated film was
9   something that he had done some work on prior.  It's an idea
10  that he had to do.  So that was something that, bringing that
11  into the company, certainly gave them a substantial project in
12  terms of being excited about it, the potential for it, knowing
13  what it could mean to the company.
14       The slate of kids films that we wanted to produce, very
15  similar in that there was actually a development slate now to
16  actually come into the company for Mr. Pritchard.
17  Q    All right.  So these are, to some extent, advantages that
18  he brought to GigaPix when he arrived and when he worked?
19  A    Correct.
20  Q    And he is working with you part of the time because he is
21  the producer?
22  A    Correct.
23  Q    One of the producers; right?
24  A    Yes.
25  Q    So he's in charge of production; right?
```

```
1   A     Yes.
2   Q     And he has occasional discussions with you; right?
3   A     I wouldn't classify it as occasional at the time.  That
4   would imply to me that would mean maybe every once in a while.
5   We had -- certainly in the beginning days, we had very many
6   discussions about what we wanted to do.
7   Q     Uh-huh.
8   A     And it was only near the end that it became occasional.
9   Q     And he also had occasional discussions with people who
10  weren't in business development because he was in charge of all
11  of production?
12  A     Sure.
13  Q     All right.  So it's not like the two of you were co- in
14  charge of business development?
15  A     No.  That's fair.  Of course.
16  Q     Right.  And he actually helped you out in the area of
17  business development.  He gave you suggestions, he gave you
18  ideas, didn't he?
19  A     Of course, yeah.
20  Q     And they were very helpful to you?
21  A     Yes.
22  Q     You mentioned that in some ways all of businesses and
23  perhaps the business of entertainment is always kind of a
24  gamble.  Do you remember saying that?
25  A     Not specifically that way.  But, yes, it's a very
```

UNITED STATES DISTRICT COURT

```
 1   speculative business, yes.
 2   Q    All right.  It's a very speculative business.  I thought
 3   you used the word "gamble" but perhaps not.
 4        What I really want to get clear on from you is what you
 5   meant by that.  What things could go wrong?  What things could
 6   go right?  Things go wrong and it hasn't been anticipated, then
 7   it makes things worse than you anticipated.
 8             THE COURT:  Are you making a statement or asking
 9   questions?
10             MR. EMMICK:  I'm trying to ask a question.
11             THE COURT:  Well, then, ask questions.  Don't make
12   statements.
13   BY MR. EMMICK:
14   Q    It's not the case that you can anticipate all of the
15   problems, is it?
16   A    Correct.
17   Q    And that's, to some extent, why it is speculative to try
18   to figure out whether the company is going to be successful;
19   right?
20   A    Correct.
21   Q    Sometimes companies are even more successful than they
22   anticipated; right?
23   A    Correct.
24   Q    And sometimes things are worse; right?
25   A    Right.
```

```
 1   Q    Now, you had mentioned -- and I don't mean this to be
 2   derogatory.  But you had mentioned that you had a funny
 3   nickname.  What was the nickname?  Heart of Darkness?
 4   A    Prince of Darkness.
 5   Q    Prince of Darkness.  Okay.  My mistake.
 6        And Prince of Darkness, what did Prince of Darkness mean?
 7   A    It was a nickname given by Colin Mutton, the CFO of the
 8   company, and they told me that it meant because I was sort of
 9   the negative one in the group, that as, you know, they talked
10   about the potential of things or what could happen or what
11   stages things were in negotiations, I really was the one sort
12   of raising my hand saying, Hey.  Well, is it real or not?  Is
13   it something that's tangible here that we can do something with
14   or is it just talk?  Is it something that just, you know, is
15   going to go away?
16   Q    You were regarded as the more negative of all the people
17   who contributed to these discussions?
18   A    I would say I was regarded as more realistic and the
19   pragmatist of the group, not negative in the sense that I was
20   trying to do something negative to the business.
21   Q    Right.  But Prince of Darkness was not a positive,
22   flattering arm around your shoulders; right?
23   A    I didn't mind the nickname.
24   Q    All right.  And you had an opportunity to announce and
25   express what you agreed and disagreed with at any of these
```

1   meetings; right?

2   A     Correct.

3   Q     People weren't saying, "Shut up.  We don't care what you

4   think," were they?

5   A     Not literally that way, no.

6   Q     Right.  And you had plenty of opportunity to speak with

7   David Pritchard about all of these concerns that you had?

8   A     I did.  And I certainly did.

9   Q     Right.  And you had those discussions in part because

10  Mr. Pritchard was interested in your views.  He would invite

11  you to say what was on your mind, didn't he?

12  A     At times, yes.

13  Q     All right.  He asked you what your thoughts were?

14  A     Correct.

15  Q     And you expressed your thoughts?

16  A     Yes.

17  Q     And he listened to you?

18  A     I think he listened, determining what to do about it.  I

19  can't speak to that.

20  Q     And whether or not he deferred to you in any particular

21  instance, you were not the producer, were you?

22  A     No, I was not.

23  Q     Okay.  You -- you mentioned the name Mutton and I -- I

24  meant to ask you.  Didn't you and Mr. Mutton disagree fairly

25  often?

```
 1   A     I think I had a different work ethic than Mr. Mutton had.
 2   Q     Okay.  Meaning what?
 3   A     That I wanted things to be real.  I wanted things to work.
 4   I wanted things to be tangible and something we can actually
 5   build a business on.
 6   Q     And how is that different from Mr. Mutton?
 7   A     I think he came in with just a different attitude.
 8   Q     Meaning what?
 9   A     Meaning that he was there, he came from a different
10   background, even though he had experience in accounting, you
11   know.  So he -- in some sense he fit the role of being the CFO
12   to some degree and that he had experience in financial
13   accounting and transactions and such.
14   Q     Right.  He had been the CFO for a rock group?
15   A     Sure.  But his -- his idea and notion that, you know, he
16   thought he was going to take over the company at some point, he
17   thought that he knew better than anybody else of what was
18   going -- he just had a general attitude disagreement with him.
19   Q     Didn't you and he have lots of disagreements?
20   A     I wouldn't say "lots of disagreements" because we didn't
21   talk too much.
22   Q     But when you did talk, you had disagreements?
23   A     I'm sure I had disagreements with everybody in the office
24   at some point.
25   Q     But you get my point.  He was one of the people that you
```

1    did disagree with fairly often?

2    A     On particular topics, yes.

3    Q     What was your role in trying to figure out how to bring

4    more money into Iowa and what to do with any money to be

5    brought into Iowa when the governor pulled away the tax

6    incentive?

7    A     From that point in time, I had sort of minimal exposure to

8    how they were trying to refinance the film in Iowa.

9    Q     And that's because other jobs were jobs that Mr. Pritchard

10   was doing; right?

11   A     Correct.

12   Q     And among the things he was doing, for example, with

13   respect to Iowa was to try to make things work; right?

14   A     Correct.

15   Q     Right.  And so when -- when the Iowa governor yanked that

16   tax incentive -- I think you said it was $500,000 -- was that a

17   surprise?

18   A     It was a surprise, yes, that the -- that the program was

19   suspended.

20   Q     All right.  It was a surprise the program was suspended.

21   The amount was about $500,000?

22   A     Well, the amount would be based on what -- the production

23   spending that GigaPix had spent in Iowa.

24   Q     Right.  But your rough estimate was --

25   A     Well, if you had spent a million dollars, it's roughly

1    50 percent of that.

2    Q    And that's -- yeah.

3    A    So whatever the exact figure was, it's some factor.

4    Q    And it was a lot of money; right?

5    A    Yeah.  It was a significant part of the financing

6    structure, to have those tax credits, yes.

7    Q    And it was a complete surprise; right?

8    A    Yes.

9    Q    And this complete surprise caused all of the other

10   subcontractors to say, "Hey, we still have to be paid"; right?

11   A    They still demanded payment yes because they had provided

12   service.  So, you know, it was not their issue of how we funded

13   the film.  The issue was if we had contracted them to do work

14   that they provided, they needed to be paid for that.

15   Q    All right.  So something had to be done; right?  I mean,

16   did you think GigaPix was just going to hand out the money to

17   them?  Where were they going to get the money?

18   A    Well, part of the issue was GigaPix, I thought, was in a

19   normal position by not having a funded production in the first

20   place, irrespective of what happened with the tax credits.  So

21   surprise or not, if you didn't have the money in the bank to

22   pay the crew and continue going, it wouldn't have mattered what

23   happened with the tax credits.

24   Q    But the expectation at the time was that the tax incentive

25   would be in place?

1    A      Correct.

2    Q      And you were, I think, earlier taking the view that you

3    tried to be a completely strict person in evaluating the

4    likelihood of events; right?

5    A      Try the best you can, yes.

6    Q      I don't mean to suggest otherwise.  But you were sort of

7    on the more strict side; is that fair to say?

8    A      I would say I took a very conservative view with business

9    matters, yes.

10   Q      Right.  And, for example, in connection with Iowa, your

11   conservative view would not have been -- well, this is a deal.

12   Your conservative view would have been what?  Maybe it will be

13   a deal, maybe it wouldn't?  Was your conservative view maybe

14   the governor will yank this?  Can you rely on Iowa, from your

15   perspective?

16           MS. LINDSAY:  Objection.  Compound.

17           THE COURT:  The objection is sustained.  We don't

18   want speeches.  We want questions.

19   BY MR. EMMICK:

20   Q      Was Iowa certain enough for you to rely on it?

21   A      At the time when they were going into production -- and

22   again, as you mentioned, I was not the producer, the executive

23   producer.  So -- but my understanding at the time was that we

24   had agreements from the office that manages those tax credits

25   that those were in place.  They had pre-approved the script and

```
 1   the budget and the plan and said they will honor these credits
 2   at this particular point in time.  So that piece of the puzzle
 3   at the time going in was certainly there, to rely upon and feel
 4   that that was going to happen.
 5        And yes, you're correct that you couldn't anticipate the
 6   governor was going to suspend the program in some sense.
 7   Q    And sometimes those agreements aren't enough because the
 8   governor --
 9   A    Right, right.
10   Q    -- come and yank it.
11        Now, while he was at GigaPix, Mr. Pritchard was actually
12   working on some other outside deals, wasn't he?
13   A    To my understanding, yes.
14   Q    Okay.  And you knew that because you had chatted with him
15   about these things?
16   A    Right.
17   Q    And that was consistent with his relationship with
18   GigaPix; right?  He's not, like, sneaking around or anything,
19   is he?
20   A    I wouldn't classify it as that.  But yes, there was
21   certainly an understanding that he was free to work on stuff
22   outside the company.
23   Q    All right.  And what were those kinds -- what were the
24   deals that you knew about that he was working on outside of
25   GigaPix?
```

```
1    A    I couldn't give you any specifics on those.
2    Q    All right.  In that same way that you couldn't give all
3    the specifics about how he was trying to overcome the Iowa
4    problem?
5    A    I think those are two separate items.
6    Q    They are, but I just need to say --
7    A    One is inside my scope of work and one is outside my scope
8    of work.
9    Q    But he was trying to overcome the Iowa problem.  He was
10   trying to talk with other companies to try to get business for
11   Iowa; right?
12   A    Correct.  Yes.
13   Q    He was trying to talk to a whole range of companies;
14   right?
15   A    Yes.
16   Q    And he was hoping that one or more of these companies
17   would put the money into Iowa so it would work out?
18   A    Yes.
19   Q    Now, the -- we were talking a little bit earlier about the
20   GigaPix Releasing.  Do you remember that?
21   A    Yes.
22   Q    All right.  Now, GigaPix Releasing actually did release
23   movies; right?
24   A    There was -- there was a title called *The Bleeding* that
25   was released on home video by GigaPix Releasing.  Yes.
```

```
1    Q    So there were some releases that occurred?

2    A    Yes.

3    Q    And GigaPix Releasing actually hadn't been in place for a

4    particularly long time.  They were a late addition to GigaPix;

5    right?

6    A    Correct.  I would say yes.

7    Q    All right.  But despite the late addition, they actually

8    were doing some of those releases?

9    A    Yes.  There were certainly activity for the releasing

10   company.

11   Q    And Blackbeard is one of the -- is the movie that was

12   really out of Iowa; right?

13   A    Correct.

14   Q    And so can you tell us a little bit more about some of

15   these other funding efforts that were going to be helping out

16   the Blackbeard production?

17   A    In what regards?

18   Q    What other investors, what other loans, what other sources

19   of funding were examined by Mr. Pritchard in order to make it

20   work?

21   A    Sure.  So there was always activity in that regards,

22   right, to find third-party financiers to come in and help for

23   the production.  It varied, you know, just a litany of folks, I

24   mean, from institutional investors to private high net worth

25   investors, you know, looking, examining back towards the
```

```
 1    GigaPix investors.  So there -- you know, yes, correct, there
 2    was always an effort to try to keep that film alive in terms of
 3    getting the funding and putting that together.
 4    Q    It's an effort that sometimes works, sometimes doesn't
 5    work, sometimes has to be repeated because there needs to be
 6    more efforts?
 7    A    Yeah.  There were certainly efforts.
 8    Q    All right.  And the person in charge of those efforts was
 9    largely Mr. Pritchard?
10    A    Correct.
11    Q    Now, one of the time periods that you were focusing on was
12    that Iowa time period because the money got taken away; right?
13    A    Right.
14    Q    And that was in 2000 -- 2008, 2009?
15    A    Mainly 2009 is where it started.
16    Q    All right.  And wasn't it in 2009 that Mr. Pritchard
17    himself agreed to accept less payment under his salary?
18    A    I don't have knowledge of that, so I don't know.
19    Q    So you don't know whether or not he was being paid at all
20    or whether or not he actually gave up '09, '010 salary
21    entirely?
22    A    I don't know.
23    Q    You had mentioned that you had some disagreements with
24    Mr. Mutton.  What sort of disagreements did you have with
25    Mr. Mutton?
```

```
 1    A     Typically it revolved around who was getting paid and who

 2    wasn't.  You know, I wasn't being paid a salary many times but

 3    other people in the company were.  So it would be discussions

 4    on why do they get paid and I don't.  Where did the money go?

 5    Q     And -- I'm sorry.  I didn't mean to interrupt.

 6    A     I -- I don't know whether he was being paid or -- or who

 7    was being paid what.  I only knew certain employees were being

 8    paid and certain ones weren't.  So I certainly had

 9    disagreements about how that should work.

10    Q     And part of the reason for the disagreement was it's hard

11    to decide who should be paid and who should not be paid?

12    A     I think that's your classification.  I didn't think it was

13    very hard to decide.

14    Q     All right.  Well, would you have decided that

15    Mr. Pritchard should not be paid?

16    A     I think if you do the work, you should be paid, period.

17    Q     And do you think Mr. Pritchard was doing some work?

18    A     Yes.  And he should be paid based on that logic.

19    Q     And if he agreed not to be paid in order to help out

20    GigaPix --

21            THE COURT:  Counsel, there's no evidence to that.

22            MR. EMMICK:  Yes, but there will be, Your Honor.

23            THE COURT:  In his direct examination.  You've gone

24    way beyond any direct examination.

25    ///
```

1   BY MR. EMMICK:

2   Q    Excuse me.  Just a moment.

3        You were asked some questions about Pixar; right?

4   A    Correct.

5   Q    And I think everyone would agree that Pixar is not the

6   same as GigaPix; right?

7   A    Correct.

8   Q    That doesn't mean that there's no similarities between

9   Pixar and GigaPix, does it?

10  A    No.  I understand the context of could you make a

11  comparison that GigaPix was like Pixar.  No.

12  Q    Right.  But there are some respects in which it's similar.

13  They're not identical, but they have some similar

14  characteristics; right?

15  A    You could say that because Pixar produces animated movies

16  and GigaPix was trying to produce animated movies.  You could

17  make a connection to that.

18  Q    There were some similarities and there are some things

19  that are not completely the same; right?

20  A    That could be said for anything, yes.

21  Q    Okay.

22  A    I'm not sure where you're going with that.

23  Q    Do you think Mr. Pritchard was trying to get things done?

24  Was his goal to get this accomplished?

25            MS. LINDSAY:  Objection.

```
 1              THE COURT:  Objection is sustained.  That's not a
 2   question.
 3   BY MR. EMMICK:
 4   Q    All right.  Wasn't Mr. Pritchard working 16 hours a day to
 5   try to accomplish GigaPix's goals?
 6   A    I couldn't say.
 7   Q    He worked very hard to try to accomplish GigaPix's goals,
 8   didn't he?
 9   A    I certainly saw Mr. Pritchard work towards the advancement
10   of GigaPix.  To classify whether it was hard work, whether it
11   was a certain number of hours, I think, is very subjective.
12   Q    And he traveled to Toronto in order to try to make
13   arrangements in Toronto for the making of a movie there?
14   A    Yes.  That's correct.
15   Q    And he talked to a lot of different businesses there to
16   make that movie there?
17   A    Yes.
18              THE COURT:  We're beyond the cross-examination of
19   this witness's testimony.  That's what cross-examination is, of
20   the testimony given by the witness.
21   BY MR. EMMICK:
22   Q    You mentioned that you had seen him occasionally on the
23   telephone with investors; right?
24   A    Correct.
25   Q    Do you have a sense of how often you saw him on the phone
```

```
 1   with an investor?
 2   A     I worked there for five years.  I mean, I'm sure it was
 3   multiple times.  I've seen him on the phone, I've seen
 4   investors in his office in person.
 5   Q     You started talking about whether or not the phrase
 6   "nearly complete" -- do you remember that phrase?
 7   A     Sure.
 8   Q     Start on the small pieces.  You remember talking about the
 9   phrase "nearly complete"; right?
10   A     Right.
11   Q     And the question was whether that phrase was being used
12   accurately or not.  People can use a phrase like "nearly
13   complete" in different ways, can't they?
14   A     Certainly.
15   Q     Sure.  And some people would say if it's 75 percent done,
16   that would be nearly complete?
17              MS. LINDSAY:  Objection.  Argumentative.
18              THE COURT:  The objection is sustained.
19   BY MR. EMMICK:
20   Q     "Nearly complete" doesn't mean is complete, does it?
21              MS. LINDSAY:  Objection.  Irrelevant.
22              THE COURT:  The objection is sustained.  It's
23   argument, Counsel, not a question of his testimony.
24   BY MR. EMMICK:
25   Q     You had a fair amount of interaction with Mr. Pritchard
```

1    during the years you were there?

2    A     Yes.

3    Q     You regarded him as smart?

4    A     Yes.

5    Q     You regarded him as organized?

6    A     I would not say organized.

7    Q     All right.  But he had a lot of different projects on his

8    plate?

9    A     Certainly.

10   Q     And he addressed those projects and worked hard at them?

11   A     Again, he put work towards those projects.  I think it's

12   subjective to say whether it's hard work.  That's your

13   definition.

14   Q     And he was persistent in that work.  For example, when

15   Iowa didn't go well, he continued to try to make Iowa work,

16   didn't he?

17   A     Yes.

18           MS. LINDSAY:  Objection asked and answered.

19           THE COURT:  The objection is sustained.  The jury is

20   admonished to disregard that question and the answer.

21           MR. EMMICK:  Just one moment, Your Honor.

22           (Pause in the proceedings.)

23           MR. EMMICK:  Nothing further, Your Honor.

24           THE COURT:  Redirect.

25   ///

**REDIRECT EXAMINATION**

BY MS. LINDSAY:

Q    Mr. Walker, you said that you learned from Mr. Pritchard some things to do and some things not to do.  Was one of the things not to do to start a production without funding being in place?

A    I would say yes.  I mean, that experience in Iowa was certainly a good lesson of seeing how not having these things locked into place to where you could finish the film will snowball into a big mess by being sued by the crew members, by using all the company money up, trying to sustain it.  It just was -- it was a lesson to don't do that again, don't ever do that.

Q    So don't do it the way Mr. Pritchard did it?

A    No.

Q    And, um, you said that you did -- you saw him with investors.  Going back to you being the realist and the pragmatist and hearing what he said to investors, do you believe he accurately conveyed the riskiness and speculative nature of the business to these investors?

A    In the conversations that I heard or were participating in, there really wasn't discussions about the risk of the business.  Those discussions really pertain about sort of the activity that we were doing and what we could do moving forward.

```
 1   Q     And you had stated in your direct testimony that you
 2   didn't believe he was fully open and accurate with the
 3   investors.  Can you tell us how that came out?  What would he
 4   say that you didn't believe was fully open and accurate?
 5   A     Well, it was more of an omission in that if you were
 6   getting funds for the Oz movie, saying, "Hey, we are in
 7   production.  We need the money to continue production," but
 8   then if that money is then being diverted to pay for lawsuits
 9   out of Iowa, I think that's an admission to an investor to
10   fully disclose to them what the use of their funds are going to
11   be.
12   Q     So he was -- he was not truthful with the investors about
13   the use of their funds?
14   A     I would say yes.
15   Q     And OZ3D, was it ever in production?
16   A     I would not say it's in production.  As I sort of
17   explained the difference between pre-production and production,
18   in animation it's a little different because it's not -- you
19   don't have a camera on set shooting film.  So in animation, the
20   pre-production phases are a lot longer in that you're
21   developing artwork, you're developing the scripts, you're doing
22   storyboards, you're putting together what you think will be the
23   film.
24         You're in production when you're doing layout, "layout"
25   meaning they actually lay out the scenes, composite the scenes,
```

```
 1    doing key frames.  It's a whole different process.  But at no
 2    time while I was at GigaPix were we in production on the film.
 3    Q    So if we could just show Exhibit 67, the first page.  And
 4    just correct me, this is a letter of May 24th, 2011, signed by
 5    Mr. Pritchard?
 6    A    Correct.
 7    Q    And if we just highlight the portion about OZ3D is in
 8    production as of May 24th, 2011.  Was that a false statement?
 9    A    Again, based on my answer, I think it's a very misleading
10    statement.  That, you know, there certainly was activity that
11    Starz Animation was doing with us to work on the script, to do
12    development work, but there wasn't production in the classic
13    sense.
14    Q    So in other words, especially to unsophisticated
15    investors, this was false and misleading?
16    A    I think it would be misleading.
17              MS. LINDSAY:  I have nothing further.
18              THE COURT:  Redirect -- or recross?
19              MS. AMES:  No, Your Honor.
20              MR. EMMICK:  No, Your Honor.
21              THE COURT:  All right.  Recross, Pritchard?
22        I have just one question and that is:  What did you
23    learn -- in all the things that you were asked about learning,
24    what did you learn from either Mr. Blauvelt or from
25    Mr. Pritchard about financing of their work?
```

1          THE WITNESS:  Well, I would say in the course of

2     working with those two, particularly with Mr. Pritchard, you

3     know, I was involved from the very beginning when he started

4     there in terms of how we were going to finance not only one

5     particular film but maybe a slate of films.  And there were

6     other projects from the outside that we were potentially going

7     to be involved in that needed production financing.  So there

8     was a pretty decent amount of exposure, different scenarios,

9     different structures, financing structures.

10         I would work with them to put together, you know,

11    spreadsheets, projections on financing, put together financial

12    models for them.  You know, I have a formal education in

13    film-making and in business.  I got a master's degree in

14    business.  So this is not something completely out of my

15    purview to understand film finances.

16         THE COURT:  Was there a situation in which Mr. --

17    that you knew of that Mr. Blauvelt or -- and/or Mr. Pritchard

18    would train those people who were looking specifically to

19    investors for funding?

20         THE WITNESS:  Sir, are you asking did they train the

21    people --

22         THE COURT:  Yes.

23         THE WITNESS:  -- who were soliciting the

24    investments?

25         I certainly think there were discussions about what

1  projects we were working on, what they would mean to investors'

2  potential.  But in terms of sort of formally educating them on

3  how the film business works, how anything works, there wasn't

4  a -- you know, formal efforts behind that.  No.

5          THE COURT:  All right.  Thank you.  You may step

6  down.

7          THE WITNESS:  Thank you.

8          (Testimony of Shawn Walker concluded at 11:37 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5

6              I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17              DATED THIS 5TH DAY OF NOVEMBER, 2014.

18

19

20              /S/ MYRA L. PONCE
     _____
21   MYRA L. PONCE, CSR NO. 11544, RMR, CRR
               FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

**UNITED STATES DISTRICT COURT**