```
 1                    UNITED STATES DISTRICT COURT

 2           CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3              HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE

 4

 5   UNITED STATES OF AMERICA,           )
                                         )
 6                     Plaintiff,        )
                                         )
 7         vs.                           )   Case No. CR 14-282 R
                                         )
 8   DAVID PRITCHARD and                 )
     CHRISTOPHER JAMES BLAUVELT,         )
 9                                       )
                       Defendants.       )
10   _____)

11

12                  REPORTER'S PARTIAL TRANSCRIPT OF
                          TRIAL PROCEEDINGS
13                    TESTIMONY OF TIFFANY RYAN
                     THURSDAY, OCTOBER 16, 2014
14                          11:38 A.M.
                      LOS ANGELES, CALIFORNIA
15

16

17

18

19

20

21

22   _____

23          MYRA L. PONCE, CSR NO. 11544, RPR, RMR, CRR
                  FEDERAL OFFICIAL COURT REPORTER
24              312 NORTH SPRING STREET, ROOM 430
                   LOS ANGELES, CALIFORNIA 90012
25                        (213) 894-2305
```

UNITED STATES DISTRICT COURT

1          **APPEARANCES OF COUNSEL:**

2

3     **FOR THE PLAINTIFF:**

4          STEPHANIE YONEKURA
           Acting United States Attorney
5          BY:  ELLYN M. LINDSAY
           BY:  BYRON J. MCLAIN
6              Assistant United States Attorneys
           United States Courthouse
7          312 North Spring Street
           Los Angeles, California  90012
8

9     **FOR THE DEFENDANT DAVID PRITCHARD:**

10         LAW OFFICES OF MICHAEL W. EMMICK
           BY:  MICHAEL W. EMMICK
11             Attorney at Law
           3701 Highland Avenue, Suite 305
12         Manhattan Beach, California  90266

13

14    **FOR THE DEFENDANT CHRISTOPHER JAMES BLAUVELT:**

15         LAW OFFICES OF STEPHANIE AMES
           BY:  STEPHANIE AMES
16             Attorney at Law
           12100 Wilshire Boulevard, Suite 800
17         Los Angeles, California  90025

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1                       **INDEX OF WITNESSES**

2

3      PLAINTIFF'S WITNESSES                                    PAGE

4      RYAN, Tiffany

5          Direct Examination by Ms. Lindsay                     5
           Cross-Examination by Mr. Emmick                      26
6          Cross-Examination by Ms. Ames                        27
           Redirect Examination by Ms. Lindsay                  30

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, OCTOBER 16, 2014

 2                            11:38 A.M.

 3                              -oOo-

 4              (The following is a partial transcript

 5               of the day's trial proceedings.)

 6              (In the presence of the jury.)

 7              THE COURT:  Call your next witness.

 8              MS. LINDSAY:  Tiffany Ryan.

 9              THE COURTROOM DEPUTY:  Ms. Ryan, you can step

10     forward this way.  Just walk all the way through.  You can

11     stand right there and then face me.  Please raise your right

12     hand.

13         Do you solemnly swear that the testimony you shall give in

14     the cause now pending before this Court shall be the truth, the

15     whole truth, and nothing but the truth, so help you God?

16              THE WITNESS:  I do.

17         **TIFFANY RYAN, PLAINTIFF'S WITNESS, WAS SWORN**

18              THE COURTROOM DEPUTY:  Okay.  Thank you.  Please

19     take a seat.

20         And please state your full name and true name for the

21     record and spell your last name.

22              THE WITNESS:  Tiffany Brisken Ryan, R-y-a-n.

23              MS. LINDSAY:  May I proceed, Your Honor?

24              THE COURT:  Yes.

25     ///
```

**DIRECT EXAMINATION**

BY MS. LINDSAY:

Q     Ms. Ryan, how are you currently employed?

A     I'm in nursing school currently.

Q     Did you ever work for a company called GigaPix?

A     I did.

Q     Prior to working at GigaPix, how had you been employed generally?

A     I had been an at-home mom with my high-functioning autistic son and I had gone to school earlier for operating room technician.

            THE COURT:  Speak up, please.

            THE WITNESS:  Okay.

BY MS. LINDSAY:

Q     And how did you come to be employed at GigaPix?

A     Cherie Brown brought me into the company.

Q     Were you an acquaintance of Ms. Brown's?

A     I was.

Q     And what did she tell you about the company?

A     She told me that they were, um, an independent film company looking to raise money through private investors.

Q     What were you -- what did she suggest that your job could be there?

A     I had some experience in the past with phone sales and she thought that maybe I could be utilized as what was called an

1    opener.

2    Q    Who interviewed you at GigaPix?

3    A    Robert Jordan.

4    Q    What was his position?

5    A    He was the sales manager at the time.

6    Q    And who was the head of the sales room at GigaPix?

7    A    Chris Blauvelt.

8    Q    Do you see him in court today?

9    A    I do.

10   Q    Can you please point him out by where he's sitting and

11   what he's wearing?

12   A    He's sitting next to the woman on the end of this table

13   (indicating) in a gray suit.

14            THE COURT:  The record will indicate that the

15   witness has identified the defendant Christopher Blauvelt.

16   BY MS. LINDSAY:

17   Q    And did you know who was in charge of production at

18   GigaPix?

19   A    I did.

20   Q    And who was that?

21   A    David Pritchard.

22   Q    Do you see him in court today?

23   A    I do.

24   Q    And please point him out by where he's sitting and what

25   he's wearing.

```
 1   A     He's on the end of the table (indicating).
 2               THE COURT:  The record will indicate the witness has
 3   identified the defendant David Pritchard.
 4   BY MS. LINDSAY:
 5   Q     When did you start work at GigaPix?
 6   A     June of 2008.
 7   Q     At the time you started at GigaPix, where was the office
 8   located?
 9   A     Chatsworth.
10   Q     On Oso Avenue?
11   A     Yes.
12   Q     What was your job when you were hired?
13   A     I was an opener.
14   Q     What does that mean?
15   A     I was the person who -- I was handed a list of phone
16   numbers and I called those numbers and tried to gain interest
17   in -- from investors.
18   Q     Were you cold calling people?
19   A     Yes.
20   Q     Did you have a relationship with the people that you
21   called prior to calling them?
22   A     No.
23   Q     To your knowledge, did GigaPix have any prior relationship
24   with the people you called prior to your calling them?
25   A     Not to my knowledge.
```

1   Q    When you reached someone, can you tell us what you would

2   say?

3   A    Um, it was our job to do some screening to make sure that

4   the people that we were talking to on the phone were people who

5   were investors.  Um, it was our job to drum up interest.

6   Q    So what were you -- were you instructed in what to say?

7   A    Yes, we were given pitches.

8   Q    So can you give us an example of what was on the pitches?

9   A    Um, we would introduce ourselves, we'd talk a little bit

10  about the company, we talked a bit about David Pritchard.  He

11  had a lot of credibility.  We talked about the project we had

12  was an animated *Wizard of Oz*.  We talked about the possible

13  amount of money that could be made with children's animation.

14  Q    And so the project that you were selling at the time in

15  2008 was the *Oz* movie?

16  A    Yes.

17  Q    And did you fill out question -- I'm sorry -- fill out

18  forms about the people who were interested?

19  A    We did.  If we felt they were qualified.

20  Q    What kind of things, information did you ask for on these

21  forms?

22  A    Name, number, maybe a second number, address, occupation,

23  if they were married, if -- what kind of investments they liked

24  to make.  We asked them if they were accredited.  I guess

25  that's about it.

```
1    Q      Who were the closers at the time when you were there?
2    A      There's quite a few of them.
3    Q      Did they include a Greg Pusateri and Cherie Brown?
4    A      Yes.
5    Q      What did Mr. Blauvelt do in connection with the people
6    selling?
7    A      I'm not quite sure.
8    Q      You're not quite sure of my question or you're not quite
9    sure of what he did?
10   A      I'm not quite sure what he did.
11   Q      So you didn't see him take a lot of control over the sales
12   room?
13   A      No.
14   Q      So what was the job of the closers?
15   A      To get money.
16   Q      When you were at the Oso office, were you aware of what
17   the closers were saying to potential investors?
18   A      No.
19   Q      Why was that?
20   A      Most of them worked behind closed doors.
21   Q      Did you sometimes ask if you could go in and listen to
22   what the closers were saying so you could learn?
23   A      There was a couple of gentlemen that would let me listen
24   to them.
25   Q      Would Ms. Cherie Brown allow you to listen to her?
```

1   A     No.

2   Q     How about Mr. Pusateri?

3   A     No.

4   Q     Now, when you first got there, did Mr. Blauvelt come and

5   have a conversation with you about himself?

6   A     Yes, he did.

7   Q     Can you tell us about that?

8   A     Um, I had been there a couple of weeks, had never met him

9   and I was alone.  As a fronter, we were all kind of in an open

10  area together.  And he came and sat down at a desk next to mine

11  and introduced himself and told me he was the founder of the

12  company and then he told me he was almost a billionaire.  And I

13  remember thinking it was a really odd conversation.  I asked

14  him what he was going to do with all the money.

15  Q     What did he say?

16  A     He -- I think it stumped him a little bit.  He kind of

17  giggled and said he hadn't really thought about it so --

18  Q     Did you talk about how he was able to get Mr. Pritchard to

19  work with him?

20  A     Later on.

21  Q     In that conversation, what did he say about getting

22  Mr. Pritchard to come work with him?

23  A     He said he was shocked.

24  Q     And why was that?

25  A     He said something to the effect of, like, "I can't believe

```
 1   that we have Pritchard" and "I can't believe we're an actual
 2   studio now."
 3        And I was, like -- I didn't really understand.  And I
 4   said, "In compared to what?"
 5        And he said, "In compared to how we started."
 6        So that made me think that they didn't start off on the
 7   up-and-up.
 8   Q    Did he say anything about how he usually comes through any
 9   kind of trouble?
10   A    Smelling like a rose.
11   Q    Now, you started in the Oso Avenue location.  Did your
12   office eventually move locations?
13   A    We did.
14   Q    Where did you move to?
15   A    We moved on to Lankershim Boulevard.
16   Q    About how -- how long after you started working there did
17   you move?
18   A    I'd say within six months.
19   Q    So this would be late 2008?
20   A    Yes.
21   Q    After the move, did you change jobs from being a fronter
22   at GigaPix?
23   A    I did.  Pretty close afterwards.
24   Q    What did you do after that?
25   A    I was made assistant sales manager.  They brought in a new
```

```
 1  sales manager.  I don't know what happened with Robert Jordan,
 2  if he quit or if he had been terminated.
 3  Q    So what was your job now as the assistant sales manager?
 4  A    Um, the new sales manager's name was Ken Gross.  And I
 5  just kind of helped him, typing stuff up or adding stuff into
 6  the computer, whatever needed to be done.
 7  Q    Now, when you were at that separate location, did
 8  Mr. Pritchard come and talk to the closers in the sales room?
 9  A    Occasionally.
10  Q    And did you know what he was saying to the people in the
11  sales room?
12  A    Yeah.
13  Q    How did you know that?
14  A    I was there.
15  Q    What kinds of things would he say?
16  A    Um, he would give updates on to -- as to what was going on
17  with whatever various projects were happening.  Or if it wasn't
18  about Oz, maybe we were getting ready to offer some stock or we
19  were going into a 10-for-1 reverse split and so people needed
20  to be educated about that in case clients were calling in to
21  talk to their -- to their reps, just stuff like that.
22  Q    Did he ever say at any of those meetings that the company
23  was in bad shape financially?
24  A    No.
25  Q    Did he ever give negative news?
```

1   A     No.  Those meetings were essentially to raise morale in --

2   to raise the morale of the salesmen so that they could go out

3   and make more money for the company.

4   Q     So it was all these are the positive things that you can

5   say in order to sell this investment?

6   A     Yes.  Sometimes there was a caveat.

7   Q     Such as what?

8   A     Sometimes he would share something and say this is not to

9   be used.

10  Q     What would an example of that be?

11  A     Oh, maybe when we were getting ready to go into the

12  10-for-1 reverse split, maybe, you know, don't talk about this

13  until it actually happens type of thing, you know.

14  Q     But that was rare?

15  A     I'd say he'd say it once per meeting, depending on what he

16  just said.  The company was in a constant state of flux.  There

17  was always something going on.

18  Q     Something good to tell the investors?

19  A     Yes.

20  Q     But according to Mr. Pritchard in the sales meetings,

21  never anything bad?

22  A     No.

23  Q     Did you see the Oso Avenue studio being fully occupied by

24  GigaPix business?  Was the -- was the -- the big studio area,

25  was it in constant use and production going on?

1   A      No.

2   Q      What was happening there?

3   A      Sales.

4   Q      And --

5   A      Sales.

6   Q      Okay.  Thank you.

7          How much money did you earn as a -- as an opener?

8   A      I think I earned $10 an hour.  So 400 a week.

9   Q      Did you get a commission?

10  A      I would.

11  Q      And when would you get a commission?

12  A      If I called somebody who was interested and I filled out

13  my -- my questionnaire and handed it off to a closer and the

14  closer sold a portion of the *Oz* movie to that investor, I would

15  get a commission off of that.

16  Q      Were you aware of how much money the closers made?

17  A      Yes.

18  Q      How much did they make?

19  A      If they closed something on their own, it was 20 percent.

20  If they closed something that a fronter had initially gotten

21  them, the closer got 15 and the fronter got the other 5.

22  Q      To your knowledge, were any of the salespeople paid in

23  stock in the company so that his or her success would be like

24  that of the investors who invested?

25  A      No.

1  Q    So would it have been a lie if one of the salespeople told

2  an investor that that was how they were compensated?

3  A    Completely compensated by stock?  Yes, that would be a

4  lie.

5  Q    Would it have been a lie for anyone to tell investors that

6  the investment carried little risk?

7  A    That would have been a huge lie.

8  Q    Were you aware of any time GigaPix or *OZ3D* investors

9  received money from the company?

10 A    Not while I was there, no.

11 Q    Would it have been true at any time you were at GigaPix if

12 anyone told potential investors that within six months to a

13 year of their investment, the investor would receive a return?

14 A    That would have been a lie.

15 Q    Would it have been true if anyone told an investor that

16 *OZ3D* was in production?

17 A    That would have been a lie.

18 Q    Would it have been true if anyone told an investor that

19 *OZ3D* would soon come out in theaters?

20 A    That would have been another huge lie.

21 Q    To your knowledge, was there ever a threat that the

22 investments would be full and closed and not accepting money

23 from investors?

24 A    Not *Oz*.  There was a -- I think we did a stock offering

25 that was for a limited amount of time.  Um, that was supposed

1   to have a time limit on it.  I'm not sure if the company would
2   have turned down money, though.
3   Q    So you never saw the company turn down money?
4   A    I never saw the company turn down money.
5   Q    So would it have been false for a salesperson to tell a
6   potential investor that the investment was almost full?
7   A    Yes.
8   Q    Now, you said that at the Oso Avenue office, the closers
9   were behind closed doors.  Did anything change in the sales
10  room when Mr. Ken Gross was hired as the sales manager?
11  A    He was hired around the time the sales crew moved to
12  Lankershim.  Um, it was a three-story building.  The top floor
13  had two offices for Chris and David.  The second floor was kind
14  of an open -- it was open seating and that's where the bulk of
15  us were.  And then downstairs the first floor had some offices.
16  Ken wanted to bring everybody up to the second floor.
17  Q    Why?
18  A    He wanted to hear what people were saying.  He was just --
19  he had just been brought on as the sales manager and he didn't
20  know any of the closers, per se.  Or not all of them, I should
21  say.  And so he wasn't sure what people were saying.
22  Q    Was he worried that people were --
23  A    Oh, yeah.
24  Q    -- closers were misrepresenting things?
25  A    Sure.

```
 1   Q    And that's why he wanted them in the open where he could

 2   hear?

 3   A    Yes.

 4   Q    Was he able to get agreement from all the closers that

 5   they would move into this open area?

 6   A    No.

 7   Q    Who would not move?

 8   A    Cherie Brown, Greg Pusateri, I think those were the only

 9   two that dug their heels in.

10   Q    And did Mr. Gross go to Mr. Blauvelt and explain that he

11   wanted to be able to listen to these people to make sure they

12   weren't misrepresenting and they would not agree to that?

13   A    Right.

14   Q    And what did Mr. Blauvelt do?

15   A    He overrode Ken.

16   Q    So he allowed them to continue to operate behind closed

17   doors?

18   A    Yes.

19   Q    And that was despite Ken Gross's worry that they were

20   misrepresenting to investors?

21   A    Yes.

22   Q    Was there a relationship between Mr. Pusateri and

23   Mr. Blauvelt?

24   A    Yes.

25        MS. AMES:  Objection.  Relevance.
```

```
 1            THE COURT:  The objection is overruled.
 2   BY MS. LINDSAY:
 3   Q    What was that relationship?
 4   A    They were friends outside of work.  I think they lived
 5   close to each other.
 6   Q    So they had a close personal relationship?
 7   A    Yes.
 8   Q    And, um, was there a closer named Hines?
 9   A    Yes.
10   Q    And did he -- was he also suspected of misrepresenting to
11   investors?
12   A    Yes.
13   Q    Did Mr. Gross attempt to bring him out in the open where
14   he could be heard?
15   A    He did, and he got that accomplished.
16   Q    He did.
17        And what happened when Mr. Hines got out in the open?
18   A    Not a thing.  He refused to work.
19   Q    So he stopped selling where he could be heard?
20   A    He absolutely made no phone calls.
21   Q    And what happened then?
22   A    He took his client list and brought them to Cherie Brown.
23   Q    And what happened from there?
24   A    I'm not sure.  They were behind closed doors.
25   Q    Do you know whether he got a portion of the clients that
```

```
 1   she sold behind closed doors of his?

 2   A     I'm assuming they had a deal as far as commissions went.

     I don't think she would work for free.

 4   Q     What was the relationship between Mr. Pritchard and

 5   Ms. Brown?

 6   A     An unusual one.

 7   Q     And can you explain that?

 8   A     Um, you know, Pritchard was the boss.  I mean, he was

 9   the -- the VP of the company and she just kind of did what she

10   wanted.  She'd walk into his office -- barge into his office, I

11   should say, didn't matter what he was doing, what was going on.

12   I always thought that was really bizarre.

13   Q     Did Ken Gross attempt to fire Cherie Brown?

14   A     Yeah.

15   Q     And when was that?

16   A     Probably the first part of '09.  Within the first two

17   quarters of 2009.

18   Q     Was he able to do that?

19   A     No.

20   Q     Who stood in the way of Ken Gross firing Cherie Brown?

21   A     All the higher-ups.

22   Q     Did that include Mr. Blauvelt?

23   A     Yes.

24   Q     And Mr. Pritchard?

25   A     Yes.
```

| | | |
|---|---|---|
| 1 | Q | Why wouldn't they allow her to be fired? |
| 2 | A | Because she was the top salesman. |
| 3 | Q | And she was bringing in too much money? |
| 4 | A | Yes. |
| 5 | Q | Regardless of how she brought it in? |
| 6 | A | Regardless of how she treated her fellow coworkers. |
| 7 | Q | Did you ever attempt to become a closer? |
| 8 | A | I did. |
| 9 | Q | How did that go? |
| 10 | A | Not very well. |
| 11 | Q | So when you were a closer, did you discuss risk with your |
| 12 | | investors? |
| 13 | A | I did. |
| 14 | Q | Did you ever guarantee a return? |
| 15 | A | No. |
| 16 | Q | Did you go through the paperwork with them carefully? |
| 17 | A | I had one sale as a closer, and I did. |
| 18 | Q | And so when -- when you were discussing the potential for |
| 19 | | returns, did you say they were speculative? |
| 20 | A | I did. |
| 21 | Q | Did you promise anything? |
| 22 | A | No. |
| 23 | Q | And did you say when, say, *OZ3D* would come out? |
| 24 | A | No. |
| 25 | Q | And you were only able to make one sale? |

```
 1    A    Yes.

 2    Q    And how long did you try to be a closer?

 3    A    Six weeks.

 4    Q    One sale in six weeks?

 5    A    Yeah.

 6    Q    Was the fact that GigaPix had regulatory problems

 7   discussed in the sales office?

 8    A    Amongst the salespeople?

 9    Q    Yeah.

10    A    Yes.

11    Q    Was that downplayed to investors, however?

12    A    Yes.

13    Q    Eventually did GigaPix run out of money?

14    A    Yes.

15    Q    And how did that become clear?

16    A    Um, the whole tone of the place changed.  You know, we --

17   we moved.  We were separated from the studio, but I lived in

18   Chatsworth and I picked up payroll every Thursday.  And so it

19   kind of went from this kind of busy kind of hive to quiet.  And

20   you could tell something was going on and not anything good.

21    Q    And also, were people going without getting paid?

22    A    Yes.

23    Q    Were you aware of Colin Mutton providing money to the

24   company to keep it going?

25    A    I was.
```

```
1    Q     And he never got repaid for that?

2    A     No.

3    Q     And were the salespeople aware of how poorly things were

4    going?

5    A     I think so.  I think so.

6    Q     Did you ever hear any salesperson tell the investors how

7    poorly things were going at GigaPix?

8    A     Never.

9    Q     What is Survey Says?

10   A     Survey Says was a company that Chris Blauvelt started.

11   All of the salespeople had pretty much disappeared.  The

12   company was on its back with its legs in the air, so to speak.

13   And I think it was a way for him to try to bring some money

14   into the company.

15   Q     And so what was he doing?

16   A     He was trying to create leads of investors to sell to

17   another -- a different telemarketing company.

18   Q     So, in other words, he was having the fronters call people

19   to gauge their interest, and this was simply to sell the leads

20   to another company?

21   A     Right.

22   Q     Meanwhile, were there any salesmen still trying to bring

23   money back into the company?

24   A     No, not at the Lankershim location, but Cherie Brown was

25   still at the studios.
```

```
 1   Q    So Cherie Brown at this time was still soliciting
 2   investors to invest and GigaPix was accepting the investors'
 3   money?
 4   A    Yes.
 5             THE COURT:  That's a statement, counsel, not --
 6             MS. LINDSAY:  Sorry, Your Honor.
 7   BY MS. LINDSAY:
 8   Q    During your time at GigaPix, did you see Mr. Blauvelt
 9   using GigaPix's money in a way that was contrary to what the
10   investors were told?
11   A    Yes.
12   Q    Can you explain that, please?
13   A    He had a mistress living at the Lankershim office.
14             MS. AMES:  I'm going to object to relevance
15   Your Honor.
16             THE COURT:  The objection is overruled.
17             THE WITNESS:  He had a mistress living at the
18   Lankershim office.  She was getting paid a salary as a fronter.
19   She stayed on the third floor with him.  I think she did a
20   little bit of telephone work, but I don't really think she
21   earned that money.
22   BY MS. LINDSAY:
23   Q    When did you leave GigaPix?
24   A    June of 2011.
25   Q    Were you actually let go?
```

```
 1   A     I was.

 2   Q     Why?

 3   A     They -- they didn't have the money for me.  They didn't

 4   need me.

 5   Q     Because nothing was going on?

 6   A     Yeah.

 7   Q     And this is -- this is July of 2011?

 8   A     June.

 9   Q     Sorry.  June.

10         So when did -- in your mind, when did things start to go

11   badly for GigaPix?

12   A     I think things started to go badly when the economy

13   crashed.

14   Q     In 2008?

15   A     In 2008.

16   Q     And then --

17   A     I think that changed the -- that changed the whole

18   financial sphere of movies.

19   Q     And then the Iowa disaster in 2010?

20   A     Yeah.  That didn't help.

21   Q     Was that kind of the downfall?

22   A     I think so.  In hindsight, yes.

23   Q     To your knowledge, were the investors ever told how badly

24   things were going at GigaPix?

25   A     No.
```

```
 1            MS. LINDSAY:  Thank you.  I have nothing further.
 2            THE COURT:  All right.  We'll take our noon recess
 3   at this time.
 4       I would remind you of your duty not to converse or
 5   otherwise communicate among yourselves or with anyone upon any
 6   subject touching the merits of the cause on trial.  And you're
 7   the not to form or express an opinion on the case until it's
 8   finally submitted for your verdict.
 9       Jury's excused until 1:00 o'clock.  Jury's excused.  Court
10   will remain in session.
11            THE COURTROOM DEPUTY:  All rise.
12            (Out of the presence of the jury.)
13            THE COURT:  1:00 o'clock.
14            THE COURTROOM DEPUTY:  This court is in recess.
15            (Noon recess was taken.)
16            THE COURT:  Bring down the jury.
17            (In the presence of the jury.)
18            THE COURT:  The record should reflect the defendants
19   are present.  The defendants are present with their counsel.
20   Jurors are present in their proper places.
21       Cross-examination, Defendant Pritchard.
22            MS. AMES:  I'm sorry, Your Honor.  I didn't hear
23   which of the defendants you would like to proceed.
24            THE COURT:  It's Defendant Pritchard.
25   ///
```

**CROSS-EXAMINATION**

1

2    BY MR. EMMICK:

3    Q    Afternoon, ma'am.  I just wanted to ask a couple of

4    questions about one particular answer that you provided.

5        The one thing you were talking about is that Mr. Pritchard

6    came and talked to the salesmen roughly once a month or once

7    occasionally, whatever it would be; is that right?

8    A    Right.

9    Q    All right.  And one of the things you said was that

10   approximately once every time he talked, he had kind of a

11   cautionary remark.  He said some things, here's the future.

12   Can you give some examples of that or spell out what that

13   meant?

14   A    I can't remember any specific things that he would say.

15   Q    Uh-huh.

16   A    But, you know, that he would give information and maybe it

17   would be kind of some forward-thinking information, this is

18   what we're trying to do, this is what we're trying to do to

19   make that happen.

20   Q    Uh-huh.

21   A    And then he would say, "But I don't want" -- "But don't

22   use that.  Don't share that.  That's for you guys."

23   Q    Don't share --

24   A    Don't share that with investors.

25   Q    Don't share that with investors?

```
 1   A      Uh-huh.  Right.
 2   Q      Okay.  And I think you estimated that just about once or
 3   so every time he talked to the salespeople, he'd give that sort
 4   of cautionary prediction, here are things that we're planning
 5   but don't know if it's going to happen, so don't say it?
 6   A      Correct.
 7   Q      All right.  That's all I wanted to touch on.  Thank you.
 8             THE COURT:  Defendant Blauvelt.
 9                     CROSS-EXAMINATION
10   BY MS. AMES:
11   Q      Good afternoon, Ms. Ryan.
12   A      Hi.
13   Q      When you joined GigaPix, Mr. Blauvelt was, in fact, the
14   CEO of the company; is that correct?
15   A      Yes.
16   Q      And Mr. Ken Gross was the manager of the sales division;
17   correct?
18   A      Not when I first started.
19   Q      But shortly thereafter, he became the manager of the sales
20   division?
21   A      Six months later.
22   Q      Okay.  And part of your job as an opener there, you
23   mentioned, was to screen potential investors; is that correct?
24   A      Correct.
25   Q      And in part of that screening, you were looking to see
```

```
 1   what their prior investment history was?
 2   A    Correct.
 3   Q    And, in fact, you were looking for accredited investors;
 4   is that correct?
 5   A    Correct.
 6   Q    Now, you -- you talked about an incident, a conversation
 7   you had with Mr. Blauvelt -- Blauvelt, excuse me, regarding
 8   Mr. Pritchard.  And you had your own interpretation of that
 9   discussion.  But you were aware of Mr. Pritchard and his
10   history prior to joining GigaPix -- correct? -- his work
11   history?
12   A    Prior to my joining GigaPix?
13   Q    Yes.
14   A    No.
15   Q    You were aware that he had been the head of Film Roman?
16   A    I was made aware of that when I joined GigaPix.
17   Q    So you were aware that he had been involved with TV shows
18   of success like *The Simpsons*?
19   A    Correct.
20   Q    And *King of the Hill*?
21   A    Correct.
22   Q    And -- and *The Family Guy*?
23   A    Correct.
24   Q    And so all these things are a big deal in the television
25   and movie industry; correct?
```

```
 1   A     Correct.

 2   Q     And so a person would be reasonably surprised or excited

 3   to have them on their team; correct?

 4   A     Correct.

 5   Q     Now, you also mentioned a woman.  Which floor did she work

 6   on?

 7   A     She -- she was on the third floor.

 8   Q     And which floor were you on?

 9   A     Number 2.

10   Q     So you had no personal observations as to what work she

11   did or didn't do when you were there; correct?

12   A     Whenever I happened to go up to the third floor.

13   Q     But you -- you were working on the second floor; correct?

14   A     I was, and I was also in charge of sending out any

15   packages that were deemed qualified to be sent out.  And so

16   based on the number of packages that I was sending out and who

17   was sending them, I can figure out who's doing their work and

18   who wasn't.  Does that make sense?

19   Q     You were working on the second floor and she was working

20   on the third floor; correct?

21   A     Correct.

22         MS. AMES:  No further questions.

23         THE COURT:  Redirect?

24   ///

25   ///
```

UNITED STATES DISTRICT COURT

**REDIRECT EXAMINATION**

BY MS. LINDSAY:

Q    Can you tell us some of the things that Mr. Pritchard
wanted the salespeople to tell investors?

A    I don't know if anything that he told us was supposed to
have been used.

Q    Well, what was the purpose of him coming to the sales
meetings, then?

A    In my opinion, the purpose was to increase morale.

Q    And morale was down?

A    Yes.

Q    And was it Mr. Pritchard's position to turn that around
and say things were great with GigaPix?

A    I don't know if the words "things are great" were used,
but maybe there was some information that would allude to
things doing okay.

Q    Getting better?

A    Sure.  We have a lot of pots on the fire type of, you
know, meetings.

Q    As opposed to the company falling --

A    As opposed to we have nothing on the fire.

Q    And the company's falling apart financially?

A    Right.

          MS. LINDSAY:  Thank you.  I have nothing else.

          THE COURT:  All right.  You may step down.

1              (Testimony of Tiffany Ryan concluded at 1:13 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3     COUNTY OF LOS ANGELES    )
                               )
4     STATE OF CALIFORNIA      )

5

6             I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7     REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8     CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9     TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10    IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11    REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12    THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17             DATED THIS 4TH DAY OF NOVEMBER, 2014.

18

19

20             /S/ MYRA L. PONCE
         _____
21         MYRA L. PONCE, CSR NO. 11544, RMR, CRR
                FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

**UNITED STATES DISTRICT COURT**