1        **UNITED STATES DISTRICT COURT**

2     **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3       **HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE**

4

5  **UNITED STATES OF AMERICA,**          )
                                          )
6                   **Plaintiff,**        )
                                          )
7      **vs.**                            )   **Case No. CR 14-282 R**
                                          )
8  **DAVID PRITCHARD and**               )
   **CHRISTOPHER JAMES BLAUVELT,**        )
9                                         )
                    **Defendants.**       )
10  _____     )

11

12              **REPORTER'S PARTIAL TRANSCRIPT OF**
                      **TRIAL PROCEEDINGS**
13              **TESTIMONY OF WILLIAM HICKS**
                **WEDNESDAY, OCTOBER 15, 2014**
14                      **3:51 P.M.**
                 **LOS ANGELES, CALIFORNIA**

15

16

17

18

19

20

21

22  _____

23       **MYRA L. PONCE, CSR NO. 11544, RPR, RMR, CRR**
              FEDERAL OFFICIAL COURT REPORTER
24            312 NORTH SPRING STREET, ROOM 430
               LOS ANGELES, CALIFORNIA 90012
25                      (213) 894-2305

**UNITED STATES DISTRICT COURT**

1          **APPEARANCES OF COUNSEL:**

2

3     **FOR THE PLAINTIFF:**

4          STEPHANIE YONEKURA
           Acting United States Attorney
5          BY:  ELLYN M. LINDSAY
           BY:  BYRON J. MCLAIN
6              Assistant United States Attorneys
           United States Courthouse
7          312 North Spring Street
           Los Angeles, California  90012

8

9     **FOR THE DEFENDANT DAVID PRITCHARD:**

10         LAW OFFICES OF MICHAEL W. EMMICK
           BY:  MICHAEL W. EMMICK
11             Attorney at Law
           3701 Highland Avenue, Suite 305
12         Manhattan Beach, California  90266

13

      **FOR THE DEFENDANT CHRISTOPHER JAMES BLAUVELT:**
14
           LAW OFFICES OF STEPHANIE AMES
15         BY:  STEPHANIE AMES
               Attorney at Law
16         12100 Wilshire Boulevard, Suite 800
           Los Angeles, California  90025
17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          **INDEX OF WITNESSES**

2

3    PLAINTIFF'S WITNESSES                                          PAGE

4    HICKS, William

5        Direct Examination by Mr. McLain                            4
         Cross-Examination by Ms. Ames                              27
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              LOS ANGELES, CALIFORNIA; WEDNESDAY, OCTOBER 15, 2014

 2                           3:51 P.M.

 3                             -oOo-

 4              (The following is a partial transcript

 5               of the day's proceedings.)

 6              (In the presence of the jury.)

 7              THE COURT:  Call your next witness.

 8              MR. MCLAIN:  The Government will call Mr. William

 9    Hicks, Professor William Hicks.

10              THE COURTROOM DEPUTY:  Right this way.  Stand right

11    here and -- and face me.  Please raise your right hand.

12         Do you solemnly swear that the testimony you shall give in

13    the cause now pending before this Court shall be the truth, the

14    whole truth, and nothing but the truth, so help you God?

15              THE WITNESS:  I do.

16         JOHN WILLIAM HICKS, PLAINTIFF'S WITNESS, WAS SWORN

17              THE COURTROOM DEPUTY:  Okay.  Thank you.  Please

18    take a seat.

19         And please state your full and true name for the record

20    and spell your last name.

21              THE WITNESS:  My name is John William Hicks,

22    H-i-c-k-s.

23                         DIRECT EXAMINATION

24    BY MR. MCLAIN:

25    Q    Professor Hicks, what do you do for a living?
```

```
 1    A     I'm a retired member of the faculty at the Maurer School
 2    of Law in Indiana University.
 3    Q     And where did you attend law school?
 4    A     I went to the University of Michigan Law School and in
 5    1965.
 6    Q     And when did you begin teaching law?
 7    A     In 1968.
 8    Q     And when did you begin teaching law at Indiana University?
 9    A     In 1977.
10    Q     Do you continue to maintain a teaching load up to this
11    time?
12    A     I do.  I teach one class a year.
13    Q     And what is your general area of focus with respect to
14    your teaching of the law?
15    A     Federal securities law.
16    Q     And is there a subset or subspecial -- subspecialization
17    within the larger securities laws that you specialize in?
18    A     Yes.  I focus primarily on exempted transactions under the
19    Securities Act of 1933 and civil liabilities under the 1933
20    Act.
21    Q     And have you published books and articles relating to
22    securities law and the Securities Act of 1933?
23    A     Yes, I have.
24    Q     And what is a security?
25    A     Well, the term "security" is defined in the Securities Act
```

1    of 1933 to cover stocks and bonds and, um, instruments that are

2    generally known but also business -- interest, investment

3    interest in business entities.

4    Q    And very briefly and in broad strokes, what is the

5    Securities Act of 1933?

6    A    Well, the Securities Act of 1933 came after the financial

7    crash of the stock market in 1929 when lots of people lost

8    money.  And it was intended to protect investors in connection

9    with public offers and sales of securities and also to provide

10   protection against fraud.

11   Q    And very briefly and in very broad strokes, what is the

12   Securities Act of 1934?

13   A    The Securities Act of 1934 is the -- is a much broader

14   statute, and it included reporting obligations for certain

15   large companies on a continuous basis as opposed to the

16   offering, sale, and transaction under the '33 Act.  It provided

17   for regulation of broker dealers, and it also created the U.S.

18   Securities and Exchange Commission.

19   Q    And what is the Securities and Exchange Commission?

20   A    Well, the SEC, as it is sometimes referred to, is an

21   independent federal agency that interprets and administers

22   the -- all the federal securities laws and adopt rules and

23   regulations.

24   Q    Now, have you previously testified as an expert relating

25   to the Securities Act of 1933?

1    A     Yes, I have.

2    Q     And have you previously testified in federal court?

3    A     Yes, I have.

4    Q     And have you previously testified in state court?

5    A     Yes, I have.

6    Q     And have you testified as an expert on behalf of the SEC?

7    A     Yes.

8    Q     And have you previously testified as an expert for the

9    Enforcement Division of the SEC?

10   A     Yes.

11   Q     And have you previously testified as an expert for the

12   Department of Justice?

13   A     Yes, I have.

14   Q     Have you been retained by the Government in this case to

15   provide expert testimony and opinions?

16   A     Yes, I have.

17   Q     And what is the rate of pay for your work in this case?

18   A     $450 an hour.

19   Q     And have you been asked to formulate and express opinions

20   about whether the offer and sales of securities of GigaPix and

21   *OZ3D* in this case by the defendants qualify for any exemption

22   to the registration requirements under the federal securities

23   laws?

24   A     Yes, I have.

25   Q     Have you reviewed documents and materials contained

1    therein in the course of formulating your opinions relating to

2    the securities of GigaPix and *OZ3D*, LLC?

3    A    Yes, I have.

4    Q    And what sorts of documents and information have you

5    reviewed in formulating your opinions?

6    A    I reviewed confidential Placement Memoranda -- Memorandum

7    for *OZ3D*, LLC, and confidential Private Placement Memoranda

8    by -- or for GigaPix.  I reviewed supporting documents such as

9    subscription agreements, investor questionnaires, and some of

10   the sales literature that was sent out.  I also reviewed some

11   of the investor interviews and some of the internal documents

12   of the companies.

13   Q    And did it also include reviewing the cease and desist

14   orders?

15   A    Yes, it did.

16   Q    Are these the types of documents and information that

17   experts in your field reasonably rely on in forming their

18   opinions concerning the registration requirements under the

19   federal securities laws?

20   A    Yes.

21   Q    And is your testimony and the opinions you might give

22   today going to be based on your review of the facts and

23   documents and information you reviewed relating to GigaPix,

24   *OZ3D*, and the defendants in this case?

25   A    Yes, it is.

1   Q    And is the testimony you're going to be giving today going

2   to be on the product, the principles, and methods which are

3   reliable within the securities law field?

4   A    Yes.

5   Q    And did you apply those principles and methods within the

6   securities law field to the facts of this case in formulating

7   your opinions?

8   A    Yes, I did.

9         MR. MCLAIN:  Your Honor, at this time, the

10  Government would like to offer this witness as an expert

11  concerning securities laws and concepts and exemption

12  requirements to securities laws.

13         THE COURT:  Does Defendant --

14         MR. MCLAIN:  Pritchard.

15         THE COURT:  -- Pritchard wish to question on his

16  expertise?

17         MR. EMMICK:  No, Your Honor.

18         THE COURT:  Defendant Blauvelt want to question the

19  witness on his expertise?

20         MS. AMES:  No, Your Honor.

21         THE COURT:  I'm sorry.  I didn't hear you.

22         MS. AMES:  No, Your Honor.  Thank you.

23         THE COURT:  All right.  You may proceed.

24  BY MR. MCLAIN:

25  Q    Professor Hicks, in your opinion, were the units or

1   membership interests in *OZ3D*, LLC, sold to investors in this

2   case securities?

3   A     Yes.

4   Q     And is it your understanding that these *OZ3D*, LLC,

5   securities were not registered with the Securities and Exchange

6   Commission?

7   A     Yes.

8   Q     Is that "yes"?

9   A     Yes, it is.

10  Q     And in your opinion, were these *OZ3D*, LLC, securities that

11  were sold to investors in this case required to be registered

12  with the Securities and Exchange Commission?

13  A     Yes, they were.

14  Q     And in your opinion, were these *OZ3D*, LLC, securities that

15  were sold to investors in this case not exempt from

16  registration?

17  A     That is my opinion, yes.

18  Q     In your opinion, were the units that were sold to

19  investors in GigaPix in this case securities?

20  A     Yes, they were.

21  Q     And is it your understanding, were these GigaPix

22  securities not registered with the Securities and Exchange

23  Commission?

24  A     They were not registered.

25  Q     And did the offer return to *OZ3D* and GigaPix denials that

1   these securities were unregistered securities?

2   A    Yes.  The PPM stated that.

3   Q    And in your opinion, were these GigaPix securities that

4   were sold to investors in this case required to be registered

5   with the Securities and Exchange Commission?

6   A    Yes, that's my opinion.

7   Q    And in your opinion, were these GigaPix securities that

8   were sold to investors in this case not exempt from

9   registration?

10   A    That is my opinion.

11   Q    Now, have you formulated an opinion as to whether or not

12   the offer and sale of securities of GigaPix sold by the

13   defendants specifically in this case in connection with the

14   Private Offering Memorandum were in violation of the

15   registration requirements under the federal securities laws?

16   A    Yes.

17   Q    And what is your opinion?

18   A    My opinion is that there was -- or is substantial and

19   compelling evidence that the unregistered offers and sales of

20   those securities by persons acting as agents or employees,

21   including the defendants, were in violation of Section 5.

22   Q    And what is Section 5 of the Securities Act of 1933?

23   A    Section 5 is -- contains the registration requirements of

24   the '33 Act which covers offers and sales of securities to the

25   public.

1   Q    And what is the purpose of the registration requirement in

2   Section 5 of the Securities Act of 1933?

3   A    The registration requirements are intended to provide

4   investors a review of specialized and required information that

5   the company or the issuer, as it's called in the law, that the

6   company is required to make available to investors.  And it is

7   filed with the SEC as a result of the requirements of Section 5

8   and is reviewed.  And after the review process, then the

9   securities can be made available to the public for -- for

10  purchase.

11  Q    So in layman's terms, is the purpose of Section 5 of the

12  Securities Act of 1933 to protect vulnerable investors in

13  particular?

14  A    I think that's a fair statement, yes.

15  Q    Is Section 5 of the Securities Act of 1933 found at

16  Title 15, United States Code, Section 77(e)?

17  A    Yes, it is.

18  Q    And how does the Securities Act of 1933 try to protect

19  unsophisticated investors in particular?

20  A    Well, as I was saying, in terms of the goals of the '33

21  Act, the -- the registration process basically requires that

22  during the period of time up to the moment when the company

23  decides it's going to make a public offering, that in the

24  pre-filing period, that there are no offers or no sales that

25  can be made by the company.

1    And then in the moment when the company files that
2  disclosure document called a registration statement with the
3  SEC, at that point there is a so-called waiting period during
4  which the SEC has an opportunity to look at all the
5  information, decide whether or not everything that should be
6  there is there, whether or not it's disclosed in plain English
7  so people can understand it.

8    And typically there's a communication between the SEC
9  staff and the company and the securities lawyers and others who
10 are working with the company to basically work towards a
11 document that will be, in the opinion of SEC, adequate and in
12 keeping with the requirements.

13    And during that period of time, the so-called waiting
14 period, again, no sales can be made.  So the vulnerable
15 investors are, during that period of time, in a position where
16 sales cannot be made to them.  And also during that time, there
17 were limited offers that can be made.  Oral offers can be made.
18 But any written offer is usually limited to a disclosure
19 document that's called a preliminary prospectus, a disclosure
20 or offering document that said it's preliminary or subject to
21 completion.

22    And then when the SEC is satisfied that the document has
23 finally been revised to the point where it's in keeping with
24 the obligations and requirements of the company and the Act,
25 the SEC declares that the registration statement is effective.

1    And at that point, going forward, sales can be made, oral and

2    written offers can be made.  But again, investors are being

3    protected because at that point there is an obligation that

4    that final disclosure document, the prospectus, as it's called

5    at that point, is delivered to investors in connection with the

6    sales of securities.

7    Q    Based on your review of the documents in this case, were

8    defendants in this case selling GigaPix securities to

9    unsophisticated or unaccredited investors?

10   A    Yes.  That's my opinion.

11   Q    And now, focusing on the *OZ3D* securities, were they also

12   selling *OZ3D* securities to unsophisticated and unaccredited

13   investors?

14   A    That is my opinion, yes.

15   Q    And have you formulated an opinion as to whether or not

16   the offer and sale of securities of *OZ3D* sold by the defendants

17   with the Private Offering Memorandum were in violation of the

18   registration requirements under the federal securities laws?

19   A    Yes, I have.

20   Q    And what is your opinion?

21   A    That the -- that there was and is compelling and

22   substantial evidence that the unregistered offers and sales of

23   the securities by persons who were functioning as agents or

24   employees, including the defendants, were in violation of

25   Section 5.

1    Q     Now, what does it mean to register stocks with the

2    Securities and Exchange Commission?

3    A     Um, it is, as your question indicates, common for persons,

4    including me, sometimes to say are going to register the stock.

5    But actually, what is registered is the offer and sale of the

6    securities so that in order to make sure that prior to the time

7    that there is a formal offer or even an informal offer of

8    securities or sale, that the -- the investors have an

9    opportunity to see in case of registration that the SEC review

10   takes place and that they receive the disclosure document that

11   contains the information that the Act requires.

12   Q     Now, may an entity sell securities publicly to individuals

13   throughout the United States without registering the offering

14   with the SEC?

15   A     Yes, it's possible.

16   Q     And under what circumstances?

17   A     Well, the circumstances would be that there's no

18   registration.  There has to be an exemption.  And it gets a

19   little technical here.  But essentially, under the Securities

20   Act registration requirements, it's either registered with the

21   SEC, the offers or sales, or they're exempted or it's illegal,

22   that is, in violation of Section 5 so that if there is an

23   exemption that's available, then the fact that the securities

24   were not or the offers or sales of the securities were not

25   registered would not mean that there was a violation of the

1  Act.

2  Q    And is it your opinion that there was no exemption

3  available for either *OZ3D* or GigaPix in this case?

4  A    Yes, that's my opinion.

5  Q    Now, what is ordinary trading?

6  A    Um, well, as you probably know, ordinary trading is

7  usually referred to -- or is associated with what takes place

8  every single trading day on the Stock Exchange, NASDAQ or

9  over-the-counter market where trade or securities owners buy

10 and sell securities.  And that is referred to as ordinary

11 trading.  And there is an exemption from Section 5 that is

12 contained in the Securities Act that exempts ordinary trading.

13 Q    And did ordinary trading occur with the offer and sales of

14 securities in this case?

15 A    I don't think so.  No.

16 Q    Now -- and you looked at -- one of the documents you

17 looked at was the Private Placement Memorandum for GigaPix

18 dated July 15th, 2009?

19 A    Yes.

20 Q    And I believe we have that in evidence as Exhibit No. 58.

21 If you could pull up Exhibit No. 58.  And actually, it would

22 be -- let's do 58, page 11.  Just take a look at the screen.

23     And do you see the first page of this Private Placement

24 Memorandum, the indication that the shares of security had not

25 been registered under the United States Securities Act?  Do you

1    see that?

2    A    Yes, I do.

3    Q    Can you highlight that?

4    A    Yes.

5    Q    And then if we take a look at the bottom of the next page,

6    that would be page 12, so 58.12, page 12 of this exhibit, the

7    GigaPix private offering for July 15th, 2009.  There's a

8    reference that "the securities offered hereby are being offered

9    and sold in reliance on exemptions."  Do you see that language?

10   A    I do.

11   Q    And it mentions exemption provided by Section 4(2)

12   and Regulation D.  Do you see that?

13   A    Yes, I do.

14   Q    Were -- were any references to potential exemptions even

15   mentioned in the PPM?

16   A    I don't believe so, no.

17   Q    And it's your testimony that no exemptions were applicable

18   to this GigaPix offering; correct?

19   A    That is correct.

20   Q    And what is Regulation D?

21   A    Well, Regulation D is a collection of rules that the SEC

22   adopted in 1982 to help companies and investors and attorneys

23   to understand the scope of Section 4(2).  The language of

24   Section 4(2) in the statute is that -- what we talked about

25   earlier, is registration with all the steps, including the

1   SEC's review.

2       "That provisions of Section 5 shall not apply to" and then

3   the language is "transactions by an issuer involving any public

4   offering."  That's the phrase.  So if it's a public offering,

5   it's registered.  Here's an exemption if it's not a public

6   offering.  But nobody knew for sure what that phrase really

7   meant, how many people, does it depend on the size of the

8   offering or depend on the quality of the purchaser.

9       And so with some of the uncertainty that caused attorneys

10  and investors and others to wonder whether or not this would be

11  a good exemption, the SEC came forward with Regulation D with

12  several safe harbors, including Rule 506 which clarifies what

13  Section 4(2) means according to the SEC.

14  Q    Okay.  And then what is the difference between a general

15  solicitation and a limited solicitation?

16  A    Well, a general solicitation is -- is made to anybody

17  under circumstances that involves communications between

18  persons who have no real connection with each other using a

19  very broad term.  The SEC clarified in a series of releases

20  what limited solicitation means.  And that's the opposite.  And

21  limited solicitation means that there exists a substantial

22  preexisting duty -- or excuse me, preexisting relationship

23  between the company and the prospective investor such that the

24  issuer would be able to evaluate the -- the sophistication and

25  the economics and financial circumstances of those persons.

```
1    Q     And based on your review of the evidence in this case and

2    your knowledge as an expert, was the solicitation of the

3    GigaPix and OZ3D investors at issue in this case a general

4    solicitation or a limited solicitation?

5    A     It was a general solicitation.

6    Q     And why is it your opinion that the solicitation of the

7    GigaPix and OZ3D investors at issue in this case was a general

8    solicitation?

9    A     Because it -- it falls into the -- into the general

10   definition of general solicitation in one of the rules of

11   Regulation D which is part of -- of what the company cannot do

12   if its going to claim an exemption.

13   Q     And what effect does general solicitation have on Rule 506

14   of Regulation D?

15   A     It makes it unavailable as an exemption for the issuer.

16   Q     And is that expressed within the rules of the Securities

17   Act of 1933?

18   A     Yes, it is.

19   Q     And what is that rule?

20   A     It's Rule 502, paragraph (c).

21   Q     And now what does the, quote, "reloading of investors"

22   mean?

23   A     That's a -- a nontechnical phrase.  It means that a

24   company might go back or a company that has sold stock before

25   might go back to persons who have bought in the past and offer
```

1    additional securities to them in sort of a reloading process.

2    Q    And does the reloading of investors also violate the

3    prohibition against general solicitation under 506 of

4    Regulation D?

5    A    I think it depends on the circumstances.

6    Q    And the circumstances in this case, would it have been a

7    violation?

8    A    I think so, yes.

9    Q    And for an offer under Rule 506 of Regulation D, if the

10   issuer complied with the rule, the offering would not be a

11   public offering?

12   A    That's correct.  It would not be a public offering.

13   Q    And when a company offers and sells securities under

14   Rule 506 in a private placement, is the issuer required to

15   provide information like audited financial statements?

16   A    It is required to the extent that the issuer is offering

17   and selling those securities to any person who is not an

18   accredited investor.

19   Q    And when audited financials are not provided, does this

20   make an exemption under Section 5 unavailable?

21   A    Yes, it does.

22   Q    I believe you referenced accredited investors.  What is an

23   accredited investor?

24   A    That is a term of art that is included in one of the rules

25   under Regulation D that's relevant to a company that is

1   claiming an exemption under 506.  And it defines -- defines the

2   term "accredited investor" to include persons who fall into one

3   of eight different categories that are included there.

4   Q    And what are the two categories that are specifically

5   relevant to our case?

6   A    Well, one of them is a category that says if any person --

7   any natural person who has a net worth in excess of

8   $1 million -- that's the difference between assets and

9   liabilities and net worth.  If that person has that prior to

10  the investment, then that person would be an accredited

11  investor.

12       The other category is any individual who has a net income

13  of $200,000 or in the case with the spouse $300,000 for the

14  past two years and has a reasonable basis for believing that it

15  will reach that same economic or financial level in the current

16  year.

17  Q    In order for an issuer such as GigaPix or *OZ3D*, LLC, to

18  meet an exemption under Rule 506 of Regulation D, what must it

19  do to determine if its investors are accredited investors?

20  A    Well, I believe it should have -- and the law supports

21  what I'm saying, I think -- is that it must have some kind of a

22  mechanism or a procedure for assessing whether or not the

23  information that they have about that investor is going to

24  allow them to -- to meet those terms and conditions for

25  somebody who is an accredited investor.

```
 1   Q    Is it enough for the issuer to just ask the investor to

 2   self-report whether or not the investor is an accredited

 3   investor?

 4   A    No, it's not.

 5   Q    And why is self-reporting by the investor not sufficient

 6   to meet the exemption requirements of Rule 506 of Regulation D?

 7   A    Because the definition of "accredited investor" basically

 8   requires that there be some reasonable basis for the issuer to

 9   believe that the person who is saying I am an accredited

10   investor is, in fact, that.

11   Q    And is the, quote, "reasonable basis" requirement for

12   establishing the accredited investor status met when offering

13   relies on investors to self-report?

14   A    No.

15   Q    Now, based on the discovery you reviewed in this case, did

16   OZ3D, LLC, or GigaPix have a mechanism or procedure in place to

17   independently assess the status of an investor as either an

18   accredited or unaccredited investor?

19   A    No.  I -- I know of no such mechanism or procedure.

20   Q    Now, to meet the requirements of Rule 506 of Regulation D,

21   do all unaccredited investors need to understand the merits and

22   risks of the investment?

23   A    All credited or all unaccredited?  I'm sorry.

24   Q    All unaccredited investors.

25   A    Yes, they do.  They must have such knowledge and
```

1  experience that -- in financial and business matters that they

2  are able to evaluate the merits and risks of the investment.

3  Q    In your opinion, does engaging in interstate cold-call

4  telemarketing through interstate wires to individuals with whom

5  you have no prior relationship constitute general solicitation?

6  A    Yes, it does.

7  Q    In your opinion, would such conduct eliminate or prohibit

8  taking advantage of the exemption under Rule 506?

9  A    Yes, it would.

10 Q    Is the general solicitation conduct in this case one of

11 the reasons or bases for your opinion that the offer and sale

12 of securities for GigaPix were made in violation of Section 5?

13 A    Yes, it was.

14 Q    Now, from 2006 to 2012, did the general solicitation of

15 investors eliminate the opportunity for GigaPix to take

16 advantage of any exemption to registration?

17 A    Yes, it did.

18 Q    With respect to the general solicitation prohibition under

19 Rule 506, would it be okay for an issuer or individual to

20 cold-call, solicit someone in another state who was accredited?

21 A    I -- it would not be proper.  It would eliminate the

22 exemption.

23 Q    So to the extent that cold-call telemarketing was used to

24 even contact wealthy accredited investors, would that still

25 have not conformed with the exemption under Rule 506?

1   A     Yes.

2   Q     And based on the information that you reviewed, did

3   Defendants Blauvelt and Pritchard qualify for any other

4   exemption to registration under Section 5 of the Securities Act

5   of 1933?

6   A     I know of no such exemption.

7   Q     I'm now going to focus very briefly on the *OZ3D* offering.

8   In this case you also indicated that you formed an opinion that

9   the offer and sale of securities of *OZ3D*, LLC, also violated

10  Section 5; correct?

11  A     Yes, I did.

12  Q     And is the general solicitation conduct in this case one

13  of the reasons or bases for your opinion that the offer and

14  sale of securities for *OZ3D* were made in violation of

15  Section 5?

16  A     Yes, it was.

17  Q     And did you review the Private Offering Memorandum for

18  *OZ3D* in formulating that opinion?

19  A     Yes, I did.

20  Q     And did you also review other materials, subscription

21  agreements in formulating that opinion?

22  A     That's correct.

23  Q     Now, please take a look at, again, Exhibit 58.  And this

24  will be page 50.  Is this the Private Placement Memorandum you

25  reviewed in relation to forming your opinion in this case

1    concerning the offer and sales of securities for *OZ3D*?

2    A    I believe it is, yes.

3    Q    And if you look at page 50, on the first page of this *OZ3D*

4    Private Offering Memorandum, is there also an indication here

5    that the shares of the securities have not been registered

6    under the Securities Act of 1933?

7    A    Yes.  It's in the bold hard caps.

8    Q    And if you look at page 56 of this document, so, 58.56,

9    are these *OZ3D* securities being sold in reliance on the

10   registration exemption requirements of the Securities Act of

11   1933 provided by Regulation D?

12   A    I believe it says that up in the top under the suitable --

13   Q    Is that the same Regulation D that we've just discussed in

14   connection with the GigaPix private offering?

15   A    Yes, it is.

16   Q    And in order to comply with Regulation D for the *OZ3D*

17   private offering, were audited financial statements required to

18   be included in the *OZ3D* PPM for unaccredited investors?

19   A    Yes.

20   Q    And did the *OZ3D* PPM dated May 5th, 2008, that you

21   reviewed contain any audited financial statements?

22   A    No, it did not.

23   Q    And in your opinion, would the cold-call interstate

24   telemarketing of investors through telephone lines in

25   solicitation of investors for *OZ3D* eliminate the exemption or

1    the eligibility for the exemption under Regulation D that is

2    referenced in this Private Offering Memorandum?

3    A    Yes, it did.

4    Q    And is that the same reasons that you described why there

5    was no exemption for the GigaPix offerings?

6    A    Yes, it is.

7    Q    And if you look at page 6 of this memorandum, there's an

8    indication it's a 58 -- actually, I'm sorry.  It's the -- the

9    next page at the top.  Do you remember there being an

10   indication in this document that the company would offer the

11   securities to sophisticated persons?

12   A    I -- I do recall that.  I think it's on page 2.

13   Q    Oh.  Okay.  And based on your review of documents in this

14   case, were the *OZ3D* securities offered to unsophisticated and

15   unaccredited investors?

16   A    Yes, it was.  The -- the language is right at the bottom

17   of that page that's now on the screen.  It says, "The company

18   intends to privately offer the units to selected sophisticated

19   persons."

20   Q    Thank you.

21       And based on your review of the documents in this case,

22   were the *OZ3D* securities only offered to investors who had a

23   personal or business relationship with the officers and

24   directors of GigaPix?

25   A    No.

1   Q     And now, the individuals who may have sold these units of

2   *OZ3D*, would they -- in particular, Defendants Blauvelt and

3   Pritchard, would they have qualified for any other exemption to

4   registration of Section 5 of the Securities and Exchange Act of

5   1933 for the *OZ3D* offering?

6   A     I know of no such exemption.

7             MR. MCLAIN:  No further questions for this witness.

8             THE COURT:  Cross-examination, Defendant Pritchard.

9             MR. EMMICK:  Nothing, Your Honor.  Thank you.

10            THE COURT:  Defendant Blauvelt.

11                         **CROSS-EXAMINATION**

12  BY MS. AMES:

13  Q     Good afternoon, sir.

14  A     Good afternoon.

15  Q     And, sir, you are a retired law professor; is that

16  correct?

17  A     That is correct.

18  Q     And you, it appears, have testified many times as an

19  expert in court; correct?

20  A     I -- I have testified a number of times, yes.

21  Q     And all of those times you have testified for the

22  Government; is that accurate?

23  A     No, it's not.

24  Q     Okay.  You have -- in any criminal action, you have never

25  testified for the defense; is that correct?

```
1    A     Um, I -- I believe that is correct.  I was -- I was

2    retained to testify on behalf of a defendant in a criminal

3    action, but the person pled guilty at the end of the

4    prosecution's case and so I didn't have an opportunity.

5    Q     But you have actually worked on the defense side, then, as

6    well?

7    A     In many cases.  Not in criminal cases but in non-criminal

8    cases.

9    Q     So in civil cases --

10   A     Yes.

11   Q     -- is that correct?

12         And you -- you haven't in criminal cases because you don't

13   have any experience in the criminal aspects of securities laws;

14   is that correct?

15   A     Well, this is a criminal case, and I'm involved in this

16   one.  But I -- I'm not testifying as to that portion of the

17   Securities Act of 1933 that relates to criminal matters.

18   Q     Right.  You're just strictly testifying and giving your

19   opinions as it relates to the civil aspects; correct?

20   A     I'm testifying with respect to the conditions and the

21   requirements of the '33 Act and the exemptions, and that forms

22   the basis possibly for a criminal action where the Government

23   would have to show that there was a willful violation.

24   Q     And so you -- you're not expressing an opinion as to

25   willfulness; correct?
```

```
 1   A     That is correct.
 2   Q     And you are not licensed to practice law; correct?
 3   A     I was admitted to practice law in New York in 1966 and did
 4   until I moved out of the state, had that privilege as an
 5   admitted lawyer.  But I am not presently admitted to practice
 6   law in any state.
 7   Q     And so when were you last admitted to practice law?
 8   A     Well, when I left the state of New York to practice -- or
 9   not to practice but to teach at Indiana University, which would
10   have been the fall of 1977.
11         MS. AMES:  Thank you, sir.  I have no further
12   questions.
13         MR. MCLAIN:  No further questions from the
14   Government.
15         THE COURT:  All right.  You may step down.
16      Members of the jury, you've heard enough talk so that I'm
17   going to recess until 9:30 tomorrow morning.  I would remind
18   you that you are not to converse with or otherwise communicate
19   among yourselves or anyone about any subject touching upon the
20   merits of the cause on trial and you're not to form or express
21   any opinion on the case until it's finally submitted for your
22   verdict.
23      The jury's excused until 9:30 tomorrow morning.  You're
24   excused.  The court will remain in session.
25         THE COURTROOM DEPUTY:  All rise.
```

1          THE COURT:  9:30 tomorrow morning.

2          (Trial Day 2 concluded at 4:25 p.m.)

1                  **CERTIFICATE OF OFFICIAL REPORTER**

2

3 COUNTY OF LOS ANGELES   )
                           )

4 STATE OF CALIFORNIA     )

5

6         I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7 REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8 CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9 TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10 IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11 REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12 THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13 REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17               DATED THIS 6TH DAY OF NOVEMBER, 2014.

18

19

20                 /S/ MYRA L. PONCE
                    _____

21          MYRA L. PONCE, CSR NO. 11544, RMR, CRR
             FEDERAL OFFICIAL COURT REPORTER

22

23

24

25

                   **UNITED STATES DISTRICT COURT**