1          **UNITED STATES DISTRICT COURT**

2     **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3      **HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE**

4

5   **UNITED STATES OF AMERICA,**         )
                                 )

6              **Plaintiff,**    )
                                 )

7     **vs.**                 )  **Case No. CR 14-282 R**
                                 )

8   **DAVID PRITCHARD and**           )
   **CHRISTOPHER JAMES BLAUVELT,**    )

9                                   )
              **Defendants.**   )

10  ————————————————————————————)

11

12            **REPORTER'S TRANSCRIPT OF**

13              **TRIAL PROCEEDINGS**
     **TESTIMONY OF KENNETH STEPHEN GROSS**

14         **FRIDAY, OCTOBER 17, 2014**
            **10:17 A.M.**

15         **LOS ANGELES, CALIFORNIA**

16

17

18

19

20

21

22  ————————————————————————————————————

23     **MYRA L. PONCE, CSR NO. 11544, RPR, RMR, CRR**
       FEDERAL OFFICIAL COURT REPORTER

24       312 NORTH SPRING STREET, ROOM 430
       LOS ANGELES, CALIFORNIA 90012

25           (213) 894-2305

1          **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4       STEPHANIE YONEKURA
        Acting United States Attorney
5       BY:  ELLYN M. LINDSAY
        BY:  BYRON J. MCLAIN
6            Assistant United States Attorneys
        United States Courthouse
7       312 North Spring Street
        Los Angeles, California  90012

8

9   **FOR THE DEFENDANT DAVID PRITCHARD:**

10      LAW OFFICES OF MICHAEL W. EMMICK
        BY:  MICHAEL W. EMMICK
11           Attorney at Law
        3701 Highland Avenue, Suite 305
12      Manhattan Beach, California  90266

13

    **FOR THE DEFENDANT CHRISTOPHER JAMES BLAUVELT:**
14

        LAW OFFICES OF STEPHANIE AMES
15      BY:  STEPHANIE AMES
             Attorney at Law
16      12100 Wilshire Boulevard, Suite 800
        Los Angeles, California  90025
17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1                          **INDEX OF WITNESSES**

2

3    DEFENDANT'S WITNESSES                                      PAGE

4    GROSS, Kenneth Stephen

5        Direct Examination by Mr. Emmick                          6
         Cross-Examination by Ms. Ames                            14
6        Cross-Examination by Ms. Lindsay                         19

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **INDEX OF EXHIBITS**

2                                                  FOR            FOR
                                          IDENTIFICATION   EVIDENCE
3    NUMBER   DESCRIPTION                      PG.            PG.

4    258  -   Order to Cease and Desist Assessing    27
             Civil Penalty Denying Exemptions,
5            Case 0-99-0023 (Department of
             Consumer and Business Services -
6            State of Oregon) in the Matter of
             Tracker International, Inc., v.
7            Ken Gross, et al.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


                    **UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; FRIDAY, OCTOBER 17, 2014

 2                            10:17 A.M.

 3                            -oOo-

 4              (The following is a partial transcript

 5               of the day's proceedings.)

 6              (In the presence of the jury.)

 7              THE COURT:  Call your next witness.

 8              MR. EMMICK:  Thank you, Your Honor.  Call Mr. Ken

 9   Gross.

10              THE COURTROOM DEPUTY:  Mr. Gross, right this way.

11   Walk all the way through to the wall.  Please face me.  Please

12   raise your right hand.

13        Do you solemnly swear that the testimony you shall give in

14   the cause now pending before this Court shall be the truth, the

15   whole truth, and nothing but the truth, so help you God?

16              THE WITNESS:  I do.

17   KENNETH STEPHEN GROSS, DEFENDANT'S WITNESS, WAS SWORN

18              THE COURTROOM DEPUTY:  Thank you.  Please take a

19   seat.

20        And please state your full and true name for the record

21   and spell your last name.

22              THE WITNESS:  Kenneth Stephen Gross, G-r-o-s-s.

23   Stephen is spelled with a p-h.

24   ///

25   ///
```

**DIRECT EXAMINATION**

BY MR. EMMICK:

Q    Good morning, Mr. Gross.

     Can you tell me if you ever worked at GigaPix?

A    Yes, I did.

Q    Can you tell us when you worked at GigaPix?

A    I don't remember the exact years.  But when it was first formed, I was there.  I worked there for three or four years, um, left the company and came back about a year or so later and worked there for maybe a year and a half, two years.

Q    Can you tell us sort of the start dates and end dates and then we'll try to fill it in as best we can?

A    The start date would be when the company was formed which I think was in 2002 but I'm not sure.

Q    Uh-huh.  And then -- go ahead.

A    And the end date was, I believe, around 2010, but it's -- it's not something I put on my calendar, so I can't -- it's a little vague.  And when I came back to work, I was there for, I believe, a year and a half, but that's just a guesstimate.

Q    And that would have been something like 2008, 2010?

A    Uh-huh.

Q    2009?

A    Yes, sir.

Q    All right.  And what was your role there?  What was it that you were doing for GigaPix?

1  A    We had a room full of people whose job it was to help

2  raise money for the company, for its growth by contacting

3  investors and offering them stock in the company.

4  Q    Uh-huh.

5  A    And we were reps or producers.  We weren't salespeople, we

6  weren't officers of the company.  Our job was to identify

7  investors, inform them, give them the materials they needed to

8  make a decision, collect those materials, and turn them over to

9  an officer of the company.

10  Q    And would that apply to both of the periods of time that

11  you worked there?

12  A    Yes, sir.

13  Q    Have you heard the terms "openers" and "closers"?

14  A    Yes, sir.

15  Q    All right.  Would you tell us what those things mean?

16  A    In our jargon, an opener was somebody who was calling

17  people to identify whether or not they were qualified to invest

18  and getting them interested enough so that we could send them a

19  package of information.

20  Q    And closers?

21  A    A closer was somebody who would take it from that point,

22  answer their questions, provide them with additional

23  information, and, if necessary, help them fill out the

24  documentation and then arrange for it to be delivered to the

25  company where an officer of the company was supposed to take

```
 1    over, do a compliance call and complete the sale.  Since we
 2    were not officers of the company, we couldn't complete the
 3    sale.
 4    Q     And so what was your role within that arrangement?
 5    A     My job was to supervise the producers/reps, depending on
 6    how you want to call them, and provide them with the materials,
 7    train them in what they were supposed to do but most
 8    importantly to make sure that they stayed within the confines
 9    of what the company wanted them to say, didn't do anything
10    which was a misrepresentation of any material facts.
11    Q     Uh-huh.  Um, how many people at GigaPix would you come to
12    know during that period you were working there?
13    A     Who were reps?
14    Q     Yes.
15    A     Um, I'd have to guess about 15 to 20.  You mean at one
16    time or total?
17    Q     Just total.  Break it down after that.
18    A     25, maybe 30.
19    Q     All right.  And working in one place?
20    A     Well, initially we were working in one place.  The second
21    time when I came back to the company, we were in a different
22    location.
23    Q     Uh-huh.  At some point did you come to know David
24    Pritchard?
25    A     Yes, sir.
```

```
1   Q    Tell us when you came to know David Pritchard.

2   A    Chris Blauvelt called me and asked me if I'd come back to

3   the company to work for the company.  And one of the things

4   that he told me was that he had a new --

5              MS. LINDSAY:  Objection.  Calls for hearsay.

6              THE COURT:  The objection is sustained.

7              MR. EMMICK:  It's not offered for the truth of the

8   matter asserted, Your Honor.  It's offered with respect to his

9   motives for coming to the company.

10             THE COURT:  The objection is sustained, Counsel.

11  BY MR. EMMICK:

12  Q    All right.  You did come back to the company?

13  A    When I learned that David Pritchard was involved and did

14  research on his background, it was my thought that the company

15  would have a really good chance for success and it warranted my

16  coming back.

17  Q    So you did come back?

18  A    Yes, I did.

19  Q    And did you come back in the same role?

20  A    Yes, I did.

21  Q    Did you come back and have occasion to meet Mr. Pritchard?

22  A    A number of times.

23  Q    All right.  Tell us about how you came to meet

24  Mr. Pritchard, what the circumstances were, the number of

25  occasions, that background.
```

1   A    I was first introduced to Mr. Pritchard by Mr. Blauvelt.

2   And we took a little walk around the building, got to know each

3   other, and I started listing off the different reps and -- and

4   what I knew about them to see if -- how familiar he was with

5   the people that I had under me.

6   Q    And what did you find out?

7   A    I found out that this was a man who seemed very confident,

8   experienced, knew what he wanted to do and who was basically

9   somebody who could get things done in terms of films, movies,

10  production because he had -- he'd won, I believe, five Emmys

11  and was responsible for a lot of things on television, in the

12  movies that I knew about personally.

13  Q    And was that to be successful in what he was going to be

14  doing at GigaPix?

15  A    I didn't see any reason why he couldn't be successful if

16  he was left to do what he was supposed to do.

17  Q    And in connection with your discussions with investors,

18  did you talk about Mr. Pritchard?

19  A    Yes.

20  Q    What did you -- what did you say and what was their

21  reaction?

22  A    Well, what I said was this was a man who was responsible

23  for -- and I would name certain TV shows that he was

24  responsible for and give a background based on what I had in

25  front of me.  And I said that, you know, we brought him in to

1    get movies done and to get the company to a position where it

2    could go public, and his qualifications were a big part of the

3    presentation.

4    Q    What kinds of matters was GigaPix getting involved in at

5    that point?

6    A    Well, we had -- we were transitioning from an animation

7    studio to a production -- to a studio where we would have

8    movies made or make movies or be involved in movies and

9    television shows and other projects but not necessarily do the

10   animation in-house.  And so there was a change in the direction

11   of how we were going to get things done, but the idea was we

12   were going to secure the rights or produce or make or

13   co-produce projects that would make the company money, that

14   would make the company famous and allow it at some point to go

15   public by either a buyout or merger or whatever.

16   Q    And what would be Mr. Pritchard's role in connection with

17   those changes and direction?

18   A    He was the -- we had had two people.  We had Mr. Pritchard

19   and Mr. Blauvelt.  Mr. Blauvelt's expertise was in raising

20   money.  Mr. Pritchard's expertise was in film-making,

21   television shows, production.  The guts of what the company was

22   supposed to do was Pritchard's purview.  Mr. Blauvelt's

23   position essentially was to help raise the money to get that

24   done.

25   Q    Um, did you work directly with Mr. Pritchard on any

```
 1   occasions?  For example, did he speak with you on occasions?
 2   A     We had occasion to talk.  Um, and he would have meetings
 3   every once in a while with all of the reps where he would give
 4   us an update, basically news, what we had accomplished, what we
 5   were doing, what was going on in Iowa, what was going on with
 6   Oz or the script for Oz.  And it was just to keep us up-to-date
 7   on what the company was accomplishing.
 8   Q     Can you give us your best estimate of how often those
 9   sorts of discussions by Mr. Pritchard to that sales group took
10   place?
11   A     Every couple of months.  It wasn't a regular thing.  But
12   on average, I would say about every 60 days we'd have a
13   meeting.
14   Q     And was Mr. Pritchard giving you a full picture of the
15   status of the company?
16              MS. LINDSAY:  Objection.  Calls for speculation.
17              THE COURT:  The objection is sustained.
18   BY MR. EMMICK:
19   Q     Can you give us some examples of what Mr. Pritchard told
20   the sales group about the status of the company's production
21   efforts?
22   A     He would tell us, um, about deals that were pending, deals
23   that were completed.  He would tell us about the set that we
24   were building for a movie that we were making and show us
25   pictures of the set.  He would talk about the problem in Iowa,
```

```
 1   that Iowa was supposed to give us a tax credit and we invested
 2   a lot of money based on those.  But Iowa had a problem with
 3   that, apparently defaulted, the way it was explained to us.
 4   And that was inhibiting us from completing the project.  Those
 5   are the examples of the types of things he would tell us.
 6   Q    And over the course of the years, did you have occasion to
 7   see whether or not what Mr. Pritchard had told you was right?
 8   A    Do you mean did I visit the sets or anything like that?
 9   Q    Or however you might acquire more information.  In other
10   words, was he telling you the truth?
11   A    Well, I was able to verify a lot of the things he said
12   because a lot of the things were published or available.  You
13   could Google those things, you could get them off of *Variety*
14   articles and other things we were provided with so that they
15   were public and common knowledge.  The investors could also
16   refer to them.  So it kind of corroborated -- I never heard
17   anything or saw anything that circumvented things we were told
18   in terms of what the company was doing or trying to do.
19   Q    Did you then come to an opinion about whether or not he
20   was credible, whether he was being honest?
21   A    I never thought anything different that -- I never had a
22   reason to doubt his honesty.
23   Q    Was he careful?
24   A    I believe he was very careful.
25   Q    Did he listen to other people when he had discussions?
```

```
1   A     Yes.

2   Q     Can you -- do you have any examples in mind?

3   A     Well, we would have meetings with all of the reps

4   sometimes once a week.  We would be called into the conference

5   room.  Mr. Pritchard would be there, Mr. Blauvelt would be

6   there, and there would be dialogues back and forth.  And

7   Mr. Pritchard would listen to what we had to say and what

8   Mr. Blauvelt had to say.  And so I got the feeling that he was

9   open to -- as a good manager, I believe you have to listen to

10  what people under you are saying because that's where the

11  information comes.  It comes from the bottom up.

12             MR. EMMICK:  One moment, Your Honor.

13             (Pause in the proceedings.)

14             MR. EMMICK:  Nothing further with this witness,

15  Your Honor.

16             THE COURT:  Defendant Blauvelt.

17                   CROSS-EXAMINATION

18  BY MS. AMES:

19  Q     Good morning, sir.

20  A     Good morning.

21  Q     Now, as I understand it, it was your role at GigaPix to

22  oversee -- oversee the salespeople; correct?

23  A     The reps.

24  Q     The reps.

25        And these are the people who were selling the investment
```

1    opportunity in GigaPix; correct?

2    A    As I previously defined it.

3    Q    Okay.

4    A    They weren't consummating the sale, but they were in the

5    "food chain," quote/unquote.

6    Q    Okay.  So let me further understand that process.  You had

7    individuals who would make first contact with potential

8    investors; correct?

9    A    Correct.

10   Q    And those people were part of -- they did kind of an

11   initial screening?

12   A    That's correct.

13   Q    And part of that initial screening was to make sure that

14   those investors were accredited; is that correct?

15   A    That's correct.

16   Q    And what was your understanding of that?

17   A    My understanding was that we were allowed to bring in 3500

18   unaccredited investors but we would prefer not to.  And that if

19   the investor was unaccredited, we had to pay specific attention

20   to how old he was, his occupation, his level of expertise, his

21   ability to -- to risk the funds.  In other words, kind of a

22   suitability test.  If they're not accredited but they're an

23   89-year-old retired person, um, we didn't consider those

24   people.

25   Q    So you wanted to get rid of those people.  You don't want

1   to have them as --

2   A    We didn't think they were qualified to make the

3   investments based on the qualifications that were given to us

4   by management.

5   Q    So when you were working there, if you saw a potential

6   investor that fit that description you just gave me, you would

7   choose not to pursue that individual.  Is that --

8   A    If I was aware of that fact or talked to the person and I

9   felt that the person was not suitable, then I would refuse to

10  allow the sale to continue.

11  Q    And that was kind of part of your control job; is that

12  correct?

13  A    That's correct.

14  Q    And just -- I think we maybe misunderstood the question I

15  was posing with you, so maybe I didn't formulate it very well.

16  But these openers that you had working for you, one of the main

17  criteria was that they were actually looking for accredited

18  investors; correct?

19  A    That's correct.

20  Q    Their goal was to find people who were accredited to

21  invest?

22  A    That's correct.

23  Q    And then once they found these people, then they were

24  turned over to who you referred to as closers?

25  A    Well, first -- before that, they were sent a package of

1    information.  And in some cases, the same person was the

2    closer.

3    Q    I see.

4    A    It -- it was -- if the person's only job was to qualify,

5    then it was turned over to somebody else.  If the person was

6    experienced and did the qualification, then he kept it and

7    continued on with it.

8    Q    And when you talk about the packages, that included these

9    questionnaires to -- to further determine if someone was

10   accredited?

11   A    That's correct.

12   Q    And then the closers talked to the individual?

13   A    That's correct.

14   Q    And it wasn't until after the closers talked to them that

15   then they were turned over to the executives; is that correct?

16   A    They were turned over to the executives when the closer

17   had collected the funds and the documentation necessary to

18   complete the sale.

19   Q    And this was your standard policy or procedure at

20   GigaPix -- correct? -- when you were working there?

21   A    It was in writing.  We had a disclaimer that was handed

22   out to all the reps.  We told them that if they didn't explain

23   to the prospect that an officer of the company would finish the

24   sale, that they'd be buying it from an officer of the company,

25   that we were not brokers and we were not authorized to sell

```
 1    them stock, if they didn't read that disclaimer prior to
 2    collecting the final package, the sale could be refused.
 3    Q    Um, and so I understand the process, though, the executive
 4    didn't talk to any of the potential investors or investors
 5    until it had made that second-step process?
 6    A    Not necessarily.  At some point -- at some -- there were
 7    occasions where an officer of the company might get involved
 8    because a potential investor had questions that could only be
 9    answered by somebody who had that knowledge, in which case he
10    would talk to the investor prior to the completion of the
11    transaction.
12    Q    And part of your job was to make sure that these
13    salespeople were honest and up-front with the investors and
14    potential investors; correct?
15    A    That was my main function.
16    Q    And that's what Mr. Blauvelt had hired you to do?
17    A    That's correct.
18    Q    And that's what he directed you to do to make sure that
19    they did not make any misrepresentations and that they were
20    honest; correct?
21    A    He insisted on it and was very adamant about the fact that
22    it was my responsibility to make sure that misrepresentations
23    of material facts were not made on my watch.
24    Q    And you took that responsibility seriously?
25    A    Very seriously.
```

```
 1   Q    And so to the best of your ability, you made sure that
 2   that did not happen; correct?
 3   A    Whenever possible, I would -- I would make sure that --
 4   that did not happen.
 5           MS. AMES:  No further questions.
 6           THE COURT:  Cross-examination for the Government.
 7                      CROSS-EXAMINATION
 8   BY MS. LINDSAY:
 9   Q    Good morning, Mr. Gross.
10   A    Good morning.
11   Q    Now, you -- you said that part of your job was to make
12   sure that salespeople were not making misrepresentations to
13   investors?
14   A    That's correct.
15   Q    And one of the reasons that there's concern about that is
16   because telemarketers who work for high commissions are known
17   to be not necessarily a trustworthy lot?
18   A    I agree.
19   Q    So in the commissions -- in the investment, both GigaPix
20   and OZ3D were 20 percent; correct?
21   A    Yes.  That's what I recall.
22   Q    So, um -- so your job was to make sure that these people
23   who are somewhat suspect were scrupulously open and honest with
24   the investors?
25   A    If they were somewhat suspect in my opinion, I would have
```

```
 1    never hired them or allowed them to continue to work there.
 2    You were asking generically telemarketers I thought of as
 3    suspect, I agree with that.  But the people that I work with,
 4    if I thought that, I would terminate them.
 5    Q    Well, wasn't it true that at one point you were worried
 6    enough to want all your closers in the open so you could hear
 7    them?
 8    A    That was always my concern.
 9    Q    And isn't it true that Mr. Blauvelt prevented you from
10    putting certain of your closers out in the open?
11    A    In two instances, that is correct.
12    Q    And weren't those Mr. Pusateri and Ms. Brown?
13    A    Yes, ma'am.
14    Q    And your concern in having them behind closed doors was
15    that they might be lying to investors; correct?
16    A    My concern was that not being able to hear them, I
17    couldn't do my job with -- with respect to preventing them from
18    doing misrepresentations.
19    Q    And presumably, if they were being fully open and honest,
20    there would be no reason not to let you hear what they had to
21    say; correct?
22    A    That's correct.
23    Q    But they refused; correct?
24    A    That's correct.
25    Q    And Mr. Blauvelt backed them up; correct?
```

1    A    That's correct.

2    Q    And they were not fired; correct?

3    A    Correct.

4    Q    Now, you -- you stated that you would not take money from

5    somebody who was unaccredited and 89.  What if they were 85?

6    A    I think the best way to answer that is you look at the

7    entire person, his background, his occupation, his income, his

8    age, his health, and you make a determination as to whether or

9    not you feel it's a suitable investment, knowing that at the

10   end of the day an officer of the company doing compliance will

11   have the final say-so.  It's not just up to you.  But if you're

12   going to proceed, you want to get the feeling that the investor

13   is qualified to make the investment, qualified to take the risk

14   of loss.  And in your opinion -- I mean, you can only form an

15   opinion.  You can't --

16   Q    So, in other words, you would want to have a very

17   detailed, very open and honest discussion with such an investor

18   about the risks involved in an investment like this?

19   A    I think the risks were very clearly spelled out in the

20   offering memorandum and other documentations and in a lot of

21   cases big, bold writing.

22   Q    And you made sure that all of your closers went over in

23   detail the Private Placement Memorandum with the investors?

24   A    Um, they weren't required to go over it in detail.

25   However, they were required to present it and to ask the

1    investor to review it and to be open to questions or

2    interpretation on any questions they had.

3    Q     Now, when you said that -- the things that Mr. Pritchard

4    said that you went and verified, were those things about, for

5    example, them maybe getting together production on, say,

6    *Blackbeard* in Iowa, that kind of thing, what they were doing

7    with production?

8    A     That's correct.

9    Q     And because the investors' money was going into that

10   *Blackbeard* film; correct?

11   A     I can't tell you where the investors' money ever went.

12   Q     Okay.  So you have no --

13   A     Specifically.

14   Q     You had no idea where the investors' money went?

15   A     I wasn't privy to that.

16   Q     And were you aware that -- well, let's talk about the *OZ3D*

17   offering.  Now, you oversaw that raise too; correct?

18   A     That's correct.

19   Q     And the investors were told that their money would be used

20   for the production of *OZ3D*; correct?

21   A     Correct.

22   Q     And were you aware of how the *OZ3D* investor money was

23   spent?

24   A     No.

25   Q     And were you aware that Mr. Pritchard directed that all

1  but 5 percent of that money go to GigaPix?

2  A    Again, I wasn't aware of how the money was used.

3  Q    And would it change your opinion of Mr. Pritchard's

4  honesty and integrity if you knew that all but 5 percent of the

5  investor money into *OZ3D* went to pay off GigaPix debts?

6  A    It's a complicated question.  Can I give you a bifurcated

7  answer?  It's not a yes or no question to me.  May I answer

8  it --

9  Q    Go ahead.

10  A    Okay.  Um, GigaPix was the parent company.  GigaPix

11  apparently owned *OZ3D* or the property and was producing it.  If

12  the money needed to go to GigaPix or to *Oz* and the idea was to

13  keep the company afloat so that *Oz* can be completed and if

14  there were agreements in place to allow GigaPix to retain some

15  of the money that was -- that was reserved for *Oz* and vice

16  versa, if those things were all in place and that was the

17  purpose of doing it, it would not change my opinion.  If, on

18  the other hand, those things weren't in place and he was doing

19  it improperly, it would change my opinion.

20  Q    Well, isn't it a fact that the investors into *OZ3D* were

21  told that only $1 million or -- at most $2 million would go to

22  GigaPix as the producer of *OZ3D*?

23  A    That's a -- that's a detail that I can't specifically

24  recall.

25  Q    Well, assuming that's in the PPM but, in fact, over half

**UNITED STATES DISTRICT COURT**

1    of the money into *OZ3D* went to GigaPix, then that would be a

2    false statement?

3    A    If more money went to GigaPix than was allocated or in the

4    Private Placement Memorandum, then if you're asking for my

5    opinion, then it would be improper.

6    Q    And it would change your opinion about Mr. Pritchard's

7    honesty?

8    A    If Mr. Pritchard did something improper intentionally and

9    knowingly, yes, it would.

10   Q    Now, talking about the problems in Iowa, did Mr. Pritchard

11   come in and tell you that the company was falling apart

12   financially?

13   A    Which company?

14   Q    GigaPix.

15   A    Um, he never really presented that scenario to us in the

16   way you're stating it.

17   Q    Did he say that you had had problems in Iowa but now you

18   were changing the focus and looking to maybe doing a movie in

19   Toronto?

20   A    There were a lot of things on the table, some of which

21   were in various stages of completion and negotiation.  Um,

22   we -- what we knew was that the situation in Iowa was causing a

23   great economic drain on the company because we had invested a

24   lot of money there and we were at a standstill.

25   Q    Did you tell your investors that the situation in Iowa had

1  created a great financial strain on the company and the company

2  was struggling financially?  You didn't, did you?

3  A    Actually, what we told them was that we were having a

4  problem in Iowa and that that problem was preventing us from

5  going through with production.  But we -- we never had enough

6  information to be -- or instructions to tell the investor what

7  the financial status of the company was.

8  Q    So you never told the investors that you couldn't pay --

9  GigaPix couldn't even pay its salaries or debts?

10  A    I was never aware of that.

11  Q    So you never told the investors that?

12  A    I never told the investors anything I wasn't aware of.

13  Q    And wouldn't you agree that it was extreme -- it would

14  have been extremely important for the investors to know that

15  GigaPix was struggling financially, couldn't pay salaries, and

16  was shoveling investor money towards lawsuits surrounding Iowa?

17  A    Um, I think if that information were available and we were

18  instructed to tell the investors, I think that would be the

19  proper thing to do.

20  Q    Well, was it then improper not to make that information

21  available to the very people who were talking to the investors?

22  A    Um, since we didn't know it at the time --

23  Q    No.  I'm asking you.  Was it improper not to inform you of

24  that so that you would be in the know and you'd be able to

25  convey the accurate condition of the company to the investors?

UNITED STATES DISTRICT COURT

```
 1   A     If that was, in fact, true and we were not told to convey
 2   it as part of the presentation, in my personal opinion, that
 3   would be improper.
 4   Q     Now, are you in your dealings -- are you telling us that
 5   you operate always with honesty and integrity?
 6   A     I try to.
 7   Q     Isn't it a fact that in 1999 you were the subject of a
 8   cease and desist order in the case of Tracker International,
 9   Inc., Mark Labertew, David Cheng, Southport S.D.G.,
10   Les Fleishman, Ken Gross, Anthony Hall, and Craig Williams
11   brought by the Department of Consumer and Business Services,
12   Division of Finance and Corporate Securities, in the state of
13   Oregon?  Yes or no.
14   A     Um, honestly, I can't recall, but I -- I can't refute
15   that.
16   Q     And so you can't recall --
17   A     I wasn't a principal in that company.  And if the company
18   received a cease and desist because of something it did and I
19   was working there, then I've never --
20   Q     Isn't it a fact that you were a named defendant in this
21   lawsuit?
22   A     Never received any -- any paperwork to that effect.
23   Q     And isn't it a fact that it states that pursuant to Oregon
24   statute, the offer and sales of Tracker common stock by Gross,
25   Hall, and Williams as described herein constitutes the
```

```
 1   transactions of securities business in Oregon by an unlicensed
 2   salesperson, in violation of Oregon law?
 3             MR. EMMICK:  Your Honor, objection.  He's already
 4   said he didn't look at the --
 5             THE COURT:  The objection is sustained.
 6   BY MS. LINDSAY:
 7   Q    Would it refresh your recollection if I showed you the
 8   lawsuit stating that you, in connection with the offer and sale
 9   of securities, made untrue statements of material fact and
10   omitted to state material facts which were necessary in order
11   to make the statements, made in light of the circumstances?
12             MR. EMMICK:  Same objection, Your Honor.  She's just
13   read the report.
14             THE COURT:  It's overruled as to that.
15             MR. EMMICK:  He's not seen it.
16   BY MS. LINDSAY:
17   Q    Would it refresh your recollection if I showed you the
18   lawsuit?
19   A    Yes.
20             MS. LINDSAY:  May I approach, Your Honor?
21   BY MS. LINDSAY:
22   Q    Showing you Government's Exhibit 258 for identification.
23             THE COURTROOM DEPUTY:  Exhibit 258 is identified and
24   placed before the witness.
25             (Exhibit 258 for identification.)
```

1  BY MS. LINDSAY:

2  Q    If you could look where I marked it with a sticky pad.

3  Does that refresh your recollection of that lawsuit and order

4  against you?

5  A    Since I've never before seen it, I -- I can't tell you

6  whether or not it refreshes my recollection.  However, a cease

7  and desist was brought because apparently the company had not

8  done the necessary Blue Sky filing with the state which is

9  necessary in order to telemarket in that state.  And so the

10 state was saying since you're not registered to sell in this

11 state, you must cease and desist, which allows the company to

12 then comply and reregister.

13      As far as misrepresentations, I'm -- I'm not aware of any

14 misrepresentations I ever made that were brought to my

15 attention, either of fact or by omission of fact.

16 Q    But isn't it a fact that the lawsuit not only talks about

17 securities violations but about misrepresentations and

18 omissions of material fact?

19 A    Well, based on what --

20 Q    Isn't it a fact that the lawsuit mentions that?

21 A    Yes, it is.

22      MR. EMMICK:  Your Honor, the questions are trying to

23 refresh his recollection.

24      THE COURT:  The objection is overruled.

25 ///

1    BY MS. LINDSAY:

2    Q    So the -- the lawsuit claims that you personally made

3    false statements and omissions of material fact?  Yes or no.

4    A    That's what it claims, yes.

5    Q    Okay.  And then in 2013, you were actually the subject of

6    a lawsuit in the Central District of California, which is here,

7    a complaint for violations of the federal securities laws in

8    the lawsuit of Securities and Exchange Commission vs. Robert

9    Hurd, Your Best Memories International, Inc., and Kenneth

10   Gross; correct?

11   A    Correct.

12   Q    And in that case, the allegation is the conduct involved

13   fraud, deceit, or delivery of reckless disregard of regulatory

14   requirements and resulted in substantial loss or significant

15   risk of substantial loss to other persons; correct?

16   A    No.  Not correct.

17   Q    So you're -- you're saying that's not what the lawsuit

18   alleged?

19   A    No.  What you've done is you've combined the lawsuit as to

20   me and Mr. Hurd and you've included me in things which were

21   not -- Mr. Hurd was the only person accused of fraud.  It was

22   separate from me.  He was -- fraud was alleged in his -- his

23   circumstance, not in mine.  And I settled with the SEC.  And

24   basically it was because Mr. Hurd hadn't complied properly with

25   the securities laws.  And because he hadn't, the company was

```
 1   violating securities laws.  But as to fraud specifically, I was
 2   not charged with that, only Mr. Hurd.
 3   Q    Well, in fact, you were charged with violating securities
 4   laws; correct?
 5   A    That's correct.
 6   Q    And you agreed that you did?
 7   A    I -- I -- rather than fight it, I -- I settled with them.
 8   And in the settlement, I agreed not to continue to do it.  It
 9   was -- it was one of those things where you say I didn't do
10   anything wrong but I won't do it again.
11             MS. LINDSAY:  Okay.  I have nothing further.
12             THE COURT:  Mr. Gross, do the names Harold Anderson,
13   Linda Hampshire, and Jerome Goodman mean anything to you?
14             THE WITNESS:  Um, they may have been investors in
15   the company, but I didn't have any -- don't have any other --
16             THE COURT:  As investors in the company, do you know
17   what Mr. Pusateri told any or -- or Ms. Brown told any of these
18   people --
19             THE WITNESS:  No, I don't -- I'm sorry.
20             THE COURT:  -- about the financing of this company?
21             THE WITNESS:  No, I don't.
22             THE COURT:  Do you know any -- anything that any of
23   the -- that any of the closers or cold callers told people that
24   were then investing in the company GigaPix and the --
25             MS. LINDSAY:  OZ3D, Your Honor.
```

```
 1                    THE COURT:  -- OZ3D matter?
 2                    THE WITNESS:  I'm sorry.  I don't understand.
 3                    THE COURT:  Do you know what was told to any of the
 4      people who then invested in GigaPix or OZ3D?
 5                    THE WITNESS:  Yes.
 6                    THE COURT:  Were you present?
 7                    THE WITNESS:  Not with regard to Mr. Pusateri or
 8      Ms. Brown.
 9                    THE COURT:  All right.  Did any of those that you
10      heard have to do with Mr. Anderson, Ms. Hampshire, or
11      Mr. Goodman?
12                    THE WITNESS:  Your Honor, I cannot recall.
13                    THE COURT:  All right.  Thank you.  You may step
14      down.
15                    (Testimony of Kenneth Stephen Gross
16                     concluded at 10:54 a.m.)
17
18
19
20
21
22
23
24
25
```

UNITED STATES DISTRICT COURT

1              **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES   )
                              )
4    STATE OF CALIFORNIA     )

5

6              I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17             DATED THIS 6TH DAY OF NOVEMBER, 2014.

18

19

20             /S/ MYRA L. PONCE
     _____
21   MYRA L. PONCE, CSR NO. 11544, RMR, CRR
             FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

**UNITED STATES DISTRICT COURT**